UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| PERSONAL COMMUNICATIONS | ) | Case No.  13- |
| DEVICES, LLC, *et al.*,[1] | ) | 13- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DECLARATION OF RAYMOND F. KUNZMANN PURSUANT TO RULE 1007-4 OF THE LOCAL RULES FOR THE EASTERN DISTRICT OF NEW YORK IN SUPPORT OF CHAPTER 11 PETITION AND REQUESTS FOR RELIEF

I, Raymond F. Kunzmann, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am the Chief Financial Officer of Personal Communications Devices, LLC ("PCD LLC"), one of the debtors in the above-captioned cases.  I have held this position since January 9, 2009.  I am intimately familiar with the Debtors' financial affairs and their related agreements and contracts.

2.      I submit this declaration (the "Declaration") pursuant to Local Bankruptcy Rule ("LBR") 1007-4 of the United States Bankruptcy Court for the Eastern District of New York in connection with the voluntary chapter 11 petitions and first-day motions of the debtors (each a "Debtor," and collectively, the "Debtors" or "PCD") in the above-referenced chapter 11 cases (the "Chapter 11 Cases").  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first-day motion or application.  All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by

---

[1]      The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171) and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096).  The Debtors' mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

people who report to me, upon information supplied to me by the Debtors' professionals and consultants, upon my review of relevant documents, or upon my opinion based on my experience and knowledge with respect to the Debtors' operations, financial condition and related business issues.  The documents attached hereto, referenced herein or otherwise relied upon by me for purposes of this declaration are the business records of the Debtors, prepared and kept in ordinary and regularly conducted business activity of the Debtors, and used by me for those purposes.  If I were called upon to testify, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the Debtors.

3.      Part I of this Declaration describes PCD's business and the relevant background preceding the filing of these chapter 11 cases.  Part II of this Declaration sets forth the relevant facts in support of each first-day motion and application filed by the Debtors concurrently herewith.

## I.      **BACKGROUND**

### B.      **Business Overview**

4.      PCD is a leading distributor of wireless communication devices and accessories, as well as a provider of value-added services to wireless device manufacturers and wireless telecom carriers.  The Debtors act as an important intermediary between domestic wireless carriers (*e.g.,* Verizon Wireless, Sprint, AT&T) and various foreign, generally smaller market, wireless handset manufacturers.  In its role as intermediary, PCD provides an unmatched suite of product planning, logistics, reverse logistics, and after-market services that are designed to benefit and streamline the path to the end user for all sides of the wireless device supply chain.

5.      PCD services domestic wireless carriers by acting as their trusted partner in screening and qualifying new vendors to fill product lineups and by providing supply chain and technical services to bring those products to market.  Thus, PCD provides valuable services to

2

the domestic carriers.  These carriers generally prefer not to have to work directly with smaller, foreign vendors to fill out their annual product lineups and customer offerings.  Instead, the carriers are able to work with PCD, who acts as a single vendor with a broad product offering comprised of the products from many different companies, thereby making the process virtually seamless from the domestic carrier's perspective.  Without PCD to fill this role, the domestic carriers would offer fewer products to customers and the foreign manufacturers' access to the U.S. market would be limited.  PCD's current offerings include more than fifty phones from twelve distinct companies located in China, Korea and Japan.

6.       PCD has numerous long-standing relationships with domestic wireless carriers, including AT&T, Verizon Wireless and T-Mobile, who depend on the Debtors to work with vendors to ensure (1) product development, (2) the convenience of dealing with a single "vendor" for multiple products with multiple suppliers, (3) technical approval and quality control, (4) dependability of delivery of handsets and (5) post-sales support and reverse logistics. PCD also has the proven ability to identify mobile device manufacturers who have competitive products and well-developed product pipelines, which enables PCD to efficiently identify potential growth opportunities and new product offerings.

7.       On the other side of the supply equation, PCD also works directly with various foreign wireless handset manufacturers to shepherd their products through all stages of product development in the domestic carrier market.  These foreign manufacturers depend on PCD for access to the U.S. market since, without PCD's expertise, many of the foreign manufacturers would be unable to bring their products to market in a timely fashion due to a lack of expertise or of sufficient dedicated resources to navigate the highly-complex US carrier approval process. The breadth of PCD's suite of services for both domestic wireless carriers and foreign device

manufacturers is unmatched by any of PCD's competitors.  Indeed, PCD has only limited competition from other service providers in its market that provide similar, albeit more limited, services.

8.      In addition to working to bring devices to market, PCD also provides a full complement of authorized repair and warranty services to its domestic carrier clients.  Rather than have to deal with multiple foreign manufacturers, PCD acts as a single warranty repair center capable of fixing or replacing the phones it sells.

### C.    Company History

9.      PCD began distributing mobile devices in 1984 as part of Audiovox Corporation. In 1992, all businesses related to the distribution of mobile communication devices were consolidated into Audiovox Communications Corporation ("ACC"), a subsidiary of Audiovox Corporation.  ACC, as well as Audiovox's handset manufacturing business, were acquired by UTStarcom, Inc. on November 1, 2004.  In July 2008, a group of private investors and management led by PineBridge Investments ("PineBridge") purchased PCD from UTStarcom, Inc.

10.     In 2012, PCD generated $1.6 billion in revenue but suffered a loss of $16.9 million on a normalized basis.  Over the prior four full years, PCD has produced an average EBITDA of approximately $50 million annually.

### D.    Organizational and Operational Structure

11.     Both PCD, LLC and Personal Communications Devices Holdings, LLC ("PCD Holdings") are Delaware limited liability companies.  As demonstrated by the organizational chart attached as Exhibit A hereto, PCD Holdings owns 100% of the membership interests in PCD, LLC.  PCD, LLC owns 100% of the interests in Personal Communications Canada Ltd. ("PCD Canada"), a non-debtor entity.  PCD Holdings and PCD, LLC own, respectively, 1% and

4

99% of the interests in three other foreign entities:  PCD Equipamentos de Comunicacao Ltd. (Brazil), Personal Communications Devices S de RI de CV (Mexico) and Personal Communications Devices Services S de RI de CV (Mexico) (collectively, the "PCD Foreign Subsidiaries").  None of the PCD Foreign Subsidiaries have any material assets or operations, nor are they parties to any insolvency proceedings in the United States or in their home jurisdictions.

