**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel:  (212) 813-8800
Fax:  (212) 355-3333
Emanuel C. Grillo
Matthew L. Curro
Christopher Newcomb

- *and* -

**TOGUT, SEGAL & SEGAL LLP**
One Penn Plaza, Suite 3335
New York, New York  10119
Tel:  (212) 594-5000
Frank A. Oswald
David A. Paul
Leo Muchnik

*Proposed Co-Counsel to the*
*Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| PERSONAL COMMUNICATIONS | ) | Case No.  13- |
| DEVICES, LLC, *et al.*,[1] | ) | 13- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**(Debtor-in-Possession Financing Motion)**

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171) and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096). The Debtors' mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

**MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS PURSUANT TO 11 U.S.C. § § 105(a), 364(C) AND 364(D); (B) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL; (C) MODIFYING THE AUTOMATIC STAY PURSUANT
TO 11 U.S.C. § 362; (D) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § § 361
AND 363; AND (E) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Personal Communications Devices, LLC ("PCD") and Personal Communications

Devices Holdings, LLC ("Holdings", and together with PCD, the "Debtors"), as debtors and

debtors in possession in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), hereby

submit this motion (the "Motion") for entry of interim and final orders (the "Interim Order" and

"Final Order," respectively, and together, the "DIP Orders"),[2] seeking, *inter alia*:

(i)    authorization for the Debtors to obtain up to $46
million (the "DIP Facility") of debtor in possession financing, by entering
into that certain Senior Secured, Super-Priority Debtor-In-Possession
Credit Agreement (the "DIP Credit Agreement", and, together with all
other loan and security documents executed in connection with the DIP
Credit Agreement, the "DIP Loan Documents")[3] on an interim basis for a
period through and including the date of entry of a Final Order on the
Motion, from each of those banks that are currently "Lenders" under that
certain Amended and Restated Credit Agreement established by JPMorgan
Chase Bank, N.A., as administrative agent (the "First Lien Agent" or "DIP
Agent"), and such Lenders (the "First Lien Lenders" or the "DIP
Lenders") in favor of PCD, as "Borrower", dated as of May 14, 2012 (as
amended, supplemented or otherwise modified from time to time prior to
the Petition Date, the "First Lien Credit Agreement") substantially on the
terms and conditions set forth in the DIP Credit Agreement, a copy of
which is attached hereto as **Exhibit B**[4];

(ii)    authorization for the roll-up of certain amounts
outstanding (the "First Lien Credit Obligations") under the First Lien
Credit Agreement into DIP Obligations by satisfying the First Lien Credit

---

[2]    A form of the Interim Order is attached hereto as **Exhibit A**.  The Final Order shall be substantially similar to
the Interim Order.  The Debtors will file with the Bankruptcy Court a form of Final Order shortly after the form
of Interim Order is approved.

[3]    Capitalized terms used but not defined herein shall have meanings set forth in the DIP Credit Agreement.

[4]    The Debtor's obligations under the DIP Credit Documents shall be referred to herein as the "DIP Obligations."

Obligations through application of Cash Collateral (as defined below) post-petition;

(iii)    approval of the terms of, and authorization for the Debtors to execute and perform under, the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(iv)    authorization for the Debtors to grant (i) to the DIP Agent, for the benefit of itself and the other DIP Lenders, the DIP Liens (as defined below) on all of the Collateral pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and (ii) to the DIP Agent and the DIP Lenders, pursuant to section 364(c)(1) of the Bankruptcy Code, super-priority administrative claims having recourse to all prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired;

(v)    authorization for the Debtors to use the Prepetition Secured Lenders' (defined below) cash collateral (the "Cash Collateral");

(vi)    authorization for the Debtors to grant certain adequate protection to the Prepetition Secured Lenders as set forth herein;

(vii)    the modification of the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders and subject in all respects to the Debtors' rights herein;

(viii)    authorization for the Debtors, at any time prior to the entry of the Final Order, to borrow under the DIP Facility for the purposes of funding the operations of the Debtors' business, paying certain transaction fees and expenses and other costs and expenses of administration of the Chapter 11 Cases, all subject to, and in accordance with, the DIP Loan Documents, this Interim Order and the Approved Budget (as defined below);

(x)    the scheduling of a final hearing (the "Final Hearing") to be held before this Court to consider entry of the Final Order approving, among other things, the DIP Facility as set forth in the DIP Credit Agreement in the aggregate principal amount of $46,000,000 on a final basis;

(xi)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order; and

(xii)    such further relief as this Court shall deem appropriate.

3

## JURISDICTION

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.    Venue of this proceeding and this Motion in this District is proper under 28

U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are 11 U.S.C. § § 105, 361, 362,

363, 364(c) and 364(d).

## GENERAL BACKGROUND

4.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").

5.    The Debtors continue to operate their business and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.    No trustee, examiner, creditors' committee, or other official committee has been

appointed in the Chapter 11 Cases.

7.    PCD, one of the above-captioned debtors, which is headquartered in Hauppauge,

New York, distributes wireless communication devices and accessories, and provides value-

added services to wireless device manufacturers and wireless telecom carriers.  Collectively, the

Debtors act as a critical intermediary between domestic wireless carriers (e.g., Verizon Wireless,

Sprint, AT&T) and various foreign, generally smaller market, wireless handset manufacturers.

In that role, PCD provides numerous product planning, logistics, reverse logistics, and after-

market services that are designed to benefit and streamline the path to the end user for all sides of

the wireless device supply chain.

