Requested Bidding Procedures Objection Deadline:  August 29, 2013 at 4:00 p.m. Prevailing Easter Time
Requested Bidding Procedures Hearing Date: September 3, 2013
Requested Sale Objection Deadline:  September 19, 2013 at 4:00 p.m. Prevailing Easter Time
Requested Sale Hearing Date:  October 8, 2013

**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel:  (212) 813-8800
Fax:  (212) 355-3333
Emanuel C. Grillo
Matthew L. Curro
Christopher Newcomb

*- and -*

**TOGUT, SEGAL & SEGAL LLP**
One Penn Plaza, Suite 3335
New York, New York  10119
Tel:  (212) 594-5000
Frank A. Oswald
David A. Paul
Leo Muchnik

*Proposed Co-Counsel to the*
*Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

————————————————————————

|  |  |  |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| PERSONAL COMMUNICATIONS DEVICES, | ) | Case No.   13- |
| LLC, *et al.*,[1] | ) |                 13- |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | |

————————————————————————

**(Bidding Procedures and Sale Motion)**

---

[1]     The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171) and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096). The Debtors' mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

**DEBTORS MOTION FOR ENTRY OF ORDERS:  (A)(I) APPROVING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; (VI) SCHEDULING A HEARING ON THE PROPOSED SALE; AND  (VII) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

Personal Communications Devices, LLC ("PCD") and Personal Communications Devices Holdings, LLC ("Holdings", and together with PCD, the "Debtors") hereby submit this motion (the "Motion") and respectfully represent as follows:

**Relief Requested**

By this Motion, the Debtors are seeking entry of two orders, as described below, pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rules 1015, 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules") and the Sale Guidelines, adopted as Administrative Order No. 557 of the United States Bankruptcy Court for the Eastern District of New York (the "Sale Guidelines").  The Debtors request entry of two orders:

(a) the first order, substantially in the form annexed hereto as Exhibit A (the "Bidding Procedures Order"), (i) approving bidding procedures (the "Bidding Procedures") substantially in the form annexed to the Bidding Procedures Order, (ii) approving the bid protections as set forth in the asset purchase agreement (the "Agreement")[2] annexed to the Bidding Procedures as

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

Exhibit 1[3] between the Debtors and Quality One Wireless, LLC ("Quality One") and Q1W Newco, LLC (the "Stalking Horse"), with respect to the proposed sale (the "Sale") of substantially all of the assets of the Debtors, (iii) scheduling a hearing (the "Approval Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iv) approving the form and manner of notice of an auction for the Purchased Assets (as defined herein) (the "Auction"), (v) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the "Assigned Contracts"); and (vi) granting related relief; and

(b) a second order, substantially in the form annexed hereto as Exhibit B (the "Sale Order"), (i) authorizing and approving the Agreement (or such other asset purchase agreement as may be selected at the Auction as the highest or best offer); (ii) authorizing the sale of substantially all of the Debtors' assets free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement; (iii) authorizing the assumption and assignment of the Assigned Contracts, and (iv) granting related relief.

In support of this Motion, the Debtors are relying on the Declaration of David Saperstein in support of this Motion, filed contemporaneously herewith or shortly thereafter, and respectfully state as follows:

**Jurisdiction**

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

---

[3]     To avoid unnecessary duplication, those exhibits to the Agreement that are copies of other motions or pleadings filed with the Bankruptcy Court have been omitted.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008, and Local Rule 6004-1.

**Background**

**A.      General Background**

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, creditors' committee, or other official committee has been appointed in the Debtors' Chapter 11 Cases.

5.      PCD is headquartered in Hauppauge, New York and engages in the business of distributing wireless communication devices and accessories, and providing value-added services to mobile device manufacturers and wireless telecom carriers.  Collectively, the Debtors act as a critical intermediary between domestic wireless carriers (e.g., Verizon Wireless, Sprint, AT&T) and various foreign, generally smaller market, wireless handset manufacturers.  In that role, PCD provides numerous product planning, logistics, reverse logistics, and after-market services that are designed to benefit and streamline the path to the end user for all sides of the wireless device supply chain.

6.      The Debtors service domestic wireless carriers by acting as the carrier's trusted partner in screening and qualifying new vendors to fill product lineups and by providing supply chain and technical services to bring those products to market.  On the other side of the supply equation, the Debtors also work directly with various foreign wireless handset manufacturers to shepherd their products through all stages of product development in the domestic carrier market.

In addition to working to bring devices to market, PCD also provides a full complement of authorized repair and warranty services to its domestic carrier clients.

7.    In 2012, the Debtors generated $1.6 billion in revenue but suffered a loss of $16.9 million on a normalized basis.  Due to a number of factors, including a shift in consumer preferences within the mobile device market and the damage inflicted upon the Debtors by their prior management, the Debtors' business has declined, such that their resulting cash flow is insufficient to meet the Debtors' debt servicing requirements.  The Debtors have sought chapter 11 protection to effect a sale of substantially all of their assets which will maximize the return to all stakeholders and preserve the maximum number of jobs for PCD's current employees.

8.    A more detailed description of the Debtors' business, capital structure, and the circumstances leading to the chapter 11 filings is set forth in the *Declaration of Raymond F. Kunzmann in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

###    B.    **The Sale Process**

9.    The Debtors believe that a sale of all or substantially all of their assets offers the highest potential recovery for all stakeholders and the best prospects for the continued operation of the Debtors' business in some form (in the hands of new ownership).  To this end, the Debtors retained BG Strategic Advisors ("BGSA") to undertake a comprehensive search to identify any and all potential buyers.  BGSA performed a comprehensive review of the marketplace and identified and contacted sixty-seven (67) potential buyers, twenty-six (26) of which expressed sufficient interest to execute non-disclosure agreements and conduct preliminary due diligence.

Ultimately, BGSA procured five (5) bids[4], and following review and analysis of each bid by the Debtors and their legal and financial advisors, the Debtors determined that the bid submitted by Quality One, an Orlando, Florida-based wireless equipment and services provider, was the highest and best offer in terms of value for the estates.   Following preliminary discussions with Quality One, on June 24, 2013, Quality One and the Debtors executed a term sheet whereby Quality One agreed to form Q1Newco, LLC for the purpose of executing the proposed Sale and serve as the Stalking Horse bidder in connection with the Debtors' efforts to market and sell their assets through these bankruptcy proceedings.

10.    Since that time, the Debtors and the Stalking Horse have engaged in extensive negotiations regarding the details of a transaction whereby the Stalking Horse would acquire the Debtor's assets subject to higher and/or better bids pursuant to Section 363 of the Bankruptcy Code.

11.    As a result of these negotiations, the Debtors and the Stalking Horse have agreed to pursue a sale of substantially all of the Debtors' assets (as defined in the Agreement, the "Purchased Assets"), subject to and pursuant to the Agreement and the Bidding Procedures detailed herein.  In order to assure that the highest and/or best transaction is achieved, once the Bidding Procedures Order is entered, the Debtors will continue to market the Purchased Assets to other potential purchasers prior to the Debtors' proceeding with an auction and sale process before the Court.

