**<u>Exhibit A to Bidding Procedures/Sale Motion</u>**

Bidding Procedures Order

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| PERSONAL COMMUNICATIONS | ) | Case No.  13- |
| DEVICES, LLC, *et al.*,[1] | ) | 13- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**ORDER (I) APPROVING BIDDING PROCEDURES RELATING
TO SALE OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS,
(III) SCHEDULING A HEARING TO CONSIDER THE SALE; (IV) APPROVING THE FORM
AND MANNER OF NOTICE OF SALE BY AUCTION; (V) ESTABLISHING PROCEDURES FOR
NOTICING AND DETERMINING CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Bidding Procedures and Sale Motion") of Personal

Communications Devices, LLC ("PCD") and Personal Communications Devices Holdings, LLC

("Holdings", and together with PCD, the "Debtors") for entry of an Order (i) approving bidding

procedures (the "Bidding Procedures") substantially in the form annexed to this Bidding

Procedures Order, (ii) approving the bid protections as set forth in the asset purchase agreement

(the "Agreement") annexed to the Bidding Procedures as Exhibit 1 between the Debtors, Q1W

Newco, LLC and Quality One Wireless, LLC (together, the "Stalking Horse"), with respect to

the proposed sale (the "Sale") of substantially all of the assets of the Debtors, (iii) scheduling a

hearing (the "Bidding Procedures Hearing") on the Bidding Procedures and setting objection and

bidding deadlines with respect to the Sale, (iv) approving the form and manner of notice of an

auction (the "Auction") for the sale of substantially all of the Debtor's assets (as defined in the

Agreement, the "Purchased Assets"), (v) establishing procedures to determine cure amounts and

---

[1]      The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax
identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171)
and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096).  The Debtors'
mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the "Assigned Contracts"); (vi) scheduling a hearing to approve the sale of the Debtors' assets, and (vii) granting related relief; (the "Bidding Procedures Order");[2] and it appearing that this Court has jurisdiction over the Bidding Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(a); this Court having considered the Bidding Procedures Motion; and it appearing that the relief requested in the Bidding Procedures Motion is in the best interests of the Debtors' bankruptcy estates, their creditors and other parties-in-interest; and after due deliberation and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.    Notice of the Bidding Procedures Motion was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of 11 U.S.C. §§ 102 and 363, Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure, and any other applicable provisions of title 11 of the United States Code (the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure.

B.    The Bidding Procedures attached hereto as Exhibit A are reasonable and appropriate under the circumstances of these chapter 11 cases.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

C.    All objections to the relief requested in the Bidding Procedures Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Bidding Procedures Motion or the Agreement as the case may be.

D.      The Breakup Fee and Reimbursement Amount (together, the "<u>Bid Protections</u>") to be paid under the circumstances described herein and in the Agreement are (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse, (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse, and (iv) necessary to induce the Stalking Horse to continue to pursue the sale transaction and to continue to be bound by the Agreement.  In addition, the liquidated damages provided under Section 13.2 of the Agreement are necessary and appropriate under the circumstances, and were a material inducement to the Stalking Horse entering into the Agreement.

E.      The Bid Protections also induced the Stalking Horse to submit a bid that will not only serve as a minimum floor bid on which the Debtors, their creditors, and other bidders may rely, but also provide the Debtors with the opportunity to sell their business on a "going concern" basis for the benefit of all parties.  The Stalking Horse has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible price for the Purchased Assets will be received.  Accordingly, the Bidding Procedures and the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estate.

F.      The *Notice of Bidding Procedures, Auction and Sale Hearing* substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Bidding Procedures and Sale Notice</u>") and the Cure Notice attached as <u>Exhibit C to the Bidding Procedures and Sale Motion</u> each provide adequate

notice concerning the proposed sale of the Purchased Assets and the proposed assumption and assignment of the Assigned Contracts, as contemplated in the Agreement, that are the property of the Debtors, and are intended to and do in fact provide due and adequate notice of the relief sought in the Sale Motion.

**IT IS HEREBY ORDERED THAT**:

1.      The relief requested in the Bidding Procedures Motion is granted as set forth in this Bidding Procedures Order.

2.      The Bidding Procedures as set forth on the attached Exhibit A are approved in their entirety, and are incorporated herein by reference.

3.      The proposed sale of the Purchased Assets, the proposed assumption and assignment of the Assigned Contracts, the Auction (as defined below), and the Approval Hearing shall be conducted in accordance with the provisions of this Bidding Procedures Order and the Bidding Procedures.

4.      The Bid Protections as set forth in the Agreement are hereby approved in their entirety.  If the Stalking Horse becomes entitled to payment of the Bid Protections under the Agreement, (i) such amounts shall be paid in accordance with and pursuant to the terms of the Agreement, without further action or order by the Bankruptcy Court and (ii) the Stalking Horse shall be, and hereby is, granted an allowed Superpriority Claim in an amount equal to the Bid Protections; *provided*, *however*, that such Superpriority Claim shall be junior and subordinate only to the DIP Superpriority Claims and the First Lien Adequate Protection Superpriority Claims (as such terms are defined in the DIP Financing Order).  Notwithstanding the foregoing and anything contained to the contrary in the Agreement, the Bid Protections shall be paid only after the DIP Obligations and First Lien Credit Obligations are Paid in Full.  The liquidated

damages provided for under Section 13.2(b) of the Agreement are hereby approved and shall constitute the Debtors' sole remedy for a breach of the Agreement by the Stalking Horse, as further provided in the Agreement.

5.       Within three (3) business days following entry of this Bidding Procedures Order, the Debtors shall serve by first-class mail the Bidding Procedures and Sale Notice on (a) the U.S. Trustee; (b) counsel to any official committee of unsecured creditors that may be appointed in this case (the "Committee"); (c) all parties known to be asserting a lien on any of the Debtors' assets; (d) all known vendors, suppliers, customers, lenders, contract, license and lease counterparties; (e) all entities known to have expressed an interest in acquiring any of the Purchased Assets; (f) the United States Attorney's office; (g) all state attorneys general in states in which the Debtors do business; (h) various federal and state agencies and authorities asserting jurisdiction over the Purchased Assets, including the Internal Revenue Service and the Securities and Exchange Commission; (i) the Stalking Horse and its counsel; (j) all other parties that have filed a notice of appearance and demand for service of papers in the Debtors' chapter 11 case under Bankruptcy Rule 2002 as of the date of filing the Motion; and (k) all other known creditors and parties in interest (the "Notice Parties").

6.       The following Cure Procedures hereby are approved:

a.    Promptly but in no event later than three (3) business days after entry of this Bidding Procedures Order, the Debtors shall file with the Bankruptcy Court and serve on each non-Debtor party to the Assigned Contracts (each a "Counterparty" and collectively, the "Counterparties") a notice, substantially in the form annexed as Exhibit C to the Bidding Procedures and Sale Motion (a "Cure Notice"), listing (i) the Assigned Contract(s); and (ii) the Cure Amount(s), if any.  Pursuant to the terms of the Agreement, the Stalking Horse may designate a contract or lease to be an Assigned Contract after the Debtors file and serve their initial Cure Notice, provided that the Debtors will file and serve a supplemental cure notice (each, a "Supplemental Cure Notice") indicating any newly-designated Assigned Contracts and setting forth any proposed Cure Amounts.

b.  The Counterparties shall have until 5:00 p.m. (Prevailing Eastern Time) on the date that is ten (10) days after service of the Cure Notice, (the "Contract Objection Deadline") to object to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assigned Contracts in connection with the Sale (such objection, a "Contract Objection").

c.  Each Counterparty shall have until 5:00 p.m. (Prevailing Eastern Time) on the date that is seven (7) days after service of a Supplemental Cure Notice (each, a "Supplemental Cure Notice Objection Deadline") to file and serve a Contract Objection.

d.  The Debtors reserve the right to amend any proposed Cure Amount in any Cure Notice, *provided, however*, that if the Debtors amend a Cure Notice to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the Counterparties to the reduced Cure Amount contract or lease shall have until seven (7) days after such amendment to file an objection to such reduced Cure Amount (the "Amended Contract Objection Deadline").

7.      Any party objecting to (i) any Cure Amount and/or (ii) the proposed assumption and assignment of any Assigned Contract in connection with the Sale shall file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assigned Contracts(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such Assigned Contracts, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 5:00 p.m. (Prevailing Eastern Time), on the Contract Objection Deadline, the Amended Contract Objection Deadline, or the Supplemental Cure Notice Objection Deadline, as applicable.  Where a Counterparty to an Assigned Contract files an objection asserting a cure amount higher than the proposed Cure Amount (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Approval Hearing, and subject to the consent of the Stalking Horse or the Successful Bidder, as applicable, of such consensual resolution, no further action or hearing shall be necessary to resolve the Disputed

Cure Amount and such Assigned Contract shall be assumed and assigned as part of the Sale; (b) to the extent the parties are unable to consensually resolve the dispute prior to the Approval Hearing, then such objection will be heard at the Approval Hearing or thereafter; or (c) the Stalking Horse or the Successful Bidder, as applicable, may remove the contract to which the Contract Objection relates from the schedule of contracts to be assumed and assigned.

8.      If a Counterparty timely objects to a Supplemental Cure Notice or an amended Cure Amount, and such objection cannot be heard at the Sale Hearing, such objection will be heard by the Bankruptcy Court at a date to be determined (to the extent the parties are unable to resolve the objection consensually).  The pendency of a dispute relating to Cure Amounts will not prevent or delay the assumption and assignment of any Assigned Contract as part of the Sale. If an objection is filed only with respect to the Cure Amount (as opposed to the assumption and assignment of the subject contract generally), the Debtors may file a Certificate of No Objection as to the Assigned Contract's assumption and assignment only.  The Stalking Horse shall escrow in a segregated amount at Closing the undisputed cure amount pending agreement of the parties or further order of the Bankruptcy Court.  The Stalking Horse (or other Successful Bidder) shall be authorized to remove an Assigned Contract from the list of contracts and leases to be assumed and assigned in the event the Bankruptcy Court makes a final determination that the applicable Cure Amount is in excess of the proposed Cure Amount.  If the Stalking Horse (or other Successful Bidder) removes a contract or lease from the list of Assigned Contracts, any Cure Amounts escrowed by the Stalking Horse (or other Successful Bidder) shall thereafter be released to the Stalking Horse (or other Successful Bidder).

9.      Unless an objection to the assumption and assignment of an Assigned Contract is filed and served before the Contract Objection Deadline, Supplemental Cure Notice Objection

Deadline, or the Amended Contract Objection Deadline, as applicable, all Counterparties to the Assigned Contracts shall be (i) forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assigned Contracts, and the Debtors and the Stalking Horse, or Successful Bidder, as applicable, shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (ii) deemed to have consented to the assumption and assignment, and (iii) forever barred and estopped from asserting or claiming against the Debtors, their estates, and the Stalking Horse (or the Successful Bidder), as applicable, that any additional amounts are due and owing or other defaults exist, that conditions to assignment must be satisfied under such Assigned Contracts, including, without limitation, any consent rights, or that there is any objection or defense to the assumption and assignment of such Assigned Contracts.  Notwithstanding anything to the contrary, no executory contract or unexpired lease will be assumed unless and until the occurrence of the Closing Date and in accordance with the terms of this Bidding Procedures Order and the Agreement, including, without limitation, the Purchasers' rights to exclude certain contracts from assumption and assignment by providing written notice to the Debtors and the Counterparty to any such agreements at least one (1) Business Day prior to the Auction.

10.    Any other objections to the relief requested at the Approval Hearing or to the proposed form of order (the "Sale Order") attached as Exhibit B to the Bidding Procedures and Sale Motion shall be in writing, shall state the basis of such objection with specificity, and shall be filed with the Court on or before _____, 2013 at 5:00 p.m. (Prevailing Eastern Time), and served in accordance with the Notice of Bidding Procedures, Auction and Sale Hearing so as to be received by (a) counsel for the Debtors; (b) counsel for any official committee(s) appointed in the Debtors' cases; (c) the United States Trustee; and (d) counsel for the Stalking Horse.

11.     Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed sale of the Purchased Assets, the contemplated assumption and assignment of the Assigned Contracts and proposed amount of any Cure Amounts, and no additional notice of such contemplated transactions need be given.

12.     If the Debtors receive more than one Qualified Bid (as defined in the Bidding Procedures), an auction (the "Auction") will be held on _____, 2013 at 10:00 a.m. (Prevailing Eastern Time), at the offices of Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, or at any such other location as the Debtors may hereafter designate.

13.     Counsel to the Debtors are authorized to hold and conduct the Auction in accordance with the Bidding Procedures.

14.     The hearing regarding the acceptance of the Successful Bid(s) and Backup Bid(s) shall be held on _____, 2013, at _____ p.m. (Prevailing Eastern Time) (the "Approval Hearing") in the Courtroom of the Honorable _____, 2013 and, subject to the terms of the Agreement, may be adjourned from time to time without further notice other than an announcement in open court at the Approval Hearing.

15.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) and 7062 or otherwise, the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Bidding Procedures Order.

16.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Bidding Procedures Order.

Dated: _____, 2013

_____

UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A to Bidding Procedures Order</u>**

Bidding Procedures

## **BIDDING PROCEDURES**

These bidding procedures (the "Bidding Procedures") set forth the process by which Personal Communications Devices, LLC and Personal Communications Devices Holdings, LLC (collectively, the "Debtors") shall market their assets to interested parties and conduct a sale by auction (the "Auction").

On [_____] 2013, the Debtors filed their *Motion for Entry of Orders (A)(I) Approving Bidding Procedures Relating to the Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of the Debtors' Assets; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Bidding Procedures and Sale Motion") [Docket No. ____]. On [_____], 2013, the Bankruptcy Court entered an *Order (I) Approving Bidding Procedures Relating to the Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale by Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief* [Docket No. ____] thereby approving these Bidding Procedures and the Bid Protections.

The Debtors, Q1W Newco, LLC and Quality One Wireless LLC (together, the "Stalking Horse") have entered into an asset purchase agreement (the "Agreement"), attached as Exhibit 1, for the sale of substantially all of the Debtors' assets (as defined in the Agreement, the "Purchased Assets"). Capitalized terms used in these Bidding Procedures and not otherwise defined shall have the meanings ascribed to such terms in the Agreement.

Any party desiring to obtain a copy of the Agreement or a form of Non-Disclosure Agreement (as defined below) may do so by contacting the Debtors' counsel at:

Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
Attn:   Matthew L. Curro (mcurro@goodwinprocter.com)
         Eugenia Tzakas (etzakas@goodwinprocter.com)
Tel:  (212) 813-8800
Fax:  (212) 355-3333

The Debtors provide these Bidding Procedures for use by Potential Bidders (as defined below) and Qualified Bidders (as defined below) in submitting bids proposing a transaction to purchase or otherwise acquire substantially all of the Purchased Assets, and, as necessary, qualifying for and participating in the Auction.

1.      **Important Dates**

The Debtors shall:

- Assist Qualified Bidders in conducting their reasonable due diligence investigations;

- Negotiate, solicit and entertain offers for the sale of the Purchased Assets pursuant to the terms of these Bidding Procedures;

- Accept Written Offers (as defined below) from Qualified Bidders (as defined below) until [__] p.m. (Prevailing Eastern Time) on **September 28, 2013**;

- Select the Successful Bidder and Backup Bidder(s) (each as defined below) at the conclusion of the Auction to be held on **October 3, 2013** at 10:00 a.m. (Prevailing Eastern Time); and

- Seek authority to sell assets to such Successful Bidder(s) at a hearing before the Bankruptcy Court (the "Approval Hearing"), to be held on **October 8, 2013** at 2:00 p.m. (Prevailing Eastern Time).

2.      **Assets to be Sold**

The Debtors seek to sell substantially all of their assets in their entirety as a going concern.

3.      **Qualified Bidders, Non-Disclosure Agreements and Access to Data Room**

Any person or entity wishing to bid on the Purchased Assets (each a "Potential Bidder") must deliver (unless previously delivered) to the Debtors a confidentiality and non-disclosure agreement (a "Non-Disclosure Agreement") in form and substance no less protective of the Debtor than the confidentiality and nondisclosure agreement entered into by the Debtors and the Stalking Horse.

The Debtors will afford any Potential Bidder who fully executes and delivers a Non-Disclosure Agreement such reasonable due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate. The Debtors will coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders. The Debtors shall not be obligated to furnish any due diligence information after the conclusion of the Auction. Neither the Debtors nor their advisors are responsible for, or will bear liability with respect to, any information obtained by Potential Bidders in connection with due diligence. Notwithstanding anything contained herein to the contrary, the Debtors will decide what, if any, diligence information to make available to a particular Potential Bidder in their business judgment, and neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

Potential Bidders seeking information about the qualification process should contact counsel to the Debtors:

Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
Attn:  Emanuel C. Grillo (egrillo@goodwinprocter.com)
          Matthew L. Curro (mcurro@goodwinprocter.com)
Tel:  (212) 813-8800
Fax:  (212) 355-3333

A "Qualified Bidder" is a Potential Bidder that (a) delivers a fully executed Non-Disclosure Agreement, (b) demonstrates to the Debtors a reasonable likelihood of the ability to close on the proposed transaction in a timely manner (including the financial capability of the Potential Bidder to consummate the proposed transaction for the Purchased Assets and the ability to receive the necessary governmental, licensing, regulatory, or other approvals necessary for such proposed transaction), (c) agrees that as a component of the Purchase Price, it will provide for Payment in Full of the DIP Obligations and First Lien Credit Obligations by wire transfer at the Closing directly to the DIP Agent, and (d) submits a Qualified Bid as set forth below.  As promptly as practicable after a Potential Bidder delivers a Non-Disclosure Agreement, and in all events by not later than noon (Prevailing Eastern Time) on the day preceding the Auction, the Debtors shall determine, and shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder.  By not later noon (Prevailing Eastern Time) on the day preceding the Auction, the Debtors shall provide copies of all Qualified Bids (as defined below) to the Stalking Horse and to each other Qualified Bidder that has submitted a Qualified Bid.

Qualified Bidders requesting information in connection with their due diligence should contact the Debtors.  Notwithstanding the foregoing or anything else in these Bidding Procedures, the Stalking Horse (or any designated Affiliate thereof) is hereby determined to be a Qualified Bidder for all purposes at the Auction.

4.     **Requirements for a Qualified Bid**

In order to participate in the Auction, if any, a Qualified Bidder must deliver to the Debtors a written offer (each, a "Written Offer"), which in order to be deemed a "Qualified Bid," must meet each of the requirements listed below:

(a)     State that the Qualified Bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Agreement (as determined by the Debtors in their business judgment, and taking into account the Bid Protections) and in any event, must include as a component of the Purchase Price, Payment in Full of the DIP Obligations and the First Lien Credit Obligations by wire transfer at the Closing;

(b)     Be accompanied by a clean and duly executed and binding Agreement or alternate purchase and sale agreement (together with the exhibits and schedules thereto, a "Modified Agreement");

(c)    Be accompanied by a marked Modified Agreement reflecting any variations from the Agreement;

(d)    Be accompanied by a list of any executory contracts or unexpired leases that are to be assumed and/or assigned under such Written Offer;

(e)    Contain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Agreement or Modified Agreement, which evidence is satisfactory to the Debtors in their discretion including, without limitation, such financial and other information setting forth adequate assurance of future performance under section 365 of title 11 of the Bankruptcy Code in a form requested by the Debtors;

(f)    To the Debtors' satisfaction, (i) fully disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such bid, (ii) the terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the assets, the parties that will bear liability for any breach by such entity, and (iii) the ability of such parties to obtain government, licensing or regulatory approval in connection with the consummation of any proposed transaction;

(g)    State that the Written Offer is irrevocable until the closing of the transaction, if such Qualified Bidder is designated as a Successful Bidder or a Backup Bidder (each as defined below);

(h)    Not request or entitle the Qualified Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

(i)    Not contain any material due diligence or financing contingencies as determined by the Debtors in their reasonable discretion;

(j)    Provide evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Agreement or Modified Agreement to the Debtors' satisfaction;

(k)    Include a good faith deposit (the "Good Faith Deposit") in the form of a certified check, wire transfer or such other form as is acceptable to the Debtors in an amount equal to Five Million Two Hundred Fifty Thousand Dollars ($5,250,000.00);

(l)    Set forth the anticipated timeframe for (i) obtaining any required approvals, and (ii) consummating the proposed transactions;

(m)    Include a written acknowledgement by such Qualified Bidder that it agrees to the terms of the Bidding Procedures;

(n)    Include such other information as may be reasonably requested in writing by the Debtors at least two (2) calendar days prior to the Auction; and

      (o)     Provide for a closing date (the "Closing Date") which shall be no later than 65 days after the Petition Date or such later date as is acceptable to the Debtors.

      The Agreement with the Stalking Horse constitutes a Qualified Bid.

      Any Good Faith Deposit accompanying a Written Offer that the Debtors determine not to be a Qualified Bid shall be returned promptly following such determination.  Between the Bid Deadline (as defined below) and the Auction, the Debtors may negotiate or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the consent of the Debtors, a Qualified Bidder may not amend, modify or withdraw its Qualified Bid, except for proposed amendments to increase the amount or otherwise improve the terms of the Qualified Bid, during the period that such Qualified Bid is required to remain irrevocable and binding.

## 5.    Bid Deadline

      All Qualified Bids must be received prior to 5:00 p.m. (Prevailing Eastern Time) on September 28, 2013 (the "Bid Deadline"), by each of the parties listed below.

| | |
|---|---|
| Debtors: | Personal Communications Devices LLC |
| | 80 Arkay Drive |
| | Hauppauge, NY 11788 |
| | Attn:  Raymond F. Kunzmann |
| | Facsimile:  (631) 951-0784 |
| | E-mail:  Raymond.kunzmann@pcdphones.com |
| | |
| Debtors' Counsel: | Goodwin Procter LLP |
| | 620 Eighth Avenue |
| | New York, NY 10018 |
| | Attn:    Emanuel C. Grillo |
| |        Matthew L. Curro |
| | Fax:  (212) 355-3333 |
| | E-mail:  egrillo@goodwinprocter.com |
| |      mcurro@goodwinprocter.com |
| | |
| Stalking Horse Counsel: | Munsch, Hurdt, Kopf & Harr P.C. |
| | 3800 Lincoln Plaza |
| | 500 N. Akard Street |
| | Dallas, Texas  75201-6659 |
| | Attn:    Joseph J. Wielebinski |
| | Fax:  (214) 978-4375 |
| | E-mail:  jwielebinski@munsch.com |

## 6.    Determination of Qualified Bids

      Debtors shall, by no later than noon (Prevailing Eastern Time) two (2) days prior to the Auction, (i) determine in their business judgment (in consultation with the Committee and the

DIP Agent), whether a Written Offer is a Qualified Bid and (ii) notify each Qualified Bidder submitting a Written Offer whether that Written Offer is a Qualified Bid.

7.      **"As Is, Where Is"**

Except as otherwise provided in the applicable agreement, the sale of the Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, its agents or its estate except to the extent set forth in the applicable agreement of the Successful Bidder(s) as approved by the Bankruptcy Court. Except as otherwise provided in the applicable agreement, all of the Debtors' right, title and interest in and to the assets subject thereto shall be sold free and clear of all liens, claims, interests and encumbrances (collectively, the "Interests") in accordance with sections 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the assets. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all desired due diligence regarding the assets prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its Qualified Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder(s), the terms of the transaction(s) as set forth in the applicable agreement.

8.      **Auction**

In the event that, as the case may be, two or more Qualified Bids are received, the Debtors shall conduct an Auction of the Purchased Assets.  The Auction shall be held on October 3, 2013 at 10:00 a.m. (Prevailing Eastern Time) at the offices of Goodwin Procter LLP, and continue thereafter until completed.  Subject to Section 10 hereof, the Debtors reserve the right to cancel or postpone the Auction or to not proceed with any sale transaction in their sole discretion.

Except as otherwise permitted in the Debtors' discretion, only the Debtors, the Debtors' pre- and post-petition secured lenders, any statutory committee appointed in these cases, and Qualified Bidders and their respective professionals shall be entitled to attend the Auction.  Only a Qualified Bidder that submitted a Qualified Bid is eligible to participate in the Auction.

The Auction shall be governed by the following procedures:

(a)      Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

(b)      The Debtors, in their discretion and after consultation with the Committee and consultation with and consent of the DIP Agent, may conduct the Auction, in the manner that and may adopt rules for the Auction at the Auction that will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order or the Agreement.  All such rules will provide that:  (i) the Auction procedures must be fair and open, and not intended to cause any participating Qualified Bidder to be disadvantaged in any

material way as compared to any other participating Qualified Bidder, and (ii) all participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder (i.e., the principals submitting each bid) shall be fully disclosed to all other participating Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction. Each bid by a Qualified Bidder at the Auction, if not inconsistent with the provisions of these Bidding Procedures, shall be deemed to constitute a Qualified Bid. Notwithstanding the foregoing, any overbid by the Stalking Horse will be credited with the full amount of the Bid Protections, for purposes of comparison with other bids (it being understood that, as provided in Section 9(e) of these Bidding Procedures, if the Stalking Horse is the Successful Bidder at the Auction (and the Sale Transaction is consummated), it shall not be entitled to payment of the Bid Protections).

(c)     The Debtors will arrange for the actual bidding at the Auction to be transcribed.

(d)     Each Qualified Bidder participating in the Auction will be expected to confirm at the Auction that it has not engaged in any collusion:  1) regarding these Bidding Procedures, 2) with any other Qualified Bidder, 3) the Auction or 4) with respect to any proposed transaction relating to the Purchased Assets.

(e)     At the Auction, the first bid for the Purchased Assets other than the offer of Stalking Horse set forth in the Agreement shall be considered only if it exceeds the purchase price set forth in the Agreement by a minimum of (i) the amount that would be owed if the Debtors would be required to pay the Break-Up Fee to the Stalking Horse (i.e., $4,250,000) *plus* (ii) cash consideration in an amount not less than $1,250,000. Subsequently, bidding will continue in minimum increments of at least $100,000, with the specific increments for each round of bidding to be announced on the record at the Auction.

(f)     All Qualified Bidders shall have the right to, at any time, request that the Debtors announce, subject to any potential new bids, the then current highest or best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then current highest or best bid.

(g)     The Debtors, after consultation with the Committee and consultation and consent of the DIP Agent, may determine that all Qualified Bidders shall have the right to submit additional bids and make additional modifications to the Agreement or Modified Agreement, as applicable, at the Auction, *provided*, *however*, that any such modifications to the Agreement or Modified Agreement, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors.

(h)     Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable identify and determine in their business judgment the highest and/or best Qualified Bid for the Purchased Assets (the "<u>Successful Bid</u>" and the entity or entities submitting such Successful Bid, the "<u>Successful Bidder</u>"), taking into account the Stalking Horse's entitlement to the full amount or the Bid Protections ($5,250,000), if applicable, and advise the Qualified Bidders of such determination, and require the Successful Bidder (other than

Stalking Horse) to deliver an executed Agreement or Modified Agreement prior to commencement of the Approval Hearing.

(i)    In addition, the Debtors will determine which Qualified Bid, if any, is the next highest and/or best Qualified Bid and designate such Qualified Bid as a "Backup Bid" in the event the Successful Bidder fails to consummate the contemplated transaction.  A Qualified Bidder that submitted a Qualified Bid that is designated a Backup Bid is a "Backup Bidder". Each Backup Bid shall remain open and binding until the earlier of (i) two business days after the closing of the transaction(s) by which all of the assets that were subject to such Backup Bid have been transferred to one or more Qualified Bidders pursuant to these Bidding Procedures and (ii) thirty (30) days after the date of the Auction.  For the avoidance of doubt, the terms of the Agreement shall govern in the event the Agreement is designated a Backup Bid.

(j)    Following the conclusion of the Auction, the Debtors may resume bidding on such procedures determined by the Debtors in their discretion for the sale of discrete assets not sold to the Successful Bidder.

(k)    The Court will not consider bids made after the Auction has been closed, unless a motion to reopen the Auction is made and allowed.

## 9.    **Sole Qualified Bid**

If the Agreement with the Stalking Horse is the only Qualified Bid submitted by the Bid Deadline, the Debtors will not hold an Auction and instead shall request at the Approval Hearing that the Bankruptcy Court approve the Agreement with the Stalking Horse.

## 10.    **Approval Hearing**

The Approval Hearing will be held before the Honorable [_____] on October 8, 2013, at 2:00 p.m. (Prevailing Eastern Time) at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, P.O. Box 9013, Central Islip, NY 11722-9013.

At the Approval Hearing, the Debtors shall present the results of the Auction to the Bankruptcy Court and seek approval for the Successful Bid and any Backup Bid(s).  The Court will not consider bids made after the Auction has been closed, unless a motion to reopen the Auction is made and allowed by the Bankruptcy Court after the Debtors and other interest parties have responded with any objections thereto.

In accordance with the Agreement, upon (i) entry of an order approving a Successful Bid or Back Up Bid other than that of Stalking Horse ("Alternative Transaction"), and (ii) the closing of such Alternate Transaction, the Debtors shall pay to the Stalking Horse a sum equal to the Bid Protections without further order of the Bankruptcy Court.

Following the Approval Hearing approving the transaction with respect to the Successful Bidder, if such Successful Bidder fails to consummate an approved transaction for any reason, the appropriate Backup Bidder(s) shall be designated the Successful Bidder and the Debtors shall be authorized to effect such transaction without further order of the Bankruptcy Court.  The

Successful Bidder and Backup Bidder (if any) should be represented by counsel at the Approval Hearing.

## 11.    Consummation of the Purchase

    (a)    Closing Date; Good Faith Deposit

The Successful Bidder shall consummate the sale transaction contemplated by the Successful Bid (the "Purchase") on or before the Closing Date.  If a Successful Bidder successfully consummates an approved transaction by the Closing Date, such Successful Bidder's Good Faith Deposit shall be applied to the purchase price in such transaction.

If the Successful Bidder either fails to consummate the Purchase on or before the Closing Date, breaches the Agreement or Modified Agreement or otherwise fails to perform, the Debtors shall, without further order of the Bankruptcy Court, deem the Successful Bidder to be a "Defaulting Buyer," at which time the Successful Bid shall be deemed rejected.

Except with respect to the Stalking Horse in accordance with the terms of the Agreement, including Section 13.2 thereof, the Debtors shall be entitled to (i) retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Defaulting Buyer, and (ii) seek all available damages from such Defaulting Buyer occurring as a result of such Defaulting Buyer's failure to perform.

    (b)    Back-Up Purchase

Upon a determination by the Debtors that the Successful Bidder is a Defaulting Buyer, the Debtors shall consummate a sale transaction with the Backup Bidder on the terms and conditions of the Backup Bid (the "Backup Purchase") without further order of the Bankruptcy Court.

If a Backup Bidder consummates a Backup Purchase, the Good Faith Deposit of such Backup Bidder will be applied to the purchase price in such transaction.  In the event that the Debtors seek to consummate a Backup Purchase with a Backup Bidder and such Backup Bidder fails to consummate the Backup Purchase on or before the alternative Closing Deadline, breaches the Agreement or Modified Agreement or otherwise fails to perform, the Debtors may, in their discretion and without further order of the Bankruptcy Court, deem such Backup Bidder to be a Defaulting Buyer.

## 12.    Return of Good Faith Deposits

Good Faith Deposits of all Qualified Bidders shall be held in an interest-bearing escrow account.  Except for the Successful Bidder and the Backup Bidder(s), the Debtors shall hold the Good Faith Deposits of all Qualified Bidders that submit Written Offers until three (3) business days after the closing of the sale with the Successful Bidder.

13.    <u>**Reservation of Rights**</u>

At or prior to the Auction, the Bidding Procedures may be modified by the Debtors, after consultation with counsel to the Committee and the Stalking Horse, and with the consent of the DIP Agent; *provided* that all such modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction; and *provided further*, that all such modifications shall not be materially inconsistent with the Agreement.  The Debtors, in their reasonable discretion, may, after consultation with counsel to the Committee and the Stalking Horse, and with the consent of the DIP Agent, (a) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject, at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid (other than the Stalking Horse bid) that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale; or (iii) contrary to the best interests of the Debtors, their estates, their creditors and other stakeholders. Notwithstanding the foregoing, the Debtors cannot waive compliance with the requirement that a Qualified Bid must provide for Payment in Full in cash of the DIP Obligations and First Lien Credit Obligations at closing by wire transfer from the Qualified Bidder to the DIP Agent on behalf of the DIP Lenders

In accordance with the terms of the Bidding Procedures and to the extent not materially inconsistent with the terms of the Agreement, the Debtors reserve the right (1) to cancel or postpone the Auction, the sale of the Purchased Assets or the Approval Hearing; (2) adjourn the Approval Hearing in open court without further notice, or (3) impose additional conditions with respect to potential bidders.

**<u>Exhibit 1 to Bidding Procedures</u>**

Asset Purchase Agreement

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**Personal Communications Devices Holdings, LLC,**

**Personal Communications Devices, LLC**

**("Seller"),**

**Q1W Newco, LLC**

**("Buyer"),**

**AND**

**Quality One Wireless, LLC**

**("Quality One")**

**dated as of August 19, 2013**

## TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** .......................................................................................................... 1
    1.1    Certain Definitions ................................................................................................ 1
    1.2    Other Definitional and Interpretive Matters ...................................................... 12

**ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES** ............... 13
    2.1    Purchase and Sale of Assets ............................................................................... 13
    2.2    Excluded Assets .................................................................................................. 14
    2.3    Assumption of Liabilities ................................................................................... 15
    2.4    Excluded Liabilities ............................................................................................ 15
    2.5    Cure Amounts ..................................................................................................... 15
    2.6    Further Conveyances and Assumptions .............................................................. 16
    2.7    Bulk Sales Law ................................................................................................... 16
    2.8    Post-Closing Financing ...................................................................................... 16

**ARTICLE III CONSIDERATION** ............................................................................................. 16
    3.1    Consideration ...................................................................................................... 16
    3.2    Net Working Capital Determinations ................................................................. 17
    3.3    Effect of Post-Closing Net Working Capital Adjustment .................................. 17
    3.4    Escrow Deposit ................................................................................................... 18

**ARTICLE IV CLOSING AND TERMINATION** ......................................................................... 18
    4.1    Closing Date ....................................................................................................... 18
    4.2    Deliveries by Seller ............................................................................................ 19
    4.3    Payment of Purchase Price ................................................................................. 19
    4.4    Deliveries by Purchasers .................................................................................... 20
    4.5    Working Capital Estimate and Post-Closing Adjustment to Note...................... 20
    4.6    Estimated DIP Loan Payoff Amount; Test of Closing Condition ...................... 21
    4.7    Termination of Agreement .................................................................................. 21
    4.8    Effect of Termination ......................................................................................... 22

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** ........................................ 23
    5.1    Organization and Good Standing ........................................................................ 23
    5.2    Authorization of Agreement............................................................................... 23
    5.3    Conflicts; Consents of Third Parties................................................................... 23
    5.4    Financial Statements ........................................................................................... 24
    5.5    Inventories .......................................................................................................... 24
    5.6    Absence of Certain Developments ..................................................................... 24
    5.7    Taxes .................................................................................................................. 25
    5.8    Title to Purchased Assets.................................................................................... 25
    5.9    Intellectual Property ........................................................................................... 25
    5.10    Labor .................................................................................................................. 26
    5.11    Litigation ............................................................................................................ 26
    5.12    Compliance with Laws; Permits......................................................................... 26
    5.13    Related Party Transactions .................................................................................. 27
    5.14    Defective $35 Fee Reserve Obligations; MDF Obligations; Product Warranty Obligations 27
    5.15    Financial Advisors.............................................................................................. 27
    5.16    Foreign Subsidiaries ........................................................................................... 27

| | | |
|---|---|---|
| 5.17 | Inspections; No Other Representation | 27 |
| 5.18 | No Other Representations and Warranties | 28 |

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASERS** ............................ **28**

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | 28 |
| 6.2 | Authorization of Agreement | 28 |
| 6.3 | Conflicts; Consents of Third Parties | 28 |
| 6.4 | Litigation | 28 |
| 6.5 | Financial Advisors | 29 |
| 6.6 | Financing | 29 |
| 6.7 | Inspections; No Other Representation | 29 |
| 6.8 | No Other Representations and Warranties | 30 |

**ARTICLE VII BANKRUPTCY COURT MATTERS** ............................ **30**

| | | |
|---|---|---|
| 7.1 | Pleadings and Motions | 30 |
| 7.2 | DIP Financing | 30 |
| 7.3 | Filing of Sale Motion | 30 |
| 7.4 | Service of Sale Motion | 30 |
| 7.5 | The Sale Order | 31 |
| 7.6 | Bidding Procedures Order | 32 |
| 7.7 | Approval of Break-Up Fee and Expense Reimbursement | 32 |
| 7.8 | Bidding Procedures | 32 |
| 7.9 | Cooperation | 34 |
| 7.10 | Non-Solicitation Period | 34 |
| 7.11 | Bankruptcy Court Objections | 35 |

**ARTICLE VIII COVENANTS** ............................ **35**

| | | |
|---|---|---|
| 8.1 | Access to Information | 35 |
| 8.2 | Conduct of the Business Pending the Closing | 35 |
| 8.3 | Consents | 36 |
| 8.4 | Reasonable Efforts; Further Assurances | 37 |
| 8.5 | Certain Filings | 37 |
| 8.6 | Non-Competition; Non-Solicitation; Confidentiality | 38 |
| 8.7 | Preservation of Records | 39 |
| 8.8 | Publicity | 40 |
| 8.9 | Use of Name | 40 |
| 8.10 | Financing Statement Releases | 40 |
| 8.11 | Seller's Fiduciary Duties | 40 |
| 8.12 | Quality One Guarantee | 40 |
| 8.13 | Inventory Sales; Purchasers' Right of First Refusal | 40 |

**ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS** ............................ **41**

| | | |
|---|---|---|
| 9.1 | Employment | 41 |

**ARTICLE X CONDITIONS TO CLOSING** ............................ **41**

| | | |
|---|---|---|
| 10.1 | Conditions Precedent to Obligations of Purchasers | 41 |
| 10.2 | Conditions Precedent to Obligations of Seller | 42 |
| 10.3 | Conditions Precedent to Obligations of Purchasers and Seller | 43 |
| 10.4 | Frustration of Closing Conditions | 43 |

**ARTICLE XI SURVIVAL** ............................ **43**

| | | |
|---|---|---|
| 11.1 | Survival of Representations and Warranties | 43 |

**ARTICLE XII TAXES** ............................ **44**

ii

12.1 Transfer Taxes ..................................................................................................... 44
12.2 Apportionment of Taxes .................................................................................... 44
12.3 Purchase Price Allocation ................................................................................. 44
12.4 Cooperation on Tax Matters ............................................................................. 44

**ARTICLE XIII MISCELLANEOUS ......................................................................... 45**
13.1 Expenses ........................................................................................................... 45
13.2 Remedies .......................................................................................................... 45
13.3 Submission to Jurisdiction; Consent to Service of Process .............................. 46
13.4 Waiver of Right to Trial by Jury ....................................................................... 46
13.5 Entire Agreement; Amendments and Waivers .................................................. 46
13.6 Governing Law ................................................................................................. 46
13.7 Notices .............................................................................................................. 47
13.8 Severability ....................................................................................................... 47
13.9 Binding Effect; Assignment ............................................................................. 48
13.10 Non-Recourse ................................................................................................... 48
13.11 Counterparts ...................................................................................................... 48

## Disclosure Schedule

5.3(a)      –   Conflicts
5.3(b)      –   Consents of Third Parties
5.6         –   Absence of Certain Developments
5.8         –   Title to Purchased Assets
5.9(a)      –   Intellectual Property: Software, Marks, Copyrights
5.9(b)      –   Intellectual Property: Licenses
5.9(d)      –   Intellectual Property: Legal Proceedings; Disputes
5.9(e)      –   Intellectual Property: Hardware and Software
5.11        –   Litigation
5.12(b)     –   Permits
5.13        –   Related Party Transactions
5.15        –   Financial Advisors
5.16        –   Foreign Subsidiaries

## Other Schedules

2.1(a)      –   Purchased Contracts
2.1(b)      –   Foreign Assets
2.1(d)(i)   –   Software
2.1(d)(ii)  –   Copyrights
2.1(d)(iii) –   Marks
2.1(f)      –   Products
2.1(g)      –   Equipment

## Exhibits

Exhibit A   –   Form of Buyer Assignment and Assumption Agreement
Exhibit B   –   Form of Buyer Bill of Sale
Exhibit C   –   Form of Credit Suisse Note and Security Agreement
Exhibit D   –   Form of DIP Financing Motion
Exhibit E   –   Form of DIP Financing Order
Exhibit F   –   Eligible Accounts Receivable

| Exhibit G | – | Form of Escrow Agreement |
| Exhibit H | – | Inventory |
| Exhibit I | – | Form of PineBridge Notes and Security Agreements |
| Exhibit J | – | Form of Quality One – Credit Suisse Guaranty |
| Exhibit K | – | Form of Quality One – PineBridge Guaranty |
| Exhibit L | – | Form of Sale Motion |
| Exhibit M | – | Form of Sale Order |
| Exhibit N | – | Pre-Closing Liabilities |
| Exhibit O | – | DIP Budget |
| Exhibit P | – | Seller Marks |

LIBNY/5268665.16

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of the 19th day of August, 2013 ("Agreement"), is entered into by and among Personal Communications Devices Holdings, LLC, a Delaware limited liability company ("Holdings"), Personal Communications Devices, LLC, a Delaware limited liability company ("PCD") and an Affiliate (as defined below) of Holdings, Q1W Newco, LLC, a Delaware limited liability company ("Buyer"), and Quality One Wireless, LLC, a Nevada limited liability company ("Quality One"), an Affiliate of Buyer. Holdings and PCD are sometimes collectively referred to as "Debtor" or "Seller." Buyer and Quality One are sometimes hereinafter referred to collectively as the "Purchasers."

## W I T N E S S E T H :

WHEREAS, Seller is engaged in the business of aggregating, distributing and servicing OEM wireless communications products sold through direct and indirect wireless carrier distribution channels throughout North America and South America (the "Business");

WHEREAS, each of Holdings and PCD intends to commence a chapter 11 case in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") (such cases, the "Chapter 11 Case") and shall be a debtor-in-possession under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"); and

WHEREAS, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and the Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Certain Definitions**. In addition to terms defined elsewhere herein, as used in this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement, the following capitalized terms have the following respective meanings ascribed to them:

"Account Debtor" means any Person who is obligated under any Account Receivable.

"Accounts Receivable" means rights to payment of monetary obligations, whether or not earned by performance, (i) for property that has been sold, leased, licensed, or assigned, or otherwise disposed of by Seller, or (ii) for services rendered or to be rendered by Seller, for which payment has not yet been made by the Account Debtors.

"Administrative Expense Claims Reserve Account" means an account of Seller containing any and all funds provided for in connection with the DIP Financing under the line item "Ch. 11 Admin Claims" of the DIP Budget that have not been previously paid out by Seller prior to Closing.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the

possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Transaction" means a bid for the Purchased Assets received by Seller from a Person other than the Buyer, which is considered by Seller to be a higher or better bid than the bid of the Buyer for the Purchased Assets, as more particularly defined in the Bidding Procedures Order.

"Approval Hearing" shall mean the hearing conducted by the Bankruptcy Court to consider the relief sought in the Sale Motion.

"Asset Acquisition Statement" has the meaning assigned to that term in Section 12.3 hereof.

"Assumed Liabilities" has the meaning assigned to that term in Section 2.3 hereof.

"Auction" shall mean the auction for the Debtor's assets to be conducted in accordance with the Bidding Procedures Order.

"Auction Date" means the date of the sale of the Purchased Assets as set forth in the Bidding Procedures Order, which date shall not be later than forty-five (45) days after the filing of the Chapter 11 Case, unless an extension is requested by the Buyer for HSR or other legal compliance purposes.

"Bid Deadline" has the meaning assigned to that term in Section 7.8(a) hereof.

"Bidding Procedures Order" means the order, in form and substance acceptable to the Purchasers, entered by the Bankruptcy Court approving the bidding procedures to be used in connection with the Auction and more fully described in Article VII hereof. The Bidding Procedures Order shall be substantially in the form attached to the Sale Motion.

"Break-Up Fee" means a break-up fee payable to Buyer in an amount equal to Four Million Two Hundred and Fifty Thousand Dollars ($4,250,000) or such other amount as approved by the Bankruptcy Court with the consent of Buyer, to be included in and subject to the terms of the Bidding Procedures Order, which, among other things, shall deem the Break-Up Fee as an administrative priority expense under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

"Breakout Units" means all of the 4G LTE Pantech Breakout handset units owned by Seller and held as part of Seller's Inventory.

"Business Day" means any day of the year other than a Saturday or Sunday on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Business Employees" has meaning assigned to that term in Section 9.1 hereof.

"Buyer Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in the form attached hereto as Exhibit A to be executed and delivered by Seller and Buyer at the Closing.

"Buyer Bill of Sale" means the bill of sale in the form attached hereto as Exhibit B to be executed and delivered by Seller to Buyer at the Closing.

LIBNY/5268665.16

"<u>Cash Consideration</u>" means the DIP Loan Payoff Amount, the Wind-Down Payment, and the Transaction Expenses.

"<u>Claim</u>" means a claim as defined in Section 101(5) of the Bankruptcy Code.

"<u>Closing</u>" has the meaning assigned to that term in <u>Section 4.1</u> hereof.

"<u>Closing Calculation</u>" has the meaning assigned to that term in <u>Section 3.2(b)</u> hereof.

"<u>Closing Date</u>" has the meaning assigned to that term in <u>Section 4.1</u> hereof.

"<u>COBRA</u>" has the meaning assigned to that term in <u>Section 9.1(c)</u> hereof.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Commitment Letter</u>" has the meaning assigned to that term in <u>Section 6.6</u> hereof.

"<u>Confidential Information</u>" has the meaning assigned to that term in <u>Section 8.6(c)</u> hereof.

"<u>Confidentiality Agreement</u>" means that certain non-disclosure agreement by and between BG Strategic Advisors, LLC, on behalf of Seller, and Purchasers, dated May 21, 2013.

"<u>Contract</u>" means any contract, agreement, indenture, note, bond, loan, instrument, lease, commitment or other arrangement or agreement, whether written or oral, unless otherwise defined or delineated.

"<u>Credit Suisse Note and Security Agreement</u>" means the senior secured promissory note and security agreement issued by Buyer to the CS Term Lenders in the aggregate principal amount necessary to pay the outstanding balance of Seller's obligations to the CS Term Lenders under the Second Lien Credit Agreement (approximately $36,340,067.01) dated as of the Closing Date, and granting security interests in certain of Buyer's assets, in form and substance subject to approval of the CS Term Lenders, Purchasers and Purchasers' Lender, and in a form substantially similar to the form attached hereto as <u>Exhibit C</u>.

"<u>CS Term Lenders</u>" has the meaning specified in the Second Lien Credit Agreement.

"<u>Cure Amounts</u>" has the meaning assigned to that term under <u>Section 2.5</u> hereof.

"<u>Defective $35 Fee Reserve Obligations</u>" means the $35 penalty charged by Verizon Wireless for any phone supplied by PCD that is returned by a customer and deemed defective by Verizon Wireless within the contractual warranty period, calculated by the Seller consistent with its prior calculation methodology.

"<u>DIP Budget</u>" has the meaning assigned to that term in <u>Section 7.2</u> hereof.

"<u>DIP Financing</u>" has the meaning assigned to that term in <u>Section 7.2</u> hereof.

"<u>DIP Financing Motion</u>" means the motion to be filed with the Bankruptcy Court in form and substance reasonably acceptable to the Purchasers, seeking approval of the DIP Financing and containing such other provisions as contemplated by <u>Article VII</u> hereof. The DIP Financing Motion shall be substantially in the form attached hereto as <u>Exhibit D</u>.

"<u>DIP Financing Order</u>" means the order, in form and substance reasonably acceptable to the Purchasers, entered by the Bankruptcy Court with respect to the DIP Financing Motion and more fully described in <u>Article VII</u> hereof. The DIP Financing Order shall be substantially in the form attached hereto as <u>Exhibit E</u>.

"<u>DIP Loan Documents</u>" means any promissory note, security agreement and related Documents mutually agreed upon between Seller, as borrower, and the lenders subject to the Revolving Credit Agreement, and subject to the approval of the Purchasers, evidencing or relating to the DIP Financing to be extended to the Seller, as Debtor in its Chapter 11 Case, and subject to the terms hereof.

"<u>DIP Loan Payoff Amount</u>" means cash sufficient to pay the amount outstanding to the lenders under the DIP Loan Documents as of the Closing Date, including the Secured Obligations (as such term is defined in the Revolving Credit Agreement, estimated to be approximately $33,980,946.67 as of the date hereof); *provided, however*, the DIP Loan Payoff Amount may include advances to pay allowed and approved Chapter 11 professional fees, allowed and approved transaction fees and expenses, and allowed and approved Bankruptcy administrative claims, but only up to, and not after, the Closing Date, and further subject to the condition that the total amount of cumulative allowed and approved administrative claims, including professional fees, to be included in the DIP Loan Payoff Amount, shall not exceed the amounts set forth in the approved budget as defined in the DIP Loan Documents and as in effect as of the Closing Date.

"<u>Dispute Notice</u>" has the meaning assigned to that term under <u>Section 3.2(b)</u> hereof.

"<u>Disputed Items</u>" has the meaning assigned to that term under <u>Section 3.2(b)</u> hereof.

"<u>Documents</u>" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Seller's Business and the Purchased Assets in each case whether or not in electronic form.

"<u>Eligible Accounts Receivable</u>" means "Eligible Accounts" for borrowing base purposes computed in accordance with GAAP consistently applied, as defined in the Revolving Credit Agreement, and as applied in the computation of Seller's borrowing base availability as of June 24, 2013, except for the following: (i) notwithstanding that they are ineligible for borrowing base purposes, Accounts owing by an Account Debtor, to the extent the aggregate amount of Accounts owing from such Account Debtor exceeds 20% of the aggregate Eligible Accounts or such other percentage applied to specified customers in the Revolving Credit Agreement ("A/R concentration borrowing base ineligibles"), shall be considered Eligible Accounts Receivable; and (ii) any accounts receivable owing from (net of any accounts payable to) Quality One Wireless shall be considered an Eligible Accounts Receivable, regardless of whether it is ineligible for borrowing base purposes due to the ageing or any other reason.  Eligible Accounts Receivable shall satisfy each of conditions specified on <u>Exhibit F</u> hereof.

"<u>Eligible Inventory</u>" means Eligible Inventory for borrowing base purposes computed in accordance with GAAP consistently applied, as defined in the Revolving Credit Agreement, and as applied in the computation of Seller's borrowing base availability as of June 24, 2013, including In-Transit Inventory, except for the following: (i) the inventory lower-of-cost-or-market borrowing base reserve is to be excluded from ineligible inventory (meaning that the Eligible Inventory will be stated at cost, less prior write-downs, consistent with methodology for reporting borrowing base inventory in effect

as of June 24, 2013); and (ii) the value of Breakout Units at an agreed-upon unit value of $140 per unit shall be included in Eligible Inventory. Without limiting the generality of the foregoing, Eligible Inventory shall not include: (aa) Inventory in which a Person has a Lien, except for Purchasers' Lender and except for liens arising in connection with the Revolving Credit Agreement, the Second Lien Credit Agreement and the DIP Loan Documents; (bb) Inventory that has been shipped or delivered to a customer on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval, consignment or any other repurchase or return basis; (cc) Inventory that is not in good condition or does not comply with all applicable laws, rules and regulations with respect to its manufacture, use, or sale; (dd) Inventory with respect to which a claim exists disputing the title of Seller to or right to possession of the Inventory; and (ee) Inventory evidenced by a negotiable or non-negotiable document of title

"Employee" means an individual, as of the date hereof, who is employed by Seller in connection with its Business, together with individuals who are hired in respect of the Seller's Business after the date hereof.

"Equipment" means the furniture, fixtures and equipment of Seller, including without limitation the furniture, fixtures and equipment set forth on Schedule 2.1(g).

"Escrow Agent" means BNY Mellon, National Association.

"Escrow Agreement" means the Escrow Agreement among Quality One, Seller and the Escrow Agent, executed and delivered concurrently with the execution and delivery of this Agreement, in the form attached hereto as Exhibit G.

"Escrow Deposit" means the sum of $2,500,000 deposited by Quality One with the Escrow Agent on the date hereof upon execution and delivery of this Agreement and held in escrow pursuant to the Escrow Agreement and the terms of this Agreement.

"Estimated DIP Loan Payoff Amount" has the meaning assigned to that term under Section 4.6 hereof.

"Estimated Eligible Accounts Receivable" has the meaning assigned to that term under Section 4.6 hereof.

"Estimated Net Working Capital" has the meaning assigned to that term under Section 4.5(a) hereof.

"Estimated Transaction Expenses" has the meaning assigned to that term under Section 4.6 hereof.

"Expense Reimbursement" means the amount to be paid by the Seller, subject to the terms and conditions of this Agreement and the approval of the Bankruptcy Court, as a reimbursement for Purchasers' out-of-pocket expenses in connection with the sale of the Purchased Assets under Section 363 of the Bankruptcy Code and the transactions contemplated thereby, which shall include Purchasers' reasonable and documented legal fees and expenses (but excluding any investment banking fees) relating to the Section 363 auction sale process of the Purchased Assets if Buyer does not have the highest and best bid, and which shall deem the Expense Reimbursement as a super priority administrative expense claim under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, but the Expense Reimbursement shall not exceed One Million Dollars ($1,000,000).

"<u>Excluded Assets</u>" shall mean all assets, properties, interests and rights of Seller other than the Purchased Assets and those assets, properties, interests and rights primarily related to the Purchased Assets.

"<u>Excluded Liabilities</u>" has the meaning assigned to that term in <u>Section 2.4</u> hereof.

"<u>Failure to Close</u>" has the meaning assigned to that term in <u>Section 13.2(b)</u> hereof.

"<u>Failure to Fund</u>" means the failure of the Closing to occur where (i) Seller is not in breach of any of its obligations hereunder (or any such breach has been waived), and (ii) all conditions precedent in <u>Article X</u> hereof (other than Purchasers' Lenders, Credit Suisse and PineBridge having agreed to, executed and delivered the intercreditor agreement as contemplated by the Commitment Letter) have been satisfied or waived.

"<u>Foreign Assets</u>" means all equity interests and shares of capital stock owned (directly or indirectly) by each Seller in the Foreign Subsidiaries.

"<u>Foreign Subsidiaries</u>" means PCD Equipamentos de Comunicacao Ltd. (Brazil), Personal Communications Devices S de RI de CV (Mexico), and Personal Communications Devices Services S de RI de CV (Mexico).

"<u>Foreign Jurisdictions</u>" means the jurisdictions outside of the United States where the Foreign Assets are located.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America as of the date hereof.

"<u>Governmental Body</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) (including the Bankruptcy Court).

"<u>Hardware</u>" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"<u>HSR Act</u>" shall mean the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"<u>Independent Accountant</u>" has the meaning assigned to that term under <u>Section 3.2(b)</u> hereof.

"<u>Intellectual Property</u>" means all intellectual and industrial property rights, title and interests arising from or used in connection with the Business of Sellers, whether protected, created or arising under the laws of the United States or any other jurisdiction, including: (i) all patents and applications therefor, inventions and invention disclosures, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "<u>Patents</u>"), (ii) all trademarks, service marks, trade names, service names, industrial designs, brand names, trade dress rights, logos, Internet domain names, identifying symbols, logos, emblems, signs or insignia, and corporate names including without limitation the name "Personal Communications Devices," and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof (collectively, "<u>Marks</u>"), (iii) copyrights (including copyrights in computer software programs) and registrations and applications therefor, works of authorship and mask work rights (collectively, "<u>Copyrights</u>"), (iv) discoveries, concepts, ideas, research and development,

LIBNY/5268665.16

know-how, formulae, inventions, compositions, manufacturing and production processes and techniques, technical data, procedures, designs, drawings, specifications, databases (including source code, object code and algorithms), and other proprietary and confidential information, including customer lists, supplier lists, pricing and cost information, and Business and marketing plans and proposals (collectively, "Trade Secrets"); together with all rights of action and remedies for past, present and future infringement of any of the foregoing Intellectual Property; and (v) all causes of action arising from the infringement or violation of Seller's intellectual property acquired by Buyer pursuant to this Agreement.

"Intellectual Property Licenses" means (i) any contract that contains any grant by Seller to a third Person of any right to use any of the Purchased Intellectual Property, and (ii) any contract (other than a Contract concerning the licensing of generally commercially available software, including "shrink wrap" and "click wrap" licenses) that contains a grant by a third Person to Seller of a right to use a third Person's Intellectual Property concerning or relating to the Business as it relates to the Purchased Assets.

"In-Transit Inventory" means such inventory which is in transit with a common carrier from a vendor or a supplier to a facility owned or leased by Seller in the United States.

"Inventory" means: (A) Products that have been leased by Seller as lessor; (B) Products that are held by Seller for sale or lease or to be furnished under a contract of service; (C) Products that have been furnished by Seller under a contract of service; or (D) goods that consist of raw materials, work in process, or materials used or consumed in Seller's Business, including but not limited to the inventory described in Exhibit H hereto.

"Inventory Acceptance Notice" has the meaning assigned to that term under Section 8.13 hereof.

"IRS" means the Internal Revenue Service.

"Knowledge of Seller" or other words of similar meaning shall mean and include all facts and other matters that any of George Appling, Raymond Kunzmann and Jorge Garcia, actually knows, after due inquiry, and shall not refer to the knowledge of any other person or entity.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation or other requirement (including the Bankruptcy Code).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, loss, damage, adverse claim, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), and including all costs and expenses relating thereto.

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, encumbrance or any other restriction or limitation whatsoever.

"MDF Obligations" means PCD's commitment to provide funds to carriers or other customers to assist in the marketing of cellular phones or other products supplied by the Seller, calculated by the Seller consistent with its prior calculation methodology.

"Material Adverse Event" means (i) an event or occurrence that results in a material adverse effect on the Business, assets or properties of Seller, taken as a whole; (ii) an event or occurrence that results in a material adverse effect on the value of the Purchased Assets, taken as a whole; (iii) an event or occurrence that results in a material adverse effect on the ability of Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement or under the Seller Document; (iv) a negative Net Working Capital Adjustment in excess of $7,500,000, as determined prior to Closing pursuant to <u>Section 4.5(a)</u>; (v) the sum of the DIP Loan Payoff Amount plus the Transaction Expenses is an amount in excess of either (aa) $47,000,000, or (bb) eighty percent (80%) of Eligible Accounts Receivable (including Seller's trade Accounts Receivable from Quality One), as determined prior to Closing pursuant to <u>Section 4.6</u>; or (vi) Seller's failure to comply with its obligations pursuant to <u>Section 8.13</u>, excluding, in the case of clauses (i)–(iii) above, any such effect to the extent resulting from or arising in connection with (x) the filing of the Chapter 11 Case; or (y) this Agreement, the transactions contemplated hereunder and the announcement, pendency or performance thereof.

"Minimum Overbid" has the meaning assigned to that term in <u>Section 7.8(a)</u> hereof.

"Modification" means, with respect to any item, any modification, translation, conversion, compilation, upgrade or other derivative version of, or change or addition to, such item. "Modified" and "Modify" shall have corollary meanings.

"Net Working Capital" means the amount calculated as of the close of business on the day immediately preceding the Closing Date equal to the following: (a) Eligible Accounts Receivable; plus (b) Eligible Inventory; plus (c) unrestricted cash on hand; less (d) Cash Consideration; less (e) post-petition accounts payable assumed by Buyer; less (f) any assumed liabilities associated with In-Transit Inventory.

"Net Working Capital Adjustment" means the amount equal to the following: the difference between the Net Working Capital and Target Net Working Capital.

"Offer Notice" has the meaning assigned to that term under <u>Section 8.13</u> hereof.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Seller's Business consistent with past practice to the extent consistent with the limitations of the Chapter 11 Case.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"PineBridge" means, collectively, PineBridge Vantage Partners, L.P., PineBridge Co-Investment AIV Partners, L.P., Vantage Star Investment Corp., PineBridge PEP IV Co-Investment, L.P., PineBridge Plan Star Investment Corp., PineBridge PEP V Co-Investment, L.P., and The Insurance Company of the State of Pennsylvania.

"PineBridge Notes and Security Agreements" means the secured promissory notes and security agreements issued by Buyer to PineBridge at or subsequent to the Closing in the aggregate principal

LIBNY/5268665.16

amount of $25,000,000 (subject to adjustment pursuant to the Net Working Capital Adjustment as provided in <u>Section 3.3</u> below), dated as of the Closing Date, regardless of issue date, and granting security interests in certain of Buyer's assets, subject to the terms and conditions hereof, and in form and substance acceptable to PineBridge, Purchasers and Purchasers' Lender, and in the form substantially similar to the form attached hereto as <u>Exhibit I</u>.

"<u>Post-Termination Covenants</u>" means all rights and remedies of Sellers with respect to all confidentiality and non-solicitation covenants, agreements and undertakings of present and former employees and consultants of PCD or Holdings which by their terms survived or will survive the termination of agreements between PCD or Holdings and such present and former employees or consultants or the termination of the respective employment or consulting relationships with respect thereto.

"<u>Product Warranty Obligations</u>" means the contractual requirements to bear the cost of repairing phones or other devices returned by a customer within the warranty period that are deemed defective by the carrier, calculated by the Seller consistent with its prior calculation methodology.

"<u>Products</u>" or "<u>Product</u>" means, collectively or individually, any and all mobile cellular handset systems and other wireless communications devices and accessory products developed, manufactured, owned, purchased, sold or licensed by Sellers or any of their Subsidiaries, including, but not limited to, the Products specified on <u>Schedule 2.1(f)</u>.

"<u>Purchase Price</u>" has the meaning assigned to that term in <u>Section 3.1</u> hereof.

"<u>Purchased Assets</u>" has the meaning assigned to that term in <u>Section 2.1</u> hereof.

"<u>Purchased Contracts</u>" means the contracts set forth on <u>Schedule 2.1(a)</u> hereof; provided, however, Buyer shall have the right, by written notice delivered to Seller at any time during the period from and after the date hereof and until one (1) day prior to the Auction Date to delete any Contract from <u>Schedule 2.1(a)</u> (it being understood that any such Contract deleted by Buyer from such schedule may subsequently be rejected by Seller in the Chapter 11 Case). Buyer shall also have the right by written notice delivered to Seller at any time during the period from and after the date hereof up until one (1) day prior to the Auction Date to add any Contract to <u>Schedule 2.1(a)</u>; <u>provided</u> that such Contract has not been previously rejected in the Chapter 11 Case. <u>Schedule 2.1(a)</u> also sets forth the estimated amounts (as of the date hereof), which will be payable by Buyer pursuant to Section 365(b) of the Bankruptcy Code on account of the assumption and assignment of any Purchased Contract.

"<u>Purchased Intellectual Property</u>" means (a) the Software identified in <u>Schedule 2.1(d)(i)</u>, (b) the Copyrights identified on <u>Schedule 2.1(d)(ii)</u>, (c) the Marks identified in <u>Schedule 2.1(d)(iii)</u>, and (d) the Trade Secrets relating to the Purchased Assets.

"<u>Purchaser Documents</u>" has the meaning assigned to that term in <u>Section 6.2</u> hereof.

"<u>Purchasers' Lender</u>" means the commercial lender providing Purchasers with funding to pay the Cash Consideration portion of the Purchase Price.

"<u>Quality One – Credit Suisse Guaranty</u>" means that certain Guaranty and Security Agreement executed by Quality One in favor of the CS Term Lenders guarantying the payment of the Credit Suisse Note and Security Agreement, in form and substance acceptable to the CS Term Lenders, Quality One and Purchasers' Lender, and substantially in the form attached hereto as <u>Exhibit J</u>.

"<u>Quality One – PineBridge Guaranty</u>" means that certain Guaranty and Security Agreement executed by Quality One in favor of PineBridge guarantying the payment of the PineBridge Notes and Security Agreements, in form and substance acceptable to PineBridge, Quality One and Purchasers' Lender, and substantially in the form attached hereto as <u>Exhibit K</u>.

"<u>Recovery Period</u>" has the meaning assigned to that term in <u>Section 8.7</u> hereof.

"<u>Restricted Business</u>" has the meaning assigned to that term in <u>Section 8.6(a)</u> hereof.

"<u>Restructuring Transaction</u>" means (a) a recapitalization transaction involving, in whole or in part, Seller and its existing security holders or creditors, (b) any merger, consolidation, share exchange, business combination or other similar transaction with Seller, (c) any tender offer or exchange offer for forty percent (40%) or more of the outstanding shares of Seller's common stock or any class of Seller's debt securities or the filing of a registration statement under the Securities Act of 1933, as amended, in connection therewith, or (d) the acquisition of beneficial ownership or a right to acquire beneficial ownership of, or the formation of any "group" (as defined under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) which beneficially owns or has the right to acquire beneficial ownership of ten percent (10%) or more of the then outstanding shares of any class of Seller's common stock or any class of Seller's debt securities or (e) a transaction or series of transactions, including by way of a plan of reorganization, in connection with a liquidation or reorganization or other continuation of Seller's Business relating to some or all of the Purchased Assets.

"<u>Revised Statements</u>" has the meaning assigned to that term in <u>Section 12.3</u> hereof.

"<u>Revolving Credit Agreement</u>" shall mean the Amended and Restated Credit Agreement dated as of May 14, 2012 among Seller and others as borrowers, and JPMorgan Chase Bank, N.A. and others, as lenders, as amended December 21, 2012.

"<u>ROFR Inventory</u>" has the meaning assigned to that term under <u>Section 8.13</u> hereof.

"<u>ROFR Price</u>" has the meaning assigned to that term under <u>Section 8.13</u> hereof.

"<u>Sale Motion</u>" shall mean the motion, substantially in the form attached hereto as <u>Exhibit L</u>, filed by the Debtor in the Chapter 11 Case seeking (i) approval of certain bidding procedures to be used in connection with the Auction and (ii) authority to sell substantially all of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code.

"<u>Sale Order</u>" means the order of the Bankruptcy Court, in form and substance acceptable to Purchasers, granting the relief requested in the Sale Motion, and substantially in the form attached hereto as <u>Exhibit M</u>.

"<u>Second Lien Credit Agreement</u>" shall mean the Amended and Restated Second Lien Credit Agreement dated as of May 14, 2012 among PCD and Holdings, as borrower, and the CS Term Lenders, as lenders, and PineBridge, as amended on December 21, 2012.

"<u>Secured Incentive Amount</u>" means five hundred fifteen thousand dollars ($515,000.00) deposited into Seller's bank account to secure the obligations of the Seller in respect of that certain senior incentive agreement and change of control letter agreement between the Seller and George Appling.

"<u>Seller Documents</u>" has the meaning assigned to that term in <u>Section 5.2</u> hereof.

"<u>Software</u>" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code, object code or other form, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"<u>Straddle Period</u>" has meaning assigned to that term in <u>Section 12.2</u> hereof.

"<u>Subsidiary</u>" means any and all corporations, partnerships, limited liability companies, joint ventures, associations and other entities controlled by the Seller, directly or indirectly through one or more intermediaries or in which either of the Sellers directly or indirectly through one or more intermediaries has an economic interest. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company, association or other business entity gains or losses or shall be or control the managing director or general partner of such partnership, limited liability company, association or other business entity.

"<u>Target Net Working Capital</u>" means $70,110,000 plus (a) the value of the Breakout Units projected to be on hand at closing as per the June 13, 2013 cash forecast (200,294 units less 2,400 unit work fee = 197,894 net units) at an agreed-upon unit value of $140 per unit, for a total value of $27,705,160. Based on the foregoing, the Target Net Working Capital shall be $97,815,160.

"<u>Tax</u>" or "<u>Taxes</u>" means (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i), and (iii) any liability in respect of any items described in clauses (i) and/or (ii) payable by reason of contract, assumption, transferee liability, operation of law, Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under law) or otherwise.

"<u>Taxing Authority</u>" means the U.S. Internal Revenue Service and any other Governmental Body responsible for the administration of any Tax.

"<u>Tax Return</u>" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof) including, but not limited to, any information return, claim for refund, amended return or declaration of estimated Tax.

"<u>Transaction Expenses</u>" means (i) payments in cash at the Closing to (A) George Appling in accordance with that certain Amended and Restated Senior Executive Incentive Plan Agreement, dated April 12, 2013, between PCD and George Appling, and (B) BG Strategic Advisors, LLC in accordance with that certain Engagement Letter, dated January 28, 2013, between BG Strategic Advisors, LLC, Holdings and Goodwin Procter LLP, as counsel to Seller, as amended, in each case calculated based upon the aggregate Purchase Price assuming a deemed principal amount of the PineBridge Notes and Security Agreements determined using the Estimated Net Working Capital, and (ii) an amount equal to fifty percent (50%) of any fees previously paid by Seller and/or owing to the Escrow Agent (including the set-up fee in connection with the opening of the escrow account).

"Transferred Employees" has the meaning assigned to that term in Section 9.1(a) hereof.

"Transitional Services Agreement" means an agreement dated as of the Closing Date between Buyer and Seller, on terms and conditions reasonably satisfactory to Buyer and Seller, pursuant to which each of Seller and Buyer shall provide to one another, as applicable, such transitional services as mutually agreed to by Buyer and Seller, which is expected to include, among other things, (i) engagement by Buyer of certain employees of Seller for reasonable limited purposes, and (ii) engagement by Seller of certain key employees who are Transferred Employees, including employees in the accounting, information technology and certain other key administrative departments, in each case, subject to pro rata reimbursement for services provided thereunder.

"Undisputed Items" has the meaning assigned to that term under Section 3.2(b) hereof.

"WARN" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

"Wind-Down Payment" means a cash payment of $250,000 to fund a Plan of Reorganization Liquidation to facilitate the wind-down of the Seller's remaining bankruptcy estate after the Closing Date.

**1.2     Other Definitional and Interpretive Matters.**

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)        The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

**2.1    Purchase and Sale of Assets**. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Buyer, all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens, Claims, and interests pursuant to Section 363 of the Bankruptcy Code.

"Purchased Assets" means the following assets:

(a)        All Purchased Contracts;

(b)        All Foreign Assets, but excluding any Excluded Assets held by any such foreign Subsidiary;

(c)        All Accounts Receivable;

(d)        All Purchased Intellectual Property;

(e)        All Intellectual Property Licenses;

(f)        All Inventory and all Products;

(g)        All warehouse, production and office Equipment; *provided, however*, that the Seller may delete all emails (and other non-email electronic documents) protected by the attorney-client or work product privileges, where such privileges concern Excluded Liabilities;

(h)        All prepaid expenses and deposits (other than those amounts set forth in Sections 2.2(c), 2.2(d) and 2.2(e));

(i)        All cash on hand and on deposit at financial institutions, other than (x) the Secured Incentive Amount and (y) the amounts held in the Administrative Expense Claims Reserve Account;

(j)        All rights of Seller under the Purchased Contracts;

(k)        All computer hardware and Software owned or licensed by Seller;

(l)        All Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Purchased Assets, including Documents relating to Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information),

supplier lists, records, literature and correspondence, but excluding personnel files for Employees of Seller who are not Transferred Employees;

(m)    All Permits used by Seller in connection with the Purchased Assets to the extent assignable;

(n)    All rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Purchased Assets (or any portion thereof);

(o)    All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to Products sold, or services provided, to Seller or to the extent affecting any Purchased Assets;

(p)    All rights, claims or causes of action against third parties to the extent they relate to the Purchased Assets, Purchased Contracts or Assumed Liabilities;

(q)    All Post-Termination Covenants; and

(r)    All other assets of Seller not comprising Excluded Assets.

2.2    **Excluded Assets**. Nothing herein contained shall be deemed to transfer, assign or convey the Excluded Assets to Buyer, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. It is expressly understood and agreed that, notwithstanding anything to the contrary set forth herein, the Purchased Assets shall not include Seller's right, title or interest in or to any of the following, which are deemed to be "Excluded Assets":

(a)    The Secured Incentive Amount;

(b)    All insurance policies (including directors' and officers' insurance policies), and all rights of Seller to insurance claims, related refunds and proceeds thereunder relating solely to any Excluded Assets or any Excluded Liabilities;

(c)    All security deposits and prepaid expenses relating solely to Contracts that are not Purchased Contracts;

(d)    All professional fee retainers;

(e)    The Administrative Expense Claims Reserve Account and all funds held therein;

(f)    The rights which accrued or will accrue to Seller under this Agreement or any agreement contemplated hereby;

(g)    Any Tax asset of the Seller or its Subsidiaries relating to all periods ending on or prior to the Closing Date, including all Tax Returns;

(h)    All personnel records and other records that Seller is required by law to retain in its possession or is not permitted under law to provide to Buyer;

(i)    All actions, claims, causes of action, rights of recovery, causes of action and rights of setoff of any kind arising before, on or after the Closing Date relating solely to any Excluded Asset or any Excluded Liabilities;

(j)      All equity interests and shares of capital stock in Personal Communications Canada Ltd.; and

(k)      All rights (other than Post-Termination Covenants) and obligations under any Contract that is not a Purchased Contract.

**2.3      Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall  assume, effective as of the Closing, only the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(a)      All Liabilities of Seller under the Purchased Contracts that arise out of or relate to the period on and after the Closing Date;

(b)      Contractual Liabilities of Seller that arose or arise out of or relate to the period prior to the Closing Date and that are specified on Exhibit N;

(c)      The warranties and guarantees which are contractual obligations relating to the Products included in the Purchased Assets;

(d)      All liabilities and obligations to be paid, performed or discharged under or with respect to the Purchased Assets (including their ownership and sale) following the Closing Date; and

(e)      All Cure Amounts related to the Purchased Contracts assumed by Seller and assigned by Seller to Buyer pursuant to Section 365 of the Bankruptcy Code.

**2.4      Excluded Liabilities**. Notwithstanding anything contained in this Agreement to the contrary, Buyer does not assume or agree to pay, satisfy, discharge or perform, and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the transactions contemplated by this Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform, any Liability of Seller, arising in connection with or relating to any period prior to the Closing Date, whether primary or secondary, direct or indirect, known or unknown, contingent or absolute, determined or indeterminable, other than the Assumed Liabilities. Seller shall retain and pay, satisfy, discharge and perform in accordance with the terms thereof, all Liabilities (including without limitation Liabilities arising out of tort) other than the Assumed Liabilities (all such liabilities and obligations retained by Seller (including without limitation the contingent Liabilities described on Schedule 5.9(d) and Schedule 5.11) being referred to herein as the "Excluded Liabilities").

**2.5      Cure Amounts**.

(a)      At Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Buyer the Purchased Contracts. The cure amounts, as determined by the Bankruptcy Court, if any (the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts, shall be assumed by Buyer in whole or in part.

(b)      Purchasers and Seller agree that they shall each use reasonable commercial efforts to establish the adequate assurance of future performance by Buyer, including by taking the following actions: furnishing affidavits or other documents or information for filing with the Bankruptcy Court or testimony, as reasonably requested by Seller.

15

**2.6**    **Further Conveyances and Assumptions**.

(a)    From time to time following the Closing, Seller shall, or shall cause its Subsidiaries to, make available to Purchasers such non-confidential data in personnel records of Transferred Employees as is reasonably necessary for Buyer to transition such employees into Buyer's records.

(b)    From time to time following the Closing, at the sole expense of Buyer, Seller and Purchasers shall, and shall cause their respective Subsidiaries and Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be necessary or appropriate to assure fully to Purchasers and their respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents and to assure fully to Seller and its Subsidiaries and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

**2.7**    **Bulk Sales Law**. Purchasers hereby waive compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any Liens, Claims, or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**2.8**    **Post-Closing Financing**.    Subject to Section 13.2(b), Closing shall not be contingent upon Purchasers obtaining financing except for financing represented by the Credit Suisse Note and Security Agreement and PineBridge Notes and Security Agreements.  Upon issuance of the Credit Suisse Note and Security Agreement, the PineBridge Notes and Security Agreements, the Quality One – Credit Suisse Guaranty, and the Quality One – PineBridge Guaranty, the Second Lien Credit Agreement and Seller's obligations, indebtedness and liabilities thereunder, including any Liens on collateral and guaranties, shall be terminated and released.

**ARTICLE III**
**CONSIDERATION**

**3.1**    **Consideration**.  Seller and Purchasers estimate that the aggregate consideration for the Purchased Assets (the "Purchase Price") will be comprised of:

(a)    Assumption of the Assumed Liabilities;

(b)    Payment and discharge of the DIP Loan Payoff Amount in cash;

(c)    Payment and discharge of the Transaction Expenses in cash;

(d)    Payment of the Wind-Down Payment; and

(e)    Execution and delivery of the Credit Suisse Note and Security Agreement, the Quality One – Credit Suisse Guaranty, the PineBridge Notes and Security Agreements, and the Quality One – PineBridge Guaranty.

### 3.2    Net Working Capital Determinations.

(a)    Within five (5) days following the Closing Date, Buyer and Seller shall take a count of the Seller's Inventory as of the close of business on the day immediately preceding the Closing Date.  Seller's financial advisors shall be permitted to participate in such Inventory count.  Such inventory count shall be taken in accordance with Seller's historical inventory taking procedures, provided such procedures are not substantially different from standard inventory taking procedures, in which case such standard procedures shall apply. Buyer and Seller hereby agree that such mutually agreed Inventory count shall be used in determining the Net Working Capital.

(b)    Within forty-five (45) days (or sixty (60) days if Seller has not theretofore consolidated at least ninety five percent (95%) of its Inventory at its New York facility) following the Closing Date, Purchasers will prepare and deliver to Seller Purchasers' calculation of the Net Working Capital and the Net Working Capital Adjustment, if any (the "Closing Calculation"). The Closing Calculation will be completed, and delivered in writing to Seller for review, together with Purchasers' related work papers, books and records. After the delivery of the Closing Calculation, Purchasers shall cooperate with Seller in connection with its review of the Closing Calculation, including by providing Seller and its accountants reasonable access during business hours to materials used in the preparation of the Closing Calculation.  Seller shall then have thirty (30) days from receipt of Purchasers' Closing Calculation to formally notify Purchasers of any objections to or disputes of the Closing Calculation (the "Dispute Notice").  If Seller delivers a Dispute Notice, the parties shall use reasonable, good-faith efforts to resolve any such objections within ten (10) days following the Purchasers' receipt of Seller's Dispute Notice, and if any such objections are so resolved within such ten (10) day period, the Closing Calculation, with such changes as may have been previously agreed in writing by Purchasers and Seller, shall be final and binding to the extent of any items no longer in dispute.  If all items of dispute are so resolved, the Closing Calculation (as so modified) shall be conclusive and binding on all parties.  If Purchasers and Seller fail to reach agreement with respect to all of the matters set forth in the Dispute Notice within the aforementioned (10) day period, then Purchasers and Seller shall, within five (5) days thereafter, retain a mutually acceptable national independent accounting firm, and if the parties are unable to mutually agree to the appointment of such firm, then the parties shall retain the Melville, New York office of BDO USA, LLP (the "Independent Accountant") to resolve any amounts then remaining in dispute ("Disputed Items"), and any amounts not so disputed (the "Undisputed Items") shall be final and binding on the parties.  The parties shall cooperate fully with the Independent Accountant so as to enable it to make such determination as quickly and as accurately as practicable. The Independent Accountant shall have fifteen (15) days from its selection and engagement to resolve Disputed Items only in writing, with a copy to all parties.  The Independent Accountants shall only decide the specific items under dispute by the parties and their decision for each Disputed Item must be within the range of values assigned to each such item in the Closing Calculation and the Dispute Notice, respectively.  The determination of the Independent Accountant shall be final and binding on the parties, absent manifest error or willful misconduct, and the cost of the Independent Accountant shall be borne by the party whose position is determined to be the least correct by the Independent Accountant.

### 3.3    Effect of Post-Closing Net Working Capital Adjustment.

(a)    Any positive Net Working Capital Adjustment up to $7,500,000 will increase the aggregate principal amount of the PineBridge Notes and Security Agreements on a dollar-for-dollar basis.

(b)    Any negative Net Working Capital Adjustment up to $7,500,000 will decrease the aggregate principal amount of the PineBridge Notes and Security Agreements on a dollar-for-dollar basis.

**3.4**    **Escrow Deposit**.

(a)    Concurrently with the execution and delivery of this Agreement, Purchasers shall deliver the Escrow Deposit to the Escrow Agent pursuant to the Escrow Agreement, which the Escrow Agent shall deposit into a segregated interest bearing account designated by the Escrow Agent and which shall be held and distributed in accordance with the terms of this Agreement and the Escrow Agreement.

(b)    In the event of a Closing, the Escrow Deposit and all interest earned thereon shall constitute part of the Purchase Price and be credited against the Transaction Expenses payable to Seller or its designees, and the parties shall submit joint written instructions to the Escrow Agent to give effect to the same.

(c)    If the Closing does not occur as a result of (i) the termination of this Agreement by Purchasers pursuant to any termination right specified in Section 4.7 or (ii) the termination of this Agreement by the parties pursuant to Section 4.7(a), then the Escrow Deposit and all interest earned thereon shall be returned to the Purchasers by the Escrow Agent within three (3) Business Days of such termination, and the parties shall submit joint written instructions to the Escrow Agent to give effect to the same, and no party hereto shall have any further obligations or liabilities of any party to any other parties hereunder.

(d)    If the Closing does not occur due to a Failure to Fund, then (i) fifty-percent (50%) of the Escrow Deposit and all interest earned thereon shall be disbursed to Purchasers by the Escrow Agent, and (ii) the remaining fifty-percent (50%) of the Escrow Deposit and all interest earned thereon shall be disbursed to Seller by the Escrow Agent as liquidated damages and shall be the Seller's exclusive remedy in the event of a Failure to Fund, as specified in Section 13.2(b), and the parties shall submit joint written instructions to the Escrow Agent to give effect to the same, and this Agreement shall be deemed terminated and no party hereto shall have any further obligations or liabilities of any party to any other parties hereunder.

(e)    If there is no Closing for any reason other than as set forth in clauses (c) and (d) above, then the Escrow Deposit and all interest earned thereon shall be disbursed to Seller by the Escrow Agent as liquidated damages and shall be the Seller's exclusive remedy in the event of a Failure to Close, as specified in Section 13.2(b), and the parties shall submit joint written instructions to the Escrow Agent to give effect to the same, and this Agreement shall be deemed terminated and no party hereto shall have any further obligations or liabilities of any party to any other parties hereunder.

**ARTICLE IV**
**CLOSING AND TERMINATION**

**4.1**    **Closing Date**. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2, and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Goodwin Procter LLP located at 620 Eighth Avenue, New York, NY 10018 (or at such other place as the parties may designate in writing) at 10:00 a.m. (prevailing Eastern time) on a date to be specified by the parties, which date shall be no later than the second Business Day after satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title

and interest of Seller to be acquired by Buyer hereunder shall be considered to have passed to Buyer as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

4.2     **Deliveries by Seller**.   At the Closing, Seller shall deliver to Buyer:

(a)     The duly executed Buyer Bill of Sale;

(b)     The duly executed Buyer Assignment and Assumption Agreement;

(c)     Duly executed assignments of the registrations and applications for registration included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark office and applicable foreign counterpart offices, and general assignments of all other Purchased Intellectual Property;

(d)     Copies of all consents, waivers and approvals referred to in Section 10.1(d);

(e)     The duly executed affidavit of non-foreign status for Seller that complies with Section 1445 of the Code;

(f)     The duly executed Transitional Services Agreement;

(g)     The officer's certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b); and

(h)     Such other good and sufficient instruments of transfer as Buyer may reasonably request.

4.3     **Payment of Purchase Price**.   At the Closing, Buyer shall pay the Purchase Price as follows:

(a)     Purchasers shall, by wire transfer of immediately available funds, remit to JPMorgan Chase Bank, N.A. and others, as lenders, an amount equal to the amount of the DIP Loan Payoff Amount;

(b)     Purchasers shall pay, in cash by wire transfer of immediately available funds to account(s) designated by the Seller or its designees, (i) the Transaction Expenses less (ii) the Escrow Deposit and interest earned thereon;

(c)     In accordance with the terms of the Escrow Agreement, the Escrow Agent shall be directed to release the Escrow Deposit and interest earned thereon to Seller or its designees;

(d)     Purchasers shall deliver to the CS Lenders the duly executed Credit Suisse Note and Security Agreement and the Quality One – Credit Suisse Guaranty;

(e)     Purchasers shall deliver to PineBridge one or more duly executed PineBridge Notes and Security Agreements, issued in the aggregate principal amount of $17,500,000, subject to increase for the Net Working Capital Adjustment described in Sections 3.3 and 4.5(b), and the Quality One – PineBridge Guaranty; and

(f)     Purchasers shall pay the balance of Purchase Price by delivering to Seller, by wire transfer of immediately available funds, the amount of $250,000, representing the Wind-Down Payment.

LIBNY/5268665.16

**4.4**    **Deliveries by Purchasers**. At the Closing, Purchasers shall deliver to the Seller the following:

(a)    The duly executed Buyer Assignment and Assumption Agreement;

(b)    The duly executed Transitional Services Agreement;

(c)    The officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b); and

(d)    Such other documents, instruments and certificates as Seller may reasonably request.

**4.5**    **Working Capital Estimate and Post-Closing Adjustment to Note**.

(a)    Estimated Net Working Capital; Test of Closing Condition.    Seller shall deliver to Purchasers, not less than five (5) days prior to the Closing Date, a determination of the estimated Net Working Capital of Seller as of the close of business on the Closing Date (the "Estimated Net Working Capital"). The parties agree that Estimated Working Capital shall be calculated in accordance with GAAP and on a basis consistent with the accounting methodologies, practices, estimation techniques, assumptions and principles applied in a manner consistent with the definition of Net Working Capital. Seller and the Purchasers shall confer and adjust the Estimated Net Working Capital as may be mutually agreed.  If, based on such Estimated Net Working Capital, the Purchasers reasonably determine that a negative Net Working Capital Adjustment (using such Estimated Net Working Capital in place of "Net Working Capital" in any applicable definitions) would be calculated to exceed $7,500,000, then such event shall be deemed to constitute a Material Adverse Event, and Purchasers may terminate this Agreement within three (3) Business Days following receipt of the Estimated Net Working Capital pursuant to Sections 10.1(c) and 4.7(g) as a result thereof.  If Purchasers do not terminate this Agreement pursuant to this Section 4.5(a), any such Material Adverse Event shall be deemed waived for the purposes of Closing, but such waiver shall in no way affect the calculation of the Net Working Capital Adjustment pursuant to Section 3.2.

(b)    Post-Closing Net Working Capital Adjustment.  Within three (3) Business Days following the determination of Net Working Capital as provided in Section 3.2,

(i)    if no Net Working Capital Adjustment has occurred, then Buyer shall simultaneously execute and deliver to PineBridge an additional PineBridge Note and Security Agreement in the aggregate principal amount of $7,500,000, in the same form as the initial PineBridge Note and Security Agreement was issued at Closing;

(ii)    if a positive Net Working Capital Adjustment has occurred, then Buyer shall simultaneously execute and deliver to PineBridge an additional PineBridge Note and Security Agreement in the aggregate principal amount of the sum of (x) $7,500,000 plus (y) the amount of such positive Net Working Capital Adjustment up to $7,500,000, in the same form as the initial PineBridge Note and Security Agreement was issued at Closing; or

(iii)    if a negative Net Working Capital Adjustment has occurred, then Buyer shall simultaneously execute and deliver to PineBridge an additional PineBridge Note and Security Agreement in the aggregate principal amount of the difference, if any, between (x) $7,500,000, minus (y) the amount of such negative Net Working Capital Adjustment up to

$7,500,000, in the same form as the initial PineBridge Note and Security Agreement was issued at Closing.

Any PineBridge Notes and Security Agreements issued by Buyer pursuant to this <u>Section 4.5(b)</u> shall be guaranteed pursuant to the PineBridge Guaranty guarantying the payment of such additional PineBridge Notes and Security Agreements.

**4.6** **Estimated DIP Loan Payoff Amount; Test of Closing Condition**.  Seller shall deliver to Purchasers, not less than three (3) Business Days prior to the Closing Date, a determination of (a) the estimated DIP Loan Payoff Amount as of the close of business on the Closing Date (the "<u>Estimated DIP Loan Payoff Amount</u>"), (b) the estimated Transaction Expenses (the "<u>Estimated Transaction Expenses</u>") and (c) the estimated Eligible Accounts Receivable as of the close of business on the Closing Date (the "<u>Estimated Eligible Accounts Receivable</u>").  If the sum of the Estimated DIP Loan Payoff Amount plus the Estimated Transaction Expenses is calculated to exceed eighty percent (80%) of the Estimated Eligible Accounts Receivable (including Seller's trade Accounts Receivable from Quality One net of any accounts payable to Quality One), then such event shall be deemed to constitute a Material Adverse Event, and Purchasers may terminate this Agreement within two (2) Business Days following receipt of the Estimated DIP Loan Payoff Amount, the Estimated Transaction Expenses and the Estimated Eligible Accounts Receivable pursuant to <u>Sections 10.1(c)</u> and <u>4.7(g)</u> as a result thereof.  If Purchasers do not terminate this Agreement pursuant to this <u>Section 4.6</u>, any such Material Adverse Event shall be deemed waived for the purposes of Closing.

**4.7** **Termination of Agreement**. This Agreement may be terminated prior to the Closing as follows:

(a) by mutual written consent of Seller and Purchasers;

(b) by Purchasers, if any of the conditions to the obligations of Purchasers set forth in <u>Sections 10.1</u> and/or subsections (a) through (d) of <u>Section 10.3</u> shall have become incapable of fulfillment other than as a result of a breach by Purchasers of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchasers;

(c) by Seller, if any condition to the obligations of Seller set forth in <u>Sections 10.2</u> and <u>10.3</u> shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(d) by Purchasers, if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 10.1</u> or <u>10.3</u> and which breach cannot be cured or has not been cured by ten (10) Business Days after the giving of written notice by Purchasers to Seller of such breach;

(e) by Seller, if there shall be a breach by Purchasers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 10.2</u> or <u>10.3</u> and which breach cannot be cured or has not been cured by ten (10) Business Days after the giving of written notice by Seller to Purchasers of such breach;

(f) by Seller or Purchasers if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence) that the parties reasonably agree is advisable to pursue;

(g)    by Purchasers, if there is a Material Adverse Event;

(h)    by Purchasers, if Seller has not commenced the Chapter 11 Case within five (5) days after the date hereof;

(i)    by Purchasers, if the Seller has not filed with the Bankruptcy Court the Sale Motion as approved by Purchasers within three (3) days after the date of commencement of the Chapter 11 Case;

(j)    by Purchasers, if the Bidding Procedures Order has not been entered by the Bankruptcy Court within sixteen (16) days after the date of commencement of the Chapter 11 Case;

(k)    by Purchasers, if the Sale Order has not been entered by the Bankruptcy Court within fifty (50) days after the date of commencement of the Chapter 11 Case;

(l)    by Seller or Purchasers, if the Bankruptcy Court approves a Restructuring Transaction or an Alternative Transaction or the sale of all or substantially all of the assets of Seller or any of the Purchased Assets to a Person (or group of Persons) other than Purchasers or an Affiliate of Purchasers, provided that no termination under this Section 4.7(l) shall be effective until the Break-Up Fee and the Expense Reimbursement shall have been paid to Purchasers;

(m)    by Purchasers, if (i) the Bankruptcy Court enters an order appointing a trustee, examiner with expanded powers or responsible officer in the Chapter 11 Case, (ii) the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code or (iii) the Chapter 11 Case is dismissed;

(n)    by Purchasers, if the Bidding Procedures Order (including the Break-Up Fee, Expense Reimbursement or any of the provisions set forth in Section 7.2 hereof) or the Sale Order is modified in any material respect without the consent of Purchasers;

(o)    by Purchasers, if any secured creditor of Seller obtains relief from the stay to foreclose on or enforce its rights against any of the Purchased Assets; or

(p)    by Purchasers, if the closing of an Alternative Transaction that is a sale pursuant to which a party other than Buyer is the Successful Bidder (as defined in the Bidding Procedures Order) shall not have occurred by the close of business on the date that is sixty-five (65) days after the date of the commencement of the Chapter 11 Case.

Notwithstanding the foregoing, if the Closing shall not have occurred by the close of business on sixty-five (65) days after the date of the commencement of the Chapter 11 Case, either Seller or the Purchasers may terminate this Agreement; provided, however, that the right to terminate this Agreement under this paragraph of Section 4.7 shall not be available to any party whose failure to comply with any provision of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date.

**4.8    Effect of Termination**.  Except as otherwise set forth in this Section 4.8, in the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchasers or Seller; provided, however, that the obligations of the parties set forth in Article XIII, Section 3.4 and Section 7.7 hereof shall survive any such termination and shall be enforceable hereunder; provided, further, however, and subject to the limiting provisions of

LIBNY/5268665.16

Article XIII, that nothing in this Section 4.8 shall relieve Purchasers or Seller of any liability for a breach of this Agreement prior to the effective date of such termination.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

PCD and Holdings jointly and severally represent and warrant to each of Purchasers that:

**5.1** **Organization and Good Standing**. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its Business as now conducted. Seller is duly qualified or authorized to do business as a foreign limited liability company and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its Business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not result in a Material Adverse Event. Seller has delivered to Purchasers true, complete and correct copies of its certificate of incorporation and by-laws or comparable organizational documents as in effect on the date hereof.

**5.2** **Authorization of Agreement**. Subject only to obtaining Bankruptcy Court approval pursuant to the Sale Order, Seller has all requisite organizational power, authority and legal capacity to execute and deliver this Agreement and Seller has all requisite organizational power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, the execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller, including any approvals of the board of managers and its members. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) following the approval of this Agreement and the transactions contemplated hereby by the Bankruptcy Court pursuant to the Sale Order, this Agreement, constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**5.3** **Conflicts; Consents of Third Parties**.

(a) Except as a result of the Chapter 11 Case or as set forth on Schedule 5.3(a) hereto, none of the execution and delivery by Seller of this Agreement or by Seller of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or give rise to any obligation of Seller to make any payment under, or to the increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens upon any of the properties or assets of Seller under any provision of (i) the certificate of incorporation and by-laws or comparable

organizational documents of Seller; (ii) subject to entry of the Sale Order approving the assumption and assignment of such Purchased Contract or Permit, any Purchased Contract or Permit to which Seller is a party or by which any of the properties or assets of Seller are bound; (iii) subject to entry of the Sale Order, any Order of any court, Governmental Body or arbitrator applicable to Seller or any of the properties or assets of Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law.

(b)    Other than in connection with the commencement of the Chapter 11 Case, entry of the Bidding Procedures Order and entry of the Sale Order or as set forth on Schedule 5.3(b), subject to the entry of the Sale Order, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller (i) in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or the taking by Seller of any other action contemplated hereby, or (ii) the continuing validity and effectiveness immediately following the Closing of any Purchased Contract or Permit of Seller.

5.4    **Financial Statements**.

(a)    Seller has delivered to Purchasers copies of (i) the audited consolidated balance sheets of Holdings and its Subsidiaries as of the fiscal year ending December 31, 2011, and consolidated statement of operations and cash flows for such fiscal year then ended; (ii) the unaudited consolidated balance sheets of Holdings and its Subsidiaries as of the fiscal year ending December 31, 2012, and consolidated statement of operations for such fiscal year then ended; and (iii) the unaudited consolidated balance sheet as of June 30, 2013 (the "Financial Statement Date") and the related consolidated statement of operations for the periods then ended, reflecting the sales of the Products and the value of the Inventory (such financial statements, including the related notes and schedules thereto, are referred to herein as the "Financial Statement"). The Financial Statement has been prepared in accordance with GAAP consistently applied without modification of the accounting principles used in the preparation thereof throughout the periods presented.

(b)    Seller makes and keeps books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets.

5.5    **Inventories**. With the exception of the Inventory reflected in the Financial Statement as being obsolete, excess, damaged or otherwise unusable Inventory, the Inventory of Seller is in good and marketable condition, and is saleable in the Ordinary Course of Business.

5.6    **Absence of Certain Developments**.    Except as expressly contemplated by this Agreement or as set forth on Schedule 5.6, since the Financial Statement Date (i) Seller has conducted its Business only in the Ordinary Course of Business and (ii) there has not been any event, change, occurrence or circumstance singly or in the aggregate that has had or could reasonably be expected to constitute a Material Adverse Event.  Since the Financial Statement Date:

(a)    there has not been any damage, destruction or physical loss, whether or not covered by insurance, with respect to the Purchased Assets having a replacement cost of more than $10,000 for any single loss or $100,000 for all such losses;

(b)    there has not been any change by Seller in accounting or Tax reporting principles, methods or policies; and

(c)     Seller has not mortgaged, pledged or subjected to any Lien any of its assets, or acquired any assets or sold, assigned, transferred, conveyed, leased or otherwise disposed of any assets of Seller, except for assets acquired or sold, assigned, transferred, conveyed, leased or otherwise disposed of in the Ordinary Course of Business, and except for any Lien securing loans under the Revolving Credit Agreement or the DIP Financing.

### 5.7     **Taxes**.

(a)     With respect to the Purchased Assets, (i) all material Tax Returns required to be filed by or on behalf of Seller or any affiliated group of which Seller is or was a member have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings); and (ii) all material Taxes payable by or on behalf of Seller or any affiliated group of which Seller is or was a member have been fully and timely paid.

(b)     Seller has timely paid or caused to be paid all Taxes due with respect to the Purchased Assets, the non-payment of which would result in a Lien on any Purchased Asset or would result in Purchasers becoming liable or responsible therefor.

(c)     Seller is not a foreign person within the meaning of Section 1445 of the Code.

### 5.8     **Title to Purchased Assets**.

Except as set forth on Schedule 5.8 hereto, Seller owns and has good title to each of the Purchased Assets other than liens for Taxes not yet due and payable, Liens under the Revolving Credit Agreement, and at the Closing, Seller shall convey each of the Purchased Assets free and clear of all Liens, Claims and interests, other than liens for Taxes not yet due and payable, liens under the credit agreement contemplated by the Commitment Letter (as defined below) and liens under the Credit Suisse Note and Security Agreement or PineBridge Notes and Security Agreements, and, with respect to the Foreign Assets, restrictions on transfer under applicable securities laws. The Purchased Assets will be delivered on an "as is, where is" basis, subject only to the representations and warranties and other applicable terms and provisions expressly made part of this Agreement.

### 5.9     **Intellectual Property**.

(a)     Schedule 5.9(a) sets forth an accurate and complete list of all (i) Software, (ii) registered Marks, material unregistered Marks, pending applications for registrations of any Marks and unregistered Marks, and (iii) registered Copyrights, and pending applications for registration of Copyrights, in each case owned or filed by Seller and included in the Purchased Intellectual Property. Schedule 5.9(a) lists the jurisdictions in which each such item of Purchased Intellectual Property has been issued or registered or in which any such application for such issuance and registration has been filed.

(b)     Schedule 5.9(b)(i) lists each Intellectual Property License to which Seller is granted any license or other right to use any Purchased Intellectual Property the loss of which would constitute a Material Adverse Event. Schedule 5.9(b)(ii) lists each Intellectual Property License to which Seller grants to any third Person a license or other right to use, resell, sublicense or develop any Purchased Intellectual Property the loss of which would constitute a Seller Material Adverse Event. To the Knowledge of Seller, each of the Intellectual Property Licenses set forth in Schedules 5.9(b)(i) and 5.9(b)(ii) is in full force and effect and is the legal, valid and binding obligation of Seller and the other parties thereto, enforceable against them in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). Seller is not in default under any Intellectual

25

Property License set forth in Schedules 5.9(b)(i) or 5.9(b)(ii), nor, to the Knowledge of Seller, is any other party to such Intellectual Property License in default thereunder.  No party to any such Intellectual Property Licenses has exercised any termination rights with respect thereto.

(c)    No Trade Secret or any other non-public, proprietary information material to Seller's Business as presently conducted has been authorized to be disclosed or, to the Knowledge of Seller, has been actually disclosed by Seller to any employee or any third party other than pursuant to a non-disclosure agreement restricting the disclosure and use of such Trade Secret or information. Seller has taken adequate security measures to protect the secrecy, confidentiality and value of all the Trade Secrets of Seller and any other confidential information, including invention disclosures, not covered by any patents owned or published patent applications filed by Seller, which measures are reasonable in the industry in which Seller operates.

(d)    Except as set forth on Schedule 5.9(d), Seller is not subject of any pending or, to the Knowledge of Seller, threatened Legal Proceedings which involve a claim of infringement, unauthorized use, misappropriation or other violation by any Person against Seller with respect to the Purchased Intellectual Property or challenging the ownership, use, validity or enforceability of, any Purchased Intellectual Property.  Except as set forth in Schedule 5.9(d), to the Knowledge of Seller, the Purchased Intellectual Property and all of Seller's rights in and to Purchased Intellectual Property are valid and enforceable.

(e)    Schedule 5.9(e) sets forth a complete and accurate list of (i) all Hardware and Software that is owned exclusively by Seller and is material to the operation of Seller's Business and (ii) all Software that is used by Seller in its Business that is not exclusively owned by Seller, excluding Software available on reasonable terms through commercial distributors or in consumer retail stores for a license fee of no more than $10,000.

**5.10    Labor**.  Seller is not a party to any labor or collective bargaining agreement and there are no labor or collective bargaining agreements which pertain to employees of Seller.

**5.11    Litigation**. Except as set forth in Schedule 5.11 and the Chapter 11 Case, there is no suit, action, proceeding, investigation, claim or order pending or, to the Knowledge of Seller, threatened, against Seller or any of the officers, directors or key employees of Seller with respect to their Business activities on behalf of Seller, or to which Seller is otherwise a party, which, if adversely determined, would singly or in the aggregate constitute a Material Adverse Event, before any Governmental Body; nor to the Knowledge of Seller is there any reasonable basis for any such action, proceeding, or investigation. Other than the Chapter 11 Case, Seller is not subject to any Order of any Governmental Body, except to the extent the same could not reasonably be expected to constitute a Material Adverse Event and Seller is not engaged in any legal action to recover monies due it or for damages sustained by it.

**5.12    Compliance with Laws; Permits**.

(a)    Subject to the Chapter 11 Case, Seller is in compliance in all material respects with all Laws of any Governmental Body applicable to its operations, the Purchased Assets or its Business.  Seller has not received any written or other notice of or been charged with the violation of any Laws nor, to the Knowledge of Seller, is Seller under investigation with respect to the violation of any Laws, in each case that would adversely affect its ability to consummate the sale of the Purchased Assets.

(b)    Seller currently has all Permits, which Permits are listed on Schedule 5.12(b) hereto, that are required for the operation of its Business as presently conducted.

### 5.13    Related Party Transactions.

(a)    Except as set forth on Schedule 5.13, none of Seller, any Subsidiary of Seller or, to the Knowledge of Seller, any of their respective officers or employees (i) owns any direct or indirect interest of any kind in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from, or has the right to participate in the profits of, any Person which is (A) a competitor, supplier or customer of Seller, (B) engaged in a business related to the business of Seller, or (C) a participant in any transaction to which Seller is a party or (ii) is a party to any Purchased Contract with Seller.

(b)    Each Purchased Contract, agreement, or arrangement between Seller on the one hand, and any Affiliate of Seller or any officer, director or employee of Seller on the other hand, is on commercially reasonable terms no more favorable to the Affiliate, director, officer or employee of Seller than what any third party negotiating on an arms-length basis would expect.

### 5.14    Defective $35 Fee Reserve Obligations; MDF Obligations; Product Warranty Obligations.  The estimated aggregate amounts as of June 30, 2013 of each of (i) the Defective $35 Fee Reserve Obligations, (ii) the MDF Obligations, and (iii) the Product Warranty Obligations provided to Purchasers by Seller prior to the date hereof are the best estimates of Seller of such amounts, and such estimated amounts were calculated in accordance with Seller's past practices.

### 5.15    Financial Advisors.  Except as set forth on Schedule 5.15, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.**Foreign Subsidiaries**.  Except as set forth on Schedule 5.16, none of the Foreign Subsidiaries owns or holds any assets, and none of the Foreign Subsidiaries nor any of their respective assets are subject to or encumbered by any fixed or contingent obligations or Liabilities.

### 5.17    Inspections; No Other Representation.  Each of PCD and Holdings is an informed and sophisticated seller, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Each of PCD and Holdings has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Each of PCD and Holdings agrees, warrants and represents that except as set forth in this Agreement and the other documents delivered by Purchasers to Seller pursuant to this Agreement, neither Buyer nor Quality One nor any director, officer, manager, employee, agent, consultant, or representative of Purchasers has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the subject matter or this Agreement.  Each of PCD and Holdings further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Seller and Purchasers after good faith arms'-length negotiation.  Each of PCD and Holdings agrees, warrants and represents that, except as set forth in this Agreement, it has relied, and shall rely, solely upon its own investigation of all such matters.  **Except as set forth in this Agreement and the other documents delivered by Purchasers to Seller pursuant to this Agreement, Purchasers hereby disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Affiliates or representatives (including without limitation any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, manager, employee, agent, consultant or representative of Purchasers).**

27

**5.18    No Other Representations and Warranties**.  Purchasers acknowledge  that except as expressly provided in this Agreement, Seller makes no representation or warranty of any kind whatsoever or by operation of law, by statute or otherwise.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Buyer and Quality One jointly and severally represent and warrant to each of PCD and Holdings that:

**6.1    Organization and Good Standing**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Quality One is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada.

**6.2    Authorization of Agreement**. Purchasers have full  organizational power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchasers in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchasers of this Agreement and each Purchaser Document have been duly authorized by all necessary organizational action on behalf of Purchasers including any approvals of its managers and its members. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchasers and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, legal, valid and binding obligations of Purchasers, enforceable against Purchasers in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**6.3    Conflicts; Consents of Third Parties**.

(a)    Except as set forth on Schedule 6.3 hereto, neither of the execution and delivery by Purchasers of this Agreement and of the Purchaser Documents, nor the compliance by Purchasers with any of the provisions hereof or thereof will (i) conflict with, or result in the breach of, any provision of the certificate of incorporation or by-laws of Purchasers, (ii) conflict with, violate, result in the breach of, or constitute a default under any note, bond, mortgage, indenture, license, agreement or other obligation to which either of the Purchasers is a party or by which either of the Purchasers or its properties or assets is bound or (iii) violate any statute, rule, regulation or Order by which either of the Purchasers is bound.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchasers in connection with the execution and delivery of this Agreement or Purchaser Documents or the compliance by Purchasers with any of the provisions hereof or thereof.

**6.4    Litigation**. There are no Legal Proceedings pending or, to the knowledge of Purchasers, threatened that are reasonably likely to prohibit or restrain the ability of Purchasers to enter into this Agreement or consummate the transactions contemplated hereby.

**6.5**    **Financial Advisors**.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchasers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof, except Raymond James & Associates, Inc.

**6.6**    **Financing**.  Closing shall not be contingent upon obtaining financing except for financing represented by the Credit Suisse Note and Security Agreement and PineBridge Notes and Security Agreements.  Purchasers have received a written commitment from Purchasers' Lender to provide Purchasers with funding to pay the Cash Consideration portion of the Purchase Price and such commitment will not expire before October 22, 2013 (the "Commitment Letter").  The Commitment Letter provides for and acknowledges, inter alia, that:

(a)    The intercreditor agreement will be entered into by the CS Term Lenders and PineBridge, on the one hand, and Purchasers' Lender, on the other hand, and shall provide that any standstill provisions in respect of the first priority security interests in the Inventory and proceeds granted pursuant to the Credit Suisse Note and Security Agreement and the PineBridge Notes and Security Agreements shall not extend beyond the respective maturity dates thereof;

(b)    Buyer shall be permitted to distribute to the CS Term Lenders and PineBridge seventy-five percent (75%) of the proceeds of the sale by Buyer of the Inventory, excluding Buyer's receipt of the first $8,000,000 in proceeds from the sale of Breakout Units acquired at Closing;

(c)    Buyer shall grant a first priority security interest on the Inventory and the proceeds thereof to each of the CS Term Lenders and PineBridge; provided that when the CS Term Lenders and PineBridge receive payment of 75% of the sale price for items of the Inventory, their respective first priority security interests in the associated proceeds will be automatically released;

(d)    The CS Term Lenders and PineBridge will acquire a second priority security interest in certain accounts receivable of Purchasers; and

(e)    Purchasers' Lender shall acquire a second priority security interest in the Inventory and the proceeds thereof, subject to, in the case of clauses (c), (d) and (e), a standstill on the respective lenders pursuant to the intercreditor agreement referenced above.

**6.7**    **Inspections; No Other Representation**.  Each Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder.  Each Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Each Purchaser agrees, warrants and represents that (a) such Purchaser is purchasing the Purchased Assets on an "**AS IS**" and "**WITH ALL FAULTS**" basis and (b) except as set forth in this Agreement, neither Seller nor any director, officer, manager, employee, agent, consultant, or representative of Seller have made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Seller, or the physical condition of the Purchased Assets.  Each Purchaser further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Seller and the Purchasers after good faith arms'-length negotiation in light of the Purchasers' agreement to purchase the Purchased Assets "**AS IS**" and "**WITH ALL FAULTS.**"  Each Purchaser agrees warrants and represents that, except as set forth in this Agreement, such Purchaser has relied, and shall rely, solely upon its own investigation of all such matters, and that each Purchaser has assumed all risks with respect thereto.  **Except as set forth in this**

Agreement, Seller hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Purchasers or their Affiliates or representatives (including without limitation any opinion, information, projection, or advice that may have been or may be provided to Purchasers by any director, officer, manager, employee, agent, consultant or representative of Seller). Seller makes no representations or warranties to Purchasers regarding the probable success, profitability or value of any of the Purchased Assets.

**6.8    No Other Representations and Warranties**. Seller acknowledges that except as expressly provided in this Agreement, Purchasers make no representation or warranty of any kind whatsoever or by operation of law, by statute or otherwise.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

**7.1    Pleadings and Motions**.  Prior to filing any pleading or motion, including the DIP Financing Motion and the Sale Motion, Seller will provide Purchasers with a list of creditors and parties in interest who will receive notice of such motions and other pleadings in the Chapter 11 Case. Purchasers shall have the right to request that additional Persons be included on such list. In addition, Seller shall provide Purchasers with drafts of all documents, motions, orders, filings or pleadings that it proposes to file with the Bankruptcy Court that relate to the approval of this Agreement and the consummation of the transactions contemplated hereby. Seller shall also promptly provide Purchasers with copies of all pleadings received by or served by or upon Seller in connection with the Chapter 11 Case not otherwise served on Purchasers that relate to or may reasonably be expected to affect the transactions provided for in this Agreement and which have not otherwise been served on Purchasers; it being understood that the attorneys for Purchasers shall file an electronic notice of appearance requesting service of all documents, notices, motions, pleadings and responses in the Chapter 11 Case.

**7.2    DIP Financing.** This Agreement is specifically subject to Bankruptcy Court approval of debtor-in-possession financing to be provided by the existing pre-petition lenders under the Revolving Credit Agreement ("DIP Financing") pursuant to the DIP Loan Documents which have been agreed upon by Buyer.  The DIP Financing Motion shall be filed no later than two (2) days after the filing of Chapter 11 by Seller and shall propose to fully fund the ten (10) week cash flow budget dated August 19, 2013 approved by Purchasers and attached hereto as Exhibit O (the "DIP Budget").  Seller agrees that the foregoing DIP Budget will not be materially altered or amended except with the prior approval of Purchasers, which shall not be unreasonably withheld.

**7.3    Filing of Sale Motion**.  No later than two (2) days after the filing of Chapter 11 case, Seller shall file the Sale Motion with the Bankruptcy Court requesting entry of the Sale Order that*, inter alia,* (i) requests (A) approval of the sale of the Purchased Assets to Purchasers on the terms and conditions set forth in this Agreement and (B) authorization for Seller to proceed with the Closing, (ii) includes a specific finding and conclusion of law that Purchasers are good faith purchasers of the Purchased Assets within the meaning of Section 363(m) of the Bankruptcy Code, (iii) states that the sale of the Purchased Assets shall be free and clear of all Liens, Claims, and interests whatsoever, and (iv) such other provisions as reasonably requested  by Purchasers.

**7.4    Service of Sale Motion**.  Seller will serve a copy of the Sale Motion and the accompanying attachments on the Persons identified in paragraph C of the Sale Order and such other Persons as Purchasers reasonably request. Prior to service of such documents, Seller will provide Purchasers a list of such Persons identified in paragraph C of the Sale Order.  At least five (5) days prior to the hearing approving the Sale Order, Seller shall serve a copy of the Sale Motion (along with a copy at

the proposed Sale Order and the Bidding Procedures Order) on each jurisdiction where the Purchased Assets are subject to Tax. Seller shall obtain entry of the Sale Order no later than fifty (50) days after the date of commencement of the Chapter 11 Case.

      **7.5**    **The Sale Order**. In addition to the requirements of <u>Section 7.2</u> hereof and to the extent not covered thereby, the Sale Order shall include, among other provisions reasonably requested by Purchasers, the following provisions (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order):

      (a)    the sale of the Purchased Assets by the Seller to Purchasers (A) is or will be legal, valid and effective transfers of the Purchased Assets; (B) vests or will vest in Purchasers all right, title and interest of Seller to the Purchased Assets free and clear of all Liens, Claims and interests pursuant to Section 363(f) of the Bankruptcy Code (other than Liens created by Purchasers); and (C) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the states in which Seller is conducting business and any other applicable non-bankruptcy laws;

      (b)    all amounts to be paid to Purchasers pursuant to this Agreement constitute administrative expenses under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and are immediately payable if and when the obligations of Seller arise under this Agreement, without any further order of the Bankruptcy Court;

      (c)    all Persons are enjoined from taking any actions against Purchasers or any Affiliates of Purchasers (as they existed immediately prior to the Closing) to recover any claim which such Person has against a Seller or its Affiliates;

      (d)    subject to <u>Article XII</u>, obligations of Seller relating to Taxes, whether arising under law or by this Agreement, shall be the responsibility of Seller;

      (e)    the provisions of the Sale Order are non-severable and mutually dependent;

      (f)    provide that Purchasers will not have any successor or transferee liability whatsoever for liabilities of Seller (whether under federal or state law or otherwise) as a result of the sale of the Purchased Assets;

      (g)    Purchasers have acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the transactions contemplated by this Agreement are undertaken by Purchasers and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and Purchasers are entitled to the protections of Section 363(m) of the Bankruptcy Code;

      (h)    all Purchased Contracts shall be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code;

      (i)    the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement, the DIP Financing Order, the Bidding Procedures Order, and the Sale Order in all respects; <u>provided</u>, <u>however</u>, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control,

31

prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter; and

(j)    such other provisions as Purchasers may agree to, or reasonably request or require.

**7.6    Bidding Procedures Order**.  The relief sought in the Sale Motion shall include approval of the Bidding Procedures Order, which, among other things, will name the Seller as the "stalking horse bidder" and contain such other terms and provisions as the Purchasers may require, including without limitation (i) the provisions described in Section 7.7 and Section 7.8 hereof and (ii) a finding that the liquidated damages described in Section 13.2 hereof are approved and constitute the sole remedy to Seller in the event of a breach by Purchasers, as further provided in Section 13.2.  The hearing on and approval of bid procedures, establishment of the Buyer as the "stalking horse" Starting Auction Bid (defined below) and other Buyer protections such as the Break-Up Fee and Expense Reimbursement, shall be scheduled to occur no later than fourteen (14) days after the filing of the Chapter 11 Case.

**7.7    Approval of Break-Up Fee and Expense Reimbursement**.

(a)    Seller acknowledges and agrees that Purchasers have expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller. In consideration therefor, Seller shall timely file with and seek the approval of the Bankruptcy Court as part of the Sale Motion and Bidding Procedures Order, an order approving the payment of the Break-Up Fee and the Expense Reimbursement as super priority administrative expense claims under Sections 503(b) and 507(a)(1) of the Bankruptcy Code.

(b)    Seller shall pay to Purchasers the Break-Up Fee and the Expense Reimbursement on the first (1st) Business Day after the earlier occurrence of any of the following events:

(i)    Seller voluntarily withdraws the Sale Motion other than in connection with Seller's termination of this Agreement in accordance with Section 4.7(c) or Section 4.7(e) hereof;

(ii)    the Bankruptcy Court approves an Alternative Transaction (subject to clause (c) below) or Restructuring Transaction, whether or not within the bidding procedures set forth in the Bidding Procedures Order;

(iii)    to the extent that Seller is no longer under the jurisdiction of the Bankruptcy Court, Seller consummates an Alternative Transaction or Restructuring Transaction prior to a date eighteen (18) months following the date hereof; or

(iv)    Purchasers terminate this Agreement in accordance with the provisions of Sections 4.7(b), 4.7(d), 4.7(g), 4.7(h), 4.7(i), 4.7(j), 4.7(k), 4.7(l), 4.7(m), 4.7(n), 4.7(o), 4.7(p), or the last paragraph of Section 4.7.

(c)    Seller shall pay to Purchasers the Break-Up Fee and the Expense Reimbursement on the date of the closing of an Alternative Transaction that is a sale pursuant to which a party other than Buyer is the Successful Bidder (as defined in the Bidding Procedures Order).

**7.8    Bidding Procedures**. The Bidding Procedures Order shall provide that the Purchase Price to be paid by the Purchasers pursuant to the terms of this Agreement is a qualifying bid and the starting bid for all qualified bids ("Starting Auction Bid"), and that any competing qualified bids must

comply with the following bidding procedures and overbid protections for the submission and consideration of qualified bids, along with such other bidding procedures as agreed to by Seller and Purchasers:

(a) In order for any offer to be a qualified bid (each a "Qualified Bid") in pursuit of an Alternative Transaction, it must be:

(i) in writing;

(ii) received by Purchasers and Seller at their respective addresses set forth in Section 13.7 no later than forty (40) days after the filing of the Chapter 11 case (the "Bid Deadline");

(iii) a firm, unconditional bid to purchase the Purchased Assets, not subject to any contingencies as to the validity, effectiveness and/or binding nature of the offer, including, without limitation, further due diligence review or financing (other than a financing substantially similar to the financing contemplated by the transaction set forth herein);

(iv) a firm bid of at least $1,250,000 in total consideration plus the Break-Up Fee over the Starting Auction Bid (the "Minimum Overbid");

(v) accompanied by sufficient information (as determined in the reasonable business judgment of the Seller) to demonstrate that the competing bidder has the financial wherewithal and ability to timely consummate the acquisition of the Purchased Assets on terms and conditions substantially the same as this Agreement, including evidence of adequate financing and a financial guaranty, if appropriate;

(vi) accompanied by a signed contract substantially in the form of this Agreement, and marked to show any changes made to this Agreement; and

(vii) accompanied by a good faith cash deposit in an amount equal to the $5,250,000 to be deposited with Seller on or before the Bid Deadline;

(b) Seller shall promptly deliver to Purchasers all Qualified Bids;

(c) Seller shall evaluate all Qualified Bids received and shall determine which Qualified Bid reflects the highest or best offer in comparison to the Starting Auction Bid for the Purchased Assets. Seller shall announce its determination of the Starting Auction Bid at the commencement of the Auction;

(d) the first incremental competitive bid at the Auction shall be at least $100,000 over the Minimum Overbid, with any subsequent increases of bids to be made in increments equal to at least $100,000;

(e) no bids shall be considered by Seller unless a party submitted a Qualified Bid and participates in the Auction;

(f) all of the Purchased Assets shall be sold in a single lot;

(g) the payment of the Break-Up Fee and the Expense Reimbursement to Purchasers;

(h)    In the event that Seller determines in good faith that it has not received a Qualified Bid by the Bid Deadline that is a higher or better bid than the one represented by this Agreement, Seller shall seek approval of this Agreement at the Approval Hearing without conducting an Auction and without further motion; and

(i)    such other terms as the Bankruptcy Court deems necessary and are reasonably acceptable to Purchasers.

**7.9**    **Cooperation**.    Seller shall cooperate with Purchasers and its representatives in connection with the DIP Financing Order, Sale Order, Bidding Procedures Order and the bankruptcy proceedings related thereto. Such cooperation shall include, but not be limited to, consulting with Purchasers at Purchasers' reasonable request concerning the status of such proceedings and providing Purchasers with copies of requested pleadings, notices, proposed orders and other documents not otherwise received by Purchasers as a result of the filing of a notice of appearance relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. Seller further covenants and agrees that the terms of any plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, without limitation, any transaction contemplated by or approved pursuant to the DIP Financing Order, Sale Order or the Bidding Procedures Order.

**7.10**    **Non-Solicitation Period**.

(a)    From the time of Seller's and Purchasers' execution and delivery of this Agreement until the Bankruptcy Court's entry of the Bidding Procedures Order (the "Non-Solicitation Period"), Seller shall not, nor shall it authorize or permit any Subsidiary of Seller to, nor shall it authorize or permit any officer, director, manager or employee of, or any investment banker, attorney or other advisor, agent or representative of, Seller or any of its Subsidiaries (collectively, "Seller Representatives") to solicit or otherwise proactively encourage any entity with respect to the submission of an Alternative Transaction or negotiate the terms of an Alternative Transaction; provided, however, that during the Non-Solicitation Period so long as Seller is not otherwise in breach of this Agreement, nothing in this Agreement shall prohibit Seller or Seller Representatives from entering into confidentiality agreements with any entity or furnishing to any entity any information relating to the Purchased Assets with respect to any proposal or expression of interest that constitutes, or which may lead to, a Qualified Bid; and provided, further, however, that Seller shall not execute any Alternative Transaction prior to the Bankruptcy Court's entry of the Bidding Procedures Order. In the event Seller receives an Alternative Transaction during the Non-Solicitation Period, Seller shall as promptly as practicable (and in any event within twenty-four (24) hours after receipt) deliver to Purchaser by facsimile transmission or send by courier service for delivery to Purchasers by the morning of the next Business Day, true and complete copies of any such Alternative Transaction, and, to the extent known by the Seller, the principals who are backing such entity.

(b)    Following entry of the Bidding Procedures Order until the Bid Deadline, Seller and Seller Representatives shall not be subject to any restrictions with respect to the solicitation or encouragement of any entity concerning the potential or actual submission of a Qualified Bid; provided, however, that promptly upon Seller's receipt of any offer for an Alternative Transaction, Seller must deliver to Purchasers by electronic mail, facsimile transmission or by courier service for delivery to Purchasers by the morning of the next Business Day true and complete copies of any such Alternative Transaction or a summary of the material terms of such Alternative Transaction, including, without limitation, the identity of the counterparty thereto.

**7.11** **Bankruptcy Court Objections**. In furtherance and not in limitation of the covenants of the parties contained in this Article VII, each of the parties hereto shall use its commercially reasonable efforts to resolve objections, if any, as may be asserted or raised by the Bankruptcy Court, any party in interest to the Chapter 11 Case, a Governmental Body or other Person with respect to the transactions contemplated by this Agreement.

## ARTICLE VIII
## COVENANTS

**8.1** **Access to Information**. Seller agrees that, prior to the Closing Date, Purchasers shall be entitled, through their officers, employees and representatives (including, without limitation, their legal and financial advisors and accountants) and subject to the Confidentiality Agreement, to make such investigation of the properties, businesses and operations of Seller and such examination of the books, records and financial condition of Seller as they reasonably request and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours and under reasonable circumstances, and Seller shall cooperate fully therein. No investigation by Purchasers prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of Seller contained in this Agreement or the Seller Documents. In order that Purchasers may have full opportunity to make such physical, business, accounting and legal review, examination or investigation as it may reasonably request of the affairs of Seller, Seller shall use commercially reasonable efforts to cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller to cooperate fully with such representatives in connection with such review and examination.  Seller shall promptly provide to Purchasers all documents and materials relating to the proposed sale of the Purchased Assets, Purchased Contracts or any portion thereof, including, without limitation, with respect to competing bids, and otherwise cooperate with Purchasers, to the extent reasonably necessary in connection with Purchasers' preparation for or participation in any part of the Chapter 11 Case in which Purchasers' participation is necessary, required or reasonably appropriate. Seller shall promptly deliver to Purchasers all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding as Purchasers may reasonably request. In addition, Seller shall consult with Purchasers with respect to any written or oral communication concerning, in whole or in part, the transactions contemplated by this Agreement.  If an Alternative Transaction is approved by the Bankruptcy Court, Purchasers agree, at the request of the Seller, to return or destroy any and all records, documents and copies of information provided by the Seller at any time.

**8.2** **Conduct of the Business Pending the Closing**.

(a) Except as otherwise expressly contemplated by this Agreement (including the prosecution of the Chapter 11 Case) or with the prior written consent of Purchasers, Seller shall:

(i) conduct its Business only in the Ordinary Course of Business;

(ii) use its commercially reasonable efforts to (A) preserve its present Business operations, organization (including management and the sales force) and goodwill of Seller and (B) preserve the present relationships with Persons having business dealings with Seller (including customers and suppliers);

(iii) maintain (A) all of the Purchased Assets and assumed Liabilities of Seller in their current condition, ordinary wear and tear excepted and (B) insurance upon all of the Purchased Assets and Assumed Liabilities of Seller in such amounts and of such kinds comparable to that in effect on the date of this Agreement;

35

(iv)    (A) maintain the books, accounts and records of Seller in the Ordinary Course of Business, (B) continue to collect accounts receivable and pay accounts payable utilizing normal procedures and without discounting or accelerating payment of such accounts other than in the Ordinary Course of Business as conducted in the past three (3) months, and (C) comply with all contractual and other obligations applicable to the operation of Seller;

(v)    comply in all material respects with applicable Laws including without limitation WARN and any state counterpart to WARN, subject to any limitations under the Bankruptcy Code; and

(vi)    not take any action which would adversely affect the ability of the parties to consummate the transactions contemplated by this Agreement.

(b)    Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Purchasers, Seller shall not:

(i)    sell, assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except for fair consideration in the Ordinary Course of Business) of Seller;

(ii)    enter into or agree to enter into any merger or consolidation with, any corporation, limited liability company or other entity, and not engage in any new business or invest in, make a loan, advance or capital contribution to, or otherwise acquire the securities of any other Person;

(iii)    enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(iv)    introduce any material change with respect to the operation of the Seller's Business, including any material change in the types, nature, composition or quality of products or services, or, other than in the Ordinary Course of Business, make any change in product specifications or prices or terms of distributions of such products;

(v)    enter into any transaction or to enter into, modify or renew any material Contract which by reason of its size or otherwise is not in the Ordinary Course of Business;

(vi)    enter into any material Contract, understanding or commitment that restrains, restricts, limits or impedes the ability of the Seller's Business, or the ability of Purchasers, to compete with or conduct any business or line of business in any geographic area;

(vii)    terminate or waive any rights under any (A) Purchased Contract or (B) Permit; or

(viii)    agree to do anything prohibited by this <u>Section 8.2</u> or anything which would make any of the representations and warranties of Seller in this Agreement untrue or incorrect in any material respect.

**8.3    <u>Consents</u>.**    Seller shall use its commercially reasonable efforts, and Purchasers shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in <u>Section 5.3(b)</u> hereof.

LIBNY/5268665.16

**8.4    Reasonable Efforts; Further Assurances**. Subject to the terms and conditions of this Agreement, each of Seller and Purchasers shall use their respective commercially reasonable efforts to (i) take, or cause to be taken, all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement, in each case, subject to the Seller's obligation under the Bankruptcy Code.  The Seller and Purchasers agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and to vest in Buyer good title to the Purchased Assets, including, subject to <u>Section 2.5</u>, assistance by Seller with the transfer of the Inventory and Purchased Contracts.

**8.5    Certain Filings**.

(a)    Seller and Purchasers shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Body is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(b)    Seller and Purchasers shall use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under the HSR Act, if any, and any comparable laws or regulations in any Foreign Jurisdiction to obtain any necessary regulatory approval, as applicable, and to consummate and make effective the transactions contemplated by this Agreement, including furnishing all information required by applicable law in connection with approvals of or filings with any Governmental Body, and filing, or causing to be filed, as promptly as practicable, any required notification and report forms under other applicable competition laws with the applicable governmental antitrust authority.  The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings.  Subject to appropriate confidentiality safeguards, each party shall use its commercially reasonably efforts to (i) respond promptly to any request for additional information made by the antitrust agency, (ii) promptly notify counsel to the other party of, any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement, (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat, and (iv) furnish counsel to the other Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency.  Seller and Purchasers shall use their commercially reasonable efforts to cause the waiting periods under the applicable competitions laws to expire at the earliest possible date after the date of filing.  Notwithstanding anything in this Agreement to the contrary, the parties shall take or cause to be taken all commercially reasonable actions necessary, proper or advisable to obtain any consent, approval or waiver relating to the HSR Act, the U.S. antitrust laws or any comparable laws or regulations in any Foreign Jurisdiction that is required for the consummation of the transactions contemplated by this Agreement.  The parties shall work together to propose, negotiate, offer to commit and effect (and if such offer is accepted, commit to and effect), by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of such assets or businesses as may be necessary in order to avoid or effect the dissolution of any  Order or the taking of any other action by any Government Body to restrain, enjoin or otherwise prohibit the consummation of the transactions contemplated by this Agreement.  In the event that any Order is sought to be imposed that would prevent, delay or make unlawful the consummation of the transactions contemplated this Agreement, the parties will use commercially reasonable efforts to

contest and resist any action seeking to have imposed any such Order and take promptly any and all steps (including the appeal thereof or the taking of the steps set forth in this paragraph but not the posting of a bond) reasonable and necessary to vacate, modify or suspend any such Order so as to permit such consummation as promptly as practicable after the date hereof.  For the avoidance of doubt, but subject to the proviso above, the parties shall consult and cooperate with one another to take any and all commercially reasonable actions necessary in order to ensure that no (i) requirement for a waiver, consent or approval of any Governmental Body, (ii) decree, judgment, injunction, temporary restraining order or any other Order in any suit or proceeding, and (iii) other matter relating to the HSR Act, the U.S. antitrust laws that would preclude consummation of the transactions.  All filing fees relating to this Section 8.5 shall be borne and paid fully by Purchasers.

**8.6**     **Non-Competition; Non-Solicitation; Confidentiality**.

(a)     If the Bankruptcy Court approves the Sale Motion and the transactions contemplated by this Agreement are consummated, then for a period from the Closing Date until the third (3rd) anniversary of the Closing Date, Seller shall not and shall cause its Subsidiaries not to directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of any business, whether in corporate, proprietorship or partnership form or otherwise, engaged in Seller's business as of the date hereof and during the preceding twelve (12) months, including the production marketing and aggregation and distribution of OEM wireless communications products throughout North America and South America (a "Restricted Business"); provided, however, that the restrictions contained in this Section 8.6(a) shall not restrict the acquisition by Seller, directly or indirectly, of less than 2% of the outstanding capital stock of any publicly traded company engaged in a Restricted Business. The parties hereto specifically acknowledge and agree that the remedy at law for any breach of the foregoing will be inadequate and that Purchasers, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage or posting any bond whatsoever.

(b)     If the Bankruptcy Court approves the Sale Motion and the transactions contemplated by this Agreement are consummated, then for a period from the date hereof to the third (3rd) anniversary of the Closing Date, Seller shall not and shall cause its Subsidiaries not to: (i) cause, solicit, induce or encourage any employees of Seller who are or become employees of Purchasers or their Affiliates to leave such employment or hire, employ or otherwise engage any such individual; or (ii) cause, induce or encourage any material actual or prospective client, customer, supplier, or licensor of Seller's Business (including any existing or former customer of Seller and any Person that becomes a client or customer of Seller's Business after the Closing) or any other Person who has a material business relationship with Seller's Business, to terminate or modify any such actual or prospective relationship.

(c)     From and after the date hereof, Seller shall not and shall cause its Subsidiaries and their respective officers, and directors not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors and employees of Purchasers or use or otherwise exploit for its own benefit or for the benefit of anyone other than Purchasers, any Confidential Information (as defined below). Seller and its officers, directors and Subsidiaries shall not have any obligation to keep confidential any Confidential Information if and to the extent disclosure thereof is specifically required by law; provided, however, that in the event disclosure is required by applicable Law, Seller shall, to the extent reasonably possible, provide Purchasers with prompt notice of such requirement prior to making any disclosure so that Purchasers may seek an appropriate protective order. For purposes of this Section 8.6(c), "Confidential Information" shall mean any confidential information with respect to Seller's Business, including, methods of operation, customers, customer lists, Products, prices, fees, costs, technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary

38

matters. "Confidential Information" does not include, and there shall be no obligation hereunder with respect to, information that (i) is generally available to the public on the date of this Agreement or (ii) becomes generally available to the public other than as a result of a disclosure not otherwise permissible thereunder. This Section 8.6 shall not in any way limit the disclosure of information (x) by Seller in connection with the prosecution of the Chapter 11 Case or (y) regarding Seller to other bidders or potential bidders to the extent specifically permitted by this Agreement or the Bid Procedures Order. Prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect. After the Closing has occurred, the Confidentiality Agreement shall be terminated to the extent relating to the Purchased Assets and Assumed Liabilities and the employees of the Seller, and shall, with respect to any of the Excluded Assets and Excluded Liabilities, remain in full force and effect.

(d)    The covenants and undertakings contained in this Section 8.6 relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this Section 8.6 will cause irreparable injury to the parties, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Therefore, Purchasers will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this Section 8.6. The rights and remedies provided by this Section 8.6 are cumulative and in addition to any other rights and remedies which Purchasers may have hereunder or at law or in equity. In the event that Purchasers were to seek damages for any breach of this Section 8.6, the portion of the Purchase Price which is allocated by the parties to the foregoing covenant shall not be considered a measure of or limit on such damages.

(e)    The parties hereto agree that, if any court of competent jurisdiction in a final nonappealable judgment determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this Section 8.6 is unreasonable, arbitrary or against public policy, then a lesser time period, geographical area, business limitation or other relevant feature which is determined to be reasonable, not arbitrary and not against public policy may be enforced against the applicable party.

**8.7    Preservation of Records**.  Seller and Purchasers agree that each of them shall preserve and keep the records held by it, Seller's Subsidiaries or Purchasers' Affiliates relating to Seller's Business for a period of three (3) years from the Closing Date, or such longer period as may be required under applicable Laws, and shall make such records and personnel available to the other (including through providing remote access to the appropriate computer servers) as may be reasonably required by such party in connection with, among other things, any insurance claims by, legal proceedings (including without limitation the Chapter 11 Case of Seller) against, or governmental investigations of, Seller or Purchasers or any of their current or future Affiliates, or in order to enable Seller or Purchasers to comply with their respective obligations (including any administrative obligations relating to the Chapter 11 Case and wind-down the Seller estate) under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Seller or Purchasers wishes to destroy such records before or after that time, such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice. Purchasers acknowledge and agree that upon the closing of any sale of the Purchased Assets, the Seller intends to wind-down its operations and, to the extent that Purchasers consummate the transactions contemplated by this Agreement, Purchasers will pay for the reasonable storage costs for such records.  It is acknowledged and agreed to by the parties that a failure by the Seller to remove materials identified in Section 2.1(g) of this Agreement to the extent that such materials are otherwise protected by the attorney-client or work product privileges, is inadvertent and that the Seller shall, after receiving written notice from the Purchasers of said failure, have ninety (90) days

("Recovery Period") to request the return of such documents from the Purchasers. At all times prior to the lapse of the Recovery Period, the Purchasers agree to take no actions with regard to the documents that would be inconsistent with the Seller's claims of privilege.

**8.8    Publicity**. Neither Seller nor Purchasers shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchasers or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement provided that the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

**8.9    Use of Name**. Seller hereby agrees that upon the consummation of the transactions contemplated hereby, Buyer shall have the sole right to the use of the name "Personal Communications Devices" or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including without limitation "PCD" or any other  name or mark confusingly similar thereto owned or licensed by Seller (collectively, the "Seller Marks"), all of which Seller Marks are identified on Exhibit P hereto and constitute Purchased Intellectual Property, and Seller shall not, and shall not permit any Subsidiary to, use such name or any variation or simulation thereof. In furtherance thereof, as promptly as practicable but in no event later than thirty (30) days following the Closing Date, Seller shall remove, strike over or otherwise obliterate all Seller Marks from all materials owned by Seller and used or displayed publicly including, without limitation, any sales and marketing materials, displays, signs, promotional materials and other materials.

**8.10    Financing Statement Releases**.  On or prior to the Closing, Seller shall have filed valid releases and/or termination statements for any and all financing statements and other recorded liens and security interests filed or recorded with any Governmental Body with respect to any Purchased Asset.

**8.11    Seller's Fiduciary Duties**.  Notwithstanding anything herein to the contrary, nothing in this Agreement shall require the Seller, its Affiliates or their respective directors or officers (in such person's capacity as a director or officer) or agents or advisors to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be reasonably likely to result in a breach of such person's fiduciary obligations under applicable law.

**8.12    Quality One Guarantee**. The Purchasers hereby agree that they are jointly and severally liable for all obligations of one another under this Agreement.  In furtherance of the foregoing and subject to the provisions of Section 13.2, Quality One hereby guarantees the prompt and full payment and performance of all payment and other obligations of Buyer and its successors under this Agreement.

**8.13    Inventory Sales; Purchasers' Right of First Refusal**.  From the date hereof until the Closing Date, if Seller proposes to sell (other than to Seller's carrier customers) all or a portion of either (a) the Inventory to any Person at a price below the cost of such Inventory, or (b) any Breakout Units at any price to any Person (in either case, the "ROFR Inventory"), then, at least two (2) Business Days prior to the sale of such ROFR Inventory, Seller shall provide Purchasers with written notice (which may be via electronic mail) of the proposed sale (the "Offer Notice").  Such Offer Notice shall set forth the quantity of the Products included in the ROFR Inventory proposed to be sold, as well as the proposed price (the "ROFR Price") at which those units of ROFR Inventory are proposed to be sold, and shall constitute an offer to sell all but not less than all of the ROFR Inventory proposed to be sold.  Within thirty six (36) hours of Purchasers' receiving the Offer Notice, Purchasers may elect to accept the offer to purchase all, but not less than all, of such ROFR Inventory at no less than the ROFR Price and shall give

written notice of such election, which shall include an executed purchase order for such ROFR Inventory contemplating immediate delivery thereof (the "Inventory Acceptance Notice").  The Inventory Acceptance Notice shall constitute a valid, legally binding and enforceable agreement for the sale and purchase of the ROFR Inventory included in Purchasers' Inventory Acceptance Notice.  All purchases of ROFR Inventory pursuant to an Inventory Acceptance Notice shall be in compliance with the terms of the line of credit Purchasers have with the Seller and, in the event the purchase price payable by Purchasers in respect of the ROFR Inventory is in excess of such credit limit, such amounts in excess of the credit limit shall be paid to Seller cash on delivery (C.O.D.) by wire transfer of immediately available funds.  In the event that Purchasers do not elect to exercise the rights to purchase ROFR Inventory under this Section 8.13 with respect to all of the ROFR Inventory proposed to be sold, Seller may sell such ROFR Inventory to the initial buyer on the terms and conditions set forth in the Offer Notice.

## ARTICLE IX
## EMPLOYEES AND EMPLOYEE BENEFITS

**9.1    Employment**.

(a)    Except as otherwise provided herein, at any time prior to or after the Closing, Purchasers shall be permitted to offer employment to any employees of Seller ("Business Employees"). Prior to the Closing, the Purchasers shall make offers of employment to at least thirty (30) Business Employees, and Purchasers will confirm the names of such offerees, and that offers were made thereto, within thirty (30) days following the date of commencement of the Chapter 11 Case. With respect to those Business Employees to whom Purchasers offer employment, Purchasers will use commercially reasonable efforts to offer such employment at competitive salary levels.  Those individuals who accept such offer are referred to herein as the "Transferred Employees."  Subject to applicable Laws, Purchasers shall have the right to dismiss any or all Transferred Employees at any time, with or without cause, and to change the terms and conditions of their employment (including compensation and employee benefits provided to them). Nothing herein shall be construed as an offer of employment on other than an employee-at-will basis.

(b)    To the extent permitted by applicable Law, from time to time following the Closing, Seller shall make available to Purchasers such non-confidential data in personnel records of Transferred Employees as is reasonably necessary for Buyer to transition such employees into Buyer' records.

(c)    Purchasers agree to provide any required notice under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") and any other similar applicable law on or after the Closing Date.  Buyer shall assume all liabilities for post-employment health coverage under COBRA or otherwise with respect to the Transferred Employees on and after the Closing Date.

## ARTICLE X
## CONDITIONS TO CLOSING

**10.1    Conditions Precedent to Obligations of Purchasers**. The obligation of Purchasers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchasers in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Seller set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing as though made at and as of the Closing (except to the extent that such representations and warranties expressly relate to an earlier date, in

41

which case such representations and warranties shall be true and correct on and as of such earlier date), except for breaches or inaccuracies of representations or warranties that would not constitute or reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Event, and Purchasers shall have received a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchasers), dated the Closing Date, to such effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchasers shall have received a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchasers), dated the Closing Date, to such effect and copies of such corporate resolutions and other documents evidencing the performance thereof as Purchasers may reasonably request;

(c)     there shall not have been or occurred any event, change, occurrence or circumstance individually or in the aggregate that has had or which could reasonably be expected to constitute a Material Adverse Event since the Financial Statement Date, and Purchasers shall have received a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchasers), dated the Closing Date, to such effect;

(d)     Seller shall have obtained all consents, waivers and approvals referred to in Section 5.3(b) hereof in a form satisfactory to Purchasers;

(e)     To the extent Buyer may elect, Seller shall cause an assignment of any other of the Seller's master equipment vendor agreements, each of which shall be considered Purchased Contracts, as of the Closing Date and with counterparty consent or an Order of the Bankruptcy effecting the same;

(f)     Buyer shall have received an assignment at Closing of all of Seller's rights in each of the Purchased Contracts in form and substance acceptable to Purchasers in their discretion;

(g)     At least fifty percent (50%) of the Business Employees offered employment by Buyer or Quality One prior to the Closing Date pursuant to Section 9.1(a) shall have accepted such employment with Purchasers or one of their Affiliates pursuant to employment offer letters entered into following the date of this Agreement; and

(h)     The sum of the DIP Loan Payoff Amount plus the Estimated Transaction Expenses shall not be in excess of $47,000,000.

**10.2    Conditions Precedent to Obligations of Seller**.    The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable law): The representations and warranties of each Purchaser set forth in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing as though made at and as of the Closing (except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date), except for breaches or inaccuracies of representations or warranties that would not constitute or reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Event, and Seller shall have received a certificate signed by an authorized officer of each Purchaser (in form and substance reasonably satisfactory to Seller), dated the Closing Date, to such effect; and

42

(b)      Purchasers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of each Purchaser (in form and substance reasonably satisfactory to Seller), dated the Closing Date, to such effect and copies of such corporate resolutions and other documents evidencing the performance thereof as Seller may reasonably request.

**10.3    Conditions Precedent to Obligations of Purchasers and Seller**. The respective obligations of Purchasers and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchasers and Seller in whole or in part to the extent permitted by applicable Law):

(a)      no Legal Proceedings over which the Bankruptcy Court has jurisdiction under 28 U.S.C. § 157(b) and (c) shall have been instituted or threatened seeking to restrain or prohibit the consummation of the transactions contemplated hereby, and there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)      the Bankruptcy Court shall have entered the DIP Financing Order and Bidding Procedures Order;

(c)      the Bankruptcy Court shall have entered the Sale Order approving Buyer as the "Buyer" thereunder and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)      the requisite waiting period, if any, under the HSR Act applicable to the consummation of the transactions contemplated by this Agreement shall have expired or been terminated, and any Governmental Body whose consent is required for consummation of the transactions contemplated hereby shall have issued all consents required for the transactions contemplated hereby, without any unreasonable condition or limitation;

(e)      Each of the CS Term Lenders and PineBridge shall have duly executed and delivered its acknowledgement under the Credit Suisse Note and Security Agreement, the Quality One – Credit Suisse Guaranty, the PineBridge Notes and Security Agreements, and the Quality One – PineBridge Guaranty, as applicable; and

(f)      Purchasers' Lender shall have provided Seller and Purchasers written approval of the form and substance of each of the Credit Suisse Note and Security Agreement, the PineBridge Notes and Security Agreements, the Quality One – Credit Suisse Guaranty, and the Quality One – PineBridge Guaranty, and all other documents and instruments related thereto.

**10.4    Frustration of Closing Conditions**.    Neither Seller nor Purchasers may rely on the failure of any condition set forth in Section 10.1, 10.2, or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

**ARTICLE XI
SURIVIVAL**

**11.1    Survival of Representations and Warranties**. The (a) representations and warranties of the parties and (b) covenants and agreements of the parties that by their terms are to be performed before

Closing, whether contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing.  The covenants and agreements contained herein that by their terms are to be performed after Closing shall survive the Closing until such agreements are performed, except the covenants, agreements, representations and warranties contained in <u>Article XII</u> shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

**ARTICLE XII**
**TAXES**

**12.1**    **Transfer Taxes**.  Purchasers shall (i) be responsible for (and shall indemnify and hold harmless Seller against) any and all Liabilities for any sales, use, stamp, documentary, filing, recording, transfer, real estate transfer, stock transfer, gross receipts, registration, duty, securities transactions or similar fees or taxes or governmental charges (together with any interest or penalty, addition to tax or additional amount imposed) as levied by any Taxing Authority in connection with the transactions contemplated by this Agreement (collectively, "<u>Transfer Taxes</u>"), regardless of the Person liable for such Transfer Taxes under applicable Law and (ii) timely file or caused to be filed all necessary documents (including all Tax Returns) with respect to Transfer Taxes.  The parties will reasonably cooperate to minimize any such Transfer Taxes, including with respect to delivery location.

**12.2**    **Apportionment of Taxes**.  In the case of any Tax period, with respect to any non-income Tax, that includes (but does not end on or before) the Closing Date (a "<u>Straddle Period</u>"), the portion of any Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date shall be: (A) in the case of Taxes that are imposed on a periodic basis (and not based on invoices, receipts, sales or payments), deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of calendar days in the Straddle Period ending on (and including) the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period, and (B) in the case of Taxes not described in (A) (such as Taxes that are imposed in connection with any sale or other transfer or assignment of property, or based on invoices, receipts or payments), deemed equal to the amount that would be payable if the taxable year or period ended and the books closed at the close of the Closing Date.

**12.3**    **Purchase Price Allocation**.  Not later than sixty (60) days after the Closing Date, Purchasers shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "<u>Asset Acquisition Statement</u>") allocating the purchase price and the Assumed Liabilities among the Purchased Assets in accordance with Section 1060 of the Code, such Asset Acquisition Statement subject to Seller's review and written approval, not to be unreasonably withheld. Purchasers shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "<u>Revised Statements</u>") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any), subject to Seller's review and written approval, not to be unreasonably withheld.   All income Tax Returns filed by Purchasers and Seller shall be prepared consistently with such Asset Acquisition Statement as revised by the Revised Statements.

**12.4**    **Cooperation on Tax Matters**.

(a)    Purchasers and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters.

44

(b)     Purchasers shall be entitled to a copy of all accounting, business, financial and non-income Tax Returns that are in existence on the Closing Date and transferred to Purchasers hereunder for a period of at least three (3) years from the Closing Date. Purchasers shall give Seller notice and an opportunity to retain any such records in the event that Purchasers determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Purchasers shall provide access to Seller (after reasonably detailed prior notice and during normal business hours), to the books, records, documents and other information relating to the Purchased Assets as is reasonably necessary for Seller to properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer.

## ARTICLE XIII
## MISCELLANEOUS

**13.1     Expenses**. Except for the Expense Reimbursement and as otherwise provided in this Agreement, each of Seller and Purchasers shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**13.2     Remedies**.

(a)     _Specific Performance_. Each of Seller and Purchasers acknowledges and agrees that the breach of this Agreement would cause irreparable damage to Purchasers, and that Purchasers will not have an adequate remedy at law. Therefore, the obligations of Seller under this Agreement, including, without limitation, Seller's obligation to sell the Purchased Assets to Purchasers, shall be enforceable by a decree of specific performance issued by the Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith.

(b)     _Liquidated Damages_. Notwithstanding anything herein provided to the contrary, in the event there is no Closing for any reason other than (i) a Failure to Fund, (ii) termination of this Agreement by mutual consent pursuant to Section 4.7(a), or (iii) the exercise by Purchasers of any termination right specified in Section 4.7 (any such failure to close other than as set forth in clauses (i), (ii), or (iii), a "Failure to Close"), Seller and Purchasers agree that because of the inherent difficulty of measuring and quantifying actual damages and the uncertainty thereof in the event of a Failure to Close or Failure to Fund, as applicable, the retention by the Seller of the Escrow Deposit and interest earned thereon as contemplated in Section 3.4(d) or Section 3.4(e) shall constitute liquidated damages for such Failure to Close or Failure to Fund, as applicable, and shall constitute the sole and exclusive remedy of Seller therefor.  Seller and Purchasers agree that the amount of the Escrow Deposit and interest earned thereon bears a reasonable and agreed upon measure of Seller's anticipated loss and damages in the event of a Failure to Close or Failure to Fund, as applicable.  The foregoing exclusive remedy is an essential element of this Agreement, and the Purchasers would not have entered into this Agreement without the foregoing exclusive remedy for the events specified.

(c)     _Exclusivity of Remedies for Other Breaches_.  Except as specifically set forth in this Agreement, including without limitation this Section 13.2, effective as of Closing each party waives any rights and claims it may have against the other, whether in law or in equity, relating to (i) any breach of representation, warranty, covenant or agreement contained herein occurring on or prior to the Closing or (ii) the Purchased Assets or Assumed Liabilities, except that no party shall be deemed to have waived or released any right or claim, in law or in equity, that such party may have against any other party as the result of fraud or willful misrepresentation.  Purchasers and Seller acknowledge and agree that if this Agreement is terminated for any reason, the provisions of Section 3.4, Section 4.7 and this Section 13.2

LIBNY/5268665.16

shall be the sole and exclusive remedies of the Parties for any breach of the representations, warranties, covenants or agreements contained herein.

(d)       No Consequential or Indirect Damages.  NOTWITHSTANDING ANYTHING HEREIN PROVIDED TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS REPRESENTATIVES BE LIABLE UNDER THIS AGREEMENT TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, INCLUDING ANY DAMAGES FOR BUSINESS INTERRUPTION, LOSS OF USE, REVENUE OR PROFIT, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE AND WHETHER OR NOT THE BREACHING PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**Submission to Jurisdiction; Consent to Service of Process**.

(a)       The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in the Bankruptcy Court; provided, however, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this sentence or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court in the Southern District of New York or the federal courts of the United States located in the State of New York having competent jurisdiction with respect to any such matter. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)       Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by the mailing of a copy thereof in accordance with the provisions of Section 13.7.

**13.4       Waiver of Right to Trial by Jury**.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof. **Entire Agreement; Amendments and Waivers**. This Agreement (including the schedules and exhibits hereto) and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law. **Governing Law**. This Agreement shall be governed by and construed in

LIBNY/5268665.16

accordance with the laws of the State of New York applicable to contracts made and performed in such State.

**13.7**    **Notices**. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Personal Communications Devices, LLC
80 Arkay Dr., Hauppauge, NY 11788
Attention: Chief Executive Officer
Facsimile: (631) 951-0784

With a copy to:
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
Attention: Andrew J. Weidhaas, Emanuel Grillo and Breck Hancock
Facsimile: (212) 355-3333

If to Purchasers, to:

Quality One Wireless, LLC
1500-A Tradeport Drive, Orlando FL 32824
Facsimile: (307) 857-3737
Attention: Chief Executive Officer

With a copy to:

Quality One Wireless, LLC
1500-A Tradeport Drive, Orlando FL 32824
Facsimile: (307) 857-3737
Attention: Marshall S. Harris, General Counsel

And with a copy to:

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, TX 75201
Facsimile: 214-855-7584
Attention: Joseph J. Wielebinski and Jeffrey D. Dunn

**13.8**    **Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the

transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**13.9**    **Binding Effect; Assignment**.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below.    No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchasers (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer may assign this Agreement and any or all rights or obligations hereunder (including, without limitation, Buyer's rights to purchase the Purchased Assets hereunder) to any Affiliate of Buyer. Upon any such permitted assignment, the references in this Agreement to Buyer shall also apply to any such assignee unless the context otherwise requires.    For the avoidance of doubt, Quality One shall not be permitted to assign its rights and obligations hereunder, and each of the Credit Suisse Note and Security Agreement, the Quality One – Credit Suisse Guaranty, the PineBridge Notes and Security Agreements, and the Quality One – PineBridge Guaranty shall not be assignable by the Purchasers, as applicable, without the express prior written consent of the Seller and other parties thereto.

**13.10**    **Non-Recourse**.    No past, present or future director, officer, employee, incorporator, member, manager, partner, equity holder, Affiliate, agent, attorney or representative of Purchasers or their Affiliates shall have any liability for any obligations or liabilities of Purchasers under this Agreement or the Purchasers Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

**13.11**    **Counterparts**.    This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. (Signatures on following page)

LIBNY/5268665.16

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

PERSONAL COMMUNICATIONS DEVICES HOLDINGS, LLC

By: _____
Name: George Appling
Title:  Manager

PERSONAL COMMUNICATIONS DEVICES, LLC

By: _____
Name: George Appling
Title: Chief Executive Officer

Q1W NEWCO, LLC

By: _____
Name: John Chiorando
Title: President

QUALITY ONE WIRELESS, LLC

By: _____
Name: John Chiorando
Title: President

## **Exhibit A – Form of Buyer Assignment and Assumption Agreement**

See attached.

**Exhibit A**

**FORM OF
ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (the "Agreement"), effective as of _____, 2013 (the "Effective Date"), is entered into by and among Personal Communications Devices Holdings, LLC, a Delaware limited liability company ("Holdings"), Personal Communications Devices, LLC, a Delaware limited liability company and wholly owned subsidiary of Holdings ("PCD"), and Q1W Newco, LLC, a Delaware limited liability company ("Assignee"). Holdings and PCD are sometimes collectively referred to as "Assignor."

WHEREAS, Assignor, Assignee and Quality One Wireless, LLC have entered into a certain Asset Purchase Agreement, dated as of _____, 2013 (the "Purchase Agreement"), pursuant to which, among other things, Assignor has agreed to assign all of its rights, title and interests in substantially all of its assets (other than the Excluded Assets), and Assignee has agreed to assume certain of Assignor's duties and obligations as specified in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.    Assigned Assets. Assignor hereby sells, assigns, grants, conveys and transfers to Assignee all of Assignor's right, title and interest in and to the following assets of Seller (the "Assigned Assets"):

a.    All Accounts Receivable;

b.    All Purchased Contracts;

c.    All Purchased Intellectual Property;

d.    All Intellectual Property Licenses;

a.    All computer Software owned by Seller;

b.    All Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Purchased Assets, including Documents relating to Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, but

excluding personnel files for Employees of Seller who are not Transferred Employees;

c.    All Permits used by Seller in connection with the Purchased Assets to the extent assignable;

d.    All rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties to the extent relating to the Purchased Assets (or any portion thereof);

e.    All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to Products sold, or services provided, to Seller or to the extent affecting any Purchased Assets;

f.    All rights, claims or causes of action against third parties to the extent they relate to the Purchased Assets, Purchased Contracts or Assumed Liabilities;

g.    All Post-Termination Covenants (including without limitation the confidentiality and non-solicitation covenants set forth in the August 17, 2012 Employment Agreement between PCD and George Appling); and

h.    All other intangible assets included in the Purchased Assets.

Notwithstanding the foregoing, the assets to be transferred to Buyer under this Agreement shall not include the Excluded Assets.

3.    <u>Assumed Liabilities</u>.  Assignee hereby accepts such assignment and assumes and agrees to pay, perform and discharge, as and when due, all of the Assumed Liabilities.

4.    <u>Terms of the Purchase Agreement</u>.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants and agreements relating to the Assigned Assets and Assumed Liabilities, to the extent they survive the Closing pursuant to the terms of the Purchase Agreement, are incorporated herein by this reference.  The parties hereto acknowledge and agree that the representations, warranties, covenants and agreements contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule.

2

6.      <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

7.      <u>Further Assurances</u>. Subject to the provisions of the Purchase Agreement and without expanding the obligations of Assignor or Assignee thereunder, each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

[SIGNATURE PAGE FOLLOWS]

3

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first above written.

ASSIGNOR

PERSONAL   COMMUNICATIONS
DEVICES HOLDINGS, LLC

By:      _____

Name:

Title:

PERSONAL   COMMUNICATIONS
DEVICES, LLC

By:      _____

Name: George Appling

Title: Chief Executive Officer

ASSIGNEE

Q1W NEWCO, LLC

By: _____

Name: John Chiorando

Title: President

## **Exhibit B – Form of Buyer Bill of Sale**

See attached.

**Exhibit B**

**FORM OF**
**BILL OF SALE**

This Bill of Sale, effective as of _____, 2013, is entered into by and among Personal Communications Devices Holdings, LLC, a Delaware limited liability company, Personal Communications Devices, LLC, a Delaware limited liability company (collectively, "Sellers"), and Q1W Newco, LLC, a Delaware limited liability company ("Buyer").

WHEREAS, Sellers, Buyer and Quality One Wireless, LLC have entered into a certain Asset Purchase Agreement, dated as of _____, 2013 (the "Purchase Agreement"); and

WHEREAS, the Purchase Agreement provides for the sale and transfer by Sellers of certain tangible assets to Buyer.

NOW, THEREFORE, Sellers and Buyer agree as follows:

1.      All capitalized terms used but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.      For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Sellers hereby grant, bargain, transfer, sell, assign, convey and deliver to Buyer and Buyer's successors and assigns, to have and hold forever, all of Sellers' right, title and interest in and to the following tangible personal property:

        a.      All Foreign Assets, but excluding any Excluded Assets held by any such foreign Subsidiary;

        b.      All Foreign Subsidiaries;

        c.      All Inventory and all Products;

        d.      All Equipment;

        e.      All prepaid expenses and deposits (other than those amounts set forth in Sections 2.2(c), 2.2(d) and 2.2(e) of the Purchase Agreement);

        f.      All cash on hand and on deposit at financial institutions, other than the Secured Incentive Amount and the amounts held in the Administrative Expense Claims Reserve Account;

        g.      All computer Hardware owned by Seller; and

        h.      All other tangible assets included in the Purchased Assets.

3.      Notwithstanding the foregoing, the assets to be transferred to Buyer under this Bill of Sale shall not include the Excluded Assets.

4.      This sale, conveyance, assignment and transfer has been executed and delivered by Sellers in accordance with the Purchase Agreement and is expressly made subject to those liabilities, obligations and commitments which Buyer has expressly assumed and agreed to perform, pay and discharge pursuant to the Assignment and Assumption Agreement executed by Buyer and Sellers of even date herewith.

5.      Buyer acknowledges and agrees that Sellers make no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement, and neither the representations and warranties nor the rights and remedies of Buyer or Sellers under the Purchase Agreement shall be deemed to be enlarged, diminished, modified or altered in any way by this instrument.

6.      Subject to the provisions of the Purchase Agreement and without expanding the obligations of Buyer or Sellers thereunder, Sellers, hereby jointly and severally covenant and agree that, at any time and from time to time upon the written request of Buyer, Sellers will do, execute, acknowledge and deliver all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the Purchased Assets transferred by this Bill of Sale.

7.      This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule.

8.      This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, Sellers and Buyer have duly executed this Bill of Sale as of the date first above stated.

SELLERS:

PERSONAL  COMMUNICATIONS DEVICES HOLDINGS, LLC

By: _____
Name:
Title:

PERSONAL  COMMUNICATIONS DEVICES, LLC

By: _____
Name: George Appling
Title: Chief Executive Officer

ACCEPTED:

Q1W NEWCO, LLC

By: _____
Name: John Chiorando
Title: President

## **Exhibit C – Form of Credit Suisse Note and Security Agreement**

See attached.

### Form of Secured Note and Security Agreement

THIS SECURED NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED ABSENT REGISTRATION THEREUNDER OR AN EXEMPTION THEREFROM.

### SECURED NOTE AND SECURITY AGREEMENT

**$36,340,067.01**                                                                                       **[Date]**

                                                                                       **New York, New York**

FOR VALUE RECEIVED, Q1W Newco, LLC, a Nevada limited liability company (the "Company"), hereby promises to pay to the order of [DLJ Investment Partners III, L.P., DLJ Investment Partners, L.P. – Series C, and IP III Plan Investors, L.P.], or their permitted assigns (each, a "Fund" and collectively, the "Holder"), the aggregate principal amount of Thirty-Six Million Three Hundred Forty Thousand Sixty-Seven and 1/100 Dollars ($36,340,067.01), together with interest thereon from the date hereof or such lesser amount as may be outstanding from time to time.  The proportionate interest that each Fund holds in this Secured Note and Security Agreement (this "Note") is set forth in Schedule A attached hereto.

This Note is one of up to three (3) Notes issued pursuant to that certain Asset Purchase Agreement, by and among the Company, Quality One Wireless, LLC ("Quality One"), Personal Communications Devices, LLC ("PCD"), and Personal Communications Devices Holdings, LLC (the "Asset Purchase Agreement"), providing for the issuance of this Note to the Holder, a note to [certain funds managed by PineBridge Investments] (the "PB Note"), and an additional note to such funds managed by [PineBridge Investment] in respect of the Net Working Capital Adjustment, if any, pursuant to Sections 3.3 and 4.5 of the Asset Purchase Agreement (collectively, the "PB Notes," and, together with this Note, the "Notes").  Capitalized terms used but not defined herein shall have the meaning set forth in the Asset Purchase Agreement.

1.       Final Payment Date. Unless earlier paid pursuant to Sections 3.2 or 3.3 below, the aggregate unpaid principal amount of this Note, all accrued and unpaid interest and all other amounts payable under this Note shall be due and payable by the Company on the earlier of (i) [_____] (the "Maturity Date"),[1] and (ii) when, upon or after the occurrence of an Event of Default, such amounts are declared due and payable by the Holder or made automatically due and payable in accordance with the terms hereof.

2.       Interest.  The outstanding principal amount under this Note shall bear interest from the date hereof to the Maturity Date or, if earlier, the date when this Note is paid in full, equal to the three-month London Interbank Offered Rate for corresponding deposits of U.S. dollars, *plus* three and one-half percent (3.5%) per annum. Interest on the then outstanding principal amount hereunder shall be calculated on the basis of a year of 365 days and charged for the actual number of days elapsed and shall be payable monthly in arrears on the first day of each calendar month and on the Maturity Date, commencing on the first such date to occur after the

---

[1] To insert 6 months from date of issuance.

date hereof.  Any accrued and unpaid Interest as of the Maturity Date shall be due and payable on the Maturity Date.

3.    Payment.

3.1    General.  Payments of the principal amount of this Note and interest hereunder shall be made in lawful money of the United States of America and in immediately available funds at such place as may be designated in writing by the Holder.  All payments shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal.  If any payment hereunder becomes due and payable on a day other than a business day, the maturity thereof shall be extended to the next succeeding business day.  As used herein, the term "business day" shall mean a day other than a Saturday, Sunday or day on which commercial banks are authorized to close under the laws of the State of New York.

3.2    Optional Prepayment.  Subject to Section 3.1, the Company shall have the right at any time and from time to time to prepay this Note, in whole or in part, without premium or penalty.

3.3    Mandatory Prepayments.

(a)    The Company shall from time to time make mandatory prepayments ("Mandatory Prepayment(s)") hereunder, on the dates set forth below,  in aggregate amounts equal to seventy-five percent (75%) of Inventory Sale Proceeds (as defined below), except for the first $8,000,000 of Inventory Sale Proceeds received by the Company from the sale or disposition of Breakout Units (as defined below), until such time as the Notes have been paid in full. As used herein, "Inventory Sale Proceeds" means an amount equal to (i) the invoiced sale amount of each unit of Purchased Inventory (each, a "Unit"), less (ii) any sales or transfer taxes attributable to the sale of such Unit.  The term "Breakout Units" means all of the 4G LTE Pantech Breakout handset units purchased by the Company from PCD and held as part of the Company's inventory.

(b)    Until such time as the Notes have been paid in full, prior to the close of business on Friday of each week (or if such day is not a Business Day, on the next following Business Day), the Company shall deliver to the Holder Mandatory Prepayments with respect to Units sold by the Company for which the Company has (i) acquired Purchased Inventory A/R included for the first time in the calculation of the Company's eligible borrowing base under the Credit Agreement during the week ending on the immediately preceding Tuesday; and/or (ii) received cash proceeds from the sale of such Units, whether cash on delivery, prepayment or upon collection of Purchased Inventory A/R not otherwise included under the Company's eligible borrowing base under the Credit Agreement or otherwise, in each case during the week ending on the immediately preceding Tuesday.

4.    Priority.  This Note, and the obligations of the Company hereunder, shall be subject to the terms of that certain Intercreditor Agreement, dated as of the date hereof, between

Callidus Capital Corporation (the "<u>Company's Lender</u>"), the holder of the PB Note, and the Holder (the "<u>Intercreditor Agreement</u>"), and <u>Section 7.6</u> hereof.

5.      <u>Security Interests</u>.  The Company is granting the Holder a security interest in the Collateral (as defined below) to secure its due and prompt payment and performance under this Note.

5.1      <u>Purchased Inventory</u>.  The Company hereby pledges and grants to the Holder, and hereby creates a continuing first priority lien and security interest in favor of the Holder in and to all of its rights, title and interest in and to all of the Inventory purchased by the Company from PCD pursuant to the Asset Purchase Agreement, and as specifically set forth on <u>Schedule B</u> attached hereto, wherever located (the "<u>Purchased Inventory</u>").

5.2      <u>Purchased Inventory A/R</u>.  The Company hereby pledges and grants to the Holder, and hereby creates a continuing first priority lien and security interest in favor of the Holder in and to all of the Company's rights, title and interest in and to the Company's right to receive payment for Purchased Inventory that is sold or otherwise disposed of (the "<u>Purchased Inventory A/R</u>").

5.3      <u>Other Accounts Receivable</u>.  The Company hereby pledges and grants to the Holder, and hereby creates a continuing second priority lien and security interest in favor of the Holder, subject to the first priority lien and security interest in favor of Company's Lender, in and to all of the Company's rights, title and interest in and to the Company's right to receive payment for all accounts receivable of the Company, other than the Purchased Inventory A/R, in an amount of such accounts receivable, at any time, of not more than $75,000,000.00 in the aggregate pursuant to this Note and under the Guaranty and Security Agreement of even date herewith made by Quality One in favor of Holder ("<u>Accounts Receivable</u>").

All of the Purchased Inventory, the Purchased Inventory A/R and Accounts Receivable are collectively referred to herein as the "<u>Collateral</u>."

5.4      <u>Continuing Security Interest; Further Actions</u>.  This Note shall create a continuing first priority lien and security interest in the  Purchased Inventory and the Purchased Inventory A/R and a continuing second priority lien and security interest in the Accounts Receivable, and shall (a) subject to release or termination pursuant to <u>Section5.5</u>, remain in full force and effect until payment and performance in full of the principal amount of the Note and interest accrued thereon, (b) be binding upon the Company, its successors and assigns, (c) inure to the benefit of the Holder and its successors, transferees and assigns; provided that the Company may not assign or otherwise transfer any of its rights or obligations under this Note without the prior written consent of the Holder, and (d) be subject to the terms of the Intercreditor Agreement.

5.5      <u>Termination; Release</u>.

(a)      In connection with the sale of each Unit, Holder shall be deemed to have released its first priority lien and security interest in such Unit upon the sale of such Unit; provided that the sale is a Qualified Sale.  The Company shall not enter into any agreement with respect to the sale of the Purchased Inventory

constituting Collateral hereunder other than pursuant to a "Qualified Sale." For purposes of this Section 5.5(a), a "Qualified Sale" shall mean a sale or assignment of all or any portion of the Purchased Inventory between the Company or any of its affiliates, on the one hand, and an unrelated third party, on the other hand, that provides for a base sale price per Unit of not less than the price indicated for such Unit under the heading "Minimum Sale Price" in the Purchased Inventory Schedule attached to this Note as Schedule B. If the Company proposes to make a sale of Units or to enter into an agreement with respect to the sale of Units, in either case that does not constitute a Qualified Sale, then, at least one (1) business day prior to such proposed sale, the Company shall provide the Holder with written notice during business hours (which shall be via electronic mail or facsimile) of the proposed sale (the "Sale Notice"). Such Sale Notice shall set forth the quantity of the Units proposed to be sold, as well as the proposed price at which such Units are proposed to be sold. Within twenty four (24) hours of receipt of the Sale Notice, the Holder shall either object to the proposed sale or provide consent (which may be via electronic mail or facsimile) to the release of its first priority lien and security interest in such Units upon the consummation of the sale of such Units, in accordance with the terms set forth in the Sale Notice. If the Holder does not object to the proposed sale within twenty four (24) hours following delivery of the Sale Notice, the Holder shall be deemed to have consented to such proposed sale at the price set forth in the Sale Notice and such sale shall constitute a Qualified Sale.

(b)    Upon receipt by Holder of each Mandatory Prepayment pursuant to Section 3.3 from a Qualified Sale for such Unit, Holder agrees (i) that Holder shall be deemed to have released, as to such sold Unit, all security interests and liens in the Purchased Inventory A/R in respect of such Unit granted to or held by Holder pursuant to this Note, and (ii) to take such reasonable steps and execute such documents as may be necessary or appropriate as requested by the Company to evidence the release of Holder's security interests in such Purchased Inventory A/R in respect of such sold Units of Purchased Inventory.

(c)    On the date on which all the principal amount of the Note and interest accrued thereon have been paid and performed in full, the Holder will, at the request and sole expense of the Company, (i) duly assign, transfer and deliver to or at the direction of the Company (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Holder, together with any monies at the time held by the Holder hereunder, and (ii) execute and deliver to the Company a proper instrument or instruments acknowledging the satisfaction and termination of this Note.

5.6    Further Assurances; Agreement to Deliver Additional Collateral Documents. In order to perfect and protect any security interest granted hereby or to enable the Holder to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to the Collateral, at the request of Holder, the Company: (a) shall execute, deliver and acknowledge such security agreements, pledge agreements, financing statements, assignments and other collateral documents, in form and substance reasonably

4

satisfactory to Holder; (b) hereby irrevocably authorizes Holder at any time and from time to time to file in any relevant jurisdiction any such financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any such statement relating to the Collateral; and (c) shall promptly take such further actions as Holder may request from time to time, subject to the terms of the Intercreditor Agreement.  All of the foregoing shall be at the sole cost and expense of the Company.

6.    Representations and Warranties. The Company represents and warrants to (and, where applicable, agrees with) Holder that:

6.1    Authorization; Enforceability.  The Company has the power and authority to execute, deliver and carry out the terms and provisions of this Note applicable to it.  All necessary action on the part of the Company has been taken to authorize the execution and delivery of the Note.  The Note constitutes the legal, valid and binding obligation of the Company, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, or general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

6.2    No Conflicts.  Neither the execution, delivery or performance by the Company of this Note , nor compliance by the Company with the terms and provisions of this Note, nor the consummation by it of the transactions contemplated by this Note , (a) will contravene in any material respect any applicable provision of any law, statute, rule, regulation, order, writ, injunction or decree of any governmental authority, (b) will contravene or cause a default under the articles of incorporation, the bylaws or other organizational document of the Company, or (c) will conflict in any material respect with or result in any breach of any material terms, covenants, conditions or provisions of, or constitute a material default under, or result in the creation or imposition of (or the obligation to create or impose) any lien (except a lien arising pursuant to the Note in favor of Holder) upon any of the property or assets of the Company (including the Collateral) pursuant to the terms of any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Company is a party or by which it or any of its property or assets is bound or to which it is subject, or give rise to a right thereunder to require any payment to be made by the Company.

6.3    Collateral.

(a)    The Company has and will have good title to the Collateral and the proceeds thereof, free and clear of all liens other than (i) those liens created by this Note; (ii) those liens created by the PB Notes, and (ii) the first priority lien and security interest in favor the Company's Lender under that certain [*describe Credit Agreement*] (the "Credit Agreement") in respect of the Accounts Receivable.

(b)    The pledge of the Collateral pursuant to this agreement creates a valid and perfected first priority lien security interest in the Purchased Inventory and in the Purchased Inventory A/R and a valid and perfected second priority lien security interest in the Accounts Receivable, securing the payment and

performance when due of the obligations of the Company hereunder, subject to the terms of the Intercreditor Agreement.

7.    <u>Covenants</u>.  Until the principal amount of this Note, any and all interest thereon and any and all other amounts payable hereunder shall have been paid in full, the Company covenants and agrees with Holder that:

7.1    <u>Negative Pledge</u>.  Except as otherwise provided in or contemplated by the Intercreditor Agreement and <u>Section 7.6</u> hereof, the Company shall not transfer, pledge or otherwise grant a security interest or lien on any of the Collateral without the prior consent of Holder, in its sole and absolute discretion, other than (i) those liens created by the PB Notes, and (ii) the first priority lien and security interest in favor the Company's Lenders under the Credit Agreement in respect of the Accounts Receivable and the second priority lien and security interest in favor the Company's Lenders under the Credit Agreement in respect of the Purchased Inventory and the Purchased Inventory A/R.  The foregoing shall not be construed to prohibit, restrict or limit the Company from selling the Purchased Inventory in the ordinary course of business for cash or on credit, provided the net proceeds therefrom are applied in accordance with the terms of this Note.

7.2    <u>Defend Claims</u>.  The Company shall, at its own cost and expense, defend title to the Purchased Inventory and the Purchased Inventory A/R and the first priority lien and security interest granted to the Holder with respect thereto against all claims and demands of all persons at any time claiming any interest therein adverse to the Holder and shall maintain and preserve such perfected first priority security interest for so long as this Note shall remain in effect.

7.3    <u>Modification of Constituent Documents</u>.  The Company shall not amend or cause the amendment of any of the Company's organizational documents in any manner that adversely impacts the validity or enforceability of this Note.  The Company will not, without providing at least 30 days' prior written notice to the Holder, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Company will, prior to any change described in the preceding sentence, take all actions requested by the Holder to maintain the perfection and priority of the Holder's security interest in the Collateral.

7.4    <u>No Distributions</u>.   The Company shall make no dividend or other distribution on equity to its members (except in respect of tax distributions) until the then outstanding principal amount of this Note and any accrued and unpaid interest thereon shall have been paid in full.

7.5    <u>Transfer of Collateral</u>.  Notwithstanding anything herein to the contrary, the Company shall not be prevented from assigning or transferring any of the Collateral to Quality One; *provided, however*, that if the Company proposes to transfer any of the Collateral to Quality One, Quality One's rights in the Collateral shall be subordinate to and subject in all respect to all liens in favor of Holder granted herein, and no such transfer shall occur unless

6

Quality One executes and delivers a security agreement in favor of Holder containing terms substantially identical to those contained herein.

7.6    <u>Refinancing of Credit Agreement; Subordination</u>.    If the Company refinances any portion of its indebtedness (including with the Company's Lender) or repays the Company's indebtedness in full in accordance with the terms of the Credit Agreement, then, in connection with such refinancing or repayment, subject to the terms of the Intercreditor Agreement, the Holder agrees to enter into an intercreditor agreement with subordination and/or standstill terms no less favorable than the terms of the Intercreditor Agreement, and any subordination and/or standstill terms set forth in any future intercreditor agreement with respect to the Holder's rights shall not extend beyond the Maturity Date, except in the case of an Event of Default (as defined in the Credit Agreement).

7.7    <u>Financial Reports</u>.    Promptly, but in any event within two (2) business days following delivery by the Company of any consolidated balance sheets and related statements of operations and cash flows or other financial or operating metrics to the Company's Lender in accordance with the Credit Agreement (the "<u>Financial Reports</u>"), the Company shall deliver a copy of such Financial Reports to Holder.

8.    <u>Default</u>.

8.1    <u>Events of Default</u>.    Each of the following shall constitute an "<u>Event of Default</u>" under this Note:

(a)    the Company shall fail to make any payment to Holder when due under this Note; *provided*, that in the case of mandatory prepayments pursuant to <u>Section 3.3</u>, such Event of Default shall not be deemed to have occurred unless such failure is not cured by payment within five (5) business days following such due date;

(b)    the Company shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 7</u> hereof, and such failure, if capable of being remedied, shall continue unremedied for a period of thirty (30) days after notice thereof from Holder to the Company;

(c)    the Company (i) becomes insolvent (however evidenced); (ii) makes a general assignment for the benefit of creditors; or (iii) files any petition or commences any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors;

(d)    a material breach by the Company of any of the representations and warranties set forth in <u>Section 6</u> and, with respect to a breach of any of the representations and warranties set forth in <u>Section 6.3</u>, such breach, if capable of being remedied, shall continue unremedied for a period of fifteen (15) days after such breach.

(e) the failure by the Company to make any payment under the PB Notes which failure is not cured by payment within any applicable grace or cure period, if any; or

(f) a merger or consolidation of the Company in which the equity holders of the Company immediately prior to such transaction would own, in the aggregate, less than 50% of the total combined voting power of all classes of equity of the surviving entity normally entitled to vote for the election of directors of the surviving entity or (ii) the sale by the Company of all or substantially all the Company's assets in one transaction or in a series of related transactions.

8.2     Remedies.  Upon the occurrence and during the continuance of an Event of Default, and subject to the terms of the Intercreditor Agreement, (a) Holder may, at its option and without notice (such notice being expressly waived), DECLARE AND DEMAND this Note immediately due and payable; (b) Holder may proceed against, sell or otherwise dispose of any or all of the Collateral, in any order, priority or combination that Holder may elect within its sole discretion; (c) Holder may also elect to retain the Collateral or any part thereof in satisfaction of the principal amount and any accrued but unpaid interest thereon in accordance with the requirements of the Uniform Commercial Code; (d) Holder may pursue all rights and remedies available hereunder or under the Uniform Commercial Code or other security documents; (e) Holder may foreclose the liens created hereunder, (f) Holder may realize upon, take possession of and/or sell any of the Collateral, and (g) Holder may exercise all rights and powers with respect to the Collateral as the Company might exercise in its absolute discretion, including, without limitation, to (1) relinquish or abandon any Collateral or any lien thereon, (2) execute all such contracts, agreements, deeds, documents and instruments, to bring, defend and abandon all such actions, suits and proceedings, and to take all actions in relation to all or any part of the Collateral, and/or (3) to appoint managers, sub-agents, and officers for any of the purposes mentioned in the foregoing provisions of this Section and to dismiss the same.  The enumeration of any rights and remedies in this Note is not intended to be exhaustive.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.  Holder's rights, remedies and powers, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against the Company or any collateral security given at any time to secure the payment hereof, all at the sole discretion of Holder.  Additionally, Holder may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Holder's sole discretion.  Failure of Holder, for any period of time or on more than one occasion, to DECLARE AND DEMAND this Note immediately due and payable shall not constitute a waiver of the right to exercise the same at any time from and after any Event of Default.

9.     Governing Law.  This Note shall be construed and enforced in accordance with the internal laws of the State of New York and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note and the transactions contemplated hereby shall be governed by the laws of the State of New York without reference to choice of law doctrine that would apply a different law other than New York General Obligations Law § 5-1401 and 5-1402.

10.    <u>Waivers</u>. The Company, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note and in connection with any suit, action or proceeding brought by Holder on this Note, any and every right it may have to (a) a trial by jury, (b) interpose any counterclaim therein (other than a counterclaim which can only be asserted in a suit, action or proceeding brought by Holder on this Note and cannot be maintained in a separate action), (c) have the same consolidated with any other or separate suit, action or proceeding, and (d) setoff or assert any defenses with respect hereto or the obligations of the Company hereunder (other than the defense of payment in full of the entire indebtedness set forth in Holder's suit, action or proceeding on this Note), and agrees that their respective liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Holder.  The Company, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby consents to every extension of time, renewal, waiver or modification that may be granted by Holder with respect to the payment or other provisions of this Note, and to the release of the Company, endorsers, guarantors or sureties, and their heirs, legal representatives, successors and assigns, and of any collateral given to secure the payment hereof, or any part hereof, with or without substitution, and agrees that additional borrowers, endorsers, guarantors or sureties and their heirs, legal representatives, successors and assigns, may become parties hereto without notice to the Company or to any endorser, guarantor or surety and without affecting the liability of any of them.

11.    <u>Loss, Theft or Destruction of Note</u>.  Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft or destruction of this Note and of indemnity or security reasonably satisfactory to it, the Company will make and deliver a new Note which shall carry the same rights carried by this Note, stating that such Note is issued in replacement of this Note, making reference to the original date of issuance of this Note (and any successors hereto) and dated as of such cancellation, in lieu of this Note.

12.    <u>Amendment</u>.   This Note may not be amended, modified, supplemented or terminated and no provision shall be waived without the prior written approval of the Holder and the Company.  There are no third-party beneficiaries of this Note.

13.    <u>Captions</u>. The captions of the Sections of this Note are for convenience of reference only and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

14.    <u>Severability</u>.  The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note, and to this end, the provisions of this Note are declared to be severable.

15.    <u>Notices</u>.  Any notice required hereunder shall be in writing and shall be sent to the parties by first class mail or by facsimile or, in respect of <u>Section 5.5(a)</u>, by electronic mail at the

addresses set forth herein below (or such other address designated by a party pursuant to written notice):

| | |
|---|---|
| Company: | Q1W Newco, LLC |
| | 1500-A Tradeport Drive |
| | Orlando, Florida 32824 |
| | Attn: President |
| | Phone:  407-857-3737 |
| | Fax: 407-857-3747 |
| | Email: jchiorando@q1w.net |
| | |
| Holder: | [_____] |
| | [_____] |
| | [_____] |
| | Phone:  [_____] |
| | Fax: [_____] |
| | Email: [_____] |

Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; (ii) sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next business day); and, in respect of Section 5.5(a), (iii) sent by electronic mail with verification of receipt shall be deemed to have been given when sent.

16. <u>Time of Essence</u>.  Time is of the essence of this Note and the performance of each of the covenants and agreements on the Company's part to be performed hereunder.

17. <u>No Wavier by Holder</u>.  Neither the exercise of any provision hereof nor the delay in asserting any right granted to Holder (including the acceptance of past due payments) shall be construed as a waiver by Holder of the right to accelerate the indebtedness evidenced hereby as above provided or to pursue any other remedies available under this Note nor shall the exercise of any single or partial exercise of any right, power, privilege or remedy preclude any further exercise thereof.  Any waiver hereunder shall be valid and enforceable only if in writing and signed by the party against whom enforcement is sought, and then only to the extent therein set forth.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently.  No executory agreement unless in writing and signed by Holder, and no course of dealing between the Company, the endorser(s) or guarantor(s) hereof, or any of them, shall be effective to change or modify or discharge, in whole or in part, this Note.

18. <u>Obligations</u>.  The Company acknowledges that this Note and the Company's obligations hereunder are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Note and the obligations of the Company hereunder or the obligations of any other person or party relating to this Note or the obligations of the Company hereunder.  The obligations of the

Company hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than, payment of the Note in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Note or otherwise. Without limiting the generality of the foregoing, the obligations of the Company herein shall not be discharged or impaired or otherwise affected by the failure of the Holder to assert any claim or demand or to enforce any remedy under this Note or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Note obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Company or would otherwise operate as a discharge of the Company as a matter of law or equity.

19. <u>Expenses</u>. The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the Holder of this Note in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("<u>Costs</u>"). The Company agrees that any delay on the part of the Holder in exercising any rights hereunder will not operate as a waiver of such rights. The Holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

20. <u>Assignment</u>. Upon the delivery of an assignment and assumption agreement in form reasonably satisfactory to the Company, Holder, at any time and without the consent of the Company, may, solely to related parties, grant participations in or sell, transfer, assign and convey all or any portion of its right, title and interest in and to the loan obligations, this Note and any collateral, if any, given to secure the loan obligations.

21. <u>Venue; Service of Process</u>. All actions or proceedings arising in connection with this Note shall be tried and litigated in state or federal courts located in the State of New York, unless such actions or proceedings are required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy. THE COMPANY WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u>, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE HEREWITH. IN ANY ACTION AGAINST THE COMPANY, SERVICE OF PROCESS MAY BE MADE UPON THE COMPANY BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS ABOVE SET FORTH, WHICH SERVICE SHALL BE DEEMED SUFFICIENT FOR PERSONAL JURISDICTION AND SHALL BE DEEMED EFFECTIVE THREE (3) DAYS AFTER MAILING.

22. <u>Jury Trial Waiver</u>. THE COMPANY, AND THE HOLDER BY ITS ACCEPTANCE OF THIS NOTE, HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS NOTE AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND

VOLUNTARILY MADE BY THE COMPANY AND BY HOLDER, AND THE COMPANY ACKNOWLEDGES THAT NEITHER HOLDER NOR ANY PERSON ACTING ON BEHALF OF HOLDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

23. <u>Counterparts</u>.  This Note and any amendments, waivers, consents or supplements hereto may be executed in multiple counterparts (including by facsimile or in electronic format), each of which shall constitute an original, but all taken together shall constitute a single contract.

[Remainder of page intentionally left blank.]

IN WITHNESS WHEREOF, this Secured Note and Security Agreement has been duly executed on behalf of the undersigned on the day and in the year first written above.

COMPANY:

**Q1W NEWCO, LLC**

By: _____
    Name:
    Title:

ACKNOWLEDGED AND AGREED

HOLDERS:

[_____]

By: _____
    Name:
    Title:

[_____]

By: _____
    Name:
    Title:

[_____]

By: _____
    Name:
    Title:

Schedule A

Proportionate Interest of Funds Holding Note

| Entity | Percentage of Principal Amount | Portion of Original Principal Amount |
|---|---|---|
| [DLJ Investment Partners III, L.P.] | [__] | [_____] |
| [DLJ Investment Partners, L.P. – Series C] | [__] | [_____] |
| [IP III Plan Investors, L.P.] | [__] | [_____] |
| Total | 100% | 36,340,067.01 |

<u>Schedule B</u>

Purchased Inventory

[See attached.]

**<u>Exhibit D – Form of DIP Financing Motion</u>**

See attached.

**<u>Exhibit E – Form of DIP Financing Order</u>**

See attached.

## Exhibit F

### Eligible Accounts Receivable

(a)     The Account Receivable was created for commercial or business purposes and not for personal, family or household purposes, and complies with all applicable laws, rules and regulations, including, without limitation, usury laws;

(b)     The Account Receivable has not been outstanding for more than one hundred and twenty (120) days past the original date of invoice;

(c)     The Account Receivable was created in connection with (i) the sale of Inventory in the Ordinary Course of Business and the sale has been fully consummated and the Inventory has been shipped and delivered and received by the Account Debtor or (ii) the performance of services by Seller in the Ordinary Course of Business and the services have been completed and accepted by the Account Debtor;

(d)     The Account Receivable represents a legal, valid and binding payment obligation of the Account Debtor enforceable in accordance with its terms and arises from an enforceable contract, the performance of which contract, insofar as it relates to the Account Receivable, has been completed by Seller;

(e)     The Account Receivable does not arise from the sale of any Inventory on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval, consignment or any other conditional basis;

(f)     Seller has good and indefeasible title to the Account Receivable and the Account Receivable is not subject to any security interest in or lien favor of any lender prior to the Closing Date other than the lender under the DIP Loan Documents;

(g)     The Account Receivable does not arise out of a Contract or an Order that, by its terms, prohibits or makes void or unenforceable the sale of the Account Receivable to Quality One;

(h)     The amount of the Account Receivable included in Eligible Accounts Receivable is not subject to any setoff, counterclaim, defense, dispute, recoupment or adjustment other than normal discounts for prompt payment;

(i)     The Account Debtor is not insolvent or the subject of any bankruptcy, insolvency or similar proceeding and has not made an assignment for the benefit of creditors, suspended normal business operations, dissolved, liquidated, terminated its existence, ceased to pay its debts as they become due or suffered a receiver or trustee to be appointed for any of its assets or affairs;

(j)     The Account Receivable is not evidenced by chattel paper or an instrument;

(k)     The Account Debtor has not returned or refused to retain, or otherwise notified Seller of any dispute concerning, or claimed nonconformity of, any of the Inventory or services relating to the Account Receivable;

(l)     The Account Receivable is not owed by an Affiliate of Seller, any Subsidiary of Seller, or any stockholder, officer, director or employee of Seller or any Subsidiary;

(m)      The Account Receivable is payable by the Account Debtor in lawful money of the United States of America or Canada;

(n)      The Account Receivable does not constitute progress billings, retainages, or deferred payments under a contract or order not fully performed;

(o)      The Account Receivable is not owed by an Account Debtor as to which more than fifty percent (50%) of the aggregate balances then outstanding on Accounts Receivable owed by the Account Debtor and/or its affiliates to Seller are more than 120 days past due from the dates of their original invoices;

(p)      The Account Debtor is not the United States or any department, bureau, agency or instrumentality of the United States; and

The amount of the Eligible Accounts Receivable owed by an Account Debtor shall be net of, and shall be reduced by (if and to the extent not already so reduced by virtue of the preceding clauses of this definition), the amount of all contra accounts, reserves, credits, rebates and other indebtedness, liabilities and obligations owed by Seller to the Account Debtor, as defined in the Revolving Credit Agreement, and as applied in the computation of Seller's borrowing base availability as of June 24, 2013.

Page 2 of Exhibit F

**<u>Exhibit G – Form of Escrow Agreement</u>**

See attached.

## BNY MELLON, NATIONAL ASSOCIATION

## ESCROW AGREEMENT

This Escrow Agreement, dated as of August [__], 2013 (this "Agreement"), is by and among Personal Communications Devices Holdings, LLC, a Delaware limited liability company having its principal place of business at 80 Arkay Drive, Hauppauge, NY 11788 ("Holdings"), Personal Communications Devices, LLC, a Delaware limited liability company having its principal place of business at 80 Arkay Drive, Hauppauge, NY 11788 ("PCD"), Quality One Wireless, LLC, a Nevada limited liability company having its principal place of business at 1500-A Tradeport Drive, Orlando, FL 32824 ("Quality One") (collectively, the "Escrow Parties"), and BNY Mellon, National Association, a national banking association with its principal place of business at BNY Mellon Center, Pittsburgh, PA 15258 (the "Escrow Agent").

WHEREAS, Holdings, PCD, Quality One and Q1W Newco, LLC, a Delaware limited liability company, and an affiliate of Quality One, are parties to that certain Asset Purchase Agreement dated as of even date herewith (as such agreement may be amended, restated or otherwise modified from time to time, the "Asset Purchase Agreement");

WHEREAS, concurrently with the execution and delivery of the Asset Purchase Agreement, Quality One will deposit into escrow two million five hundred thousand dollars ($2,500,000.00) in accordance with, and pursuant to, the terms and conditions of the Asset Purchase Agreement, and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement.

WHEREAS, the parties desire to set forth their understandings with regard to the escrow account established by this Agreement.

NOW, THEREFORE, in consideration of the premises and agreements of the parties contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1. **Appointment of Agent.** The Escrow Parties appoint the Escrow Agent as their agent to hold in escrow, and to administer the disposition of, the Escrow Fund (as defined below) in accordance with the terms of this Agreement, and the Escrow Agent accepts such appointment.

2. **Establishment of Escrow.** Upon the execution of this Agreement, Quality One shall (a) cause two million five hundred thousand dollars ($2,500,000.00) in immediately available funds to be deposited with the Escrow Agent (the "Initial Deposit") in an account designated in writing by the Escrow Agent, and Escrow Agent shall promptly upon request acknowledge to the Escrow Parties or any of them receipt of any funds so deposited; and (b) deliver one fully executed copy of this Agreement to the Escrow Agent in accordance with the Notice section below. The Initial Deposit and all additional amounts now or hereafter deposited with the Escrow Agent, together with all interest, dividends and other income earned, shall be referred to as the "Escrow Fund." The Escrow Parties acknowledge that the sum held in escrow hereunder may be reduced or increased from time to time during the term hereof pursuant to the terms of this Agreement. Accordingly, the term "Escrow Fund" shall refer both to the Initial Deposit and

to such lesser or greater amount as may be held pursuant hereto at any point during the term hereof.

### 3. **Customer Identification and TIN Certification.**

(a)     To help the government fight the funding of terrorism and money laundering activities, Federal laws require all financial institutions to obtain, verify and record information that identifies each individual or entity that opens an account.  Therefore, the Escrow Agent must obtain the name, address, taxpayer or other government identification number, and other information, such as date of birth for individuals, for each individual and business entity that is a party to this Agreement.  For individuals signing this Agreement on their own behalf or on behalf of another, the Escrow Agent requires a copy of a driver's license, passport or other form of photo identification.  For business and other entities that are parties to this Agreement, the Escrow Agent will require such documents, as it deems necessary to confirm the legal existence of the entity.

(b)     At the time of or prior to execution of this Agreement, any Escrow Party providing a tax identification number for tax reporting purposes shall provide to the Escrow Agent a completed IRS Form W-9 (or the appropriate IRS Form W-8, in the case of non U.S. persons), and every individual executing this Agreement on behalf of an Escrow Party shall provide to the Escrow Agent a copy of a driver's license, passport or other form of photo identification acceptable to the Escrow Agent.  The Escrow Parties agree to provide to the Escrow Agent such organizational documents and documents establishing the authority of any individual acting in a representative capacity as the Escrow Agent may require in order to comply with its established practices, procedures and policies.

(c)     The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Fund in accordance with the Form W-9 (or the appropriate IRS Form W-8, in the case of non U.S. persons) information provided to the Escrow Agent by PCD.  The Escrow Parties understand that, in the event one or more tax identification number is not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the Initial Deposit.

(d)     The Escrow Agent shall have no duty to prepare or file any information reports (including without limitation IRS Forms 1099-B) other than such information reports of interest earned on the Escrow Fund as the Escrow Agent is required to prepare and file in the ordinary course of its business.

### 4. **Deposit of the Escrow Fund.**  The Escrow Agent shall deposit the Escrow Fund in one or more deposit accounts at BNY Mellon, National Association in accordance with such written instructions and directions as may from time to time be provided to the Escrow Agent by the Escrow Parties.  In the event that the Escrow Agent does not receive written instructions, the Escrow Agent shall deposit the Escrow Fund in a checking with interest account at BNY Mellon, National Association.  Deposits shall in all instances be subject to the Escrow Agent's standard funds availability policy.  The Escrow Agent shall not be responsible for any loss due to interest rate fluctuation or early withdrawal penalty.  The Escrow Parties understand that deposits of the Escrow Fund are not necessarily insured by the United States Government or any agency or

instrumentality thereof (other than FDIC insurance coverage up to and including the applicable federal limit), or of any state or municipality, and that such deposits do not necessarily earn a fixed rate of return.  In no instance shall the Escrow Agent have any obligation to provide investment advice of any kind.  The Escrow Agent shall not be liable or responsible for any loss resulting from any deposits made pursuant to this Section 4, other than as a result of bad faith, the gross negligence or willful misconduct of, or a breach of this Agreement by, the Escrow Agent.

## 5.   **Release of the Escrow Fund.**

(a)    The Escrow Agent shall disburse the Escrow Fund only in accordance with (a) written instructions from all of the Escrow Parties, or their respective successors or assigns, substantially in the form of <u>Exhibit A</u>, as to the disbursement of the Escrow Fund or any portion thereof ("<u>Joint Written Instructions</u>"), or (b) a final, non-appealable court order issued by a court of competent jurisdiction (an "<u>Order</u>"), a copy of which shall be delivered to the Escrow Agent by one or more Escrow Parties.  The delivery to the Escrow Agent of an Order shall constitute a representation to the Escrow Agent that such Order complies with the requirements of this Section 5(a) and the Escrow Agent shall be entitled to rely thereon without any further duty of inquiry.  Upon receipt of Joint Written Instructions or an Order, as applicable, the Escrow Agent shall disburse the Escrow Fund pursuant to, and in accordance with, the instructions set forth in such Joint Written Instructions or Order, as applicable.  The Escrow Agent shall have no obligation to follow any directions set forth in any Joint Written Instructions unless and until the Escrow Agent is satisfied, in its sole discretion, that the persons executing said Joint Written Instructions are authorized to do so.

(b)    Notwithstanding anything to the contrary in this Agreement, if any amount to be released at any time or under any circumstances exceeds the balance in the Escrow Fund, the Escrow Agent shall release the balance in the Escrow Fund and shall have no liability or responsibility to the Escrow Parties for any deficiency.

## 6.   **Methods of Payment.**  All payments required to be made by the Escrow Agent under this Agreement shall be made by wire transfer or by check in accordance with written payment instructions provided to the Escrow Agent by the party receiving the funds.  Any wire transfers shall be made subject to, and in accordance with, the Escrow Agent's normal funds transfer procedures in effect from time to time.  The Escrow Agent shall be entitled to rely upon all bank and account information provided to the Escrow Agent by any of the Escrow Parties.  The Escrow Agent shall have no duty to verify or otherwise confirm any written wire transfer instructions but it may do so in its discretion on any occasion without incurring any liability to any of the Escrow Parties for failing to do so on any other occasion.  Any such verification may include, but not be limited to, a telephone call to the party receiving the funds or to one or more of the Escrow Parties in accordance with Section 14.  The Escrow Parties agree that any such call back is a commercially reasonable security procedure and that the Escrow Agent may record such calls according to the Escrow Agent's standard operating procedures or as the Escrow Agent deems appropriate for security and/or service purposes.  The Escrow Agent shall process all wire transfers based on bank identification and account numbers rather than the names of the intended recipient of the funds, even if such numbers pertain to a recipient other than the

recipient identified in the payment instructions.  The Escrow Agent shall have no duty to detect any such inconsistencies and shall resolve any such inconsistencies by using the account number.

## 7.  **Responsibilities and Liability of Escrow Agent.**

(a)    _Duties Limited_.  The Escrow Agent undertakes to perform only such duties as are expressly set forth in this Agreement.  The Escrow Agent's duties shall be determined only with reference to this Agreement and applicable laws and it shall have no implied duties.  The Escrow Agent shall not be bound by, deemed to have knowledge of, or have any obligation to make inquiry into or consider, any term or provision of any agreement between any of the Escrow Parties and/or any other third party or as to which the escrow relationship created by this Agreement relates, including without limitation any documents referenced in this Agreement.

(b)    _Limitations on Liability of Escrow Agent_.  Except in cases of the Escrow Agent's bad faith, willful misconduct or gross negligence, the Escrow Agent shall be fully protected (i) in acting in reliance upon any certificate, statement, request, notice, advice, instruction, direction, other agreement or instrument or signature reasonably and in good faith believed by the Escrow Agent to be genuine, (ii) in assuming that any person purporting to give the Escrow Agent any of the foregoing in connection with either this Agreement or the Escrow Agent's duties, has been duly authorized to do so, and (iii) in acting or failing to act in good faith on the advice of any counsel retained by the Escrow Agent.  The Escrow Agent shall not be liable for any mistake of fact or law or any error of judgment, or for any act or omission, except as a result of its bad faith, willful misconduct or gross negligence or its breach of this Agreement. The Escrow Agent shall not be responsible for any loss incurred upon any action taken in accordance with the terms of this Agreement under circumstances not constituting bad faith, willful misconduct or gross negligence.

In connection with any payments that the Escrow Agent is instructed to make by wire transfer, the Escrow Agent shall not be liable for the acts or omissions of (x) any Escrow Party or other person providing such instructions, including without limitation errors as to the amount, bank information or bank account number; or (y) any other person or entity, including without limitation any Federal Reserve Bank, any transmission or communications facility, any funds transfer system, any receiver or receiving depository financial institution, and no such person or entity shall be deemed to be an agent of the Escrow Agent.

Without limiting the generality of the foregoing, it is agreed that in no event will the Escrow Agent be liable for any lost profits or other indirect, special, incidental or consequential damages which the parties may incur or experience by reason of having entered into or relied on this Agreement or arising out of or in connection with the Escrow Agent's services, even if the Escrow Agent was advised or otherwise made aware of the possibility of such damages; nor shall the Escrow Agent be liable for acts of God, acts of war, breakdowns or malfunctions of machines or computers, interruptions or malfunctions of communications or power supplies, labor difficulties, actions of public authorities, or any other similar cause or catastrophe beyond the Escrow Agent's reasonable control.

In the event that the Escrow Agent shall be uncertain as to its duties or rights under this Agreement, or shall receive any certificate, statement, request, notice, advice, instruction,

direction or other agreement or instrument from any other party with respect to the Escrow Fund which, in the Escrow Agent's reasonable and good faith opinion, is in conflict with any of the provisions of this Agreement, or shall be advised that a dispute has arisen with respect to the Escrow Fund or any part thereof, the Escrow Agent shall be entitled, without liability to any person, to refrain from taking any action other than to keep safely the Escrow Fund until the Escrow Agent shall be directed otherwise in accordance with Joint Written Instructions or an Order of a court with jurisdiction over the Escrow Agent.  The Escrow Agent shall be under no duty to institute or defend any legal proceedings, although the Escrow Agent may, in its discretion and at the expense of the Escrow Parties as provided in subsections (c) or (d) immediately below, institute or defend such proceedings.

(c)    <u>Indemnification of Escrow Agent</u>.  The Escrow Parties jointly and severally agree to indemnify the Escrow Agent for, and to hold it harmless against, any and all claims, suits, actions, proceedings, investigations, judgments, deficiencies, damages, settlements, liabilities and expenses (including reasonable legal fees and expenses of attorneys chosen by the Escrow Agent) as and when incurred, arising out of or based upon any act, omission, alleged act or alleged omission by the Escrow Agent or any other cause, in any case in connection with the acceptance of, or performance or non-performance by the Escrow Agent of, any of the Escrow Agent's duties under this Agreement, except as a result of the Escrow Agent's bad faith, willful misconduct or gross negligence.

(d)    <u>Authority to Interplead</u>.  The Escrow Parties authorize the Escrow Agent, if the Escrow Agent is threatened with litigation or is sued, to interplead all interested parties in any court of competent jurisdiction and to deposit the Escrow Fund with the clerk of that court.  In the event of any dispute under this Agreement, the Escrow Agent shall be entitled to petition a court of competent jurisdiction and shall perform any acts ordered by such court.

**8.    Termination.**  This Agreement and all the obligations of the Escrow Agent under this Agreement shall terminate upon the earliest to occur of the release of the entire Escrow Fund by the Escrow Agent in accordance with this Agreement or the deposit of the Escrow Fund by the Escrow Agent in accordance with Section 7(d) hereof.

**9.    Removal of Escrow Agent.**  The Escrow Parties acting together shall have the right to terminate the appointment of the Escrow Agent, specifying the date upon which such termination shall take effect.  Thereafter, the Escrow Agent shall have no further obligation to the Escrow Parties except to hold the Escrow Fund as depository and not otherwise.  The Escrow Parties agree that they will jointly appoint a banking corporation, trust company or attorney as successor escrow agent.  The Escrow Agent shall refrain from taking any action until it shall receive joint written instructions from the Escrow Parties designating the successor escrow agent.  The Escrow Agent shall deliver all of the then remaining balance of the Escrow Fund to such successor escrow agent in accordance with such instructions and upon receipt of the Escrow Fund, the successor escrow agent shall be bound by all of the provisions of this Agreement.

**10.    Resignation of Escrow Agent.**  The Escrow Agent may resign and be discharged from its duties and obligations hereunder at any time by giving no less than fifteen (15) days' prior written notice of such resignation to the Escrow Parties, specifying the date when such resignation will take effect.  Thereafter, the Escrow Agent shall have no further obligation to the

Escrow Parties except to hold the Escrow Fund as depository and not otherwise. In the event of such resignation, the Escrow Parties agree that they will jointly appoint a banking corporation, trust company, or attorney as successor escrow agent within fifteen (15) days of notice of such resignation. The Escrow Agent shall refrain from taking any action until it shall receive joint written instructions from the Escrow Parties designating the successor escrow agent. The Escrow Agent shall deliver all of the then remaining balance of the Escrow Fund to such successor escrow agent in accordance with such instructions and upon receipt of the Escrow Fund, the successor escrow agent shall be bound by all of the provisions of this Agreement.

**11. Accounting.** On a monthly basis, the Escrow Agent shall render a written statement setting forth the balance of the Escrow Fund, all interest earned and all distributions made, which statements shall be delivered to the Escrow Parties at the addresses set forth below:

Address 1:    Personal Communications Devices, LLC
              80 Arkay Drive
              Hauppauge, NY 11788
              Attention: Raymond Kunzmann

Address 2:    Quality One Wireless, LLC
              1500-A Tradeport Drive
              Orlando, FL 32824
              Attention: Robert Staats, Chief Financial Officer

**12. Survival.** Notwithstanding anything in this Agreement to the contrary, the provisions of Sections 7, 9 and 10 shall survive any resignation or removal of the Escrow Agent, and any termination of this Agreement.

**13. Escrow Agent Fees, Costs, and Expenses.** The Escrow Agent shall charge a non-refundable setup fee of two thousand five hundred dollars ($2,500.00) due upon the execution of this Agreement. The Escrow Agent shall not charge any fee for its services under this Agreement, but the Escrow Agent shall be entitled to be reimbursed for its customary fees and charges for any wire transfers or other depository services rendered in connection with the Escrow Fund and any delivery charges or other out of pocket expenses incurred in connection the Escrow Fund. The Escrow Parties each acknowledge their joint and several obligation to pay any fees, expenses and other amounts owed to the Escrow Agent pursuant to this Agreement. The Escrow Parties agree that the Escrow Agent shall be entitled to pay itself for any fees, expenses or other amounts owed to the Escrow Agent as described in this paragraph out of the amounts held in the Escrow Fund. The Escrow Parties further agree that the Escrow Agent shall be entitled to withhold any distribution otherwise required to be made from the Escrow Fund to the extent any fees, expenses or other amounts owed to the Escrow Agent that remain unpaid on the date such distribution would otherwise be made.

**14. Notices.** All notices under this Agreement shall be transmitted to the respective parties, shall be in writing and shall be considered to have been duly given or served when personally delivered to any individual party, or on the first (1st) business day after the date of deposit with an overnight courier for next day delivery, postage paid, or on the third (3rd) business day after deposit in the United States mail, certified or registered, return receipt

requested, postage prepaid, or on the date of telecopy, fax or similar transmission during normal business hours, as evidenced by mechanical confirmation of such telecopy, fax or similar transmission, addressed in all cases to the party at his or its address set forth below, or to such other address as such party may designate, provided that notices will be deemed to have been given to the Escrow Agent on the actual date received:

<u>If to PCD or Holdings</u>:

> Personal Communications Devices, LLC
> 80 Arkay Drive
> Hauppauge, NY 11788
> Attention: Chief Executive Officer
> Fax: (631) 951-0784

Copy (which shall not constitute notice to PCD or Holdings) to:

> Goodwin Procter LLP
> The New York Times Building
> 620 Eighth Avenue
> New York, NY 10018
> Attention: Andrew J. Weidhaas, Emanuel Grillo and Breck Hancock
> Fax: (212) 355-3333

<u>If to Quality One</u>:

> Quality One Wireless, LLC
> 1500-A Tradeport Drive
> Orlando, FL 32824
> Attention: Chief Executive Officer
> Fax: (307) 857-3737

Copy (which shall not constitute notice to Quality One) to:

> Quality One Wireless, LLC
> 1500-A Tradeport Drive
> Orlando, FL 32824
> Attention: Marshall S. Harris, General Counsel
> Fax: (407) 857-3747

<u>If to the Escrow Agent</u>:

> BNY Mellon, National Association, Escrow Agent
> c/o Escrow Services
> Banking Services Support Center; Suite 154-0655
> 500 Ross Street
> Pittsburgh, PA 15262
> Phone: 412.234.7796 / 412.234.2350

Fax: 732.667.4499 / 615.932.4035
Email: escrowservices@bnymellon.com

Copy (which shall not constitute notice to the Escrow Agent) to:

Bruce D. Berns, Esq.
Abendroth, Berns & Warner LLC
40 Grove Street, Suite 375
Wellesley, MA 02482
Facsimile: (781) 237-8891

Any notice, except notice by the Escrow Agent, may be given on behalf of any party by its counsel or other authorized representative. In all cases the Escrow Agent shall be entitled to rely on a copy or a fax transmission of any document with the same legal effect as if it were the original of such document. The Escrow Parties shall promptly notify the Escrow Agent of any changes to the contact information contained in this Section and the Escrow Agent may rely on the contact information contained in this Section until notified of a change.

To facilitate the performance by the Escrow Agent of its duties and obligations hereunder, including resolving any issues arising hereunder (but not the giving of notice as provided above), the Escrow Parties agree that the Escrow Agent may contact the following representatives of each of the Escrow Parties identified below, or such other individuals as any of the Escrow Parties may identify by written notice to the Escrow Agent:

PCD's Representatives:

Name:          Raymond Kunzmann
Telephone:     (631) 233-3347
Email:         raymond.kunzmann@pcdphones.com

Name:          Jorge Garcia
Telephone:     (631) 233-6453
Email:         jorge.garcia@pcdphones.com

Holdings' Representatives:

Name:          George Appling
Telephone:     (631) 233-3604
Email:         george.appling@pcdphones.com

Name:          Winston Chow
Telephone:     (646) 857-8654
Email:         winston.chow@pinebridge.com

Quality One's Representative:

Name:          Robert Staats, Chief Financial Officer

Telephone:     (407) 857-3737
E-mail:        rstaats@q1w.net

    15. **Modifications; Waiver.**  This Agreement may not be altered or modified without the express prior written consent of all of the parties to this Agreement.  No course of conduct shall constitute a waiver of any terms or conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified.  A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion.

    16. **Further Assurances.**  If at any time the Escrow Agent shall determine or be advised that any further agreements, assurances or other documents are reasonably necessary or desirable to carry out the provisions of this Agreement and the transactions contemplated by this Agreement, the Escrow Parties shall execute and deliver any and all such agreements or other documents, and do all things reasonably necessary or appropriate to carry out fully the provisions of this Agreement.

    17. **Assignment.**  This Agreement shall inure to the benefit of and be binding upon the successors, heirs, personal representatives, and permitted assigns of the parties.  This Agreement is freely assignable by the Escrow Parties; provided, however, that no assignment by such party, or it successors or assigns, shall be effective unless prior written notice of such assignment is given to the other parties, including, without limitation, the Escrow Agent; and provided, further, that any assignee satisfies the Escrow Agent's requirements set forth in Section 3 above.  This Agreement may not be assigned by the Escrow Agent, except that upon prior written notice to the Escrow Parties, the Escrow Agent may assign this Agreement to an affiliated or successor bank or other qualified bank entity.

    18. **Section Headings.**  The section headings contained in this Agreement are inserted for purposes of convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

    19. **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

    20. **Counterparts and Facsimile Execution.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile transmission, pdf or other electronic means shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes (and such signatures of the parties transmitted by facsimile, pdf or other electronic means shall be deemed to be their original signatures for all purposes).

    21. **Waiver of Jury Trial**.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE

OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**PERSONAL COMMUNICATIONS DEVICES HOLDINGS, LLC**

By: _____

Name: _____

Title: _____

**PERSONAL COMMUNICATIONS DEVICES, LLC**

By: _____

Name: _____

Title: _____

**QUALITY ONE WIRELESS, LLC**

By: _____

Name: John Chiorando

Title:  President and Chief Executive Officer

**BNY MELLON, NATIONAL ASSOCIATION**

By: _____

Name: _____

Title: _____

[Signature Page to Escrow Agreement]

## EXHIBIT A

### JOINT WRITTEN INSTRUCTIONS
### FOR RELEASE OF ESCROW FUNDS

Pursuant to Section 5 of the Escrow Agreement dated as of August __, 2013, by and among Personal Communications Devices Holdings, LLC, a Delaware limited liability company ("Holdings"), Personal Communications Devices, LLC, a Delaware limited liability company ("PCD"), Quality One Wireless, LLC, a Nevada limited liability company ("Quality One") and BNY Mellon, National Association (the "Escrow Agent"), PCD, Holdings and Quality One hereby instruct the Escrow Agent to release $[_____] from the Escrow Fund in accordance with the following instructions:

**Wire Instructions:**

Account Name: _____
Account Number: _____
Bank Name: _____
Bank ABA Number: _____
Bank Address: _____
_____
For credit to: _____
Special Instructions: _____
_____

**Bank Check:**

Payee Name: _____
Mailing Address: _____
_____
_____

Personal Communications Devices, LLC          Quality One Wireless, LLC

By: _____          By: _____
Name:                                          Name:  John Chiorando
Title:                                         Title:    President and Chief Executive Officer

Personal Communications Devices Holdings, LLC

By: _____
Name:
Title:

**Exhibit H - Inventory**

The following table sets for a listing of the Inventory.  The branch name and locations are identified by branch code, each of which is listed at the end of the Inventory list.

| Branch | Type | Vendor | Item | Description | Units @ 8-18-13 |
|--------|------|--------|------|-------------|-----------------|
| 10310 | Accessories | All Other Vendors | CNRKIT2 | Universal USB A/C Adapter + US | 155 |
| | | | CNRUSB | Universal USB Standard A/C Ada | 100 |
| | | | IWCSDTVLCS | Bigstream Travel Case | 498 |
| | | | MSD4G | 4GB  SD Card | 828 |
| | | All Other Vendors Total | | | 1,581 |
| | | Pantech | BTE8995B | Extended Battery | 247 |
| | | | BTE910B | Extended Battery (3000MAH) + B | 249 |
| | | | BTR291B | STANDARD BATTERY-4040MAH | 375 |
| | | | BTR291C | STANDARD BATTERY COVER ONLY | 200 |
| | | | BTR8045C | Standard Battery Cover | 500 |
| | | | BTR910B | 1680MAH Li-Ion Battery | 21 |
| | | | BTR930B | 950 Ma Li-Ion Battery | 200 |
| | | | PAN291MOCK | MOCK UP FOR MHS291LVW | 5,212 |
| | | | PAN295MOCK | Mock Up | 2,830 |
| | | | PAN930MOCK | Mock Up for ADR930LVW | 4,341 |
| | | | VZW291BAT | STANDARD BATTERY-4040MAH VZW | 143 |
| | | | VZW291BATDR | STANDARD BATTERY COVER VZW ONL | 150 |
| | | | VZW8045CMU | Mock Up | 275 |
| | | | VZW8992CMU | Mock Up | 830 |
| | | | VZW910CMU | Mock Up | 91 |
| | | Pantech Total | | | 15,664 |
| | | Sharp-Tels | BTR5B | Standard Battery | 1,448 |
| | | | CMUADS1 | Mock Up | 23 |
| | | Sharp-Tels Total | | | 1,471 |
| | | HTC | ADR6330LKOV | Dual Band 800/1900 MHZ 2000 | 14 |
| | | | ADR6425LKOV | Launch Kit Overage Units-LTE, | 14 |
| | | | BTR6280B | Standard Battery | 1,400 |
| | | | BTR6400M | Standard Battery | 20 |
| | | | BTR6410C | Standard Battery Cover Only- | 100 |
| | | | BTR6425B | Standard Battery | 1,129 |
| | | | CMU6285 | Mock Up | 694 |
| | | | CMU6290CS | Mock Up | 382 |
| | | | CMU6410LRA | Mock Up | 260 |
| | | | CNR6300 | A/C Charger | 739 |
| | | | DICMUSB | Micro USB Cable | 188 |

| | | | |
|---|---|---|---|
| | DICU6425B | Data Cable w/ HTC 12 Pin Conne | 1,037 |
| | HTC6435LLKOV | Launch Kit Overage Units | 110 |
| | HTC6435MOCK | Android Ice Cream Sandwich Lte | 92 |
| | HTC6990BKMOCK | Gsm,Cdma 1Xevdo Rev A Lte | 149 |
| | HTC6990MOCK | Gsm,Cdma 1Xevdo Rev A Lte | 161 |
| | HTC6990RMOCK | Gsm,Cdma 1Xevdo Rev A Lte | 46 |
| | IBHS6425B | Ibeats Headset | 1,027 |
| | SHS6425BK | Black Stero Hs | 720 |
| HTC Total | | | 8,282 |
| Casio | BTR771B | 1460MAH Standard Battery | 95 |
| Casio Total | | | 95 |
| Huawei | 3310BAT | Huawei Ascend Y Standard | 1,300 |
| | 3310BATC | Huawei Ascend Y Battery Door | 1,300 |
| | 3310CNR | Huawei Ascend AC Charger | 1,300 |
| | 3310DIC | Huawei Ascend Micro USB Cable | 1,300 |
| | ANT256B | Antenna | 99 |
| | ANT259B | Antenna for F259 | 43 |
| | BTR2260B | Standard Battery Pack | 28 |
| | BTR259B | Standard Battery Pack for F259 | 300 |
| | VZW256CMU | Mock Up | 1 |
| Huawei Total | | | 5,671 |
| Teleepoch | BTR2030B | Standard Battery For The | 100 |
| | BTR2080B | 800MAH 2.96Wh Li-Ion Standard | 2,610 |
| | BTR2080C | Battery Cover for CDM2080 | 2,660 |
| | BTR209B | Standard Battery - PLVMADR209 | 156 |
| | CA2080B | 2080 Specific USB to Mirco USB | 2,610 |
| | EM2080B | Wired Ear Mic | 2,610 |
| Teleepoch Total | | | 10,746 |
| TCT-Alcatel | BTR3035B | Standard Battery 3.7V/1300Mah | 6,815 |
| | BTR3045B | Standard Battery 3.7V/1300Mah | 375 |
| | BTR3505B | Standard Battery | 20 |
| | BTR510AB | Standard Battery For Ot510A | 748 |
| | BTR510ABX | Extended Battery For Ot510A | 1,000 |
| | BTR510AC | Standard Battery Cover For | 1,000 |
| | CMU510A | Dummy Device For Ot510A | 10 |
| | CNR510AKITX | Ac Adaptor (1Pc Wired) After | 200 |
| | CNR871A | AC Adaptor CBA3001AG0CX | 25 |
| | CNR871AX | Ac Adaptor After Market | 100 |
| | DIC871A | Data Cable CDA3122005CX | 25 |
| | DIC871AX | Usb Data Cable After Market | 100 |
| TCT-Alcatel Total | | | 10,418 |

| | | | | |
|---|---|---|---|---:|
| | NetGear | ANT1515B | External Antenna | 30 |
| | | CAB1515B | Yellow Cat5 1.5M Cable | 30 |
| | | CNR1515 | AC Power Adapter | 30 |
| | NetGear Total | | | 90 |
| Accessories Total | | | | 54,018 |
| Telephone | Pantech | ADR8995OM | Dual Band 800/1900 Lte Slim | 146 |
| | | ADR8995OMH | Dual Band 800/1900 Lte Slim | 30 |
| | | ADR8995VW | Dual Band 800/1900 Lte Slim | 12,871 |
| | | ADR910LVW | LTE With Sliding Qwerty | 14,008 |
| | | ADR910LVWMS | LTE With Sliding Qwerty | 44 |
| | | ADR930LVW | HF LTE EVDO Rev A | 11,892 |
| | | CDM8992VW | Dual Band 800/1900 MHZ | 2,665 |
| | | CLNRPCDADR8995 | Dual Band 800/1900 Lte Slim | 2 |
| | | CLNRPCDADR910 | LTE With Sliding Qwerty | 997 |
| | | CLNRPCDADR930 | HF LTE EVDO Rev A | 1,280 |
| | | CLNRPCDCDM8992 | Dual Band 800/1900 MHZ | 438 |
| | | CLNRPCDMHS291 | Mobile Hotspot Dual Band | 80 |
| | | CLNRPCDTXT8045 | Dual Mode 800/1900 MHZ CDMA & | 233 |
| | | CLNRPCDUML295 | Global Lte Usb Modem Fru | 320 |
| | | IQCDM8992VW | Dual Band 800/1900 MHZ | 21 |
| | | MHS291LVW | Mobile Hotspot Dual Band | 3,500 |
| | | TXT8045US | Dual Mode 800/1900 MHZ CDMA & | 8 |
| | | TXT8045USH | Dual Mode 800/1900 MHZ CDMA & | 98 |
| | | TXT8045VW | Dual Mode 800/1900 MHZ CDMA & | 13,099 |
| | | UM185US | EVDO Modem Phone US Cellular | 8 |
| | | UML290GFRU | Global Lte USB Modem W/Global | 540 |
| | | UML290VW-G | Global Lte USB Modem W/Global | 1,510 |
| | | UML295VW | Global Lte USd Modem | 10 |
| | Pantech Total | | | 63,800 |
| | Sharp-Tels | ADS1 | Touch Qwerty | 176 |
| | | ADS1H | Touch Qwerty | 194 |
| | | FRUPCDPB20 | Pb20Zu Fru | 60 |
| | Sharp-Tels Total | | | 430 |
| | HTC | ADR6103MOBFRU | Htc-Mobilicity Amaze 4 Fru | 60 |
| | | ADR6103WMFRU | Htc-Wind Amaze 4G Fru | 15 |
| | | ADR6107MOBFRU | Htc One S 4.0 Mobi/Ingram | 10 |
| | | ADR6200MTS | Android Device With Touch | 5 |
| | | ADR6225AL | Android Device W/Touch Screen | 1 |
| | | ADR6225CSF | Dual Band 800/1900 MHZ CDMA | 19 |
| | | ADR6230PUS | Dual Band 800/1900 MHZ Google | 4 |
| | | ADR6230PUSH | Dual Band 800/1900 MHZ Google | 41 |

|  |  | ADR6230US | Dual Band 800/1900 MHZ Google | 47 |
|---|---|---|---|---|
|  |  | ADR6275AL | Android Device W/Touch Screen | 15 |
|  |  | ADR6275CSF | Android Device With Touch & Fr | 2 |
|  |  | ADR6280CS | Dual Band 800/1900 MHZ Google | 13 |
|  |  | ADR6285CS | Dual Band 800/1900 MHZ Google | 607 |
|  |  | ADR6285CSH | Dual Band 800/1900 MHZ Google | 76 |
|  |  | ADR6285USH | Dual Band 800/1900 MHZ Google | 1 |
|  |  | ADR6290CS | CDMA2000 1XEVDO, 1Xrtt, Is-95A | 36 |
|  |  | ADR6290CSH | CDMA2000 1XEVDO, 1Xrtt, Is-95 | 104 |
|  |  | ADR6290USH | CDMA2000 1XEVDO, 1Xrtt, Is-95 | 50 |
|  |  | ADR6325ALAN | Android Device W/Touch Screen | 18 |
|  |  | ADR6325VW | Dual Band 800/1900 MHZ CDMA | 27 |
|  |  | ADR6330VW | Dual Band 800/1900 MHZ 2000 | 9,031 |
|  |  | ADR6350VW | Dual Band 800/1900 MHZ Google | 41 |
|  |  | ADR6350VW-R | Dual Band 800/1900 MHZ Google | 9 |
|  |  | ADR6400LOMH | Dual Band 800/1900 MHZ Google | 10 |
|  |  | ADR6400LVW | Dual Band 800/1900 MHZ Google | 2 |
|  |  | ADR6410LRA | Dual Band 800/1900 MHZ Google | 31 |
|  |  | ADR6410LRAH | Dual Band 800/1900 MHZ Google | 62 |
|  |  | ADR6410LVW | Dual Band 800/1900 MHZ Google | 1 |
|  |  | ADR6425LVW | Gingerbread Lte 700-LTE UMTS | 184 |
|  |  | CLNRPCDADR6330 | Dual Band 800/1900 MHZ 2000 | 4 |
|  |  | CLNRPCDADR6350W | Dual Band 800/1900 MHZ Google | 4 |
|  |  | CLNRPCDHTC6435 | Android Ics Lte 700 Mhz Cdma | 1 |
|  |  | CLNRPCDHTC6990 | Cdma 1Xevdo Rev A Lte | 3 |
|  |  | HTC6435LVW | Android Ice Cream Sandwich Lte | 8 |
|  |  | HTC6435LVW-DU | Android Ice Cream Sandwich Lte | 2 |
|  |  | HTC6990LVW | Cdma 1Xevdo Rev A Lte | 15 |
|  |  | HTC6990LVWBK | Cdma 1Xevdo Rev A Lte | 2 |
|  |  | IQADR6410LVW | Dual Band 800/1900 MHZ Google | 5 |
|  |  | MWP6105WM | Radar UMTS HSPA | 1 |
|  |  | MWP6885CS | Android Device Dual Band Gold | 1 |
|  |  | MWP6885US | Android Device Dual Band Gold | 5 |
|  |  | MWP6985VW | 1X EVDO Rev A GSM/GPRS Edge | 10 |
|  |  | OTCADR6325ALAN | Android Device W/Touch Screen | 1 |
|  | HTC Total |  |  | 10,584 |
|  | Casio | C751 | Dual Band 800/1900 MHZ CDMA | 1 |
|  |  | C771 | Dual Band 800/1900 MHZ CDMA | 121 |
|  |  | C781 | Dual Band 800/1900 MHZ CDMA + | 4 |
|  |  | CLNRPCDC751 | Dual Band 800/1900 MHZ CDMA | 158 |
|  |  | CLNRPCDC771 | Dual Band 800/1900 MHZ CDMA | 31 |

| | IQC771 | Seed Stock Units | 27 |
|---|---|---|---|
| Casio Total | | | 342 |
| Huawei | ADR3305USH | Android Chrome Lite 2.1 | 19 |
| | ADR3310USB | Huawei Ascend Y Walmart | 1,300 |
| | ADR3310USBH | Huawei Ascend Y Walmart | 800 |
| | ADR3310USH | Android Gingerbread 1Xrtt 800/ | 42 |
| | CLNRPCDF256 | Fixed Wireless Terminal Dual | 3,979 |
| | CLNRPCDF259 | Fixed Wireless Terminal Dual | 429 |
| | F256VW | Fixed Wireless Terminal Dual | 27,565 |
| | F259 | Fixed Wireless Terminal Dual | 28 |
| | FT2260USH | Fixed Wireless Terminal Dual | 130 |
| | IQF256VW | Fixed Wireless Terminal Dual | 48 |
| | UML397US | Lte Multi-Mode Usb For Us | 2,271 |
| Huawei Total | | | 36,611 |
| Cellon | ADR555OM | CDMA Android | 26 |
| | ADR555OMPFRU | CDMA Android In Purple | 12 |
| | ADR555OMSFRU | CDMA Android Silver | 1 |
| | CL1136CAFRU | 850/1900 CIF Camera Ph Dual Ba | 72 |
| | PCD775ENFRU | GPRS Mini Qwerty | 50 |
| Cellon Total | | | 161 |
| Teleepoch | CDM2030BG | Dual Band Voice Test  Bar | 7 |
| | CDM2030CS | Dual Band Voice Test  Bar | 8 |
| | CDM2030CSH | Dual Band 1X Cdna Voice Text | 19 |
| | CDM2080US | Rugged/Waterproof Phone | 406 |
| | PCD2030BLK | Dual Band Voice Test  Bar | 30 |
| Teleepoch Total | | | 470 |
| TCT-Alcatel | ADR3035US | 2.8 Touch Screen Smart | 7 |
| | ADR3035USH | 2.8 Touch Screen Smart | 420 |
| | ADR3045US | Durable Android Smartphone | 16 |
| | ADR3045USH | Durable Android Smartphone | 320 |
| | OT510AMS | Feature Bar Device For At&T | 248 |
| | OT510APIB | 510A Blk Pib | 113 |
| | OT871AMS | Feature Bar Device W/Qwerty | 265 |
| TCT-Alcatel Total | | | 1,389 |
| Meta-7 | CDMRF101 | Delphi Module# 28090761 K2 For | 11,700 |
| | CDMRF101B | Delphi Module# 28235591 For | 13,140 |
| | CLNRPCDER10 | Mobile Personal Emergency | 363 |
| | ER10VW | Mobile Personal Emergency | 605 |
| | ER10VW-DU | Mobile Personal Emergency | 20 |
| Meta-7 Total | | | 25,828 |
| Franklin | CLNRPCDX720 | Lte Dual Band Cdma 1X Rtt Evd | 6 |

|  |  |  | VZW110000080002 | Lte Dual Band Cdma 1X Rtt Evd | 10 |
|---|---|---|---|---|---|
|  |  | Franklin Total |  |  | 16 |
|  |  | ZTE | LHS891US | Zte Unite Lte Hotspot For Us | 6 |
|  |  |  | MWP3505USH | Windows 7.5 Smartphone Fru | 20 |
|  |  | ZTE Total |  |  | 26 |
|  |  | NetGear | IQMBR1515LVW | Iq Units For Mbr1515Lvw | 57 |
|  |  | NetGear Total |  |  | 57 |
|  |  | AnyData | CLNRPCDACT231 | Cdma 1X Vehicle Modem 1Gb Fru | 150 |
|  |  | AnyData Total |  |  | 150 |
|  |  | Gemtek | CLNRPCDWIFIDISPLAY5901 | Wireless Media Receiver Wifi | 126 |
|  |  | Gemtek Total |  |  | 126 |
|  | Telephone Total |  |  |  | 139,990 |
| 10310 Total |  |  |  |  | 194,008 |
| 10340 | Accessories | TCT-Alcatel | BTR510AB | Standard Battery For Ot510A | 104,898 |
|  |  |  | BTR510AC | Standard Battery Cover For | 37,654 |
|  |  |  | BTR871AC | Standard Battery Cover | 17 |
|  |  |  | BTR871AGC | Bulk Gray Gemini Battery Back | 68,049 |
|  |  |  | CMU871AGR | Gray Gemini Dummy Phone for | 11,600 |
|  |  |  | CNR510AKIT | Standard Charger- One Piece | 37,555 |
|  |  |  | CNR871A | AC Adaptor CBA3001AG0CX | 67,988 |
|  |  |  | CNR871AX | Ac Adaptor After Market | 150 |
|  |  |  | DIC871A | Data Cable CDA3122005CX | 67,991 |
|  |  |  | DIC871AX | Usb Data Cable After Market | 150 |
|  |  |  | OT510APIBKIT | Feature Bar Device For At&T | 1 |
|  |  |  | SC510A | Screen Cling for Clamshell | 500 |
|  |  |  | SC510APIB | Screen Cling for Giftbox | 500 |
|  |  |  | SC871A | Screen Cling for Clamshell | 500 |
|  |  |  | SC871APIB | Screen Cling for Giftbox | 500 |
|  |  | TCT-Alcatel Total |  |  | 398,053 |
|  | Accessories Total |  |  |  | 398,053 |
|  | Telephone | TCT-Alcatel | 7030LES | Alcatel 7030L Eng Samples | 128 |
|  |  |  | OT510A | 510A Blk Payg | 5,919 |
|  |  |  | OT510AB | Feature Bar Device For At&T | 364 |
|  |  |  | OT510ABPIB | Feature Bar Device For At&T | 29,322 |
|  |  |  | OT510ABPIBD | Feature Bar Device For At&T | 1 |
|  |  |  | OT510ANB | Bulk Aries Clamshell New | 8,000 |
|  |  |  | OT510APIB | 510A Blk Pib | 1,422 |
|  |  |  | OT510APIBH | Ot510Apib Fru Seedstock | 5,249 |
|  |  |  | OT871A | 871A Wht Payg | 1,154 |

| | | | OT871AB | Feature Bar Device For At&T | 1 |
|---|---|---|---|---|---|
| | | | OT871AG | 871AG Gry Paygo | 28,304 |
| | | | OT871AGB | Bulk Gray Gemini Clamshell Uni | 47,696 |
| | | | OT871AGBPIB | Bulk Gray Gemini Giftbox Units | 17,553 |
| | | | OT871AGBPIBD | Bulk Gray Gemini Dealer Giftbo | 2,797 |
| | | | OT871AGPIB | 871A Gry PIB | 25,447 |
| | | | OT871AGPIBD | 871A Gry IDB | 2,200 |
| | | | OT871APIB | 871A Wht Pib | 21 |
| | | | OT871APIBD | 871A Wht Ibd Saa3254Wb11C | 2 |
| | | | OT871APIBH | Ot871A Seed Stock | 7,548 |
| | | TCT-Alcatel Total | | | 183,128 |
| | Telephone Total | | | | 183,128 |
| 10340 Total | | | | | 581,181 |
| 10350 | Accessories | All Other Vendors | BC9900B | Belt Clip | 2 |
| | | | BTR7026B | 1050MA Li-Ion Standard Battery | 200 |
| | | | CLC9900B | Cigarette Lighter Charger- Rub | 16 |
| | | | CNR7000 | A/C Charger | 4 |
| | | | DICU7025B | Data Interface Cable | 19 |
| | | | IWCSDBK | Iphone Wireless TV Adapter | 1,760 |
| | | All Other Vendors Total | | | 2,001 |
| | | Pantech | LB8940VWB | Leather Bag | 7 |
| | | Pantech Total | | | 7 |
| | | HTC | BTE5800B | 1800MA Extended Battery | 1 |
| | | | CD6700 | Companion Cd For Generic | 43 |
| | | | CLC5600B | Cigarette Lighter Charger | 3 |
| | | | CNR5500 | A/C Charger | 15 |
| | | | CNR5600 | A/C Adapter w/ Connector | 2 |
| | | | CRU6700C | Cradle Only w/ USB- Dual Port | 5 |
| | | | LB5600B | Leather Bag | 9 |
| | | | LB6600B | Pouch w/ Belt Clip | 3 |
| | | | LB6800B | Leather Bag | 100 |
| | | HTC Total | | | 181 |
| | | TCT-Alcatel | CMU510A | Dummy Device For Ot510A | 17,988 |
| | | TCT-Alcatel Total | | | 17,988 |
| | Accessories Total | | | | 20,177 |
| | Telephone | Pantech | ADR8995VW | Dual Band 800/1900 Lte Slim | 121,089 |
| | | | ADR930LVW | HF LTE EVDO Rev A | 23,200 |
| | | | IQADR910LVW | LTE With Sliding Qwerty | 70 |
| | | | TXT8045US | Dual Mode 800/1900 MHZ CDMA & | 22,934 |

| | | | | | |
|---|---|---|---|---|---:|
| | | | TXT8045USH | Dual Mode 800/1900 MHZ CDMA & | 90 |
| | | | UM185USH | EVDO Modem Phone US Cellular | 145 |
| | | | UML290GFRU | Global Lte USB Modem W/Global | 1,210 |
| | | | UML295VW | Global Lte USd Modem | 4,290 |
| | | Pantech Total | | | 173,028 |
| | | HTC | ADR6230PUS | Dual Band 800/1900 MHZ Google | 7,016 |
| | | | ADR6230US | Dual Band 800/1900 MHZ Google | 1,200 |
| | | | ADR6285CS | Dual Band 800/1900 MHZ Google | 300 |
| | | HTC Total | | | 8,516 |
| | | Huawei | ADR3305USH | Android Chrome Lite 2.1 | 890 |
| | | Huawei Total | | | 890 |
| | | Cellon | ADR555OMP | CDMA Android In Purple | 1,566 |
| | | | GFM114CPFRU | Single Band Bar W/FM Radio | 263 |
| | | Cellon Total | | | 1,829 |
| | | Teleepoch | CDM2080US | Rugged/Waterproof Phone | 10,252 |
| | | Teleepoch Total | | | 10,252 |
| | | TCT-Alcatel | ADR3035US | 2.8 Touch Screen Smart | 660 |
| | | | ADR3045US | Durable Android Smartphone | 5,000 |
| | | TCT-Alcatel Total | | | 5,660 |
| | | Meta-7 | CDMRF101 | Delphi Module# 28090761 K2 For | 19,743 |
| | | | ER10VW | Mobile Personal Emergency | 22,400 |
| | | Meta-7 Total | | | 42,143 |
| | | Franklin | CLNRPCDX720 | Lte Dual Band Cdma 1X Rtt Evd | 390 |
| | | | VZW110000080002 | Lte Dual Band Cdma 1X Rtt Evd | 10,020 |
| | | Franklin Total | | | 10,410 |
| | Telephone Total | | | | 252,728 |
| 10350 Total | | | | | 272,905 |
| 10351 | Accessories | Meta-7 | BC10B | Belt Clip/Holster | 5,285 |
| | | | CNR10 | A/C Adapter | 5,285 |
| | | | LD10B | Pendant Accessory/ Lanyard | 5,385 |
| | | | TDS10B | Travel Dock Station | 5,285 |
| | | Meta-7 Total | | | 21,240 |
| | Accessories Total | | | | 21,240 |
| | Telephone | Pantech | ADR8995VW | Dual Band 800/1900 Lte Slim | 63,075 |
| | | | ADR930LVW | HF LTE EVDO Rev A | 49,550 |
| | | Pantech Total | | | 112,625 |
| | | HTC | ADR6103MOB | Amaze UMTS HSPA | 3,005 |
| | | | ADR6107MOB | Htc One S 4.0 Mobi/Ingram | 1,000 |
| | | | ADR6230US | Dual Band 800/1900 MHZ Google | 4,800 |

| | | | ADR6330VW | Dual Band 800/1900 MHZ 2000 | 25,800 |
|---|---|---|---|---|---|
| | | HTC Total | | | 34,605 |
| | Telephone Total | | | | 147,230 |
| 10351 Total | | | | | 168,470 |
| 10371 | Accessories | All Other Vendors | BTR7026B | 1050MA Li-Ion Standard Battery | 45 |
| | | | BTR9200B | Battery | 198 |
| | | | CLC7000B | Cigarette Lighter Charger | 8 |
| | | | EMBDSIM | Sim Card | 801 |
| | | | IWCSDBK | Iphone Wireless TV Adapter | 2 |
| | | | MSD16G | 16GB SD Card | 228 |
| | | | TRC7000B | Travel Charger | 1 |
| | | All Other Vendors Total | | | 1,283 |
| | | Pantech | BC8945B | Belt Clip | 4 |
| | | | BC8950B | Belt Clip | 4 |
| | | | BTR291B | STANDARD BATTERY-4040MAH | 10 |
| | | | BTR8945B | Standard Battery | 10 |
| | | | BTR8995B | Standard Battery | 2 |
| | | | BTR910B | 1680MAH Li-Ion Battery | 7 |
| | | | BTR930B | 950 Ma Li-Ion Battery | 9 |
| | | | LB8615B | Leather Bag | 7 |
| | | | LB8910B | Leather Bag | 27 |
| | | | SHS8940B | Stereo Headset | 2 |
| | | | VZW8030BAT | Standard Battery- VZW Packagin | 27 |
| | | | YC150B | Extension Y Cable Connector | 6 |
| | | Pantech Total | | | 115 |
| | | Sharp-Tels | CLC150B | Cigarette Lighter Charger | 6 |
| | | Sharp-Tels Total | | | 6 |
| | | HTC | BTE6700B | Extended Battery- Black | 2 |
| | | | BTE6800BLKC | Black Extended Battery Cover- | 23 |
| | | | BTE6900SPB | 1900MA Extended Battery- Black | 1 |
| | | | BTR5800B | 1050MA Standard Battery | 25 |
| | | | BTR6350B | 1400MAH Standard Battery | 10 |
| | | | BTR6400M | Standard Battery | 92 |
| | | | BTR6425B | Standard Battery | 3 |
| | | | CNR6300 | A/C Charger | 3 |
| | | | CRU6800C | Cradle Only | 2 |
| | | | DCC5500B | DC Converter | 2 |
| | | | DICMUSB | Micro USB Cable | 15 |
| | | | LB6800B | Leather Bag | 23 |

| | | LB6900B | Carry Case w/ Bc | 1 |
|---|---|---|---|---|
| | | SCA6800B | Mini USB Cable w/ Splitter- US | 32 |
| | | SHS6600B | Stereo Headset w/ Microphone | 33 |
| | | SHS6700B | Stereo Headset | 4 |
| | | SP6800DSB | Stylus Pen- Dark Sliver- Sprin | 1 |
| | | SP6900SPB | Stylus Pen | 44 |
| | HTC Total | | | 316 |
| | Casio | BCGZB | Belt Clip | 3 |
| | | BTEC511B | 1680MA Li Ion Extended Battery | 6 |
| | | BTR211RDB | Standard Battery- Red | 1 |
| | | BTR751C | Standard Battery Cover | 492 |
| | | BTR771B | 1460MAH Standard Battery | 107 |
| | | CC211B | Carry Case | 2 |
| | Casio Total | | | 611 |
| | Sharp-Parts | BTR2B | 1240MA Li-Ion Standard Battery | 1 |
| | Sharp-Parts Total | | | 1 |
| | Huawei | BTR2260B | Standard Battery Pack | 3 |
| | Huawei Total | | | 3 |
| | Cellon | VM2090KIT | Accessory Kit For Chaser | 2 |
| | Cellon Total | | | 2 |
| | TCT-Alcatel | BTR3010B | Battery For Adr3010 | 18 |
| | | BTR3035B | Standard Battery 3.7V/1300Mah | 20 |
| | | BTR3045B | Standard Battery 3.7V/1300Mah | 6 |
| | | BTR510AB | Standard Battery For Ot510A | 184 |
| | | BTR510AC | Standard Battery Cover For | 272 |
| | | BTR871AC | Standard Battery Cover | -88 |
| | | CNR510AKIT | Standard Charger- One Piece | 72 |
| | | CNR871A | AC Adaptor CBA3001AG0CX | 112 |
| | | DIC871A | Data Cable CDA3122005CX | 112 |
| | | OT510APIBKIT | Feature Bar Device For At&T | 57 |
| | TCT-Alcatel Total | | | 765 |
| | Wistron New Web | PS10001 | Power Supply Only For The | 998 |
| | Wistron New Web Total | | | 998 |
| | Axesstel | TX340GVIA | Data Cable | 14 |
| | Axesstel Total | | | 14 |
| Accessories Total | | | | 4,114 |
| Telephone | Pantech | ADR8995OM | Dual Band 800/1900 Lte Slim | 1 |
| | | ADR8995VW | Dual Band 800/1900 Lte Slim | 280 |
| | | ADR910LVW | LTE With Sliding Qwerty | 23 |
| | | ADR910LVWMS | LTE With Sliding Qwerty | 1 |

| | | ADR930LVW | HF LTE EVDO Rev A | 14 |
|---|---|---|---|---|
| | | CDM8410USH | Handset Only Cdm8410Us | 41 |
| | | CDM8615ACS | Trimode CDMA Clamshell Phone | 2 |
| | | CDM8615H | Trimode Clamshell Phone | 1 |
| | | CDM8615PPB | Trimode Clamshell Phone | 114 |
| | | CDM8912SP | Trimode Cdma Clamshell W/Color | 3 |
| | | CDM8992VW | Dual Band 800/1900 MHZ | 8 |
| | | CLNRPCDADR8995 | Dual Band 800/1900 Lte Slim | 127 |
| | | CLNRPCDADR910 | LTE With Sliding Qwerty | 216 |
| | | CLNRPCDCDM8992 | Dual Band 800/1900 MHZ | 772 |
| | | CLNRPCDMHS291 | Mobile Hotspot Dual Band | 30 |
| | | CLNRPCDTXT8045 | Dual Mode 800/1900 MHZ CDMA & | 4 |
| | | CLNRPCDUML290 | Global Lte USB Modem | 297 |
| | | FRUPCDWP8990 | Dual Band/CDMA/Quad Band/GSM | 98 |
| | | IQADR8995VW | Dual Band 800/1900 Lte Slim | 4 |
| | | MHS291LVW | Mobile Hotspot Dual Band | 4 |
| | | OTCUM175ALA | Fru For Um175ALADual Band 800/ | 30 |
| | | PLS5750DC | Pcmcia Card Dual Mode 800/1900 | 14 |
| | | PXE500DORA | Pcmcia Card Dual Mode 800/1900 | 78 |
| | | TXT8035BPP | 1X Dual Mode 800/1900 MHZ CDMA | 2 |
| | | TXT8035PP | 1X Dual Mode 800/1900 MHZ CDMA | 2 |
| | | TXT8045US | Dual Mode 800/1900 MHZ CDMA & | 12 |
| | | TXT8045USH | Dual Mode 800/1900 MHZ CDMA & | 2 |
| | | TXT8045VW | Dual Mode 800/1900 MHZ CDMA & | 158 |
| | | UM185C | EVDO Modem Phone For Cricket | 1 |
| | | UM185US | EVDO Modem Phone US Cellular | 1 |
| | | UML290VW | Global Lte USB Modem | 28 |
| | | UML290VW-G | Global Lte USB Modem W/Global | 49 |
| | | UML295VW | Global Lte USd Modem | 3 |
| | | UMW190NCD | Dual Band/Quad USB Modem  CDMA | 33 |
| | | UMW190VW | Dual Band/Quad USB Modem  CDMA | 1 |
| Pantech Total | | | | 2,454 |
| | Sharp-Tels | ADS1 | Touch Qwerty | 240 |
| | | ADS1MS | Touch Qwerty Android Device | 3 |
| | | CLNRPCDPB20M | 3.4 Touch Screen 8.0 Megapixel | 840 |
| | | FRUPCDPB20 | Pb20Zu Fru | 1,710 |
| | | PB10ZUM | 2.6 Touch Screen 5.0 Megapixel | 12 |
| | | PB20ZUM | 3.4 Touch Screen 8.0 Megapixel | 13 |
| | | STX2 | Messaging Device With Touch | 74 |
| Sharp-Tels Total | | | | 2,892 |
| | HTC | ADR6200MTS | Android Device With Touch | 5 |

| | | |
|---|---|---|
| ADR6200VW | Android Device With Touch | 10 |
| ADR6225ACSF | Android Device W/Froyo | 5 |
| ADR6225AL | Android Device W/Touch Screen | 8 |
| ADR6225CSF | Dual Band 800/1900 MHZ CDMA | 1 |
| ADR6225NWF | Android Device W/Froyo | 1 |
| ADR6230PUS | Dual Band 800/1900 MHZ Google | 1 |
| ADR6230US | Dual Band 800/1900 MHZ Google | 11 |
| ADR6250ALA | Android Device W/Touch Screen | 1 |
| ADR6250CS | Android Device W/Touch Screen | 3 |
| ADR6250CSBK | Android Device W/Touch Screen | 8 |
| ADR6275CSFH | Android Device With Touch | 9 |
| ADR6280CS | Dual Band 800/1900 MHZ Google | 3 |
| ADR6285CS | Dual Band 800/1900 MHZ Google | 9 |
| ADR6285US | Dual Band 800/1900 MHZ Google | 19 |
| ADR6285USH | Dual Band 800/1900 MHZ Google | 2 |
| ADR6290ACS | CDMA2000 1XEVDO 1Xrtt Is-95A | 3 |
| ADR6290CC | CDMA2000 1XEVDO 1Xrtt Is-95A | 2 |
| ADR6290CS | CDMA2000 1XEVDO, 1Xrtt, Is-95A | 4 |
| ADR6290CSH | CDMA2000 1XEVDO, 1Xrtt, Is-95 | 1 |
| ADR6290EL | CDMA2000 1XEVDO 1Xrtt Is-95A | 2 |
| ADR6290NT | CDMA2000 1XEVDO 1Xrtt Is-95A | 1 |
| ADR6290SRT | CDMA2000 1XEVDO 1Xrtt Is-95A | 1 |
| ADR6290US | CDMA2000 1XEVDO, 1Xrtt, Is-95A | 24 |
| ADR6300VW | Dual Band 800/1900 MHZ Google | 1 |
| ADR6300VW3 | Dual Band 800/1900MHZ Google | 75 |
| ADR6325ACSG | Gingerbread Android Device | 1 |
| ADR6325CC | Android Device W/Froyo | 1 |
| ADR6325CCG | Gingerbread Android Device | 2 |
| ADR6325CS | Dual Band 800/1900 MHZ CDMA | 18 |
| ADR6325CSG | Gingerbread Android Device | 8 |
| ADR6325CSGH | Gingerbread Android Device | 3 |
| ADR6325NWG | Gingerbread Android Device | 1 |
| ADR6325SN | Android Device W/Froyo | 4 |
| ADR6325SNG | Gingerbread Android Device | 6 |
| ADR6325US | Dual Band 800/1900 MHZ CDMA | 66 |
| ADR6325USH | Dual Band 800/1900 MHZ CDMA | 2 |
| ADR6325VW | Dual Band 800/1900 MHZ CDMA | 3 |
| ADR6330VW | Dual Band 800/1900 MHZ 2000 | 10 |
| ADR6350VW | Dual Band 800/1900 MHZ Google | 1 |
| ADR6350VW-DU | Verizon Launch Kit | 2 |
| ADR6350VW-R | Dual Band 800/1900 MHZ Google | 27 |

| | | ADR6400LVW | Dual Band 800/1900 MHZ Google | 3 |
|---|---|---|---|---|
| | | ADR6410LRACC | Dual Band 800/1900 MHZ Google | 14 |
| | | ADR6410LVW | Dual Band 800/1900 MHZ Google | 8 |
| | | ADR6410LVW-DU | Dual Band 800/1900 MHZ Google | 1 |
| | | ADR6425LVW | Gingerbread Lte 700-LTE UMTS | 3 |
| | | ADR6425LVW-DU | Gingerbread Lte 700-LTE UMTS | 1 |
| | | CLNRPCDADR6325 | Dual Band 800/1900 MHZ CDMA | 1 |
| | | CLNRPCDADR6350R | Dual Band 800/1900 MHZ Google | 1 |
| | | CLNRPCDADR6410 | Dual Band 800/1900 MHZ Google | 708 |
| | | HTC6280BLK | Dual Band 800/1900 MHZ Google | 1 |
| | | HTC6290GRY | CDMA2000 1X EVDO, 1Xrtt, | 33 |
| | | HTC6435LVW | Android Ice Cream Sandwich Lte | 5 |
| | | HTC6435LVWEMPA | Android Ice Cream Sandwich Lte | 14 |
| | | HTC6885GRY | Android Device Dual Band Gold | 4 |
| | | HTC6990LVW | Cdma 1Xevdo Rev A Lte | 22 |
| | | HTC6990LVWBK | Cdma 1Xevdo Rev A Lte | 2 |
| | | HTC6990LVWR | Gsm Cdma 1Xevdo Rev A Lte | 2 |
| | | MP6950AL | Dual Band 800/1900 MHZ | 1 |
| | | MWP6885CS | Android Device Dual Band Gold | 8 |
| | | MWP6885US | Android Device Dual Band Gold | 8 |
| | | MWP6985VW | 1X EVDO Rev A GSM/GPRS Edge | 12 |
| | | OTCPPC6700AL | Ppc6700Al Fru | 5 |
| | | PLS7373ADRFRU | 4G Android Touch With Sliding- | 5 |
| | | XV6175 | Cedar Smart Phone | 11 |
| | | XV6950 | Dual Band 800/1900 MHZ | 1 |
| HTC Total | | | | 1,239 |
| | Casio | C211RD | 900/1800 WIFI Qwerty W/Vga | 1 |
| | | C731 | Dual Band EVDO Rev A With | 4 |
| | | C741 | Dual Band 800/1900 MHZ Rugged | 3 |
| | | C751 | Dual Band 800/1900 MHZ CDMA | 9 |
| | | C771 | Dual Band 800/1900 MHZ CDMA | 10 |
| | | C781NC | Non Camera C781 Dual Band CDMA | 5 |
| Casio Total | | | | 32 |
| | Huawei | ADR3305US | Android Chrome Lite 2.1 | 5 |
| | | ADR3310US | Android Gingerbread 1Xrtt | 46 |
| | | ADR3310USBH | Huawei Ascend Y Walmart | 20 |
| | | CLNRPCDF256 | Fixed Wireless Terminal Dual | 708 |
| | | CLNRPCDFT2260 | Fixed Wireless Terminal Dual | 2 |
| | | F256VW | Fixed Wireless Terminal Dual | 6 |
| | | FT2260VW | Fixed Wireless Terminal Dual | 4 |
| | | FT2260VWX | Fixed Wireless Terminal Dual | 431 |

| | | | |
|---|---|---|---:|
| | PCDH364SPC | Fixes Wireless Cdma Terminal | 20 |
| | PCDH364SPCES | Fixed Wireless Cdma Terminal | 2 |
| | PCDH5072HS | 3G/4G Hotspot Device  WiMax | 3 |
| | PCDM650KT | Android Qwerty With TS & WiFi | 8 |
| | REC364SPC1 | Fixed Wireless Cdma Terminal | 6 |
| | UML397US | Lte Multi-Mode Usb For Us | 8 |
| Huawei Total | | | 1,269 |
| Cellon | VM2090B | Android 2.3 Device With Touch | 204 |
| | VM2090FRU | Android 2.3 Device With Touch | 101 |
| | VM2090PDKIT180 | Android 2.3 Device With Touch | 30 |
| Cellon Total | | | 335 |
| Teleepoch | CDM2030CS | Dual Band Voice Test  Bar | 4 |
| | CDM2030CSH | Dual Band 1X Cdna Voice Text | 6 |
| | CDM2080US | Rugged/Waterproof Phone | 148 |
| | CDM2080USH | Rugged/Waterproof Phone | 293 |
| | PCD2030BLK | Dual Band Voice Test  Bar | 3 |
| Teleepoch Total | | | 454 |
| TCT-Alcatel | ADR3010CMH | Android Os 2.3 Tri Band CDMA/A | 10 |
| | ADR3010RSH | Android Os 2.3 Tri Band CDMA/A | 11 |
| | ADR3035US | 2.8 Touch Screen Smart | 167 |
| | ADR3045US | Durable Android Smartphone | 24 |
| | OT510ABPIB | Feature Bar Device For At&T | 17 |
| | OT510ABPIBD | Feature Bar Device For At&T | 1 |
| | OT510APIB | 510A Blk Pib | 54 |
| | OT606TMB | Handset Only | 1 |
| | OT606TMFRU | GSM Dual Band Slide Out Qwerty | 1 |
| | OT665TMFRU | Dual Band GSM Clamshell Camera | 1 |
| | OT871A | 871A Wht Payg | 2 |
| | OT871AB | Feature Bar Device For At&T | 79 |
| | OT871ABPIB | Feature Bar Device For At&T Pi | 33 |
| | VM2045PDKIT177 | Qwerty With Touch | 29 |
| | VM2045PDKIT177B | Qwerty With Touch | 1 |
| TCT-Alcatel Total | | | 431 |
| Axesstel | PCDTX340GT | Fixed Wirless Terminal | 174 |
| | RECTX340G1 | Fixed Wirless Terminal | 427 |
| Axesstel Total | | | 601 |
| Meta-7 | CDM8610VM | Trimode Cdma Phone W/Gps And 1 | 2 |
| | ER10VW | Mobile Personal Emergency | 182 |
| Meta-7 Total | | | 184 |
| Franklin | CLNRPCDX720 | Lte Dual Band Cdma 1X Rtt Evd | 2 |
| Franklin Total | | | 2 |

| | | | | | |
|---|---|---|---|---|---|
| | | ZTE | LHS891US | Zte Unite Lte Hotspot For Us | 14 |
| | | | MWP3505US | Windows 7.5 Smartphone | 24 |
| | | ZTE Total | | | 38 |
| | | Gemtek | WIFIDISPLAY5901 | Wireless Media Receiver Wifi | 1 |
| | | Gemtek Total | | | 1 |
| | Telephone Total | | | | 9,932 |
| 10371 Total | | | | | 14,046 |
| 10373 | Telephone | Pantech | CLNRPCDCDM8992 | Dual Band 800/1900 MHZ | 90 |
| | | Pantech Total | | | 90 |
| | | HTC | ADR6325VW | Dual Band 800/1900 MHZ CDMA | 4 |
| | | | ADR6330VW | Dual Band 800/1900 MHZ 2000 | 88 |
| | | | ADR6400LVW | Dual Band 800/1900 MHZ Google | 11 |
| | | HTC Total | | | 103 |
| | Telephone Total | | | | 193 |
| 10373 Total | | | | | 193 |
| 10381 | Telephone | Pantech | CLNRPCDUML290 | Global Lte USB Modem | 50 |
| | | Pantech Total | | | 50 |
| | | Huawei | CLNRPCDF256 | Fixed Wireless Terminal Dual | 110 |
| | | | FT2260VWX | Fixed Wireless Terminal Dual | 100 |
| | | Huawei Total | | | 210 |
| | Telephone Total | | | | 260 |
| 10381 Total | | | | | 260 |
| 10387 | Telephone | TCT-Alcatel | OT510A | 510A Blk Payg | 2 |
| | | | OT510APIB | 510A Blk Pib | 11 |
| | | | OT606TM | GSM Dual Band Slide Out Qwerty | 2,632 |
| | | | OT665PP | Dual Band GSM Clamshell Camera | 162 |
| | | | OT665TMVSW | Dual Band GSM Clamshell Camera | 155 |
| | | | OT871A | 871A Wht Payg | 46 |
| | | | OT871APIB | 871A Wht Pib | 40 |
| | | | WFM606 | Qwerty Slide Phone | 80 |
| | | TCT-Alcatel Total | | | 3,128 |
| | Telephone Total | | | | 3,128 |
| 10387 Total | | | | | 3,128 |
| 10400 | Accessories | All Other Vendors | BULKSIM-NFC-A | 4G SIM Card | 50 |
| | | | CLCMUSB | Universal Cigarette Lighter Ch | 1,197 |
| | | | CNRKIT2 | Universal USB A/C Adapter + US | 2 |

| | | MSD1G | 1GB SD Card | 43 |
| | | MSD4G | 4GB  SD Card | 2 |
| All Other Vendors Total | | | | 1,294 |
| Pantech | | BTR910B | 1680MAH Li-Ion Battery | 2 |
| Pantech Total | | | | 2 |
| HTC | | CNR6300 | A/C Charger | 2 |
| | | DICMUSB | Micro USB Cable | 2 |
| | | DICU6425B | Data Cable w/ HTC 12 Pin Conne | 2 |
| HTC Total | | | | 6 |
| TCT-Alcatel | | BTR510AB | Standard Battery For Ot510A | 79 |
| | | BTR510AC | Standard Battery Cover For | 84 |
| | | BTR871AC | Standard Battery Cover | 1 |
| | | CNR510AKIT | Standard Charger- One Piece | 149 |
| | | CNR871A | AC Adaptor CBA3001AG0CX | 1 |
| | | DIC871A | Data Cable CDA3122005CX | 1 |
| TCT-Alcatel Total | | | | 315 |
| Wistron New Web | | CLNRPCDTC10001 | Fixed Wireless Terminal  LTE | 1 |
| Wistron New Web Total | | | | 1 |
| Accessories Total | | | | 1,618 |
| Telephone | Pantech | ADR8995VW | Dual Band 800/1900 Lte Slim | 5 |
| | | ADR910VW | LTE With Sliding Qwerty | 21 |
| | | ADR930LVWES | HF LTE EVDO Rev A | 299 |
| | | ADR970LVWES | Lte Global Cdma Waterproof | 3 |
| | | MHS291LVWES | Mobile Hotspot Dual Band | 54 |
| | | TXT8045USES | Dual Mode 800/1900 MHZ CDMA & | 17 |
| | | TXT8045VW | Dual Mode 800/1900 MHZ CDMA & | 28 |
| | | UML295VW | Global Lte USd Modem | 2 |
| | | UML295VWES | Global Lite Usb Modem | 379 |
| | Pantech Total | | | 808 |
| | Sharp-Tels | ADS1ES | Touch Qwerty | 180 |
| | | ADS1MS | Touch Qwerty Android Device | 170 |
| | | STX2 | Messaging Device With Touch | 19 |
| | Sharp-Tels Total | | | 369 |
| | HTC | ADR6225CS | Dual Band 800/1900 MHZ CDMA | 2 |
| | | ADR6250ALA | Android Device W/Touch Screen | 8 |
| | | ADR6250CSBK | Android Device W/Touch Screen | 15 |
| | | ADR6275E | Android Devise With Touch | 24 |
| | | ADR6285CS | Dual Band 800/1900 MHZ Google | 22 |
| | | ADR6290CSES | CDMA2000 1X EVDO,1Xrtt, | 4 |

|  |  | ADR6290CSH | CDMA2000 1XEVDO, 1Xrtt, Is-95 | 1 |
|---|---|---|---|---|
|  |  | ADR6325CS | Dual Band 800/1900 MHZ CDMA | 106 |
|  |  | ADR6330VW | Dual Band 800/1900 MHZ 2000 | 234 |
|  |  | ADR6400LVW | Dual Band 800/1900 MHZ Google | 6 |
|  |  | ADR6410LRA | Dual Band 800/1900 MHZ Google | 8 |
|  |  | ADR6410LRAES | Dual Band 800/1900 MHZ Google | 79 |
|  |  | ADR6410LVWES | Dual Band 800/1900 MHZ Google | 13 |
|  |  | ADR6425LVW | Gingerbread Lte 700-LTE UMTS | 93 |
|  |  | HTC6435LRAES | Android Ics Lte 700 Mhz Cdma | 9 |
|  |  | HTC6990LVWBKCU | Gsm,Cdma 1Xevdo Rev A Lte | 45 |
|  |  | HTC6990LVWCU | Gsm,Cdma 1Xevdo Rev A Lte | 45 |
|  |  | HTC6990LVWES | Cdma 1Xevdo Rev A Lte | 46 |
|  |  | HTC6990LVWRCU | Gsm,Cdma 1Xevdo Rev A Lte | 19 |
|  |  | MWP6885AL | Android Device Dual Band Gold | 31 |
|  |  | MWP6885CS | Android Device Dual Band Gold | 11 |
|  | HTC Total |  |  | 821 |
|  | Casio | C781ES | Dual Band 800/1900 MHZ CDMA + | 60 |
|  | Casio Total |  |  | 60 |
|  | Huawei | ADR3305US | Android Chrome Lite 2.1 | 14 |
|  |  | ADR3310USES | Android Gingerbread 1Xrtt | 14 |
|  |  | F256VWES | Fixed Wireless Terminal Dual | 30 |
|  |  | PCDH364SPCES | Fixed Wireless Cdma Terminal | 60 |
|  | Huawei Total |  |  | 118 |
|  | TCT-Alcatel | 7030LES | Alcatel 7030L Eng Samples | 79 |
|  |  | ADR3045USES | Durable Android Smartphone | 3 |
|  |  | OT510AB | Feature Bar Device For At&T | 147 |
|  |  | OT510ABPIB | Feature Bar Device For At&T | 8 |
|  |  | OT510AES | Feature Bar Device | 36 |
|  |  | OT510APIB | 510A Blk Pib | 11 |
|  |  | OT871ABPIB | Feature Bar Device For At&T Pi | 1 |
|  |  | OT871AES | Feature Bar Device W/ Qwerty | 84 |
|  | TCT-Alcatel Total |  |  | 369 |
|  | ZTE | LHS891US | Zte Unite Lte Hotspot For Us | 5 |
|  |  | LHS891USES | Eufi 891 Lte Hotspot For Uscc | 2 |
|  | ZTE Total |  |  | 7 |
|  | NetGear | MBR1515LVW-AES | 3G4G LTE Modem Router | 80 |
|  |  | MBR1515LVWES | Mobile Broadband Router 4G Lte | 86 |
|  | NetGear Total |  |  | 166 |
|  | AnyData | ACT231VWES | Cdma 1X Vehicle Modem 1Gb | 29 |
|  | AnyData Total |  |  | 29 |
| Telephone Total |  |  |  | 2,747 |

| 10400 Total | | | | | 4,365 |
|---|---|---|---|---|---|
| 20312 | Accessories | All Other Vendors | 6.10215E+11 | TMO Kitted Activation Cards | 25,910 |
| | | | CELLXKIT | Sprint Expansion Board Kit | 4 |
| | | | CLCMUSB | Universal Cigarette Lighter Ch | 1 |
| | | | LHX0021Q | HRM-BLE-100 (BLE4.0) HR Chest | 1,497 |
| | | | MSD4G | 4GB  SD Card | 470 |
| | | All Other Vendors Total | | | 27,882 |
| | | Pantech | BTE930B | Extended Battery For Adr930Lvw | 100 |
| | | | BTR8035C | Standard Battery Cover | 1,107 |
| | | | BTR8635B | Standard Battery | 305 |
| | | | BTR8995B | Standard Battery | 12 |
| | | | BTR910C | Battery Cover | 200 |
| | | | BTR930B | 950 Ma Li-Ion Battery | 100 |
| | | | VZW8030BAT | Standard Battery- VZW Packagin | 456 |
| | | | VZW8035BAT | 920MA Li-On Battery | 334 |
| | | | VZW8045BAT | Standard Battery | 310 |
| | | | VZW8045CMU | Mock Up | 600 |
| | | | VZW8990BATDR | Standard Battery Door Cover | 58 |
| | | | VZW8990BATX | Extended Battery | 262 |
| | | | VZW8990INTERTVL | Charger w/ Int'l Adapters | 8 |
| | | | VZW8992BAT | Standard Battery | 312 |
| | | | VZW8995BAT | Standard Battery | 125 |
| | | | VZW8995BATX | Extended Battery | 10,895 |
| | | | VZW910BAT | 1680MAH Li-Ion Battery | 48 |
| | | | VZW910BATX | Extended Battery (3000MAH) + B | 552 |
| | | Pantech Total | | | 15,784 |
| | | HTC | BTR6350B | 1400MAH Standard Battery | 21 |
| | | | BTR6425B | Standard Battery | 100 |
| | | | BTR6425C | Standard Battery Cover- VZW | 299 |
| | | | HTC6400BAT1 | Standard Battery | 1,630 |
| | | | HTC6990LLKOV | Launch Kit Overage Units | 110 |
| | | | VZW6975BATX | Extended Battery & Cover | 862 |
| | | HTC Total | | | 3,022 |
| | | Casio | BTE781B | 11430MA Li-Ion Extended Batter | 151 |
| | | | BTR781C | Standard Battery Cover | 46 |
| | | | DTC781 | Desk Top Cradle | 116 |
| | | | VZW771DTC | Desk Top Cradle (No Charging C | 7 |
| | | | VZWC751BATX | 1600MAH Extended Battery Pack | 24 |
| | | | VZWC751DTC | Desk Top Cradle (No Charging C | 24 |
| | | Casio Total | | | 368 |

| | | | | |
|---|---|---|---|---|
| Huawei | ANT259B | Antenna for F259 | 40 |
| | BTR259C | Battery Cover for F259 | 40 |
| | CNR259 | AC Adaptor for F259 | 40 |
| | PCDH364SMU | Mock Up For Pcdh364Spc | 25 |
| | PCDM650MU | Mock Up- Express from Sprint | 10 |
| | VZWF256BATDR | Battery Cover- VZW Packaging | 50 |
| | VZWFT2260BAT | Standard Battery- VZW Packagin | 17 |
| | VZWFT2260TVL | A/C Adaptor- VZW Packaging | 22 |
| Huawei Total | | | 244 |
| Cellon | CMU2090 | Mock Up | 90 |
| | VM2090KIT | Accessory Kit For Chaser | 342 |
| | VM2090KITFRU | FRU Accessory Kit for Chaser | 140 |
| Cellon Total | | | 572 |
| TCT-Alcatel | BTR3010B | Battery For Adr3010 | 7,560 |
| | BTR3010C | Battery Cover For Adr3010 | 7,674 |
| | CMU2045 | Mock Up | 100 |
| | CMU606 | Mock Up | 10 |
| | CMU665 | Mock Up | 7 |
| | CMU768 | Mock Up For Ot768 | 40 |
| | CMU875 | OT875 MOCK UP UNIT | 180 |
| | CNR3010B | Ac Charger For Adr3010 | 7,673 |
| | DIC3010B | Charger Cable For Adr3010 | 7,672 |
| | ZZZ260R034 | Sim Card- T-Mobile | 109,604 |
| TCT-Alcatel Total | | | 140,520 |
| Wistron New Web | BRK10002 | Bracket for Ca10002 (Cantenna) | 9,070 |
| | CLNRPCDTC10001 | Fixed Wireless Terminal  LTE | 1,188 |
| | CNR10002 | Power Supply for Ca10002 (Cant | 6,802 |
| | TC10001 | Home Service Gateway Asurion | 314 |
| | TC10001ES | Home Service Gateway- Engineer | 2 |
| Wistron New Web Total | | | 17,376 |
| Axesstel | PCDTX340MU | Mock Up | 4 |
| | TX340GVIA | Data Cable | 8 |
| Axesstel Total | | | 12 |
| NetGear | PROB4GANT | Repeater Antenna | 20 |
| NetGear Total | | | 20 |
| Accessories Total | | | 205,800 |
| Telephone | All Other Vendors | CELLX4 | Sprint Fixed Wireless Gateway | 72 |
| | | CELLX8 | Sprint Fixed Wireless Gateway | 4 |
| | | MTCBAC1EN2 | Multimodem Rcell 1Xrtt | 184 |
| | All Other Vendors | | | 260 |

| Total | | | |
|---|---|---|---|
| Pantech | ADR8995VW | Dual Band 800/1900 Lte Slim | 30,644 |
| | CDM8992VW | Dual Band 800/1900 MHZ | 482 |
| | TXT8035B | 1X Dual Mode 800/1900 MHZ CDMA | 38,484 |
| | TXT8035BPP | 1X Dual Mode 800/1900 MHZ CDMA | 10,923 |
| | TXT8045VW | Dual Mode 800/1900 MHZ CDMA & | 7,782 |
| | UML290VW-G | Global Lte USB Modem W/Global | 5 |
| Pantech Total | | | 88,320 |
| HTC | ADR6280CS | Dual Band 800/1900 MHZ Google | 6 |
| | ADR6280CSH | Dual Band 800/1900 MHZ Google | 7 |
| | ADR6290CSH | CDMA2000 1XEVDO, 1Xrtt, Is-95 | 4 |
| | ADR6325CS | Dual Band 800/1900 MHZ CDMA | 3 |
| | ADR6330VW | Dual Band 800/1900 MHZ 2000 | 652 |
| | MWP6985VW | 1X EVDO Rev A GSM/GPRS Edge | 4 |
| HTC Total | | | 676 |
| Huawei | F256VW | Fixed Wireless Terminal Dual | 2 |
| | F259 | Fixed Wireless Terminal Dual | 10,110 |
| | PCDH364SPC | Fixes Wireless Cdma Terminal | 10,902 |
| | REC364SPC1 | Fixed Wireless Cdma Terminal | 4,164 |
| Huawei Total | | | 25,178 |
| Cellon | VM2090B | Android 2.3 Device With Touch | 19 |
| | VM2090FRU | Android 2.3 Device With Touch | 37 |
| | VM2090PDKIT180 | Android 2.3 Device With Touch | 9 |
| Cellon Total | | | 65 |
| TCT-Alcatel | ADR3010C | Android Os 2.3 Tri Band CDMA/A | 8,500 |
| | ADR3010CMFRU | Authority Fru For Mvni Channel | 600 |
| | ADR3010CMH | Android Os 2.3 Tri Band CDMA/A | 5,680 |
| | ADR3010FRU | Android Os 2.3 Tri Band CDMA/A | 500 |
| | ADR3010RSFRU | Authority Fru For Radio Shack | 760 |
| | ADR3010RSH | Android Os 2.3 Tri Band CDMA/A | 1,964 |
| | NCOT768TMB | ALC 768 Teal Blue TMUS Kit | 20 |
| | OT665PPB | Dual Band GSM Clamshell Camera | 12,511 |
| | OT665PPBFRU | Dual Band Gsm Clamshell Cam | 6,300 |
| | OT665TM | Dual Band GSM Clamshell Camera | 15,660 |
| | OT665TMFRU | Dual Band GSM Clamshell Camera | 3,039 |
| | OT768TMB | T-Mobile 768 Postpaid 3G | 75 |
| | OT875PPB | ALC/875/MO SPARQ II BLACK CLAM | 104 |
| | VM2045FRU | Qwerty With Touch | 4 |
| | VM2045PDKIT177 | Qwerty With Touch | 5 |
| | WFM606FRU | Qwerty Slide Phone | 718 |
| TCT-Alcatel Total | | | 56,440 |

| | | | | | |
|---|---|---|---|---|---|
| | | Wistron New Web | CA10002 | Fixed Wireless Terminal  LTE | 11,147 |
| | | | CLNRPCDCA10002 | Fixed Wireless Terminal  LTE | 239 |
| | | Wistron New Web Total | | | 11,386 |
| | | Axesstel | PCDTX340GT | Fixed Wirless Terminal | 241 |
| | | | RECTX340G1 | Fixed Wirless Terminal | 775 |
| | | Axesstel Total | | | 1,016 |
| | | NetGear | CLNRPCDMBR1515 | Mobile Broadband Router 4G Lte | 10 |
| | | | MBR1515LVW | Mobile Broadband Router 4G Lte | 2 |
| | | NetGear Total | | | 12 |
| | | AnyData | ACT231VW | Cdma 1X Vehicle Modem 1Gb | 2,887 |
| | | AnyData Total | | | 2,887 |
| | | Ingram Micro | WR21B11BDB1 | Transport Wr21 1Xrtt Sprint | 199 |
| | | Ingram Micro Total | | | 199 |
| | Telephone Total | | | | 186,439 |
| 20312 Total | | | | | 392,239 |
| 25330 | Accessories | All Other Vendors | CNRKIT2 | Universal USB A/C Adapter + US | 50 |
| | | | IWCSDBK | Iphone Wireless TV Adapter | 50 |
| | | | MSD4G | 4GB  SD Card | 50 |
| | | | PR00 | S-TPU CASE FOR SAMSUNG GALAXY | 500 |
| | | | PR0002BK | PC Case for T-Mobile-Island | 1,000 |
| | | | PR0004BK | PC Case for Alcatel 871a | 1,000 |
| | | | PR0007BK | PC Case for Alcatel 510a | 1,000 |
| | | | PR0010BK-A | S-TPU CASE FOR iPHONE 5 | 500 |
| | | | PR0011BK-A | S-TPU CASE FOR iPHONE 4/4S | 500 |
| | | | PR0012BK-A | S-TPU CASE FOR SAMSUNG GALAXY | 500 |
| | | | PR0013BK-A | S-TPU CASE FOR SAMSUNG GALAXY | 500 |
| | | | PR01CL | iPhone 5 Screen Protector | 1,000 |
| | | | PR02CL | Galaxy GS III Screen Protector | 1,000 |
| | | | PR03CL | Galaxy GS IV Screen Protector | 1,000 |
| | | | PR04CL | i Phone 4/4S Screen Protector | 1,000 |
| | | | PR05CL | Galaxy Note II Screen Protecto | 1,000 |
| | | | VGB05 | Protector Case For Htc 8X, | 500 |
| | | | VGB06 | Protector Case For Htc Dlx, | 500 |
| | | | VGC2-03 | Htc 8X Screen Protectors, | 1,000 |
| | | | VGC2-04 | Htc Dlx Screen Protectors, | 1,000 |
| | | | VGC2-11 | Pantech Breakouts Screen | 1,000 |
| | | | VGC2-12 | PANTECH ADR930 SCREEN | 989 |
| | | | VGF-37 | Tpu+Pc Case A Design For | 1,989 |
| | | | VGF-37 PK | TPU+PC case for Pantech ADR930 | 1,000 |

| | VGF-37 PR | TPU+PC case for Pantech ADR930 | 1,000 |
|---|---|---|---|
| | VGQC-03 | X-Tpu For Htc8X, Black | 500 |
| | VGQC-05 | S Tpu For Htc Dlx, Black | 500 |
| | VGQC-11 | S-Tpu Shell For Htc 6280 | 1,000 |
| | VGQC-12 | S-Tpu Shell For Htc 6290 One | 250 |
| All Other Vendors Total | | | 21,878 |
| Pantech | BTE8995B | Extended Battery | 50 |
| | BTE910B | Extended Battery (3000MAH) + B | 50 |
| | BTR8635B | Standard Battery | 50 |
| | BTR8992B | 1000MA Standard Battery | 50 |
| | BTR8995B | Standard Battery | 50 |
| | VZW8030BAT | Standard Battery- VZW Packagin | 50 |
| | VZW8035BAT | 920MA Li-On Battery | 50 |
| | VZW8045BAT | Standard Battery | 50 |
| | VZW8990BATX | Extended Battery | 50 |
| | VZW8995BATX | Extended Battery | 50 |
| Pantech Total | | | 500 |
| Sharp-Tels | BTR5B | Standard Battery | 50 |
| Sharp-Tels Total | | | 50 |
| HTC | BTE6410VWB | Extended Battery 2150 Mah And | 50 |
| | BTR6280B | Standard Battery | 50 |
| | BTR6425B | Standard Battery | 50 |
| | CNR6300 | A/C Charger | 50 |
| | DICMUSB | Micro USB Cable | 50 |
| | DICU6425B | Data Cable w/ HTC 12 Pin Conne | 50 |
| | HTC6400BAT1 | Standard Battery | 50 |
| | IBHS6425B | Ibeats Headset | 30 |
| | SHS6425BK | Black Stero Hs | 50 |
| | VZW6975BATX | Extended Battery & Cover | 50 |
| HTC Total | | | 480 |
| Casio | BTR771B | 1460MAH Standard Battery | 50 |
| | DTC781 | Desk Top Cradle | 50 |
| Casio Total | | | 100 |
| Huawei | BTR2260B | Standard Battery Pack | 50 |
| | BTR3305B | 1400MAH Li-Ion Standard Batter | 47 |
| Huawei Total | | | 97 |
| Teleepoch | BTR2030B | Standard Battery For The | 50 |
| | BTR2080B | 800MAH 2.96Wh Li-Ion Standard | 50 |
| | CA2080B | 2080 Specific USB to Mirco USB | 50 |
| | CNR2080 | A/C Adapter | 2,660 |
| | DICU2080B | USB To Micro USB Cable Only | 2,660 |

| | | | | | |
|---|---|---|---|---|---|
| | | | EM2080B | Wired Ear Mic | 50 |
| | | Teleepoch Total | | | 5,520 |
| | | TCT-Alcatel | BTR3045B | Standard Battery 3.7V/1300Mah | 50 |
| | | TCT-Alcatel Total | | | 50 |
| | Accessories Total | | | | 28,675 |
| 25330 Total | | | | | 28,675 |
| 30302 | Telephone | Cellon | ADR21ENFRU | Android Smart Phone For Enitel | 7 |
| | | | CL1135CARFRU | Dual Band GPRS W/FM Radio-Red | 51 |
| | | | CL1136CAFRU | 850/1900 CIF Camera Ph Dual Ba | 20 |
| | | Cellon Total | | | 78 |
| | Telephone Total | | | | 78 |
| 30302 Total | | | | | 78 |
| 30303 | Accessories | All Other Vendors | MSD2G | 2GB SD Card | 7,210 |
| | | All Other Vendors Total | | | 7,210 |
| | Accessories Total | | | | 7,210 |
| 30303 Total | | | | | 7,210 |
| 30304 | Telephone | Cellon | CL252CA | Triband WIFI Qwerty W/Vga | 4 |
| | | | CL252EN | Triband WIFI Qwerty W/Vga | 6 |
| | | | CL381CA | 2MP Camera Bluetooth Touch | 2 |
| | | | CL381CR | 2MP Camera Bluetooth Dual Band | 1 |
| | | | CLD1261CA | Bluetooth + Java Vga Dual Band | 3 |
| | | | CLD129CA | Dual Band Bluetooth+ Java Vga | 12 |
| | | Cellon Total | | | 28 |
| | Telephone Total | | | | 28 |
| 30304 Total | | | | | 28 |
| 30305 | Telephone | Cellon | CL252CR | Triband WIFI Qwerty W/Vga | 7,500 |
| | | | CL252CRFRU | Triband WIFI Qwerty W/Vga | 235 |
| | | | TTX38GT | Edge Text Unit W/Quad Band | 3,000 |
| | | | TTX38GTFRU | Ttx38Gt Fru | 30 |
| | | Cellon Total | | | 10,765 |
| | | Teleepoch | CM370MV | CDMA Bar Type Single Band w/Ca | 29,232 |
| | | | CM370MVFRU | CDMA Bar Type Single Band w/Ca | 590 |
| | | Teleepoch Total | | | 29,822 |
| | Telephone Total | | | | 40,587 |
| 30305 Total | | | | | 40,587 |

| 30306 | Telephone | Cellon | C285P | Bartype GPRS MP3 And FM Radio | 1,500 |
|---|---|---|---|---|---|
| | | | C285PFRU | Bartype GPRS MP3 And FM Radio | 30 |
| | | | CL1261CLPFRU | Bluetooth + Java Vga Bar Type | 100 |
| | | | CL1261CLRFRU | Bluetooth + Java Vga Bar Type | 100 |
| | | | CL129CLB | Bluetooth + Java Vga Clamshell | 5,000 |
| | | | CL129CLBFRU | Bluetooth + Java Vga Clamshell | 100 |
| | | | CL129CLR | Bluetooth + Java Vga Clamshell | 5,000 |
| | | | CL129CLRFRU | Bluetooth + Java Vga Clamshell | 100 |
| | | | CL381CLFRU | 2MP Camera Bluetooth Touch | 100 |
| | | | CL381CLWFRU | 2MP Camera Bluetooth Touch Whi | 100 |
| | | | GTX212CL | Music Qwerty Phone | 7,500 |
| | | | GTX212CLFRU | Music Qwerty Phone | 150 |
| | | | GTX212CLR | Music Qwerty Phone | 12,500 |
| | | | GTX212CLRFRU | Music Qwerty Phone | 250 |
| | | Cellon Total | | | 32,530 |
| | Telephone Total | | | | 32,530 |
| 30306 Total | | | | | 32,530 |
| 30307 | Telephone | Cellon | C180/9RFRU | Dual Band Phone | 1 |
| | | | C185/9FRU | Bartype Color Display With FM | 75 |
| | | | C600/8FRU | Gsm Phone W/Color Screen For | 1 |
| | | | C600/8RFRU | Gsm Phone W/Color Screen For | 1 |
| | | | C655/9RFRU | GPRS Dual Band With FM | 1 |
| | | | CL252ENWFRU | Triband WIFI Qwerty W/ Vga Whi | 94 |
| | | | GPFE128TGFRU | 850/1900 Clamshell With FM & E | 33 |
| | | | GPRS1328GTFRU | Fru Only For Gprs1328Gt | 20 |
| | | | GPT380CTEFRU | Low Cost Touch Screen Grps | 6 |
| | | | TE1202NIFRU | Bluetooth Java Vga Camera Bar | 40 |
| | | Cellon Total | | | 272 |
| | Telephone Total | | | | 272 |
| 30307 Total | | | | | 272 |
| 30308 | Accessories | Cellon | DICU381B | USB Data Cable | 2,040 |
| | | Cellon Total | | | 2,040 |
| | Accessories Total | | | | 2,040 |
| | Telephone | Cellon | ADR1105D | 3MP Camera | 1,600 |
| | | | ADR21CA | Android Smart Phone | 7,500 |
| | | | ADR21CAFRU | Android Smart Phone | 75 |
| | | | ADR21EN | Android Smart Phone For Enitel | 5,800 |
| | | | ADR21ENFRU | Android Smart Phone For Enitel | 181 |

| | | | CL1136CARFRU | 850/1900 CIF Camera Ph Dual Ba | 140 |
|---|---|---|---|---|---|
| | | | CL129CAFRU | Bluetooth + Java Vga Clamshell | 50 |
| | | | CL129ENFRU | Bluetooth + Java Vga Clamshell | 220 |
| | | | CL381CA | 2MP Camera Bluetooth Touch | 135 |
| | | | CL381CRW | 2MP Camera Bluetooth Dual Band | 2,000 |
| | | | CL381CRWFRU | 2MP Camera Bluetooth Dual Band | 40 |
| | | | CL381EN | 2MP Camera Bluetooth Touch | 2,200 |
| | | | CL381ENW | 2MP Camera Bluetooth Touch Whi | 5,000 |
| | | | CL381ENWFRU | 2MP Camera Bluetooth Touch Whi | 50 |
| | | | CLD1261CA | Bluetooth + Java Vga Dual Band | 5,400 |
| | | | CLD1261CAFRU | Bluetooth + Java Vga Dual Band | 379 |
| | | | GLPL148SV | 1.3 Megapixel Camera | 5,260 |
| | | | GTX212CA | Music Qwerty Phone | 6,728 |
| | | | GTX212CAFRU | Music Qwerty Phone | 83 |
| | | | GTX212ENFRU | Music Qwerty Phone | 190 |
| | | | PCD1299D | Bartype Vga Camera With BT | 2 |
| | | | PCD775ENFRU | GPRS Mini Qwerty | 42 |
| | | | PCD777DS | Gsm Quad Band 3G 900/2100 | 2 |
| | | | PCD777TLW | Quad Band 850/900/1800/1900 | 25,000 |
| | | | PCD777TLWFRU | Quad Band 850/900/1800/1900 | 240 |
| | | | PCD787CA | 3G Quad Band  UMTS | 3,000 |
| | | | PCD787CAFRU | 3G Quad Band  UMTS | 190 |
| | | | PCD787CAR | 3G Quad Band  UMTS | 3,900 |
| | | | PCD787CARFRU | 3G Quad Band  UMTS | 88 |
| | | | PCD787ENFRU | 3G Quad Band  UMTS | 80 |
| | | | TE1202MX | Bluetooth Java Vga Camera Bar | 10,000 |
| | | | TE1202MXFRU | Bluethooth Java Vga Camera Bar | 200 |
| | | | TE1299MX | 3G Bar Type Vga Camera W/BT | 323 |
| | | | TE1299MXFRU | 3G Bar Type Vga Camera W/BT | 140 |
| | | | TE1303MX | Qwerty Hsdpa Dual Band UMTS | 120 |
| | | | TE1303MXFRU | Qwerty Hsdpa Dual Band UMTS | 120 |
| | | Cellon Total | | | 86,478 |
| | Telephone Total | | | | 86,478 |
| 30308 Total | | | | | 88,518 |
| 50326 | Telephone | Cellon | PCD252TL | Dual Band 850/1900 Qwerty WIFI | 18,000 |
| | | | PCD252TLFRU | Dual Band 850/1900 Qwerty WIFI | 360 |
| | | | PCD252TLW | Dual Band 850/1900 Qwerty WIFI | 13,000 |
| | | | PCD252TLWFRU | Dual Band 850/1900 Qwerty WIFI | 260 |
| | | | PCD777TLW | Quad Band 850/900/1800/1900 | 20,000 |
| | | | PCD777TLWFRU | Quad Band 850/900/1800/1900 | 400 |

| | | | | | |
|---|---|---|---|---|---|
| | | | TE129MX | Bluetooth + Java Vga Clamshell | 9,686 |
| | | | TE129MXFRU | Bluetooth + Java Vga Clamshell | 194 |
| | | Cellon Total | | | 61,900 |
| | Telephone Total | | | | 61,900 |
| 50326 Total | | | | | 61,900 |
| Grand Total | | | | | 1,890,593 |

| Branch # & Name | Street Address |
|---|---|
| 10310 PCD New York | 1516 Motor Parkway, Islandia NY 11749 |
| 10340 ATC Logistics & Electronics | 13500 Independence Pkwy Ft. Worth TX 76177 |
| 10350 International Warehouse Group | 290 Spagnoli Rd., Melville, NY 11747 |
| 10351 International Warehouse | 135 Spagnoli Rd., Melville, NY 11747 |
| 10371 PCD New York-Parts | 80 Arkay Dr., Hauppauge, NY 11788 |
| 10373 Shine Electronics | 11-22 45th Road, Long Island City, NY 11101 |
| 10381 KMT Wireless (Cynergy) | 3435 Breckinridge Blvd Suite 110, Duluth, GA 30096 |
| 10383 High Tech Computers Corp | 23 Hsin-Hua Rd, Taoyan, Taiwan |
| 10400 PCD New York-Engineering | 80 Arkay Dr., Hauppauge, NY 11788 |
| 20312 PCD California | 1125 Beacon Street, Brea, CA 92821 |
| 25330 PCD Accessories/Internet | Heritage Paper Co. , 2400 S. Grand Ave., Santa Ana, CA  92705 |
| 30302 Virtual Warehouse | Virtual Warehouse.  Used for billing purposes only |
| 30303 Eternal Int'l (HK) LTD. | Topsail Plaza 11, Sum Street Shatin, Hong Kong |
| 10387 TCT Mobil Multinational Ltd | Room 1910-12A, Tower 3, China HK City, 33 Canton Road, Tsimshatsui, Kowloon, Hong Kong |
| 30304 PCD International Engineering | 80 Arkay Dr., Hauppauge, NY 11788 |
| 30305 Connexion | Zona Libre de Colon, Colon City, Street 8 y Ave 2, France, Field, Zona Libre de Colon, Panama |
| 30306 STS Logistics/WWL Pacifico | Warehouse #1, Flex #1, International Business Park, Panama Pacific, Howard, Panama City, Panama |
| 30307 Vortex Worldwide Logistics | 2025 North West 102nd Ave, Suite 103  Doral, FL 33172-2233 |
| 30308 Hong Kong Warehouses #1 | SCS Warehouse 9/F, Block B, China Merchants Godown, 18 Sai Ning Street, Kennedy Town, Hong Kong |
| 30308 Hong Kong Warehouses #2 | OnTime Worldwide Logistics Ltd. 12/F YKK Building Phase 3, 7 San Ping Circuit, Tuen Mun, NT Hong Kong |
| 50326 PCD Mexico | Paseo de la Reforma 2654 Lomas Altas Mexico |

## **<u>Exhibit I – Form of PineBridge Note and Security Agreement</u>**

See attached.

**Form of Secured Note and Security Agreement**

THIS SECURED NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED ABSENT REGISTRATION THEREUNDER OR AN EXEMPTION THEREFROM.

**SECURED NOTE AND SECURITY AGREEMENT**

$[_____]                                                                                      **[Date]**

**New York, New York**

FOR VALUE RECEIVED, Q1W Newco, LLC, a Nevada limited liability company (the "Company"), hereby promises to pay to the order of [PineBridge Vantage Partners, L.P., PineBridge Co-Investment AIV Partners, L.P., Vantage Star Investment Corp., PineBridge PEP IV Co-Investment, L.P., PineBridge Plan Star Investment Corp., PineBridge PEP V Co-Investment, L.P., and The Insurance Company of the State of Pennsylvania], or their permitted assigns (each, a "Fund" and collectively, the "Holder"), the aggregate principal amount of [Seventeen Million Five Hundred Thousand and XX/100 Dollars ($17,500,000.00)][1], together with interest thereon from the date hereof or such lesser amount as may be outstanding from time to time. The proportionate interest that each Fund holds in this Secured Note and Security Agreement (this "Note") is set forth in Schedule A attached hereto.

This Note is one of up to three (3) Notes issued pursuant to that certain Asset Purchase Agreement, by and among the Company, Quality One Wireless, LLC ("Quality One"), Personal Communications Devices, LLC ("PCD"), and Personal Communications Devices Holdings, LLC (the "Asset Purchase Agreement"), providing for the issuance of this Note to the Holder, a note to [certain funds managed by Credit Suisse] (the "CS Note"), and an additional note to the Holder in respect of the Net Working Capital Adjustment, if any, pursuant to Sections 3.3 and 4.5 of the Asset Purchase Agreement (collectively, the "Notes"). Capitalized terms used but not defined herein shall have the meaning set forth in the Asset Purchase Agreement.

1.    Final Payment Date. Unless earlier paid pursuant to Sections 3.2 or 3.3 below, the aggregate unpaid principal amount of this Note, all accrued and unpaid interest and all other amounts payable under this Note shall be due and payable by the Company on the earlier of (i) [_____] (the "Maturity Date"),[2] and (ii) when, upon or after the occurrence of an Event of Default, such amounts are declared due and payable by the Holder or made automatically due and payable in accordance with the terms hereof.

2.    Interest. The outstanding principal amount under this Note shall bear interest from the date hereof to the Maturity Date or, if earlier, the date when this Note is paid in full, in accordance with the following schedule:

---

[1] The Note issued at closing will for an aggregate principal amount of $17,500,000, and the additional note, if any, will be issued in an amount in accordance with Section 4.5 of the Asset Purchase Agreement.

[2] To insert 18 months from date of issuance.

| Period Note Remains Outstanding from Date of Issuance | Interest Rate (per annum) |
| --- | --- |
| 0 – 6 months | N/A |
| 6 – 9 months | LIBOR + 4.50% |
| 10 – 12 months | LIBOR + 5.50% |
| 12 months or greater | LIBOR + 6.50% |

As used herein, "LIBOR" means the three-month London Interbank Offered Rate for corresponding deposits of U.S. dollars.  Interest on the then outstanding principal amount hereunder shall be calculated on the basis of a year of 365 days and charged for the actual number of days elapsed and shall be payable monthly in arrears on the first day of each calendar month and on the Maturity Date, commencing on the six (6) month anniversary of the date hereof.  Any accrued and unpaid Interest as of the Maturity Date shall be due and payable on the Maturity Date.

3.    Payment.

3.1    General.  Payments of the principal amount of this Note and interest hereunder shall be made in lawful money of the United States of America and in immediately available funds at such place as may be designated in writing by the Holder.  All payments shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal.  If any payment hereunder becomes due and payable on a day other than a business day, the maturity thereof shall be extended to the next succeeding business day.  As used herein, the term "business day" shall mean a day other than a Saturday, Sunday or day on which commercial banks are authorized to close under the laws of the State of New York.

3.2    Optional Prepayment.  Subject to Section 3.1, the Company shall have the right at any time and from time to time to prepay this Note, in whole or in part, without premium or penalty.

3.3    Mandatory Prepayments.

(a)    The Company shall from time to time make mandatory prepayments ("Mandatory Prepayment(s)") hereunder, on the dates set forth below,  in aggregate amounts equal to seventy-five percent (75%) of Inventory Sale Proceeds (as defined below), except for the first $8,000,000 of Inventory Sale Proceeds received by the Company from the sale or disposition of Breakout Units (as defined below), until such time as the Notes have been paid in full. As used herein, "Inventory Sale Proceeds" means an amount equal to (i) the invoiced sale amount of each unit of Purchased Inventory (each, a "Unit"), less (ii) any sales or transfer taxes attributable to the sale of such Unit.  The term "Breakout Units" means all of the 4G LTE Pantech Breakout handset units purchased by the Company from PCD and held as part of the Company's inventory.

2

(b)       Until such time as the Notes have been paid in full, prior to the close of business on Friday of each week (or if such day is not a Business Day, on the next following Business Day), the Company shall deliver to the Holder Mandatory Prepayments with respect to Units sold by the Company for which the Company has (i) acquired Purchased Inventory A/R included for the first time in the calculation of the Company's eligible borrowing base under the Credit Agreement during the week ending on the immediately preceding Tuesday; and/or (ii) received cash proceeds from the sale of such Units, whether cash on delivery, prepayment or upon collection of Purchased Inventory A/R not otherwise included under the Company's eligible borrowing base under the Credit Agreement or otherwise, in each case during the week ending on the immediately preceding Tuesday.

4.       Priority.  This Note, and the obligations of the Company hereunder, shall be subject to the terms of that certain Intercreditor Agreement, dated as of the date hereof, between Callidus Capital Corporation (the "Company's Lender"), the holder of the CS Note, and the Holder (the "Intercreditor Agreement"), and Section 7.6 hereof.

5.       Security Interests.  The Company is granting the Holder a security interest in the Collateral (as defined below) to secure its due and prompt payment and performance under this Note.

5.1       Purchased Inventory.  The Company hereby pledges and grants to the Holder, and hereby creates a continuing first priority lien and security interest in favor of the Holder in and to all of its rights, title and interest in and to all of the Inventory purchased by the Company from PCD pursuant to the Asset Purchase Agreement, and as specifically set forth on Schedule B attached hereto, wherever located (the "Purchased Inventory").

5.2       Purchased Inventory A/R.  The Company hereby pledges and grants to the Holder, and hereby creates a continuing first priority lien and security interest in favor of the Holder in and to all of the Company's rights, title and interest in and to the Company's right to receive payment for Purchased Inventory that is sold or otherwise disposed of (the "Purchased Inventory A/R").

5.3       Other Accounts Receivable.  The Company hereby pledges and grants to the Holder, and hereby creates a continuing second priority lien and security interest in favor of the Holder, subject to the first priority lien and security interest in favor of Company's Lender, in and to all of the Company's rights, title and interest in and to the Company's right to receive payment for all accounts receivable of the Company, other than the Purchased Inventory A/R, in an amount of such accounts receivable, at any time, of not more than $75,000,000.00 in the aggregate pursuant to this Note and under the Guaranty and Security Agreement of even date herewith made by Quality One in favor of Holder ("Accounts Receivable").

All of the Purchased Inventory, the Purchased Inventory A/R and Accounts Receivable are collectively referred to herein as the "Collateral."

5.4    <u>Continuing Security Interest; Further Actions</u>. This Note shall create a continuing first priority lien and security interest in the Purchased Inventory and the Purchased Inventory A/R and a continuing second priority lien and security interest in the Accounts Receivable, and shall (a) subject to release or termination pursuant to <u>Section 5.5</u>, remain in full force and effect until payment and performance in full of the principal amount of the Note and interest accrued thereon, (b) be binding upon the Company, its successors and assigns, (c) inure to the benefit of the Holder and its successors, transferees and assigns; *provided that* the Company may not assign or otherwise transfer any of its rights or obligations under this Note without the prior written consent of the Holder, and (d) be subject to the terms of the Intercreditor Agreement.

5.5    <u>Termination; Release</u>.

(a)    In connection with the sale of each Unit, Holder shall be deemed to have released its first priority lien and security interest in such Unit upon the sale of such Unit; provided that the sale is a Qualified Sale.  The Company shall not enter into any agreement with respect to the sale of the Purchased Inventory constituting Collateral hereunder other than pursuant to a "Qualified Sale."  For purposes of this <u>Section 5.5(a)</u>, a "<u>Qualified Sale</u>" shall mean a sale or assignment of all or any portion of the Purchased Inventory between the Company or any of its affiliates, on the one hand, and an unrelated third party, on the other hand, that provides for a base sale price per Unit of not less than the price indicated for such Unit under the heading "Minimum Sale Price" in the Purchased Inventory Schedule attached to this Note as <u>Schedule B</u>.  If the Company proposes to make a sale of Units or to enter into an agreement with respect to the sale of Units, in either case that does not constitute a Qualified Sale, then, at least one (1) business day prior to such proposed sale, the Company shall provide the Holder with written notice during business hours (which shall be via electronic mail or facsimile) of the proposed sale (the "<u>Sale Notice</u>").  Such Sale Notice shall set forth the quantity of the Units proposed to be sold, as well as the proposed price at which such Units are proposed to be sold.  Within twenty four (24) hours of receipt of the Sale Notice, the Holder shall either object to the proposed sale or provide consent (which may be via electronic mail or facsimile) to the release of its first priority lien and security interest in such Units upon the consummation of the sale of such Units, in accordance with the terms set forth in the Sale Notice.  If the Holder does not object to the proposed sale within twenty four (24) hours following delivery of the Sale Notice, the Holder shall be deemed to have consented to such proposed sale at the price set forth in the Sale Notice and such sale shall constitute a Qualified Sale.

(b)    Upon receipt by Holder of each Mandatory Prepayment pursuant to <u>Section 3.3</u> from a Qualified Sale for such Unit, Holder agrees (i) that Holder shall be deemed to have released, as to such sold Unit, all security interests and liens in the Purchased Inventory A/R in respect of such Unit granted to or held by Holder pursuant to this Note, and (ii) to take such reasonable steps and execute such documents as may be necessary or appropriate as requested by the Company

to evidence the release of Holder's security interests in such Purchased Inventory A/R in respect of such sold Units of Purchased Inventory.

(c)     On the date on which all the principal amount of the Note and interest accrued thereon have been paid and performed in full, the Holder will, at the request and sole expense of the Company, (i) duly assign, transfer and deliver to or at the direction of the Company (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Holder, together with any monies at the time held by the Holder hereunder, and (ii) execute and deliver to the Company a proper instrument or instruments acknowledging the satisfaction and termination of this Note.

5.6     <u>Further Assurances; Agreement to Deliver Additional Collateral Documents</u>.  In order to perfect and protect any security interest granted hereby or to enable the Holder to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to the Collateral, at the request of Holder, the Company: (a) shall execute, deliver and acknowledge such security agreements, pledge agreements, financing statements, assignments and other collateral documents, in form and substance reasonably satisfactory to Holder; (b) hereby irrevocably authorizes Holder at any time and from time to time to file in any relevant jurisdiction any such financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any such statement relating to the Collateral; and (c) shall promptly take such further actions as Holder may request from time to time, subject to the terms of the Intercreditor Agreement.  All of the foregoing shall be at the sole cost and expense of the Company.

6.     <u>Representations and Warranties</u>.  The Company represents and warrants to (and, where applicable, agrees with) Holder that:

6.1     <u>Authorization; Enforceability</u>.  The Company has the power and authority to execute, deliver and carry out the terms and provisions of this Note applicable to it.  All necessary action on the part of the Company has been taken to authorize the execution and delivery of the Note.  The Note constitutes the legal, valid and binding obligation of the Company, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, or general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

6.2     <u>No Conflicts</u>.  Neither the execution, delivery or performance by the Company of this Note , nor compliance by the Company with the terms and provisions of this Note, nor the consummation by it of the transactions contemplated by this Note , (a) will contravene in any material respect any applicable provision of any law, statute, rule, regulation, order, writ, injunction or decree of any governmental authority, (b) will contravene or cause a default under the articles of incorporation, the bylaws or other organizational document of the Company, or (c) will conflict in any material respect with or result in any breach of any material terms, covenants, conditions or provisions of, or constitute a material default under, or result in the creation or imposition of (or the obligation to create or impose) any lien (except a lien arising pursuant to the Note in favor of Holder) upon any of the property or assets of the Company

(including the Collateral) pursuant to the terms of any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Company is a party or by which it or any of its property or assets is bound or to which it is subject, or give rise to a right thereunder to require any payment to be made by the Company.

   6.3 <u>Collateral</u>.

     (a) The Company has and will have good title to the Collateral and the proceeds thereof, free and clear of all liens other than (i) those liens created by this Note; (ii) those liens created by the CS Note, and (ii) the first priority lien and security interest in favor the Company's Lender under that certain [*describe Credit Agreement*] (the "<u>Credit Agreement</u>") in respect of the Accounts Receivable.

     (b) The pledge of the Collateral pursuant to this agreement creates a valid and perfected first priority lien security interest in the Purchased Inventory and in the Purchased Inventory A/R and a valid and perfected second priority lien security interest in the Accounts Receivable, securing the payment and performance when due of the obligations of the Company hereunder, subject to the terms of the Intercreditor Agreement.

   7. <u>Covenants</u>. Until the principal amount of this Note, any and all interest thereon and any and all other amounts payable hereunder shall have been paid in full, the Company covenants and agrees with Holder that:

   7.1 <u>Negative Pledge</u>. Except as otherwise provided in or contemplated by the Intercreditor Agreement and <u>Section 7.6</u> hereof, the Company shall not transfer, pledge or otherwise grant a security interest or lien on any of the Collateral without the prior consent of Holder, in its sole and absolute discretion, other than (i) those liens created by the CS Note, and (ii) the first priority lien and security interest in favor the Company's Lenders under the Credit Agreement in respect of the Accounts Receivable and the second priority lien and security interest in favor of the Company's Lenders under the Credit Agreement in respect of the Purchased Inventory and the Purchased Inventory A/R. The foregoing shall not be construed to prohibit, restrict or limit the Company from selling the Purchased Inventory in the ordinary course of business for cash or on credit, provided the net proceeds therefrom are applied in accordance with the terms of this Note.

   7.2 <u>Defend Claims</u>. The Company shall, at its own cost and expense, defend title to the Purchased Inventory and the Purchased Inventory A/R and the first priority lien and security interest granted to the Holder with respect thereto against all claims and demands of all persons at any time claiming any interest therein adverse to the Holder and shall maintain and preserve such perfected first priority security interest for so long as this Note shall remain in effect.

   7.3 <u>Modification of Constituent Documents</u>. The Company shall not amend or cause the amendment of any of the Company's organizational documents in any manner that adversely impacts the validity or enforceability of this Note. The Company will not, without

providing at least [30] days' prior written notice to the Holder, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Company will, prior to any change described in the preceding sentence, take all actions requested by the Holder to maintain the perfection and priority of the Holder's security interest in the Collateral.

7.4    No Distributions.    The Company shall make no dividend or other distribution on equity to its members (except in respect of tax distributions) until the then outstanding principal amount of this Note and any accrued and unpaid interest thereon shall have been paid in full.

7.5    Transfer of Collateral.    Notwithstanding anything herein to the contrary, the Company shall not be prevented from assigning or transferring any of the Collateral to Quality One; *provided, however*, that if the Company proposes to transfer any of the Collateral to Quality One, Quality One's rights in the Collateral shall be subordinate to and subject in all respect to all liens in favor of Holder granted herein, and no such transfer shall occur unless Quality One executes and delivers a security agreement in favor of Holder containing terms substantially identical to those contained herein.

7.6    Refinancing of Credit Agreement; Subordination.    If the Company refinances any portion of its indebtedness (including with the Company's Lender) or repays the Company's indebtedness in full in accordance with the terms of the Credit Agreement, then, in connection with such refinancing or repayment, subject to the terms of the Intercreditor Agreement, the Holder agrees to enter into an intercreditor agreement with subordination and/or standstill terms no less favorable than the terms of the Intercreditor Agreement, and any subordination and/or standstill terms set forth in any future intercreditor agreement with respect to the Holder's rights shall not extend beyond the Maturity Date, except in the case of an Event of Default (as defined in the Credit Agreement).

7.7    Financial Reports.    Promptly, but in any event within two (2) business days following delivery by the Company of any consolidated balance sheets and related statements of operations and cash flows or other financial or operating metrics to the Company's Lender in accordance with the Credit Agreement (the "Financial Reports"), the Company shall deliver a copy of such Financial Reports to Holder.

8.    Default.

8.1    Events of Default.    Each of the following shall constitute an "Event of Default" under this Note:

(a)    the Company shall fail to make any payment to Holder when due under this Note; *provided*, that in the case of mandatory prepayments pursuant to Section 3.3, such Event of Default shall not be deemed to have occurred unless such failure is not cured by payment within five (5) business days following such due date;

(b)    the Company shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 7</u> hereof, and such failure, if capable of being remedied, shall continue unremedied for a period of thirty (30) days after notice thereof from Holder to the Company;

(c)    the Company (i) becomes insolvent (however evidenced); (ii) makes a general assignment for the benefit of creditors; or (iii) files any petition or commences any proceeding for any relief under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors;

(d)    a material breach by the Company of any of the representations and warranties set forth in <u>Section 6</u> and, with respect to a breach of any of the representations and warranties set forth in <u>Section 6.3</u>, such breach, if capable of being remedied, shall continue unremedied for a period of fifteen (15) days after such breach.

(e)    the failure by the Company to make any payment under the CS Note which failure is not cured by payment within any applicable grace or cure period, if any; or

(f)    a merger or consolidation of the Company in which the equity holders of the Company immediately prior to such transaction would own, in the aggregate, less than 50% of the total combined voting power of all classes of equity of the surviving entity normally entitled to vote for the election of directors of the surviving entity or (ii) the sale by the Company of all or substantially all the Company's assets in one transaction or in a series of related transactions.

8.2    <u>Remedies</u>.    Upon the occurrence and during the continuance of an Event of Default, and subject to the terms of the Intercreditor Agreement, (a) Holder may, at its option and without notice (such notice being expressly waived), DECLARE AND DEMAND this Note immediately due and payable; (b) Holder may proceed against, sell or otherwise dispose of any or all of the Collateral, in any order, priority or combination that Holder may elect within its sole discretion; (c) Holder may also elect to retain the Collateral or any part thereof in satisfaction of the principal amount and any accrued but unpaid interest thereon in accordance with the requirements of the Uniform Commercial Code; (d) Holder may pursue all rights and remedies available hereunder or under the Uniform Commercial Code or other security documents; (e) Holder may foreclose the liens created hereunder, (f) Holder may realize upon, take possession of and/or sell any of the Collateral, and (g) Holder may exercise all rights and powers with respect to the Collateral as the Company might exercise in its absolute discretion, including, without limitation, to (1) relinquish or abandon any Collateral or any lien thereon, (2) execute all such contracts, agreements, deeds, documents and instruments, to bring, defend and abandon all such actions, suits and proceedings, and to take all actions in relation to all or any part of the Collateral, and/or (3) to appoint managers, sub-agents, and officers for any of the purposes mentioned in the foregoing provisions of this Section and to dismiss the same. The enumeration of any rights and remedies in this Note is not intended to be exhaustive. The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy. Holder's rights, remedies and powers, as provided in this Note are cumulative

and concurrent, and may be pursued singly, successively or together against the Company or any collateral security given at any time to secure the payment hereof, all at the sole discretion of Holder. Additionally, Holder may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Holder's sole discretion. Failure of Holder, for any period of time or on more than one occasion, to DECLARE AND DEMAND this Note immediately due and payable shall not constitute a waiver of the right to exercise the same at any time from and after any Event of Default.

9.    <u>Governing Law</u>.  This Note shall be construed and enforced in accordance with the internal laws of the State of New York and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Note and the transactions contemplated hereby shall be governed by the laws of the State of New York without reference to choice of law doctrine that would apply a different law other than New York General Obligations Law § 5-1401 and 5-1402.

10.    <u>Waivers</u>. The Company, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note and in connection with any suit, action or proceeding brought by Holder on this Note, any and every right it may have to (a) a trial by jury, (b) interpose any counterclaim therein (other than a counterclaim which can only be asserted in a suit, action or proceeding brought by Holder on this Note and cannot be maintained in a separate action), (c) have the same consolidated with any other or separate suit, action or proceeding, and (d) setoff or assert any defenses with respect hereto or the obligations of the Company hereunder (other than the defense of payment in full of the entire indebtedness set forth in Holder's suit, action or proceeding on this Note), and agrees that their respective liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Holder. The Company, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby consents to every extension of time, renewal, waiver or modification that may be granted by Holder with respect to the payment or other provisions of this Note, and to the release of the Company, endorsers, guarantors or sureties, and their heirs, legal representatives, successors and assigns, and of any collateral given to secure the payment hereof, or any part hereof, with or without substitution, and agrees that additional borrowers, endorsers, guarantors or sureties and their heirs, legal representatives, successors and assigns, may become parties hereto without notice to the Company or to any endorser, guarantor or surety and without affecting the liability of any of them.

11.    <u>Loss, Theft or Destruction of Note</u>.  Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft or destruction of this Note and of indemnity or security reasonably satisfactory to it, the Company will make and deliver a new Note which shall carry the same rights carried by this Note, stating that such Note is issued in replacement of this Note, making reference to the original date of issuance of this Note (and any successors hereto) and dated as of such cancellation, in lieu of this Note.

LIBNY/5270091.7

12.    Amendment.    This Note may not be amended, modified, supplemented or terminated and no provision shall be waived without the prior written approval of the Holder and the Company.  There are no third-party beneficiaries of this Note.

13.    Captions. The captions of the Sections of this Note are for convenience of reference only and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof.

14.    Severability.  The invalidity, illegality or unenforceability of any provision of this Note shall not affect or impair the validity, legality or enforceability of the remainder of this Note, and to this end, the provisions of this Note are declared to be severable.

15.    Notices.  Any notice required hereunder shall be in writing and shall be sent to the parties by first class mail or by facsimile or, in respect of Section 5.5(a), by electronic mail at the addresses set forth herein below (or such other address designated by a party pursuant to written notice):

Company:                Q1W Newco, LLC
                        1500-A Tradeport Drive
                        Orlando, Florida 32824
                        Attn: President
                        Phone:  407-857-3737
                        Fax: 407-857-3747
                        Email: jchiorando@q1w.net

Holder:                 [_____]
                        [_____]
                        [_____]
                        Phone:  [_____]
                        Fax: [_____]
                        Email: [_____]

Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; (ii) sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next business day); and, in respect of Section 5.5(a), (iii) sent by electronic mail with verification of receipt shall be deemed to have been given when sent.

16.    Time of Essence.  Time is of the essence of this Note and the performance of each of the covenants and agreements on the Company's part to be performed hereunder.

17.    No Wavier by Holder. Neither the exercise of any provision hereof nor the delay in asserting any right granted to Holder (including the acceptance of past due payments) shall be construed as a waiver by Holder of the right to accelerate the indebtedness evidenced hereby as above provided or to pursue any other remedies available under this Note nor shall the exercise of any single or partial exercise of any right, power, privilege or remedy preclude any further

exercise thereof.  Any waiver hereunder shall be valid and enforceable only if in writing and signed by the party against whom enforcement is sought, and then only to the extent therein set forth.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently.  No executory agreement unless in writing and signed by Holder, and no course of dealing between the Company, the endorser(s) or guarantor(s) hereof, or any of them, shall be effective to change or modify or discharge, in whole or in part, this Note.

18.   <u>Obligations</u>.  The Company acknowledges that this Note and the Company's obligations hereunder are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Note and the obligations of the Company hereunder or the obligations of any other person or party relating to this Note or the obligations of the Company hereunder.  The obligations of the Company hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than, payment of the Note in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Note or otherwise.  Without limiting the generality of the foregoing, the obligations of the Company herein shall not be discharged or impaired or otherwise affected by the failure of the Holder to assert any claim or demand or to enforce any remedy under this Note or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Note obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Company or would otherwise operate as a discharge of the Company as a matter of law or equity.

19.   <u>Expenses</u>.  The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the Holder of this Note in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("Costs").  The Company agrees that any delay on the part of the Holder in exercising any rights hereunder will not operate as a waiver of such rights.  The Holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

20.   <u>Assignment</u>.  Upon the delivery of an assignment and assumption agreement in form reasonably satisfactory to the Company, Holder, at any time and without the consent of the Company, may, solely to related parties, grant participations in or sell, transfer, assign and convey all or any portion of its right, title and interest in and to the loan obligations, this Note and any collateral, if any, given to secure the loan obligations.

21.   <u>Venue; Service of Process</u>. All actions or proceedings arising in connection with this Note shall be tried and litigated in state or federal courts located in the State of New York, unless such actions or proceedings are required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy.  THE COMPANY WAIVES ANY RIGHT IT

MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u>, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE HEREWITH.  IN ANY ACTION AGAINST THE COMPANY, SERVICE OF PROCESS MAY BE MADE UPON THE COMPANY BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS ABOVE SET FORTH, WHICH SERVICE SHALL BE DEEMED SUFFICIENT FOR PERSONAL JURISDICTION AND SHALL BE DEEMED EFFECTIVE THREE (3) DAYS AFTER MAILING.

22.    <u>Jury Trial Waiver</u>.    THE COMPANY, AND THE HOLDER BY ITS ACCEPTANCE OF THIS NOTE, HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS NOTE AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE COMPANY AND BY HOLDER, AND THE COMPANY ACKNOWLEDGES THAT NEITHER HOLDER NOR ANY PERSON ACTING ON BEHALF OF HOLDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

23.    <u>Counterparts</u>.  This Note and any amendments, waivers, consents or supplements hereto may be executed in multiple counterparts (including by facsimile or in electronic format), each of which shall constitute an original, but all taken together shall constitute a single contract.

[Remainder of page intentionally left blank.]

IN WITHNESS WHEREOF, this Secured Note and Security Agreement has been duly executed on behalf of the undersigned on the day and in the year first written above.

COMPANY:

**Q1W NEWCO, LLC**

By: _____
    Name:
    Title:

ACKNOWLEDGED AND AGREED

HOLDERS:

[_____]

By: _____
    Name:
    Title:

[_____]

By: _____
    Name:
    Title:

[_____]

By: _____
    Name:
    Title:

[_____]

[Signature page to Secured Note and Security Agreement (PineBridge)]

By: _____
    Name:
    Title:

**[_____]**

By: _____
    Name:
    Title:

**[_____]**

By: _____
    Name:
    Title:

**[_____]**

By: _____
    Name:
    Title:

[Signature page to Secured Note and Security Agreement (PineBridge)]

<u>Schedule A</u>

Proportionate Interest of Funds Holding Note

| Entity | Percentage of Principal Amount | Portion of Original Principal Amount |
|---|---|---|
| [PineBridge Vantage Partners, L.P.] | [__] | [_____] |
| [PineBridge Co-Investment AIV Partners, L.P.] | [__] | [_____] |
| [Vantage Star Investment Corp.] | [__] | [_____] |
| [PineBridge PEP IV Co-Investment, L.P.] | [__] | [_____] |
| [PineBridge Plan Star Investment Corp.] | [__] | [_____] |
| [PineBridge PEP V Co-Investment, L.P.] | [__] | [_____] |
| [The Insurance Company of the State of Pennsylvania] | [__] | [_____] |
| Total | 100% | [17,500,000.00] |

<u>Schedule B</u>

Purchased Inventory

[See attached.]

LIBNY/5270091.7

## **Exhibit J – Form of Quality One – Credit Suisse Guaranty and Security Agreement**

See attached.

# GUARANTY AND SECURITY AGREEMENT

Guaranty and Security Agreement (this "Guaranty"), dated as of [_____], 2013, made by Quality One Wireless, LLC, a Nevada limited liability company (the "Guarantor"), in favor of each of [DLJ Investment Partners III, L.P., a Delaware limited partnership, DLJ Investment Partners, L.P. – Series C, and Delaware limited partnership, and IP III Plan Investors, L.P., a Delaware limited partnership], or their permitted assigns (each, a "Fund" and collectively, the "Holder").

WHEREAS, Guarantor has entered into that certain Asset Purchase Agreement, dated as of [_____], 2013, by and between the Guarantor, Q1W Newco, LLC (the "Company"), Personal Communications Devices, LLC ("PCD"), and Personal Communications Devices Holdings, LLC ("Holdings") (the "Asset Purchase Agreement"), pursuant to which the Company is issuing a secured note to the Holder as partial consideration for the transfer of certain Holdings and PCD assets to the Company;

WHEREAS, on the date hereof, the Company is entering into the Secured Note and Security Agreement payable to the order of the Holder in the principal amount of Thirty-Six Million Three Hundred Forty Thousand Sixty-Seven and 1/100 Dollars ($36,340,067.01) (the "Note and Security Agreement");

WHEREAS, Guarantor is an affiliate of the Company, and each of the Company and the Guarantor are wholly-owned subsidiaries of Q1W Group, LLC;

WHEREAS, as a condition for the Holder to accept the Note and Security Agreement, and as consideration for certain of the Holdings and PCD assets to be transferred under the Asset Purchase Agreement, the Guarantor is required to cause this Guaranty to be delivered to the Holder; and

NOW, THEREFORE, as an inducement to the Holder to accept the Note and Security Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms.  Capitalized terms used herein and not otherwise defined shall have the meanings assigned by the Note and Security Agreement. "Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

2.    Guaranty.  The Guarantor hereby irrevocably and unconditionally guarantees to the Holder the following (collectively, the "Guaranteed Obligations"): the full and prompt payment when due in accordance with the Note and Security Agreement of all amounts due and owing by the Company thereunder, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, and including all interest and expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency proceeding with respect to the Company, whether or not such interest or expenses are allowed as a claim in such proceeding.

3.    Payment by Guarantor.  The Guarantor hereby agrees, in furtherance of the foregoing and not in limitation of any other right that the Holder may have at law or in equity against the Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as they shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, the Guarantor shall, upon demand, pay (or cause to be paid) in cash, to the Holder, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due and, accrued and unpaid interest on such Guaranteed Obligations.

4.    Liability of Guarantor Absolute.  The Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance that constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, the Guarantor agrees as follows: (a) this Guaranty is a guaranty of payment when due and not of collectability; this Guaranty is a primary obligation of the Guarantor and not merely a contract of surety; (b) the Holder may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and the Holder with respect to the existence of such Event of Default; (c) the obligations of the Guarantor hereunder are independent of the obligations of the Company, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce its obligations under this Guaranty whether or not any action is brought against the Company and whether or not the Company is joined in any such action or actions, and recovery may be had against the Guarantor in such action or proceeding or any independent action or proceeding against the Guarantor, without any requirement that the Holder first assert, prosecute or exhaust any remedy or claim against the Company; (d) payment by the Guarantor of part, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge the Guarantor's liability for any part of the Guaranteed Obligations that has not been paid; (e) the Holder, upon such terms as they deem appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of the Guarantor's liability hereunder, from time to time may settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; and (f) the Guarantor's obligations hereunder shall, to the fullest extent permitted by law, be unaffected by any event of bankruptcy, reorganization or insolvency with respect to the Company; by amendment, supplement, reformation or other modification of the Note and Security Agreement or any other agreement, document or instrument relating thereto, or any Guaranteed Obligation; by the Holder's exercise or non-exercise or delay in exercising of any rights under this Guaranty, the Note and Security Agreement, or any other agreement, document or instrument relating thereto; by any change in the time, manner or place of payment, or any other amendment or waiver of, or any consent or departure from, the Note and Security Agreement, in each case undertaken in accordance with the terms of the Note and Security Agreement; by the permitted assignment or transfer of the Note and Security Agreement or any other agreement, document or instrument relating thereto in whole or in part; or by any change in the ownership or control of the Holder, the Guarantor or the Company; and the absence of any notice to, or knowledge by, the Guarantor of the existence of any of the aforesaid matters or events. The intent of this Section 4 being that the obligations of the Guarantor hereunder shall be absolute and unconditional, under any and all circumstances

including any circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

5.    Waiver.  The Guarantor hereby irrevocably, unconditionally and expressly waives, and agrees that it shall not at any time assert any claim or take the benefit or advantage of: any appraisal, valuation, stay, extension, marshalling of assets or redemption laws, any bankruptcy, insolvency or similar proceedings, or exemption, whether now or any time hereafter in force, which may delay, prevent or otherwise affect the performance by the Guarantor of its obligations hereunder. The Guarantor also hereby irrevocably, unconditionally and expressly waives, for the benefit of the Holder, (a) all notices, promptness, diligence, presentment, demand and protest of every kind and any requirement that the Holder exhausts any rights or first proceeds against the Company or any other person or entity or pursue any other remedy in the power of the Holder whatsoever, (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or the Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or the Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and (d) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of the Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Holder protect, secure, perfect or insure any security interest or lien or any property subject thereto.  The Guarantor hereby further agrees that if the Company shall default in the payment or performance of any of the Guaranteed Obligations, the Guarantor will promptly pay and perform the same, without any demand or notice whatsoever.

6.    Guarantor's Rights of Subrogation, Contribution, etc.  Until the Guaranteed Obligations shall have been paid in full, the Guarantor hereby waives any claim, right or remedy, direct or indirect, that the Guarantor now has or may hereafter have against the Company or any of its assets in connection with this Guaranty or the performance by the Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that the Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that the Holder now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Holder.  In addition, the Guarantor agrees that it will not exercise any subrogation rights it may acquire, by payment made hereunder or otherwise, until the obligation to pay the Guaranteed Obligations in accordance with the Note and Security Agreement to the Holder has been fully satisfied and discharged. If, the preceding sentence notwithstanding, any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the Holder and shall forthwith be paid over to the Holder to be

credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.    <u>Subordination of Other Obligations</u>. Any indebtedness of the Company now or hereafter held by the Guarantor (the "<u>Obligee Guarantor</u>") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust Holder and shall forthwith be paid over to the Holder to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

8.    <u>Specific Guaranty</u>.  This Guaranty is a specific guaranty that shall remain in effect until all of the Guaranteed Obligations have been paid in full.  The Guarantor hereby irrevocably waives any right to revoke this Guaranty.

9.    <u>Payments Free and Clear of Taxes, Etc</u>.  All payments by the Guarantor under this Guaranty shall be made without setoff, counterclaim or other defense.

10.    <u>Reinstatement</u>.  The obligations of the Guarantor hereunder shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Company in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and the Guarantor agrees that it will indemnify the Holder on demand for all reasonable costs and expenses (including reasonable and documented fees and expenses of counsel) incurred by each such party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.  This provision shall survive the termination of this Guaranty.

11.    <u>Security Interests</u>.  The Guarantor is granting the Holder a security interest in the Collateral (as defined below) to secure both its due and prompt payment and performance under this Guaranty and the Company's due and prompt payment and performance under the Note and Security Agreement.  The Guarantor hereby pledges and grants to the Holder, and hereby creates a continuing second priority lien and security interest in favor of the Holder in and to all of the Guarantor's rights, title and interest in and to the Guarantor's right to receive payment for all accounts receivable of the Guarantor, in an amount of such accounts receivable, at any time, of not more than $75,000,000.00 in the aggregate pursuant to this Guaranty and under the Note and Security Agreement (the "<u>Collateral</u>").

a)    <u>Continuing Security Interest; Further Actions</u>.  This Guaranty shall create a continuing second priority lien and security interest in the Accounts Receivable, and shall (i) subject to Section 11, remain in full force and effect until payment and performance in full of the principal amount of the Note and interest accrued thereon, (ii) be binding upon the Guarantor, its successors and assigns, and (iii) inure to the benefit of the Holder and its successors, transferees and assigns; provided that the Guarantor may not assign or

otherwise transfer any of its rights or obligations under this Guaranty without the prior written consent of the Holder.

b)      <u>Termination; Release</u>. On the date on which all the principal amount of the Note and interest accrued thereon have been paid and performed in full, the Holder will, at the request and sole expense of the Guarantor, (i) duly assign, transfer and deliver to or at the direction of the Guarantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Holder, together with any monies at the time held by the Holder hereunder, and (ii) execute and deliver to the Guarantor a proper instrument or instruments acknowledging the satisfaction and termination of this Guaranty.

c)      <u>Further Assurances; Agreement to Deliver Additional Collateral Documents</u>.  In order to perfect and protect any security interest granted hereby or to enable the Holder to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to the Collateral: at the request of the Holder, the Guarantor: (i) shall execute, deliver and acknowledge such security agreements, pledge agreements, financing statements, assignments and other collateral documents, in form and substance reasonably satisfactory to Holder; (ii) hereby irrevocably authorizes Holder at any time and from time to time to file in any relevant jurisdiction any such financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any such statement relating to the Collateral; and (iii) shall promptly take such further actions as Holder may request from time to time.  All of the foregoing shall be at the sole cost and expense of the Guarantor.

12.    <u>Company Refinancing; Subordination</u>.  If the Company refinances any portion of its indebtedness (including with the Company's Lender) or repays the Company's indebtedness in full in accordance with the terms of the Credit Agreement, then, in connection with such refinancing or repayment, subject to the terms of the Intercreditor Agreement, the Holder agrees to enter into an intercreditor agreement with subordination and/or standstill terms no less favorable than the terms of the Intercreditor Agreement, and any subordination and/or standstill terms set forth in any future intercreditor agreement with respect to the Holder's rights shall not extend beyond the Maturity Date, except in the case of an Event of Default (as defined in the Credit Agreement).

13.    <u>Guarantor Representations and Warranties</u>.  The Guarantor hereby represents and warrants to (and, where applicable, agrees with) the Holder that:

a)      <u>Authorization; Enforceability</u>.  The Guarantor is validly existing and in good standing under the laws of Nevada and has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty.  All necessary action on the part of the Guarantor has been taken to authorize the execution and delivery of this Guaranty, and the Guarantor's agreements hereunder constitute the legal, valid and binding obligations of the Guarantor, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, or general principles of

5

equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

b)    <u>No Conflicts</u>.  Neither the execution, delivery or performance by the Guarantor of this Guaranty, nor the compliance by the Guarantor with any of the terms and provisions hereof, nor the consummation by it of the transactions contemplated hereby, (i) will contravene in any material respect any applicable provision of any law, statute, rule, regulation, order, writ, injunction or decree of any governmental authority, (ii) will contravene or cause a default under the articles of incorporation, the bylaws or other organizational document of the Guarantor, or (iii) will conflict in any material respect with or result in any breach of any material terms, covenants, conditions or provisions of, or constitute a material default under, or result in the creation or imposition of (or the obligation to create or impose) any lien upon any of the property or assets of the Guarantor (including the Collateral) pursuant to the terms of any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Guarantor is a party or by which it or any of its property or assets is bound or to which it is subject, or give rise to a right thereunder to require any payment to be made by the Guarantor.

c)    <u>Priority</u>.  The obligations of the Guarantor hereunder will at all times rank in right of payment in accordance with the terms of the Intercreditor Agreement.

d)    <u>Collateral</u>.

i.    The Guarantor has and will have good title to the Collateral and the proceeds thereof, free and clear of all liens other than those liens created by this Guaranty and the Credit Agreement.

ii.    The pledge of the Collateral pursuant to this agreement creates a valid and perfected second priority lien security interest in the Collateral, securing the payment and performance when due of the obligations of the Guarantor hereunder and of the Company under the Note and Security Agreement.

14.    <u>Covenants</u>.  Until the Guaranteed Obligations have been paid in full, the Guarantor covenants and agrees with Holder that:

a)    <u>Negative Pledge</u>.  Except as provided in or contemplated by the Intercreditor Agreement and Section 12 hereof, the Guarantor shall not pledge or otherwise grant a security interest or lien on any of the Collateral without the prior consent of Holder, in its sole and absolute discretion, other than (i) those liens created by the PB Notes, and (ii) the first priority lien and security interest in favor the Company's Lender under the Credit Agreement in respect of the Collateral.

b)    <u>Defend Claims</u>.  Subject to the Intercreditor Agreement, the Guarantor shall, at its own cost and expense, defend title to the Collateral and the second priority lien and security interest granted to the Holder with respect thereto against all claims and demands of all persons at any time claiming any interest therein adverse to the Holder and shall maintain and preserve such perfected second priority security interest for so long as this Guaranty shall remain in effect.

c)   <u>Modification of Constituent Documents</u>.  The Guarantor shall not amend or cause the amendment of any of the Guarantor's organizational documents in any manner that adversely impacts the validity or enforceability of this Guaranty.  The Guarantor will not, without providing at least 30 days' prior written notice to the Holder, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number.  The Guarantor will, prior to any change described in the preceding sentence, take all actions requested by the Holder to maintain the perfection and priority of the Holder's security interest in the Collateral.

d)   <u>Financial Reports</u>.  Promptly, but in any event within two (2) business days following delivery by the Company of any consolidated balance sheets and related statements of operations and cash flows or other financial or operating metrics to the Company's Lender in accordance with the Credit Agreement (the "<u>Financial Reports</u>"), the Company shall deliver a copy of such Financial Reports to Holder.

15.   <u>Remedies</u>.  Subject to the terms of the Intercreditor Agreement, the Guarantor agrees that, as between the Guarantor and the Holder, the obligations of the Company under the Note and Security Agreement may be declared to be forthwith due and payable (and, in the event of the commencement of any bankruptcy or insolvency proceeding, shall be deemed to have become automatically due and payable) for purposes of Section 2 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Company and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Company) shall forthwith become due and payable by the Guarantor for purposes of Section 2.  Upon the occurrence and during the continuance of an Event of Default, subject to the terms of the Intercreditor Agreement, (a) Holder may proceed against, sell or otherwise dispose of any or all of the Collateral, in any order, priority or combination that Holder may elect within its sole discretion; (b) Holder may also elect to retain the Collateral or any part thereof in satisfaction of the principal amount and any accrued but unpaid interest thereon in accordance with the requirements of the Uniform Commercial Code; (c) Holder may pursue all rights and remedies available hereunder or under the Uniform Commercial Code or other security documents; (d) Holder may foreclose the liens created hereunder, (e) Holder may realize upon, take possession of and/or sell any of the Collateral, and (f) Holder may exercise all rights and powers with respect to the Collateral as the Company might exercise in its absolute discretion, including, without limitation, to (i) relinquish or abandon any Collateral or any lien thereon, (ii) execute all such contracts, agreements, deeds, documents and instruments, to bring, defend and abandon all such actions, suits and proceedings, and to take all actions in relation to all or any part of the Collateral, and/or (iii) to appoint managers, sub-agents, and officers for any of the purposes mentioned in the foregoing provisions of this Section and to dismiss the same.  The enumeration of any rights and remedies in this Guaranty is not intended to be exhaustive.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.  Holder's rights, remedies and powers, as provided in this Guaranty are cumulative and concurrent, and may be pursued singly, successively or together against the Guarantor or any collateral security given at any time to secure the payment hereof, all at the sole discretion of Holder.  Additionally, Holder may resort to every other right or remedy available at law or in

equity without first exhausting the rights and remedies contained herein, all in Holder's sole discretion.

16.    Payment of Dollars.  The Guarantor shall make any payment required to be made hereunder in lawful money of the United States of America and in immediately available funds to the Holder.

17.    Governing Law. This Guaranty shall be construed and enforced in accordance with the internal laws of the State of New York and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Guaranty and the transactions contemplated hereby shall be governed by the laws of the State of New York without reference to choice of law doctrine that would apply a different law other than New York General Obligations Law § 5-1401 and 5-1402.

18.    Amendments and Waivers; Remedies Cumulative.  Except as otherwise expressly provided in this Guaranty and subject to the terms of the Intercreditor Agreement, any provision of this Guaranty may be amended or modified only by an instrument in writing signed by the Guarantor and the Holder, and any provision of this Guaranty may be waived only by the Holder and any waiver hereunder shall be valid and enforceable only if in writing and signed by Holder, and then only to the extent therein set forth.  No failure on the part of the Holder to exercise, and no delay in exercising, any right granted to Holder hereunder shall be construed as a waiver by Holder of the right to accelerate the indebtedness evidenced hereby as above provided or to pursue any other remedies available under this Guaranty nor shall the exercise of any single or partial exercise of any right, power, privilege or remedy preclude any further exercise thereof.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently.

19.    Headings.  The headings and captions hereunder are for convenience of reference only and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof and shall not affect the interpretation or construction hereof.

20.    Severability.  The provisions of this Guaranty are intended to be severable.  If for any reason any provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

21.    Notices.  Any notice required hereunder shall be in writing and shall be sent to the parties by first class mail or by facsimile at the addresses set forth herein below (or such other address designated by a party pursuant to written notice):

|  |  |
|---|---|
| Guarantor: | Quality One Wireless, LLC |
|  | 1500-A Tradeport Drive |
|  | Orlando FL 32824 |
|  | Phone:  [_____] |
|  | Fax: (307) 857-3737 |
|  | Attention: [_____] |
|  |  |
| Holder: | [_____] |
|  | [_____] |
|  | [_____] |
|  | Phone:  [_____] |
|  | Fax: [_____] |
|  | Attention: [_____] |

Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next business day).

22.   Obligations.  The Guarantor acknowledges that this Guaranty and the Guarantor's obligations hereunder are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Guaranty and the obligations of the Guarantor hereunder or the obligations of any other person or party relating to this Guaranty or the obligations of the Guarantor hereunder.  The obligations of the Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than, payment of the Note and Security Agreement in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranty or otherwise.  Without limiting the generality of the foregoing, the obligations of the Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of the Holder to assert any claim or demand or to enforce any remedy under this Guaranty or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations or this Guaranty, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantor or would otherwise operate as a discharge of the Guarantor as a matter of law or equity.

23.   Assignment; Participations.  This Guaranty shall be binding upon, and shall inure to the benefit of, the Guarantor, the Holder and their respective successors and assigns, except that Guarantor may not assign or transfer any of its rights or obligations hereunder without the prior written consent of the Holder (and such assignment or transfer without such consent shall be null and void).  Without limiting the generality of the foregoing, the Holder may assign or transfer all or any portion of its rights and obligations under this Guaranty, the Note and Security Agreement

and any collateral given to secure the Guaranteed Obligations to any other person, and such other person shall thereupon become vested with all of the rights and obligations in respect thereof granted to the Holder herein or otherwise.

24.    Venue; Service of Process. The Guarantor irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts of the State of New York sitting in Manhattan and of the United States District Court of the Southern District of New York, and any applicable appellate court, in any action or proceeding arising out of or relating to this Guaranty, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims with respect to any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Guaranty shall affect any right that the Holder may otherwise have to bring any action or proceeding relating to this Guaranty against the Guarantor or its property in the courts of any jurisdiction. THE GUARANTOR WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE HEREWITH. IN ANY ACTION AGAINST THE GUARANTOR, SERVICE OF PROCESS MAY BE MADE UPON THE GUARANTOR BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS ABOVE SET FORTH, WHICH SERVICE SHALL BE DEEMED SUFFICIENT FOR PERSONAL JURISDICTION AND SHALL BE DEEMED EFFECTIVE THREE (3) DAYS AFTER MAILING.

25.    Jury Trial Waiver. THE GUARANTOR, AND HOLDER BY ITS ACCEPTANCE OF THIS GUARANTY, HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS GUARANTY AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE GUARANTOR AND BY THE HOLDER, AND THE GUARANTOR ACKNOWLEDGES THAT NEITHER THE HOLDER NOR ANY PERSON ACTING ON BEHALF OF THE HOLDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

26.    Expenses; Indemnification. The Guarantor shall reimburse the Holder for all out-of-pocket costs expenses and charges (including, without limitation, reasonable fees and charges of legal counsel for the Holder) in connection with the enforcement or preservation of any rights or remedies following an Event of Default (including, without limitation, in connection with any restructuring or insolvency or bankruptcy proceeding). The Guarantor shall indemnify the Holder and its directors, officers, employees and agents from, and hold each of them harmless against, any and all losses, liabilities, claims, damages or out-of-pocket expenses incurred by any of them arising out of or by reason of any litigation or other proceedings (including any threatened investigation or litigation or other proceedings) arising out of or relating to this Guaranty or to the enforcement of this Guaranty, including, without limitation, the reasonable

fees and disbursements of counsel incurred in connection with any such litigation or other proceedings.  The obligations of the Guarantor under this Section 26 shall survive the termination of this Guaranty.

27.    <u>Further Assurances</u>.  Guarantor agrees, upon the written request of the Holder, to execute and deliver to the Holder, from time to time, any additional instruments or documents reasonably considered necessary by the Holder to cause this Guaranty to be, become or remain valid and effective in accordance with its terms.

28.    <u>Counterparts</u>.  This Guaranty and any amendments, waivers, consents or supplements hereto may be executed in multiple counterparts (including by facsimile or in electronic format), each of which shall constitute an original, but all taken together shall constitute a single contract.

[remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, this Guaranty has been duly executed and delivered by the duly authorized officer of the Guarantor as of the date first above written.

**GUARANTOR:**

QUALITY ONE WIRELESS, LLC

By: _____
     Name:
     Title:

**ACCEPTED**

[HOLDER]

By: _____
     Name:
     Title:

## **Exhibit K – Form of Quality One – PineBridge Guaranty and Security Agreement**

See attached.

## GUARANTY AND SECURITY AGREEMENT

Guaranty and Security Agreement (this "Guaranty"), dated as of [_____], 2013, made by Quality One Wireless, LLC, a Nevada limited liability company (the "Guarantor"), in favor of each of [PineBridge Vantage Partners, L.P., PineBridge Co-Investment AIV Partners, L.P., Vantage Star Investment Corp., PineBridge PEP IV Co-Investment, L.P., PineBridge Plan Star Investment Corp., PineBridge PEP V Co-Investment, L.P., and The Insurance Company of the State of Pennsylvania], or their permitted assigns (each, a "Fund" and collectively, the "Holder").

WHEREAS, Guarantor has entered into that certain Asset Purchase Agreement, dated as of [_____], 2013, by and between the Guarantor, Q1W Newco, LLC (the "Company"), Personal Communications Devices, LLC ("PCD"), and Personal Communications Devices Holdings, LLC ("Holdings") (the "Asset Purchase Agreement"), pursuant to which the Company is issuing a secured note to the Holder as partial consideration for the transfer of certain Holdings and PCD assets to the Company;

WHEREAS, on the date hereof, the Company is entering into the Secured Note and Security Agreement payable to the order of the Holder in the principal amount of $_____ (the "Note and Security Agreement");

WHEREAS, Guarantor is an affiliate of the Company, and each of the Company and the Guarantor are wholly-owned subsidiaries of Q1W Group, LLC;

WHEREAS, as a condition for the Holder to accept the Note and Security Agreement, and as consideration for certain of the Holdings and PCD assets to be transferred under the Asset Purchase Agreement,  the Guarantor is required to cause this Guaranty to be delivered to the Holder; and

NOW, THEREFORE, as an inducement to the Holder to accept the Note and Security Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms.  Capitalized terms used herein and not otherwise defined shall have the meanings assigned by the Note and Security Agreement. "Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

2.    Guaranty.  The Guarantor hereby irrevocably and unconditionally guarantees to the Holder the following (collectively, the "Guaranteed Obligations"): the full and prompt payment when due in accordance with the Note and Security Agreement of all amounts due and owing by the Company thereunder, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, and including all interest and expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency proceeding with respect to the Company, whether or not such interest or expenses are allowed as a claim in such proceeding.

3.    <u>Payment by Guarantor</u>.  The Guarantor hereby agrees, in furtherance of the foregoing and not in limitation of any other right that the Holder may have at law or in equity against the Guarantor by virtue hereof, that upon the failure of the Company to pay any of the Guaranteed Obligations when and as they shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, the Guarantor shall, upon demand, pay (or cause to be paid) in cash, to the Holder, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due and, accrued and unpaid interest on such Guaranteed Obligations.

4.    <u>Liability of Guarantor Absolute</u>.  The Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance that constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, the Guarantor agrees as follows: (a) this Guaranty is a guaranty of payment when due and not of collectability; this Guaranty is a primary obligation of the Guarantor and not merely a contract of surety; (b) the Holder may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and the Holder with respect to the existence of such Event of Default; (c) the obligations of the Guarantor hereunder are independent of the obligations of the Company, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce its obligations under this Guaranty whether or not any action is brought against the Company and whether or not the Company is joined in any such action or actions, and recovery may be had against the Guarantor in such action or proceeding or any independent action or proceeding against the Guarantor, without any requirement that the Holder first assert, prosecute or exhaust any remedy or claim against the Company; (d) payment by the Guarantor of part, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge the Guarantor's liability for any part of the Guaranteed Obligations that has not been paid; (e) the Holder, upon such terms as they deem appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of the Guarantor's liability hereunder, from time to time may settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; and (f) the Guarantor's obligations hereunder shall, to the fullest extent permitted by law, be unaffected by any event of bankruptcy, reorganization or insolvency with respect to the Company; by amendment, supplement, reformation or other modification of the Note and Security Agreement or any other agreement, document or instrument relating thereto, or any Guaranteed Obligation; by the Holder's exercise or non-exercise or delay in exercising of any rights under this Guaranty, the Note and Security Agreement, or any other agreement, document or instrument relating thereto; by any change in the time, manner or place of payment, or any other amendment or waiver of, or any consent or departure from, the Note and Security Agreement, in each case undertaken in accordance with the terms of the Note and Security Agreement; by the permitted assignment or transfer of the Note and Security Agreement or any other agreement, document or instrument relating thereto in whole or in part; or by any change in the ownership or control of the Holder, the Guarantor or the Company; and the absence of any notice to, or knowledge by, the Guarantor of the existence of any of the aforesaid matters or events. The intent of this Section 4 being that the obligations of the Guarantor hereunder shall be absolute and unconditional, under any and all circumstances

2

including any circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

5.    Waiver.  The Guarantor hereby irrevocably, unconditionally and expressly waives, and agrees that it shall not at any time assert any claim or take the benefit or advantage of: any appraisal, valuation, stay, extension, marshalling of assets or redemption laws, any bankruptcy, insolvency or similar proceedings, or exemption, whether now or any time hereafter in force, which may delay, prevent or otherwise affect the performance by the Guarantor of its obligations hereunder. The Guarantor also hereby irrevocably, unconditionally and expressly waives, for the benefit of the Holder, (a) all notices, promptness, diligence, presentment, demand and protest of every kind and any requirement that the Holder exhausts any rights or first proceeds against the Company or any other person or entity or pursue any other remedy in the power of the Holder whatsoever, (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company or the Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company or the Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and (d) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of the Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Holder protect, secure, perfect or insure any security interest or lien or any property subject thereto.  The Guarantor hereby further agrees that if the Company shall default in the payment or performance of any of the Guaranteed Obligations, the Guarantor will promptly pay and perform the same, without any demand or notice whatsoever.

6.    Guarantor's Rights of Subrogation, Contribution, etc.  Until the Guaranteed Obligations shall have been paid in full, the Guarantor hereby waives any claim, right or remedy, direct or indirect, that the Guarantor now has or may hereafter have against the Company or any of its assets in connection with this Guaranty or the performance by the Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that the Guarantor now has or may hereafter have against the Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that the Holder now has or may hereafter have against the Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Holder.  In addition, the Guarantor agrees that it will not exercise any subrogation rights it may acquire, by payment made hereunder or otherwise, until the obligation to pay the Guaranteed Obligations in accordance with the Note and Security Agreement to the Holder has been fully satisfied and discharged. If, the preceding sentence notwithstanding, any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all of the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the Holder and shall forthwith be paid over to the Holder to be

3

credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.    Subordination of Other Obligations. Any indebtedness of the Company now or hereafter held by the Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust Holder and shall forthwith be paid over to the Holder to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

8.    Specific Guaranty.  This Guaranty is a specific guaranty that shall remain in effect until all of the Guaranteed Obligations have been paid in full.  The Guarantor hereby irrevocably waives any right to revoke this Guaranty.

9.    Payments Free and Clear of Taxes, Etc.  All payments by the Guarantor under this Guaranty shall be made without setoff, counterclaim or other defense.

10.    Reinstatement.  The obligations of the Guarantor hereunder shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Company in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and the Guarantor agrees that it will indemnify the Holder on demand for all reasonable costs and expenses (including reasonable and documented fees and expenses of counsel) incurred by each such party in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.  This provision shall survive the termination of this Guaranty.

11.    Security Interests.  The Guarantor is granting the Holder a security interest in the Collateral (as defined below) to secure both its due and prompt payment and performance under this Guaranty and the Company's due and prompt payment and performance under the Note and Security Agreement.  The Guarantor hereby pledges and grants to the Holder, and hereby creates a continuing second priority lien and security interest in favor of the Holder in and to all of the Guarantor's rights, title and interest in and to the Guarantor's right to receive payment for all accounts receivable of the Guarantor, in an amount of such accounts receivable, at any time, of not more than $75,000,000.00 in the aggregate pursuant to this Guaranty and under the Note and Security Agreement (the "Collateral").

a)    Continuing Security Interest; Further Actions.  This Guaranty shall create a continuing second priority lien and security interest in the Accounts Receivable, and shall (i) subject to Section 11, remain in full force and effect until payment and performance in full of the principal amount of the Note and interest accrued thereon, (ii) be binding upon the Guarantor, its successors and assigns, and (iii) inure to the benefit of the Holder and its successors, transferees and assigns; *provided that* the Guarantor may not assign or

otherwise transfer any of its rights or obligations under this Guaranty without the prior written consent of the Holder.

b)    <u>Termination; Release</u>.  On the date on which all the principal amount of the Note and interest accrued thereon have been paid and performed in full, the Holder will, at the request and sole expense of the Guarantor, (i) duly assign, transfer and deliver to or at the direction of the Guarantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Holder, together with any monies at the time held by the Holder hereunder, and (ii) execute and deliver to the Guarantor a proper instrument or instruments acknowledging the satisfaction and termination of this Guaranty.

c)    <u>Further Assurances; Agreement to Deliver Additional Collateral Documents</u>.  In order to perfect and protect any security interest granted hereby or to enable the Holder to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to the Collateral: at the request of the Holder, the Guarantor: (i) shall execute, deliver and acknowledge such security agreements, pledge agreements, financing statements, assignments and other collateral documents, in form and substance reasonably satisfactory to Holder; (ii) hereby irrevocably authorizes Holder at any time and from time to time to file in any relevant jurisdiction any such financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any such statement relating to the Collateral; and (iii) shall promptly take such further actions as Holder may request from time to time.  All of the foregoing shall be at the sole cost and expense of the Guarantor.

12.    <u>Company Refinancing; Subordination</u>.  If the Company refinances any portion of its indebtedness (including with the Company's Lender) or repays the Company's indebtedness in full in accordance with the terms of the Credit Agreement, then, in connection with such refinancing or repayment, subject to the terms of the Intercreditor Agreement, the Holder agrees to enter into an intercreditor agreement with subordination and/or standstill terms no less favorable than the terms of the Intercreditor Agreement, and any subordination and/or standstill terms set forth in any future intercreditor agreement with respect to the Holder's rights shall not extend beyond the Maturity Date, except in the case of an Event of Default (as defined in the Credit Agreement).

13.    <u>Guarantor Representations and Warranties</u>.  The Guarantor hereby represents and warrants to (and, where applicable, agrees with) the Holder that:

a)    <u>Authorization; Enforceability</u>.  The Guarantor is validly existing and in good standing under the laws of Nevada and has the requisite power and authority to execute, deliver and carry out the terms and provisions of this Guaranty.  All necessary action on the part of the Guarantor has been taken to authorize the execution and delivery of this Guaranty, and the Guarantor's agreements hereunder constitute the legal, valid and binding obligations of the Guarantor, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, or general principles of

equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

b)  <u>No Conflicts</u>.  Neither the execution, delivery or performance by the Guarantor of this Guaranty, nor the compliance by the Guarantor with any of the terms and provisions hereof, nor the consummation by it of the transactions contemplated hereby, (i) will contravene in any material respect any applicable provision of any law, statute, rule, regulation, order, writ, injunction or decree of any governmental authority, (ii) will contravene or cause a default under the articles of incorporation, the bylaws or other organizational document of the Guarantor, or (iii) will conflict in any material respect with or result in any breach of any material terms, covenants, conditions or provisions of, or constitute a material default under, or result in the creation or imposition of (or the obligation to create or impose) any lien upon any of the property or assets of the Guarantor (including the Collateral) pursuant to the terms of any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Guarantor is a party or by which it or any of its property or assets is bound or to which it is subject, or give rise to a right thereunder to require any payment to be made by the Guarantor.

c)  <u>Priority</u>.  The obligations of the Guarantor hereunder will at all times rank in right of payment in accordance with the terms of the Intercreditor Agreement.

d)  <u>Collateral</u>.

i.  The Guarantor has and will have good title to the Collateral and the proceeds thereof, free and clear of all liens other than those created by this Guaranty and the Credit Agreement.

ii.  The pledge of the Collateral pursuant to this agreement creates a valid and perfected second priority lien security interest in the Collateral, securing the payment and performance when due of the obligations of the Guarantor hereunder and of the Company under the Note and Security Agreement.

14.  <u>Covenants</u>.  Until the Guaranteed Obligations have been paid in full, the Guarantor covenants and agrees with Holder that:

a)  <u>Negative Pledge</u>.  Except as provided in or contemplated by the Intercreditor Agreement and Section 12 hereof, the Guarantor shall not pledge or otherwise grant a security interest or lien on any of the Collateral without the prior consent of Holder, in its sole and absolute discretion, other than (i) those liens created by the CS Note, and (ii) the first priority lien and security interest in favor the Company's Lender under the Credit Agreement in respect of the Collateral.

b)  <u>Defend Claims</u>.  Subject to the Intercreditor Agreement, the Guarantor shall, at its own cost and expense, defend title to the Collateral and the second priority lien and security interest granted to the Holder with respect thereto against all claims and demands of all persons at any time claiming any interest therein adverse to the Holder and shall maintain and preserve such perfected second priority security interest for so long as this Guaranty shall remain in effect.

c)    <u>Modification of Constituent Documents</u>.  The Guarantor shall not amend or cause the amendment of any of the Guarantor's organizational documents in any manner that adversely impacts the validity or enforceability of this Guaranty.  The Guarantor will not, without providing at least 30 days' prior written notice to the Holder, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number.  The Guarantor will, prior to any change described in the preceding sentence, take all actions requested by the Holder to maintain the perfection and priority of the Holder's security interest in the Collateral.

d)    <u>Financial Reports</u>.  Promptly, but in any event within two (2) business days following delivery by the Company of any consolidated balance sheets and related statements of operations and cash flows or other financial or operating metrics to the Company's Lender in accordance with the Credit Agreement (the "<u>Financial Reports</u>"), the Company shall deliver a copy of such Financial Reports to Holder.

15.    <u>Remedies</u>.  Subject to the terms of the Intercreditor Agreement, the Guarantor agrees that, as between the Guarantor and the Holder, the obligations of the Company under the Note and Security Agreement may be declared to be forthwith due and payable (and, in the event of the commencement of any bankruptcy or insolvency proceeding, shall be deemed to have become automatically due and payable) for purposes of Section 2 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Company and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Company) shall forthwith become due and payable by the Guarantor for purposes of Section 2.  Upon the occurrence and during the continuance of an Event of Default, subject to the terms of the Intercreditor Agreement, (a) Holder may proceed against, sell or otherwise dispose of any or all of the Collateral, in any order, priority or combination that Holder may elect within its sole discretion; (b) Holder may also elect to retain the Collateral or any part thereof in satisfaction of the principal amount and any accrued but unpaid interest thereon in accordance with the requirements of the Uniform Commercial Code; (c) Holder may pursue all rights and remedies available hereunder or under the Uniform Commercial Code or other security documents; (d) Holder may foreclose the liens created hereunder, (e) Holder may realize upon, take possession of and/or sell any of the Collateral, and (f) Holder may exercise all rights and powers with respect to the Collateral as the Company might exercise in its absolute discretion, including, without limitation, to (i) relinquish or abandon any Collateral or any lien thereon, (ii) execute all such contracts, agreements, deeds, documents and instruments, to bring, defend and abandon all such actions, suits and proceedings, and to take all actions in relation to all or any part of the Collateral, and/or (iii) to appoint managers, sub-agents, and officers for any of the purposes mentioned in the foregoing provisions of this Section and to dismiss the same.  The enumeration of any rights and remedies in this Guaranty is not intended to be exhaustive.  The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.  Holder's rights, remedies and powers, as provided in this Guaranty are cumulative and concurrent, and may be pursued singly, successively or together against the Guarantor or any collateral security given at any time to secure the payment hereof, all at the sole discretion of Holder.  Additionally, Holder may resort to every other right or remedy available at law or in

equity without first exhausting the rights and remedies contained herein, all in Holder's sole discretion.

16.    Payment of Dollars.  The Guarantor shall make any payment required to be made hereunder in lawful money of the United States of America and in immediately available funds to the Holder.

17.    Governing Law. This Guaranty shall be construed and enforced in accordance with the internal laws of the State of New York and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Guaranty and the transactions contemplated hereby shall be governed by the laws of the State of New York without reference to choice of law doctrine that would apply a different law other than New York General Obligations Law § 5-1401 and 5-1402.

18.    Amendments and Waivers; Remedies Cumulative.  Except as otherwise expressly provided in this Guaranty and subject to the terms of the Intercreditor Agreement, any provision of this Guaranty may be amended or modified only by an instrument in writing signed by the Guarantor and the Holder, and any provision of this Guaranty may be waived only by the Holder and any waiver hereunder shall be valid and enforceable only if in writing and signed by Holder, and then only to the extent therein set forth.  No failure on the part of the Holder to exercise, and no delay in exercising, any right granted to Holder hereunder shall be construed as a waiver by Holder of the right to accelerate the indebtedness evidenced hereby as above provided or to pursue any other remedies available under this Guaranty nor shall the exercise of any single or partial exercise of any right, power, privilege or remedy preclude any further exercise thereof.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently.

19.    Headings.  The headings and captions hereunder are for convenience of reference only and shall not be deemed to modify, explain, enlarge or restrict any of the provisions hereof and shall not affect the interpretation or construction hereof.

20.    Severability.  The provisions of this Guaranty are intended to be severable.  If for any reason any provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

21.    Notices.  Any notice required hereunder shall be in writing and shall be sent to the parties by first class mail or by facsimile at the addresses set forth herein below (or such other address designated by a party pursuant to written notice):

Guarantor:          Quality One Wireless, LLC
                    1500-A Tradeport Drive
                    Orlando FL 32824
                    Phone:  [_____]
                    Fax: (307) 857-3737
                    Attention: [_____]


Holder:             [_____]
                    [_____]
                    [_____]
                    Phone:  [_____]
                    Fax: [_____]
                    Attention: [_____]


     Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received; and (ii) sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next business day).

22.   <u>Obligations</u>.  The Guarantor acknowledges that this Guaranty and the Guarantor's obligations hereunder are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Guaranty and the obligations of the Guarantor hereunder or the obligations of any other person or party relating to this Guaranty or the obligations of the Guarantor hereunder.  The obligations of the Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than, payment of the Note and Security Agreement in full), including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranty or otherwise.  Without limiting the generality of the foregoing, the obligations of the Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of the Holder to assert any claim or demand or to enforce any remedy under this Guaranty or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations or this Guaranty, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantor or would otherwise operate as a discharge of the Guarantor as a matter of law or equity.

23.   <u>Assignment; Participations</u>.  This Guaranty shall be binding upon, and shall inure to the benefit of, the Guarantor, the Holder and their respective successors and assigns, except that Guarantor may not assign or transfer any of its rights or obligations hereunder without the prior written consent of the Holder (and such assignment or transfer without such consent shall be null and void).  Without limiting the generality of the foregoing, the Holder may assign or transfer all

or any portion of its rights and obligations under this Guaranty, the Note and Security Agreement and any collateral given to secure the Guaranteed Obligations to any other person, and such other person shall thereupon become vested with all of the rights and obligations in respect thereof granted to the Holder herein or otherwise.

24.    Venue; Service of Process. The Guarantor irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the courts of the State of New York sitting in Manhattan and of the United States District Court of the Southern District of New York, and any applicable appellate court, in any action or proceeding arising out of or relating to this Guaranty, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims with respect to any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Guaranty shall affect any right that the Holder may otherwise have to bring any action or proceeding relating to this Guaranty against the Guarantor or its property in the courts of any jurisdiction.  THE GUARANTOR WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE HEREWITH.  IN ANY ACTION AGAINST THE GUARANTOR, SERVICE OF PROCESS MAY BE MADE UPON THE GUARANTOR BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS ABOVE SET FORTH, WHICH SERVICE SHALL BE DEEMED SUFFICIENT FOR PERSONAL JURISDICTION AND SHALL BE DEEMED EFFECTIVE THREE (3) DAYS AFTER MAILING.

25.    Jury Trial Waiver.  THE GUARANTOR, AND HOLDER BY ITS ACCEPTANCE OF THIS GUARANTY, HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS GUARANTY AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY THE GUARANTOR AND BY THE HOLDER, AND THE GUARANTOR ACKNOWLEDGES THAT NEITHER THE HOLDER NOR ANY PERSON ACTING ON BEHALF OF THE HOLDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.

26.    Expenses; Indemnification.  The Guarantor shall reimburse the Holder for all out-of-pocket costs expenses and charges (including, without limitation, reasonable fees and charges of legal counsel for the Holder) in connection with the enforcement or preservation of any rights or remedies following an Event of Default (including, without limitation, in connection with any restructuring or insolvency or bankruptcy proceeding).  The Guarantor shall indemnify the Holder and its directors, officers, employees and agents from, and hold each of them harmless against, any and all losses, liabilities, claims, damages or out-of-pocket expenses incurred by any of them arising out of or by reason of any litigation or other proceedings (including any threatened investigation or litigation or other proceedings) arising out of or relating to this

Guaranty or to the enforcement of this Guaranty, including, without limitation, the reasonable fees and disbursements of counsel incurred in connection with any such litigation or other proceedings.    The obligations of the Guarantor under this Section 26 shall survive the termination of this Guaranty.

27.    <u>Further Assurances</u>.  Guarantor agrees, upon the written request of the Holder, to execute and deliver to the Holder, from time to time, any additional instruments or documents reasonably considered necessary by the Holder to cause this Guaranty to be, become or remain valid and effective in accordance with its terms.

28.    <u>Counterparts</u>.  This Guaranty and any amendments, waivers, consents or supplements hereto may be executed in multiple counterparts (including by facsimile or in electronic format), each of which shall constitute an original, but all taken together shall constitute a single contract.

[remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, this Guaranty has been duly executed and delivered by the duly authorized officer of the Guarantor as of the date first above written.

**GUARANTOR:**

QUALITY ONE WIRELESS, LLC


By: _____
    Name:
    Title:


**ACCEPTED**

[HOLDER]


By: _____
    Name:
    Title:

## **<u>Exhibit L – Form of Sale Motion</u>**

See attached.

## **Exhibit M – Form of Sale Order**

See attached.

## <u>Exhibit N – Pre-Closing Liabilities</u>

- Product Warranty Obligations

- Defective $35 Fee Reserve

- MDF Obligations

## **Exhibit O – DIP Budget**

See attached.

**PCD DIP Cash Flow Forecast - for August 19, 2013 Filing**

| ($000's) | Pre-Filing 16-Aug | 23-Aug | 30-Aug | 06-Sep | 13-Sep | 20-Sep | 27-Sep | 04-Oct | 11-Oct | 18-Oct | 25-Oct | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Chapter 11 Period - DIP Cash Flow | | | | | | | | | | |
| **AR Collections** | | $ 5,065 | $ 7,098 | $ 8,430 | $ 5,521 | $ 11,514 | $ 6,020 | $ 6,622 | $ 7,845 | $ 9,046 | $ 8,198 | $ 75,359 |
| **Disbursements** | | | | | | | | | | | | |
| Trade Vendors | | (7,433) | (6,842) | (6,800) | (3,624) | (10,189) | (1,580) | (3,247) | (2,339) | (7,765) | (3,200) | (53,019) |
| Non-Trade Vendors | | (1,436) | (1,436) | (1,466) | (1,447) | (1,341) | (1,338) | (1,337) | (1,343) | (1,332) | (1,332) | (13,808) |
| Payroll | | (56) | (547) | (56) | (547) | (56) | (547) | (56) | (547) | (56) | (56) | (2,524) |
| | | (8,925) | (8,825) | (8,323) | (5,618) | (11,587) | (3,465) | (4,640) | (4,228) | (9,153) | (4,588) | (69,351) |
| **Net CF from Operations** | | (3,859) | (1,727) | 108 | (97) | (73) | 2,555 | 1,982 | 3,617 | (108) | 3,610 | 6,008 |
| Interest / DIP Fee / Swap Settlement | | - | (36) | (240) | - | - | - | (277) | - | - | (676) | (1,229) |
| Professional Fees | | - | (125) | - | (320) | - | (200) | - | (640) | - | (1,240) | (2,525) |
| Existing Employee Retention Plan Payment | | - | (500) | - | - | - | - | - | - | - | - | (500) |
| Pantech Software Upgrade Fees | | - | - | (2,500) | - | - | - | - | - | - | - | (2,500) |
| Ch. 11 Admin. Claims | | - | - | - | - | - | - | - | - | - | (3,000) | (3,000) |
| | | - | (661) | (2,740) | (320) | - | (200) | (277) | (640) | - | (4,916) | (9,754) |
| **Net Cash Flow** | | $ (3,859) | $ (2,388) | $ (2,633) | $ (417) | $ (73) | $ 2,355 | $ 1,705 | $ 2,977 | $ (108) | $ (1,306) | $ (3,746) |
| **Opening Book Cash** | | - | - | - | - | - | - | - | - | - | - | |
| Net Cash Flow | | (3,859) | (2,388) | (2,633) | (417) | (73) | 2,355 | 1,705 | 2,977 | (108) | (1,306) | (3,746) |
| Increase (Decrease) in Revolver | | 3,859 | 2,388 | 2,633 | 417 | 73 | (2,355) | (1,705) | (2,977) | 108 | 1,306 | 3,746 |
| **Closing Book Cash** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Liquidity** | | | | | | | | | | | | |
| Borrowing Base Availability | | $ 31,996 | $ 39,579 | $ 40,000 | $ 46,000 | $ 46,000 | $ 43,000 | $ 41,000 | $ 38,000 | $ 38,000 | $ 38,000 | $ 38,000 |
| Availability Block | | - | - | - | - | - | - | - | - | - | - | - |
| **Availability** | | $ 31,996 | $ 39,579 | $ 40,000 | $ 46,000 | $ 46,000 | $ 43,000 | $ 41,000 | $ 38,000 | $ 38,000 | $ 38,000 | $ 38,000 |
| DIP Revolver | | (8,925) | (18,411) | (29,474) | (35,412) | (42,878) | (40,523) | (38,818) | (35,841) | (35,949) | (37,255) | (37,255) |
| **Net Availability per BB (A)** | | $ 23,071 | $ 21,168 | $ 10,526 | $ 10,588 | $ 3,122 | $ 2,477 | $ 2,182 | $ 2,159 | $ 2,051 | $ 745 | $ 745 |
| *Maximum Outstanding Obligation* | | $ 45,000 | $ 45,000 | $ 46,000 | $ 46,000 | $ 46,000 | $ 43,000 | $ 41,000 | $ 38,000 | $ 38,000 | $ 38,000 | $ 38,000 |
| Pre-Petition Revolver | 33,507 | 28,441 | 21,344 | 12,914 | 7,393 | - | - | - | - | - | - | - |
| DIP Revolver | - | 8,925 | 18,411 | 29,474 | 35,412 | 42,878 | 40,523 | 38,818 | 35,841 | 35,949 | 37,255 | 37,255 |
| Outstanding Loan | 33,507 | 37,366 | 39,755 | 42,388 | 42,805 | 42,878 | 40,523 | 38,818 | 35,841 | 35,949 | 37,255 | 37,255 |
| **Net Availability per Max. Obligation (B)** | | $ 7,634 | $ 5,245 | $ 3,612 | $ 3,195 | $ 3,122 | $ 2,477 | $ 2,182 | $ 2,159 | $ 2,051 | $ 745 | $ 745 |
| **Net Borrowing Availability (Lesser of A & B)** | | $ 7,634 | $ 5,245 | $ 3,612 | $ 3,195 | $ 3,122 | $ 2,477 | $ 2,182 | $ 2,159 | $ 2,051 | $ 745 | $ 745 |

**Borrowing Base Calculation**

| ($000's) | | 23-Aug | 30-Aug | 06-Sep | 13-Sep | 20-Sep | 27-Sep | 04-Oct | 11-Oct | 18-Oct | 25-Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Chapter 11 Period - DIP Cash Flow | | | | | | |
| **Accounts Receivable** | $ | 66,905 | $ 65,510 | $ 65,974 | $ 69,944 | $ 67,069 | $ 68,526 | $ 69,289 | $ 70,638 | 67,768 | 65,940 |
| Less: Ineligibles | | (15,449) | (15,449) | (15,449) | (15,449) | (15,449) | (15,449) | (15,449) | (15,449) | (16,633) | (18,113) |
| **A/R** | | 51,456 | 50,061 | 50,525 | 54,495 | 51,620 | 53,077 | 53,840 | 55,189 | 51,134 | 47,827 |
| Advance Rate | | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% | 80% |
| **Available A/R** | | 41,165 | 40,049 | 40,420 | 43,596 | 41,296 | 42,461 | 43,072 | 44,151 | 40,908 | 38,262 |
| **Inventory** | | 181,958 | 180,375 | 177,861 | 169,096 | 169,110 | 162,221 | 158,228 | 150,035 | 151,813 | 149,026 |
| Less: Parts | | (15,240) | (15,240) | (15,240) | (15,240) | (15,240) | (15,240) | (15,240) | (15,240) | (15,240) | (15,240) |
| Breakout Units | | (68,764) | (67,289) | (67,289) | (64,236) | (64,236) | (62,761) | (62,761) | (59,811) | (59,811) | (59,811) |
| Other Ineligibles | | (18,073) | (18,061) | (18,042) | (17,976) | (17,976) | (17,925) | (17,895) | (17,833) | (17,847) | (17,826) |
| **Eligible Inventory** | | 79,881 | 79,785 | 77,290 | 71,643 | 71,657 | 66,295 | 62,332 | 57,151 | 58,916 | 56,149 |
| Advance Rate | | 43% | 43% | 43% | 41% | 41% | 40% | 38% | 36% | 37% | 36% |
| **Available Inventory** | | 34,384 | 34,375 | 32,893 | 29,474 | 29,533 | 26,289 | 23,854 | 20,671 | 21,755 | 20,056 |
| Inventory Cap | | - | - | - | - | - | - | - | - | - | - |
| **Net Avail. Inventory** | | 34,384 | 34,375 | 32,893 | 29,474 | 29,533 | 26,289 | 23,854 | 20,671 | 21,755 | 20,056 |
| **Reserves** | | | | | | | | | | | |
| Product Warranty Reserve | | (8,974) | (8,974) | (8,974) | (8,974) | (8,974) | (7,974) | (7,974) | (7,974) | (7,974) | (6,849) |
| Defective Repair Reserve | | (522) | (522) | (522) | (522) | (522) | (272) | (272) | (272) | (272) | (147) |
| MDF Reserve | | (4,471) | (2,860) | (2,546) | (1,489) | (1,201) | (804) | (490) | (414) | (219) | (219) |
| Rent/ WH Handling Charge | | (348) | (348) | (348) | (348) | (348) | (348) | (348) | (348) | (348) | (348) |
| Swap Reserve | | (497) | (497) | (497) | (497) | (497) | (497) | (497) | (497) | (497) | - |
| Carve-out Reserve | | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) | (300) |
| Availability Reserves | | (15,112) | (13,501) | (13,187) | (12,130) | (11,842) | (10,195) | (9,881) | (9,805) | (9,610) | (7,863) |
| **Net Availability** | $ | 60,437 | $ 60,923 | $ 60,126 | $ 60,940 | $ 58,987 | $ 58,555 | $ 57,046 | $ 55,018 | $ 53,053 | $ 50,454 |
| Availability Block | | - | - | - | - | - | - | - | - | - | - |
| Pre-Petition Revolver | | (28,441) | (21,344) | (12,914) | (7,393) | - | - | - | - | - | - |
| **Availability, net (A)** | $ | 31,996 | $ 39,579 | $ 47,212 | $ 53,547 | $ 58,987 | $ 58,555 | $ 57,046 | $ 55,018 | $ 53,053 | $ 50,454 |
| *DIP Limit* (**B**) | $ | 40,000 | $ 40,000 | $ 40,000 | $ 46,000 | $ 46,000 | $ 43,000 | $ 41,000 | $ 38,000 | $ 38,000 | $ 38,000 |
| **Max. Net Availability (C)** | $ | 31,996 | $ 39,579 | $ 40,000 | $ 46,000 | $ 46,000 | $ 43,000 | $ 41,000 | $ 38,000 | $ 38,000 | $ 38,000 |
| DIP Revolver (**D**) | | (8,925) | (18,411) | (29,474) | (35,412) | (42,878) | (40,523) | (38,818) | (35,841) | (35,949) | (37,255) |
| **Excess Availability (C-D)** | $ | 23,071 | $ 21,168 | $ 10,526 | $ 10,588 | $ 3,122 | $ 2,477 | $ 2,182 | $ 2,159 | $ 2,051 | $ 745 |

**Working Capital Rollforwards**

| | | | | | Chapter 11 Period - DIP Cash Flow | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($000's) | 23-Aug | 30-Aug | 06-Sep | 13-Sep | 20-Sep | 27-Sep | 04-Oct | 11-Oct | 18-Oct | 25-Oct | | Total |
| **Accounts Receivable** | | | | | | | | | | | | |
| Opening Balance | $ 69,000 | $ 66,905 | $ 65,510 | $ 65,974 | $ 69,944 | $ 67,069 | $ 68,526 | $ 69,289 | $ 70,638 | $ 67,768 | | $ 69,000 |
| Net Sales | 7,443 | 7,314 | 9,208 | 10,548 | 8,927 | 7,874 | 7,700 | 9,270 | 6,370 | 6,370 | | 81,023 |
| Collections | (5,065) | (7,098) | (8,430) | (5,521) | (11,514) | (6,020) | (6,622) | (7,845) | (9,046) | (8,198) | | (75,359) |
| Reserve/ MDF Settlement | (4,473) | (1,611) | (314) | (1,057) | (288) | (397) | (314) | (76) | (195) | - | | (8,725) |
| **Ending Balance** | $ 66,905 | $ 65,510 | $ 65,974 | $ 69,944 | $ 67,069 | $ 68,526 | $ 69,289 | $ 70,638 | $ 67,768 | $ 65,940 | | $ 65,940 |
| **Inventory** | | | | | | | | | | | | |
| Opening Balance | $ 183,546 | $ 181,958 | $ 180,375 | $ 177,861 | $ 169,096 | $ 169,110 | $ 162,221 | $ 158,228 | $ 150,035 | $ 151,813 | | $ 183,546 |
| Purchases | 7,433 | 6,842 | 6,800 | 3,624 | 10,189 | 1,580 | 3,247 | 2,339 | 7,765 | 3,200 | | 53,019 |
| COGS | (9,020) | (8,426) | (9,314) | (12,389) | (10,176) | (8,469) | (7,240) | (10,531) | (5,987) | (5,987) | | (87,539) |
| **Ending Balance** | $ 181,958 | $ 180,375 | $ 177,861 | $ 169,096 | $ 169,110 | $ 162,221 | $ 158,228 | $ 150,035 | $ 151,813 | $ 149,026 | | $ 149,026 |
| **Accounts Payable** | | | | | | | | | | | | |
| Opening Balance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | |
| Inventory Purchases | 7,433 | 6,842 | 6,800 | 3,624 | 10,189 | 1,580 | 3,247 | 2,339 | 7,765 | 3,200 | | |
| Trade Disbursements | (7,433) | (6,842) | (6,800) | (3,624) | (10,189) | (1,580) | (3,247) | (2,339) | (7,765) | (3,200) | | |
| **Ending Balance** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | |

## Exhibit P – Seller Marks

| OBLIGOR OWNED MARK | COUNTRY | CLASS | GOODS/PROPERTY COVERED | APPLICATION NO. | FILING DATE | REGISTRATION NO. |
|---|---|---|---|---|---|---|
| **AUTHORITY** | U.S.A. | 9 | Mobile phones, cellular phones, smart phones, personal digital assistants and wireless handheld digital telecommunications devices featuring voice, text, data and image transmission, including voice, text, data, picture and video messaging, and push to talk capabilities | 85/520,504 | 1/19/2012 | TBD |
| **BIG STREAM** | U.S.A. | 9 | Digital media streaming devices | 85/170,509 | 11/5/2010 | TBD |
| **BIG⬤STREAM** <br> **BIG STREAM & Design** | U.S.A. | 9 | Digital media streaming devices | 85/170,532 | 11/5/2010 | TBD |
| **PCD** | India | 35 | Marketing and reselling mobile cellular handsets and other wireless communications devices | 1960450 | 5/4/2010 | TBD |
| **PCD** | India | 9 | Marketing and reselling mobile cellular handsets and other wireless communications devices | 1980017 | 6/15/2010 | TBD |
| **PCD PERSONAL COMMUNICATIONS DEVICES** | India | 9 & 35 | Marketing and reselling mobile cellular handsets and other wireless communications devices | 1980019 | 6/15/2010 | TBD |
| **PCD PERSONAL COMMUNICATIONS DEVICES** | Brazil | 9 | Mobile phones, cellular phones, smart phones, personal digital assistants and wireless handheld digital telecommunications devices featuring voice, text, data and image transmission, including voice, text, | 831162503 | 12/2/2011 | TBD |

| OBLIGOR OWNED MARK | COUNTRY | CLASS | GOODS/PROPERTY COVERED | APPLICATION NO. | FILING DATE | REGISTRATION NO. |
|---|---|---|---|---|---|---|
| | | | data, picture and video messaging, and push to talk capabilities | | | |
| **PCD PERSONAL COMMUNICATIONS DEVICES** | Brazil | 35 | Marketing and reselling mobile cellular handsets and other wireless communications devices | 831161361 | 12/2/2011 | TBD |
| **PCD & Design**  | Brazil | 9 | Mobile phones, cellular phones, smart phones, personal digital assistants and wireless handheld digital telecommunications devices featuring voice, text, data and image transmission, including voice, text, data, picture and video messaging, and push to talk capabilities. | 831161353 | 12/2/2011 | TBD |
| **PCD & Design**  | Brazil | 35 | Marketing and reselling mobile cellular handsets and other wireless communications devices | 831162511 | 12/2/2011 | TBD |
| **PCD & Design**  | Mexico | 9 | Handsets and telecommunication equipment. | 1235039 | 12/13/2011 | TBD |
| **PCD & Design**  | Mexico | 35 | Advertising; business management; business administration; office functions | 1235041 | 12/13/2011 | TBD |
| **PCD DE MÉXICO** | Mexico | 9 | Handsets and telecommunication equipment. | 1235036 | 12/13/2011 | TBD |
| **PCD DE MÉXICO** | Mexico | 35 | Advertising; business management; business administration; office functions | 1235038 | 12/13/2011 | TBD |
| **PCD PERSONAL COMMUNICATIONS DEVICES & Design**  | Mexico | 9 | Handsets and telecommunication equipment. | 1235043 | 12/13/2011 | TBD |

| OBLIGOR OWNED MARK | COUNTRY | CLASS | GOODS/PROPERTY COVERED | APPLICATION NO. | FILING DATE | REGISTRATION NO. |
|---|---|---|---|---|---|---|
| **PCD PERSONAL COMMUNICATIONS DEVICES & Design**  | Mexico | 35 | Advertising; business management; business administration; office functions | 1235044 | 12/13/2011 | TBD |
| **PEER**  | U.S.A. | 9 | mobile phones, cellular phones, smart phones, personal digital assistants and wireless handheld digital telecommunications devices featuring voice, text, data and image transmission, including voice, text, data, picture and video messaging, and push to talk capabilities | 85/542,315 | 2/14/2012 | TBD |

**<u>Exhibit B to Bidding Procedures Order</u>**

Bidding Procedures and Sale Notice

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| PERSONAL COMMUNICATIONS DEVICES, LLC, *et al.*,[1] | ) ) | Case No.  13- 13- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

<u>**NOTICE OF BIDDING PROCEDURES, AUCTION AND SALE HEARING**</u>

**Please Take Notice That:**

On _____, 2013, Personal Communications Devices, LLC ("PCD") and Personal Communications Devices Holdings, LLC (together with PCD, the "Debtors"),[2] filed their *Motion for Entry of Orders:  (A)(I) Approving Bidding Procedures Relating to Sale of the Debtors' Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice of Sale By Auction; (V) Establishing Procedures for Noticing and Determining Cure Amounts; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All of the Debtors' Assets; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. __] (the "Bidding Procedures and Sale Motion") with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

By order dated [__], 2013, the Bankruptcy Court approved the Bidding Procedures [Docket No. ___] (the "Bidding Procedures Order").

The Debtors have entered into an asset purchase agreement (the "Agreement") with Q1W Newco, LLC and Quality One Wireless, LLC (together, the "Stalking Horse"), pursuant to which the Stalking Horse will purchase substantially all of the Debtors' assets free and clear of all Liens, Claims, encumbrances and other "interests" within the meaning of 11 U.S.C. § 363(f) to the Stalking Horse.  As set forth in the Bidding Procedures, the Sale of the assets remains subject to any other Successful Bidders, and subject to higher or better bids.

---

[1]     The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171) and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096).  The Debtors' mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures and Sale Motion.

All interested parties are invited to submit a Qualified Bid and to make offers for the assets in accordance with the terms of the Bidding Procedures attached hereto as <u>Exhibit A</u> and the Bidding Procedures Order. The deadline to submit bids (the "<u>Bid Deadline</u>") is [__], 2013 at 5:00 p.m. (Prevailing Eastern Time).

Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "<u>Bid</u>") shall deliver by courier or email written copies of its Bid to:

| Debtors | Debtors' Counsel |
|---|---|
| Personal Communications Devices, LLC<br>80 Arkay Drive, Hauppauge<br>Suffolk County, NY 11788<br>Attn: Raymond F. Kunzmann<br>Fax: (631) 951-0784<br>E-mail: raymond.kunzmann@pcdphones.com | Goodwin Procter LLP<br>The New York Times Building<br>New York, NY 10018<br>Attn: Emanuel C. Grillo<br>Matthew L. Curro<br>Fax: (212) 355-3300<br>E-mail: egrillo@goodwinprocter.com<br>mcurro@goodwinprocter.com |
| Stalking Horse Counsel | |
| Munsch, Hurdt, Kopf & Harr P.C.<br>3800 Lincoln Plaza<br>500 N. Akard Street<br>Dallas, Texas 75201-6659<br>Attn: Joseph J. Wielebinski<br>Fax: (214) 978-4375<br>E-mail: jwielebinski@munsch.com | |

Pursuant to the Bidding Procedures Order, in the event that the Debtors receive one or more Qualified Bids other than the Stalking Horse Bid by the Bid Deadline, the Debtors shall conduct an Auction of the assets to determine the highest or otherwise best bid with respect to the assets. No later than [__], 2013 at [__] (Prevailing Eastern Time), the Debtors will notify all Qualified Bidders, counsel to the Committee and counsel to the Stalking Horse whether the Auction will occur. The Auction shall commence at 10:00 a.m. (Prevailing Eastern Time) on [__], 2013 at the offices of Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, or at such other place and time as the Debtors shall notify all parties that submitted Qualified Bids.

Objections, if any, to the proposed Sale must be: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, P.O. Box 9013, Central Islip, NY 11722-9013; and (d) be served so as to be received by: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Debtors' prepetition lender; (iv) counsel to the Committee; (v) the Office of the United States Trustee; (vi) counsel to the Stalking Horse; and (vii) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Bankruptcy Rule 2002 **on or before [__], 2013 at 5:00 p.m. (Prevailing Eastern Time)**.

**The Sale Hearing**

The Sale Hearing shall be conducted by the Bankruptcy Court **on [___], 2013, at [__] (Prevailing Eastern Time)**, or on such other date as the Court may direct.  Requests for a copy of the Agreement or for any other information concerning the sale of the assets should be directed by written request to the undersigned Debtors' counsel.

Dated:        _____, 2013

                                   Respectfully submitted,

                                   /s/ draft_____
                                  GOODWIN PROCTER LLP
                                  Emanuel C. Grillo
                                  Matthew L. Curro
                                  Christopher Newcomb
                                  The New York Times Building
                                  620 Eighth Avenue
                                  New York, NY 10018-1405
                                  Tel:  212.813.8800
                                  Fax:  212.355.3333

                                  *Proposed Attorneys for the Debtors and Debtors in Possession*

LIBNY/5274859.9