## EXHIBIT A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| PERSONAL COMMUNICATIONS | ) | Case No.  13- |
| DEVICES, LLC, *et al.*,[1] | ) | 13- |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF EPIQ BANKRUPTCY SOLUTIONS, LLC AS NOTICE AND CLAIMS AGENT

This matter coming before the Court on the Application (the "Application")[2] by Personal

Communications Devices, LLC ("PCD") and Personal Communications Devices Holdings, LLC

("Holdings", and together with PCD, the "Debtors"), debtors and debtors in possession in these

chapter 11 cases (the "Chapter 11 Cases"), for an order authorizing the retention and

appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") as claims and noticing agent under 28

U.S.C. §156(c), section 105(a) of the Bankruptcy Code, Local Bankruptcy Rule 5075-1 and the

First Day Guidelines to, among other things, (i) distribute required notices to parties-in-interest,

(ii) receive, maintain, docket and otherwise administer the proofs of claim filed in the Debtors'

Chapter 11 Cases, and (iii) provide such other administrative services – as required by the

Debtors – that would fall within the purview of services to be provided by the Clerk's Office;

and upon the Wuertz Declaration submitted in support of the Application; and the Debtors

---

[1]  The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171) and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096). The Debtors' mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

[2]  All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Application.

having estimated that there are in excess of 1,000 creditors and parties-in-interest in these Chapter 11 Cases, many of which are expected to file proofs of claim, and it appearing that the receiving, docketing and maintaining of proofs of claim would be unduly time consuming and burdensome for the Clerk; and the Court being authorized under 28 U.S.C. §156(c) to utilize, at the Debtors' expense, outside agents and facilities to provide notices to parties in title 11 cases and to receive, docket, maintain, photocopy and transmit proofs of claim; and the Court being satisfied that Epiq has the capability and experience to provide such services and that Epiq does not hold an interest materially adverse to the Debtors or the estates respecting the matters upon which it is to be engaged; and good and sufficient notice of the Application having been given; and no other or further notice being required; and it appearing that the employment of Epiq is in the best interests of the Debtors and their estates and creditors; and sufficient cause appearing therefor; it is

HEREBY ORDERED THAT:

1.       Notwithstanding the terms of the Services Agreement attached to the Application, the Application is approved solely as set forth in this Order.

2.       The Debtors are authorized to retain Epiq as their notice and claims agent effective as of the Petition Date under the terms of the Services Agreement and the Application. Epiq is authorized and directed to perform the notice and claims agent services described in the Application, including, but not limited to, noticing services and to receive, maintain, record and otherwise administer the proofs of claim filed in these Chapter 11 Cases, and all related tasks (the "Claims and Noticing Services").

3.       Epiq shall serve as the custodian of court records and shall be designated as the authorized repository for all proofs of claim filed in these Chapter 11 Cases and is authorized and

directed to maintain official claims registers for each of the Debtors and to provide the Clerk with a certified duplicate thereof upon the request of the Clerk.

4.      Epiq is authorized and directed to obtain a post office box or address for the receipt of proofs of claim.

5.      Epiq is authorized to take such other action to comply with all duties set forth in the Application.

6.      The Debtors are authorized to compensate Epiq in accordance with the terms of the Services Agreement, in the ordinary course of business, upon the receipt of reasonably detailed invoices setting forth the services provided by Epiq and the rates charged for each, and to reimburse Epiq for all reasonable and necessary expenses it may incur, upon the presentation of appropriate documentation, without the need for Epiq to file fee applications, monthly statements or otherwise seek Court approval for the compensation of its services and reimbursement of its expenses.

7.      Epiq shall maintain records of all services showing dates, categories of services, fees charged and expenses incurred, and shall serve monthly invoices on the Debtors, the office of the United States Trustee, counsel for the Debtors, counsel for any official committee, if any, monitoring the expenses of the Debtors and any party-in-interest who specifically requests service of the monthly invoices.

