1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF NEW YORK

3    Case No. 13-74303-ast

4    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5

6    In the Matter of:

7

8    PERSONAL COMMUNICATIONS DEVICES, LLC,

9

10            Debtors.

11

12    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13

14                    U.S. Bankruptcy Court

15                    Alfonse M. D'Amato Federal Courthouse

16                    290 Federal Plaza

17                    Central Islip, New York

18

19                    August 21, 2013

20                    11:06 AM

21

22

23    B E F O R E :

24    HON ALAN S. TRUST

25    U.S. BANKRUPTCY JUDGE

1    Motion to Use Cash Collateral (Motion of Debtors for Interim

2    and Final Orders (A) Authorizing the Debtors to Obtain Post-

3    Petition Financing and to Grant Security Interests and

4    Superpriority Administrative Expense Claims Pursuant to 11

5    U.S.C. 105(a), 364(c); (B) Authorizing the Debtors to Use

6    Cash Collateral; (C) Modifying the Automatic Stay Pursuant

7    to 11 U.S.C. 362; (D) Granting Adequate Protection Pursuant

8    to 11 U.S.C. 361 and 363; and (E) Scheduling a Final Hearing

9    Pursuant to Bankruptcy Rule 4001) filed by Emanuel C. Grillo

10   on behalf of Personal Communications Devices, LLC [4]

11

12   Motion to Authorize/Direct (Motion of the Debtors for Entry

13   of Interim and Final Orders Authorizing the Debtors to (I)

14   Pay Prepetition Personnel Wages, Salaries, and Other

15   Compensation; (II) Reimburse Prepetition Personnel Business

16   Expenses; (III) Make Payments for Which Prepetition Payroll

17   Deductions Were Made; (IV) Continue Employee Benefit

18   Programs; (V) Pay Workers Compensation Obligations; and (VI)

19   Pay All Costs and Expenses Incident to the Foregoing) Filed

20   by Emanuel C. Grillo on behalf of Personal Communications

21   Devices, LLC [5]

22

23

24

25

1    Motion to Authorize/Direct (Motion of the Debtors for

2    Interim and Final Orders Authorizing the Debtors to (I)

3    Continue Using Debtors Bank Accounts and Cash Management

4    System, and (II) Honor Certain Prepetition Obligations

5    Related Thereto) Filed by Emanuel C. Grillo on behalf of

6    Personal Communications Devices, LLC [6]

7

8    Motion for Continuation of Utility Service (Motion of the

9    Debtors for Interim and Final Orders (A) Prohibiting Utility

10    Companies from Discontinuing, Altering, or Refusing Service,

11    (B) Deeming Utility Companies to Have Adequate Assurance of

12    Payment, and (C) Establishing Procedures for Resolving

13    Requests for Additional Assurance) Filed by Emanuel C.

14    Grillo on behalf of Personal Communications Devices, LLC [7]

15

16    Motion to Authorize/Direct (Motion of the Debtors for Entry

17    of Interim and Final Orders (I) Authorizing, But Not

18    Directing, the Debtors to (A) Maintain and Administer

19    Customer Programs and (B) Honor Related Prepetition

20    Obligations to Customers and (II) Authorizing, But Not

21    Directing, Financial Institutions to Honor All Related

22    Payment Requests) Filed by Emanuel C. Grillo on behalf of

23    Personal Communications Devices, LLC [8]

24

25

1    Motion for Joint Administration of Case 13-74303 with

2    Case(s) 13-74304 Filed by Emanuel C. Grillo on behalf of

3    Personal Communications Devices, LLC [3]

4

5    Motion to Authorize/Direct (Motion of the Debtors for an

6    Order (1) Extending the Debtors' Time to File Schedules and

7    Statement of Financial Affairs, (2) Authorizing the Debt to

8    File a Consolidated List of the Debtors 30 Largest Unsecured

9    Creditors, (3) Waiving the Requirement of E.D.N.Y. 1007-1

10   That the Debtors File a List of Creditors, (4) Authorizing

11   the Debtors to Mail Initial Notices and (5) Authorizing the

12   Debtors to Use Prepetition Business Forms) Filed by Emanuel

13   C. Grillo on behalf of Personal Communications Devices, LLC

14   [9]

15

16   Hearing on Application to Employ Epiq Bankruptcy Solutions,

17   LLC, as Notice and Claims Agent (Application of the Debtors

18   for Entry of an Order Authorizing the Employment and

19   Retention) Filed by Emanuel C. Grillo on behalf of Personal

20   Communications Devices, LLC [12]

21

22

23

24

25

1   Motion to Authorize/Direct (Ex Parte Motion of the Debtors

2   to Shorten Time with Respect to Hearing on Debtors' Motion

3   for Entry of Order Approving Bidding Procedures Relating to

4   Sale of the Debtors' Assets; (II) Approving Bid Procedures;

5   (III) Scheduling a Hearing to Consider the Sale; (IV)

6   Approving the Form and Manner of Notice of Sale by Auction;

7   (V) Establishing Procedures for Noticing and Determining

8   Cure Amounts; and (VI) Granting Related Relief) Filed by

9   Emanuel C. Grillo on behalf of Personal Communications

10  Devices, LLC (RE: Related document(s) 10 Motion to Sell

11  filed by Debtor Personal Communications Devices, LLC) [11]

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach, CERT*D-397

1    A P P E A R A N C E S :

2    GOODWIN PROCTER, LLP

3          Attorneys for Debtors

4          The New York Times Building

5          620 Eighth Avenue

6          New York, New York 10018

7

8    BY:   EMANUEL C. GRILLO, ESQ.

9

10   TOGUT, SEGAL & SEGAL, LLP

11          Co-counsel to Debtors

12          One Penn Plaza

13          New York, New York 10119

14

15   BY:   FRANK A. OSWALD, ESQ.

16

17   LATHAM & WATKINS, LLP

18          Attorneys for DLJ Investment Partners

19          53rd at Third, 885 Third Avenue

20          New York, New York 10022

21

22   BY:   ADAM J. GOLDBERG, ESQ.

23

24

25

1    EDWARDS WILDMAN PALMER, LLP

2         Attorneys for JPMorgan Chase

3         111 Huntington Avenue

4         Boston, Massachusetts 02199

5

6    BY:  DAVID L. RUEDIGER, ESQ.

7         CHARLES L. GLERUM, ESQ.

8

9    EDWARDS WILDMAN PALMER, LLP

10        Attorneys for JPMorgan Chase

11        750 Lexington Avenue

12        New York, New York 10022

13

14   BY:  PAUL J. LABOV, ESQ.

15

16   SILVERMAN ACAMPORA

17        Attorneys for Quality One Wireless, LLC

18        100 Jericho Quadrangle

19        Suite 300

20        Jericho, New York 11753

21

22   BY:  ADAM L. ROSEN, ESQ.

23

24

25

1    MUNSCH HARDT

2         Attorneys for Quality One Wireless, LLC

3         3800 Lincoln Plaza

4         500 North Akard Street

5         Dallas, Texas 75201

6

7    BY:  JOSEPH J. WIELEBINSKI, ESQ.

8

9    UNITED STAETS DEPARTMENT OF JUSTICE

10   OFFICE OF THE UNITED STATES TRUSTEE

11        Attorneys for U.S. Trustee

12        560 Federal Plaza

13        Central Islip, New York 11722

14

15   BY:  ALFRED M. DIMINO, ESQ.

16

17   APPEARING TELEPHONICALLY:

18   GARY EISENBERG

19   MAX TUCKER

20   JASPREET MAYALL

21   ERIC WILSON

22   JAMIE WELTON

23   KIMBERLY COHEN

24   MARK HAUT

25

1                    P R O C E E D I N G S

2           THE CLERK:  Case Number 13-74303, Personal

3    Communications Device, LLC.

4           THE COURT:  I'll take appearances, please, first

5    in the courtroom.

6           MR. GRILLO:  Sure.  If I may begin, Your Honor,

7    Emanuel Grillo, a member of the firm of Goodwin Procter, LLB

8    -- LLP, proposed counsel -- co-counsel to the debtors and

9    debtors-in-possession.  With me is our co-counsel, Mr. Frank

10   Oswald.

11          THE CLERK:  Sir, you have to state your name for

12   the record.

13          MR. OSWALD:  Good morning, Your Honor.  Frank

14   Oswald, Togut, Segal & Segal.  As Mr. Grillo said, we're

15   proposed co-counsel for the debtors.

16          THE COURT:  All right.

17          MR. LABOV:  Good morning, Your Honor.  Paul Labov,

18   Edwards, Wildman, Palmer on behalf of JPMorgan Chase.  With

19   me this morning, Your Honor, are Dave Ruediger and Charlie

20   Glerum, both of Edward, Wildman, Palmer.  Mr. Ruediger has

21   been moved in. Mr. Glerum, we anticipate moving him in

22   shortly after the hearing.

23          MR. GLERUM:  Good morning, Your Honor.

24          MR. RUEDIGER:  Good morning.

25          THE COURT:  Good morning.  For Chase.

1          MR. GLERUM:  For Chase.

2          MR. OSWALD:  Yes.

3          THE COURT:  All right.

4          MR. DIMINO:  Good morning, Judge.  Alfred Dimino

5     for the Office of the United States Trustee.