12.    PCD Holdings has five classes of membership interests outstanding:  Class A, Class B, Class B-1, Class C and Class D.  The majority of the voting interests in PCD Holdings is held by affiliates of PineBridge Investments.  Interests in Class B-1 and Class C, which were predominantly issued to either PCD's former CEO, Philip Christopher, or other employees, are subject to a put right in favor of the interest holder.  On or about March 5, 2013, Mr. Christopher provided notice to PCD purportedly exercising his put option.  Since then, a number of former employees have also purportedly exercised their put options.  A chart detailing the ownership interest by class is annexed hereto as Exhibit B.

13.    PCD is headquartered in Hauppauge, New York, employs approximately 189 people, and maintains approximately 85,000 square feet of total leased warehouse space.  PCD keeps its books and records at its Hauppauge location.  In addition to warehouse space maintained in Hauppauge, PCD also maintains leased offices and warehouses in Brea, California and Toronto, Ontario.  PCD's 189 employees are comprised of 185 full-time employees and four part-time employees.  PCD has 127 employees based out of their Hauppauge, New York headquarters.  PCD also utilizes the services of a number of temporary workers and independent contractors for various projects, the precise number of which varies on a regular basis.

14.    The senior management team consists of George Appling, its president and chief executive officer,  Jorge Garcia, its chief operating officer, and Raymond Kunzmann, its chief financial officer.  Mr. Appling joined PCD in 2012, upon the departure of Mr. Christopher and has brought substantial expertise in supply chain management, business strategy and organizational performance to PCD.  He has been instrumental in reducing PCD's significant inventory risk on devices through his relationships with the wireless carriers.  In his capacity as chief operating officer since 2011, Jorge Garcia oversees all operational aspects of PCD and serves as the point person on various claims made against PCD.  As chief financial officer, I am responsible for all aspects of financial management of the Debtors, including planning, reporting and treasury matters.  Additional biographical information on the Debtors' senior management is attached as Schedule 10.

### E.    Capital Structure

15.    As a critical aspect of its business, PCD assumes significant inventory risk as a purchaser of wireless communication devices for re-sale to wireless carriers and distributors of wireless products.  Accordingly, a substantial component of its asset value consists of the inventory that it purchases from overseas suppliers.  On account of the factors that have adversely affected its business, the overall enterprise value of the Debtors has declined and will ultimately be determined to the extent a successful auction of its assets occurs.  Until such time, the Debtors have included as Schedule 4, a balance sheet prepared as part of its financial reporting process.

16.    As of the Petition Date, PCD has secured indebtedness in the approximate principal amount of $107, 000,000.  Of that amount, approximately $35,850,000 is secured by a first priority lien.  The remaining secured indebtedness is secured by a second priority lien.

17.    PCD's first-lien secured debt is governed by that certain Amended and Restated Credit Agreement, dated as of May 14, 2012 (as amended, modified or supplemented from time to time, the "First Lien Credit Agreement," and together with the other documents and agreements executed in connection therewith, the "First Lien Loan Documents"), among PCD, LLC, as borrower, the guarantors thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, Wells Fargo Capital Finance, LLC as Syndication Agent, Bank of America, N.A., ("JP Morgan") as Documentation Agent, and the lenders thereto (the "First Lien Lenders").  The First Lien Credit Agreement was amended on December 21, 2012, to, among other things, reduce the Aggregate Revolving Commitments (as defined in the First Lien Credit Agreement).  As of the date hereof, the aggregate principal amount of revolving commitments under the First Lien Loan Documents is $115,000,000 (together with all applicable interest, fees and expenses, the "First Lien Debt"), of which $35,850,000 is outstanding.  The Debtors have been in default under the First Lien Credit Agreement for the current year.

18.    PCD's second-lien secured debt is governed by that certain Amended and Restated Second Lien Credit Agreement, dated as of May 14, 2012 (as amended, modified and supplemented from time to time, the "Second Lien Credit Agreement," and together with the other documents and agreements executed in connection therewith, the "Second Lien Loan Documents," and together with the First Lien Loan Documents, the "Secured Loan Documents"), among PCD, LLC, as Borrower, the loan guarantors party thereto, the Lenders party thereto, and U.S. Bank National Association, ("US Bank") as Administrative Agent, and the lenders thereto (the "Second Lien Lenders").  DLJ Investment Partners, L.P., DLJ Investment Partners II, L.P. and IP III Plan Investors, L.P. (collectively, the "CS Term Lenders") and PineBridge Vantage Capital, L.P., The Insurance Company of the State of Pennsylvania,

7

PineBridge Co-Investment AIV Partners, L.P., Vantage Star Investment Corp., PineBridge Plan Star Investment Corp., PineBridge PEP IV Co-Investment L.P., and PineBridge PEP V Co-Investment L.P. are the Second Lien Lenders and are subject to an intercreditor agreement between them separate and apart from the Intercreditor Agreement (defined below).  As of the date hereof, the aggregate principal amount of the term loan made pursuant to the Second Lien Loan Documents is approximately $71, 250,000, inclusive of approximately $9.1 million of interest and fees paid in kind since December 21, 2012 (together with any additional interest and fees and applicable expenses, the "Second Lien Debt").

19.    Under the Secured Loan Documents and the pledge and security agreements entered into in connection therewith, the lenders thereto (collectively, the "Prepetition Secured Lenders") maintain a security interest in substantially all of the Debtors' assets.  The Prepetition Secured Lenders are also party that certain Intercreditor Agreement (the "Intercreditor Agreement"), dated as of July 1, 2008, by and among PCD, LLC, PCD Holdings, PCD Communications Canada LTD, JPMorgan, in its capacity as collateral agent for the First Lien Obligations (as defined in the Intercreditor Agreement), and U.S. Bank, in its capacity as collateral agent for the Second Lien Obligations (as defined in the Intercreditor Agreement). Subsequent to its initial execution, the Intercreditor Agreement was confirmed in connection with the May 2012 refinancing pursuant to that certain Confirmation of Intercreditor Agreement, dated as of May 14, 2012.

20.    A list of the holders of the thirty largest general unsecured claims (on a consolidated basis) is attached hereto as Schedule 2.

**F.    Events Leading to the Chapter 11 Cases**

21.    PCD's Chapter 11 filing is the result of changing industry dynamics that have adversely affected PCD's business, exacerbated by a unique set of events detailed below.

8

<em>i.        A Shift in the Mobile Device Market</em>

22.     In the last three to five years, the mobile device industry has experienced dramatic changes in consumer demand and industry dynamics.  Specifically, because of a shift in consumer demand towards premium smartphones, industry profits as a whole have been consolidated amongst fewer and fewer manufacturers.  As has recently been publicly reported, Apple Inc. and Samsung Electronics America now account for a majority of the industry's overall sales.  This resulting profit concentration has predictably had a considerable impact on the ability of non-premium handset manufacturers to generate the profit they once did.  PCD, as a supplier of non-premium and niche handsets and wireless devices, has correspondingly been adversely affected as profit margins have continued to erode.