4

8.      The Debtors service domestic wireless carriers by acting as the carrier's trusted partner in screening and qualifying new vendors to fill product lineups and by providing supply chain and technical services to bring those products to market.  On the other side of the supply equation, the Debtors also work directly with various foreign wireless handset manufacturers to shepherd their products through all stages of product development in the domestic carrier market. In addition to working to bring devices to market, PCD also provides a full complement of authorized repair and warranty services to its domestic carrier clients.

9.      In 2012, the Debtors generated $1.6 billion in revenue but suffered a loss of $16.9 million on a normalized basis.  Due to a number of factors, including a shift in consumer preferences within the mobile device market and the damage inflicted upon the Debtors by its prior management, the Debtors' business has declined, such that their resulting cash flow is insufficient to meet the Debtors' debt service requirements.  The Debtors have sought chapter 11 protection to effect a sale of substantially all of their assets, which the Debtors believe will maximize the return to all stakeholders, as well as preserve the maximum number of jobs for PCD's current employees.

10.     A more detailed description of the Debtors' business, capital structure, and the circumstances leading to the chapter 11 filings is set forth in the *Declaration of Raymond F. Kunzmann in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.  The Debtors are relying on the First Day Declaration for support of this Motion as well.

5

**Summary of the Debtors' Existing Secured Indebtedness**

11.     As of the Petition Date, PCD has secured indebtedness in the approximate

principal amount of $104,976,000.  Of that amount, approximately $33,980,947 is secured by a

first priority lien.  The remaining secured indebtedness is secured by a second priority lien.

12.     PCD's first-lien secured debt is governed by the First Lien Credit Agreement

(together with the other documents and agreements executed in connection therewith, the "First

Lien Loan Documents") among PCD, as borrower, the guarantors thereto, and the First Lien

Agent, Wells Fargo Capital Finance, LLC as Syndication Agent, Bank of America, N.A., as

Documentation Agent, and the First Lien Lenders.  The First Lien Credit Agreement was

amended on December 21, 2012, to, among other things, reduce the Aggregate Revolving

Commitments (as defined in the First Lien Credit Agreement).  As of the date hereof, the

aggregate principal amount of revolving commitments under the First Lien Loan Documents is

$115,000,000, of which $33,980,947 is outstanding (together with all applicable interest, fees

and expenses, the "First Lien Credit Obligations").

13.     PCD's second-lien secured debt is governed by that certain Amended and

Restated Second Lien Credit Agreement, dated as of May 14, 2012 (as amended, modified and

supplemented from time to time, the "Second Lien Credit Agreement," and together with the

other documents and agreements executed in connection therewith, the "Second Lien Loan

Documents," and together with the First Lien Loan Documents, the "Prepetition Secured Loan

Documents"), among PCD, as Borrower, the loan guarantors party thereto, the Lenders party

thereto, and U.S. Bank National Association, as Administrative Agent (the "Second Lien

Agent"), and the lenders thereto (the "Second Lien Lenders", together with the First Lien

Lenders, the "Prepetition Secured Lenders").  As of the date hereof, the aggregate principal

amount of the term loan made pursuant to the Second Lien Loan Documents (including accrued

6

but unpaid interest) is approximately $70,994,813 (together with any applicable interest, fees and expenses, the "Second Lien Debt").

14.     Under the Prepetition Secured Loan Documents and the pledge and security agreements entered into in connection therewith, the Prepetition Secured Lenders maintain a security interest in substantially all of the Debtors' assets.  The Prepetition Secured Lenders are also party that certain Intercreditor Agreement (the "Intercreditor Agreement"), dated as of July 1, 2008, by and among PCD, Holdings, PCD Communications Canada LTD, JPMorgan, in its capacity as collateral agent for the First Lien Credit Obligations (as defined in the Intercreditor Agreement), and U.S. Bank, in its capacity as collateral agent for the Second Lien Obligations (as defined in the Intercreditor Agreement).  Subsequent to its initial execution, the Intercreditor Agreement was confirmed in connection with the May 2012 refinancing pursuant to that certain Confirmation of Intercreditor Agreement, dated as of May 14, 2012.

## THE DIP FINANCING

### The Debtors' Financing Needs

15.     On or about September 14, 2012, the Debtors retained Richter Consulting, Inc. ("Richter") to serve as its financial advisor in connection with restructuring its debts, including by obtaining financing to address its pending liquidity issues, and in pursuing a potential sale both within and outside the context of a chapter 11 proceeding.  By the time that Richter was retained, the Debtors' liquidity situation was precarious and the Debtors were in desperate need of immediate financing to address their working capital needs.

16.     The Debtors' assets are fully encumbered by both first and second liens in favor of the Prepetition Secured Lenders.  The aggregate amount of the debt secured by such liens likely exceeds the value of the Debtors' assets.  The Debtors' believe that a going-concern sale of their business is the best way to maximize the value of their estates and to provide the greatest

7

direct and indirect recovery for their stakeholders.  Accordingly, the Debtors' primary objective

in obtaining postpetition financing was to secure adequate liquidity to fund a sale process.

Representatives of the Debtors contacted two other potential third-party DIP lenders.  However,

due to the short-term maturity date of the proposed financing on account of the proposed sale of

the Debtors assets, the lack of any significant unencumbered assets in which to grant security

interests, and the Debtors' limited ability to grant any security interests absent costly, time

consuming and uncertain lien-priming litigation with the Debtors' Prepetition Secured Lenders,

those discussions failed to produce any concrete financing proposals.  The Debtors, therefore,

focused on obtaining the best terms for the financing being offered by the First Lien Lenders.