---

[4]    A sixth bid was delivered verbally, but was never reduced to writing.

C.    **The Proposed Sale**

12.    The Debtors believe that it is in the best interests of their estates to enter into the Agreement.  The following sub-paragraphs summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement:

a.    Purchase Price.  The aggregate consideration for the sale and transfer of the Purchased Assets (the "Purchase Price") shall be approximately $105,250,000.  The Purchase Price is subject to adjustment depending on the amount of the Debtors' working capital at close. See Agreement § 3.3.  As a component of the Purchase Price, the DIP Obligations and the First Lien Credit Obligations (both as defined in the *Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Secured Financing pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (B) to Utilize Cash Collateral pursuant to 11 U.S.C. § 363; (II) Granting Liens and Superpriority Claims; (III) Granting Adequate Protection to Prepetition Secured Parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "DIP Order")) will be paid in full in cash at closing by wire transfer made directly by the purchaser to the DIP Agent (as defined in the DIP Order).  In addition, the CS Term Lenders and PineBridge will receive, respectively, (i) the Credit Suisse Note and Security Agreement and the Quality One – Credit Suisse Guaranty and (ii) the PineBridge Notes and Security Agreements and the Quality One – PineBridge Guaranty, in full and final satisfaction of their claims under the Second Lien Credit Agreement.

b.    Purchased Assets.  Substantially all of the Debtors' assets, including, all properties, assets, rights, titles and interests of every kind and nature, owned, licensed or leased by the Debtors, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including without limitation, cash and cash equivalents, receivables, inventory, machinery and equipment, personal property, intellectual property assets, deposits and

7

advances, assumed executory contracts, books and records, governmental approvals, certain claims and rights to insurance proceeds, goodwill, and all other assets, properties, rights and claims related to the operations or conduct of the Debtors' business (but exclusive, in all cases, of the Excluded Assets as described in the Agreement).

        c.    <u>Assumed Liabilities</u>.  Under the Agreement, the Stalking Horse will assume certain liabilities as follows:  (i) all Liabilities of Seller under the Purchased Contracts that arise out of or relate to the period on and after the Closing Date, (ii) certain scheduled Contractual Liabilities of Seller that arose or arise out of or relate to the period prior to the Closing, (iii) the warranties and guarantees which are contractual obligations relations to the Products included in the Purchased Assets, (iv) all liabilities and obligations to be paid, performed or discharged under or with respect to the Purchase Assets (including their ownership and sale) following the Closing Date and (v) all Cure Amounts related to the Purchased Contracts assumed by Seller and assigned by Seller to Buyer.

        d.    <u>Excluded Assets</u>.  The Secured Incentive Amount, the Administrative Expense Claims Reserve Account and all funds held therein, all insurance policies, all security deposits and prepaid expenses relating solely to Contracts that are not Purchased Contracts, all professional fee retainers, the rights which accrued or will accrue to Seller under the Agreement or any agreement contemplated thereby, any Tax asset of the Seller or its Subsidiaries relating to all periods ending on or prior to the Closing Date, including all Tax Returns, all personnel records and other records that Seller is required by law to retain in its possession or is not permitted under law to provide to Buyer, all actions, claims, causes of action, rights of recovery, causes of action and rights of setoff of any kind arising before, on or after the Closing Date

relating solely to any Excluded Asset or any Excluded Liabilities, and all rights and obligations under any Contract that is not a Purchased Contract.

        e.    <u>Excluded Liabilities</u>.  Debtors shall retain all liabilities and obligations that are not Assumed Liabilities, as described in the Agreement.

        f.    <u>Books and Records</u>.  Books and Records are an Acquired Asset.  Pursuant to the Agreement, the Stalking Horse agrees to make such records available to the Debtors.

        g.    <u>Due Diligence or Financing Condition</u>.  There are no due diligence or financing conditions except for the execution and delivery of the new secured term notes.

        h.    <u>Closing and Other Deadlines</u>.  The Closing is subject to certain customary conditions.  <u>See</u> Agreement, Article  X.

        i.    <u>Termination</u>.  The rights of the Debtors and Stalking Horse to terminate the Agreement are set forth in Section 4.7 of the Agreement.

        j.    <u>Liquidated Damages</u>.  Upon signing the Agreement, the Stalking Horse shall provide the Debtors with the Escrow Deposit (in the amount of $2,500,000.00).  Upon certain events of default, all or a portion of such Escrow Deposit shall constitute the Debtors' liquidated damages and sole remedy.  <u>See</u> <u>infra</u> ¶ 24.

        k.    <u>No Stay</u>.  Relief from the fourteen day stay of Bankruptcy Rule 6004(h) is requested herein.

        l.    <u>Non-Solicitation</u>.  Section 7.10 of the Agreement provides certain limitations on the Debtors' ability to solicit offers for the Purchased Assets in the period between execution of the Agreement and entry of the Bidding Procedures Order.

        13.    The Debtors believe that the Sale will provide the best means to maximize value for all of their constituencies.  Upon approval of the Bidding Procedures, the Debtors will

continue to market their assets to and negotiate with all potential purchasers, including the

Stalking Horse, in an effort to achieve maximum value for the benefit of all of their constituents.

14.     As described above, the Debtors, after efforts to maximize value, a review of

various reorganization, liquidation and sale options and discussions with their professionals,

determined in the exercise of their reasonable business judgment that the most effective way to

maximize the value of the Debtors' estates for the benefit of all stakeholders would be (i) to enter

into the Agreement subject to higher and better bids and (ii) to proceed with the Sale process.

Accordingly, the Debtors believe that the proposed Sale will maximize the value of the Debtors'

assets for all stakeholders.

**D.     Proposed Bidding Procedures**

15.     The Bidding Procedures (as summarized below) were developed consistent with

the objective of promoting active bidding that will result in the highest or best offer for the

Purchased Assets while affording appropriate protection for the Stalking Horse.  Moreover, the

Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but

fair and open, fashion that promotes interest in the Debtors' assets by financially-capable,

motivated bidders who are likely to close the transaction.

16.     The Debtors seek to conduct an open sales process pursuant to which the winning

bidder will enter into an asset purchase agreement, substantially in the form of the Agreement,

for the purchase of substantially all of the Debtors' assets, free and clear of liens, claims, and

encumbrances, with such liens, claims and encumbrances attaching to the sale proceeds.

17.     Attached as Exhibit A to the Bidding Procedures Order are the proposed Bidding

Procedures.  The Bidding Procedures provide:  (i) the date, time and place at which the Auction

will be conducted and the method for providing notice to parties of any changes thereto; (ii) that

each bidder participating at the Auction will be required to confirm that it has not engaged in any

collusion with respect to the bidding or the Sale; (ii) that the Auction will be conducted openly, and all creditors may attend the Auction, and (iv) that bidding at the Auction will be transcribed. The Bidding Procedures are typical for asset sales of this size and nature, require a refundable, good faith deposit, and require that a bidder be a "Qualified Bidder" as defined in the Bidding Procedures.