8.      The parties shall meet and confer in an attempt to resolve any dispute which may arise relating to the Services Agreement or monthly invoices, and the parties may seek resolution of the matter from the Court if resolution is not achieved.

9.      Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, the fees and expenses of Epiq under this Order shall be deemed an administrative expense of the Debtors' estates

without further need for Epiq to file a proof of claim for such fees and expenses, notwithstanding the terms of any future order requiring or setting a date for the filing of administrative proofs of claim.

10.     Epiq may apply its retainer to all prepetition invoices, which retainer shall be replenished to the original retainer amount, and thereafter, Epiq may hold its retainer under the Services Agreement during the Chapter 11 Cases as security for the payment of fees and expenses incurred under the Services Agreement.

11.     The Debtors shall indemnify Epiq under the terms of the Services Agreement.

12.     All requests by Epiq for the payment of indemnification as set forth in the Application and/or the Services Agreement shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Application and/or the Services Agreement and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought, provided however, that in no event shall Epiq be indemnified in the case of its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

13.     In the event that Epiq seeks reimbursement from the Debtors for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Application and/or the Services Agreement, the invoices and supporting time records for the attorneys' fees and expenses shall be included in Epiq's own applications, both interim and final, but determined by this Court after notice and a hearing.

14.     In the event Epiq is unable to provide the services set out in this Order, Epiq will immediately notify the Clerk and Debtors' counsel and cause to have all original proofs of claim and relevant creditor information turned over to another claims and noticing agent with the

advice and consent of the Clerk and Debtors' counsel; provided, however, that Epiq shall be compensated for such transition services in accordance with the terms of the Services Agreement and this Order.

15.    The Debtors may submit a separate retention application, pursuant to 11 U.S.C. § 327 and/or any applicable law, for work that is to be performed for the Debtors by Epiq but is not specifically authorized by this Order.

16.    The Debtors and Epiq are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

17.    Notwithstanding any term in the Services Agreement to the contrary, the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order during the pendency of these Chapter 11 Cases.

18.    Epiq shall not cease providing claims processing services during the Chapter 11 Cases for any reason, including nonpayment, without an order of the Court; provided, however, that Epiq may seek such an order on expedited notice with overnight or facsimile delivery notice to be served on the Debtors, the U.S. Trustee and any official committee appointed in these Chapter 11 Cases.

19.    In the event of any inconsistency between the Services Agreement, the Application and this Order, this Order shall govern.

20.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

21.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Dated: _____, 2013
      Central Islip, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

**Services Agreement**



# EPIQ

## STANDARD SERVICES AGREEMENT

This Standard Services Agreement is being entered into by and between Epiq Bankruptcy Solutions, LLC ("Epiq") and Personal Communications Devices LLC and related debtors (collectively, the "Client"), as of June _1_, 2013.

In consideration of the premises herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## General Terms and Conditions

**1.  Services.**

In accordance with the charges, terms and conditions contained in this agreement and in the schedule(s) attached hereto (collectively, the "Agreement"), Epiq agrees to furnish Client with the services set forth on Exhibit A hereto (the "Services") in connection with a corporate restructuring. Services will be provided on an as needed basis and upon request or agreement of the Client. Charges for the Services will be based on the pricing schedule set forth on Exhibit B hereto (the "Pricing Schedule"). The Pricing Schedule sets forth individual unit pricing for each of the Services provided by Epiq and represents a bona fide proposal for that Service. The Client may request separate Services or all of the Services reflected in the Pricing Schedule.

**2.  Term.**

This Agreement shall become effective on the date of its acceptance by both Epiq and the Client; provided, however, Epiq acknowledges that Bankruptcy Court approval of its engagement may be required in order for Epiq to be engaged in a chapter 11 proceeding. The Agreement shall remain in effect until terminated: (a) by the Client, on thirty (30) days' prior written notice to Epiq and, to the extent Epiq has been retained by Bankruptcy Court order, entry of an order of the Bankruptcy Court discharging Epiq; or (b) by Epiq, on ninety (90) days' prior written notice to the Client and, to the extent Epiq has been retained by Bankruptcy Court order, entry of an order of the Bankruptcy Court discharging Epiq.