6          MR. WIELEBINSKI:  Good morning, Your Honor.  I'm

7     Joe Wielebinski.  I'm with the law firm of Munsch Hardt in

8     Dallas, Texas.  I think you entered an order this morning on

9     our appearance.  With me is my local counsel Adam Rosen with

10    Silverman Acampora.

11         Mr. ROSEN:  Good morning, Your Honor.  Adam Rosen,

12    Silverman Acampora.

13         THE COURT:  Okay.  And you all are in for --

14         MR. WIELEBINSKI:  I'm sorry, Your Honor.  We

15    represent the Quality One Wireless, the --

16         THE COURT:  Stalking horse.

17         MR. WIELEBINSKI:  Yes, sir.

18         THE COURT:  All right.  Any other appearances in

19    the courtroom?

20         MR. GOLDBERG:  Good morning, Your Honor.  Adam

21    Goldberg of Latham & Watkins on behalf of DLG Investment

22    Partners, which is also referred to as Credit Suisse in

23    these cases.

24         UNIDENTIFIED SPEAKER:  I think we're to the phone

25    now.

1          THE COURT:  All right.  I'll take appearances on

2     the telephone.

3          MR. EISENBERG:  Gary Eisenberg, Perkins Coie on

4     behalf of HTC.

5          THE COURT:  Others on the phone.

6          MR. WELTON:  Jamie Welton --

7          MR. TUCKER:  Max --

8          MR. WELTON:  Go ahead.

9          MR. TUCKER:  Max Tucker on behalf of Pine Bridge

10    Investments.

11         MR. MAYALL:  Good morning, Your Honor.  Jaspreet

12    Mayall, Certilman Balin, on behalf of Reliance

13    Communications, LLC.

14         MR. WILSON:  Good morning, Your Honor.  Eric

15    Wilson of Kelley Drye just monitoring.

16         MR. WELTON:  Jamie Welton with Lackey Hershman on

17    behalf of the Richards Group, Inc., and Richards Partners.

18         MS. COHEN:  Kimberly Cohen on behalf of U.S. Bank.

19         MR. HAUT:  Mark Haut from Norton, Rose Fulbright,

20    just monitoring.

21         THE COURT:  Anyone else?

22         All right.  Mr. Grillo.

23         MR. GRILLO:  Yes.  Thank you, Your Honor.

24         Again, Emanuel Grillo of the firm Goodwin Procter,

25    proposed co-counsel to the debtors and debtors-in-

1    possession.

2         First, Your Honor, a thank you to the Court and to

3    your chambers for accommodating us this morning.  Having

4    filed the case very late Monday night, we were pleased that

5    the Court was able to hear us for our first day hearings

6    this morning.  So a thanks goes to the Court to begin.

7         Before I get to the background to the filings, I

8    just would like to introduce a couple of other people who

9    are in the courtroom with us today.  George Appling, the CEO

10   of Personal Communications.  If you could maybe stand,

11   George, please.  With George is our CFO and affiant today,

12   Mr. Ray Kunzmann, and our chief operating officer, Jorge

13   Garcia.

14        THE COURT:  All right.

15        MR. GRILLO:  Okay.  Your Honor, we're here today

16   as the culmination of approximately six to nine months of

17   negotiations regarding the re -- ultimate restructuring of

18   Personal Communications Devices.

19        By way of background, PCD is located in

20   neighboring Hauppauge, approximately six miles away.  We

21   employ 189 people, 130 of which are employed here locally.

22        What PCD does is it distributes programs and

23   services wireless communication devices.  It effectively

24   serves as an intermediary for the domestic wireless

25   carriers, the AT&T, the Verizon's, the Sprint's of the

1    world, and the smaller foreign device suppliers and

2    producers of the products, so Walway (ph), Pantech, Alcatel

3    and others.

4          In a variety of shapes and forms the company goes

5    back to 1984 and was acquired by affiliates of Pine Bridge

6    Investments in 2008.  There are several non-debtor entities

7    that -- that the operating entity owns, and those are

8    located in Canada, Brazil and Mexico.  They're not the

9    subject of any proceeding, and as set forth in the Kunzmann

10   affidavit, they don't have any material operations or

11   anything like that.  Some have a little bit of inventory.

12   There are a few employees and we'll talk about that in the

13   context of the first day hearings.

14          There are five -- five classes of interests that

15   are outstanding.  One class of interests is held by the

16   former CEO, Mr. Philip Christopher.  We'll talk about Mr.

17   Christopher a little bit when we describe some of the

18   background leading up to the cases.

19          In terms of the company's financial condition, in

20   2012 PCD generated approximately $1.6 billion (sic) in

21   revenue, but suffered a loss of 16.9 million.  Historically,

22   it had generated EBITDA of approximately $50 million a year.

23   And its capital structure, as it exists right now, is that

24   we have a first lien loan which is led by JPMorgan Chase as

25   administrative agent for which the Edwards Wildman firm is

1    here on behalf of counsel, and that's approximately $30

2    million outstanding.  The loan balance moves from day to day

3    depending on receipts and collections.

4          The -- there's also second lien debt in the

5    approximate aggregate amount of $71 million, and that's held

6    -- well, U.S. Bank is the agent, and I heard their counsel

7    on the phone.  And counsel for DLJ Investment Partners, who

8    came up and introduced himself before, Mr. Goldberg, is here

9    and, also, Pine Bridge has counsel on the phone as well, Mr.

10   Tucker.  And, again, that -- that amount is $71 million.

11         There's also significant trade debt in these

12   cases, Your Honor.  The trade debt is probably subject --

13   while subject to some disputes and contingencies and the

14   like, it's probably about $200 million in the aggregate.

15         When we talk about what the reasons for the filing

16   were, there's been a shift in the wireless communications

17   device market.  Over the last couple of years the market has

18   really concentrated -- and I guess as a user of the cell

19   phone I'm probably, I guess, you know, one of the reasons

20   why as I carry my Apple device and the client is probably

21   not very happy about that.  But I'm stuck under a contract

22   and there's nothing I can do for -- for the moment.  But in

23   any event, the mobile device market has shifted whereas the

24   dominant players, Apple and Samsung, presently hold about 76

25   percent of the market.

1         PCD bears for its suppliers inventory risk and in

2    2012 accumulated significantly higher amounts of inventory

3    when the inventory for the devices that it sells did not

4    move in the ways that it had moved historically.  The

5    difficulties of the company were compounded by the departure

6    of its prior CEO, Mr. Philip Christopher, in 2 -- September

7    of 2012 who took a third of the workforce with him and

8    attempted to set up a competing entity at that time.  It

9    forced the company to take a number of steps, including the

10   implementation of stay bonuses and the like to keep a core

11   of the company together.

12         But, ultimately, what this case is about -- what

13   these cases are about, Your Honor, is that we are here to

14   hopefully implement a sale.  We have spent a significant

15   amount of time marketing the company, going back to February

16   of this year, to try and find a buyer to save the enterprise

17   value, to preserve the jobs, and have the company continue

18   at least in some form on a go forward basis.

19         What we won't present today, but we'll ask for a

20   hearing date on, is a bid procedures hearing a couple of

21   weeks out and then look to have an extended bidding process

22   for about 30 days after that.  Again, we'll ask for a

23   hearing date for that motion at the appropriate time.  But

24   the bottom line is that's what this case really comes down

25   to.

1              Under its current capital structure, the company

2      wasn't going to be able to continue to exist and really

3      needed to start anew.  We were fortunate that we have

4      identified and signed an agreement with a stalking horse

5      buyer.  And, again, at the appropriate time we'll present

6      the specifics on that deal, but that's really the crux of

7      why we're before the Court today.

8              We have a number of -- of motions, typical sort of

9      first day pleadings that we would like Your Honor to

10     consider.  They've been filed with the Court.  We sent a

11     binder of those pleadings in substantially final form to the

12     U.S. Trustee on Friday.  We contact -- we spoke with Mr.

13     Dimino yesterday.  My colleague, Matt Curro, spoke with Mr.

14     Dimino.  We have received some comments.  I think we've

15     accommodated pretty much everything.  I'm sure Mr. Dimino,

16     if he has any continuing issues, we will -- we'll -- we'll

17     hear about that today.

18             But, again, there's a series of first day motions

19     and I would like to take the Court through them, if -- if

20     the Court would like me to do so, or if the Court has

21     questions about the background.  I should note that the

22     background is summarized in actually more detail in the

23     Kunzmann affidavit.  At the end of the hearing I'll ask the

24     Court to accept that as a proffer of evidence, and Mr.

25     Kunzmann is in the courtroom if parties would look to cross-

1    examine him.  But we would offer that up as his direct

2    testimony at the appropriate time.

3            THE COURT:  Just very basic.  In terms of the

4    business structure, there's no -- the debtor doesn't go into

5    office or other environments and install equipment.  It --

6    it sells handheld devices and then arranges for service with

7    carriers who are FCC and state authorized to provide what

8    used to be called dial tone.

9            MR. GRILLO:  I think that's correct, Your Honor.

10   I -- yes.  We basically import the devices into the U.S.

11   And so when you go to your local Verizon or AT&T store and

12   they have a display of all of their devices, once you get

13   past the Apples and the Samsungs you see all of our products

14   that are out there.  We reserve slots with carriers, you

15   know, for purposes of display, you know, as any other sort

16   of wholesaler would, in effect, and we provide servicing for

17   that and we also provide programming for those devices.