23.     Against this difficult business environment, two major events served to exacerbate PCD's increasingly precarious position.  First, starting in the second half of 2011, several manufacturers working with PCD introduced new products to the U.S. market.  Likely as a result of the industry shift noted above, many of those products did not meet their manufacturers' sales expectations.  As the device manufacturers struggled to meet their sales numbers, many of them began requesting that PCD accept an increasing number of devices, swelling PCD's inventory to historically high levels.  While PCD historically carried approximately $300 to $350 million in inventory at any given time, by the start of 2012, PCD's inventory had grown to almost $600 million worth of product.  The inventory buildup did not cause immediate alarm because several of the manufacturers provided PCD with extended payment terms and, in some cases, price protection – that is, if PCD were forced to liquidate the inventory for less than the purchase price, the manufacturer would reimburse the difference.

24.     In the first seven months of 2012, PCD was able to reduce its inventory level to approximately $400 million – a level much more in line with PCD's historical practice.

9

However, at that point, PCD's remaining inventory was beginning to age in the rapidly changing mobile device market. As PCD was forced to liquidate the inventory, in many instances for markedly lower prices than projected, certain manufacturers began to delay, or refuse, payment of the inventory price protections in place. This caused a significant strain on PCD's cash flow and liquidity.

ii.      The Former CEO's Departure and Resulting Litigation

25.      The second major event that caused significant disruption to PCD's business was the departure of PCD's former Chief Executive Officer, Philip Christopher, in September 2012. Upon his departure, Mr. Christopher took with him a number of key PCD employees and approximately one-third of PCD's total workforce to a competitor. The defection of those employees and Mr. Christopher's scheme to ruin PCD's business and to compete unlawfully in violation of his employment contract and in breach of his fiduciary duties caused substantial disruption to PCD. As a result of Mr. Christopher's and others' actions, on September 27, 2012, PCD initiated a lawsuit against AirTyme Communications, LLC ("AirTyme"), Reliance Communications, LLC ("Reliance"), Philip Christopher, Louis Antoniou, Kostas Kastamonitis, Cornelius VinGanhoven, Stacy Klug, Eileen McGilly and Bonnie Rabinowitz (the "Defendants"). Among other things, while Mr. Christopher still worked for PCD, he conspired with several then-current PCD employees, AirTyme and Reliance, to create a competitive entity (AirTyme). In order to gain an unfair competitive advantage over PCD, the defendants used their time as PCD employees to recruit over seventy employees to work for AirTyme and began a campaign to disparage and defame PCD and its Board of Directors.

26.      The lawsuit in which these matters are addressed is captioned *Personal Communications Devices, LLC v. Airtyme Communications PVT. LTD., et al.* (the "State Court

Litigation"), and is currently pending in the Supreme Court of New York, Suffolk County, Index No. 30060/12.

27.     Beginning in early 2013, PCD entered into settlement talks with all Defendants except for Mr. Christopher.  Those talks were largely successful and resulted in the execution of settlement agreements with all Defendants except for Mr. Christopher and Mr. Kastamonitis.  On March 29, 2013, PCD moved the court for leave to amend its complaint against Mr. Christopher and Mr. Kastamonitis.  PCD's proposed amended complaint is substantially similar to its original complaint, except that it incorporates facts made available to PCD through the cooperation of the settling-Defendants, including facts concerning actions taken by Mr. Christopher and Mr. Kastamonitis to interfere with PCD's valuable business relationships.

28.     Fortunately, the disruption that resulted from the departure of not only Mr. Christopher, but a large number of other employees was not, by itself, fatal.  However, the departure caused yet another financial and operational strain on PCD's business at the exact time when PCD could not afford any other setbacks.  Instead of focusing on PCD's core business turnaround, much of management's attention was focused on blunting the effects of Mr. Christopher's scheme to undermine PCD's business, including the departure of a significant portion of PCD's engineering and programming department.  As a result, PCD was forced to hire a number of temporary workers, including temporary engineers and programmers, at rates far in excess of what PCD had paid to its own employees.  In addition, to reduce employee attrition, PCD was required to grant substantial retention bonuses to its remaining employees.  These retention bonuses cover the period from September 2012 to September 2013 and were payable in two installments.  The Board subsequently modified the retention to divide the second installment into three periods and approving the amounts payable for the period from March 1 to

June 13, 2013, to be paid on June 14, 2013, for the period from June 14 to July 29, 2013, to be paid on July 29, 2013, and for the period from July 30 to September 1, 2013, to be paid on September 2, 2013.  These increases in payroll further strained PCD's free cash flow.

### G.    Default and Negotiations with PCD's Lenders

29.    On December 21, 2012, the Debtors entered into (i) that certain Amendment to Credit Agreement, which amended the First Lien Credit Agreement, and (ii) that certain First Amendment to Amended and Restated Second Lien Credit Agreement, which amended the Second Lien Credit Agreement (together, the "Loan Amendments").  The Loan Amendments were intended to remedy a default from occurring at the end of the fourth quarter of 2012 as a result of a projected breach of certain financial covenants contained in the original Secured Loan Documents.

30.    As part of the Loan Amendments, a covenant measuring the Debtors' actual cumulative sales of "Specified Handheld Inventory" (the "Sales Covenant") was added to the loan agreements.  By letter dated January 23, 2013, the First Lien Lenders, through the Agent, advised the Debtors that they had failed to satisfy the Sales Covenant.

### H.    Trade Vendor Litigation and Arbitration

31.    As a result of the Debtors' financial difficulty, the imminent sale of their businesses, and in certain instances, the failure of certain vendors to recognize the Debtors' right to offset claims against accounts payable owing to these vendors, the Debtors have, in certain instances, failed to make payments to their vendors in the ordinary course.  Consequently, certain vendors have commenced legal action to collect upon purportedly outstanding amounts due and owing.  The Debtors, as appropriate, have asserted a number of defenses and counterclaims to these actions which are in different procedural phases.  A schedule of outstanding actions is set forth in Schedule 9 to this Declaration.

### I.    The Sale Process

32.    In February 2013, the Board authorized the retention of BG Strategic Advisors, LLC ("BGSA") to explore the possibility of a sale of substantially all of the Debtors' assets. BGSA conducted a robust sales process, contacting approximately sixty-two potential buyers, including both potential strategic and financial buyers. Of those contacted, nineteen signed nondisclosure agreements and conducted diligence with respect to the Debtors' business and assets. Five preliminary expressions of interest were received, with a sixth delivered verbally but never reduced to writing.