Those efforts, which included extensive arm's-length negotiations between the First Lien

Lenders and the Debtors' and their representatives, resulted in the DIP Facility proposed under

this Motion.

17.    Given the circumstances of these cases, the Debtors' immediate need for

financing and their limited ability to give additional security absent lien-priming litigation, the

Debtors believe entering into the DIP Facility with the DIP Lenders is in the best interests of

their estates and will advance their goal of maximizing the value of the Debtors' assets.  The

Debtors believe that any attempt to prime the liens of the Prepetition Secured Lenders would

result in costly litigation that would also delay the Debtors' ability to complete the sale process

and endanger the current Stalking Horse APA (defined below).

18.    Holdings is the only guarantor under the DIP Facility.

**Sale of Substantially All of the Assets of the Debtors**

19.    As noted above, the Debtors have spent the past ten months actively pursuing a

solution to their liquidity issues.  As part of this process, the Debtors engaged Benjamin Gordon

Strategic Advisors ("BGSA") to design and implement a sale process for the sale of the Debtors'

assets.  This effort culminated in the execution of a "stalking horse" asset purchase agreement

(the "Stalking Horse APA") with Quality One Wireless LLC and its newly-formed affiliate,

Q1W Newco, LLC.  Pursuant to the Stalking Horse APA, Quality One has agreed, subject to an

auction process to be conducted under section 363 of the Bankruptcy Code, to acquire all of the

Debtors' assets and assume certain liabilities (as more specifically defined in the Stalking Horse

APA, the "Purchased Assets" and "Assumed Liabilities," respectively).  Under the Stalking

Horse APA, Quality One has agreed to purchase substantially all of the Debtors' assets for an

aggregate purchase price of approximately $105,250,000.[5]  An express purpose of the DIP

Facility is to fund certain expenses associated with closing the sale of the Debtors' assets to

Quality One.  Under the Stalking Horse APA, the DIP Obligations and First Lien Credit

Obligations will be paid in full at closing.

20.     Contemporaneously with the filing of this Motion, the Debtors will be filing a

motion (the "Sale Motion") to (i) establish bidding procedures (the "Bidding Procedures") with

respect to the sale of the Purchased Assets, (ii) approve the Stalking Horse APA, and (iii)

approve the sale of the Purchased Assets to Quality One (or such other party determined to be

the successful bidder at the auction).[6]  The Debtors believe the Stalking Horse APA and the

auction process represent the Debtors best chances to maximize the value of their estates.

**The DIP Financing**

21.     The DIP Facility provides the Debtors with up to $46 million in availability on a

final basis, $40 million of which will be available on an interim basis.  The availability is

reduced gradually from $46 million to $38 million in the final three weeks of the borrowing

---

[5]     The purchase price is subject to adjustment depending on the amount of the Debtors' working capital at closing. See Stalking Horse APA §  3.3.

[6]     For an additional description of the terms of the Stalking Horse APA, please reference the Sale Motion.

period.  The total availability under the DIP Facility will be calculated based on certain formulas

relating to the Debtors' borrowing base, with the funds to be used in accordance with the

Approved Budget (defined below).  Part of the DIP Facility includes access to a $5 million swing

line of credit, which may be requested on a same-day basis.  The Debtors have provided a budget

to the DIP Agent, setting forth in reasonable detail all projected receipts and disbursements of the

Debtors through and including October 25, 2013 (the "Approved Budget").  As noted above, the

DIP Facility's primary purpose is to fund operating expenses and certain expenses associated

with the closing of the sale to Quality One (or such other bidder as may be determined to have

the highest and best bid at the auction).  Accordingly, the maturity date is set to be sixty-five

days after the closing of the loan, which is expected to coincide with the timing of the Debtors'

proposed sale.  The Approved Budget represents the culmination of significant negotiations

between the Debtors, the DIP Agent and the DIP Lenders and the Debtors believe that the DIP

Facility provides sufficient liquidity for the Chapter 11 Cases.

22.     The DIP Facility contemplates an incremental "roll-up" of the First Lien Credit

Obligations (the "Roll-Up").  The Roll-Up is structured so that as the Debtors' generate cash

receipts through the normal operation of their business, those cash receipts are used, in the DIP

Agent's discretion, first to pay the First Lien Credit Obligations.  See DIP Credit Agreement

§ 2.10(b).  As those cash receipts are swept and applied to the First Lien Credit Obligations, the

Debtors will then draw on the DIP Facility to fund their ongoing cost of operations.  The

Approved Budget contemplates this incremental Roll-Up of the First Lien Credit Obligations.

The DIP Lenders would not have agreed to provide the DIP Facility without the Roll-Up and

deemed refinancing of certain of the First Lien Credit Obligations.  In addition, the Roll-Up will

allow the Debtors to continue with the same borrowing practices as existed prepetition – that is,

as new cash receipts enter the Debtors' system, those amounts are applied to preexisting

obligations and new money is then borrowed under the existing facility to fund operations.

**The Purported Pantech Lien**

23.     On May 10, 2013, Pantech Wireless, Inc., and Pantech Co., Ltd. filed a UCC

financing statement with the New York Department of State alleging an all asset lien on the

Debtors' assets (the "Purported Pantech Lien").  For the avoidance of doubt, the Purported

Pantech Lien is *not* considered a Non-Avoidable Lien under the terms of the DIP Facility or the

Interim Order and, to the extent it is a valid lien (which it is not), it is the intent of the DIP

Parties for such lien to be primed by the DIP Facility.  Because the Purported Pantech Lien holds

no value, it may be primed by the DIP Liens and Pantech is not entitled to any adequate

protection.   The Purported Pantech Lien is neither a valid security interest nor a perfected lien.