18.     The following paragraphs in this section summarize key provisions of the Bidding Procedures, but are qualified in their entirety by reference to the actual Bidding Procedures.

a.      <u>Participation Requirements</u>.  In order to participate in the bidding process and obtain due diligence access, a potential bidder must first deliver (unless previously delivered) to the Debtors' financial advisor and counsel an executed confidentiality agreement and nondisclosure agreement in form and substance reasonably acceptable to the Debtors and no less protective of the Debtors than the Confidentiality Agreement entered into by the Debtors and Stalking Horse;

b.      <u>Qualified Bid</u>.  To be eligible to participate in the bidding process, each Qualified Bidder, other than the Stalking Horse,[5] must deliver to the Debtors, the Debtors' counsel, and the Stalking Horse's counsel, a written, irrevocable offer to be received by the Bid Deadline (defined below) and in compliance with each of the following conditions:

i.      State that the Qualified Bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the Purchased Assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Agreement (as determined by the Debtors in their business judgment and taking into account the

---

[5] For the avoidance of doubt, the Stalking Horse bid constitutes a Qualified Bid.

Bid Protections), including Payment in Full[6] of the DIP Obligations and First Lien Credit

Obligations at closing by wire transfer from the Qualified Bidder to the DIP Agent on behalf of

the DIP Lenders;

         ii.     Be accompanied by a clean and duly executed and binding

alternate purchase and sale agreement (together with the exhibits and schedules thereto, a

"Modified Agreement");

         iii.     Be accompanied by a marked Modified Agreement reflecting any

variations from the Agreement;

         iv.     Be accompanied by a list of any executory contracts or unexpired

leases that are to be assumed and/or assigned under such written offer;

         v.     Contain evidence of financing, access to funds or such other

financial and other information that will reasonably allow the Debtors to make a determination as

to such Qualified Bidder's financial and other capabilities to consummate the transactions

contemplated by the Agreement or Modified Agreement, which evidence is satisfactory to the

Debtors in their discretion including, without limitation, such financial and other information

setting forth adequate assurance of future performance under section 365 of the Bankruptcy

Code in a form requested by the Debtors;

         vi.     To the Debtors' satisfaction, (i) fully disclose the identity of each

entity that will be bidding for the Purchased Assets or otherwise participating in connection with

such bid, (ii) the terms of any such participation, and if an entity has been formed for the purpose

of acquiring some, or all, of the Purchased Assets, the parties that will bear liability for any

---

[6] "Payment in Full" or "Paid in Full" shall mean, with respect to any referenced DIP Obligations and/or First Lien Credit Obligations, (i) the indefeasible payment in full in cash of such obligations and (ii) the termination of all credit commitments under the DIP Loan Documents and/or First Lien Loan Documents, as applicable.

breach by such entity, and (iii) the ability of such parties to obtain government, licensing or regulatory approval in connection with the consummation of any proposed transaction;

vii.    State that the Written Offer is irrevocable until the closing of the transaction, if such Qualified Bidder is designated as a Successful Bidder or a Backup Bidder;

viii.    Not request or entitle the Qualified Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

ix.    Not contain any due diligence or financing contingencies as determined by the Debtors in their reasonable discretion;

x.    Provide evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Agreement or Modified Agreement to the Debtors' satisfaction;

xi.    Include a good faith deposit (the "Good Faith Deposit") in the form of a certified check, wire transfer or such other form as is acceptable to the Debtors in an amount equal to Five Million Two Hundred Fifty Thousand Dollars ($5,250,000.00);

xii.    Set forth the anticipated timeframe for (i) obtaining any required approvals, and (ii) consummating the proposed transactions;

xiii.    Include a written acknowledgement by such Qualified Bidder that it agrees to the terms of the Bidding Procedures;

xiv.    Include such other information as may be reasonably requested in writing by the Debtors at least two (2) calendar days prior to the Auction; and

xv.    Provide for a closing date (the "Closing Date") which shall be no later than 65 days after the Petition Date or such later date as is acceptable to the Debtors.

13

c.      Bid Deadline.  The deadline for submitting bids by a Qualified Bidder, other than the Stalking Horse, shall be no later than **September 28, 2013**, at 5:00 p.m. (Prevailing Eastern Time) (the "Bid Deadline").  A bid received after the Bid Deadline shall not constitute a Qualified Bid.

d.      Auction.  In the event that the Debtors receive two or more Qualified Bids by the Bid Deadline, the Debtors shall conduct an Auction of the Purchased Assets to determine the highest or otherwise best bid with respect to the Purchased Assets.  The Auction shall commence at 10:00 a.m. (Prevailing Eastern Time) no later than **October 3, 2013** at the offices of Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018.  No later than 12:00 noon (Prevailing Eastern Time) two days before the Auction, the Debtors will notify all Qualified Bidders, counsel to the Committee and counsel to the Stalking Horse whether the Auction will occur.  The following procedures shall govern any Auction:

i.      Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative;

ii.      The Debtors, in their discretion and after consultation with counsel to the official committee of unsecured creditors (the "Committee") and the DIP Agent (the "Auction Advisor Parties"), may conduct the Auction in a manner they determine will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order or the Agreement.  All such rules will provide that:  (i) the Auction procedures must be fair and open, and not intended to cause any participating Qualified Bidder to be disadvantaged in any material way as compared to any other participating Qualified Bidder, and (ii) all participating Qualified Bidders shall be entitled to be present for all bidding with the

14

understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other participating Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction.  Each bid by a Qualified Bidder at the Auction, if not inconsistent with the provisions of these Bidding-Procedures or the Agreement, shall be deemed to constitute a Qualified Bid.  Notwithstanding the foregoing, any overbid by the Stalking Horse will be credited with the amount of the Bid Protections ($5,250,000), for purposes of comparison with other bids (it being understood that, as provided in Section 9(e) of the Bidding Procedures, if the Stalking Horse is the Successful Bidder at the Auction (and the Sale Transaction is consummated), it shall not be entitled to payment of the Bid Protections);

    iii. The Debtors will arrange for the actual bidding at the Auction to be transcribed;

    iv. Each Qualified Bidder participating in the Auction will be expected to confirm at the Auction that it has not engaged in any collusion:  1) regarding these Bidding Procedures, 2) with any other Qualified Bidder, 3) with respect to the Auction, or 4) with respect to any proposed transaction relating to the Purchased Assets or a portion thereof;

    v. At the Auction, the first bid for the Purchased Assets other than the offer of Stalking Horse set forth in the Agreement shall be considered only if it exceeds the purchase price set forth in the Agreement by a minimum of (i) the amount that would be owed if the Debtors would be required to pay the Break Up Fee to the Stalking Horse (i.e., $4,250,000.00) plus (ii) cash consideration in an amount not less than $1,250,000.  Subsequently, bidding will continue in minimum increments of at least $100,000, with the specific increments for each round of bidding to be announced on the record at the Auction;

vi.        All Qualified Bidders shall have the right to, at any time, request that the Debtors announce, subject to any potential new bids, the then current highest or best bid and, to the extent requested by any Qualified Bidder, the Debtors shall use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then current highest or best bid;

vii.        In the Debtors' discretion, all Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Agreement or Modified Agreement, as applicable, at the Auction, *provided*, *however*, that any such modifications to the Agreement or Modified Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors as determined by the Debtors after consultation with the Auction Advisor Parties;

viii.        Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable, identify and determine in their business judgment (and after consultation with the Auction Advisor Parties) the highest and/or best Qualified Bid for the Purchased Assets (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder"), taking into account the Stalking Horse's entitlement to the Bid Protections, if applicable, and advise the Qualified Bidders of such determination, and require the Successful Bidder (other than Stalking Horse) to deliver an executed Agreement or Modified Agreement prior to commencement of the Approval Hearing;

ix.        In addition, the Debtors will determine which Qualified Bid, if any, is the next highest and/or best Qualified Bid and designate such Qualified Bid as a "Backup Bid" in the event the Successful Bidder fails to consummate the contemplated transaction. A Qualified Bidder that submitted a Qualified Bid that is designated a Backup Bid is a "Backup