**3.  Charges.**

3.1    For the Services and materials furnished by Epiq under this Agreement, the Client shall pay the fees, charges and costs set forth in the Pricing Schedule. Epiq will bill the Client monthly. All invoices shall be due and payable upon receipt.

3.2    Epiq reserves the right to make reasonable increases to the unit prices, charges and professional service rates reflected in the Pricing Schedule on an annual basis effective

1



January 2, 2014. If such annual increases exceed 10% from the prior year's level, Epiq shall provide sixty (60) days' prior written notice to the Client of such proposed increases.

3.3    Client agrees to pay Epiq for all materials necessary for performance of the Services under this Agreement (other than computer hardware and software) and any reasonable out of pocket expenses including, without limitation, transportation, long distance communications, printing, photocopying, fax, postage and related items.

3.4    Client shall pay or reimburse all taxes applicable to services performed under this Agreement and, specifically, taxes based on disbursements made on behalf of the Client, notwithstanding how such taxes may be designated, levied or based. This provision is intended to include sales, use and excise taxes, among other taxes, but is not intended to include personal property taxes or taxes based on net income of Epiq.

3.5    Client shall pay to Epiq any actual charges (including fees, costs and expenses as set forth in the Pricing Schedule) related to, arising out of or resulting from any Client error or omission. Such charges may include, without limitation, print or copy re-runs, supplies, long distance phone calls, travel expenses and overtime expenses for work chargeable at the rates set forth on the Pricing Schedule.

3.6    In the event of termination pursuant to Section 2 hereof, Client shall be liable for all amounts then accrued and/or due and owing to Epiq under the Agreement.

3.7    To the extent permitted by applicable law, Epiq shall receive a retainer in the amount of $25,000.00 (the "Retainer") that may be held by Epiq as security for the Company's payment obligations under the Agreement. The Retainer is due upon execution of this Agreement. Epiq shall be entitled to hold the Retainer until the termination of the Agreement. Following termination of the Agreement, Epiq shall return to the Company any amount of the Retainer that remains following application of the Retainer to the payment of unpaid invoices

## 4.   Confidentiality.

Client data provided to Epiq during the term of this Agreement in connection with the Services ("Client Data") shall be maintained confidentially by Epiq in the same manner and to the same level as Epiq safeguards data relating to its own business; provided, however, that if Client Data is publicly available, was already in Epiq's possession or known to it, was required to be disclosed by law, was independently developed by Epiq without use or reference to any Client Data, or was rightfully obtained by Epiq from a third party, Epiq shall bear no responsibility for public disclosure of such data. Client agrees that Epiq shall not be liable for damages or losses of any nature whatsoever arising out of the unauthorized acquisition or use of any Client Data or other Client materials provided to Epiq in the performance of this Agreement.

## 5.   Title to Property.

Epiq reserves all property rights in and to all materials, concepts, creations, inventions, works of authorship, improvements, designs, innovations, ideas, discoveries, know-how, techniques, programs, systems and other information, including, without limitation, data processing programs,



specifications, applications, processes, routines, sub-routines, procedural manuals and documentation furnished or developed by Epiq for itself or for use by the Client (collectively, the "Property"). Charges paid by Client do not vest in Client any rights to the Property, it being expressly understood that the Property is made available to Client under this Agreement solely for Client's use during and in connection with each use of the Epiq equipment and services. Client agrees not to copy or permit others to copy any of the Property.

### 6. Disposition of Data.

6.1    Client is responsible for the accuracy of the programs and Client Data it provides or gives access to Epiq and for the output resulting from such data. Client shall initiate and maintain backup files that would allow Client to regenerate or duplicate all programs and Client Data which Client provides or gives access to Epiq. Client agrees, represents and warrants to Epiq that, prior to delivery of any Client Data to Epiq, Client warrants that it has full authority to deliver the Client Data to Epiq. Client has obtained binding consents, permits, licenses and approvals from all necessary persons, authorities or individuals, and has complied with all applicable policies, regulations and laws, required by Client, in order to allow Epiq to use all Client Data delivered to it in connection with its Services. Epiq shall not be liable for, and Client accepts full responsibility for, any liability or obligation with respect to Client Data prior to Epiq's receipt, including without limitation, any liability arising during the delivery of Client Data to Epiq.