18            And, effectively, by operating as an intermediary,

19   it relieves the burden on the carriers who don't have to

20   deal with as many producers and it facilitates, you know,

21   for the -- for the suppliers it facilitates access to the

22   U.S. markets.  And that's really the core of the business.

23            THE COURT:  All right.

24            All right.  Well, why don't we start with the

25   easier of the motions.

1          MR. GRILLO:  That would be joint administration in

2     my book, Your Honor, if I may.

3          THE COURT:  All right.

4          MR. GRILLO:  Your Honor, we have -- we have two

5     cases, Personal Communications Devices, LLC, and Personal

6     Communication Devices Holding, LLC.  Holdings is the 100

7     percent owner of Devices.  We -- you know, as the operations

8     essentially take place through Devices, LLC, we think it

9     makes sense to administer the two cases together, and we

10    would submit that motion for Your Honor's consideration.

11          THE COURT:  All right.

12          Mr. Dimino.

13          MR. DIMINO:  Judge, the United States Trustee has

14    reviewed the application and has no objection to the entry

15    of that order.

16          THE COURT: All right.  All right.  Then the Court

17    will enter an order authorizing joint administration.  So --

18          MR. GRILLO:  We're off to a good start.  Thank

19    you, Your Honor.

20          THE COURT:  You're doing great so far.  You're one

21    for one.

22       (Laughter)

23          MR. GRILLO:  Okay.  Thank you, Your Honor.

24          THE COURT:  Pick -- pick the next easiest motion

25    on the --

1          (Laughter)

2                  THE COURT:  -- on the menu and I won't lock you

3      into a two-year contract on it.

4                  MR. GRILLO:  Excellent.

5                  How about I take an important motion for our

6      company, which is the wage motion, which I -- I don't think

7      is controversial in any way.

8                  Your Honor, the wage motion is -- is sort of a

9      typical wage motion in the sense that it offers the -- the

10     debtors offer comprehensive wages and benefits packages to

11     their employees who are obviously critical to our success.

12     We're looking to maintain the wages and benefits without --

13     without interruption.

14                 What we're seeking to do is to pay in the

15     aggregate, and this is all included as part of the budget,

16     $512,000 in prepetition amounts for accrued, but unpaid

17     wages, reimbursable expenses due to employees, and amounts

18     owed to independent contractors and temporary workers.  The

19     independent contractors are individuals, Your Honor, who do

20     work not on an employee basis, but through contract work.

21     And we would look to maintain that.

22                 We note, Your Honor, that this amount is different

23     than what we put in the motion.  We had anticipated filing

24     earlier on Monday, and so we have now increased it by

25     approximately $55,000 for the additional day of wages that

1    accrued because we didn't file until midnight on Monday as

2    opposed to when we thought we were going to file, which was,

3    you know, before the opening of business.  So that's a -- a

4    modification.

5            I would note, Your Honor, the debtors are not

6    seeking to pay any single employee in excess of the

7    507(a)(4) priority cap, and we would submit this motion to

8    Your Honor for your consideration.

9            THE COURT:  All right.

10           Mr. Dimino.

11           MR. DIMINO:  Judge, the only question I have is in

12   terms of the payments and the individuals who are receiving

13   payments, are any of those officers and directors?

14           MR. GRILLO:  Yes.  I believe there -- the officers

15   and directors are included.

16           MR. DIMINO:  I would like to -- I have no

17   objection to the payment and the other relief that's

18   requested with regard to all of the employees other than the

19   officers and directors until I can get a breakdown of just

20   who they are and how much they're getting.

21           MR. GRILLO:  We're happy to submit that breakdown

22   to the U.S. Trustee, Your Honor.

23           MR. DIMINO:  And assuming that we have no problem

24   with that, we can submit the order.

25           THE COURT:  All right.  And, again, all -- even at

1    the officer and director level, all individuals are within

2    the 507(a)(4) cap.

3              MR. GRILLO:  Inclusive of the officers and

4    directors.  Yes.  That's --

5              THE COURT:  Including.

6              MR. GRILLO:  -- correct, Your Honor.

7              THE COURT:  All right.  Any other party in

8    interest wish to be heard on the wage motion?

9              All right.  Then, again, subject to the breakdown

10   of the officer/director, if you'll go ahead and provide that

11   in -- well, any reason not to put that up on the docket of

12   the case?

13             MR. GRILLO:  To --

14             THE COURT:  In other words, not to --

15             MR. GRILLO:  -- to schedule --

16             THE COURT:  -- go ahead and file that schedule,

17   just put it up on the docket and then any party in interest

18   can review it.

19             MR. GRILLO:  I would rather not disclose

20   individual salary -- I mean, I'm happy to -- if -- if

21   somebody wants to ask me for it, I'm happy to provide it,

22   Your Honor.  I mean, anyone can -- you know, I would just

23   rather not post individual's salaries on the docket, if I

24   may.

25             THE COURT:  All right.  Then go ahead and send

1    that breakdown to the U.S. Trustee's Office.

2              MR. GRILLO:  Of course.

3              THE COURT:  And then when -- assuming they've

4    signed off on that aspect of it, when you upload the order

5    -- I know there's already been an order submitted, but go

6    ahead and upload the order showing an S/approved for entry

7    by the U.S. Trustee's Office.  That way the Court knows

8    they've made their review and they have no objection.  If

9    there is an objection to that portion of the wage motion,

10   then you'll need to notify the Court and we'll decide how to

11   take that up, although most likely, if there is an objection

12   to it, then I'll take that part of the wage motion up at the

13   final hearing on the DIP loan.

14             MR. GRILLO:  Understood, Your Honor.

15             THE COURT:  All right.  It's granted per the

16   terms.

17        (Pause)

18             THE COURT:  And for -- for purposes of the

19   debtors' internal workings, if the debtors want to submit an

20   order now that authorizes the prepetition wage and

21   compensation benefit payments to all other than the officers

22   and directors, we can enter that order now awaiting entry of

23   the other order.

24             MR. GRILLO:  Sure.

25             THE COURT:  Which -- whichever is preferable from

1    the debtors' standpoint.

2           MR. GRILLO:  I'm sure we'll submit an order

3    quickly.  We'll carve out the officers and directors, and

4    then we'll work with the U.S. Trustee and make sure that we

5    can submit a supplemental order on that --

6           THE COURT:  All right.  That --

7           MR. GRILLO:  -- if that works.

8           THE COURT:  -- will be fine.  All right.

9           You want to do cash management?

10          MR. GRILLO:  That's where I was going to go next,

11   Your Honor, if I may.

12          THE COURT:  All right.

13          MR. GRILLO:  Your Honor, this -- again, sort of

14   typical first day motion to maintain the debtors'

15   centralized cash management.  The cash -- centralized cash

16   management system is an important element, one, of the

17   operations of the business and, two, the relationship

18   between the debtors and its senior lenders in connection

19   with the asset based facility that forms the premise for the

20   post-petition financing.

21          With respect to comments that have been received

22   with the order, we understand that the U.S. Trustee has

23   asked that we mark our accounts as debtor-in-possession

24   accounts.  We've made that change to the uploaded ECF

25   system, the order that's there.  I would defer to Mr. Dimino

1    to see whether or not that resolves any issues that he may

2    have, but we certainly are prepared to mark our -- our

3    payment -- our checks, excuse me, and our invoices as

4    debtor-in-possession.

5            THE COURT:  All right.

6            Mr. Dimino.

7            MR. DIMINO:  Judge, that is -- that is fine with

8    the United States Trustee and that's what we did request.

9            The motion, however -- there are a number of these

10   motions and sometimes they -- they appear to overlap.  With

11   regard to the business forms, that is acceptable.  There's

12   also the request in terms of the bank accounts and the cash

13   management, and if that's included in this motion --

14           MR. GRILLO:  Yes.

15           MR. DIMINO:  -- then what we have requested and I

16   believe we have an agreement is that we will not consent to

17   the waiver of the 345 requirements, but we have agreed to

18   defer that for the 30 days or so --

19           MR. GRILLO:  That's correct.  Yes.

20           MR. DIMINO:  -- that has been requested.  So the

21   debtor will not be required to change over the bank accounts

22   to the debtor-in-possession accounts.  They may continue to

23   operate and use the existing accounts, and we will revisit

24   that issue during the 30 day period from now.

25           THE COURT:  All right.  So the checks will all be

1  legended (sic) debtor-in-possession, but not the business

2  forms?

3          MR. DIMINO:  No.  The business forms as well.

4          THE COURT:  The business forms as well?

5          MR. GRILLO:  That's fine.

6          THE COURT:  All right.

7          MR. DIMINO:  They won't be -- it won't be

8  necessary for them to move -- physically move the accounts

9  to the new debtor-in-possession accounts and it won't be

10  necessary to go out and have new forms printed.  They can

11  utilize whatever manual or other means to alter the existing

12  ones.

13          THE COURT:  All right.  And then we'll need to

14  visit or revisit the 345 issue at a later hearing.

15          MR. GRILLO:  That's --

16          MR. DIMINO:  That's correct.

17          MR. GRILLO:  -- correct.

18          THE COURT:  But it's otherwise operating status

19  quo.

20          MR. GRILLO:  Right.  Your Honor, I would note that

21  our -- our accounts are with JPMorgan Chase, which is an

22  approved depository for -- for -- under 345.