33.    BGSA and the Debtors, with the assistance of counsel and the Debtors' financial advisors, Richter Consulting, Inc., made a substantial amount of data available to the potential bidders. BGSA worked from February through the middle of June to identify a potential stalking horse bidder. The efforts to produce one or more viable bids took substantially longer than expected. The changing market in this industry made identifying potential buyers more difficult. Consequently, the Debtors even considered proposing a "naked" auction without a stalking horse bid and attempted to induce a credit bid by its secured creditors to jumpstart the sales process. As described below, a potential stalking horse bidder emerged and certain other parties have continued to express interest in the Debtors' assets. Accordingly, the Debtors anticipate that one or more of these bidders will participate in the sale and auction proposed by the Debtors.

### J.    The Stalking Horse Bid

34.    The Debtors, with the assistance of their advisors and BGSA, weighed each of the options presented by the multiple bidders for the Debtors' assets. The Debtors believed that establishing a "stalking horse" bid was an important part of the bankruptcy filing because it would provide a "floor" price for the Debtors' assets and ensure the highest chance of preserving the Debtors' continuing business and the jobs of at least a meaningful portion of their employees.

13

While the Debtors received numerous bids for their assets, they determined that the offer received from Quality One Wireless, LLC ("Quality One") was the best offer that had the highest probability of resulting in a signed asset purchase agreement.  On June 24, 2013, the Debtors and Quality One signed a letter of intent for the purchase of substantially all of the Debtors' assets. Between June 24th and the Petition Date, the Debtors and Quality One actively negotiated the terms of an asset purchase agreement.  Part of this process included an active effort on the Debtors' and Quality One's part to present to the Debtors' partners (*e.g.*, the wireless carriers and device manufacturers) the viability of the new business.  Based on certain preliminary expressions of support from those parties, the Debtors and Quality One executed that certain Asset Purchase Agreement by and among PCD, Holdings, Q1W Newco, LLC and Quality One, dated August 19, 2013 (the "Stalking Horse APA").  The Stalking Horse APA establishes a firm offer for the purchase of the Debtors' assets, but remains subject to higher or better offers and an auction process.  Accordingly, the Debtors believe that entering into the Stalking Horse APA, including the implementation of the Bid Protections (as defined therein), subject to the approval of the Bankruptcy Court is in the best interests of the Debtors, their creditors and all other parties in interest.

## II.    First Day Relief

35.    In accordance with LBR 1007-4, attached as Exhibit C hereto are Schedules 1 through 12, which include the information required by the Local Rules.

36.    As required by LBR 1007 -4(a)(xiv), the estimated amount of weekly payroll for the Debtors for the 30 day period following the Petition Date is $1,090,000, exclusive of officers, directors, stockholders, partners and members.  For the same period, the amount payable to the executive officers of the Debtors is expected to be $110,000 exclusive of any incentive plan or

retention bonuses of any kind as required by LBR 1007-4(a) (sv).[2] There are no amounts

payable to shareholders, partners or members.  To the extent that any of the executive officers

hold equity interests, they are not receiving payments on account of those interests.  Finally, as

part of the DIP Motion (as defined below), the Debtors have agreed, subject to the approval of

this Court, to a budget, inclusive of the 30-day period following the Petition Date, that has been

submitted to the Court.  I refer the Court to that budget as the Debtors' disclosure under LBR

1007-4(a)(xvi).

37.      In addition, to enable the Debtors to continue operating during the pendency of

their Chapter 11 Cases, the Debtors have requested various forms of relief by means of "First

Day Pleadings" filed contemporaneously with this Declaration and the Chapter 11 petitions.   I

participated in preparing and have reviewed each of the First Day Pleadings (including the

exhibits and schedules attached thereto).  To the best of my knowledge, the facts set forth therein

are true and correct.  Such representation is based upon information and belief and through my

review of various materials and information, as well as my experience and knowledge of the

Debtors' operations and financial condition.  If called upon to testify, I could and would, based

on the foregoing, competently testify to each of the facts set forth in each of the First Day

Pleadings.    The following First Day Pleadings have been filed by the Debtors:[3]

---

[2] It is anticipated that the Debtors will seek authority to pay certain incentive and retention bonuses by separate motion shortly after the Petition Date, but after the appointment of an official committee of unsecured creditors.
[3] Capitalized terms used by not otherwise defined in this Section II shall have the meanings ascribed to such terms in the applicable First Day Pleading.

LIBNY/5248396.16

A.    **The "<u>DIP Motion</u>":  Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and to Grant Security Interests and Superpriority Claims Pursuant to 11 U.S.C. § § 105(a), 364(c) and 364(d); (B) Authorizing the Debtors to use Cash Collateral; (C) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (D) Granting Adequate Protection to Prepetition Secured Parties; and (E) Scheduling a Final Hearing**

38.    In the DIP Motion, the Debtors have requested authority to, among other things, borrow $40 million under the proposed $46 million priming DIP Facility on an interim basis, and use the Prepetition Secured Lenders' Cash Collateral.  The Debtors have proposed an adequate protection package for the Prepetition Secured Lenders in connection therewith, which includes replacement liens on all of the Debtors' assets. Without immediate access to the proposed funding under the DIP Facility and use of Cash Collateral, I believe that the Debtors will suffer immediate and irreparable harm.

39.    I believe that, absent the interim relief sought in the Motion, the Debtors would be unable to adequately fund their day-to-day operations, including buying inventory and funding other essential business costs, while they pursue the sale of their assets or another value-maximizing transaction that is in the best interests of all stakeholders.  As a result, I believe the Debtors have an immediate need for access to liquidity to preserve estate value and maintain essential businesses operations and relationships with vendors, suppliers and customers, satisfy their payroll obligations and satisfy other basic working capital and operational needs that maximize enterprise value pending an expedited bankruptcy sale transaction.

40.    On or about September 14, 2012, the Debtors retained Richter to serve as its financial advisor in connection with restructuring its debts, including by obtaining financing to address its pending liquidity issues, and in pursuing a potential sale both within and outside the context of a chapter 11 proceeding.  By the time that Richter was retained, the Debtors' liquidity situation was precarious and the Debtors were in urgent need of immediate financing to address

16

their working capital need.  Richter provided the Debtors with substantial assistance in the presentation of the budgets for the Debtors' lenders.