While the Debtors are parties to a number of contracts with Pantech pursuant to which the

Debtors purchase various wireless devices and accessories, none of those contracts grant Pantech

a security interest in the Debtors' assets.  Additionally, the financing statement was filed in New

York, which, under the applicable provisions of the Uniform Commercial Code, fails to perfect a

valid security interest (if one existed) in the assets of a Delaware limited liability company, such

as PCD.

<u>**Overview of DIP Terms**</u>[7]

The pertinent terms of the DIP Credit Agreement and related DIP Orders are as follows:[8]

| Material Terms of Proposed Postpetition Financing | |
|---|---|
| <u>**Parties**</u> | <u>Borrower</u>:  Personal Communications Devices, LLC<br><br><u>Guarantor</u>:  Personal Communications Devices Holdings, LLC<br><br><u>Lenders</u>:  JPMorgan Chase Bank, N.A., as Administrative Agent, and certain other Lenders as defined in the DIP Credit Agreement<br><br>[Recitals, §  1.01][9] |
| <u>**Amounts**</u> | <u>Total</u>:  $46 million[10]<br><br><u>Interim Amount</u>:  $40 million<br><br><u>Swing Line</u>:  $5 million<br><br>Subject to certain availability restrictions, including calculation of DIP Borrowing Base.  "Availability" means, at any time, an amount equal to (a) the lesser of (i) the Maximum Revolver Amount then in effect and (ii) the Borrower Base at such time <u>minus</u> (b) the Aggregate Revolving Credit Exposure at such time.<br><br>[§ 1.01] |
| <u>**Purpose**</u> | The Debtors require access to additional financing to, among other things, fund working capital needs, to fund fees, costs and expenses with respect to the Sale Transaction, and for other general corporate purposes.  The DIP Credit Agreement permits the use of funds in accordance with the Approved Budget, a copy of which is attached hereto as **Exhibit C**.<br><br>[Recitals, § 5.08] |

---

[7]     To the extent there is any conflict between the summary set forth herein and the DIP Credit Documents, the terms of the DIP Credit Documents shall govern.  To the extent there is any conflict between the terms of the DIP Credit Documents and the proposed DIP Orders being submitted herewith, the terms of the approved and applicable DIP Order shall govern.

[8]     This overview is provided pursuant to Bankruptcy Rule 4001(c)(1) and this Court's requirements under E.D.N.Y.  Bankr. L.R. 4001-5 and Administrative Order No. 558 – In re:  Adoption Guidelines for Financing Motions (the "<u>Financing Guidelines</u>").

[9]     All document references in this table are references to the DIP Credit Agreement, unless otherwise indicated.

[10]    The availability is reduced from $46 million to $38 million for the final three weeks of the borrowing period.

| **Material Terms of Proposed Postpetition Financing** |
| --- |

| | |
| --- | --- |
| **Maturity & Termination** | <u>Maturity</u>:  Date that is 65 days after the Closing Date |
| | The DIP Facility and use of Cash Collateral may, under certain circumstances, be restricted or terminated upon certain default events as discussed below. |
| | <u>Termination</u>:  the earliest to occur of (a) the Maturity Date, (b) the date which is 25 days after the date on which the Interim Order is entered, if on or prior to such date the Bankruptcy Court shall not have entered the Final Order, (c) the date on which the Interim Order or the Final Order, as applicable, is reversed, vacated or modified in any material respect without the express written consent of the Administrative Agent in its reasonable discretion, (d) the substantial consummation (as such term is defined in Section 1101 of the Bankruptcy Code, and for purposes of this definition shall be no later than the effective date) of a plan of reorganization or liquidation that is confirmed pursuant to an order entered by the Bankruptcy Court or any other court having jurisdiction over the Bankruptcy Case, (e) the date of any Bid/Sale Failure, (f) the dismissal of either of the Bankruptcy Cases or conversion of either of the Bankruptcy Cases to chapter 7 cases, or the appointment of a chapter 11 trustee or examiner with expanded powers to operate the Debtors or other responsible person in either of the Bankruptcy Cases, (g) the failure by the Debtors to timely perform, in any respect, any of the terms, provisions, conditions, covenants or other obligations under the Interim Order or the Final Order, as applicable, (h) any termination of the Stalking Horse APA (other than as a result of an Approved Alternative Sale Transaction), (i) the failure, on or prior to the date of the scheduled hearing in the Bankruptcy Cases for approval of the Bid Procedures Order, of: (i) the Pre-Petition Second Lien Lenders to have reached final agreement with the Stalking Horse Bidder with respect to the Credit Suisse Note and Security Agreement, the PineBridge Notes and Security Agreements, the Quality One – Credit Suisse Guaranty and the Quality One – PineBridge Guaranty (as each such term is defined in the Stalking Horse APA), (ii) the Second Lien Lenders, the Stalking Horse Bidder and the Stalking Horse Bidder's lender or other financing source to reach final agreement on the definitive terms of an intercreditor agreement in connection with the financing of the Stalking Horse Sale, or (iii) the Second Lien Lenders and the Stalking Horse Bidder to reach final agreement on the definitive terms of an intercreditor agreement establishing the relative priorities of the Second Lien Lenders; or (j) the acceleration of the Obligations and the termination of the Revolving Commitments in accordance with Article VII of the DIP Credit Agreement. |
| | [§ 1.01] |
| | Under the Interim Order, among other events, the following shall be a |