16

Bidder". Each Backup Bid shall remain open and binding until the earlier of (i) two business days after the closing of the transaction(s) by which all of the Purchased Assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders pursuant to these Bidding Procedures and (ii) thirty (30) days after the date of the Auction[7]; and

        x.      Following the conclusion of the Auction, the Debtors may resume bidding on such procedures determined by the Debtors in their discretion for the sale of discrete assets not sold to the Successful Bidder.

        e.      <u>Approval Hearing</u>. The Approval Hearing shall be conducted by the Bankruptcy Court no later than **October 8, 2013** or on such other date as the Court may direct.

        f.      <u>Modifications</u>. At or prior to the Auction, the Bidding Procedures may be modified by the Debtors, after consultation with counsel to the Committee and the Stalking Horse, and with the consent of the DIP Agent; *provided* that all such modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction; and *provided further*, that all such modifications shall not be materially inconsistent with the Agreement. The Debtors, in their reasonable discretion, may, after consultation with counsel to the Committee and the Stalking Horse, and with the consent of the DIP Agent, (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject, at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid (other than the Stalking Horse bid) that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale; or (iii) contrary to the best interests of the Debtors, their estates, their creditors and other stakeholders.

---

[7]    For the avoidance of doubt, if the Stalking Horse bid is designated as a Backup Bid, it shall remain subject to the terms of such Agreement, including the provisions pertaining to the timing of Closing.

19.     In accordance with the terms of the Bidding Procedures and to the extent not inconsistent with the terms of the Agreement, the Debtors reserve the right (1) to cancel or postpone the Auction, the sale of the Purchased Assets or the Approval Hearing; or (2) impose additional conditions with respect to potential bidders.

20.     Notwithstanding any provision contained herein, the Stalking Horse will be deemed a Qualified Bidder.

**E.**     **Breakup Fee and Reimbursement Amount**

21.     In recognition of the Stalking Horse's substantial expenditure of time, energy and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or guaranteed minimum bid, the Debtors seek approval to pay a breakup fee (the "Breakup Fee") of $4,250,000 and an expense reimbursement not to exceed $1,000,000 (the "Reimbursement Amount," and together with the Breakup Fee, the "Bid Protections") to the Stalking Horse in the event that the Stalking Horse is not the Successful Bidder at the Auction and as provided in the Agreement.

22.     The Breakup Fee and Reimbursement Amount are required by the Agreement. The Debtors believe that the Breakup Fee and Reimbursement Amount are fair and reasonable, given the benefits to the estates of having a definitive Agreement and the risk to the Stalking Horse that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of the Debtors' estates.

23.     The Agreement and the Stalking Horse's monetary offer will form the basis upon which other bids will be submitted and evaluated.  The establishment of the Breakup Fee and Reimbursement Amount permits the Debtors to insist that competing bids for the Purchased Assets be higher or otherwise better than the purchase price under the Agreement, which is a clear benefit to the Debtors' estates.  Thus, even if the Stalking Horse is ultimately not the Successful Bidder, and is paid the Breakup Fee and Reimbursement Amount, the Debtors will

still have benefited significantly from the Agreement, due to the floor established by the Stalking Horse leading to an improved bid and increasing the likelihood that the Purchased Assets will be sold at the highest value to the Debtors' estates.

**F.** **Liquidated Damages Payable Debtors Upon Failure to Close**

24.     In connection with the execution of the Agreement, the Stalking Horse has provided a deposit in the amount of $2.5 million, which is held by BNY Mellon, National Association, as escrow agent.  In the event of a Failure to Fund, which is the failure of Closing to occur where the Debtors are not in breach of their obligations under the Agreement and all other conditions precedent to Closing have occurred (or have been waived) except for the delivery and execution of the intercreditor agreement between Credit Suisse, PineBridge and the Stalking Horse's lender, then the Debtors shall be entitled to retain fifty percent (50%) of the deposit as their liquidated damages.  In the event Closing does not occur for any reason other than (i) the foregoing or (ii) the termination of the Agreement by the Stalking Horse pursuant to any termination right specified in Section 4.7 of the Agreement or the termination of the Agreement by the parties in accordance with Section 4.7(a), then the Debtors shall be entitled to retain the entirety of the deposit as liquidated damages as the sole remedy available to the Debtors under the Agreement.

**G.** **Notice of Auction**

25.     Based on the time deadlines contained in the Agreement, the Debtors seek to have the Auction scheduled for a date no later than **October 3, 2013**.  It is imperative to move forward with the Auction and the Sale promptly because the Debtors have limited financing available to them.  Also, the Debtors' key customers, vendors and potential bidders may lose confidence in the certainty of the Sale process and the future of the Debtors' business.

26.      Within three (3) business days of the entry of the Bidding Procedures Order, the

Debtors will serve by first class mail, postage prepaid, copies of:  (i) the Bidding Procedures

Order; and (ii) the Sale Notice upon the following entities:  (a) the Office of the United States

Trustee for the Eastern District of New York; (b) counsel to the Committee; (c) counsel to the

Debtors' prepetition lenders; (d) all taxing authorities having jurisdiction over any of the

Purchased Assets subject to the sale, including the Internal Revenue Service and the Securities

and Exchange Commission; (e) the state/local environmental agencies in the jurisdictions where

the Debtors own or lease real property; (f) all parties that have requested special notice pursuant

to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bidding Procedures

Order; (g) all persons or entities known to the Debtors that have or have asserted a lien on, or

security interest in, all or any portion of the Purchased Assets; (h) all Contract Parties; (i) counsel

to the Stalking Horse; (j) all Attorneys General for the states in which the Debtors conduct

business; and (k) all potential bidders previously identified or otherwise known to the Debtors

(collectively, the "Notice Parties").  In addition, within three (3) business days of entry of the

Bidding Procedures Order the Debtors will serve copies of the Sale Notice upon all other known

creditors and parties in interest.

27.      The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if

any, to the proposed Sale:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local

Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the Eastern District

of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, P.O. Box 9013, Central

Islip, NY 11722-9013; and (d) be served so as to be received by:  (i) the Debtors; (ii) counsel to

the Debtors; (iii) counsel to the Debtors' prepetition lenders; (iv) counsel to the Committee;

(v) the Office of the United States Trustee; (vi) counsel to the Stalking Horse; and (vii) all parties

entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy

Rule 2002-1(b) on or before **September 19, 2013** at 4:00 p.m. (Eastern Time).