6.2    Any Client Data, programs, storage media or other materials furnished by the Client to Epiq in connection with this Agreement (collectively, the "Client Materials") may be retained by Epiq until the services provided pursuant to this Agreement are paid for, or until this Agreement is terminated with the services provided herein having been paid for in full. Client shall remain liable for all out of pocket charges incurred by Epiq under this Agreement as a result of any Client Materials maintained by Epiq. Epiq shall dispose of Client Materials in the manner requested by Client (except to the extent disposal may be prohibited by law). Client agrees to pay Epiq for reasonable expenses incurred as a result of the disposition of the Client Materials. Epiq reserves the right to dispose of any Client Materials if this Agreement is terminated without Client's direction as to the return or disposal of Client Material or Client has not paid all charges due to Epiq for a period of at least ninety (90) days; provided, however, Epiq shall provide Client with thirty (30) days' prior written notice if its intent to dispose of such data and media.

### 7. Indemnification.

The Client shall indemnify, defend and hold Epiq, its affiliates, parent, and each such entity's officers, members, directors, agents, representatives, managers, consultants and employees (each an "Indemnified Person") harmless from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, costs of preparation and attorneys' fees) and expenses as incurred (collectively, "Losses"), to which any Indemnified Person may become subject or involved in any capacity arising out of or relating to this Agreement or Epiq's rendering of services pursuant hereto, regardless of whether any of such Indemnified Persons is a party thereto, other than Losses resulting solely from Epiq's gross negligence or willful misconduct.

3



Without limiting the generality of the foregoing, "Losses" includes any liabilities resulting from claims by third persons against any Indemnified Person. Client and Epiq shall notify the other party in writing promptly of the commencement, institution, threat, or assertion of any claim, action or proceeding of which the Client is aware with respect to the services provided by Epiq under this Agreement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Client, and shall survive the termination of this Agreement until the expiration of all applicable statutes of limitation with respect to Epiq's liabilities.

## 8.  Representations / Warranties.

Epiq makes no representations or warranties, express or implied, including, without limitation, any implied or express warranty of merchantability, suitability, fitness or adequacy for a particular purpose, use, quality, productiveness or capacity.

## 9.  Confidential On-Line Workspace

Upon request of the Client, Epiq shall be authorized to: (a) establish a confidential on-line workspace with an outside vendor in connection with the provision of its services to the Client pursuant to this Agreement; and (b) with the consent of the Client and/or its designees, publish documents and other information to such confidential workspace. By publishing documents and other information to this confidential workspace in accordance with the foregoing, Epiq shall not be considered in violation of any of the provisions of this Agreement, including, but not limited to, Section 4 (Confidentiality).

## 10.  General

10.1  No waiver, alteration, amendment or modification of any of the provisions of this Agreement shall be binding upon either party unless signed in writing by a duly authorized representative of both parties.

10.2  This Agreement may not be assigned by Client without the express written consent of Epiq, which consent shall not be unreasonably withheld. The services provided under this Agreement are for the sole benefit and use of Client, and shall not be made available to any other persons.

10.3  This Agreement shall be governed by the laws of the State of New York, without regard to that state's provisions for choice of law. Client and Epiq agree that any controversy or claim arising out of or relating to this Agreement or the alleged breach thereof shall be settled by mandatory, final and binding arbitration before the American Arbitration Association in New York, New York and such arbitration shall comply with and be governed by the rules of the American Arbitration Association, provided that each party may seek interim relief in court as it deems necessary to protect its confidential information and intellectual property rights. Any arbitration award rendered pursuant to this provision shall be enforceable worldwide.