23          THE COURT:  I was waiting for someone to tell me

24  if JPMorgan Chase was not considered to be a safe depository

25  and I --

1        (Laughter)

2              THE COURT:  -- I wasn't -- you never know what

3    you're going to hear at a hearing.  So -- all right.

4              So then for carry along purposes, because we need

5    to docket control these issues, on that -- since that is a

6    portion of the cash management motion I will -- I will

7    docket that we're carrying that portion of the motion to the

8    next hearing which will be on -- the final hearing on the

9    DIP facility and, to not shock anybody, on the bid

10   procedures motion as well.  And we'll talk about the date

11   for that.

12             But the Court anticipates that would be on

13   September the 4th in the morning.

14             MR. DIMINO:  Judge, the United States Trustee

15   would not object to language in the order that would grant

16   the debtors the extension of time that they requested.

17             MR. GRILLO:  We appreciate that and we'll conform

18   the order accordingly, Your Honor.

19             THE COURT:  All right.  Yeah.  10:00.

20             Let's -- can we jump to the utility motion and

21   come back -- come back to the DIP motion at the end?

22             MR. GRILLO:  That's exactly --

23             THE COURT:  Save --

24             MR. GRILLO:  My --

25             THE COURT:  -- save this --

1          MR. GRILLO:  -- my outline follows yours, Your

2    Honor.

3          THE COURT:  For those of you who are following

4    along --

5          MR. GRILLO:  -- and I didn't even submit it that

6    way.

7          THE COURT:  -- we're going to build the suspense.

8    It's going to crescendo at the --

9       (Laughter)

10          THE COURT:  -- at the DIP hearing.

11          MR. GRILLO:  Fair enough, Your Honor.

12          The utilities motion made under Section 366 of the

13    Bankruptcy Code seeks to prohibit the utility companies from

14    discontinuing service.

15          With that, Your Honor, we would note that the

16    debtors spend approximately $43,000 per month on utilities.

17    The motion seeks to deem a deposit equal to 50 percent of

18    the debtors' estimated monthly utility bill as adequate

19    assurance and to establish procedures by which the utility

20    companies can contest their adequate assurance payments.

21          THE COURT:  What's -- what's the contemplated

22    objection period for the utility companies?  If I enter the

23    order now -- and Mr. Dimino is, I think, about to tell me

24    that his office doesn't view the utility motion as a first

25    day motion.  So I'll let him say that and then I'll --

1          (Laughter)

2                THE COURT:  -- then we'll come back to it.

3                MR. DIMINO:  Your Honor, the statute itself gives

4     a period of time and that it's not necessary to do that

5     today.  I believe it's the discretion of the Court to

6     determine.

7                THE COURT:  All right.

8                MR. GRILLO:  We -- we've submitted --

9                THE COURT:  It would seem --

10               MR. GRILLO:  -- 30 days, Your Honor, which --

11               THE COURT:  All right.  Well, the -- it -- the

12    Court's view is no less than 20, so my math is 30 is no less

13    than 20.  So a 30 day objection window would be fine.

14               So I'll grant the utility motion, again, with the

15    caveat that any of the utility providers will have 30 days

16    to object to the proposed provision of adequate assurance.

17    And those are cash money deposits.

18               MR. GRILLO:  Correct.

19               THE COURT:  All right.

20               MR. GRILLO:  Correct.

21               THE COURT:  Customer programs or do you want to go

22    to --

23               MR. GRILLO:  We're -- I'm -- we're in sync today,

24    Your Honor.

25               The customer programs --

1                THE COURT:  They gave us a list of the order of

2     the motions that everybody should have on the docket, so

3     it's -- there's --

4                MR. GRILLO:  Exactly.

5                THE COURT:  -- there's no greater magic than that.

6                MR. GRILLO:  I was hoping we would keep that

7     between us, Your Honor, but if you want to share that with

8     everyone.

9                THE COURT:  Well --

10          (Laughter)

11               THE COURT:  -- in the interest of full disclosure,

12    we're --

13               MR. GRILLO:  Absolutely.

14               THE COURT:  -- going on the same sheet of music so

15    far.

16               MR. GRILLO:  Excellent.

17               With respect to the customer programs, the motion

18    seeks to honor certain prepetition customer programs which

19    include warranty services provided by the debtors and other

20    programs.  These programs are critical to our ability to

21    continue to service the wireless carriers as the customers

22    rely on PCD to provide uninterrupted warranty and other

23    services.

24               We have two sets of programs:  A market

25    development fund program where PCD shares the cost with

1    certain customers of advertising and other incentive

2    programs just per a demand for services.  These programs

3    depend or change depending on the carrier from time to time.

4          We also provide warranty services with certain

5    third party service providers without which we couldn't

6    provide our warranty services.  Losing these venders would

7    cause a major disruption to PCD's warranty services and

8    protect -- and would damage the enterprise value of our

9    business.

10          What we're seeking to do as part of this, Your

11   Honor, is pay up to a million dollars on account of the

12   customer programs during the period between the interim and

13   the final order.  And we would submit that motion for Your

14   Honor's consideration subject to whether anyone else has any

15   thoughts.

16          THE COURT:  All right.

17          Mr. Dimino.

18          MR. DIMINO:  Judge, the United States Trustee has

19   no objection.  It appears to be a reasonable request to

20   continue the business in its normal form and, hopefully,

21   continue the value of the -- of the business.

22          THE COURT:  All right.  Any other party in

23   interest on the customer program warranty motion?

24          So what is the contemplated time frame, then?  You

25   stated about a million dollars until another hearing date.

1    What is the -- what's the contemplated time frame?

2             MR. GRILLO:  I think we were contemplating sort of

3    out -- if Your Honor were to set like an omnibus hearing or

4    something like that approximately 30 days out, I think that

5    -- 21 days?

6             UNIDENTIFIED SPEAKER:  Is the million dollars.

7             MR. GRILLO:  The million dollars gets us through

8    21 days, Your Honor.

9             THE COURT:  All right.  So then it would probably

10   make sense to carry the balance of the customer program

11   motion to the September -- to the September 4.  That's the

12   next contemplated date?

13            MR. GRILLO:  That would be the next contemplated

14   date in our minds, Your Honor.  Yes.

15            THE COURT:  All right.

16            All right.  So then the Court will grant the

17   customer program motion authorizing up to the million

18   dollars of interim expense pending further hearing and that

19   will be on September 4th.  That will be at 10:00, by the

20   way.

21            MR. GRILLO:  Okay.

22            THE COURT:  September 4th at ten, and, again,

23   having injected that the Court is aware of two sets of

24   holidays the first week in September and we're trying to

25   bridge you in in that first week given the rest of the

1    dynamics of the case.

2              So the plan is to get you all in early on

3    September 4th, have everybody out back on the roads to get

4    to wherever they need to be before the sun falls.

5              MR. GRILLO:  We appreciate Your Honor's

6    accommodation as far as that goes.  Thank you so much.

7              THE COURT:  All right.

8         (Pause)

9              THE COURT:  You want to jump to 12 and take the

10   schedule extensions?

11             MR. GRILLO:  Yes.

12             THE COURT:  All right.

13             MR. GRILLO:  The scheduling extensions are among

14   the ministerial motions that we have made to the Court.

15   We've obviously filed a consolidated list of creditors and

16   would look for another -- I think we've agreed to 30 days

17   with the U.S. Trustee's Office.

18             UNIDENTIFIED SPEAKER:  September 16th.

19             MR. GRILLO:  September 16th for the filing of our

20   schedules.

21             THE COURT:  September 16th for the schedules?

22             MR. GRILLO:  Yes.

23             THE COURT:  All right.  Mr. Dimino.

24             MR. DIMINO:  Judge, that -- that date is fine.  We

25   have a 341 meeting scheduled for the 20th of September, so

1    that would give us and other creditors and hopefully a

2    committee ample opportunity to review them in preparation

3    for the 341 meeting.

4              THE COURT:  All right.  So then the motion for

5    extension of time of the debtors' schedules is granted as

6    modified.  Schedules to be filed by September 16, 2013.

7              MR. GRILLO:  Thank you, Your Honor.  And that's --

8    that's in the up -- the form of the uploaded order.  That

9    agreement has already been reached in the one that we've

10   already submitted.

11             THE COURT:  All right.  Very well.

12             Epiq.

13        (Pause)

14             THE COURT:  All right.  You want to take up the

15   Epiq motion?

16             MR. GRILLO:  Sure.

17             Your Honor, given the size and the scope of the

18   case and the number of creditors we expect somewhere to be

19   1,000 -- between 1,000 and 2,000 creditors.  For that

20   reason, Your Honor, we have sought the Court's authorization

21   to retain Epiq Bankruptcy Solutions as our notice and claims

22   agent under 28 U.S.C. Section 156(c).

23             Prior to the filing of the case, we consulted with

24   the clerk's office and received and incorporated their

25   comments into the 156 application and order prior to filing.

1    Epiq has a long history of working with this Court and

2    others from what we understand.  We also submitted this to a

3    bid process before the bankruptcy case.  We sought three

4    bids which were substantially identical from three separate

5    providers of this service and ultimately settled on Epiq to

6    provide these services to the debtors.