41.     As noted earlier, the Debtors' assets are fully encumbered by liens in favor of the Prepetition Secured Lenders.  Subject to the results of the sale process, the aggregate amount of the debt secured by such liens likely exceeds the value of the Debtors' assets.  The Debtors believe that a going-concern sale of their business is the best way to maximize the value of their estates and to provide the greatest direct and indirect recovery for their stakeholders. Accordingly, the Debtors' primary objective in obtaining postpetition financing was to secure adequate liquidity to fund a sale process.

42.     Representatives of the Debtors contacted two other potential third-party DIP lenders.  However, due to the short-term maturity date of the proposed financing on account of the proposed sale of the Debtors' assets, the lack of any significant unencumbered assets in which to grant security interests, and the Debtors' limited ability to grant any security interests absent costly, time consuming and uncertain lien-priming litigation with the Debtors' Prepetition Secured Lenders, those discussions failed to produce any concrete financing proposals.  I understand that the Debtors' existing capital structure foreclosed any opportunities for the Debtors to access unsecured or junior credit.  After extensive, good-faith, arm's-length negotiations with the DIP Lenders, I believe that the Debtors have no alternative to the proposed priming DIP Facility with the DIP Lenders.  The Debtors, therefore, focused on obtaining the best terms for the financing being offered by the Pre-Petition First Lien Lenders.  Those efforts, which included extensive arm's-length negotiations between the Pre-Petition First Lien Lenders and the Debtors' and their representatives, resulted in the proposed DIP Facility.

43.    I believe the terms offered by the DIP Lenders are competitive and appropriate, with a 65-day maturity and reasonable milestones tied to progress with a bankruptcy sale process that permit the Debtors sufficient time to complete a transaction that maximizes value for all stakeholders, including the Prepetition Secured Lenders.  Moreover, I believe the DIP Facility is a reasonable and measured step that will permit the Debtors to maximize their sale price by maintaining essential operations while undergoing an expedited bankruptcy sale process.

44.    The DIP Facility contemplates an incremental "roll-up" of the Prepetition First Lien Obligations (the "Roll-Up").  The Roll-Up is structured so that as the Debtors' generate cash receipts through the normal operation of their business, those cash receipts are used, in the DIP Agent's discretion, first to pay the Prepetition First Lien Obligations.  *See* DIP Credit Agreement § 2.10(b).  As those cash receipts are swept and applied to the Prepetition First Lien Obligations, the Debtors will then draw on the DIP Facility to fund their ongoing cost of operations.  The Approved Budget contemplates this incremental Roll-Up of the Prepetition First Lien Obligations.  The DIP Lenders would not have agreed to provide the DIP Facility without the Roll-Up and deemed refinancing of certain of the Prepetition First Lien Obligations.  In addition, the Roll-Up will allow the Debtors to continue with the same borrowing practices as existed prepetition – that is, as new cash receipts enter the Debtors' system, those amounts are applied to preexisting obligations and new money is then borrowed under the existing facility to fund operations.  The Roll-Up, therefore, will minimize the necessity of any alterations to the Debtors' past practices in this regard.

45.    I believe that the financial terms and covenants of the DIP Facility are standard for financing of this kind.  The DIP Facility also provides for certain bankruptcy sale process milestones.  In tandem with its 65-day maturity, the terms of the DIP Facility ensure these

Chapter 11 Cases will move towards a completed sale in an expedient manner, which is consistent with the Debtors' goals and those of the Prepetition Secured Lenders. Because the DIP Facility proceeds are critical to that goal and the DIP Facility is the only available financing, I believe that sufficient justification exists for agreeing to the terms of the DIP Facility, which are the only terms on which the DIP Lenders will provide financing.

46. Given the circumstances of these cases, the Debtors' immediate need for financing and their limited ability to give additional security absent lien-priming litigation, I believe entering into the DIP Facility with the DIP Lenders is in the best interests of their estates and will advance their goal of maximizing the value of the Debtors' assets. Further, I believe that the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested by the Motion is not granted.

**B.      The "Cash Management Motion":  Debtors' Motion for Interim and Final Order Authorizing the Debtors to (I) Continue Using Debtors' Bank Accounts and Cash Management System, and (II) Honor Certain Prepetition Obligations Related Thereto**

47. The Debtors use a centralized cash management system to collect funds from and for, and to pay expenses incurred by, their operations. The Cash Management System is integral to the operation and administration of the Debtors' businesses. In this regard, the Cash Management System allows the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed to respond to these requirements, and (c) track all intercompany transfers. In short, the Cash Management System is essential to the efficient execution and achievement of the Debtors' strategic business objectives and, ultimately, to maximizing the value of the Debtors' estates.

48. The Cash Management System is illustrated in overview form in the charts attached as Exhibit B to the Cash Management Motion. The Cash Management System includes

four bank accounts held at JPMorgan Chase Bank, N.A.  JPMorgan is the Administrative Agent for the Debtors' senior secured credit facility and the DIP Facility.

49.    The Debtors' continued ability to maintain their Cash Management System, existing Bank Accounts and existing business forms and checks is indispensable to the efficient administration of these Chapter 11 Cases.  Given the size and complexity of the Debtors' operations, any disruption to their Cash Management System will severely hamper the Debtors' efforts to preserve and enhance the value of their estates.

50.    The Debtors also seek a waiver of the requirements that they close the existing bank accounts and open new postpetition bank accounts.  If enforced in these Chapter 11 Cases, such requirements would disrupt the Debtors' business, causing delays in payments to vendors, suppliers, subcontractors, administrative creditors, employees, and others, thereby impeding the Debtors' efforts to maximize the value of their estates.  As more fully described in the Cash Management Motion, the bank accounts are central to the Debtors' Cash Management System, which the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of business.  Disrupting the Cash Management System would serve no legitimate or rehabilitative purpose and be would destructive to the Debtors' value as a going concern.

51.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

C.      The "<u>Wage and Benefits Motion</u>":  Debtors' Motion for Authority to (I) Pay Prepetition Personnel Wages, Salaries, and other Compensation; (II) Reimburse Prepetition Personnel Business Expenses; (III) Make Payments for which Prepetition Payroll Deductions Were Made; (IV) Contribute to Prepetition Personnel Benefit Programs and Continue Such Programs in the Ordinary Course of Business; (V) Pay Workers' Compensation Obligations; and (VI) Pay All Costs and Expenses Incident to the Foregoing Payments and Contributions

52.      In the Wage and Benefits Motion, the Debtors are seeking authority to honor and pay all pre-petition employee wages, salaries and other accrued compensation, and to continue to honor certain other policies, programs and benefits the Debtors provide to their employees in the ordinary course of business.