| Material Terms of Proposed Postpetition Financing | |
|---|---|
| | Termination Event:<br><br>(i)    the failure of George Appling to continue to serve as the chief executive officer of the Debtors [other key employees to be determined], or any material reduction in the duties or responsibilities of George Appling in such capacity<br><br>[Interim Order ¶ 6(m)] |
| **Interest Rates** | Interest Rate:  Alternate Base Rate plus 6.75%<br><br>Default Rate:  Then applicable Interest Rate plus 2%<br><br>[§ 1.01] |
| **Conditions** | Closing Conditions:  Usual and customary conditions to effectiveness of the DIP Facility, including DIP Agent's satisfaction with the Approved Budget, entry of an Interim DIP Order and other "first day" orders satisfactory to the DIP Agent, receipt of a certificate for each Loan Party stating that no Event of Default has occurred, payment of costs and fees, and accuracy of representations and warranties.<br><br>[§ 4.01]<br><br>Funding Conditions:  Each extension of credit is subject to usual and customary funding conditions, including delivery of notice, accuracy of representations, no defaults or events of default, and that usage of the term loan commitments under the DIP Facility will not exceed the aggregate amount authorized by the applicable DIP Order then in effect.<br><br>[§ 4.02-4.03] |
| **Fees** | The Fees set forth in that certain amended and restated fee letter (the "Fee Letter"), by and between the DIP Agent and the Debtors, dated as of August 15, 2013.[11] |
| **Liens and Priorities** | Liens:  The DIP Obligations shall, (i) pursuant to Bankruptcy Code section 364(d)(1), be secured by perfected liens on all Collateral (as defined below and in the DIP Credit Agreement), which lien shall be senior in right and priority (1) to the liens in favor of the First Lien Agent securing the First Lien Credit Obligations, (2) to the liens in |

---

[11]    Due to its confidential in nature, the Debtors respectfully request pursuant to Rule 9018 of the Bankruptcy Rules  that the Fee Letter not be filed publicly.

| **Material Terms of Proposed Postpetition Financing** | |
|---|---|
| | favor of the Second Lien Agent for the Second Lien Obligations, and (3) to all other liens except those certain valid, perfected and non-avoidable liens in effect as of the date of commencement of the Bankruptcy Cases (the "Non-Avoidable Liens"); (ii) pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected lien on property of the estate that is not otherwise subject to a lien, and (iii) pursuant to Bankruptcy Code section 364(c)(3), be secured by a perfected junior lien on all property of the Debtors that is subject to Non-Avoidable Liens.<br><br>The term "Collateral" is defined in Section 1.01 to include all now owned or hereafter acquired assets and property of the Debtors, including all accounts receivable, inventory, real and personal property, plant and equipment of the Debtors, and the proceeds of all avoidance actions, subject only to the Carve-Out (defined below).<br><br>[Interim DIP Order ¶ 9]<br><br>Priorities:  DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute allowed superpriority administrative expense claims.<br><br>[Interim DIP Order ¶ 12] |
| **Carve-Out** | As set forth in the Interim DIP Order, customary for postpetition financings of this size, providing for a carve-out (the "Carve-Out") from pre- and postpetition claims, liens and interests for: (x) the payment, upon the occurrence and during the continuance of an Event of Default, of allowed and unpaid professional fees and disbursements of Professionals incurred by the Debtors and any statutory committees appointed in the Bankruptcy Cases through the date of such Event of Default (and regardless of when such fees and expenses become allowed by order of the Bankruptcy Court), and (y) the payment of fees pursuant to 28 U.S.C. § 1930 (provided, that aggregate amount of such fees and disbursements described in clauses (x) and (y) together shall not exceed $300,000); provided, further, that (i) no portion of the Carve-Out or the proceeds of the Loans may be used for the payment of fees and expenses of any person incurred in relation to the challenge of any of the liens in favor of the First Lien Agent, the First Lien Lenders, the Administrative Agent or any First Lien Lender, including any claim under chapter 5 of the Bankruptcy Code, and (ii) not more than $25,000 of the Carve-Out or proceeds of the Loans may be used to investigate any of the liens in favor of the First Lien Agent or the First Lien Lenders.<br><br>[Interim DIP Order ¶ 18, DIP Credit Agreement § 1.01] |
| **Covenants** | Affirmative Covenants:  Usual and customary for financings of this |

| Material Terms of Proposed Postpetition Financing | |
|---|---|
| | type, including delivery of financial statements, cash flow forecasts and other Borrowing Base reports.<br><br>[Art. V]<br><br><u>Negative Covenants</u>:  Usual and customary for financings of this type, including limitations on indebtedness, liens, nature of business, asset sales, investments and acquisitions, and capital expenditures.<br><br>[Art. VI] |
| **Limitations on Use of DIP Facility and Cash Collateral** | No portion of the Carve-Out or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred in relation to the challenge of any of the liens in favor of the First Lien Agent, the First Lien Lenders, the DIP Agent and/or the DIP Lenders, or the initiation or prosecution of any claim or action against the First Lien Agent, the First Lien Lenders, the DIP Agent and/or any DIP Lender, including any claim under Chapter 5 of the Bankruptcy Code.  No more than $25,000 of the Carve-Out or proceeds of the DIP Facility may be used to investigate any of the liens in favor of the First Lien Agent or the First Lien Lenders.<br><br>[Interim DIP Order ¶ 18; DIP Credit Agreement § 5.08] |
| **Events of Default** | Usual and customary for financings of this type, including non-payment of principal, interest and fees, defaults under covenants, breaches of representations and warranties, judgment defaults, appointment of a bankruptcy trustee or examiner, modification of the DIP Orders, change of control, dismissal or conversion of the bankruptcy cases, lifting of the automatic stay as to assets of the Debtors, entry of an order granting superpriority claims to other creditors, non-permitted prepetition debt payments, and the occurrence of a Bid/Sale Failure (each, an "<u>Event of Default</u>").<br><br>[Art. VII] |
| **Change of Control** | The occurrence of a "Change of Control" is included as an Event of Default.<br><br>[§ 7(g)]<br><br>Change in Control means (a) the PineBridge Entities shall cease to own, directly or indirectly, greater than 50% of the outstanding voting Equity Interests of Holdings on a fully diluted basis; (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of Holdings by Persons who were neither (1) nominated by the board of directors of Holdings nor (2) appointed by directors so nominated; (c) Holdings shall |