        H.        <u>Cure Procedures</u>

        28.        To facilitate and effect the Sale, the Debtors will be required to assume and assign

the Assigned Contracts to the Stalking Horse, or as applicable, to the Successful Bidder pursuant

to section 365 of the Bankruptcy Code.

        29.        Given the number of executory contracts and unexpired leases to which the

Debtors are a party, the Debtors seek to establish (a) procedures for determining cure amounts

through the closing date of the Sale, which amount shall include all pre- and post-petition

amounts the Debtors owe the non-debtor party under each Assigned Contract that have accrued

and not been paid prior to Closing (collectively, the "<u>Cure Amounts</u>"), and (b) the deadline for

objections to the assumption and/or assignment of contracts and leases to be assumed and/or

assigned in connection with the Sale (collectively, the "<u>Cure Procedures</u>").

        30.        The Debtors shall file with the Bankruptcy Court and serve on each non-Debtor

party to the Assigned Contracts (each a "<u>Counterparty</u>" and collectively, the "<u>Counterparties</u>") a

notice, substantially in the form annexed hereto as <u>Exhibit C</u> (a "<u>Cure Notice</u>"), listing (i) the

Assigned Contract(s); and (ii) the Cure Amount(s), if any, promptly but in no event later than

three (3) business days after entry of the Bidding Procedures Order.  Under the terms of the

Agreement, the Stalking Horse may, in its discretion, add or remove contracts and leases from

the list of Assigned Contracts to be assigned as part of the Sale.  Accordingly, if a contract or

lease is designated to be an Assigned Contract after the Debtors file and serve their initial Cure

Notice, the Debtors will file and serve a supplemental cure notice (each, a "<u>Supplemental Cure</u>

<u>Notice</u>") indicating any newly-designated Assigned Contracts and setting forth any proposed

Cure Amounts.

21

31.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assigned Contracts, the Debtors propose the following deadlines and procedures:

a.      The Counterparties shall have until 5:00 p.m. (Prevailing Eastern Time) on the date that is ten (10) days after service of the Cure Notice, (the "Contract Objection Deadline") to object to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assigned Contracts in connection with the Sale (such objection, a "Contract Objection").

b.      Each Counterparty shall have until 5:00 p.m. (Prevailing Eastern Time) on the date that is seven (7) days after service of a Supplemental Cure Notice (each, a "Supplemental Cure Notice Objection Deadline") to file and serve a Contract Objection.

c.      The Debtors reserve the right to amend any proposed Cure Amount in any Cure Notice, provided, however, that if the Debtors amend a Cure Notice to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the Counterparties to the reduced Cure Amount contract or lease shall have until seven (7) days after such amendment to file a Contract Objection (the "Amended Contract Objection Deadline").

d.      Any party objecting to (i) any Cure Amount and/or (ii) the proposed assumption and assignment of any Assigned Contract in connection with the Sale shall file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assigned Contracts(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such Assigned Contracts, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 5:00

p.m. (Prevailing Eastern Time), on the Contract Objection Deadline, the Amended Contract Objection Deadline, or the Supplemental Cure Notice Objection Deadline, as applicable. Where a Counterparty to an Assigned Contract files an objection asserting a cure amount higher than the proposed Cure Amount (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Approval Hearing, and subject to the consent of the Stalking Horse or the Successful Bidder, as applicable, of such consensual resolution, no further action or hearing shall be necessary to resolve the Disputed Cure Amount and such Assigned Contract shall be assumed and assigned as part of the Sale; (b) to the extent the parties are unable to consensually resolve the dispute prior to the Approval Hearing, then such objection will be heard at the Approval Hearing or thereafter; or (c) the Stalking Horse or the Successful Bidder, as applicable, may remove the contract to which the Contract Objection relates from the schedule of contracts to be assumed and assigned.

   e. If a Counterparty timely objects to a Supplemental Cure Notice or an amended Cure Amount, and such objection cannot be heard at the Sale Hearing, such objection will be heard by the Bankruptcy Court at a date to be determined (to the extent the parties are unable to resolve the objection consensually). The pendency of a dispute relating to Cure Amounts will not prevent or delay the assumption and assignment of any Assigned Contract as part of the Sale. If an objection is filed only with respect to the Cure Amount (as opposed to the assumption and assignment of the subject contract generally), the Debtors may file a Certificate of No Objection as to the Assigned Contract's assumption and assignment only. The Stalking Horse shall escrow in a segregated account at Closing the undisputed cure amount pending agreement of the parties or further order of the Bankruptcy Court. The Stalking Horse (or other Successful Bidder) shall be authorized to remove an Assigned Contract from the list of contracts

and leases to be assumed and assigned in the event the Bankruptcy Court makes a final determination that the applicable Cure Amount is in excess of the proposed Cure Amount.  If the Stalking Horse (or other Successful Bidder) removes a contract or lease from the list of Assigned Contracts, any Cure Amounts escrowed by the Stalking Horse (or other Successful Bidder) shall thereafter be released to the Stalking Horse (or other Successful Bidder).

32.    Unless an objection to the assumption and assignment of an Assigned Contract is filed and served before the Contract Objection Deadline, Supplemental Cure Notice Objection Deadline, or the Amended Contract Objection Deadline, as applicable, all Counterparties to the Assigned Contracts shall be (i) forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assigned Contracts, and the Debtors and the Stalking Horse, or Successful Bidder, as applicable, shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (ii) deemed to have consented to the assumption and assignment, and (iii) forever barred and estopped from asserting or claiming against the Debtors or the Stalking Horse, or the Successful Bidder, as applicable, that any additional amounts are due and owing or other defaults exist, that conditions to assignment must be satisfied under such Assigned Contracts, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Assigned Contracts.

33.    To the extent a Counterparty believes that an Assigned Contract requires such Counterparty's consent right to the assignment of such Assigned Contract to the Stalking Horse or the Successful Bidder, as applicable, such non-debtor party must raise this issue in its Contract Objection.  If no timely Contract Objection is filed, such other non-debtor parties to an Assigned

Contract shall be barred and estopped from asserting or claiming that their Assigned Contract contains an enforceable consent right.

## I.  Corporate Action

34.    The Debtors further request that no further corporate action of the Debtors or approval of any Debtor's equity security holders shall be required to authorize the Debtors to consummate the transactions contemplated by the Agreement.  Except as expressly permitted by any Orders granting this Motion, the Debtors request that all holders of claims against and interests in, and equity security holders of the Debtors be forever barred, estopped and enjoined from commencing, prosecuting or continuing in any manner any action or other proceeding of any kind against the Debtors' employees, officers or directors, or their professionals and advisors, on account of or related to the Agreement or the transactions contemplated thereby, *provided*, *however*, that nothing in any Order granting this Motion shall prevent any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

## Basis for Relief Requested

### A.  There is a Compelling Business Justification for the Sale Because It Will Maximize Value to the Debtors' Estates

35.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code in turn provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a)

25

power is proper. *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr.

S.D.N.Y. 2002).