10.4  The parties hereto agree that this Agreement is the complete and exclusive statement of the agreement between the parties which supersedes all proposals or prior agreements, oral or

4



written, and all other communications between the parties relating to the subject matter of this Agreement.

10.5 Client will use its best efforts to cooperate with Epiq at Client's facilities if any portion of the Services requires its physical presence thereon.

10.6 In no event shall Epiq's Services constitute or contain legal advice or opinion, and neither Epiq nor its personnel shall be deemed to practice law hereunder.

10.7 Except for Client's obligation to pay fees, expenses and charges hereunder when due, neither party shall be in default or otherwise liable for any delay in or failure of its performance under this Agreement to the extent such delay or failure arises by reason of any act of God, any governmental requirement, act of terrorism, riots, epidemics, flood, strike, lock-out, industrial or transportational disturbance, fire, lack of materials, war, event of force majeure, or other acts beyond the reasonable control of a performing party.

10.8 This Agreement may be executed in counterparts, each of which shall be deemed to an original, but all of which shall constitute one and the same agreement.

10.9 All clauses and covenants in this Agreement are severable; in the event any or part of them are held invalid or unenforceable by any court, such clauses or covenants shall be valid and enforced to the fullest extent available, and this Agreement will be interpreted as if such invalid or unenforceable clauses or covenants were not contained herein. The parties are independent contractors and, except as expressly stated herein, neither party shall have any rights, power or authority to act or create an obligation on behalf of the other party.

10.10 Notices to be given or submitted by either party to the other, pursuant to this Agreement, shall be sufficiently given or made if given or made in writing and sent by hand delivery, overnight or certified mail, postage prepaid, and addressed as follows:

        If to Epiq:

                  Epiq Bankruptcy Solutions, LLC
                  757 Third Avenue, Third Floor
                  New York, New York 10017
                  Attn: Lorenzo Mendizabal

        If to Client:

                  Mr. ~~Joe Giacalone~~ *Raymond Kunzmann, CFO*
                  Personal Communications Devices LLC
                  80 Arkay Drive, Suite 210
                  Hauppauge, New York 11788



With a copy to:

> Meagan E. Costello, Esq.
> Goodwin Procter LLP
> The New York Times Building
> 620 Eighth Avenue
> New York, NY 10018

10.11 Invoices sent to the Client should be delivered to the following address:

> Mr. Joe Giacalone
> Personal Communications Devices LLC
> 80 Arkay Drive, Suite 210
> Hauppauge, New York 11788

Email:        Joseph.Giacalone@pcdphones.com


IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

_____

Name:  Lorenzo Mendizabal
Title:   Managing Director



**PERSONAL COMMUNICATIONS DEVICES LLC**

By:_____
Name:  Raymond E. Kenzarry
Title:    CFO



## SERVICES SCHEDULE

### CLAIMS MANAGEMENT

➢ Maintain copies of all proofs of claim and proofs of interest filed (in hard copy and electronic form).

➢ Provide a secure on-line tool through which creditors can file proofs of claim and related documentation, eliminating costly manual intake, processing and data entry of paper claims and ensuring maximum efficiency in the claim-filing process.

➢ Create and maintain electronic databases for creditor/party in interest information provided by the debtor (e.g., creditor matrix and Schedules of Statements of Assets and Liabilities) and creditors/parties in interest (e.g., proof of claim/interests).

➢ Process all proof of claim/interest submitted.

➢ Provide access to the public for examination of copies of the proofs of claim or interest without charge during regular business hours.

➢ Maintain official claims registers, including, among other things, the following information for each proof of claim or proof of interest:

- Name and address of the claimant and any agent thereof, if the proof of claim or proof of interest was filed by an agent;
- Date received;
- Claim number assigned; and
- Asserted amount and classification of the claim.

➢ Create and maintain a website with general case information, key documents, claim search function, and mirror of ECF case docket.

➢ Transmit to the Clerk's office a copy of the claims registers on a monthly basis, unless requested by the Clerk's office on a more or less frequent basis or, in the alternative, make available the claims register on-line.