7            The debtors will also separately file an

8    application under 327(e) seeking authorization to retain and

9    employ them as the administrative advisor, to the extent

10   that we need administrative tasks performed outside the

11   scope of 28 U.S.C. 156.  And I imagine what we'll do is

12   we'll have all of the retention applications on at a later

13   hearing and we would bring those forward and we'll bring

14   Epiq along as part of that as well.

15           THE COURT:  All right.

16           Mr. Dimino.

17           MR. DIMINO:  Judge, the United States Trustee has

18   no objection.

19           THE COURT:  All right.  Then the Court will grant

20   the motion to retain Epiq as the claims agent.  That order

21   has been uploaded?

22           MR. GRILLO:  I believe it has.

23           THE COURT:  All right.

24           All right.  Why don't we go to Number 10, then,

25   the motion to shorten -- or establish a hearing date for bid

1    procedures?

2            MR. GRILLO:  Yes.

3            THE COURT:  Did you have a different order?

4            MR. GRILLO:  I did not, Your Honor.

5            THE COURT:  All right.

6            MR. GRILLO:  Item 10, Your Honor, I think, took

7    some of the surprise out of this by offering us September

8    4th, so I think that's -- I think that's fine for the

9    hearing and it's consistent with what the parties have

10   indicated.

11           I would just ask the Court to ask the parties if

12   anyone has any objection to that date as there are timelines

13   that are set forth both in the DIP papers and in the

14   application itself.  I would just like to get the formal

15   consent of our DIP lenders and our bidder to make sure that

16   date works.

17           THE COURT:  All right.  We'll start in the

18   courtroom, then.  Any -- with -- with the following

19   predicate, that I have a date after September 4th, but not

20   before, does anyone object to the bid procedure hearing

21   being on September 4th?

22           MR. GLERUM:  Charlie Glerum, Your Honor, for

23   JPMorgan Chase.  That's fine with us so long as Quality One

24   is onboard with the extension as well.

25           Thank you.

1        THE COURT:  All right.  Mr. Wielebinski.

2        MR. WIELEBINSKI:  Your Honor, I didn't hear what

3    you said right after Mr. Grillo talked.  I had started

4    whispering to him.  Did you say you're not available --

5        THE COURT:  I have a date after September 4th, but

6    not before.  So that's the predicate to the hearing being on

7    September 4th in the morning.

8        MR. WIELEBINSKI:  We -- we appreciate you setting

9    it on September 4th, Your Honor.  That will work for us at

10    10:00.  Yes.

11        THE COURT:  All right.

12        Other -- any other party in interest in the

13    courtroom?

14        All right.  And on the telephone?

15        MR. EISENBERG:  Your Honor, this is Gary Eisenberg

16    from Perkins Coie.  We don't have any issue with the setting

17    of the date on -- on September 4th.  I mean, obviously, we

18    would prefer a little more time, but I understand that given

19    the exigencies if we're the DIP lender and -- and everybody

20    else's, that that may not be realistic.

21        The question that I have is whether that will

22    change the objection deadline date.  I think originally it

23    was proposed to be the 29th and I was wondering if w would

24    be able to get the extra day on that.

25        MR. GRILLO:  We have no objection to extending the

1     objection date consistent with the hearing, Your Honor.

2             THE COURT:  All right.  Well, we're going to need

3     objections filed by no later than noon on August 30th.  I

4     think the request was to push the objection deadline back

5     from the 29th to the 30th, but we would like to have those

6     objections filed by noon on the 30th because if there are

7     any, we obviously need -- you all need time to look at them.

8     We need time to review them as well.  So we'll set an

9     objection deadline at noon on August 30th.

10            Is there any additional service that the debtor

11    contemplates making on that motion?  There was limited

12    service on the first days, or did the -- did the debtors

13    serve out the bid procedure motion more broadly?

14            MR. GRILLO:  Not as of -- we did serve it --

15            UNIDENTIFIED SPEAKER:  It ended up being served.

16            MR. GRILLO:  I'm sorry.

17            UNIDENTIFIED SPEAKER:  It ended up being served.

18            MR. GRILLO:  It ended up being served to everyone.

19    Okay.  Everyone -- the top 30 has it?

20            UNIDENTIFIED SPEAKER:  The top 30.

21            MR. GRILLO:  The top 30 have it, Your Honor.

22            THE COURT:  All right.

23            MR. GRILLO:  So we did send it out and we will

24    send out the notice to -- we will give it to Epiq to get

25    that out to all creditors.  We'll do that today.

1          THE COURT:  All right.  Mr. Dimino.

2          MR. DIMINO:  Judge, just to make the Court aware,

3      this morning my office is in the process of sending out

4      solicitation for an organizational meeting for the

5      creditors' committee to be held next Monday at 11 a.m. in my

6      office.  We would anticipate that (indiscernible) are

7      unaware of that we would be able to form a committee

8      hopefully and that committee would then have time to also

9      review --

10          UNIDENTIFIED SPEAKER:  Hello?

11          MR. DIMINO:  -- and advise the Court when we come

12      back.

13          THE COURT:  All right.  So that -- that formation

14      meeting is this Monday, August 26th?

15          MR. DIMINO:  The 26th at 11 a.m. in Room 561 here

16      in this building.

17          THE COURT:  All right.  All right.  So then go

18      ahead and get the notice out to all creditors and parties in

19      interest through Epiq.  Bid procedure hearing September 4 at

20      10; objection deadline August 30th at noon; and then if a

21      committee forms and they ask for more time we'll need to

22      figure out how to address that.

23          MR. GRILLO:  We will.

24          THE COURT:  All right.

25          So then go ahead and also submit an order on the

1   shortening time motion.

2           MR. GRILLO:  We will.

3           THE COURT:  All right.

4       (Pause)

5           THE COURT:  All right.  That, for today, leaves us

6   with the DIP motion?

7           MR. GRILLO:  I think it does.  I think we have --

8   Your Honor, just since we're doing dates, if I may, I

9   presume after the formation of a committee we're going to

10  want to have dates for the retention hearing.  We have a

11  shippers and warehouseman's motion and the like.  Just to

12  sort of jump ahead a little bit with the -- with the

13  auction, we're expecting to ask for about 30 days.  So my

14  guess is if Your Honor wants to have an omnibus hearing

15  where things would ultimately be carried to, if we want to

16  set that now and I can put the retentions on for that date.

17          I just -- you know, it would be separate from the

18  auction, just so that this way --

19          THE COURT:  We're presently looking at October 16

20  as a hearing to potentially confirm the results of the

21  auction sale.  That's within a couple of days of the

22  anticipated, or at least requested timeline for the parties,

23  but if -- for the parties' benefit and the interest of going

24  green, I'm contemplating holding those hearings in Brooklyn.

25          MR. GRILLO:  Okay.

1          THE COURT:  So that you all can travel less and

2     can --

3          MR. GRILLO:  I live 25 minutes from here, Your

4     Honor.  I'm happy to come here.

5          THE COURT:  Well, if you do it by show --

6          MR. GRILLO:  But I think for everyone else --

7          THE COURT:  -- of hands --

8          MR. GRILLO:  -- it's -- yes.

9          THE COURT:  -- who are in the city.  But it seems

10    that this would be a case that would be staffed largely out

11    of the city and/or through --

12          MR. GRILLO:  It is.

13          THE COURT:  -- the airports and, again, given that

14    -- the number of traveling attorneys I'm -- I'm happy to go

15    to Brooklyn for those hearings.  I'm happy to have them

16    here, also.  So --

17          MR. GRILLO:  I think --

18          UNIDENTIFIED SPEAKER:  That would be great.

19          MR. GRILLO:  I think I would ask the parties --

20          UNIDENTIFIED SPEAKER:  Two hours for me, but don't

21    --

22        (Laughter)

23          UNIDENTIFIED SPEAKER:  -- don't worry about my

24    comfort.

25          MR. GLERUM:  Whatever's convenient for the Court

1     will be fine with JPMorgan.  Thank you.

2              THE COURT:  All right.

3              MR. WIELEBINSKI:  Your Honor, is there any way

4     that that hearing on the sale could be accelerated; that --

5     it is a few days difference, but we are desperately trying

6     to keep to the very heavily negotiated time deadline, time

7     schedule that -- that we established in the APA.  I think

8     what I have, according to my calculation, is the last day

9     for the hearing, the agreed upon hopeful deadline would be

10    October 8th.

11             THE COURT:  Isn't that also proposed as the

12    auction date itself?

13             MR. WIELEBINSKI:  I -- I think the auction date,

14    Your Honor -- again, according to my timeline -- would be

15    October 3rd as the outside date.

16             Now you -- you have moved the hearing on bidding

17    procedures by one day, so I -- I guess my dates would move

18    up one more day, too.  So instead of October 8th, it would

19    be October 9th and October 4th.

20             THE COURT:  All right.  Hang on one second.

21        (Pause)

22             THE COURT:  All right.  I can -- I can move those

23    hearings up to October 10th.

24             MR. WIELEBINSKI:  Your Honor, I -- I think that

25    would be much better and I appreciate that accommodation.

1          THE COURT:  Well, it doesn't --

2          MR. WIELEBINSKI:  And Brooklyn --

3          THE COURT:  -- mean I'm going to approve the sale.

4    It's just --

5       (Laughter)

6          MR. WIELEBINSKI:  That I understand, Your Honor.

7    Brooklyn's fine with us.  It probably would save some time

8    and my clients are also out of town.