53.      The Debtors have a current workforce of approximately 189 employees. Approximately 80 of those employees are paid hourly.  The balance of the Debtors' employees are salaried.  The Debtors also supplement their workforce with six independent contractors, as well as certain temporary employees.  The independent contractors provide specialty consulting or subcontracting work for the Debtors.  The Debtors' temporary employees, who are hired through third-party staffing agencies, assist the Debtors with a variety of tasks, including customer service, processing returns, warehouse assistance, as well as other, more specialized projects, such as engineering tasks.  Both the independent contractors and the temporary employees are critical to the Debtors' ability remain adequately staffed, while simultaneously providing the Debtors the flexibility they need to adjust their capabilities depending on client and project needs.

54.      As of the Petition Date, the Debtors estimate that approximately $100,100 remains unpaid to the Debtors' employees on account of prepetition wages, salary, overtime, and other cash compensation.  In addition, as of the Petition Date, the Debtors estimate that

approximately $42,300 is owed to Independent Contractors for prepetition services and approximately $200,000 is owed on account of Unpaid Temporary Worker Compensation.

55.     The Debtors also offer or provide eligible Domestic Personnel (and their dependents) with a variety of benefits.  These benefits include, but are not limited to: (i) healthcare, dental, and other related coverage; (ii) certain leave benefits; (iii) a 401(k) plan in which eligible Personnel can participate; (iv) COBRA medical coverage; (v) a flexible spending plan; and (vi) other miscellaneous benefits described in greater detail below (all such benefits described in this Section B, collectively, the "Personnel Benefits").  The total cost to the Debtor to provide these benefits is approximately $287,000 per month, or $1,500 per person. The Debtors believe that as of the Petition Date, the total amount owed or accrued in connection with the Personnel Benefits is approximately $2,800.[4]

56.     The vast majority of these employees rely exclusively on their full compensation, benefits and reimbursement of their expenses to continue to pay their daily living expenses, and these employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid employee obligations.  The Debtors believe that if they are unable to honor all such obligations immediately, employee morale and loyalty will be jeopardized at a time when such support is critical.

57.     The uninterrupted continuation of the Debtors' business is critically dependent upon a stable work force.  As discussed in the "Events Leading to the Chapter 11 Cases," the Debtors have already suffered significant departures over the time commencing from Mr. Christopher's departure to the Petition Date.  The Debtors believe any significant number of employee departures or deterioration in morale at this time will immediately and substantially adversely impact the Debtors' businesses and result in immediate and irreparable harm to the

---

[4]     This estimate excludes any accrued but unused vacation time, sick days, or personal days.

estates and their creditors.  There is a real, immediate risk that if the Debtors are not authorized to continue to honor their pre-petition employee obligations in the ordinary course, the employees would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations and instantly destroying the prospects of a successful sale. Consequently, the Debtors strongly believe it is critical that they be permitted to pay their employees their pre-petition wages and continue with their ordinary course personnel policies, programs and procedures.

58.     I believe that the relief requested in the Wage and Benefits Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Wage and Benefits Motion should be approved.

**D.     The "Warranty Motion":  Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing, But Not Directing, the Debtors to (I) Maintain and Administer Warranty Programs and (II) Honor Related Prepetition Obligations to Customers and (B) Authorizing, But Not Directing, Financial Institutions to Honor All Related Payment Requests**

59.     By this motion, the Debtors are requesting authority to maintain and administer certain preexisting customer programs and to honor certain prepetition payments with respect to such Customer Programs.

60.     The Debtors market and sell their products primarily to cellular phone service providers and retailers (collectively, the "Customers").  In the ordinary course of business, the Debtors develop and implement a range of programs and practices to attract and maintain these consumers.  Generally, these programs fall into two broad categories:  (a) warranty; and (b) market development (collectively, the "Customer Programs").

i.     *The Warranty Program*

61.    Each wireless device sold by the Debtors is accompanied by a comprehensive warranty that the Debtors provide.  Such warranty repair service is essential to the Debtors' business model, as it provides the Customers a single, domestic point of access to address their warranty needs.  These warranties generally represent that the goods being sold function properly in accordance with industry standards and comply with applicable product regulations.  For the purposes of maintaining their customer relationships and reputation, the Debtors make every effort to address all claims made under such warranties.  Such a resolution is primarily accomplished through the repair of the subject equipment.

62.    To account for warranty claims, the Debtors accrue a reserve at the time of sale of the subject wireless device.  These reserves are calculated based on historical fail rates and repair costs.  The Debtors' accrued reserves for such warranty claims as of June 30, 2013 equaled approximately $20 million.  The vast majority (in excess of 97%) of the Debtors' warranty repair services are provided by certain third-party repair service vendors (collectively, the "Repair Service Vendors").  The Debtors pay Repair Service Vendors approximately $2,000,000 per month.  The Debtors estimate that as of the petition date, they owe the Repair Service Vendors approximately $975,000.

63.    Each of the Repair Service Vendors is critical to the Debtors' ability to honor their warranty claims and to refurbish phones returned out of warranty.  The loss of any one Repair Service Vendor would cause severe disruption to the Debtors' business as the Debtors' believe that locating, engaging, and training a new Repair Service Vendor would require in excess of six months.  In addition, it is my belief that due to the relatively modest size of each Repair Service Vendor and the fact that PCD is each vendor's most significant customer, any failure of PCD to pay prepetition amounts owed to the Repair Service Vendors would cause such

24

vendor to experience a business disruption.  Such disruption would likely thereby affect such Repair Service Vendor's ability to render service to PCD.

64.    The Debtors believe that the cost of honoring and paying such warranty obligations, including the amounts due to the Repair Service Vendors, is less than the harm that could be caused by not paying such amounts.  Indeed, the failure to honor the Debtors' warranty obligations and to perform the refurbishment repairs could severely damage customer satisfaction, damage the Debtors' reputation, perhaps irreparably, and generate claims arising out of the warranty agreements, all to the detriment of the Debtors' businesses and value that can be obtained for the Debtors' estates through a sale of the Debtors' business assets.  This risk is particularly acute with the Debtors' business, as they service a small number of major customers. Losing any one customer would adversely affect the Debtors' going-concern value.

ii.       *Market Development Program*

65.    The Debtors also maintain a market development program (the "Market Development Program") with various of their wireless carrier Customers.  The parameters of this program change depending on the Customer and specific circumstances.  However, generally, under the Market Development Program, the Debtors agree to absorb the cost of certain incentive programs for various wireless devices sold by the Customers.  For example, if a particular wireless device is selling less than anticipated, the Debtors may agree to reimburse the Customer a set amount per unit sold, so that the Customer can pass those savings along to the ultimate consumer and increase demand for the device.  The Debtors accrue a reserve for anticipated Market Development Program obligations, which, as of June 30, 2013, amounted to $9,400,000.  In all cases, the amounts owed by the Debtors on account of pre-existing market development programs is less than the corresponding receivable due to the Debtors from the relevant Customer.