| Material Terms of Proposed Postpetition Financing | |
|---|---|
| | cease to own, free and clear of all Liens or other encumbrances (other than Liens permitted under Section 6.02(a) or 6.02(i)), 100% of the outstanding voting Equity Interests of the Borrower on a fully diluted basis; or (d) the Borrower shall cease to own, free and clear of all Liens or other encumbrances (other than Liens permitted under Section 6.02(a) or 6.02(i)), 100% of the outstanding voting Equity Interests of each of the other Debtors on a fully diluted basis.<br><br>[§ 1.01] |
| **Milestones** | The DIP Facility is conditioned upon the achievement of certain milestones related to the sale process, including:<br>• Filing of a sale motion within two business days of the Petition Date;<br>• The hearing to approve the Bidding Procedures Order shall have occurred within fourteen days of the Petition Date;<br>• Entry of  a Bid Procedures Order within sixteen days of the Petition Date;<br>• The Debtors' receipt of one or more qualified bids within forty-five days of the Petition Date;<br>• Entry of the Sale Order within fifty-five days of the Petition Date; and<br>• Consummation of the Sale within sixty-five days of the Petition Date.<br><br>[Interim DIP Order ¶ 6(g); DIP Credit Agreement § 7(t)] |
| **Repayment** | <u>Voluntary Repayment</u>:  Borrower may prepay the DIP Facility at any time in whole or in part, without premium or penalty, subject to certain prior notice provisions.<br><br>[§ 2.11(a)]<br><br><u>Mandatory Prepayment</u>:  Borrower shall, within three business days of receiving Net Proceeds from a Prepayment Event, prepay the Obligations.<br><br>"Prepayment Event" means<br><br>(a)      any sale, transfer or other disposition pursuant to Section 363 of the Bankruptcy Code, or otherwise (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party; or<br><br>(b)      any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party. |

17

| **Material Terms of Proposed Postpetition Financing** | |
|---|---|
| | [§ 1.01; § 2.11(d)] |
| **Joint Liability** | All obligations of the Borrower are guaranteed, on a joint and several basis, by Holdings. |
| **Acknowledgements** | The Debtors make certain customary admissions and stipulations with respect to the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Lenders and the validity, enforceability and priority of the liens and security interests granted to the First Lien Agent and Second Lien Agent to secure such indebtedness.<br><br>[Interim DIP Order ¶ D] |
| **Automatic Stay** | The DIP Orders provide for the lifting of the automatic stay to allow the DIP Agent and DIP Lenders to, among other things, upon the occurrence of an Event of Default and three business days prior written notice, foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise remedies against the DIP Collateral permitted by applicable nonbankruptcy law.<br><br>[Interim DIP Order ¶ 25(b)] |
| **Waivers and Consents** | Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms.<br><br>[Interim DIP Order ¶ 2] |
| **Indemnification** | Usual and customary for financings of this type, and substantially the same as set forth in the First Lien Loan Documents, including fees, charges and disbursements of counsel to the DIP Agent. |
| **Rollup** | The DIP Documents contemplate a gradual "roll-up" of the First Lien Credit Obligations. The DIP Administrative Agent may, in its discretion, apply funds credited to the Collection Account (*i.e.*, cash receipts) first to the First Lien Credit Obligations. This gradual "roll-up" is contemplated by the Approved Budget.<br><br>[Interim DIP Order ¶ 13; DIP Credit Agreement § 2.10(b)] |
| **Challenge Period** | The earlier of (i) the later of (a) sixty (60) days from the date of selection of counsel for the Committee, (b) if no Committee has been appointed, seventy-five (75) days from entry of the Final Order, (c) with respect to a chapter 7 trustee only and excluding all other parties in interest, upon the conversion of the Chapter 11 Cases |

LIBNY/5255501.16

| Material Terms of Proposed Postpetition Financing | |
|---|---|
| | to chapter 7, to the extent that any period to investigate the facts and file a complaint or a motion seeking authority to commence litigation as a representative of the estate has not expired, seventy-five (75) days from the date a chapter 7 trustee is appointed or (ii) 5:00 p.m. prevailing Eastern time on the date that is one business day prior to the Sale Hearing (the "**_Challenge Period_**"). |

## KEY PROVISIONS

24.     Pursuant to Local Rule 4001-5(a)(i)-(iii), the Debtors are required to disclose the following provisions of the Interim Order and DIP Credit Agreement:

- Payment of Lender Fees.  The DIP Credit Agreement requires that the Borrower pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates in connection with the administration and documentation of the DIP Facility.  [DIP Credit Agreement § 9.03(a), (b).]  Under the Interim DIP Order, the Debtors have agreed to pay current fees and expenses of the Secured Lenders up to an aggregate amount of $250,000.