36.     Section 363 of the Bankruptcy Code does not set forth a standard for determining

when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to

confirmation of a plan.  However, courts in this Circuit and elsewhere hold that the sale or use of

property outside the ordinary course of business should be approved where the debtors can

articulate a business justification for the transaction.  *See Comm. of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re CPJFK, LLC,* No. 10-

50566-CEC, 2011 WL 1257208, at *10-13 (Bankr. E.D.N.Y. Mar. 30, 2011) (adopting *Lionel

Corp.* standard for sound business justification); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 680

(Bankr. S.D.N.Y. 1989).  Accordingly, in the Second Circuit, as elsewhere, even the entirety of a

debtor's business may be sold prior to plan confirmation "where there is a good business reason

to do so." *In re General Motors Corp.*, 407 B.R. 463, 489-90 (Bankr. S.D.N.Y. 2009)

(discussing *Lionel*).  Whether or not there are sufficient business reasons to justify a transaction

depends upon the facts and circumstances of each case.  *Lionel*, 722 F.2d at 1071.

37.     The Debtors submit that sound business justification exists to sell the Purchased

Assets to the Successful Bidder pursuant to the Bidding Procedures.  As explained in the First

Day Declaration, the Debtors commenced these chapter 11 cases to effectuate a prompt sale of

substantially all of their assets in the belief that doing so will maximize value for all

stakeholders.  In fact, absent a prompt sale of their assets, the Debtors will not have sufficient

cash or financing to continue to operate their business.  The value of the Purchased Assets would

also likely decline absent a prompt sale given the potential lack of financing.  In addition,

without a clear exit strategy such as the proposed Sale, the Debtors risk losing the confidence of

their vendors and customers that is vital to the value of their business assets. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of all stakeholders.

38.    A prompt sale of the Debtors' business is further necessitated by the rapidly declining value of the Debtors' inventory. Wireless devices, like any other technology product, have a relatively short shelf life. Any extended delay of a sale would likely result in a significantly lower sale price because of the reduced inventory value.

39.    Moreover, the Bidding Procedures are designed to maximize the value received for the Purchased Assets. The process set forth in the Bidding Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and perform diligence. The Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Purchased Assets to market testing and permitting prospective purchasers to bid on the Purchased Assets. Consequently, the fairness and reasonableness of the consideration paid by the winning bidder will be demonstrated through a market check, which is the best means of establishing that a fair and reasonable price is being paid.

40.    The notice of Auction is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets. The notice will explain the bidding procedures, the auction process and the terms of the proposed sale contemplated by the Agreement. Indeed, the Debtors have and, upon approval of the Bidding Procedures, will continue to market the Purchased Assets and will solicit the most likely interested competing bidders. The Debtors submit that such notice is sufficient

for entry of the Sale Order and satisfies requisite notice conditions for approval of the sale under section 363(b) of the Bankruptcy Code.

41.    Under these circumstances, a compelling business justification exists for the immediate sale of the Purchased Assets outside the ordinary course of business and prior to confirmation of a plan of reorganization.  Accordingly, the Debtors submit that the proposed sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code should be approved.

**B.    The Breakup Fee and Reimbursement Amount are Reasonable and Appropriate**

42.    Bid incentives such as the Breakup Fee and Reimbursement Amount encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process.  The Debtors submit that approval of the Breakup Fee and Reimbursement Amount are justified by the facts and circumstances of these cases, whether considered under the business judgment rule or as an administrative expense of the estates.

43.    Courts in this Circuit have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," which proscribes judicial second-guessing of good-faith decisions made by a corporation's board of directors exercising its business judgment. *See*, *e.g.*, *Gey Assocs. Gen. P'Ship v. 310 Assocs. (In re 310 Assocs.), 346 F.3d 31, 34 (2d Cir. 2003); In re Integrated Resources, Inc.*, 147 B.R. 746, 752 (Bankr. S.D.N.Y. 1992)("[T]he business judgment of the Debtor is the standard applied under the law in this district"); *In re Ray Realty Fulton, Inc.*, No. 1-09-41225-DEM, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009) (break-up fee held reasonable and appropriate under business judgment rule because it offered the best means of maximizing value for benefit of debtor's estate); *see also In re Metaldyne*

*Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal citation omitted).

44.    Courts in this Circuit have held that break-up fees should be approved as long as three questions are answered in the negative: (a) is the relationship between the parties who negotiated the fee tainted by self-dealing or manipulation; (b) does the fee discourage bidding; and (c) is the amount of the fee unreasonable relative to the proposed purchase price. *In re Integrated Resources, Inc.*, 147 B.R. at 757; *In re APP Plus, Inc*., 223 B.R. 870, 875-76 (Bankr. E.D.N.Y. 1998) (citing *Integrated Resources* but adding a fourth factor taking into account "whether the proposed [break-up fee] is unduly burdensome to the estate in view of the specific facts and circumstances of [the] case and whether it is in the best interests of the estate, creditors, and equity holders."). On this point, courts within the Second Circuit have repeatedly recognized the benefits to a debtor's estate, yielded by the presence of an established stalking horse bid. *See, e.g.*, *In re 310 Assocs.*, 346 F.3d at 33 (noting that presence of stalking horse bid may encourage later bidders, and break-up fee compensates stalking horse "for the risk it shoulders in being first bidder'); *In re APP Plus, Inc.*, 223 B.R. at 874 (discussing rationale for break-up fees); *Metaldyne*, 409 B.R. at 670 ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer."). The Debtors submit that all requisite elements for approval of the Bid Protections are met here.

45.    In this case, the Break-Up Fee and Reimbursement Amount are the product of extensive efforts by the Debtor's financial advisors to market the Purchased Assets to all

potentially interested buyers, and resulted from arm's-length negotiations conducted in good faith between the Debtors and the Stalking Horse.  The Break-Up Fee and Reimbursement Amount reflect the time spent, efforts made, and resources expended by the Stalking Horse and its advisors in the due diligence and negotiation process that culminated in the Agreement.   In light of the relatively limited interest from the market at large, and the extensive diligence efforts required to value the Purchased Assets, the Bid Protections were essential to securing the Stalking Horse's commitment to participate in the Auction as the "stalking horse bidder."   The amount of the Breakup Fee ($4,250,000) and Reimbursement Amount (for itemized expenses, not to exceed $1,000,000) is appropriate in light of the Purchase Price, and is not so high that it would cause any chilling effect on other prospective purchasers, and will have no adverse effect on any creditors.  The Break-Up Fee and Reimbursement Amount are reasonable and within "market" for such fees.

46.    The Debtors' ability to offer the Breakup Fee and Reimbursement Amount enables the Debtors to ensure the sale of the Purchased Assets to a contractually-committed bidder at a price the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of an even greater return to the estates.  The Debtors and the Stalking Horse are not related, and each has acted in good faith and negotiated at arm's length throughout this process.