➢ Implement necessary security measures to ensure the completeness and integrity of the claims registers.



➢ Record all transfers of claims pursuant to Bankruptcy Rule 3001(e) and provide notice of such transfers as required by Bankruptcy Rule 3001(e).

➢ Maintain an up-to-date mailing list for all entities that have filed a proof of claim, proof of interest or notice of appearance, which list shall be available upon request of a party in interest or the Clerk's office.

## NOTICING

➢ Prepare and serve required notices in these Chapter 11 cases, including:

- Notice of the commencement of these Chapter 11 cases and the initial meeting of creditors under section 341(a) of the Bankruptcy Code;

- Notice of any auction sale hearing;

- Notice of the claims bar date;

- Notice of objection to claims;

- Notice of any hearings on a disclosure statement and confirmation of the prepackaged plan of reorganization; and

- Other miscellaneous notices to any entities, as the debtor or the Court may deem necessary or appropriate for an orderly administration of these Chapter 11 cases.

➢ After service of a particular notice - whether by regular mail, overnight or hand delivery, email or facsimile service - file with the Clerk's office an affidavit of service that includes a copy of the notice involved, a list of persons to whom the notice was mailed and the date and manner of mailing.

➢ Update claim database to reflect undeliverable or changed addresses.

➢ Coordinate publication of certain notices in periodicals and other media.

➢ Distribute Claim Acknowledgement Cards to creditor having filed a proof of claim/interest.

## SCHEDULES/STATEMENT PREPARATION

➢ Assist the Debtors with administrative tasks in the preparation of their bankruptcy Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"), including (as needed):



- Coordinate with the Client and its advisors regarding the Schedules and Statements process, requirements, timelines and deliverables.
- Create and maintain databases for maintenance and formatting of Schedules and Statements data.
- Coordinate collection of data from Client and advisors.
- Provide data entry and quality assurance assistance regarding Schedules and Statements, including, specifically, the creation of Schedule G.

## CRISIS AND COMMUNICATION MANAGEMENT

➢ Draft crisis and restructuring communications plan and provide strategy, guidance and plan implementation support.

- Media Strategy – Work with and advise the Company on a media strategy that supplements existing media processes and procedures.

- Customer, Vendor and other Constituent Outreach – Create outreach strategy and develop supporting documents. Keeping this group informed every step of the way through open and honest outreach will support loyalty, engender trust, and ensure that ongoing operations continue.

- Employee Communications – Construct and support the Company strategize and draft employee communications. Leverage employee relationships by keeping employees in the loop which will help maintain productivity and engender trust. In other words, the more they know, the less they will assume.

- Document Development – The communications team, in collaboration with the Company and its legal, financial, and other advisors, will prepare all necessary documents such as letters, Q&A, talking points, etc. for use with media, employees, customers, vendors and other critical constituents. If the Company files for Chapter 11, the news release will also parallel the legal pleading and act as the central document from which all others will be developed. The communications team will draft each of the documents and circulate them through management and the legal team for review and comments.

- Dissemination of communication materials – The Company and/or the communications team will distribute communications documents/emails/etc. to all constituencies to ensure timely information flow to its employees, customers, vendors, and the like.

- Draft Ongoing Messages – The communications team will draft updated employee memos and follow-up letters to customers, vendors, etc., as the Company moves through the restructuring process. Keeping constituents



informed is critical to ensure that business operations are productive during the restructuring.

## BALLOTING/TABULATION

➢ Provide balloting services in connection with the solicitation process for any chapter 11 plan for which a disclosure statement has been approved by the court, including (as needed):

- Consult company and its counsel regarding timing issues, voting and tabulation procedures, and documents needed for the vote.

- Review of voting-related sections of the voting procedures motion, disclosure statement and ballots for procedural and timing issues.

- Assist in obtaining information regarding members of voting classes, including lists of holders of bonds from DTC and other entities (and, if needed, assist the company in requesting these listings).

- Coordinate distribution of solicitation documents.