9          THE COURT:  All right.  So --

10          UNIDENTIFIED SPEAKER:  That would be great.

11          THE COURT:  -- just in terms of consensus, does --

12    is Brooklyn closer for most of you all than my regular

13    courthouse?  And traditionally when we do that, Mr. Dimino,

14    the U.S. Trustee's Office typically appears by video from

15    here, so we would have that set up the same way.

16          MR. DIMINO:  Yes, Judge.  And the camera does add

17    ten pounds.  So --

18       (Laughter)

19          UNIDENTIFIED SPEAKER:  Well, then I'm not doing

20    it.

21          THE COURT:  Well, that's why I don't have it

22    pointed at me.

23          All right.  Then any consensus on the telephone?

24          MR. EISENBERG:  Thank you, Your Honor.  This is

25    Gary Eisenberg from Perkins Coie.  We appreciate the offer

1    for Brooklyn.  I think that would be, from our perspective,

2    very accommodating and we -- we would thank the Court for

3    that.

4              THE COURT:  All right.  So, then, again, on the --

5    looking down the road October 10 at 10 in Brooklyn.  When I

6    sit in Brooklyn, I use the Judge Duberstein Memorial

7    Courtroom --

8              MR. GRILLO:  Okay.

9              THE COURT:  And I'm sure it's either on the

10   website or one of my law clerks can get you the specific

11   room number for that, and we are video equipped in that

12   courtroom as well.  So if we have parties from out of state

13   -- which includes New Jersey at that point.  But if we have

14   parties from out of state who want to appear by video, as

15   long as it's not too many people, we can also accommodate

16   other video appearance.  But we are limited technologically

17   on how many video appearances we can do.

18             MR. GRILLO:  Understood, Your Honor.  We'll --

19   we'll work with the parties to figure all of that out.

20             THE COURT:  All right.  So then in terms of that

21   oncoming slew of omnibus motions, unless any of them have to

22   be heard before October 10th, I'll set the day aside for

23   this -- these cases, and we'll hear any and all such matters

24   at that time.

25             Do you need an earlier date for any of the other

1    anticipated motions?

2           MR. GRILLO:  Just the shippers and warehouseman.

3    Excuse me.

4      (Pause)

5           MR. GRILLO:  Your Honor, could -- could we use the

6    September -- to try and economize on the dates, could we use

7    September 4th also for the retentions and for the shippers

8    and warehousemen's motion?  I think -- I think we talked

9    about that earlier.  The retention program, the -- you know,

10    if you carry over --

11           THE COURT:  The curb program.

12           MR. GRILLO:  -- the program.  Yes.

13           THE COURT:  I don't think it's a 6,000 -- it's not

14    -- those aren't the --

15           MR. DIMINO:  6004, Judge.

16           THE COURT:  -- 21 day hearings?

17           MR. DIMINO:  I think that would be too soon.  It's

18    21 days, so -- 6004 --

19           THE COURT:  These aren't -- these aren't

20    professional retentions.  These are the curb --

21           MR. GRILLO:  No.  This is the --

22           MR. DIMINO:  Well, I know --

23           THE COURT:  No.  I'm not -- I'm not setting the

24    professional retentions done.

25           MR. GRILLO:  No.  No.  The employee --

1          (Pause)

2              MR. GRILLO:  And the 21 day notice period,

3     September 9th is the first day, doing the calculations here.

4              THE COURT:  All right.

5          (Pause)

6              THE COURT:  The 341 meeting is on September 20th?

7              MR. GRILLO:  That's correct.

8              THE COURT:  All right.  Then why don't we go ahead

9     and set the -- those 21 day type motions on September --

10    what time is the 341?

11             MR. DIMINO:  Judge, I think it's 11:00, but I

12    can't be positive.

13             THE COURT:  All right.

14             MR. DIMINO:  I can check with my office and, if

15    necessary, I can run down and find out.

16             THE COURT:  All right.  We'll -- all right.

17             MR. DIMINO:  It should be --

18             THE COURT:  It's at 10:00, so if we -- if we set

19    those -- the warehousemen motion, retention motion --

20             MR. GRILLO:  The employee retention motion.

21             THE COURT:  The employee retention motion at 11:00

22    on September 20th.

23             MR. DIMINO:  Can we do 11:30, Judge?  I'm not sure

24    how long the 341 meeting will take.

25             THE COURT:  All right.  So we'll set it at 11:30

1    on -- set them at 11:30 on September 20th.  If you all are

2    running substantially long on the 341 meeting, then just get

3    -- that may or may not be a good sign for the case, but just

4    get a note up to us and if we need to --

5              MR. GRILLO:  We'll send someone up --

6              THE COURT:  -- just send someone up and the Court

7    will just divide you all up and let some people come up for

8    the hearing and the other people will stay for the 341.

9              MR. GRILLO:  We'll -- we'll figure that out, Your

10   Honor. Judge.

11             THE COURT:  All right.  So September 20th at

12   11:30, go ahead and notice the warehousemen motion and the

13   retention program motion.  And then, again, if -- if there's

14   something that arises in the interim that needs to be set

15   then, then we can use that time as well.  But we'll set

16   about -- set about 90 minutes for you on September 20th.

17             MR. GRILLO:  That would be terrific.  Thank you,

18   Your Honor.

19             THE COURT:  All right.

20             All right.  Anything else, then, before the DIP

21   motion?

22             MR. GRILLO:  I think we have everything else

23   covered.

24             THE COURT:  All right.

25             MR. GRILLO:  Okay.  If I may, Your Honor, the

1    motion that's been submitted to the Court is the debtors'

2    motion for debtor-in-possession financing.  The debtor-in-

3    possession financing is the product of an extension of

4    negotiations between the debtors and its senior lenders led

5    by JPMorgan Chase.  We have negotiated everything from the

6    terms of the motion in the order to the budget which is

7    attached and incorporated as part of the motion.  This is,

8    again, something that has been prepared over an extensive

9    period of time.

10            What we can do -- we can do this a couple of

11    different ways, Your Honor.  We can sort of highlight how

12    the budget works in the first instance or we can talk about

13    the -- you know, what we're requesting by way of relief in

14    the form of the order and -- and walk through it that way,

15    or we can talk about them in either order, however Your

16    Honor would like to proceed as far as that goes.

17            THE COURT:  Why don't we start with the parts that

18    the U.S. Trustee's Office might have objections to and then

19    move to the parts that the Court has concerns with, and then

20    move to the other parties in interest?

21            MR. GRILLO:  We can -- we can do that as well,

22    Your Honor.  Absolutely.

23            THE COURT:  All right.

24            MR. DIMINO:  Judge, there's an interim order.  I'm

25    assuming what we're looking at is a process that will get us

1   -- and I -- I don't know whether or not the debtors intend

2   to move now or to take that out to the 20th of September, or

3   whether or not a budget exists that goes beyond that in

4   terms of the final hearing.  I'm assuming that the final

5   hearing is going to be September 20th.

6           THE COURT:  Well, the Court was -- the Court was

7   contemplating using September 4th as the final hearing on

8   the DIP and addressing today enough interim authority to get

9   the debtor through September the 5th or 6th.

10          MR. GRILLO:  I think we would like to stick with

11  the 4th.  I'm just conversing with JPMorgan's counsel.  I

12  think we would like to stay with the 4th, Your Honor, if we

13  could.

14          MR. DIMINO:  Judge, based --

15          THE COURT:  The Court --

16          MR. DIMINO:  -- based --

17          THE COURT:  The Court notes no surprise there.

18      (Laughter)

19          MR. GRILLO:  Duly noted.

20          THE COURT:  We have a bit of -- we have a bit of

21  added breathing on the phone, so if whomever that is just --

22  either hold -- just hold the phone a little bit further

23  back.

24          All right.  So, Mr. Dimino.  So, in other words,

25  what the Court is contemplating --

1          MR. DIMINO:  Judge, basically --

2          THE COURT:  -- is a borrowing through --

3          MR. DIMINO:  -- if we're going to go back -- if

4    we're taking this to the 4th, based upon our review of the

5    request, other than one small change that we would ask with

6    regard to the carve out in which the United States Trustee

7    did not want to find itself in a position to be fighting

8    with other professionals over its quarterly fee which I

9    believe has been agreed to and has to be carved out of the

10   carve out.  We do not have an objection to the request for

11   both the interim borrowing and the use of cash collateral

12   which, in essence, is a -- well, I think it's described as a

13   roll-up of the -- of the first lien position on the

14   (indiscernible).  We don't have an objection.

15          MR. GRILLO:  Your Honor, if I may.  Yes.  Mr.

16   Dimino's characterization of how the loan works is correct.

17   He's also correct to say that he's asked to have the carve

18   -- the U.S. Trustee's fee separated out from the carve out

19   so that this way it's not capped in any way.

20          We've spoken with JPMorgan Chase, the lenders,

21   subject to revising the carve-out and reducing it from its

22   existing $300,000 number to $250,000 number, and then the --

23   and then the U.S. Trustee's fees would be able to be pay and

24   accumulated uncapped.  I believe that's the agreement that

25   we've reached.

1              MR. WIELEBINSKI:  Yes.  It -- excuse me.  It will

2      still remain within the definition of carve-out because we

3      use the definition in other places, but it will be uncapped

4      and not part of the new 250 cap.

5              MR. DIMINO:  We appreciate that and thank them,

6      and otherwise have no objection to the request.