25

66.    I believe that the relief requested in the Warranty Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Warranty Motion should be approved.

**E.    The "Shippers and Warehousemen Motion":  Debtors' Motion for an Order Pursuant to Sections 1107(a), 1108, 363(b) and 105(a) of the Bankruptcy Code (I) Authorizing Payment of Prepetition Claims of Shippers, Warehousemen, Customs Brokers, and Other Transportation Lien Claimants and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers**

67.    By this motion, the Debtors are seeking authorization to pay certain prepetition claims of shippers, warehousemen, customs brokers, and other transportation lien claimants that have or are capable of asserting possessory liens against the Debtors' goods.

68.    The Debtors' businesses requires them to purchase cellular phones, replacement parts and other products, parts and accessories to be sold by the Debtors (collectively, the "Goods") from international sources.  The allocation of responsibility for the various aspects of transporting goods from international sellers to the Debtors, such as shipping, customs and storage, and the costs associated therewith, varies for each transaction.  In many instances, the Debtors are not responsible for any aspects of shipping the Goods or with the costs associated therewith.  However, for transactions in which the Debtors are responsible for some or all aspects of shipping the Goods, the Debtors utilize a number of third party service providers. These service providers are critical to ensuring the continuing operation of the Debtors' businesses.  However, many of these providers can assert liens against the goods until they are paid by the Debtors for their services.  Consequently, failure to make payments to the providers will likely result in the Debtors' businesses grinding to a halt.

69.    To facilitate movement of Goods, the Debtors rely on a network of shippers and freight carriers (the "Transporters") who ship from the vendors' warehouses to warehouses

operated by the Debtors or third-parties (the "Warehousemen").  Goods that are received from overseas are shipped to various ports or flown into various airports in the United States, cleared for customs, and loaded onto trucks that transport the products to the Debtors' various warehouse facilities.

70.     When Goods are received from international sources, the Debtors are required to pay customs duty charges and the Debtors utilize the services of custom brokers (the "Customs Brokers") who facilitate the payment of the customs duty charges and fees.  If the Debtors fail to pay any Customs Broker, Transporter, or Warehouseman (collectively, the "Lien Claimants") for charges incurred in connection with the use, storage, or transport of the products, various statutes, tariffs and agreements permit the Lien Claimants to assert liens against the products in their possession.

71.     As of the Petition Date, the Debtors estimate that approximately $25,000, $306,000 and $581,000 is owed on account of prepetition claims to Customs Brokers, Transporters and Warehousemen, respectively.  However, the Debtors believe that the value of the Goods that are in the possession of Lien Claimants is substantially more.  Payment of the foregoing shipping, customs, and storage charges will avoid disruption in the Debtors' business and enable the Debtors to timely service their customers and realize the value of the Goods.  The Debtors' business is dependent upon the ability to timely deliver the Goods to its customers. While the Debtors believe that they are relatively current on their payments to the Lien Claimants, to the extent that additional amounts are found to be outstanding (most likely due to delayed invoicing or the timing of certain shipments), the Debtors must be able to pay such amounts to gain access to the Goods.  The Debtors require timely receipt of the Goods to be able to sell them and to timely service consumers' needs.  Any disruption in the Debtors' movement

of Goods could result in significant consequences to the Debtors' business. The core of the

Debtors' business consists of purchasing cellular phones from vendors, making modifications

and improvements to the phones and repackaging them with other materials and selling those

phones to cellular carriers. Any failure in the chain of transportation affects not only the Debtors

but also their vendors and customers, as well as their sale prospects. As such, the Debtors

propose to pay such claims when, in the Debtors' business judgment, such creditors' exercise of

their legitimate remedies would unduly disrupt the Debtors' business. Notably, the Debtors only

seek authority, not the direction, to make such payments.

72.    I believe that the relief requested in the Shippers and Warehousemen Motion is in

the best interests of the Debtors, their estates, their creditors and all other parties in interest.

Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers and

Warehousemen Motion should be approved.

F.    **The "Utilities Motion":  Debtors' Motion for Interim and Final Orders (A) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing service, (B) Deeming Utility Companies to have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Assurance**

73.    In the ordinary course of business, the Debtors incur utility expenses for gas,

water, electricity, telecommunication service, data service, waste management and similar utility

services provided by various Utility Providers. Approximately 12Utility Providers render these

services to the Debtors. On average, the Debtors spend approximately $43,000 per month for

utility services.

74.    I believe that uninterrupted utility services are essential to the Debtors' ongoing

operations and, therefore, to the success of their Chapter 11 Cases. I further believe that any

interruption in utility services, even for a brief period of time, would negatively affect the

Debtors' operations, customer relationships, revenues and profits, thereby seriously jeopardizing

28

the Debtors' restructuring efforts and, ultimately, value and creditor recoveries. Thus, it is critical that utility services continue uninterrupted during these chapter 11 cases.

**G.     The "<u>Joint Administration Motion</u>":  Debtors' Motion for an Order Authorizing Joint Administration of Their Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(B)**

75.     The Debtors seek entry of an order directing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015.

76.     The Debtors anticipate filing numerous notices, applications, motions and other pleadings that will affect both Debtors.  Joint administration will eliminate the need to draft, replicate, file and serve duplicative notices, applications and order and will, therefore, save the Debtors and their estates considerable time and expense.  Joint administration will also ease the administrative burden on the Court, the United States Trustee and other parties in interest by allowing the clerk to maintain – and parties in interest to consult – a single docket reflecting all matters filed in each of the Debtors' Chapter 11 Cases.

77.     The relief sought in the Joint Administration Motion is purely procedural in nature and will not affect the substantive rights of the Debtors against each other or the rights of any party in interest against any of the Debtors.

78.     Under the circumstances, I believe the Joint Administration Motion is in the best interests of the Debtors and their estates.