- Use of DIP Proceeds to Challenge Liens.  No portion of the Carve-Out or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred in relation to the challenge of any of the liens in favor of the First Lien Agent, the First Lien Lenders, the DIP Agent and/or the DIP Lenders, or the initiation or prosecution of any claim or action against the First Lien Agent, the First Lien Lenders, the DIP Agent and/or any DIP Lender, including any claim under Chapter 5 of the Bankruptcy Code.  No more than $25,000 of the Carve-Out or proceeds of the DIP Facility may be used to investigate any of the liens in favor of the First Lien Agent or the First Lien Lenders.  [Interim DIP Order ¶ 18; DIP Credit Agreement § 1.01, Definition of "Carve-Out".]

## BASIS FOR RELIEF

25.     Approval of the DIP Facility and the use of Cash Collateral will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs.  Unless these expenditures are made, the Debtors will be forced to cease operations, which would (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii)

jeopardize the Debtors' ability to maximize value through the sale process. Because the Debtors' available and projected Cash Collateral is insufficient to fund such expenditures, the credit provided under the DIP Facility is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders. Additionally, the availability of credit under the DIP Facility will provide confidence to the Debtors' vendors and will be viewed favorably by the Debtors' employees, thereby promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative.

26.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

27.    The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow up to $46 million and to use such proceeds to fund their operations. Because the Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), in exchange for the grant of a superpriority administrative expense claim pursuant to section

20

364(c)(l) or without granting priming liens pursuant to section 364(d), the Debtors propose to

obtain the financing set forth in the DIP Credit Agreement by providing, *inter alia,* superpriority

claims, security interests, and priming liens pursuant to sections 364(c)(1), (2) and (3) and 364(d)

of the Bankruptcy Code.

28.     Having determined that financing is available only under sections 364(c) and (d)

of the Bankruptcy Code, the Debtors negotiated the DIP Facility with the DIP Lenders

extensively and at arm's-length.  Provided that a debtor's  business judgment does not run afoul

of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor

considerable deference in acting in accordance its business judgment.  *See, e.g., In re AMR*

*Corp.*, 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a

debtor's request under Section 364, a Court must examine whether the relief requested is an

appropriate exercise of the debtor's business judgment.");  *Bray v. Shenandoah Fed Sav. & Loan*

*Ass'n (In re Snowshoe Co., Inc.),* 789 F.2d 1085,1088 (4th Cir. 1986); *In re Ames Dep't Stores,*

*Inc.,* 115 BR. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business

judgment to be exercised so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit parties in interest"); *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D.

Utah 1981); *In re Simasko Prod. Co.,* 47 B.R. 444,449 (D. Colo. 1985).

29.     Substantially all of the Debtors' assets are encumbered and, despite the diligent

efforts of the Debtors and Richter, the Debtors have been unable to procure the required funding

absent the proposed superpriority claims and priming liens.  The Debtors have negotiated the

best terms available to obtain funding they need to maintain sufficient liquidity to preserve their

assets.  The Debtors submit that the circumstances of these cases require the Debtors to obtain

financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP

Facility reflects the exercise of their sound business judgment.

30.    More specifically, the Roll-Up is supported by the sound business judgment of the

Debtors.  The Roll-Up was a mandatory condition to the First Lien Lenders' consent to the use of

Cash Collateral and the priming of their prepetition liens, and as noted above, the Debtors were

unable to obtain any postpetition financing proposals that did not require the priming of the First

Lien Lenders' liens.  In light of the First Lien Lenders' refusal to consent to priming of their

liens by an alternate postpetition financing, and the Debtors' urgent need for use of Cash

Collateral and postpetition loan proceeds, any alternative proposals would have required

uncertain and protracted litigation, and would have been untenable.  Additionally, the DIP

Lenders' liens extend to substantially the same collateral and the rights of any creditors'

committee or other party-in-interest to challenge the First Lien Lenders' security interests during

the Challenge Period will not be affected by the Roll-Up.  Lastly, the Roll-Up will allow the

Debtors to continue with the same borrowing practices as existed prepetition – that is, as new

cash receipts enter the Debtors' system, those amounts are applied to preexisting obligations and

new money is then borrowed under the existing facility to fund operations.  The Roll-Up,

therefore, will minimize the necessity of any alterations to the Debtors' past practices in this

regard.

31.    Finally, the Second Lien Lenders have consented to the entry of the Interim

Order.  Based upon the foregoing, the Debtors respectfully request that the Court approve the

DIP Financing in accordance with the terms set forth in the DIP Orders and the DIP Loan

Documents.

**Use of Cash Collateral**

32.    In addition to the need for debtor in possession financing, the Debtors require immediate use of the Cash Collateral pending a final hearing on the Motion.  The Debtors require use of Cash Collateral to be able to pay operating expenses, including payroll, and other expenses relating to the Chapter 11 Cases.

33.    Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Prepetition Secured Lenders have consented to the Debtors' use of Cash Collateral on the terms and conditions set forth in the DIP Orders and the DIP Loan Documents.

34.    Based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in the DIP Orders and the DIP Loan Documents.

**Adequate Protection**

35.    In exchange for the Debtors' use of Cash Collateral, the Debtors have agreed to provide certain adequate protection to the Prepetition Secured Lenders.  To that end, the Debtors and the Prepetition Secured Lenders have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain protections for the Prepetition Secured Lenders' interests in the Collateral from any diminution in value, including from the implementation of the DIP Financing and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

36.    Pursuant to the DIP Orders, as adequate protection for the use of the Collateral, including the Cash Collateral, the Prepetition Secured Lenders are granted (1) valid, perfected,

postpetition security interests of the same priority as such lenders held prepetition and

replacement liens on all of the Collateral to secure an amount equal to the aggregate diminution

in the value of such lenders' interests in the Collateral and (2) superpriority administrative claim

status for any such diminution of value.