47.    Indeed, the Breakup Fee and Reimbursement Amount induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor on which the Debtors, their creditors and other bidders may rely.  Approval of the Bid Protections is all the more appropriate where, as here, the Debtors will afford the Debtors the ability to shop the Purchased Assets for a higher or better offer without risk of losing the Stalking Horse Purchaser.  *In re Global Crossing,*

*Ltd.*, 295 B.R. 726, 745-46 (Bankr. S.D.N.Y. 2003). The Debtors' ability to do so would be eliminated, however, if the Debtors are not authorized to pay the Breakup Fee and Reimbursement Amount. Absent authorization of the payment of the Breakup Fee and Reimbursement Amount, the Debtors might lose the opportunity to obtain the highest and best available offer for the Purchased Assets and the downside protection that will be afforded by the Agreement.

48.    Courts have considered break-up fees to be administrative expenses of debtors' estates, as they are "an actual and necessary cost and expense of preserving the debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code." *See In re Ray Realty Fulton, Inc.*, Case No. 09-41225, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009); *see also In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2008) (break-up fee, if triggered, deemed an actual and necessary cost and expense of preserving the debtors' estates, within the meaning of section 503 of the Bankruptcy Code); *In re Fortunoff Fine Jewelry and Silverware, LLC*, No. 08–10353, 2008 WL 618983, at *2 (Bankr. S.D.N.Y. Feb. 22, 2008) (purchasers granted an allowed administrative claim in the debtors' chapter 11 cases in an amount equal to the break-up fee).

49.    Here, the Debtors' customers and employees will take comfort that the Stalking Horse's bid will ensure the continuation of the Debtors' business. Moreover, the Stalking Horse has provided a material benefit to the Debtors and their creditors in the form of a baseline value for the Purchased Assets, which increases the likelihood that the Auction will yield the best possible price. Both the Debtors and the Stalking Horse, as parties to the Agreement, agree that the protections afforded by the Breakup Fee and Reimbursement Amount are an integral part of the bargain. Accordingly, approval of the Bidding Procedures, including the Breakup Fee and

31

Reimbursement Amount, is a bargained-for condition to the Stalking Horse's obligation to proceed with the transaction contemplated in the Agreement. *See In re Reliant Energy Channelview, L.P.*, 594 F.3d 200 (3d Cir. 2010).

50.     For the foregoing reasons, the Debtors request (1) that the payment of the Break-Up Fee and the Reimbursement Amount under the conditions set forth in the Agreement be approved as a superpriority administrative expense with priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, and (2) that the Court approve and authorize payment of the Breakup Fee and Reimbursement Amount pursuant to the terms of the Agreement in the event that the Stalking Horse is not the Successful Bidder at the Auction.

### C.      The Sale is Proposed in "Good Faith" as Contemplated By Section 363(m) of the Bankruptcy Code

51.     The Agreement is the product of extensive arm's length negotiations between the Debtors and the Stalking Horse.  In addition, the Debtors intend to negotiate any other asset purchase agreement at arm's length and in good faith and, thus, believe that any Successful Bidder, including the Stalking Horse, should be entitled to the protections of section 363(m) of the Bankruptcy Code.

52.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b)…of this section of a sale…of property does not affect the validity of a sale…under such authorization to an entity that purchased…such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale…were stayed pending appeal.

11 U.S.C. § 363(m).

53.     Section 363(m) of the Bankruptcy Code thus protects a good faith purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms,

section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Purchased Assets.

54.     The Second Circuit instructs that a party would have to show fraud or collusion between a purchaser and the debtor-in-possession or trustee to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.*, 111 F.3d 269, 273 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser's] good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (internal citations omitted); see also *In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).  No such facts exist here.

55.     To the contrary, the Debtors submit, and will present evidence at the Approval Hearing, if necessary, that as set forth above, the Agreement was an arm's-length transaction, in which the Successful Bidder acted in good faith.  The Auction is an open sale process, with the Purchased Assets to be sold to the bidder who submits the highest and best bid per the terms set forth in the Sale Guidelines, and the Debtors will have their own separate legal counsel to negotiate on their behalf throughout the Auction and the Sale.  Accordingly, the Debtors request that the Court make the finding at the Approval Hearing that the Successful Bidder has purchased the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**D.      The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Claims, Interests, and other Encumbrances**

56.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property

if any of the following criteria are met:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met); see also *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

57.    In addition, several courts have held that section 363(f) grants bankruptcy courts the power to convey assets free and clear of all pre-petition claims.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) (collecting cases and discussing need to extinguish pre-petition claims in order to facilitate sale of assets for maximum value) ("Authorizing the sale [of debtor's assets] free and clear of…successor liability claims achieves the purpose of section 363 intended by Congress."). Furthermore, other courts, concluding that section 363(f) does not empower them to convey assets free and clear of pre-petition claims, have nonetheless held that Bankruptcy Code section 105(a) provides them with the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See*, *e.g.*, *In re General Motors Corp.*, 407 B.R. 463, 499-504 (Bankr. S.D.N.Y. 2009) (discussing Second Circuit precedent permitting sale of assets "free and clear" of successor liability claims pursuant to section 363(f) and 105(a))

(internal citations omitted); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

58.     The Debtors expect that proposed sale of the Purchased Assets will satisfy, at minimum, the second and fifth requirement of section 363(f) of the Bankruptcy Code, if not others as well.  Holders of liens, claims or interests in or against the Purchased Assets will be adequately protected because their liens, claims and/or interests will attach to the proceeds of the sale with the same force, effect, and priority as their prior liens, claims and/or interest in the Purchased Assets, subject to any defenses the Debtors may possess with respect thereto. Notwithstanding the foregoing, the Debtors have negotiated with the DIP Agent on behalf of the DIP Lenders and the First Lien Agent on behalf of the First Lien Lenders, and said parties consent to the Bidding Procedures and Sale Motion is expressly conditioned upon the Payment in Full of the DIP Obligations and First Lien Credit Obligations by wire transfer directly from the purchaser to the DIP Agent at Closing.  The Debtors have agreed to these terms.  Accordingly, sale of the Purchased Assets free and clear of all adverse interests is warranted and the Sale should be approved under section 363(f) of the Bankruptcy Code.

**E.     The Assumption and Assignment of Assumed Contracts Should be Authorized, and the Cure Procedures Provide Adequate Notice and Opportunity to Object and Should Therefore be Approved**

59.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See*, *e.g.*, *In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or

rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523 (1943).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Stable Mews Assoc.*, 41 B.R. at 596.  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311  (5th Cir. 1985).   Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

60.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

61.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract…only if the trustee assumes such contract…and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See In re Sapolin Paints, Inc.,* 5 B.R. 412, 420–21 (Bankr.E.D.N.Y.1980); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

62.    Additionally, as set forth above, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11, *provided* that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *See Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Accordingly, pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See*, *e.g.*, *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

63.    The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assigned Contracts with adequate notice in the form of the Cure Notice, of the proposed assumption and/or assignment of their respective contract, as well as proposed Cure Amounts, if applicable.  Such non-Debtor

parties to the Assigned Contracts will then be given an opportunity to object to such notice.  The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues).

64.    As explained in the First Day Declaration, a significant component of the value in the Debtors' estates lies in the relationships with other parties up and down the supply chain for wireless devices.  The Cure Notice and associated Procedures are necessary to give assurance to the Debtors' vendors, customers, and other contractual counterparties that their interests will not be unduly harmed by these proceedings, and thereby preserve value for the estates.  Accordingly, the Debtors submit that implementation of the proposed Cure Procedures is appropriate in these cases.