- Respond to requests for documents from parties in interest, including brokerage firm and bank back-offices and institutional holders.

- Respond to telephone inquiries from lenders, bondholders and nominees regarding the disclosure statement and the voting procedures.

- Establish a website for the posting of solicitation documents.

- Receive and examine all ballots and master ballots cast by voting parties. Date- and time-stamp the originals of all such ballots and master ballots upon receipt.

- Tabulate all ballots and master ballots received prior to the voting deadline in accordance with established procedures, and prepare a certification for filing with the court.

- Undertake such other duties as may be requested by the Client.

## CALL CENTER

➢ Provide state-of-the-art Call Center facility and services, including (as needed):



- Create of frequently asked questions, call scripts, escalation procedures and call log formats.
- Record automated messaging.
- Train Call Center staff.
- Maintain and transmit call log to Client and advisors.

## MISCELLANEOUS

➢ Provide such other claims processing, noticing and related administrative services as may be requested from time to time by the Debtors.

➢ Promptly comply with such further conditions and requirements as the Court may at any time prescribe.

➢ Comply with applicable federal, state, municipal, and local statutes, ordinances, rules, regulations, orders and other requirements.

➢ Provide temporary employees to the Clerk's Office to process claims, as necessary.



**Exhibit B**

## EPIQ PRICING SCHEDULE

### CLAIM AND NOTICING RATES[1]

| Title | Rates |
|---|---|
| Clerical | $30.00 – $45.00 |
| Case Manager | $60.00 – $95.00 |
| IT / Programming | $70.00 – $135.00 |
| Snr. Case Manager / Consultant | $100.00 – $140.00 |
| Senior Consultant | $160.00 - $195.00 |

### NOTICING SERVICES[2]

| | |
|---|---|
| Printing | $0.10 per image (volume discounts apply) |
| Personalization / Labels | $0.05 each |
| Postage / Overnight Delivery | At cost |
| E-Mail Noticing | $50 per 1,000 |
| Fax Noticing | $0.10 per page |
| Claim Acknowledgement Card | $0.10 per card |
| Publication Noticing | Quoted at time of request |
| Processing Undeliverable Mail | $0.25 per piece |

---

[1] Epiq does not charge a premium/overtime charge for any of the professional services it performs. Outside vendors utilized by Epiq may include a premium / overtime charge for work performed on a weekend, holiday or after standard business hours.

[2] Noticing via overnight delivery after traditional overnight drop-off times (e.g., 9:00 p.m. in NYC) may result in additional print charges.



## SOLICITATION, BALLOTING AND TABULATION SERVICES

| Title | Rates |
|-------|-------|
| Executive Vice President | $290.00 |

*Standard hourly rates and noticing fees apply for work done by all other associates.*

## DATA MANAGEMENT SERVICES

| | |
|---|---|
| Database Maintenance | $0.10 per record/month |
| Data Import / Transfer | No per creditor charge |
| Electronic Imaging[3] | $0.12 per image |
| Weblink Hosting Fee | **WAIVED** |
| Manual Claim Input | No per creditor charge |
| CD- ROM (Mass Document Storage) | Quoted at time of request |
| Document Storage   (paper) | $2.00 per box |
| (electronic) | No per creditor/image charge |

## ON-LINE CLAIM FILING SERVICES

| | |
|---|---|
| On-Line Claim Filing | $600 per 100 claims filed |

## CALL CENTER SERVICES

| | |
|---|---|
| Standard Call Center Setup | $1,250 **WAIVED** |
| Call Center Operator | $75 per hour |
| Voice Recorded Message | $0.34 per minute **WAIVED FIRST 3 MONTHS** |
| Support/Maintenance | $100.00 per month **WAIVED** |

---

[3]   An additional $0.10 is charged per image for optical character recognition imaging.

13



## CRISIS COMMUNICATION

    Communication Counselor                $250.00 per hour

## DISBURSEMENT SERVICES

    Check and/or Form 1099             Quoted at time of request

    Record to Transfer Agent           Quoted at time of request