7              THE COURT:  All right.  The primary issue that the

8      -- that the Court had was on the roll-up on a first day

9      hearing.  It appeared from review of the motion and the

10     budget that if I approved the incremental, I think, is the

11     adjective used in the papers, but if I approve the

12     incremental roll-up today, by the time we get to a final

13     hearing it will be moot because the full 40 million or so

14     would be drawn before the final hearing, at least based upon

15     the way the Court is reading the papers.  And I may be

16     misreading them.

17             So is the -- is the roll-up something that can be

18     taken up at the time of the final hearing on -- on full

19     notice?

20             MR. GRILLO:  What -- what I think we would like to

21     discuss with the Court is the prospect -- the roll-up was an

22     important consideration for the lenders, and there is

23     something unique about this deal in the fact that the lion's

24     share of the loan does need to be borrowed in relatively

25     short order.  And that's a function where it is.

1        From the debtors' point of view, given -- given

2    the way the collateral worked and given the fact that we

3    believe the senior lenders are substantially over-secured,

4    we were -- we were convinced that this made the -- that this

5    made sense under those circumstances, and that I guess the

6    Court always has its equitable powers, you know, that it can

7    -- if it finds a reason that that should be unwound or that

8    there are -- or that there's some question on the challenge

9    of the liens, that the Court can certainly revisit it later.

10        I -- I don't want to be -- speak for JPMorgan

11   Chase, but our sense is that we would ask the Court to

12   authorize the roll-up today.  The Court can certainly always

13   reconsider it if there's a reason to, but we don't think

14   there's going to be one.  But we sort of leave it to

15   JPMorgan Chase to address --

16        THE COURT:  All right.

17        MR. GRILLO:  -- any concerns they may have.

18        MR. GLERUM:  Good morning again, Your Honor.

19        The roll-up is an important part of this

20   transaction for us.  We've got the same set of lenders

21   before and after.  We perceive ourselves and we have gotten

22   the same information from the debtor and its professionals

23   that we are substantially over-secured.

24        The roll-up feature is the way this loan has

25   worked historically.  And, in fairness, when we got the

1    first -- the very first budget from the debtor, it

2    contemplated this as well because this is how the loan

3    works.  Obviously, if there's a challenge to our position

4    that is somehow successful, we will have a problem and we

5    will have to fix it.  And I'm sure Your Honor will have a

6    series of ideas as to how that could be done.

7            But it -- it is the -- it is a principal part of

8    the deal for JP and also the participants that we have a

9    roll-up of this nature, not immediate, but as the Court

10   points out, yes, it does roll over quickly.  But we would

11   like to have that, please, as part of this on the first day.

12   We are here.  We could have pushed for a liquidation.  We

13   were asked to put -- we were asked to lend to a sale and we

14   are lending to a sale.  And we are trying to be supportive

15   of the debtors' efforts.  I haven't heard a bad word yet

16   about myself.  But we would -- we would like, please, to

17   have the roll-up included in the form in the order in which

18   it presently is.

19           Thank you.

20           THE COURT:  All right.

21           MR. GRILLO:  I just want to make two supporting

22   points, if I may, Your Honor.

23           One is that we've asked the senior lenders to lend

24   considerably more than what their exposure was down to at

25   this point in time.  They were the only parties that stepped

1    up to do so.

2            Just by way of background -- and this is all in

3    the Kunzmann affidavit -- the debtors did go out and solicit

4    third party DIP loan bids to either prime or take out the

5    senior loans.  We were unsuccessful as far as that went.  We

6    also asked our second lien lenders whether they would

7    consider putting in the loan.  We believe that, you know,

8    that as a matter of the dynamics of the negotiation that the

9    lender's request was the best we received.  We did go out

10   and solicit other bids.  We were unable to obtain them.

11           So we're supportive of the request on that basis,

12   and given the fact that they are materially increasing their

13   exposure to the debtors and because we believe that they're

14   over-secured, we believe it's appropriate at this time.

15           THE COURT:  All right.

16           Let me ask other parties in interest, first in the

17   courtroom, that wish to be heard on the DIP facility.

18           All right.  On the telephone?

19           MR. EISENBERG:  Your Honor, this is Gary

20   Eisenberg, again, from Perkins Coie on behalf of HTC.

21           Obviously, there's a lot to digest in the DIP

22   motion, but one issue that jumped out at me in the brief

23   time I had a chance to look at it between the filing and

24   today's hearing is the definition of collateral.  And my

25   concern, in particular, that I have is whether or not

1    avoidance actions and other property of the estate that is

2    created by operation of the filing of a bankruptcy case is

3    intended to be included in the definition of collateral,

4    which we would find problematic.

5            The reason why I raise the issue is that the

6    definition in the DIP agreement of collateral references

7    collateral that's covered by the security agreement.  The

8    security agreement isn't an exhibit to the motion, at least

9    in not what I was able to locate.  And some of the other

10   broad language in the DIP order and some of the other papers

11   leaves at least an ambiguity as to whether or not avoidance

12   actions and other post-petition filing rights of the debtor

13   are sought to be encumbered with the collateral designation

14   and that would be very problematic from the perspective of

15   unsecured creditors.

16           MR. GRILLO:  Your Honor, may I respond?

17           THE COURT:  Yes.

18           MR. GRILLO:  Okay.  After speaking with the

19   lenders, yes.  Mr. Eisenberg is correct that the avoidance

20   actions have been asked to be pledged to the lenders.  We

21   were -- we confirmed with JPMorgan Chase that they would be

22   willing to defer that to the final hearing, consideration of

23   that, and a committee will have been appointed at that point

24   in time.  I'm sure Mr. Eisenberg's client intends to

25   participate.  They are the largest unsecured creditor in

1    these cases.  And subject to whatever (indiscernible) we

2    think we have.

3              THE COURT:  And as far as the other prong,

4    wouldn't the -- wouldn't the post-petition liens be to the

5    same extent as -- the same extent validity priority is prior

6    to the petition date?  In other words, is there -- there --

7    there seem to be some references to potentially --

8    potentially priming a lien that the debtor doesn't believe

9    to be valid with a party that I'm not sure is --

10             MR. GRILLO:  Pantech.

11             THE COURT:  -- part of this hearing or not.

12             MR. GRILLO:  Your Honor, let me discuss the

13   Pantech issue.  Thank you for reminding me.

14             So, Your Honor, one of the trade suppliers to the

15   debtor is -- is Pantech.  Pantech provides mobile devices.

16   They're owed, I think, approximately $40 million and they

17   filed a UCC financing statement.  But the bottom line is is

18   that there was no security agreement and there was no

19   agreement ever into -- ever entered into with Pantech.  So

20   we think it was just kind of, you know, a sort of one off

21   filing.  But they've never been secured.  We don't have a

22   security agreement with them.  We've been in negotiations

23   and discussions with Pantech prepetition.  It's never come

24   up in those discussions and it's just kind of out there.

25             So given the fact that the senior lenders did have

1    the first lien regardless of whether or not the Pantech

2    filing, because it was only within a couple of months prior

3    to the petition date, with that in mind, that would be the

4    priming other than with respect to their -- their own liens

5    with respect to the debtor.

6              THE COURT:  All right.  Any other party in

7    interest?

8              All right.  So then the Court will carve-out

9    probably the wrong expression, but --

10        (Laughter)

11             THE COURT:  -- we'll defer the granting or

12   authorizing the granting of any liens on the Chapter 5

13   actions until the time of final hearing.  But then we'll

14   otherwise approve the DIP facility.

15             The simplest way to do this, rather than get a 67

16   page redline draft of the 65 page order is if you all will

17   simply -- the Court can interline it at the end, but then

18   sometimes the lawyers go crazy when the Court puts its own

19   words in its own order.  So if you all want to submit a

20   revised form that just has a notwithstanding paragraph at

21   the end that any issues regarding liens on Chapter 5

22   avoidance actions are reserved until the time of final

23   hearing, that that would make it simpler and easier to

24   follow.

25             MR. WIELEBINSKI:  That will be fine, Your Honor.

1       MR. GRILLO:  And we'll do the same for the U.S.

2   Trustee's fees.  Instead of changing the order we'll --

3       THE COURT:  Just put a --

4       MR. GRILLO:  -- we'll put those --

5       THE COURT:  -- notwithstanding at the end.

6       MR. GRILLO:  Right.

7       THE COURT:  All right.  I recognize this is not

8   the type of case that would go with my usual of sending a

9   two-page interim cash collateral DIP order.  So we will

10  continue to slog through all 65 pages of the order, plus the

11  48 pages of attachments.  But I would anticipate, since

12  somebody in your office is already working on revising that

13  order or will be doing that before they get lunch today,

14  that we'll get a revised form of order sometime early

15  tomorrow so that we can turn it and get it signed and back

16  to you all certainly before the end of the week.

17      MR. WIELEBINSKI:  Yeah.  We can sit here and

18  interlineate it right now and then sign it and get a

19  conforming copy if that would help.

20      MR. GRILLO:  Yeah.  We --

21      THE COURT:  And I'll so order the calendar that --

22  that the --

23      MR. GRILLO:  We can submit it today.  I'm looking

24  at my colleague to see if --

25      UNIDENTIFIED SPEAKER:  Yeah.

1          MR. GRILLO:  -- we can submit it today, right?

2          UNIDENTIFIED SPEAKER:  Yeah.

3          MR. GRILLO:  We'll get it submitted today and then

4     this way we can --

5          THE COURT:  Well --

6          MR. GRILLO:  -- with -- because we're just going

7     to change the end as -- as Your Honor, I think, suggested.