**H.     The "<u>Ministerial Matters Motion</u>":  Debtors' Motion for Entry of an order (I) Extending the Debtors' Time to File Schedules and Statements of Financial Affairs, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Creditors, (III) Waiving the Requirement of E.D.N.Y. Rule 1007-1 that the Debtors File a List of Creditors, (IV) Authorizing the Debtors to Mail Initial Notices and (V) Authorizing the Debtors to use Prepetition Business Forms**

79.     By this motion, the Debtors are requesting entry of an order (i) granting additional time to file their schedules and statements of financial affairs (collectively, the "<u>Schedules and</u>

Statements") to the dates that is 45 days after the Petition Date, (ii) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors, (iii) waiving the requirement of LBR 1007-1 that the Debtors file a list of creditors, (iv) authorize the Debtors to mail initial notices and (v) authorizing the Debtors to continue to use existing business forms. The Debtors are sensitive to the need to complete the Schedules and Statements as soon as possible given their anticipated bankruptcy sale process, and they intend to complete the Schedules and Statements before the proposed 30-day deadline, if possible.  The proposed extension means that these filings will still occur before the proposed auction of the Debtors' assets.

80.     I believe that the relief requested in the Schedules and SOFA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and SOFA Motion should be approved.

**I.      The "Epiq Retention Motion":  Application of the Debtors for an Order Authorizing the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent**

81.     By this motion, the Debtors seek entry of an order authorizing the Debtors to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims, notice and balloting agent. Upon information and belief, Epiq is an experienced claims agent and is frequently used by debtors in large chapter 11 cases, and I believe Epiq is well qualified to serve as claims agent in these cases.  The employment of Epiq will also provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases, leaving the Debtors' management and professionals to focus on the Debtors reorganization efforts.

**J.**  **The "<u>Goodwin Retention Motion</u>":  Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Goodwin Procter LLP as Attorneys for the Debtors and Debtors in Possession Effective *Nunc Pro Tunc* to the Commencement Date**

82.     Shortly after filing the Chapter 11 Cases, the Debtors anticipate filing an application to retain Goodwin Procter LLP ("<u>Goodwin</u>") as their lead restructuring attorneys. Goodwin has extensive experience and knowledge in, and an excellent reputation for, providing high quality legal services in the field of debtor protections, creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code.  In preparing for these Chapter 11 Cases, Goodwin has become familiar with the Debtors' businesses and the legal issues that may arise in these cases.  I believe that Goodwin is well-qualified and uniquely able to represent the Debtors in these chapter 11 cases and respectfully submit that the Goodwin Retention Motion should be approved.

**K.**  **The "<u>Togut Retention Motion</u>": Debtors' Application for an Order Pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rules 2014, 2016 and 6003 Authorizing the Employment and Retention of Togut, Segal & Segal LLP as Co-Counsel to the Debtors and Debtors in Possession, *Nunc Pro Tunc* to the Petition Date**

83.     Shortly after filing the Chapter 11 Cases, the Debtors anticipate filing an application to retain Togut, Segal & Segal LLP ("<u>Togut</u>") as co-counsel to their primary restructuring attorneys.  Togut will assist the Debtors in matters for which the Debtors' primary restructuring attorneys at Goodwin may have a conflict of interest or matters that may be more economically handled by a firm of Togut's size.  The Debtors will endeavor to ensure that there is no unnecessary duplication of effort between the attorneys at Togut and Goodwin.  Togut has extensive experience and knowledge in, and an excellent reputation for, providing high quality legal services in the field of debtor protections, creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code.  In preparing for these chapter 11 cases, Togut has become

31

familiar with the Debtors' businesses and the legal issues that may arise in these cases. Thus, because I believe that Togut is well-qualified to assist the Debtors in these chapter 11 cases, I respectfully submit that the Togut Retention Motion should be approved.

**L.      The "Retention Payment Motion":  Motion of the Debtors for an Order Approving the Continuation of Prepetition Retention Program**

84.      In the Retention Payment Motion, the Debtors are seeking entry of an order, pursuant to sections 363(b)(1), 503(c), and 105(a) of the Bankruptcy Code, authorizing the Debtors to continue making all required payments under the terms of the Retention Program to non-insider employees.

85.      In September, 2012, the Debtors implemented a retention bonus program to induce the majority of their employees to remain with PCD. This retention program was necessitated by two primary factors. First, as noted above, the Debtors' former chief executive officer left the company in September, 2012, taking with him approximately one-third of the Debtors' employees. The exodus of personnel was part of a designed plan by the Debtors' former CEO to form a competing company and put PCD out of business. This series of events is further detailed in the First Day Declaration and is the subject of a pending lawsuit. The immediate consequence of the departure of such a large number of employees, however, was a significant increase in the workload of the remaining employees. Second, in addition to the increased workload, the Debtors' employees were generally aware that the Debtors were experiencing a significant degree of financial distress. The combination of these two factors caused significant erosion in employee morale. Left unchecked, the Debtors feared that the loss of additional personnel, which at the time would have crippled the Debtors' operational capabilities. As a result, the Debtors determined that they needed to take action to prevent any further employee attrition and thus decided to implement the Retention Program.

86.    Under the Retention Program, the Debtors offered the majority of their employees an increase in their base pay, along with two additional payments, made in six-month intervals, provided such employee remained with the company through September, 2013.  The additional payments ranged from a total of 40% to 100% of such employee's annual base pay, with the first payment due and paid in March, 2013.  The Board subsequently modified the Retention Program to divide the second installment into three periods and paying the amount payable for the first period from March 1 to June 13 on June 14, 2013, and paying the amount payable for the second period from June 14th to July 29 on July 29, 2013.  The remaining amounts due under the Retention Program will vest on September 1, 2013 and be payable on September 2, 2013,.  However, if an employee is terminated other than "for cause," the remaining amounts due under that employee's retention agreement vest, and become payable upon termination.

87.    I believe that, without the approval of the Retention Program, the Debtors' risk losing a substantial number of employees, which would adversely affect the Debtors' ability to continue operating and complete the sale of substantially all of their assets.  Any cessation of operations, or material impairment of the Debtors' ability to operate, would negatively affect the value of the Debtors' assets.  Accordingly, I believe it is in the best interests of the Debtors, their estates and creditors that the Retention Program be approved.

## Conclusion

With the filing of these Chapter 11 Cases, the Debtors' immediate objective is to maintain operations with as little interruption to the Debtors' business as possible.  I believe that the relief sought in the First Day Pleadings is necessary to achieving that result, and will help avoid any harm to the value of the Debtors' assets for the benefit of all stakeholders.

33

       Pursuant to 28 U.S.C. §  1746, I declare under penalty of perjury that the foregoing is true and correct.

Hauppauge, New York
Dated:  August 19, 2013

                                      By: /s/ Raymond F. Kunzman                    
                                      Name:  Raymond F. Kunzmann
                                      Title:  Chief Financial Officer