37.    The Prepetition Secured Lenders have agreed that the adequate protection

described above is sufficient to allow the Debtors to use the Collateral, including the Cash

Collateral, in connection with the Chapter 11 Cases.  Based upon the foregoing, the Debtors

respectfully request that the Court authorize the Debtors to access the Collateral, including,

without limitation, the Cash Collateral, and to provide adequate protection in accordance with

the terms set forth in the DIP Order and the DIP Loan Documents.

**Modification of the Automatic Stay**

38.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the

filing of a bankruptcy petition.  The proposed DIP Financing contemplates the modification of

the automatic stay  to the extent necessary to permit the DIP Lenders to perform any act

authorized or permitted under, or by virtue of, the DIP Orders or the DIP Loan Documents.

39.    Stay modification provisions of this type are standard features of postpetition

debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable

under the present circumstances.  Accordingly, the Debtors respectfully request that the Court

authorize the modification of the automatic stay in accordance with the terms set forth in the DIP

Orders and DIP Loan Documents.

**The Challenge Period**

40.    The Challenge Period sought by the Debtors and the DIP Lenders is shorter than

the period recommended by the Financing Guidelines.  The Debtors submit that reducing the

period in which a party-in-interest may challenge the liens of the First Lien Lenders to the

24

Challenge Period is appropriate.  The DIP Agent and the First Lien Agent have advised the Debtors that the Challenge Period must expire before proceeds of the sale of the Debtors' assets are distributed to the various lenders.  Accordingly, the Challenge Period, if it has not otherwise lapsed, will expire on the day before  the hearing to approve any sale of the Debtors' assets. Under the terms of the Stalking Horse APA, the Sale Hearing is expected to occur not later than fifty days after the Petition Date.  The Debtors', therefore, respectfully submit that any official committee of unsecured creditors or other party-in-interest will have sufficient time within which to investigate the liens of the First Lien Lenders and commence any challenge action thereto.

**Interim Approval of the DIP Financing**

41.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit under section 364 of the Bankruptcy Code may not be commenced earlier than 15 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

42.     The Debtors respectfully request that the Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtors, from the entry of the Interim Order until the Final Hearing, to obtain credit under the terms contained in the DIP Documents and to utilize Cash Collateral.

**Waiver of Bankruptcy Rules 6004(a) and (h)**

43.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

**Establishing Notice Procedures and Scheduling Final Hearing**

44.    Notice of this Motion will be given to:  (i) Edwards Wildman Palmer LLP, as counsel to JPMorgan Chase Bank, N.A., in its capacities as DIP Agent and as First Lien Agent (as defined below), Attn: Charles L. Glerum, Edwards Wildman Palmer LLP, 111 Huntington Avenue, Boston, Massachusetts 02119; (ii) Latham & Watkins LLP, as counsel to DLJ Investment Partners, L.P., DLJ Investment Partners III and L.P. IP III Plan Investors, L.P.; (iii) Patton Boggs LLP, as counsel to PineBridge Investments, Inc. and its Affiliates; (iv) Shipman & Goodwin LLP, as counsel to U.S. Bank National Association; (v) Tracy Hope Davis, Esq., the United States Trustee, Region 2; (vi) the List of Thirty Largest General Unsecured Creditors of the Debtors; (vii) the Internal Revenue Service; (viii) the United States Attorney for the Eastern District of New York; (ix) the Tax Division of the United States Department of Justice; (x) the New York State Department of Taxation and Finance, (xi) any known holders of prepetition liens and (xii) Pantech Wireless, Inc. and Pantech Co., Ltd. (collectively, the "Initial Notice Parties").  The Debtor submits that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

45.    The Debtors further respectfully request that the Court schedule the Final Hearing and authorize it to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to the Initial Notice Parties and (i) any party that has filed prior to such date a request for notices with this Court; (ii) counsel for any official committee(s); and (iii) the Securities and Exchange Commission.  The Debtors' request that the Court consider such notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code, to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

LIBNY/5255501.16

46.     No previous request for the relief sought herein has been made to this Court or any other court.

LIBNY/5255501.16

WHEREFORE, the Debtors respectfully requests that this Court enter the proposed DIP Order, in substantially the form attached hereto as <u>Exhibit A</u>, and grant the Debtors the relief requested herein along with such other relief as this Court deems just and appropriate.

Dated: August 19, 2013
      New York, New York

                                        Respectfully submitted,

                                              GOODWIN PROCTER LLP

                                              */s/ Emanuel C. Grillo*
                                              Emanuel C. Grillo
                                              Matthew Curro
                                              Christopher Newcomb
                                              The New York Times Building
                                              620 Eighth Avenue
                                              New York, NY 10018-1405
                                              Tel: 212.813.8800
                                              Fax: 212.355.3333

                                              *Proposed Attorneys for the Debtors*
                                              *and Debtors in Possession*

                                              *-and-*

                                              TOGUT, SEGAL & SEGAL LLP
                                              One Penn Plaza, Suite 3335
                                              New York, New York  10119
                                              Tel:  (212) 594-5000
                                              Frank A. Oswald
                                              David A. Paul
                                              Leo Muchnik

28