<b><u>"Extraordinary Provisions" of the Sale Under the Sale Guidelines</u></b>

65.    The Agreement contains certain provisions designated "extraordinary" under the Sale Guidelines.  In each instance, as explained more fully below, the Debtors believe that the "extraordinary provisions" are necessary components of the Sale and will serve to ensure that the Purchased Assets are sold through a process that is both prompt and for the highest possible value.

66.    The Agreement contains the following "Extraordinary Provisions" as per the Sale Guidelines:

**A.    <u>Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h)</u>**

67.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of fourteen (14) days after entry of the order,

unless the court orders otherwise." The Debtors hereby request that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) is waived.

68.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id*.

69.    A prompt closing of the Sale is of critical importance to the continued stability of the Debtors' business and the preservation of value for the estates. As explained in the First Day Declaration, the Debtors rely on their relationships with other participants in the supply chain for wireless devices. Based on their experience operating the business, the Debtors believe with good cause that consummating a sale transaction as soon as practicable is necessary to maintain value. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## B.    No Successor Liability for the Successful Bidder

70.    The Debtors request that the Court enter an order authorizing the Purchased Assets to be sold free and clear of all liens, claims, interests and encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code. In addition, the Debtors submit that the Purchased Assets may be sold free and clear of claims, including successor liability claims, if

any, as no Successful Bidder will, as a result of any action taken in connection with the purchase of the Purchased Assets: (a) be a successor to the Debtors; (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  To the contrary, as explained in the First Day Declaration, the Debtors have commenced these chapter 11 proceedings for the purpose of selling all or substantially all of their assets to an outside buyer prior to a liquidation of their remaining Excluded Assets and the wind-up of any remaining operations.  The Purchased Assets will pass to the Successful Bidder and any employees of the Debtors who join the Successful Bidder following the Sale will do so on terms acceptable to the Successful Bidder and only the Successful Bidder.

71.    It is the intention of the Debtors that PCD and PCD Holdings will cease to exist following the conclusion of these chapter 11 proceedings and that the Purchased Assets will be acquired and operated or used as part of the business activities of an independent Successful Bidder.  Moreover, the ability to acquire the Purchased Assets free and clear of any successor liability claims is a critical component of the bargain reflected in the Agreement; it will bring stability and finality to the purchase of Purchased Assets via the Sale, and thus enhances the ultimate value of the Purchased Assets to the Successful Bidder, and, by extension, to the estates.

### C.    The Proposed Sale Does Not Constitute a Fraudulent Transfer

72.    The Debtors request a finding in the Sale Order that the Agreement (or any alternative agreement between the Debtors and a Successful Bidder) was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and that no Debtor or Buyer is entering into the Sale transaction fraudulently.

LIBNY/5254747.18

73.    As set forth herein, the Debtors have structured the Sale Guidelines, Bidding Procedures and Sale Process to ensure that the resulting Sale will be an arm's-length transaction yielding the highest and best value for the Purchased Assets.  In addition, the Debtors and their advisors have undertaken a comprehensive review of the market to identify all potentially interested buyers so as to ensure the maximum number of participants in the Auction.  There are no contemplated bids by any insiders of the Debtors and all of the Debtor's pre-petition secured lenders have agreed to the terms of the Agreement.  Accordingly, the Debtors submit that good cause exists for a finding that the proposed Sale does not constitute a fraudulent transfer.

**D.    The Successful Bid is Fair Consideration for the Purchased Assets and Receipt of the Assigned Contracts**

74.    The Debtors request a finding in the Sale Order that the consideration provided by the Successful Bidder to the Debtors for its purchase of the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act.  As set forth herein, the Debtors have structured the Sale Guidelines, Bidding Procedures and Sale Process to ensure that the resulting Sale will be an arms-length transaction yielding the highest and best value for the Purchased Assets.  The eventual sale price for the Purchased Assets will have been twice subjected to a market check; first by way of BGSA's marketing of the Purchased Assets and efforts to identify potential bidders, a process that resulted in the identification of the Stalking Horse and the negotiation of the Stalking Horse bid, and second, through the open and competitive Auction process.  The Debtors submit that these steps will ensure that the eventual price paid by the Successful Bidder will constitute the highest and best value for the Purchased Assets, and thus fair consideration.

41

75.      In addition, a finding that the purchase price constitutes fair consideration is an important part of the bargain reflected in the Agreement; it will bring stability and finality to the purchase of the Purchased Assets via the Sale, and thus enhances the ultimate value of the Purchased Assets to the Successful Bidder, and, by extension, to the estates.  For these reasons, the Debtors submit that good cause exists for a finding that  the consideration provided by the Successful Bidder to the Debtors for its purchase of the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

**E.**      **Any Actions Against the Successful Bidder Arising Out of the Sale Should be Enjoined**

76.      The Debtors request that, as part of the Sale Order, the Court order that all persons and entities be forever barred and permanently enjoined from taking any actions against the ultimate buyer or their affiliates (as they existed immediately prior to closing) to recover any claim which such person has against the Debtors.  Notwithstanding the foregoing, the Debtors do not seek any order (1) preventing such persons or entities from pursuing an action against the Successful Bidder under the terms of any applicable agreement or related documents for purchase of the Purchased Assets; or (2) barring any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

77.      The foregoing injunction provisions are an integral part of the bargain reflected in the Agreement.  In in the interests of bringing greater stability and finality to the transfer of the Purchased Assets pursuant to the Sale, the Debtors submit that entry of an order in the form described above is justified in the interest of maximizing the value of the Purchased Assets to the estates.

**No Prior Request**

78.    No prior Motion for the relief requested herein has been made to this or any other court.

**Notice**

79.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Debtors' prepetition lender; (c) all taxing authorities having jurisdiction over any of the Purchased Assets subject to the sale, including the Internal Revenue Service and the Securities and Exchange Commission; (d) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (e) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of this order; (f) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Purchased Assets; (g) all Contract Parties; (h) counsel to the Stalking Horse; (i) all Attorneys General for the states in which the Debtors conduct business; (j) all potential bidders previously identified or otherwise known to the Debtors; and (k) all other known creditors and parties in interest.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[Remainder of Page Intentionally Left Blank]

LIBNY/5254747.18

## Conclusion

**WHEREFORE**, the Debtors respectfully request that this Court enter an order granting the relief requested herein and that it grant the Debtors such other and further relief as is just and proper.

Dated:     August 19, 2013
           New York, New York

/s/  Emanuel C. Grillo

**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel:  (212) 813-8800
Fax:  (212) 355-3333
Emanuel C. Grillo
Matthew L. Curro
Christopher Newcomb

*- and -*

**TOGUT, SEGAL & SEGAL LLP**
One Penn Plaza, Suite 3335
New York, New York  10119
Tel:  (212) 594-5000
Frank A. Oswald
David A. Paul
Leo Muchnik

*Proposed Co-Counsel to the*
*Debtors and Debtors in Possession*

LIBNY/5254747.18