8     We'll put in two paragraphs.  We'll show the two paragraphs

9     to everyone.  We'll submit it around and then we'll submit

10    it, you know, indicating, you know, that we've gotten sign

11    off from everyone.

12         THE COURT:  All right.  I will otherwise then so

13    order the calendar that the DIP facility is approved with

14    the modifications.  Avoid -- any lien on avoidance actions

15    is deferred until the time of final hearing, and the carve-

16    out of the carve-out for the U.S. Trustee fees.

17         MR. GRILLO:  Thank you.  We also, I'm advised,

18    have a thumb drive with the order so maybe we could actually

19    do it while we're here and we could -- and then upload it

20    while -- before everyone leaves for lunch.

21         THE COURT:  Well, we have free Wi-Fi --

22         (Laughter)

23         THE COURT:  -- in the building.  I don't know who

24    the carrier is and I --

25         (Laughter)

1          MR. GRILLO:  And we have devices in a bag back

2     here that if anyone wants one, we can --

3          THE COURT:  It -- if you all do not have a mobile

4     --

5          MR. GRILLO:  -- we can do that as well.

6          THE COURT:  -- device in the courthouse that can

7     accommodate that change, then the case -- then the case

8     probably won't be able to last very long.  So --

9          MR. GRILLO:  Excellent, Your Honor.

10         MR. EISENBERG:  Thank you, Your Honor.  This is

11    Gary Eisenberg again.  If -- if I could have somebody email

12    a copy of it as its revised we can have the opportunity to

13    take a look as well.  I assume that if somebody has Wi-Fi

14    access, that that shouldn't be beyond technological

15    capacity.

16         MR. GRILLO:  We can do that.

17         THE COURT:  All right.

18         MR. GRILLO:  We can do that, Mr. Eisenberg.

19         MR. EISENBERG:  Thank you very much.  I appreciate

20    it.

21         THE COURT:  All right.  Anything else, then,

22    before --

23         MR. GRILLO:  I think that concludes -- again, we

24    thank the Court for its time this morning and the parties

25    for making their way out here for this.  And --

```
 1              THE COURT:  You can --

 2              MR. GRILLO:  -- with their support we can get this

 3     done.

 4              THE COURT:  Well, you can thank Mr. Dixon.  Your

 5     -- apparently your case woke him up in the middle of the

 6     night.  That's how we knew it was here, so --

 7          (Laughter)

 8              THE COURT:  All right.

 9              MR. GRILLO:  Thank you, Your Honor.

10              THE COURT:  Then we will -- we will look for your

11     orders that haven't yet been submitted and we will see you

12     back on September 4th for bid procedures and the final

13     hearing on the DIP.

14              MR. GRILLO:  Right.  And that -- and that we're

15     doing here, Your Honor, correct, or --

16              THE COURT:  That will be here.

17              MR. GRILLO:  That will be -- just for everyone's

18     benefit --

19              THE COURT:  It will be here.

20              MR. GRILLO:  -- that will be here.

21              THE COURT:  That will be here.  September 20th

22     will also be here.

23              MR. GRILLO:  Right.

24              THE COURT:  October 10th will be Brooklyn.

25              MR. GRILLO:  Okay.  Just to make sure everyone
```

1    understand.

2            THE COURT:  All right.  Very well.

3        (A chorus of thank-you)

4            THE COURT:  We'll be in recess on Personal

5    Communications.

6            THE CLERK:  All rise.

7        (Whereupon, these proceedings were concluded at 12:20

8    p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3                           RULINGS

4                                        Page        Line

5      Motion to Use Cash Collateral (Motion

6      of Debtors for Interim and Final

7      Orders (A) Authorizing the Debtors to

8      Obtain Post-Petition Financing and to

9      Grant Security Interests and

10     Superpriority Administrative Expense

11     Claims Pursuant to 11 U.S.C. 105(a),

12     364(c); (B) Authorizing the Debtors to

13     Use Cash Collateral; (C) Modifying

14     the Automatic Stay Pursuant to 11

15     U.S.C. 362; (D) Granting Adequate

16     Protection Pursuant to 11 U.S.C. 361

17     and 363; and (E) Scheduling a Final

18     Hearing Pursuant to Bankruptcy Rule

19     4001) filed by Emanuel C. Grillo on

20     behalf of Personal Communications

21     Devices, LLC [4]                        56          9

22

23

24

25

1                    I N D E X

2

3                    RULINGS

4                                      Page        Line

5    Motion to Authorize/Direct (Motion

6    of the Debtors for Entry of Interim

7    and Final Orders Authorizing the

8    Debtors to (I) Pay Prepetition

9    Personnel Wages, Salaries, and Other

10   Compensation; (II) Reimburse

11   Prepetition Personnel Business

12   Expenses; (III) Make Payments for

13   Which Prepetition Payroll Deductions

14   Were Made; (IV) Continue Employee

15   Benefit Programs; (V) Pay Workers

16   Compensation Obligations; and (VI)

17   Pay All Costs and Expenses Incident

18   to the Foregoing) Filed by Emanuel C.

19   Grillo on behalf of Personal

20   Communications Devices, LLC [5]          22          15

21

22

23

24

25

1                          I N D E X

2

3                             RULINGS

4                                          Page         Line

5    Motion to Authorize/Direct (Motion

6    of the Debtors for Interim and Final

7    Orders Authorizing the Debtors to

8    (I) Continue Using Debtors Bank

9    Accounts and Cash Management System,

10   and (II) Honor Certain Prepetition

11   Obligations Related Thereto) [6]          26           4

12

13   Motion for Continuation of Utility

14   Service (Motion of the Debtors for

15   Interim and Final Orders (A)

16   Prohibiting Utility Companies from

17   Discontinuing, Altering, or Refusing

18   Service, (B) Deeming Utility Companies

19   to Have Adequate Assurance of Payment,

20   and (C) Establishing Procedures for

21   Resolving Requests for Additional

22   Assurance) [7]                            28          14

23

24

25

1                    I N D E X

2

3                      RULINGS

4                                    Page        Line

5    Motion to Authorize/Direct (Motion

6    of the Debtors for Entry of Interim

7    and Final Orders (I) Authorizing,

8    But Not Directing, the Debtors to

9    (A) Maintain and Administer Customer

10   Programs and (B) Honor Related

11   Prepetition Obligations to Customers

12   and (II) Authorizing, But Not

13   Directing, Financial Institutions to

14   Honor All Related Payment Requests)

15   Filed by Emanuel C. Grillo on behalf

16   of Personal Communications Devices,

17   LLC [8]                         31          16

18

19   Motion for Joint Administration of Case

20   13-74303 with Case(s) 13-74304 Filed

21   by Emanuel C. Grillo on behalf of

22   Personal Communications Devices,

23   LLC [3]                         18          16

24

25

1                    I N D E X

2

3                    RULINGS

4                                    Page        Line

5    Motion to Authorize/Direct (Motion

6    of the Debtors for an Order (1)

7    Extending the Debtors' Time to File

8    Schedules and Statement of Financial

9    Affairs, (2) Authorizing the Debt to

10   File a Consolidated List of the

11   Debtors 30 Largest Unsecured Creditors,

12   (3) Waiving the Requirement of E.D.N.Y.

13   1007-1 That the Debtors File a List

14   of Creditors, (4) Authorizing the

15   Debtors to Mail Initial Notices and

16   (5) Authorizing the Debtors to Use

17   Prepetition Business Forms) Filed by

18   Emanuel C. Grillo on behalf of

19   Personal Communications Devices,

20   LLC [9]                              33        4

21

22

23

24

25

1                           I N D E X

2

3                            RULINGS

4                                        Page        Line

5    Hearing on Application to Employ Epiq

6    Bankruptcy Solutions, LLC, as Notice

7    and Claims Agent (Application of the

8    Debtors for Entry of an Order

9    Authorizing the Employment and

10   Retention) Filed by Emanuel C. Grillo

11   on behalf of Personal Communications

12   Devices, LLC [12]                      34          19

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      I N D E X

2

3                       RULINGS

4                                    Page        Line

5    Motion to Authorize/Direct (Ex Parte

6    Motion of the Debtors to Shorten Time

7    with Respect to Hearing on Debtors'

8    Motion for Entry of Order Approving

9    Bidding Procedures Relating to Sale of

10   the Debtors' Assets; (II) Approving Bid

11   Procedures; (III) Scheduling a Hearing

12   to Consider the Sale; (IV) Approving

13   the Form and Manner of Notice of Sale

14   by Auction; (V) Establishing Procedures

15   for Noticing and Determining Cure

16   Amounts; and (VI) Granting Related

17   Relief) Filed by Emanuel C. Grillo on

18   behalf of Personal Communications

19   Devices, LLC (RE: Related document(s)

20   10 Motion to Sell filed by Debtor

21   Personal Communications Devices,

22   LLC) [11]                              38          17

23

24

25

1          C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Sherri Breach

Digitally signed by Sherri Breach
DN: cn=Sherri Breach, o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2013.08.26 15:00:04 -04'00'

7

8    SHERRI L. BREACH

9    AAERT Certified Electronic Reporter & Transcriber

10   CERT*D -397

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17

18   Date:  August 26, 2013

19

20

21

22

23

24

25