1   UNITED STATES BANKRUPTCY COURT

2   EASTERN DISTRICT OF NEW YORK

3   Case No. 13-74303 (AST)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PERSONAL COMMUNICATIONS DEVICES, LLC,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  U.S. Bankruptcy Court

13                  Long Island Federal Courthouse

14                  Central Islip, New York

15

16                  September 10, 2013

17                  10:11 AM

18

19

20

21  B E F O R E :

22  HON ALAN S. TRUST

23  U.S. BANKRUPTCY JUDGE

24

25

1    HEARING RE:  Adj Motion to (I) Pay Pre-petition Personnel

2    Wages, Salaries, and Other Compensation; (II) Reimburse

3    Pre-petition Personnel Business Expenses; (III) May Payments

4    for Which Pre-petition Payroll Deductions Were  Made; (IV)

5    Continue Employee Benefit Programs; (V) Pay Workers

6    Compensation Obligations; and (VI) Pay All Costs and

7    Expenses Incident to the Foregoing filed by Debtor Personal

8    Communications Devices, LLC) [5]

9    Adj from 09/04/13

10

11   HEARING RE:  Adj Motion to Authorize/Direct Motion of the

12   Debtors for Interim and Final Orders Authorizing the

13   Debtors to (I) Continue Using Debtors Bank Accounts and

14   Cash Management System, and (II) Honor Certain Prepetition

15   Obligations Related Thereto) Filed by Emanuel C Grillo on

16   behalf of Personal Communications Devices, LLC. [6]

         Adj from 08/21/13 09/04/13

17

18

19

20

21

22

23

24

25

Page 3

1

2    HEARING RE:  Adj Motion to Sell Property under 363b (Debtors

3    Motion for Entry of Orders: (A)(I) Approving Bidding

4    Procedures Relating to Sale of the Debtors Assets; (II)

5    Approving Bid Protections; (III) Scheduling a Hearing to

6    Consider the Sale; (IV) Approving the Form and Manner of

7    Notice of Sale by Auction; (V) Establishing Procedures for

8    Noticing and Determining Cure Amounts; and (VI) Granting

9    Related Relief; and (B)(I) Approving Asset Purchase

10   Agreement and Authorizing the Sale of Substantially All of

11   the Debtors Assets; (II) Authorizing the Sale of Assets Free

12   and Clear of All Liens, Claims, Encumbrances and Interests;

13   (III) Authorizing the Assumption, Sale and Assignment of

14   Certain Executory Contracts and Unexpired Leases; and (IV)

15   Granting Related Relief) Filed by Emanuel C Grillo on

16   behalf of Personal Communications Devices, LLC. [10]

17   Adj from 09/04/13

18

19

20

21

22

23

24

25

1   HEARING RE:  Adj Motion to Authorize/Direct (Motion of the

2   Debtors for Entry of Interim and Final Orders (I)

3   Authorizing, But Not Directing, the Debtors to (A) Maintain

4   and Administer Customer Programs and (B) Honor Related

5   Prepetition Obligations to Customers and (II) Authorizing,

6   But Not Directing, Financial Institutions to Honor All

7   Related Payment Requests) Filed by Emanuel C Grillo on

8   behalf of Personal Communications Devices, LLC. [8]

9   Adj from 08/21/13 09/04/13

10

11  HEARING RE:  Adj Motion to Use Cash Collateral (Motion of

12  Debtors for Interim and Final Orders (A) Authorizing the

13  Debtors to Obtain Postpetition Financing and to Grant

14  Security Interests and Superpriority Administrative Expense

15  Claims Pursuant to 11 U.S.C. 105(a), 364(c) and 364(d); (B)

16  Authorizing the Debtors to Use Cash Collateral; (C)

17  Modifying the Automatic Stay Pursuant to 11 U.S.C. 362; (D)

18  Granting Adequate Protection Pursuant to 11 U.S.C. 361 and

19  363; and (E) Scheduling a Final Hearing Pursuant to

20  Bankruptcy Rule 4001) Filed by Emanuel C Grillo on behalf

21  of Personal Communications Devices, LLC. [4]

22

            Adj from 08/21/13 09/04/13

23

24

25  Transcribed by:  William Garling

1   A P P E A R A N C E S :

2   GOODWIN PROCTER, LLP

3        Attorneys for Debtors, Personal Communications Devices

4        The New York Times Building

5        620 Eighth Avenue

6        New York, NY 10018-1405

7

8   BY:  EMANUEL C. GRILLO, ESQ.

9        MATTHEW L. CURRO, ESQ.

10        BRECK N. HANCOCK, ESQ.

11

12   TOGUT, SEGAL & SEGAL, LLP

13        Co-counsel for Debtors, Personal Communications Devices

14        One Penn Plaza, Suite 3335

15        New York, NY 10119

16

17   BY:  FRANK A. OSWALD, ESQ.

18

19   DUANE MORRIS, LLP

20        Attorney for Philip Christopher

21        1540 Broadway

22        New York, NY 10036-4086

23

24   BY:  GERARD S. CATALANELLO, ESQ.

25

```
 1   EDWARDS WILDMAN PALMER, LLP
 2        Attorneys for JP Morgan
 3        750 Lexington Avenue
 4        New York, NY 10022
 5
 6   BY:  PAUL J. LABOV, ESQ.
 7
 8   EDWARDS WILDMAN PALMER, LLP
 9        Attorneys for JP Morgan
10        111 Huntington Avenue
11        Boston, MA 02199
12
13   BY:  DAVID L. RUEDIGER, ESQ.
14        CHARLES L. GLERUM, ESQ.
15
16   BG STRATEGIC ADVISORS
17        Investment banker for the seller
18        525 South Flagler Drive
19        Suite 33401
20        West Palm Beach, FL 33401
21
22   BY:  DAVID SAPERSTEIN
23
24
25
```

1   FTI CONSULTING

2        3 Times Square

3        9th  Floor

4        New York, NY 10036

5

6   BY:  CONOR P. TULLY

7

8   PERKINS COIE, LLP

9        Attorneys for the Official Committee of Unsecured

10   Creditors

11        30 Rockefeller Plaza

12        22nd  Floor

13        New York, NY 10112-0085

14

15   BY:  GARY F. EISENBERG, ESQ.

16        SCHUYLER G. CARROLL, ESQ.

17

18   SILVERMAN ACAMPORA

19        Attorneys for Quality One Wireless, LLP

20        100 Jericho Quadrangle

21        Suite 300

22        Jericho, NY 11753

23

24   BY:  ADAM L. ROSEN, ESQ.

25

1  MUNSCH HARDT KOPF & HARR, PC

2       Attorneys for Quality One Wireless, LLP

3       3800 Lincoln Plaza

4       500 North Akard Street

5       Dallas, TX 75201-6659

6

7  BY:  JOSEPH J. WIELEBINSKI, ESQ.

8

9  PATTON BOGGS, LLP

10       Attorneys for PineBridge

11       2550 M. Street, NW

12       Washington, DC 20037-1350

13

14  BY:  MARK A. SALZBERG, ESQ.

15

16  LATHAM & WATKINS, LLP

17       Attorneys for DLJ Investment Partners
            rd
18       53  at Third, 885 Third Avenue

19       New York, NY 10022-4834

20

21  BY:  ADAM J. GOLDBERG, ESQ.

22

23

24

25

1   OFFICE OF THE UNITED STATES TRUSTEE

2        Federal Courthouse

3        560 Federal Plaza

4        Central Islip, NY 11722

5

6   BY:   ALFRED M. DIMINO, ESQ.

7

8

9   APPEARED TELEPHONICALLY:

10       DAVID H. WANDER

11       MARSHALL HARRIS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  Case number 13-74303, personal

3    communications devices, LLC.

4              THE COURT:  I'll take appearances, please, first

5    in the courtroom.

6              MR. CARROLL:  Good morning, Your Honor.

7              Schuyler Carroll of Perkins Coie, on behalf of the

8    Official Committee of Unsecured Creditors.

9              And with me this morning, Your Honor, is my

10   partner, Gary Eisenberg.

11             MR. EISENBERG:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             Is it Carroll?

14             MR. CARROLL:  Yes, Schuyler Carroll.

15             THE COURT:  All right.

16             MR. GLERUM:  Good morning, Your Honor.

17             I'm Charlie Glerum from Edwards Wildman for J.P.

18   Morgan Chase as administrative agent.  I thank the Court for

19   allowing my pro hac vice application before the committee

20   could object to it.

21             With me is Paul Labov.

22             THE COURT:  Well, that order isn't final yet,

23   so...

24        (Laughter)

25             MR. DIMINO:  Good morning, Judge.

1            Alfred Dimino for the Office of the United States

2     Trustee.

3            MR. SALZBERG:  Good morning, Your Honor.

4            Mark Salzberg, Patton Boggs on behalf of the

5     PineBridge entities and I filed a notice of appearance in

6     pro hoc yesterday.  I believe the pro hoc is still pending.

7            THE COURT:  Thank you.

8            MR. CATALANELLO:  Good morning, Your Honor.

9            Gerard Catalanello from the law firm of Duane

10    Morris on behalf of Phillip Christopher.

11            MR. OSWALD:  Your Honor, Frank Oswald, Togut,

12    Segal & Segal, co-counsel for the debtors.

13            MR. GOLDBERG:  Good morning, Your Honor.

14            Adam Goldberg with Latham & Watkins, on behalf of

15    DLJ Investment Partners.

16            MR. GRILLO:  And with apologies to the Court, Your

17    Honor, for our tardy arrival, Emanuel Grillo from Goodwin

18    Procter on behalf of the debtors.

19            With me in the courtroom are my colleagues, Matt

20    Curro and Breck Hancock.

21            MR. WIELEBINSKI:  Good morning, Your Honor.

22            Jim Wielebinski with Munsch Hardt.  I'm here for

23    Quality One Wireless, stalking horse bidder.

24            MR. ROSEN:  Good morning, Your Honor.

25            Adam Rosen, Silverman Acampora, co-counsel to

1   Quality One.

2              THE COURT:  All right.  And then on the telephone?

3              MR. WANDER:  Good morning, Your Honor.

4              David Wander, Davidoff, Hutcher & Citron, counsel

5   for Shine Electronics Company.

6              MR. HARRIS:  Marshall S. Harris, general counsel

7   for Quality One Wireless, stalking horse bidder.

8              THE COURT:  All right.  Mr. Grillo?

9              MR. GRILLO:  Yes, thank you, Your Honor.

10             THE CLERK:  Please state your name.

11             MR. GRILLO:  Yes, again, Emanuel Grillo, G-R-I-L-

12  L-O, from Goodwin Procter, on behalf of the debtors and

13  debtors in possession.

14             Your Honor, we have a number of matters on the

15  calendar today.  There's been an agenda that was filed with

16  the Court.  That updates everything with respect to the

17  objections that have been filed.

18             What I would like to do, Your Honor, is take some

19  of the administrative matters first and address those and

20  then get to really what are the two substantive matters

21  before the Court, which are the sale motion and the DIP

22  order, if that's okay with Your Honor?

23             THE COURT:  That would be fine.

24             MR. GRILLO:  Okay.  Your Honor, number three on

25  the agenda today was the motion for interim and final orders

1    authorizing debtors to use certain bank accounts and cash

2    management and to honor certain pre-petition obligations

3    related thereto.  At the Initial Hearing that we had, an

4    order was filed.  Based on the discussions with the United

5    States Trustee, I believe we've resolved any remaining

6    concerns of the United States Trustee and I don't believe

7    there have been any further objections to that order and so

8    we would like to ultimately present our final order to the

9    Court.  Okay.  Mr. Dimino?

10           MR. DIMINO:  Judge, the United States Trustee has

11   no objection.

12           THE COURT:  All right.  There being no other

13   objection to item three, the Court will authorize on final

14   basis the use of bank accounts, cash management system, et

15   cetera.  If you'll submit then a final order?

16           MR. GRILLO:  We will, Your Honor.

17           THE COURT:  Okay.

18           MR. GRILLO:  Your Honor, I inadvertently skipped

19   number two, which is the notice of the motion for the entry

20   of interim and final orders authorizing the debtors to pay

21   pre-petition personnel wages, salary, and other

22   compensation, so reimburse pre-petition personnel business

23   expenses, make payments for which pay roll deductions were

24   made.  Employee benefit programs, paid Workers' Comp, and

25   the pay -- the cost and expenses incident to the foregoing.

1              As Your Honor recalled, when we had this motion at

2     the first time at the initial hearings, one issue was raised

3     with respect to the executive officers of the company.  We

4     deducted those out of from the order.  We subsequently

5     provided the U.S. Trustee with the requested information and

6     I think that issue has been resolved.

7              THE COURT:  Mr. Dimino?

8              MR. DIMINO:  Judge, the United States Trustee has

9     no objection.

10             MR. GRILLO:  So, Your Honor, we'd like to then

11    offer to submit a final order in connection with that motion

12    as well.

13             THE COURT:  All right.  So the Court will grant

14    the interim -- a final order authorizing the debtor to pay

15    pre-petition wages, et cetera.  If you'll submit a final

16    order?

17             MR. GRILLO:  Yes, we will.

18             Thank you, Your Honor.

19             Your Honor, item number four on the agenda for

20    today's hearing is the motion of the debtors for entry of

21    interim and final orders authorizing but not directing the

22    debtors to maintain and administer customer programs,

23    honoring certain pre-petition obligations to customers, and

24    authorizing, but not directing financial institutions to

25    honor all rebated payment requests.

1          Your Honor, again, this was something that was

2    originally presented at the first day hearing.  We had

3    adjourned that hearing in case something else had arisen.

4    The objection deadline was September 6th and no objection

5    has been filed, and therefore, we would request approval of

6    the final order going forward.

7          THE COURT:  Mr. Dimino?

8          MR. DIMINO:  Judge, similarly, the United States

9    Trustee has no objection.

10         THE COURT:  All right.  The Court will then

11   authorize on a final basis, maintenance of customer

12   programs, et cetera.  If you'll submit a final order?

13         MR. GRILLO:  We will.

14         Your Honor, with those matters addressed, we'd

15   like to turn to what we think are the two -- not that

16   they're more substantive or more substantive -- but

17   certainly the two larger issues that are before the Court

18   today, one being the DIP motion and the other being the

19   motion for approval of the sale.

20         We received objections to both of them.  With Your

21   Honor's permission, I would like to take the sale motion

22   first because I think the DIP, in part, depends on the sale

23   and the sale schedule and so therefore, we would kind of

24   like to go in that order if Your Honor would be willing to

25   do so?

1           THE COURT:  All right.

2

3           MR. GRILLO:  Your Honor, as part of the first day

4    motions, as you may recall, the debtors submitted a motion

5    for the entry of an order approving certain bidding

6    procedures relating to the sale of debtors' assets,

7    approving bidding protections for our stalking horse bidder

8    scheduling a hearing to consider the sale and approving the

9    form and manner of notice of the sale by auction and then

10   providing procedures for cure amounts and granting related

11   relief.

12          As Your Honor may recall from that first day

13   hearing, we indicated that the case itself was largely

14   centered on this sale, that this sale was was a culmination

15   of nine months of restructuring and a six-month sale process

16   that was put together by the company over an extended period

17   of time.

18          What we have done is we have also submitted as

19   part of that motion, a declaration of the company's

20   investment banker, David Saperstein of BGSA in support of

21   that -- in support of that motion.

22          Your Honor, we've received two objections to the

23   motion and I'd like to take a moment to address them if I

24   could.  The objections that have been received are those

25   from the Official Committee of Unsecured Creditors and the

1    objection of Phillip Christopher.

2             The objections somewhat mirror one another in

3    terms of the substance of the objections themselves.  The

4    objections sort of highlight, I guess some sort of typical

5    objections that one would expect to a process like this when

6    we've made efforts to try and work those out with the

7    parties prior to the hearing.  I cannot say that we've

8    resolved those issues, so unfortunately, we have to have

9    them addressed in front of the Court.  We did speak with the

10   parties and we did ask them to speak with one another, but

11   as of this morning, Your Honor, we had not reached agreement

12   with the committee and with the stalking horse bidder in

13   terms of what the open issues were, so I'd like to highlight

14   those --

15            THE COURT:  Are you closer now than you were two

16   days ago?

17            MR. GRILLO:  On one or two modest points, Your

18   Honor, I think I would be misrepresenting to say that we

19   were extraordinarily close.  I don't know that we are.  I

20   don't think that any of the issues probably come as a

21   surprise to the Court.  They are issue that typically get

22   raised in this type of context.

23            I can say that the process was, you know, carried

24   out over an extended period of time, pre-petition and coming

25   up with the protections and were the product of a

1    negotiation.  We've done our best to inform the committee as

2    to what those issues were.  We received document requests

3    from the committee last week.  We've done our best to

4    provide answers to those on a rolling basis.

5            I think if we kind of walk through the objections,

6    I think I can provide responses on behalf of some of them

7    and kind of go forward from there, if that makes sense.  And

8    I know that stalking horse bidder's counsel is here.  We can

9    address some of the other concerns that get raised.

10           We think a lot of them can be dispensed with

11   relatively quickly.  I mean, I think there are basically

12   just some choices that have to be made.  There's some

13   evidence with regard to the stalking horse bid, that we can

14   admit it as part of the record.  We would ask, in the first

15   instance, that Mr. Saperstein's affidavit be admitted as

16   part of the evidence.  Mr. Saperstein is in the courtroom

17   and can be cross-examined on the basis of his affidavit if

18   the parties so wish to do so.

19           THE COURT:  All right.  Let me get to his

20   affidavit then.

21           What is the docket number?

22           MR. GRILLO:  I just turned the page -- 47, Your

23   Honor.

24           THE COURT:  All right.

25           Mr. Saperstein, would you go up to the left turn

1   where Mr. Grillo.  Mr. Saperstein?

2           Just for protocol purposes, what I'm going to do

3   is ask Mr. Saperstein to identify them himself.  To ask him

4   if he's familiar with the declaration, if it is, in fact,

5   his testimony in support of the bid procedures motion.

6           Depending on the answers to those, I would then

7   admit the affidavit as his direct testimony.  He would then

8   be available for cross-examination to parties who had filed

9   timely objections to the bid procedure motion.

10          Sir, if you would state your name.

11          MR. SAPERSTEIN:  David Saperstein.

12          THE COURT:  Mr. Grillo, do you want to show him

13  his declaration?

14          MR. GRILLO:  Yes, Your Honor.

15          Let the record reflect that I'm placing in front

16  of Mr. Saperstein, a copy of his declaration, which is on

17  file with the United States Bankruptcy Court.  This is the

18  declaration filed in support of the motion and I'd ask him

19  to take a look at it and ask if he recognizes it for the

20  record.

21          MR. SAPERSTEIN:  Yes, this is my declaration.

22          THE COURT:  All right.  So do the statements

23  contained in your declaration, ECF docket item 47,

24  constitute testimony that you would give this morning in

25  support of the debtors' bid procedure motion?

1          MR. SAPERSTEIN:  Yes.

2          THE COURT:  All right.

3          If you will just stand by, Mr. Saperstein.

4   Mechanically, Mr. Grillo, I'll let you go ahead and walk

5   through -- essentially, what are the debtors' responses to

6   the objections.  We'll then make Mr. Saperstein available

7   for cross-examination to the committee and Mr. Christopher's

8   counsel.

9          MR. GRILLO:  Yes, thank you, Your Honor.

10         THE COURT:  You can go back to your seat and we'll

11  get back with you in just a few minutes.

12         MR. SAPERSTEIN:  Okay.

13         MR. GRILLO:  Your Honor, there are a couple of

14  points that I would like to note up front and these address

15  some of the objections, and I'll ask the parties for some

16  confirmation on it.

17         One of the objections that was raised -- and I'm

18  not taking them in any specific order, but this was an

19  important consideration, and I think it should be addressed

20  first -- was that there was a question regarding the -- what

21  was characterized as a financing contingency in the initial

22  bid.

23         Specifically, Your Honor, as the agreement points

24  out, there -- the two existing junior lenders, affiliates of

25  PineBridge Investments and affiliates of DLJ Investment

1    Partners are effectively taking new notes in exchange or by

2    providing financing for the bid, by taking new notes from

3    Quality One as part of that process.

4              What had to be resolved pursuant to the agreement

5    of the parties and pursuant to the asset purchase agreement,

6    before we went forward with a sales -- excuse me, a bid

7    procedures hearing today -- was that the issues regarding

8    the notes, the guarantee, and the intercreditor issues.  And

9    those are two levels, first between the new senior lender

10   for Quality One as a proposed stalking horse bidder, and the

11   two existing lenders, PineBridge and DLJ.  An intercreditor

12   had to be worked on that arrangement.  The material terms

13   had to be agreed to.

14             And then second, an intercreditor between the two

15   existing lenders, DLJ and PineBridge and their respective

16   affiliates, and that had to be reached as well.

17             So we'll be looking at several sets of documents,

18   and again, there are notes, security agreements, guarantees

19   and intercreditor.

20             And my understanding -- and I've asked the party

21   to be prepared to confirm that this morning -- is that

22   condition to the sale has been reached or it has been

23   satisfied by virtue of the agreement that's been reached

24   among the parties.

25             So with that, I'd like to ask each representative

1    from each of those parties, starting with Quality One to

2    sort of indicate that that's, in fact, been satisfied for

3    the Court.

4              MR. WIELEBINSKI:  Thank you, counsel.

5              Your Honor, I think I'd like to turn that over --

6    if I may, to Marshall Harris, the general counsel who's on

7    the line because he's been handling those discussions as

8    late as a few minutes ago or this morning.

9              THE COURT:  So is the issue as posed in whether

10   that contingency is being removed from the proposed sale

11   correct?  Because there's two different things, one is

12   whether there's an agreement on the underlying terms and the

13   other is whether irrespective of whether there's an

14   agreement on the underlying terms, it's being removed as a

15   contingency in the sale correct.

16             MR. GRILLO:  I would characterize, Your Honor,

17   that the condition -- that that condition is being

18   satisfied, is the way that I would look at it, that that

19   condition of the asset purchase agreement be satisfied.

20             MR. WIELEBINSKI:  That's my understanding as well,

21   Your Honor.

22             THE COURT:  All right.  So it's Mr. Harris on the

23   phone?

24             MR. HARRIS:  Yes, this is Mr. Harris.

25             THE COURT:  All right.  So, Mr. Wielebinski, if

1  you want to ask him the question, then?

2          MR. WIELEBINSKI:  Mr. Harris, this is Joe

3  Wielebinski.  I just want -- I don't know if you followed

4  all of the discussions, but I think the Court wants to hear

5  from us as to whether the conditions regarding the

6  intercreditor agreements with PineBridge and CS has been

7  satisfied.

8          MR. HARRIS:  Yes, subject to an agreement on all

9  major issues.  The parties are discussing them right now and

10  I can tell you that they are in essence agreeing

11  conceptually as to the solutions to the remaining issues.

12          MR. WIELEBINSKI:  Thank you very much.

13          THE COURT:  All right.

14          MR. WIELEBINSKI:  Any questions, Your Honor?

15          MR. GRILLO:  We would also ask for the

16  representatives for PineBridge and for DLJ...

17          MR. SALZBERG:  Mark Salzberg, Your Honor, on

18  behalf of PineBridge.

19          I've been advised that all material terms have

20  been agreed to regarding the documents discussed by debtors'

21  counsel.

22          THE COURT:  All right.

23          MR. SALZBERG:  And this is by PineBridge.

24          THE COURT:  Thank you.

25          Then as to DLJ Credit Suisse?

1          MR. GOLDBERG:  Your Honor, Adam Goldberg from

2    Latham Watkins, on behalf of DLJ Investment Partners.

3          We've been in active negotiations with Quality One

4    concerning the definitive documents and are awaiting final

5    form.

6          THE COURT:  Well, okay as far as that goes.

7          MR. GOLDBERG:  I -- I don't have -- that's all I

8    have at the moment.  I haven't had a chance to speak with

9    the debtors' counsel before the hearing.

10          THE COURT:  All right.  Thank you, Mr. Goldberg.

11          MR. GOLDBERG:  Thank you, Your Honor.

12          THE COURT:  For the record, that's a maybe.

13      (Laughter)

14          MR. GRILLO:  We'll ask Mr. Goldberg to check with

15    his colleagues and make sure that they're on board and you

16    can step out to do that.

17          MR. GOLDBERG:  I will, Your Honor.

18          THE COURT:  Well, on the current state of events,

19    the objections more go to that being a contingency event for

20    the contract that the buyer could walk in the event of, so

21    from the Court's vantage point, that contingency is being

22    removed from the sale contract -- or the proposed sale

23    contract.

24          MR. WIELEBINSKI:  Your Honor, I don't think we're

25    in a position to do that at this minute.  But based on what

1   I've heard including the maybe, I think if we go a little

2   bit further and go through the other objections, maybe

3   Mr. Goldberg can make a phone call and we can get

4   confirmation.  With that, we may be able to either satisfy

5   the Court's concern or the committee's concern.  So that's

6   how I would suggest we approach that, if I may have a little

7   bit of time to try and get that ball over the goal line.

8            THE COURT:  All right.

9            MR. GRILLO:  I think we have plenty to do between

10  now and then, Your Honor, so I don't think the time would be

11  lost.

12           THE COURT:  All right.

13           MR. GRILLO:  Your Honor, there are a series of

14  objections and again, I will sort of treat them together,

15  both from Mr. Christopher and from the committee, and sort

16  of attack them in the same way.

17           One other note to the adjustments, if you recall

18  the bid deadline that is presently part of the motion was

19  the -- or is the 28th of September.  That was a Saturday,

20  Your Honor.  We had received requests from a very interested

21  party that on account of religious Orthodox issues that that

22  wasn't a good day and that they had asked if we could carry

23  it forward.  We agreed and discussed with the parties

24  carrying the bid forward to the following Monday as the bid

25  deadline.

1          So the bid deadline would no longer be Saturday

2     the 28th, but would be Monday the 30th, assuming, you know,

3     everything else goes forward.  So that was the other

4     adjustment that I wanted to make the Court aware of.

5          THE COURT:  But there's no -- there's no traction

6     on the committee's request to push the bid request back

7     about 30 days?

8          MR. GRILLO:  No, there's not, Your Honor.

9          And we'll -- we've talked about it previously, but

10    we'll kind of go through that again and, you know, part of

11    Mr. Saperstein's declaration, I think, addresses that.  And

12    we'll talk about it also from the committee's perspective

13    and what they note too, because I think that's also

14    important.  And maybe we'll start with that point.

15         Again, both in the commencement declaration that

16    was introduced on the first day, and then also in the

17    declaration that was provided by Mr. Saperstein.  This was

18    not a process that began in connection the bankruptcy, but a

19    process that had gone on for an extended period of time.  In

20    Mr. Saperstein's declaration, he identifies how many parties

21    we reached out to as part of this process, both strategic

22    and financial, and the fact that certain parties came

23    forward at various points in time, we entered into a number

24    of confidentiality agreements during that process.

25         The members of the committee being all trade

1    members know as well as anyone what that process was

2    entailing and what it was going on in a current basis.  So

3    for example, one of the members of the committee, in fact,

4    actually even participated in that process pre-petition.

5    You know, to the extent of, you know, indicating their

6    interest by executing an NDA and receiving the benefit of

7    the information that was available to it.  That wasn't just

8    a current event; that's going back as far as May or June

9    during this process.

10           So we think that there's been a full and a fair

11   process.  Effectively, what the process, post-bankruptcy, is

12   intended to do is to pick up, in our view, anyone that we

13   might have missed, and interestingly enough, the party that

14   has been most active during this process since the

15   bankruptcy case was filed is a party -- without disclosing

16   names -- that was not involved the first time around.  And

17   for that reason, we've actually picked up someone during

18   this process that we hadn't picked up originally.

19           But I think if asked in cross-examination, I think

20   what Mr. Saperstein would testify to because it's part of

21   his original declaration, is that a number of people have

22   come forward.  A number of people have come forward a second

23   time since the bankruptcy.  We don't think that there's

24   anyone out there who has not otherwise known or participated

25   in this process from an industry perspective.  We can, you

1    know, under confidentiality, we're bound by

2    confidentialities not to disclose all of those names, but

3    we've made those names available to the committee.

4            In fact, more than that, Your Honor, we've taken

5    suggestions from the committee as other people to contact

6    and that's gone on as recently as this week to see if they

7    were interested and that has not -- I'm just confirming with

8    Mr. Saperstein -- that has not led to any additional leads;

9    is that correct?

10           MR. SAPERSTEIN:  Nothing substantive yet.

11           MR. GRILLO:  Nothing substantive.

12           So, we think, as far as the timing goes, we've had

13    a full and fair process.  We've discussed both in the

14    commencement affidavit and the initial presentation that we

15    made, that this company can't afford a much longer extended

16    process.  It has had credit contracted on it.  It's on a

17    cash, COD basis with all of its vendors.  Some vendors, are

18    even, in fact, refusing to ship, notwithstanding the fact

19    that we are paying COD, because they've got issues in

20    connection with the insurers of their receivables.

21           So we're really not at a point where we can keep

22    this company continuing to operate on a post-bankruptcy

23    basis to allow another 30 days.  We've spent as much time as

24    we could out of bankruptcy, frankly, to run that process and

25    the hope that we would find someone and be able to identify

1    them.  And fortunately, for the debtors, Quality One has

2    spent the time and effort necessary in order to come forward

3    with a bid, but the bottom line is that an extension of 30

4    days, essentially, would kill the company at this point.

5            There's no more trade credit available to it.

6    It's in the process of liquidating assets.  It can't make

7    purchases from its vendors because not even the COD isn't

8    enough for some of them at this point in time.  The carriers

9    with whom we deal on a regular basis need nothing happen if

10   we're going to continue to get product placement with them

11   on a go-forward basis.

12           So, with respect to the extension for a

13   significant period of time, we also note that that's an

14   element of Mr. Christopher's objection as well.

15   Mr. Christopher knows better than anyone what this company

16   has been there because he's not only the former CEO, but has

17   been in litigation since that time with the company.  So to

18   the extent that he is able or someone else is able to come

19   forward with a bid -- we've received a request for an NDA

20   from him over this weekend.  We're prepared to serve that up

21   and to have him participate in that process, notwithstanding

22   the existing litigation.

23           But again, he's a knowledgeable party.  Everyone

24   who is at the table or present is knowledgeable.  We don't

25   think that there's -- the financial buyers have all stepped

1    away at this point.  It's not really a financial buyer

2    opportunity, as opposed to a strategic buyer opportunity.

3    We are pleads that we have at least one party at the table.

4    We think we have the opportunity to have potentially one or

5    two more, and hopefully, that will make for a fruitful

6    option.

7            But with respect to the objection for an extension

8    of time, we would ask that that be overruled.

9            Your Honor, the next objection that I'd like to

10   address is the objection related to the break-up fee and the

11   expense reimbursement.  There has -- the break-up fee

12   objection is essentially twofold one -- actually, threefold

13   -- one, should it be paid at all; two, what should the

14   amount be; and two, what should the amount be -- or three,

15   rather, what should the amount be based on.

16           So effectively, we have a three-part question.  I

17   would like to address the threshold question first, if I

18   may, whether a break-up fee is appropriate.  There are some

19   insinuations in the pleadings by the committee that somehow

20   that this is a related party transaction or because there is

21   an existing customer-vendor relationship between Quality One

22   and the debtors, that for some reason, that renders the

23   break-up fee inappropriate.

24           Again, as indicated in both the commencement

25   affidavit and the Saperstein declaration, what we had was a

1    process that ran where we could not get anyone to come to

2    the table.  As Your Honor recalls, at the Initial Hearing, I

3    said we not only reached out to third-party buyers, but we

4    also -- even to the people in our own capital structure,

5    including trade vendors, including the junior lenders in our

6    capital structure and could not get them to come forward.

7    It required a lot of work.

8            Why?  Because there are two sets of relationships

9    that are critical to the company at this point.  You have

10   the vendors on the one hand, the suppliers, most of whom are

11   located overseas.  Remember, as we indicated at that first

12   hearing, you have, essentially, what amounts to second and

13   third-Tier suppliers that the company works with.  They tend

14   to be based in China, in Korea and Hong Kong.  We service as

15   their intermediary here in the United States.  What that has

16   meant is a significant amount of effort to get them to

17   continue to sell to whomever bias PCD because PCD has no

18   credit with those entities right now and also has issues

19   with the suppliers, including members of the committee, with

20   respect to reimbursement from their receivable insurers as

21   it stands right now.

22           So that was a set of relationships that required

23   con sense as part of our original LOI to make sure that they

24   were on board with whom our buyer was going to be.  We

25   didn't have contracts that we could just walk into

1    bankruptcy and have them assume with the buyout, that

2    basically, if you can show performance and adequate

3    assurance of future performance, that that would just work.

4    No relationships had to be built.

5              Quality One spent a considerable amount of time

6    traveling to China and to Korea -- and certainly

7    Mr. Wielebinski can go to greater lengths than I can to say

8    what was required, but I know that, for example, our CEO,

9    George Appling, went with Quality One to go meet and build

10   those relationships on top of the relationships that Quality

11   One had.

12             So the fact that there was a pre-existing

13   relationship between Quality One on the one hand and PCD on

14   the other, did not mean that there was, A, some sort of, you

15   know, insider deal, that it wasn't a true, arm's length

16   transaction.

17             Obviously, the terms of the transaction, itself,

18   indicate that it's been more than arm's length.  So there

19   was that side of the equation, the vendor's side.

20             On the flipside, there's also the carrier side of

21   the equation, as well, and the MSAs that the company has,

22   which are relationships that can be terminated by the

23   carriers, you know, on very short terms.  There are -- well,

24   in order to make the business viable for sale, one of the

25   things that had to be worked out were longer term

1    arrangements which meant substantial negotiations by any

2    buyer with respect to the carriers themselves.

3              Quality One has undertaken that task.  That

4    consumed a considerable amount -- not just for Quality One,

5    but for the debtors -- of their time and energy as part of

6    that process.  So you have a situation where this was not

7    just going to be turnkey operation for a buyer to come in;

8    it was going to require a significant amount of time and

9    energy.

10             Separate and apart from the expense reimbursements

11   that were required as part of that process, Quality One also

12   then went out and retained a banker.  Obviously, it retained

13   counsel, who's here in court today.  They can talk through

14   what those expenses were, but the bottom line was, this was

15   a significant commitment.  It was probably a harder deal to

16   do than most given the nature of the business because you

17   have a significant overseas contingent and, you know, the

18   large carriers on the other hand, you know, to put it

19   bluntly, have not been happy with the PCD situation for some

20   period of time.

21             So if we were ultimately to preserve enterprise

22   value, someone was going to have to come in and put a lot of

23   time and a lot of effort into that process.  We think the

24   break-up fee is reflective of that, we think it's necessary

25   to pay under the circumstances.  We think the expense

1    reimbursement has probably been exceeded at this point based

2    on my understanding from Mr. Wielebinski.

3              But the bottom line is that we think it's

4    appropriate.  We know it's arguably towards the high side of

5    market.  I mean I think the committee and Mr. Christopher

6    all point out that there are certainly cases in the two to

7    three percent range.  This one is four percent and I would

8    sort of like to get to the calculation in a moment, but the

9    bottom line is that it's four percent based on a contract

10   price of $105 million dollars.

11             When you talk about all of the assumed liabilities

12   including potential warranty and MDF liabilities, the price

13   can come to as much as $139 million dollars.  It doesn't

14   change as far as -- the break-up fee doesn't change as far

15   as it goes, but obviously it becomes smaller in relation to

16   that number.

17             The working capital adjustment could move down,

18   but the bottom line is it was fixed at a number that, one,

19   measured the effort that was required by Quality One as our

20   bidder, number two, you know, it's consistent with what the

21   overall sale price is, and three, certainly, is not out of

22   line for what is ultimately been proven by the market.

23             But what I'd like to do is ask Mr. Wielebinski if

24   he has something more that he would like to add, in respect

25   to the break-up fee?

1        MR. WIELEBINSKI:  If I may, Your Honor, a couple

2   of points.

3        THE COURT:  Sure.

4        MR. WIELEBINSKI:  One, besides -- there has been a

5   substantial investment by Quality One and I want does exceed

6   the proposed $1 million dollar expense reimbursement.  That

7   includes not just counsel fees, but direct out of pockets

8   including for numerous trips that Quality One's CEO had to

9   take to Asia to go meet with the very critical customers

10  involved in this transaction.

11       And frankly, Your Honor, we think the debtor was

12  benefitted by those trips because until we could show

13  somebody in Asia that PCD had a viable future with somebody

14  that was seriously interested in buying this company, I

15  think Mr. Grillo can testify that the customers in Asia were

16  very concerned with doing any business going forward with

17  PCD.  I think that once Quality One stepped in, there's been

18  at least a settling of the angst that's been out there.

19       In addition to my firm, Your Honor, there's also a

20  Mexican firm that we've had to retain because there's a

21  Mexican subsidiary that's part of the assets that are being

22  sold.  We've also had to retain an accounting firm that's

23  going to help us do the audit in connection with just

24  monitoring the inventory and verifying what we get at the

25  end of the day.

1           We do have an investment banker and even though

2     the entire fee is not included in those expense

3     reimbursements, there have been out of pocket costs that

4     they've incurred that we're responsible for.  I have

5     multiple counsel, Your Honor, which is a necessity in a

6     transaction of this size.

7           So it's not just one law firm that's involved and

8     it's not just a few expenses; it's significant expenses.

9           The other important point, I think, Your Honor, is

10    as I read the case law in this circuit, the justification

11    for the break-up fee has been satisfied.  We have come

12    forward with a legitimate offer which will serve as the

13    floor for any ultimate sale, assuming the Court approves

14    that.

15          But more importantly, the other standard is that

16    there's no be taint associated with -- or impropriety

17    associated with the granting of the break-up fee, and while

18    there has been an implication in the objection that there's

19    some sort of relationship there, the only relationship, Your

20    Honor, is that we were a pre-petition customer of the debtor

21    and we continue to be a customer of the debtor, but beyond

22    that, there's been no allegation and there's certainly no

23    facts that demonstrate that there's something untorted or

24    something bad about a transaction with Quality One W.

25          The rest is the reasonableness of the fee which

1    the Court can decide, but I did want to raise that element,

2    Your Honor.

3            THE COURT:  But the maximum cash component of the

4    Quality One bid is $47 million dollars?

5            MR. WIELEBINSKI:  Maximum cash component?

6            THE COURT:  Cash component.

7            MR. WIELEBINSKI:  Absolutely, Your Honor.

8            And I looked in the case law and I'm not aware of

9    a case in this circuit that says you only look at the cash

10   component when you determine what a break-up fee should be.

11   And to us, Your Honor, admittedly, we are taking on an

12   assumption of notes -- actually, we're citing new notes to

13   PineBridge and NCS -- and that's real value to us.  I mean

14   we think it's real value to the estate because it removes

15   those liabilities from the estate.

16           But it's not like we're taking on some obligation

17   that doesn't have a serious requirement for payment.

18   There's secured obligations, Your Honor; secured by

19   collateral that, you know, we'd otherwise like to know would

20   be unencumbered, but that's not how the deal was going to

21   work.

22           In addition to that, Your Honor, we are also

23   assuming executory contracts which will have a cure

24   component.  Which the committee conveniently has not

25   included in its calculation and in addition to that, Your

1   Honor, there are transactions costs that we're picking up,

2   which include the professionals -- it's somewhat ironic --

3   but we're paying for this fight today if we're the

4   successful purchaser.

5              There's also something called the MDF and the

6   warranty obligations, which we estimate, Your Honor, could

7   be as much as $10 million dollars and the debtor can confirm

8   that amount because it comes from their books.  You know,

9   whether those warranty obligations will actually arise is a

10  different story.

11             But when we add this up, Your Honor, 105 -- $105

12  million dollars is the base.  It can get as high as $139

13  million dollars, depending on what those obligations --

14  those additional obligations, real obligations, Your Honor,

15  that we have to pick up, are included.  And when you look at

16  that high number and you compare it with the break-up fee,

17  you get down to a 3.1 percent of the total value of the

18  transaction.

19             So I don't think it's just a hard 105, that's the

20  number.  I think it's dramatically higher than that.

21             THE COURT:  How much, if any, of Quality One's

22  money is now at risk?  In other words, obviously, the Court

23  would have to approve the sale before Quality One or the

24  buyer would be obligated to close.

25             So assuming that I were to approve the original

1    transaction, which is currently in flux, but if I were to

2    approve the original sale agreement and Quality One chose

3    not to close, how much money would it lose to the estate?

4                    MR. WIELEBINSKI:  Your Honor --

5                    THE COURT:  There's some debate about that, as

6    well.

7                    MR. WIELEBINSKI:  -- can I ask that question of

8    some people behind me that are -- that may know more than I

9    do just to make sure that I come back with the right answer?

10                    THE COURT:  That would be fine.

11                    Because one of the calculus issues, obviously, is

12    what's the cost to walk at this point?

13                    MR. WIELEBINSKI:  Your Honor, I think from our

14    perspective, the answer is over $4 million dollars, 2.5 of

15    which is the deposit we put up with the estate that's at

16    risk.  But that is money that we've incurred out of pocket,

17    that you ask what's the loss and maybe the question was

18    what's the loss to the estate, but the loss from Q1W

19    perspective is at least that amount.

20                    THE COURT:  The question was more if I were to

21    approve the sale transaction, and Quality One didn't close,

22    how much does it forfeit, if any?

23                    MR. WIELEBINSKI:  That's 2.5, Your Honor.  That's

24    the deposit amount.

25                    MR. GRILLO:  It's -- I'll give you a little bit

1    more explanation on it, Your Honor.  There's $2.5 million

2    dollar deposit.  There are certain circumstances in which

3    half the deposit goes back, which is the failure to fund

4    condition.  That was raised by, I think, both the committee

5    and by Mr. Christopher, and that was a scenario which we

6    were trying to eliminate this morning which is the, you

7    know, which of the financing conditions which people are

8    working on now, as I understand it.

9            But the bottom line is that that was -- otherwise

10   the $2.5 million is the number, but it's subject under the

11   failure to fund condition.

12           MR. WIELEBINSKI:  That's correct, Your Honor.

13           Thanks for that clarification, counsel.

14           Your Honor, the other point, I guess, Mr. Grillo

15   invited me to come up and just raise a few issues on the

16   issues he discussed.  With respect to timing, every case

17   that I've been involved in, no matter what side you're in,

18   with respect to a sale, there's always a request for more

19   time because it's axiomatic that particularly if you're a

20   bidder that more time is better.

21           But in this case, Your Honor, it doesn't mean that

22   you get the time, it's just that -- certainly, if we all had

23   more time to do things, it would be ideal.

24           That's just not our taking a negotiating position.

25   From our perspective, Your Honor, timing was one of the most

1    critical and I would say the most paramount factor that was

2    associated with our negotiations, price and timing, and

3    we've already given up on timing a few times already in this

4    case.

5            We gave up on it, Your Honor, when you told us

6    that you originally thought the hearing could be on October

7    16th and then you came back at my request and moved it back

8    to the 10th, because that was already beyond the deadlines

9    established in the APA for a sale hearing.

10           In addition, we gave the committee a six-day

11    extension just to file their objections.

12           Any additional extension, Your Honor, to us, is

13    fundamental enough, substantive enough that I will tell the

14    Court that in talking with our CEO -- we certainly have to

15    see what changes the Court makes -- but the timing is so

16    paramount that that is an issue that I'm not convinced that

17    Q1W will remain committed or can remain committed if that's

18    adjusted.

19           And part of the reason, Your Honor, is just simply

20    that we're coming into Q 4 of the year; it's an important

21    time period.  We're already eating into that and that's when

22    a large portion of the sales are expected to be made.  If we

23    lose that opportunity, if we move this back, certainly the

24    30 days or the 60 days that have been suggested, but even if

25    we move it back 30 days, Your Honor, it makes a huge

 1    difference for us.

 2            The other thing is understand that Q1W is a

 3    relatively small company.  It has committed for the last and

 4    a half months it's entire seen your executive group to this

 5    transaction.  They're spending 24/7 on this, Your Honor.

 6            If there was an opportunity cost -- because they

 7    can't do anything else but continue to focus on this, and

 8    they have to.  They don't have a large team, a large

 9    executive group that can be broken down and a few of them

10    work on this transaction.  It's the CEO, the general

11    counsel, the CFO, and all of their staff that are involved

12    in this on an absolute daily basis.

13            And they need to know that they're either going to

14    have an opportunity to buy this -- they know that other

15    bidders can come in, they know that there may be an auction

16    -- but they need to know that they're either going to

17    acquire this in the process or they're not and they can move

18    on to something else, and that's very important, Your Honor.

19            Those are, I think, my only comments on those

20    points.  Thank you very much.

21            THE COURT:  All right.  Thank you,

22    Mr. Wielebinski.

23            MR. GRILLO:  Your Honor, I just wanted to make one

24    point about the objection that was raised with respect to

25    the cash component versus the DIP financing.

1          Where Quality One got its financing from is not as

2     relevant for purposes -- and as Mr. Wielebinski pointed out

3     -- we didn't find any case law on this either, but the

4     bottom line is they have effectively have gone to our

5     existing lenders what have agreed to provide them financing.

6     So the bottom line is to the extent that they are assuming

7     those obligations as part of the bid -- that's part of the

8     consideration.  It doesn't fade away or it doesn't matter --

9     they're going to their own lender to get the front part of

10    the financing.  They would have to go to some other lender,

11    if it weren't this group of lenders, to get financing to pay

12    for it.

13          The fact that the financing is provided by

14    somebody who's already in the capital structure doesn't mean

15    that it makes the bid any less valuable.  Somebody else who

16    comes in still has to pay what the existing bid is.

17          THE COURT:  So wouldn't that be more equalized if

18    DLJ Credit Suisse said that they would provide that same

19    assumptive financing to any other qualified bidder in the

20    process, which I'm not expecting that they're not going to

21    say.  In other words, the playing field already at the

22    moment is $47 million -- up to $47 million cash, plus $65

23    million or so in assumed debt versus an all-cash bid with a

24    break-up fee and expense reimbursement on top.

25          MR. GRILLO:  Respectfully, Your Honor, I don't

1    know that I entirely agree with the analysis.  Only because

2    the bottom line is it's aggregate consideration.  The fact

3    you've got two secured lenders who are already in the deal,

4    who are providing the financing means that that financing

5    would have to come from somewhere.  Okay.  The fact that for

6    this particular borrower, because they spent four months as

7    part of those negotiations with them, that they are willing

8    to provide the financing.

9            One, it doesn't require them to provide staple

10   financing, in effect, for everyone.  You know, the first

11   rule is:  know thy borrower, right?  I mean that's the first

12   rule of lending at the end of the day.

13           So the bottom line is if they couldn't get it from

14   this group, then Quality One would have had to have gone

15   elsewhere.  This was the deal that, you know, worked out

16   under the circumstances.  So if someone else comes in and

17   bids, they have to come in with whatever Your Honor approves

18   in terms of the break-up fee, but whatever that ultimate

19   minimum overbid is, then they have come with it.

20           The Estate has gotten the benefit of that.  The

21   fact that there's the same party providing the financing is

22   to some degree irrelevant because the aggregate

23   consideration is what it is.  So as far as the fact that

24   it's 105 that it's based on -- we'll use that number for the

25   moment -- and it could (indiscernible), and that's what it -

1    - you know, the assumption of the other liabilities, we

2    didn't really compute that in, but if you do compute that

3    in, it brings the number down further.  Some of that is

4    contingent, so, obviously, it becomes a little fluffier

5    depending -- and it's not as hard a number as the 105 is

6    today and the other assumption of those -- the cure costs,

7    excuse me, of the agreements that are, in fact, decided.

8           But financing is financing.  You know, the dollar

9    is afungible.  Where they come from should not matter, and

10   effectively, what the committee and Mr. Christopher's

11   objection is, well, you have to think about where it comes

12   from.  They don't offer any precedent for that.  They cite,

13   you know, integrated resources, which we all know for

14   twenty-plus years now, as a standard, it doesn't change the

15   equation as far as that goes.

16          So we think, based on that, we think that

17   objection should be -- to the extent that it's pursued, that

18   it should be overruled as well.

19          Sort of moving ahead, Your Honor, the next --

20   we've talked about the break-up fee and the expense

21   reimbursement.  We've talked about the timing that's

22   requested.  You know, there's an allegation that's made on

23   page 14 of the committee's objection that there should be --

24   the debtors should be required to actively market their

25   assets post-petition.

1          Mr. Saperstein has put in his declaration -- and

2     we are still actively marketing.  No was has stopped

3     actively marketing.  I indicated in my opening comments that

4     we took the names that were provided to us by the financial

5     advisors to the committee to reach out to them, too.

6          We have not -- to be perfectly clear,

7     unequivocally, I can ask any of the debtors' representatives

8     who are here, no one has stopped marketing.  We have taken

9     meetings just this week with a potential bidder with the

10    management team this past week, you know, somebody who we

11    expect will be part of the process.  We are hoping that they

12    will be a part of that process, but there's been no basis to

13    make any sort of allegation or assumption that we are not

14    continuing to actively market.

15         We have a deal and we're very pleased with that

16    deal, but the bottom line is if a better one comes along,

17    the debtor understands perfectly well what his fiduciary

18    duties are.  And in fact, one of the issues that were raised

19    by the committee, which we -- we were certain -- we

20    indicated we weren't prepared to consent to is to fold them

21    into the process.

22         So one of the question that was raised was

23    approvals and consents and anything like that that we get,

24    we are prepared to share with them.  We are prepared to run

25    any decision that needs to be made by them in the event that

1   we do get a competing bid, we expect to be -- the debtors

2   expect to be working with both the senior lenders, although

3   it might be a little bit academic since they are, you know,

4   the cash portion gets taken care of either way -- but

5   certainly with the committee, to make sure that we have both

6   the highest and best bid as part of that process.

7           So with respect to their concern that their

8   involvement is necessary to ensure a fair sale process, we

9   fully agree.  So I don't think that we have any issue as far

10  as that goes.

11          There's a couple of other minor points -- I

12  shouldn't characterize them as minor -- with respect to

13  contracts that were raised, making sure that everyone has

14  the same time to both designate or to use a word, de-

15  designate contracts.  That should be equal all the way

16  around.  As far as that goes, I don't think that anyone has

17  an issue with that.

18          And again, in approving initial bids, we expect to

19  pull the committee in on everything with return --

20  determining who the qualified bids are.  You know, we're

21  prepared to amend the order to include that.

22          We've talked about the liquidated damages.  We've

23  talked about the -- we didn't talk about yet, the

24  requirements for a qualified bid.

25          We did talk about the assumption of the contracts.

1          We're certainly -- and if for some reason the

2    auction needs to be postponed or cancelled for whatever

3    reason, we certainly intend to take that up with the

4    committee as well.

5          THE COURT:  There's an issue about a virtual data

6    room; is that still in controversy?

7          MR. GRILLO:  We have the virtual data room.  I

8    don't believe that there's a controversy about that.  We

9    have access to -- we have gives access to everyone who's

10   asked for it.

11         We've also been -- you know, one of the concerns

12   that was raised early on by a potential bidder was making

13   sure that it was updated to include materials that may be

14   Quality One had reviewed when it was with the company.

15         Separate and apart from all that was in the data

16   room, we've endeavored to make sure that anything that was

17   reviewed in any on-site visit was made part of the data room

18   as well.

19         Your Honor, I think with that, I hit all of the

20   points from both objections.  Certainly, reserving the right

21   to respond to whatever the committee or Mr. Christopher

22   would like to sort of add.

23         I don't know if there's anything else that

24   Mr. Wielebinski wanted to add before we turn it over, but

25   with that, I think we've prepared to seat the podium.

1            THE COURT:  All right.  Very well.  Thank you.

2            Mr. Grillo, if you want to address, just in terms

3    of highlight the committee's remaining objections.  It

4    sounds like some have been resolved either before this

5    morning or this morning and then I'll leave you the

6    opportunity to cross-examine Mr. Saperstein.

7            MR. CARROLL:  Very well, Your Honor, and I thank

8    you.

9            And for the record, Schuyler Carroll of Perkins

10   Coie on behalf of the question.

11           Your Honor, just briefly, I think to summarize

12   what has been agreed, Mr. Grillo gave you most of the

13   detail, it is primarily the types of things that are between

14   the committee and the debtor, such as consultation rights

15   between the committee and the debtor.

16           But what is still left outstanding are the things

17   that really are in control of Quality One, and I'll go

18   through that, Your Honor.  First, Your Honor, it is our goal

19   here, solely, to ensure that we create a level playing field

20   and create a process that will maximize the value and

21   maximize competitive bidding.  And unfortunately, what we

22   have right now is a process that does not do that.

23           The first item, Your Honor, that we believe is

24   important to that is the timing.  And I think if we listen

25   to what Mr. Wielebinski told us, Your Honor will see that

1     it's clear that we do not have a level playing field.

2            We now have, Your Honor, on October 30th, which is

3     less that a month from now, as the bid deadline.  And what

4     Mr. Wielebinski told us is that for more than two and a half

5     months, his client has been working 24/7 on this deal.

6            Your Honor, there's obviously a big difference

7     between someone who's been in here for two and a half months

8     working 24/7 and somebody who is new for the table, and

9     Mr. Grillo told us that there is at least one party who is

10    brand new to the table and didn't even know about this until

11    after the bankruptcy filing.

12            So we're not talking about somebody who is

13    speculative, who is not really out there -- or excuse me --

14    who has been out there for a significant period of time, and

15    I can tell Your Honor that I have spoken to counsel to that

16    bidder and our financial advisors have spoken to their

17    financial advisors and they specifically said to us, look,

18    it's a very difficult time.  As Mr. Grillo pointed out, they

19    are Orthodox and this is the most busy season of holidays,

20    as it were, a couple of days last week, a day this week, two

21    more the week after coming up after that, that will take

22    them out of pocket significantly.

23            And I raise that, Your Honor, because when we

24    spoke to -- or really when our financial advisors spoke to

25    their financial advisors last week, they specifically told

1    us that client directed them not even to work on those

2    holidays.  So it's not the type of thing where we can just

3    have someone else from the firm handle it; it is a

4    significant difference.

5            And again, Your Honor, it goes to the real point

6    of we have a real bidder who, I think everyone will

7    acknowledge, has the wherewithal and has the motivation to

8    make a bid, who is saying they need more time.  We can go

9    into -- and I'd like to go into a little bit later, Your

10   Honor, why we don't think this is such a melting iceberg

11   that requires a rush to a sale.

12           But in short, we believe that if you look at the

13   cash flow and we now have the benefit of a couple of weeks

14   of actual operations, Your Honor.  If you look at those Your

15   Honor will see that the cash flow will allow us to operate

16   for a significantly longer period, but we're not asking for

17   that, Your Honor.  What we think is appropriate is just a

18   few more weeks, not off in months and months and into next

19   year.

20           Your Honor, Mr. Wielebinski said something else

21   also that I think is important and he talked about the

22   relationships that his client thought were important to

23   establish.  Well, Your Honor, that goes for any other bidder

24   as well.  They're going to need to have those same

25   conversations with vendors, with carriers and with other

1    parties.

2            Your Honor, with respect to the specific timing

3    here, there are two parts to it, as I understand it, Your

4    Honor.  There are the deadlines that Quality One has set out

5    and demanded and there then there's a -- what I'll refer to

6    as a third-party deadline -- that we, in this courtroom,

7    cannot control, and that is we understand that their lender

8    has given them a commitment letter that expires sometime

9    towards the end of October, and Your Honor, if we said,

10   well, we understand that we can't go this out into forever,

11   but perhaps we can back up to that deadline.  Maybe that's a

12   good way that we could compromise and preserve everyone's

13   rights here and still ensure a level playing field that will

14   allow other parties to come in.

15           Your Honor picked up on another important point

16   that I think plays to, both the timing and -- what I'll

17   discuss next -- the break-up fee, and that is the

18   contingencies, Your Honor.  We talked about one of them, and

19   as you so accurately pointed out, we have a maybe.  If

20   Quality One were so comfortable that this would be resolved

21   today or sometime in the near future, they could have made

22   it simple; they could have just stood up and said, Your

23   Honor, we've waived that condition, but they didn't.

24           And even if Mr. Goldberg reports back that his

25   client is -- we're Quality One, and the first lien -- excuse

1    me, and PineBridge are, which is essentially, we have the

2    substantial terms, we're working on it.  That's still not

3    done.  Quality One can, for any reason, simply come back and

4    say, you know what, we don't like the terms.  We're not

5    going to agree to them.  There's no signed document, and

6    that's a condition that's in their sole control; it's their

7    discretion.  It's not capable of us coming back and saying,

8    well, Your Honor, all the other parties were ready to go and

9    they should be forced to abide in good faith and move

10   forward.  Quality One is not required to do that.

11          The next issue Your Honor pointed out is with

12   respect to how much Quality One has at risk.  There are

13   really two parts to this, Your Honor.  One is that you were

14   referring to the amount of the break-up fee, compared to

15   what they have at risk, but I also view it in another way.

16   I view it with skepticism as to something that

17   Mr. Wielebinski said.

18          And I'll try and be precise as to what he said

19   because what he said is not what most say in this courtroom

20   in this type of hearing.  I expected him to come here and

21   say, Your Honor, if we don't get these deadlines, my client

22   is going to have to walk.  That's what I hear all the time,

23   and sometimes it's true -- pretty rare in my experience,

24   though -- but Mr. Wielebinski didn't even say that.

25          He said he's going to have to consider with his

1    client what would happen.  So he's not even telling us that

2    they would walk, but more importantly, Your Honor, is they

3    have all this money invested.  By their account, over $4

4    million dollars.  They have all this time and opportunity

5    costs invested, two and a half months, 24/7.

6           I don't think it's realistic for them to come to

7    this Court and say we're going to walk under those

8    circumstances, and the only thing we're talking about, Your

9    Honor, is a short period of time.  We're not talking about a

10   situation where sometimes it happens where there is a

11   monumental event that will be scheduled for the week after

12   the closing.

13          For example, I was in a luggage case once and the

14   luggage industry event was occurring a week after the

15   scheduled closing and the buyer would essentially be losing

16   the whole year.  That's not the case here, Your Honor.

17          Let me move on to the break-up fee, Your Honor.

18   What we heard is that essentially if you look at it in the

19   terms of what's most beneficial to the buyer and include all

20   contingencies and all non-cash, we get to a place that's

21   still above what any reported decision that I have ever seen

22   has approved, 3.1 percent.  The highest I can recall seeing

23   is 3 percent.

24          And what those cases all say, Your Honor, is that

25   that's the maximum that the Court should approve, not a

1    starting point and not a -- well, of course, we're going to

2    approve 3 percent.  That's what we always do.  So we would

3    submit to Your Honor if any break-up fee is appropriate, it

4    should be significantly less and it should be calculated on

5    the cash consideration.

6          Mr. Grillo and Mr. Wielebinski tried to make the

7    point, well, assume liabilities and cure and other things

8    are really the same.  They're not, Your Honor, but more

9    importantly, I've never seen a case that has calculated the

10   3 percent based on anything because cash.  They're not -- in

11   this particular case, Your Honor, the same thing for a very

12   important reason.

13         We have two groups of secured lenders.  We are

14   just at the very beginning of the case and we don't know if

15   those secured claims are valid or fully perfected.  If, for

16   example, it's ultimately determined that the second lien

17   lender's lien is not valid, then what do we get?  Two notes

18   that are in favor of them on some terms that they've gotten?

19         That's not what should happen.  What should happen

20   is what happened in every other case; the break-up fee is

21   calculated on the amount to the estate of cash.  Those notes

22   are not really available to the estate if those secured

23   liens are avoided and that is why Courts refer to the cash

24   component.

25         The similar issue, Your Honor, is related to a

1    couple of other parts, the warranty claims and the MDF and

2    some other parts that are part of the calculation of working

3    capital adjustment.  The buyer isn't here saying, oh, yes,

4    Your Honor, remember that under certain circumstances, the

5    working capital adjustment can reduce the purchase price by

6    $7.5 million dollars and of course they aren't saying that

7    their break-up fee should be calculated on that.  But we

8    don't know what the break-up fee -- excuse me -- what the

9    ultimate purchase price will be, and part of that is because

10    the things that go into that working capital adjustment are

11    part of what the buyer is asking a break-up fee on and it's

12    not terribly unusual to have a working capital adjustment or

13    other similar type of adjustments, but those types of things

14    that go into that are not included in the break-up fee, in

15    the standard calculation.

16            So, Your Honor, what we get to is a real -- if we

17    look at the true value of this, and I don't see any

18    differentiation really in the cases or any reason to

19    differentiate between the dollars out for a break-up fee

20    versus the dollars out for the expense reimbursement.

21    They're still dollars out to the estate.  They still have

22    the same effect on bidding because anyone who bids has to

23    pay both of those.  So we have a $5.25 million dollars

24    break-up fee expense reimbursement, bid protections,

25    whatever name you put on them, and that comes to between

1    10 percent and 14 percent, depending on what the actual cash

2    usage would be, Your Honor.  So we believe that's

3    substantially outside of a range of anything that has been

4    approved or should be approved, Your Honor.

5            Mr. Wielebinski also made the point of taint in

6    relationships -- and I will tell Your Honor I don't know

7    anything about the relationships as I stand here today other

8    than what I see in the papers and it raises some questions

9    for me, Your Honor.  First of all, the asset purchase

10   agreement requires a substantial payment of about a half a

11   million dollars to be made to the debtors' CEO.  We had the

12   discussion about all of the trips that the debtors' CEO took

13   with Quality One and those could be perfectly good faith,

14   commercial, arm's length.  I'm not here to tell Your Honor

15   anything different, but on the other hand they may not turn

16   out to be that.

17           And one of the things that causes a bit of

18   concern, Your Honor, is there was pre-petition litigation

19   several months before the filing and the State Court, New

20   York State Court entered a TRO because there was testimony

21   that the debtor had been selling product under market value,

22   and again, that may be perfectly acceptable.  It may have

23   been the best thing to do at the time, I'm not here to tell

24   Your Honor anything different, but put that together with

25   the fact that Quality One is a customer of the debtor and a

1    very unusual provision in the asset purchase agreement --

2    and I apologize, Your Honor, we didn't point this out in the

3    objection -- but there's a right of first refusal on behalf

4    of the buyer for any sales of -- excuse me -- of any

5    inventory outside the ordinary course.

6              All of those taken together, Your Honor, might

7    indicate there is something more that we should be concerned

8    about.  I want to be very clear, Your Honor, I don't have

9    any facts other than what's in the papers, so I don't want

10   to disparage anyone, but it is possible that our

11   investigation may disclose something.

12             Now, Mr. Wielebinski talked about how the cure

13   amounts should be incorporated into the break-up fee

14   calculation.  I'd be more than happy to include that, expect

15   no one in this courtroom has any idea what those cure

16   amounts will be and no one will have that idea until, as I

17   read the asset purchase agreement, at the earliest, a day

18   before the auction and at the latest, a day before the

19   closing.  That's because the EPA does not require the

20   purchaser to specify what executory contracts they will

21   designate to be assumed until the day before the auction and

22   gives them the right to reserve, as Mr. Grillo said, de-

23   designate contracts until right before the closing.

24             THE COURT:  Are those -- from the committee's

25   analysis, are those cure amounts included in the $47 million

1  or in addition to the $47 million?

2          MR. CARROLL:  It's sort of both, Your Honor.  The

3  cop of $47 million includes the cure amounts, but the

4  purchase price -- excuse me, the cash component of the

5  purchase price includes those cure amounts so that if the

6  payment to the first lien lenders is less than $47 million,

7  it still gets increased -- the cash component gets increased

8  by the cure amount.

9          Your Honor, there are certainly a number of other

10  less-important objections that we have and I can go through

11  those if you'd like, but they are in our papers and clearly

12  the big picture items are the break-up fee and the bid

13  protections -- excuse me -- the bid protections and the

14  timing.  So I'd like to -- unless you have any questions --

15  move along and Mr. Christopher's counsel, if he has anything

16  to add?

17          THE COURT:  All right.  Well, let me see if --

18  we'll go ahead and hear from Mr. Christopher's counsel and

19  then U.S. Trustee, if any, issues on the business procedures

20  and then we'll get cross-examination of Mr. Saperstein.

21          MR. CATALANELLO:  Thank you, Your Honor.

22          THE COURT:  Feel free to just point out the things

23  that are in addition to or you disagree with.

24          MR. CATALANELLO:  You just spoiled my thunder.

25      (Laughter)

1      Gerard Catalanello of the law firm, Duane Morris, on

2   behalf of Mr. Phillip Christopher.

3      Correct, Your Honor, I will not stand here and repeat

4   everything that Mr. Carroll said, although I would make it

5   clear for the record that Mr. Christopher supports wholly

6   the objections raised by creditor's committee.

7      In my remarks, which I promise will be brief, I'd like

8   to focus first on process.  I lost count around 30 or 35

9   times, how many times I should say that Mr. Grillo mentioned

10  the word process, but what I didn't lose count of or

11  certainly lose sight of, is the fact that when you drill

12  down behind the presentation made by the debtor and by

13  counsel for Quality One, there's no their there, there

14  really isn't.  Because there's no meaningful process that's

15  established by way of these proposed procedures.

16     Now, Quality One's lawyer is right, most competitive

17  bidders -- my client is a competitive bidder -- would come

18  up here and say I need more time, of course, everybody wants

19  more time.  But that's not what you're hearing today, you're

20  not hearing that from Mr. Christopher or the committee.

21  What we're saying is create a level playing field.  Create a

22  level playing field so that the extraordinary relief that

23  PCD is asking for -- and by the way, it is extraordinary --

24  they rushed into court, filed a low slew of papers asking

25  this Court to establish very, very quick deadlines for a

1    very large transaction.  That's extraordinary.

2         But they came into court asking for that extraordinary

3    relief without giving the parties an opportunity to fully

4    flush out a fair process.  That's not what this is about.

5    That's not what 363 requires.  What it does require is that

6    competitive bidders are given an opportunity to do their

7    diligence, to use their investment bankers -- and by the

8    way, Mr. Christopher hired (indiscernible - 11:23:06) as an

9    independent investment banker to flush out information and

10   diligence and to put together the ingredients for a

11   competitive bid.  That's what the process requires.

12        Particularly where nowhere in any declaration filed by

13   anybody, is there anything that suggests a sale has to

14   happen, has to happen, by October 3rd or October 10th?

15   Yeah, we know that Quality One wants it to happen like that.

16   I'd do the same thing if I were him, push it through, ram it

17   through.

18        But there's nothing there that truly supports the fact

19   that the deal has to be done by October 3rd or October 10th.

20   And in fact, they've had months, months, you heard it,

21   argument, testimony, statements and declarations, they've

22   had months to formulate their bid.  They've taken trips to

23   Asia.  They've felony around meeting with vendors and

24   suppliers.  They've had the comfort to incubate this bid for

25   a very long period of time and yet their not getting

1    competitive bidders, whether it's my client or others.

2    They're not giving us anything close to that and that's not

3    fair.   That's not meaningful process, which is a word you

4    didn't hear in the presentation by the debtor

5        So if there's one point that we would hammer home for

6    the Court to seriously consider, it's the timing.   It's the

7    timing, give competitive bidders some more time to formulate

8    their bids, do their diligence

9        Now, second point, information.   Mr. Grillo glossed

10   over the fact that everything is in the VDR.   Today is the

11   first time I've heard about a VDR.   We, therefore, would put

12   in our objection that there should be a VDR.   That's what

13   you see in these types of deals.   That way there's equal

14   access to information for all competitive bidders.   I'm glad

15   to hear that the debtor is going to do that, but what has to

16   be in the VDR is all the diligence required to compute and

17   put together a bid.

18       Inventory, what is an inventory?   Detail about

19   defective, refurbished, quality by model number.   We need to

20   see that information in order to understand what it is that

21   we're actually bidding on.   So information must be real

22       Accounts receivable, what are they?   Bad versus good,

23   projected.   We need to see that detail.   I'm hoping, based

24   on what we heard from Mr. Grillo, that that information is,

25   in fact, going to be in the VDR for my client and for other

1    competitive bidders.

2         Now, what are we bidding against?  We don't even know

3    because the asset purchase agreement that's been submitted

4    doesn't have any schedules.  Not only is there no

5    information about cure amounts, Mr. Carroll pointed that

6    out, but there's nothing in the schedules to show any of the

7    detail.  We don't know what we're bidding against.  We need

8    the schedules to the asset purchase agreement so that we can

9    match them up, an apple to an apple because everybody knows

10   when we submit a competitive bid or anybody, debtor is going

11   to look at it, the financial advisor is going to look at it

12   and they're going to say, what is it?  Compare it to what it

13   is that we have, right.  Line it up.

14        We can't line it up -- we can't redline a document

15   until we get the whole document.  We need to know what is it

16   that Quality One is actually buying.  We need the schedules.

17   There's nothing in any of the documents filed that provides

18   any of that information

19        So, again, information is critical, Your Honor.

20             THE COURT:  Are you talking about beyond assumed

21   contracts and assumed liabilities?

22             MR. CATALANELLO:  There are a list of schedules in

23   the APA like liabilities that are being assumed, Schedule

24   2.1.  Try to find it.  It doesn't exist.

25             So whatever schedules are in the APA, whatever

1    exhibits, they have to be made available to all bidders,

2    that's just fundamental.  That's 101.

3              Now, there's a very, very troubling statement in

4    paragraph three of the proposed bidding procedures, which in

5    some substance, Your Honor, says that the debtors can in

6    their own discretion decide what, if any, diligence they're

7    going to give to competitive bidders.  I've never seen that

8    before.

9              Clearly, a level playing field would not permit

10   that kind of language.  What I'm assuming Mr. Grillo is

11   prepared to do based on some of the remarks he's made is

12   remove that kind of language.  Whatever diligence is

13   available to one bidder must be made available to all other

14   bidders and I agree wholeheartedly with the requirement that

15   the committee be included in all of those decisions.  It

16   can't be up to the debtor to willy nilly pick who's going to

17   get what; that's not a fair process.

18             Now, in terms of the other objections that

19   Mr. Christopher lodged, again, I'm not going to repeat them

20   because many of them were contained in Mr. Carroll's

21   presentation, but I would emphasize that the good faith

22   deposit break-up fee, that whole dichotomy seriously,

23   seriously requires examination because either one is too low

24   or one is too high, but there's something fundamentally

25   unfair with requiring any competitive bidders to put up a

1    deposit which is nearly double the amount of the stalking

2    horse, while the stalking horse at the same time comes to

3    this court asking for a break-up fee of nearly double its

4    deposit.  It's just -- it's unbalanced.  It's unbalanced.

5            And however we get there, Your Honor, whether we

6    focus on the cash component only versus the assumption of

7    liability component, I'm not -- I'm not here to tell you how

8    to get there, but again, it's got to be fair.  To ask for a

9    competitive bidder to put up $5.25 million when the stalking

10   horse only has $2.5 at risk -- and by the way, it could be

11   half of that if the failure to fund obligation is not

12   satisfied -- that's not a fair process.  And so it's just

13   got to be fair.  It's got to be fair.

14           Whatever deposit the competitive bidder must put

15   up should, of course, include a percentage of the overall

16   purchase price.  I'm not looking for any advantage, I'm just

17   looking for a fairer process.

18           THE COURT:  And how, in that analysis, how does

19   the treatment of the second lien debt, the DLJ Credit

20   Suisse, how does that differ from the perspective of a

21   prospective bidder?  Would you or your client be

22   anticipating that it's an all-cash bid, 105 or whatever the

23   starting number is, plus assumptions, as opposed to $47

24   million plus assumption of the second lien debt, plus

25   assumed liabilities?

1          What are you all bidding at if you were to bid?

2          MR. CATALANELLO:  Well, that's a great question

3     and I don't have an answer yet because we don't have the

4     access to any information, but I will tell you that as a

5     competitive bidder, we clearly support the committee's

6     presentation and position which is that if the second lien

7     lenders are making, quote, financing available, it's not --

8     there's nothing magical about it.  All it is, is they're

9     allowing Quality One to take the inventory owned by PCD and

10    liquidate it.  That's all they're doing.  It's not like they

11    sat down and picked the buyer.

12         Mr. Grillo says know thy borrower.  Of course,

13    know thy borrower when you're extending real credit.  All

14    they're doing here, Your Honor, is saying, hey, you know

15    what, we want you to buy the asset Quality One.  You can use

16    the debtors' inventory and you can liquidate it and pay me

17    over a six months' period of time for Credit Suisse or 18

18    months period of time for PineBridge.  I mean if there's

19    going to make that available to Quality One, I truly, truly

20    would question motives if they didn't make it available to

21    all of the competitive bidders.

22         Whether my client will take advantage of that, I

23    don't know, but again, a level playing field would require

24    that everybody gets to liquidate the debtor's inventory and

25    pay off the second lien lenders, to the extent that they

1    have a valid lien and I know that that's an issue that

2    Mr. Carroll has raised.

3              So in a longwinded way, I would say, yes, it

4    should be equal for everybody and whether they take

5    advantage of that, that can be ultimately decided by the

6    bidder and ultimately taken into account by the competent

7    and the debtor when making a decision as to highest and

8    best.

9              Those are the points that I would like to

10   emphasize, Your Honor, and I'm clearly here for any

11   questions.

12             THE COURT:  Okay.  Thank you.

13             MR. CATALANELLO:  Thank you.

14             THE COURT:  All right.  I do want to get

15   Mr. Saperstein up, but Mr. Grillo, let's address this issue

16   first, if we can, which is at least from the debtors'

17   vantage point, which we then need to hear from the second

18   lien lenders, let's do that.  If -- whether it's Christopher

19   or someone has not yet been identified here wants to come in

20   and overbid the Quality One bid, is the second lien

21   financing that's been made available to Quality One in the

22   proposed contract similarly going to be available to other

23   qualified bidders or do they have to bid all cash out of the

24   gate, other than assumed warranty liabilities, et cetera?

25             MR. GRILLO:  Excuse me, Your Honor.

1          Again, Emanuel Grillo from Goodwin Procter.  I was

2     debating as to how to answer that question for a couple of

3     reasons.  One is that Mr. Catalanello's client, longer than

4     any others, has been involved with this company, and has

5     been threatening to bid since February.  And again,

6     Mr. Catalanello, when asked whether or not his client was

7     going to bid by Your Honor said, I don't have an answer to

8     that, Judge.  I don't have that information.

9          The bottom line is that, Your Honor, until you --

10    there's a phrase that goes "put up or shut up."  I think in

11    this instance as far as Mr. Christopher is concerned, who is

12    a litigant with the debtors, to whom just asked us for a

13    confidentiality agreement just this week, notwithstanding

14    the fact that he's been involved with this process for a

15    considerable period of time, now comes forward and says we

16    need a level playing field.

17         If the existing secured lenders want to advance

18    money to Mr. Christopher, he can go ask them.  He knows

19    where to find them.  Why?  Because he was the one who

20    borrowed from them back at the time when he was CEO.  It

21    requires no effort on his part to pick up the phone and call

22    Mr. Goldberg's client, Mr. Salzberg's client, and see if

23    they will extend that financing.

24         To come to this court and say to this Court well,

25    we don't know if that's going to be made available to

1    anyone.  From the former CEO, who not only ran the company,

2    but left the company with a third of the employees and set

3    up a competitor across the street, I find beyond belief that

4    they would take this Court's time with something said like

5    that.

6            That being said, Mr. Catalanello's client can

7    certainly pick up the phone.  He knows them all.  He knows

8    Mr. DeCosta from DLJ.  He knows personally the PineBridge

9    folks who are providing the financing.  You need financing,

10   you pick up the phone.  I don't think it's something for

11   this Court to provide to him.  No other party who has come

12   in to look at the company to this point in time including

13   the party that has indicated that it is willing to bid has

14   said that they need for the existing secured lenders to

15   provide financing.

16           The bottom line is, the bid is 105.  Where Quality

17   One gets its financing versus where Mr. Catalanello's client

18   gets his financing is not frankly, the debtors' concern.

19   The bottom line is, this bid, subject to the contingencies

20   that we were talking about earlier is either financed or it

21   isn't Mr. Catalanello's client can go get financing or he

22   can't, okay.  I find it hard to believe that they are going

23   to offer, frankly, in light of Mr. Christopher's conduct,

24   and we're not going to make it a part of this proceeding

25   until Mr. Catalanello's presentation where he pretends that

1    his client's an innocent third party to come in to this

2    court and say all of a sudden, we need stable financing.

3              THE COURT:  But at this juncture setting who shot

4    John aside, sure, any potential competing bidder is $105

5    million in cash?

6              MR. GRILLO:  That's how we view -- plus, whatever

7    the opening minimum overbid Your Honor sets is.  That's what

8    we -- that's what we view because that's what they're

9    paying, okay.  The fact that they got something who's in the

10   deal to finance it, kudos to them.  It wasn't because we had

11   anything to do with it.  If somebody agrees to finance them,

12   it could be anyone.  It could be the gas station down the

13   street.  I don't even care.  The debtors don't care where

14   that money comes from as far as that goes.

15             THE COURT:  All right.  Let's get to

16   Mr. Saperstein then.

17             Mr. Dimino, before I do that, any issues from your

18   office's vantage point before we get to the...

19             MR. DIMINO:  Thank you, Judge.

20             Alfred Dimino, from the office of the United

21   States Trustee.

22             Judge, I think that the issues, at least those

23   items which are at issue, have been clearly well articulated

24   by both sides.  The United States Trustee obviously believes

25   that the process should be established that would have a

1    leveled playing field that would maximize the value of the

2    assets for the benefit of the creditors.

3            I don't think it's lost on anyone that at this

4    stage of this game at $105 million dollars, this is a sale

5    for the benefit of the secured creditors.  There is no money

6    according to the recent data records that I've seen unless

7    there's some imperfection in the perfection of the security

8    interests for the unsecured creditors; therefore, it's

9    fairly obvious why the creditors' committee would want to

10   have as much time as possible to be able to market it to

11   obtain a higher and better offer that would obviously then,

12   lead to money on the table for the unsecured creditors.

13           What -- I heard that there was two issues with the

14   timing.  One being the ability of the debtor to continue to

15   operate and the second part being the need on the party of

16   the stalking horse bidder to close.  But no one has stated

17   that the parameters that exist at this point, that are being

18   requested, are so set in stone that there couldn't be some

19   modification to that.

20           Given the time and the length of the cases here,

21   United States Trustee would think that if the Court was

22   directed -- was to direct that there be an additional week,

23   I don't think that that would jeopardize the closing, nor

24   does it appear to jeopardize the ability of the debtor to

25   operate and may assist in bringing others to the table.

1          With regard to the break-up fee, if the Court is

2     to determine that a break-up fee is appropriate, it would

3     appear just from the numbers -- or that the amount already

4     is high.  There's a million dollars in costs in there and

5     the bid protection on top of that, just as a -- it appears

6     it's somewhere around $2 million dollars would be reasonable

7     under the circumstances.

8          Additionally, the last issue that I saw was that

9     it seems to me that there's no reason to ask new parties to

10    the table to put up a deposit that's any higher than what's

11    on the table today.  That seems to be fair.  They're going

12    to have to close.  They're going to have to get a -- if

13    another bidder comes in and tops the existing offer, then

14    they're going to have to come in and get their financing and

15    close the deal within the same basic period of time.

16          We obviously like to hopefully see very

17    competitive bidding.  That has yet to be seen.  Thank you.

18          THE COURT:  Thank you.

19          All right.  Mr. Saperstein, if you would head to

20    the witness box on the right-hand side of the courtroom, and

21    when you get there, just stand to be sworn by the court

22    reporter.

23       (Witness Sworn)

24          THE WITNESS:  Yes, I do.

25          THE CLERK:  Please be seated.

1          Please speak and spell your name for the record

2     and your address.

3          THE WITNESS:  David Saperstein, S-A-P-E-R-S-T-E-I-

4     N.

5          THE COURT:  And again, for the benefit of the

6     record, the Court has accepted Mr. Saperstein's declaration,

7     that ECF docket item 47, as his direct testimony in support

8     of the bid procedures motion.  That would then place him on

9     cross-examination to the committee.

10          So, Mr. Carroll?

11    CROSS-EXAMINATION

12    BY MR. CARROLL:

13    Q    Good morning, Mr. Saperstein.

14    A     Good morning.

15    Q    You have -- let me rephrase that question.

16          Have you been the primary person at BGSA working

17    with the debtors to market their assets?

18    A     Yes.

19    Q    And when did that begin?

20    A     January of 2012.

21    Q    And when did you first contact Quality One?

22    A    I don't have the precise date.  It was probably two

23    months after we began.

24    Q    So that would be March?

25    A     Again, I don't -- I would have to go back to my records

1    and provide you with the precise date.

2    Q   Mr. Saperstein, I see that you have some papers with

3    you, would you have those notes with you right now?

4    A    No, I do not.

5    Q   Okay.  Is there someone in the courtroom who does?

6    A    No.

7    Q   So your best guesstimate is you first spoke with

8    Quality One on or about March of this year?

9    A    March or April.

10   Q   Okay.  And when did Quality One begin working on this?

11   A    As soon as we began the discussions.

12   Q   And did there come a time when those discussions

13   terminated?

14   A    No.

15   Q   So, from about March or April of this year until now,

16   Quality One has been working on this transaction with you?

17   A    Yes, although the pace of the work ebbs and flows as it

18   does in any deal situation, and it sort of accelerates

19   towards the end, whereas in the beginning, there's a much

20   slower pace of discussion, exploration of strategic merits,

21   things of the sort.

22   Q   And I apologize I didn't ask this at the beginning,

23   Mr. Saperstein, but what is your position at BGSA?

24   A    I'm a vice president at BGSA.  I run all of our M & A

25   execution.

1    Q    And how long have you been doing that for BGSA?

2    A    I've been doing that for three years.

3    Q    And were you in a similar position somewhere else

4    previously?

5    A    I was, I was at Goldman Sachs in the investment banking

6    division.

7    Q    And how long was that for?

8    A    That was also for three years.

9    Q    Did you have a previous position similar?

10   A    I did.  I worked at the -- in the corporate finance

11   group at Deloitte in mergers and acquisitions.  Overall,

12   I've been in the mergers and acquisitions field for ten

13   years and I have a bachelor's degree in economics from

14   Stanford and an MBA in finance from Wharton.

15   Q    Thank you.

16            And so during your experience, which party is it

17   typically that controls the pace of a negotiations?

18   A    It depends on the robustness of the competitive

19   process.  To the extent that there is a lot of competition

20   and that there's a lot of interest, it's the seller that

21   sets the pace because the seller has the leverage against

22   the buyers.

23            To the extent that there is not that, then the

24   leverage is a bit more equalized and the buyer has a bit

25   more ability to set the pace.

1   Q  Well, let me ask you a couple of questions on that,

2   Mr. Saperstein.  In your experience, I'm sure you've seen

3   instances where the seller did not have a lot of leverage

4   and the buyer was, for one of many reasons, the only game in

5   town, and the buyer demanded things with respect to timing,

6   correct?

7   A  Can you rephrase the question?

8   Q  Sure.  Let me try it again.

9          In your experience, you have seen situations where

10   the buyer has more leverage than the seller and the buyer

11   demands certain things respect to timing?

12   A  If the question is, have I seen certain situations like

13   that, then the answer is yes.

14   Q  And with respect to this negotiation, isn't it true

15   that Quality One was really the only buyer who came to the

16   table?

17   A  No, that's not true.

18          We contacted -- well, to specifically address your

19   question, as it relates coming to the table, I would define

20   that as submitting a bid and there were six parties that

21   submitted bids.  Five of them were in writing and one of

22   them was verbal.

23   Q  One of them was?

24   A  Verbal.

25   Q  Thank you.

1           And when was that submission, was it -- let me

2     rephrase that, excuse me.

3           Was there a deadline that you set, prior to the

4     filing?

5     A    Yes, there were deadlines.  There were a series of

6     deadlines that we set, prior to the filing in order to

7     accommodate -- in order to maximize the number of

8     participants who could participate.

9     Q    And who was really the driving force of those

10    deadlines, was it the debtors or was it the buyers who were

11    giving you information and that's what you were making those

12    deadlines based upon?

13    A     It was the debtors as well as the debtors' advisors,

14    including us and counsel.

15    Q    Well, in answers to my previous question you said --

16    and I apologize that I'm not using your precise words -- but

17    you said generally that you were doing that to maximize the

18    number of participants, correct?

19    A     True.

20    Q    And so your deadlines, the deadlines that you and the

21    debtor set, were based upon what the buyers were telling

22    you, correct?

23    A     No, they were based on our judgment of what would be

24    appropriate in order to be able to maximize the number of

25    bidders while taking into account the timing constraints

1   that the company had which were very, very real, related to

2   what was happening in the operations with customers and

3   vendors.

4   Q   And your judgment was informed based upon -- in

5   addition to the items that you just mentioned -- the

6   information the bidders told you, correct?

7   A   I don't really understand the question.

8   Q   Let me ask it a different way.  So, if I understand

9   what you're saying, you're telling me that what the bidders

10  told you about the timeline and the deadlines was irrelevant

11  to your judgment; is that correct?

12  A   No, it was a factor, but not the determining factor.

13  Q   And in terms of the negotiations with Quality One, you

14  mentioned at the beginning that the pace -- and again I'm

15  not using your exact words -- but the pace ebbed and flowed;

16  is that correct?

17  A   Correct.

18  Q   And with respect to those deadlines -- excuse me --

19  with respect to that pace, isn't it true that Quality One

20  was really the one who was really determining those

21  deadlines?

22  A   No, no, it was the case that Quality One had a certain

23  number of workstreams that they needed to accomplish in

24  order to arrive at the binding purchase agreement that was

25  submitted to this Court.

1              And to the extent that -- and so we understood

2      those.  We listened to them.  We took them into account, but

3      at the same time, we never allowed them to take all of the

4      time that they want in order to work through those various

5      workstreams.  I primarily relate it to financing and due

6      diligence.

7      Q    Primarily relate it to?

8      A     Financing and due diligence.

9      Q    Thank you.

10             In your declaration, you mentioned one of the

11     intangible benefits of having a stalking horse bid -- and

12     there were a couple of them, actually.  One was that it

13     offers assurances to the debtors' vendors and customers and

14     carriers and other business parties -- counterparties, that

15     the debtors' business will continue as a growing concern; is

16     that correct?

17     A     Correct.

18     Q    And you also said that having a committed buyer

19     sentenced a very clear signal to the market about the

20     assets, their value, and the ability to continue as a going

21     concern; is that correct?

22     A     That's correct.

23     Q    And have you -- withdrawn.

24             In your declaration you've also indicated that --

25     I'm characterizing -- that the assets had been fully shopped

1    prior to the signing of that declaration; is that correct?

2    A    That's correct.

3    Q    And is that what you believe to be the case today as

4    well?

5    A    Yes, absolutely.

6    Q    Okay.  And Mr. Grillo indicated earlier -- and I think

7    that you were here in the courtroom at the time -- that

8    after the bankruptcy filing, there was a new party that came

9    forward and I think Mr. Grillo characterized them as a party

10   we all thought would be very interested and hopefully come

11   up with a substantial bid.

12            Did you hear him say that?

13   A    Yeah, absolutely, and not only did that party come, but

14   we brought that party in.

15   Q    And when did that happen, Mr. Saperstein?

16   A    Discussions occurred approximately one week before the

17   filing.

18   Q    And when was it that you learned of this party?

19   A    One week before the filing.

20   Q    So if I understand you correctly, you believe --

21   withdrawn.

22            So, if I understand correctly, this is a party

23   that you identified, but did not identify until one week

24   before the bankruptcy filing; is that correct?

25   A    That's correct.

1    Q    Okay.

2          MR. CARROLL:  Your Honor, may I have just one

3    moment?

4          THE COURT:  Certainly.

5          MR. CARROLL:  Thank you.

6          Thank you, Your Honor.  Just a couple more

7    questions for Mr. Saperstein.

8    BY MR. CARROLL:

9    Q    I believe Mr. Grillo also indicated earlier that there

10   were a number -- and this number may not be correct -- but I

11   think he said 16 parties at the creditors' committee's

12   financial advisors raised with you that had not been

13   contacted before; is that correct?

14   A    There were a certain number of parties.

15   Q    Mr. Saperstein, could I just ask you if you --

16   A    Put a number?

17   Q    -- if you could give us an answer, if you need to

18   refresh your recollection or do something previously, but

19   I'd like first for you to answer the question.

20   A    Oh, yeah.  The answer is yes.  I don't know about the

21   number 16, which is what I was looking to verify.

22   Q    Very well, if you'd like to look, please go ahead.

23   A    Yep.  The answer is yes to your question.

24   Q    And those are all parties that you had not spoken with

25   or identified previously, correct?

1    A    That's incorrect.

2    Q    I'm sorry?

3    A    That's incorrect.

4    Q    Oh, I'm sorry, what about that is incorrect?

5    A    There were a number of parties that we had already

6    spoken with.

7    Q    Oh, can you tell me how many you had already spoken to?

8    A    One, two, three, four, five -- five.

9    Q    Five that you had already spoken to, so it was about 11

10   then, correct?

11   A    Yeah.

12   Q    And then had you reached out to Mr. Christopher, prior

13   to the bankruptcy filing, to engage him?

14   A    No.

15   Q    And why was that?

16   A    Because we didn't view Mr. Christopher as having the

17   financial ability to consummate a transaction like this.

18   Q    So you just didn't ask him, did you?

19   A    No.

20   Q    Under the term -- withdrawn.

21        Have you reviewed asset purchase agreement?

22   A    Of course.

23   Q    Thank you.  And under the terms of the APA, there is a

24   working capital adjustment, correct?

25   A    Correct.

1    Q    Do you understand how that works?

2    A    Yes.

3    Q    And is it correct that if there were a positive

4    adjustment to working capital of say $20 million dollars,

5    the maximum adjustment to the purchase price would be $7.5

6    million dollars?

7    A    Yes.

8    Q    And that is the case if the positive adjustment is

9    higher, say, $30, $40, $50 million dollars as well, correct?

10   A    Correct.

11   Q    And if there was no cap to that, that would increase

12   the purchase price by whatever the working capital

13   adjustment would be, correct?

14   A    Correct.

15   Q    And where would the value of that increase go?

16   A    To the estate.

17   Q    And to whom in particular, what constituency of the

18   estate?  Let me rephrase the question for you.

19            Isn't it true that because the senior lenders are

20   being paid in cash and the second lien lenders are receiving

21   notes in the satisfaction of their claim, that that value

22   would go to the unsecured creditors?

23   A    I would need to review.  I don't -- I don't recall.  I

24   don't recall if the working capital adjustment implies an

25   increase in the PineBridge note exclusively or if it goes

```
 1   elsewhere.

 2   Q   Well, what we're talking about actually is not the

 3   PineBridge note, because what we're talking about is what

 4   would happen if there was not a cap.

 5   A    Right.

 6   Q   So if there was not a cap and there was additional

 7   value brought in, where would that value go?

 8   A    Yeah, so it would go to --

 9              MR. GRILLO:  Objection.

10              That's not part of the deal.  I mean the deal is

11   what the deal is.  The fact that there's -- if it were not

12   part of (indiscernible - 11:56:42) asks the client to

13   speculate where the funds would go if the deal was different

14   than it's proposed, but the bottom line is that the deal is

15   what's in the documents.  It's not if there were not cap on

16   the adjustment, where would the value go?  That's not the

17   deal.  If someone else wants to bid that deal, they

18   certainly can.

19              THE COURT:  Do you want to refer to a specific

20   section of the APA so that we can at least drill this down

21   just a little bit further.

22              MR. CARROLL:  If I could have just a moment, Your

23   Honor?

24              MR. GRILLO:  Your Honor, if he's going to refer to

25   a specific -- can I bring a copy of the agreement to the
```

1    witness?

2              THE COURT:  I think that would be fair.

3              THE WITNESS:  Thank you.

4              MR. GRILLO:  Judge, would you like a copy of the

5    documents?

6              THE COURT:  The Court has them, yes.

7              MR. GRILLO:  Okay.  Your Honor, may I approach the

8    witness, please?

9              THE COURT:  Yes.

10   BY MR. CARROLL:

11   Q   Mr. Saperstein, I would like to direct your attention

12   to page 20 of the asset purchase agreement, and Section 4.5.

13             And are you familiar with that section?

14   A   I am.

15   Q   Is that the section that you were just talking about,

16   the working capital adjustment?

17   A   Yes.

18   Q   And if I could ask you to go back for a moment, there's

19   really two parts to the working capital adjustment.  There's

20   a positive side, which we were talking about, and a negative

21   side; is that correct?

22   A   Correct.

23   Q   So, if the working capital judgment is negative and the

24   adjustment requires an adjustment of more than $7.5 million

25   dollars negative, what happens under that circumstance?

1    A    It's MAE.

2    Q    It's a?

3    A    A material adverse event.

4    Q    And what does that give rise to?

5    A    It gives Quality One the opportunity to terminate -- to

6    not close on the agreement.

7    Q    And in that event they would get their full deposit

8    back and they would be released from any liability, correct?

9    A    I don't know about the deposit.

10    Q    So, in the event that the working capital adjustment

11    goes down by seven and a half million -- excuse me -- more

12    than $7.5 million, the purchaser gets the ability to walk.

13             But in the event that it goes above any positive

14    $7.5 million, there's a cap on it and the buyer would

15    receive the benefit of that working capital adjustment; is

16    that correct?

17    A    They would receive the benefit of the difference

18    between the cap and the above.

19    Q    Yes.  Anything above $7.5 million, the buyer would

20    receive the benefit of, correct?

21    A    Correct.

22    Q    Thank you.

23             And we were talking a moment ago and I'll try to

24    be a little bit more clear, if the terms of this changed

25    such that that positive cap were removed, there would be

1    additional value, potentially, that could be recovered by

2    the estate is, I believe, what you said a moment ago,

3    correct?

4    A    Potentially.

5            MR. GRILLO:  Objection, Your Honor.

6            THE WITNESS:  I mean that's not what this says in

7    here.  There's no provision --

8            THE COURT:  Hold on.  Hang on.

9            Let him get his objection in.

10           MR. GRILLO:  Yes, the objection is it calls for

11   speculation.  This is the point that we were raising earlier

12   about if the cap were removed.  I think we're prepared to

13   concede, for purposes of the testimony and the facts and the

14   record, that there is a cap at 7.5 and a floor at 7.5.  I --

15   there's no sort of misunderstanding as to how it works and

16   Mr. Carroll was perfectly correct to say that if the value

17   was in excess of $7.5, the bidding aware is to the benefit

18   of the buyer.  We've made no bones about that fact.

19           We don't think it's going to get there and we can

20   put on other testimony to say that it won't -- and this is

21   only for purposes of bid protection here -- but for purposes

22   of why we're here today, I don't think that we can test that

23   fact in any way or what the implication of it is.

24           MR. CARROLL:  Your Honor, my question was a little

25   bit different, and my question relates to what would happen,

1   potentially, in bidding -- and I think it's relevant here

2   today based on our discussion of the break-up fee in that

3   the working capital adjustment may go up a lot and we don't

4   know what it's going to be, but the buyer would get the

5   benefit of that under this transaction, but the unsecured

6   creditors would get it if it were changed as we believe

7   appropriate.

8          THE COURT:  Well, going as this, the issue isn't

9   whether or not a different form of contract might be

10  negotiated with this or some other purchaser.  I've not yet

11  heard a suggestion that another purchaser would be allowed

12  to unwrap the package and bid on a different form of

13  contract.

14         To the extent that another perspective purchaser

15  is asked to speak to this form of contract, it would seem to

16  only go to the calculation of the purchase price, which

17  would be a factor in determining the break-up fee, not what

18  would happen if the clause were written differently.

19         So I'll allow it for that limited purpose.  If you

20  want to ask Mr. Saperstein what his crystal ball is telling

21  us today on what that might -- what the working capital

22  might look like in 30, 40, or 60 days, he'll tell us what he

23  knows or doesn't know.

24         But that question is relevant for that limited

25  purpose.

1           MR. CARROLL:  Yes, Your Honor.

2           And I think my purpose includes that and it's also

3   slightly different, which is a bidder can modify the asset

4   purchase agreement.  Any bidder could remove that cap, so

5   that's why I think it's also relevant as well.

6           THE COURT:  All right.

7           MR. CARROLL:  And with that, Your Honor, I think

8   the record is clear.  We don't need to belabor the point any

9   further and I don't have any questions for Mr. Saperstein.

10          THE COURT:  All right.

11          Just hang on there.

12          Mr. Catalanello, any non-duplicative?

13  CROSS-EXAMINATION

14  BY MR. CATALANELLO:

15  Q   Thank you, Your Honor

16          Gerard Catalanello from the law firm, Duane

17  Morris, on behalf of Mr. Phillip Christopher.

18          Mr. Saperstein, I believe you testified earlier

19  that -- that you did not reach out to Mr. Christopher in

20  connection with any efforts to buy the company; is that

21  correct?

22  A   That's correct.

23  Q   Okay.  And I believe you also testified that you didn't

24  reach out to him because you did not believe that he had the

25  financial wherewithal; is that correct?

1    A    Correct.

2    Q    Have you ever met with Mr. Christopher?

3    A    No.

4    Q    Have you ever examined his bank accounts or anything

5    regarding his financial wealth?

6    A    There are no individuals that we contacted to purchase

7    this -- this company.

8    Q    Okay.  Are you aware that Mr. Christopher organized the

9    2004 sale of the company from Audiovox to UTstarcom?

10    A    Yes.

11    Q    Okay.  Are you aware that Mr. Christopher led the 2008

12    management buyout from UTstarcom?

13    A    Yes.

14    Q    Okay.  And despite the fact that he essentially

15    organized two acquisitioning of this company, you still

16    didn't think that you had to reach out to him in connection

17    with your sale (indiscernible - 12:04:49)?

18    A    Yes, I would also add --

19    Q    Just yes or no?

20    A    The answer is yes.  I would like to add another reason,

21    which is that there's been a very litigious relationship

22    between the parties and that was another driver.

23    Q    So did anybody instruct you not to reach out to

24    Mr. Christopher?

25    A    No.

1    Q    Okay.   Thank you.

2              MR. CATALANELLO:   No more questions.

3              THE COURT:   Before I turn you back to Mr. Grillo,

4    there's just one question.   So there appears, at least on

5    this record, to be approximately 12 parties who were not

6    part of the pre-bankruptcy due diligence market, and sale

7    efforts, with the exception of one who may have been

8    involved about a week before the bankruptcy was filed?

9              THE WITNESS:   Correct.

10              THE COURT:   And with respect to those parties,

11    what would be a reasonable period of time on a transaction

12    of this size and nature for them to conduct meaningful due

13    diligence, to make a rational business decision as to

14    whether or not to make an offer for the purchase of this

15    estate's assets?

16              THE WITNESS:   Approximately one week, and the

17    reason for that is that we had spoken with all of them and

18    with the exception of the bidder that we brought, that we

19    began discussions with one week before the filing, all of

20    them have elected to pass for reasons related to the

21    strategic fit or their inability to exceed the stalking

22    horse bid.

23              THE COURT:   So of that group oaf 12, there's one

24    potential player left who says they can be ready in a week?

25              THE WITNESS:   No, I apologize.

1          The -- all of the -- all of the companies that the

2    committee has submitted to us to each out to post-petition

3    have passed on the opportunity.  We had discussions with all

4    of them, and for reasons independent of the timetable, and

5    the party that we've all been talking about, that we expect

6    to bid, has not voiced any concerns to me about their

7    ability to comply with the timetable set by the Court.

8          THE COURT:  All right.  Thank you.

9          Mr. Grillo, any redirect?

10          MR. GRILLO:  Your Honor took care of my redirect

11    for the most part.  I was just going to make a comment about

12    that party that we've been talking about.  We've been in

13    contact with their counsel and we -- I should have made this

14    in my opening presentation -- when we extended the deadline

15    from Saturday until Monday, the party that got involved a

16    week before the bankruptcy case, they indicated that they

17    would be fine with that.  So they are prepared to bid by

18    virtue of (indiscernible - 12:07:24) -- prepared to bid or

19    not bid by the extended deadline from the 28th to the 30th.

20          With that, I have no specific questions for

21    Mr. Saperstein on redirect?

22          THE COURT:  All right.  Very well.

23          You may step down.

24          MR. SAPERSTEIN:  Thank you.

25          THE COURT:  Any other evidence, then, on the bid

1    procedure motion?

2              MR. CATALANELLO:  Yes, Your Honor.

3              We would like to call our financial advisor to

4    testify.

5              THE COURT:  All right.

6              MR. CATALANELLO:  Your Honor, I would like to ask

7    Mr. Conor Tully, of FTI Consulting to take the stand.

8              MR. GRILLO:  Your Honor, just noting for the

9    record, because obviously we had no prior notice of this

10   witness.  He's not submitted an affidavit or anything else

11   and this is the first opportunity that we're getting to

12   speak with him at this point in time.

13             I think it's inappropriate, frankly, in and

14   objection to now start to offer factual evidence when

15   there's no affidavit that's been submitted as part of the

16   objection.  I just wanted to submit that for the record.

17             MR. CATALANELLO:  The primary reason we would like

18   to have his testimony, Your Honor, is to respond to

19   something that Mr. Saperstein said for the first time a

20   moment ago.  But certainly, Mr. Grillo, has plenty of

21   opportunity to speak with Mr. Tully.  They have been on the

22   phone several times and they certainly could have done

23   anything they wanted such as ask for who our witnesses were

24   going to be.

25             And it's certainly not a surprise at a hearing of

1   this nature that we would present our financial advisors.  I

2   think it's almost commonplace, Your Honor.

3             THE COURT:  All right.

4             Well, let's get him up and sworn and I will limit

5   his scope today to rebuttal which is the purpose for which

6   you wanted to call him.

7             MR. CATALANELLO:  Absolutely, Your Honor.  Thank

8   you.

9             THE CLERK:  Please raise your right hand.

10      (Witness Sworn)

11            MR. TULLY:  I do.

12            THE CLERK:  Please be seated.

13            Please speak and spell your name for the record

14   and your address.

15   DIRECT EXAMINATION

16   BY MR. CATALANELLO:

17   Q   Can you please spell your name.

18   A   Conor Patrick Tully, C-O-N-O-R P-A-T-R-I-C-K T-U-L-L-Y.

19   Q   Mr. Tully, could your tell us your position with FTI,

20   please?

21   A   I'm a senior managing director in the corporate finance

22   group of FTI.

23   Q   And how long have you been?

24   A   That's right approximately nine years.

25   Q   And before that, did you have a similar position?

1    A    I did.

2    Q    What was that?

3    A    I worked in the corporate finance group at Ernst &

4    Young, corporate finance, for approximately eight years.

5    Q    And do you have educational background that is similar?

6    A    Yes, my undergraduate degree is in accountancy from

7    Manhattan College.  I'm a certified turnaround professional,

8    a CIRA, which is a certified insolvency reorganization

9    advisor.  I'm a CPA.  I'm accredited in business evaluation.

10   Q    Thank you, Mr. Tully.

11          And with respect to the debtors, what was your

12   relationship?  What is your role?

13   A    Our role -- FTI is the proposed financial advisor to

14   the Official Unsecured Creditors Committee.

15   Q    In your experience, Mr. Tully, have you been involved

16   in situations where the debtors assets -- excuse me -- where

17   a company has marketed, substantially, all of its assets

18   like the debtor, here?

19   A    Yes.

20   Q    Has it happened more than once?

21   A    I've been involved in numerous 363 sales, maybe 15, 20

22   would be my guesstimate.

23   Q    Okay.  And are -- have some of those occurred in the

24   recent past?

25   A    Yes.

1    Q    And in your experience, what is the typical time for a

2    new party, who first learns about the opportunity to

3    purchase assets, what's the typical time they would want for

4    due diligence?

5    A    It obviously depends on the complexity of the assets

6    being purchased.  I mean if it's a single real estate clip

7    case they could, you know, get there relatively quickly,

8    assuming they have the appropriate real estate background.

9             More complex estate assets would take more time

10   and diligence to get comfortable with.

11   Q    And even in that real estate context, what would the

12   minimum someone would require?

13   A    It's difficult to say a minimum, but I would say, you

14   know, three to four weeks to several months, depending on,

15   you know, the situation.

16   Q    Have you seen situations where parties have bid in less

17   than say, ten days?

18   A    Yank of any off the top of my head where a bankruptcy

19   case would file and parties would become aware of it and

20   then would need to sit and be (indiscernible - 12:12:25) in

21   ten days, no.

22   Q    And so, I think you were in the courtroom when

23   Mr. Saperstein indicated that one week would be sufficient,

24   correct?

25   A    I think I heard that as the testimony, yes.

1    Q    Do you think that's a reasonable time period?

2    A    I think that my professional judgment is aggressive, no

3    doubt.

4    Q    And you mentioned that in a real estate context,

5    perhaps three or four weeks might be sufficient, but a more

6    complex transaction, you would need more time.

7         Would you say this is a more complex transaction?

8    A    I would.  I in this is more complex than simple real

9    estate, although, not as complex as I've seen other

10   situations.

11   Q    And you heard Mr. Wielebinski and Mr. Grillo earlier

12   talk about the extent of the debtors' relationships with its

13   vendors, its carriers and other parties and how important

14   that was to a buyer, did you not?

15   A    I did.

16   Q    And based on your experience with the debtor, do you

17   believe that those are items that could be -- that a buyer

18   could satisfy themselves with in just a week?

19   A    I think it would be difficult for them to get that kind

20   of comfort in that short of a time frame, yes.

21   Q    And the proposed time frame that we are now dealing

22   with by the debtors takes us to a bid deadline of September

23   30th.  Do you think it's reasonable to expect a new bidder

24   to come in on that timetable?

25   A    I think it's difficult and it would depend on their

1    purchase price.  It may not lead them to the highest price

2    potentially.  They may need to leave certain value on the

3    table or in contingency or to sort of in the back of their

4    mind, account for sort of diligence holes that they've --

5    they just certainly weren't going to -- or able to fill,

6    given the time frame.

7    Q   So what you're saying is that because there's a limited

8    timing, they might not be able to bid as much as they

9    otherwise would, correct?

10   A    That's what I'm saying, yes.

11   Q   You spoke with the financial advisors for the bidder

12   that we've been discussing, Mr. Saperstein mentioned is new

13   to the table, correct?

14   A    Yes.

15   Q   And isn't it true that they told you that they needed

16   more time to -- for the bid deadline?

17            MR. GRILLO:  Objection; hearsay.

18            THE COURT:  Well, it is, but I'll allow it.

19            It's in direct rebuttal to what Mr. Saperstein add

20   alluded to.

21            MR. CATALANELLO:  Thank you.

22            THE COURT:  And they can identify them because

23   there's an NDA.

24            MR. CATALANELLO:  Certainly, Your Honor, I think

25   we could identify them in chambers if that's a concern.

1          THE COURT:  Well, let's just refer to them as

2     "them," for the time being.

3          (Laughter)

4          MR. CATALANELLO:  That should work.

5          THE COURT:  Or "they" depending on the syntax.

6          MR. CATALANELLO:  Certainly.

7     BY MR. CATALANELLO:

8     Q   And, Mr. Tully in your discussions with them, did they

9     ask you for additional time and tell you that it would be

10    important to their bid?

11    A   The financial advisor to that party, yes, did say they

12    would like a little more time.

13    Q   And didn't they also tell you that the financial

14    advisor was just engaged more recently than the bankruptcy

15    filing?

16          MR. GRILLO:  Objection; (indiscernible -

17    12:16:58).

18          It's also calling for hearsay.

19          THE COURT:  The same, overruled.

20          Let's just -- let's just get this string out.

21          THE WITNESS:  Yes, my impression was that they

22    only very recently have become involved.

23    BY MR. CATALANELLO:

24    Q   And do you know that they also hired a law firm to

25    represent them, but also only in the last few days or

1   certainly more recently than the filing?

2   A     That was my understanding, yes.

3               MR. CATALANELLO:  Your Honor, I have no further

4   questions.

5               THE COURT:  Mr. Tully, before I turn you over to

6   Mr. Grillo, did you get any quantification of what a little

7   more time means?  That's, obviously, a bit vague.  Is that a

8   day?  A month?  Somewhere in between?

9               THE WITNESS:  It was somewhere in between, and

10  I'll narrow it further for Your Honor.  I think that the

11  quote was it's not weeks, you know, it's days.  So it's a

12  number of days.  I wasn't under the impression that it was

13  three to four weeks.  I was left with the impression that it

14  was one or two days.  It was somewhere in that more narrow

15  band.

16              THE COURT:  All right.  Thank you.

17              MR. CATALANELLO:  Thank you.

18              THE COURT:  Mr. Grillo?

19  CROSS-EXAMINATION

20  BY MR. GRILLO:

21  Q   First of all, good afternoon, Mr. Tully.  I'm looking

22  at the clock to make sure that I had my time correct.

23              Just a few questions.  You talked about sort of

24  short timelines within which to sell a company.  Is six

25  months a reasonable period of time within which to sell a

1    company?

2    A    I would say, yes.

3    Q    So if they engage in a process for a six-month period

4    of time, that would be a pretty good chance to get

5    everybody's who's out there, isn't it?

6    A    Yes.

7    Q    So in this case here, the fact that there was a six-

8    month process pre-petition would have to go into your

9    consideration as to what the post-petition period would be,

10    would it not?

11    A    It would.

12    Q    Okay.  So the bottom line is, if there was a six-month

13    period of time, that's already taken place and that's part

14    of the testimony record, we could consider the company then

15    pretty well ready, could we not?

16    A    Yes, but I think I was answering questions with respect

17    to a new bidder just coming to the table.

18    Q    I understand that, because I'm asking you a different

19    question, right.

20    A    Uh-huh.

21    Q    We're talking about the sale process here.  You've been

22    proposed as a rebuttal witness, and I'm asking you in your

23    experience what a reasonable period of time was to sell a

24    company, and I asked you if that was six months and you

25    indicated that it was, correct?

1    A    Yes, I would actually say that's a long period of time

2    to be more precise in my experience.

3    Q    Okay.  Great.

4            And then in the context of a bankruptcy case, you

5    talked about less than ten days being tough, right, to sell

6    a company, and then even 30 days was kind of tough to sell a

7    company, correct?

8    A    No, I think it was oh just to make it a little more

9    precise, I think it was a brand new party coming in, never

10   heard of the company today, tomorrow start your due

11   diligence.  Ten days would be tough, depending on the

12   complexity of the company if you get there.

13   Q    Okay.  But we all know that there are -- you're an

14   experienced restructuring professional -- we all know that

15   companies have been sold in bankruptcy in less period of

16   time, do we not?

17   A    It certainly happens.

18   Q    Right, and in fact, even some of the biggest companies

19   are sold in bankruptcy in less period of time, aren't they?

20   A    Yes.

21   Q    Lehman, General Motors, we sold billion-dollar

22   companies in bankruptcy in less time than that.

23   A    Under really unique scenarios, yes, it's true.

24   Q    But what wasn't unique in this case, was it, Mr. Tully,

25   the fact that we had a six-month marketing period pre-

1    petition and by your testimony, that's generally considered

2    sufficient periods of time to move a company, is it not?

3    That was your testimony?

4    A    Yeah, I would say that -- if the question was, if the

5    pre-petition marketing process of six months sufficient or

6    would you need more than six months?  I would say that six

7    months is certainly sufficient in most instances.

8    Q    Thanks.

9            I just want to ask you a couple of questions.

10   Your side has also challenged the break-up fee, has it not?

11   A    Yes.

12   Q    Okay.  And with respect to the break-up fee, your aware

13   -- well, strike that.

14           Are you aware of the Cabrini Medical Center

15   bankruptcy case?

16   A    The name sounds familiar.  I don't know the case at

17   all.

18   Q    Do you know what the break-up fee was in that case?

19           MR. CARROLL:  Objection, Your Honor.

20           Your Honor had already limited Mr. Tully's

21   testimony to a very specific area at Mr. Grillo's request.

22   It's not appropriate for him now to --

23           MR. GRILLO:  Fair point, Your Honor.

24           I will step back from that.  We asked him about

25   the timing.  I think we've asked him those questions about

1    the timing as far as that those goes.

2    BY MR. GRILLO:

3    Q   I do have one other related set of questions about

4    timing, though, that relate to this specific case and the

5    position that they've taken.  Is timing, in effect -- well,

6    strike that.

7            One of the factors that you consider with timing

8    has to do with the operations of the company, does it not?

9    A   I think you need to balance -- look at things like

10   that, the operations of a company being one.

11   Q   And certainly, you would want to look at the operations

12   of a particular debtor to determine whether or not timing

13   makes sense, does it not?

14   A   In the vacuum of a buyer coming in and do they have

15   enough time to make a determination of will I buy this

16   company at what price, I don't know that that's -- that that

17   buyer thinks that much about the operation of the company.

18   As part of their due diligence, they're looking at the

19   operation of the company.

20   Q   I apologize.  I didn't make myself clear.  I was

21   referring from the company's perspective, that isn't it fair

22   to consider one of the factors -- and I'll try and rephrase

23   me question.

24            Is it fair to consider one of the factors, the

25   financial condition of the company in terms of how much time

1  it has to complete a sale?

2  A    Yes.

3  Q    And wouldn't one of those factors be sort of how much

4  trade credit it's getting from its vendors?

5  A    You could factor that.  I mean that could be a

6  consideration in theory.

7  Q    Right.  Would it also be a consideration if one of the

8  vendors, who is a member of the committee, has told the

9  company that it wouldn't be able to supply it any more

10  product during the bankruptcy?

11          MR. CARROLL:  Objection, Your Honor.

12          This calls for speculation --

13          MR. GRILLO:  No, it doesn't.

14          MR. CARROLL:  -- and it's hearsay.

15          MR. GRILLO:  Well, I asked him what a factor would

16  be.  We were talking -- the issue was --

17          THE COURT:  Wasn't that subsumed in the first

18  question, though, if the debtor's access to purchasing

19  product has been impaired in the marketplace, doesn't that

20  impact on the due diligence timing that the debtor can

21  afford?  It doesn't really matter who said I won't sell to

22  you anymore.  The issue is, if the debtor can't buy product

23  anymore, doesn't that end it?  At least on that line,

24  wouldn't you agree?

25          MR. GRILLO:  Actually, it doesn't, Your Honor,

1  because the party that has turned the debtor off -- and what

2  I was going to ask Mr. Tully is if he knows this because he

3  used to represent the committee -- is one of the members of

4  the committee itself.

5            MR. CARROLL:  Your Honor, Mr. Grillo can certainly

6  ask Mr. Tully what he knows about a committee member doing

7  certain things, but we've had no testimony that any vendor

8  has turned off the debtor.  We've heard Mr. Grillo say it,

9  but we haven't had any testimony.

10            MR. GRILLO:  No, what we've had is testimony that

11  from Mr. Saperstein in deposition and also part of the

12  Kuntzman (ph) declaration to which there was no cross-

13  examination, that the company was in extraneous, that the

14  trade was constricting terms and that was affecting the

15  timing of the sale.

16            One of the parties that is doing it is a member of

17  Mr. Carroll's and Mr. Tully's committee.  So one of the

18  questions that is extraordinarily appropriate under those

19  circumstances, in our view, is what credit -- if you want to

20  extend the timeline, show that the company isn't being hurt.

21            What doesn't make sense to me, at least, is how a

22  member of the committee, who's asked its counsel to come

23  forward today, is one of the parties who can no longer allow

24  purchases in bankruptcy and then to have counsel and its

25  advisor come in and say, well, we need more time.

1          THE COURT:  Isn't the fair question then from this

2     witness, do you know whether the debtor is no longer able to

3     purchase necessary product to sustain its operations.

4          MR. GRILLO:  That was my question before the

5     objection, Your Honor.  I'm happy to have you rephrase it

6     for the witness.

7          MR. CARROLL:  I don't think that was the question,

8     but I just want to -- not to argue with the objection -- I

9     just want to point out one other matter.

10          Mr. Grillo mentioned that certain things were in

11     the Kuntzman affidavit --

12          THE COURT:  We haven't gotten to Kuntzman yet.

13          MR. CARROLL:  That's exactly what I was going to

14     say; it hasn't been offered, Your Honor.  I don't --

15          MR. GRILLO:  It was offered --

16          MR. CARROLL:  -- if he's here, but Mr. Grillo's

17     comment about the Saperstein declaration is incorrect also.

18     That's not in there.

19          THE COURT:  Well, it seems in the correct protocol

20     standpoint that the Kuntzman affidavit, while it goes to

21     both, played more to the DIP financing and I was going to

22     take his affidavit and his cross-examination.  When we turn

23     to DIP financing, I will simply consider it for purposes of

24     both because I'm going to rule on them together, so we'll

25     get to Mr. Kuntzman when we get back together after a break

1    today.

2              MR. GRILLO:  Understood.

3              THE COURT:  But let's finish up.

4              MR. GRILLO:  Your Honor, the question with this

5    witness on the stand, the question is -- really, what it

6    comes down to, and the argument is, is the witness aware of

7    all of the facts and circumstances that affect timing for

8    the sale?  This is the committee's financial advisor.  We're

9    asking about what he knows of what the members of the

10   committee are doing.

11             When it comes time, if Mr. Kuntzman is introduced

12   as a witness, his testimony has already been admitted at the

13   first hearing, if he's re-introduced as a witness, then we

14   can certainly ask Mr. Kuntzman those questions and

15   Mr. Carroll can cross-examine on it.

16             The question right now, as it respects the issue

17   that's before the Court in connection with timing, because

18   it's the committee's contention that only the bidder has an

19   issue with the timing.

20             It's been our contention in all of the papers that

21   we've filed that it's also the debtors' issue.  It's fair to

22   ask, we think, Mr. Tully, what he knows.  If the answer is

23   nothing, then that's all we're looking to establish.  If he

24   does not know, that's okay; he can answer that way.

25             THE COURT:  All right.

1          MR. CARROLL:  I have no objection to him -- to the

2     question of asking him what he knows.

3          THE COURT:  All right.

4          Mr. Tully, what do you know?

5          THE WITNESS:  What was the question?

6      (Laughter)

7          THE COURT:  I think the narrow, limited question

8     is, do you know whether this debtors' access to product or

9     inventory has been curtailed either substantially or

10    significantly in the marketplace; and if so, how does that

11    affect the timing that the debtor has to ferret out other

12    potential purchasers?

13         THE WITNESS:  Okay.  I don't have firsthand

14    knowledge of exactly what types of terms the debtors are

15    getting or what types of products vendors are continuing to

16    ship.  My assumption is that, I think the top three

17    creditors who are on the committee are owed circa $165 or

18    $185 million dollars.

19         So I would think that they're taking -- they're

20    probably not providing any credit going forward.  I think

21    that would be a logical assumption.  I don't know it as a

22    fact, and, you know, I think if there's a mutually

23    beneficial situation where one of the suppliers has product

24    and the debtor needs it, at a price, I think the debtor

25    could obtain it, that seems, to me, to be obvious.  But I

1    don't have exact facts and knowledge of exactly every

2    discussion the debtors are having with committee members who

3    --

4    BY MR. GRILLO:

5    Q    The short answer is, then, you don't know, right?  You

6    talked about assumptions and you talked about -- you just

7    don't know what the members of the committee are doing vis-

8    a-vis providing product to the debtors at this point in

9    time?

10    A    No, I see that there are purchases.  From the cash

11    flow, I see that product must be being purchased unless the

12    debtors are paying for pre-petition product; post-petition,

13    which I assume isn't the case.  But I don't know the

14    specifics of debtors' discussions with vendors.

15            MR. GRILLO:  We have no further questions of this

16    witness, Your Honor.

17            THE COURT:  All right.

18            MR. WIELEBINSKI:  May I ask a question or two,

19    Your Honor?

20            THE COURT:  I'm not certain of the stalking

21    horse's standing to examine witnesses here, but do any of

22    the parties have any issue with that?

23            MR. CARROLL:  Your Honor, I would certainly agree

24    with you.  I have not seen a Court allow a stalking horse

25    bidder permission to cross-examine or otherwise participate

1    in this way and we would object.

2         MR. GRILLO:  At the sake of being contrary, the

3    bottom line is when -- what the case law says with respect

4    to stalking horse bidders is that they can't, after the --

5    or unsuccessful bidders can't come in after the fact to

6    challenge the bid procedures.

7         Under -- the question of who's a party in interest

8    is not limited merely to creditors and equity holders, but

9    rather anyone involved.  It's included, but not limited to

10   is the language in the statute.  So it would be our view,

11   frankly, that because, A, they're a party to the motion,

12   okay, and they're a party to an agreement that is before the

13   Court, as opposed to an unsuccessful bidder on which the

14   case law, we agree, is legion, that there's a distinction in

15   this instance with respect to the stalking horse bidder in

16   this case.

17        So not to steal Mr. Wielebinski's thunder, but

18   that was -- that's our view of the case law and I don't know

19   if it's something contrary to that.

20        MR. CARROLL:  Your Honor, I don't believe the

21   bidder is a party to the motion.  The motion on the first

22   page says the debtors' motion, but more precisely, the

23   standing issue is not satisfied because they have entered

24   into a contract with the pre-petition debtor that has not

25   been approved by this Court.  That doesn't change their lack

1    of standing.

2              THE COURT:  All right.  I will go ahead and

3    terminate the examination of Mr. Tully at this juncture, so

4    you can go ahead and step down.

5              MR. TULLY:  Thank you, Your Honor.

6              THE COURT:  I think we've learned from Mr. Tully

7    what he can add to the equation this afternoon.

8              All right.  Other than the overflow pass that

9    Mr. Kuntzman will have on the sale motion, Mr. Grillo, was

10    there any other witnesses that the debtor wanted to present?

11             MR. GRILLO:  In connection --

12             THE COURT:  And I take it he's here?

13             MR. GRILLO:  Mr. Kuntzman is back there, Your

14    Honor.  I'm going to apologize for not introducing him

15    before the hearing.

16             Mr. Kuntzman is here.  I don't think we have

17    either factual witnesses on the sale unless Your Honor

18    wanted more -- and I don't think this is the case -- but if

19    Your Honor wanted more specific testimony on how the working

20    capital adjustment works, we also in the courtroom with us

21    Mr. Barbieri from Richter Consulting who could, if not

22    necessarily provide testimony, also to answer some of the

23    more specific questions with regard to the working capital

24    adjustment.

25             But as it respects the sale and the procedures

1    motion, we would have Mr. Kuntzman and that would be it, and

2    then, obviously, also have the DIP motion, but it depends on

3    where we get on that.

4            THE COURT:  All right.

5            Then let's do this, let's take about a 15-minute

6    recess.  I want to work until about 1:30 and then I'll break

7    you all.  I have a first-day hearing in another case coming

8    in at 2:00, which will hopefully occupy less of the

9    courtroom itself so there will be room for you all to come

10    back, but that would give you all a chance to talk some more

11    and grab something to eat.

12            So we'll resume at 12:45.

13            Just one reflection from the Court.  It seems like

14    the issues which divide you at the moment are far less

15    substantial than the issues which unite you at the moment.

16    From the testimony and argument, it appears that there's a

17    disagreement over some extension of the window of time that

18    the debtor originally asked the Court to work within.  I'm

19    not hearing the committee.  We'll set Mr. Richards aside for

20    the moment, but I'm not hearing from the committee or from

21    the testimony, an elongated period of weeks or even a month.

22    It sounds like you all are talking in the numbers of days

23    between when the bidding would close, from the current

24    proposed deadline, and when the Court would have an auction

25    sale hearing.

1          The break-up fee is independent of that.  The

2    Court will simply set that.

3          But in terms of the timing mechanic, if you all

4    want to have a further discussion, again, I'll -- I'm sure

5    I'm missing something, but what I've heard over the past two

6    hours or so, the gap between the you want it yesterday and

7    he wants it next week is not that substantial.  So if you

8    all will visit on that and then we'll resume at 12:45 with

9    Mr. Kuntzman.

10          We'll go off the record.

11          THE CLERK:  All rise, please.

12      (Recess at 12:33 p.m.)

13          MR. CARROLL:  Your Honor, we may have Mr. Tully on

14    as well for today.

15          THE COURT:  All right.  So we'll adjourn on

16    Personal Communications Devices until 2:45 and we'll see you

17    all back at that time.

18          MR. CARROLL:  Thank you, Your Honor.

19      (Recess at 12:51 p.m.)

20          THE COURT:  We're back on the record now on 13-

21    74303, Personal Communications Devices, LLC.

22          Mr. Grillo?

23          MR. GRILLO:  Yes, thank you, Your Honor.

24          Again, Emanuel Grillo of Goodwin Procter, proposed

25    counsel for the debtors and debtors in possession.

1           Your Honor, we had two motions as Your Honor knows

2    that were carried over to this afternoon's session, both the

3    sales procedures and the bid protection is one.  The other

4    is the DIP loan.  What we'd like to do, Your Honor, is

5    address the DIP loan because we have an agreement, I think,

6    with the parties.

7           Mr. Glerum insisted that he be the one to put it

8    on the record, so I'd like to yield the podium to

9    Mr. Glerum.

10          MR. GLERUM:  Thank you.  Insist might be a bit of

11   an overstatement, but since Mr. Grillo and -- I'm Charlie

12   Glerum, Your Honor, for J.P. Morgan Chase from Edwards

13   Wildman.

14          Since other counsel had spent most of the day

15   talking, I thought that perhaps we would give them a rest

16   and I would report the deal on the DIP agreement.  You --

17   there were -- as you might have noted, a number of

18   objections.  We have resolved all of those objections and

19   the objections will be withdrawn pursuant to our agreement

20   on what I hope I get right as the following points.

21          There will be a rollup.  The DIP collateral will

22   not extend to collateral in which the agent did not have a

23   lien pre-petition.  So to the extent that the agent's pre-

24   petition lien in receivables and inventory was perfected and

25   enforceable and valid, it will extend to after -- to

1    properties of similar -- acquired after the petition which

2    will be the DIP collateral.

3            To the extent that we didn't have avoidance

4    actions, we will not have avoidance actions.

5            To the extent that we didn't have tort claims or a

6    particular tort claim or a right to tort claims, we won't

7    have a right to tort claims, similar with insurance

8    proceeds.

9            But to the extent that our lien was what we have

10   been saying it was, we will have a DIP lien in that as well.

11           There was a -- some objections with respect to the

12   carve out and to professional fees.  Professional fees as

13   they are incurred, but unpaid and unallowed during a case, a

14   sum to that extent will be put into an account in cash.  It

15   will be a borrowing.  Interest will be paid on it.

16           And in the event that we call a termination event,

17   that money in that account will not be swept, but will

18   remain available to the extent this Court allows the fees

19   that are requested.  At present, this would include the fees

20   of counsel for the committee, itself financial advisor,

21   counsel for the debtor and its financial advisor, and indeed

22   there could be other new professionals who are added, but

23   that would be that group for this purpose.

24           The $250,000 carve out will be available for post-

25   termination costs for those professionals.  That number will

1    be capped.  It will not be capped as it is currently not

2    capped with respect to the Office of the United States

3    Trustee and those fees.

4              As currently provided in the interim order, the

5    final order will also provide that when we are paid in full,

6    any obligation to carve out will go away because we will be

7    paid and gone.  The agreement presently provides that in the

8    case of a termination, they have, I think, seven days to

9    come in to Your Honor and complain that the termination was

10   inappropriate or some similar belief.  We have extended that

11   from three days to ten days.

12             I had been asked to note that paragraph 24 of the

13   final order is only intended to ensure my client's payment

14   in full from the proceeds of any buyer, whether it be the

15   stalking horse or another buyer, directly at the closing.

16   That's all it's intended to do.  It's not intended to allow

17   us to have any other control over who the buyer is.  Simply,

18   whoever the buyer is has to pay us off in full, directly, at

19   closing or that person is not going to be the buyer.

20             Did I leave anything else out?

21             MR. EISENBERG:  One minor item -- well, maybe

22   minor from your perspective, but certainly major from our

23   perspective.

24             This is Gary Eisenberg from Perkins Coie on behalf

25   of the committee.  The debtor has agreed to increase the

1    budget for professional fees from what currently was

2    submitted in an amount of $300,000.  I think they're making

3    various line item adjustments.  That increase in the budget

4    of the period through October 25th, the anticipated sale

5    date is going to be part of this, so that that sum that will

6    be subject to the reserving arrangement that Mr. Glerum had

7    described previously.

8                So with that, then that amount of money, to the

9    extent that on we base it -- it's accrued by professionals

10   and a termination event occurs, it's based on that increased

11   number.  That would be the cut off in terms of approved and

12   allowed professional fees.

13               MR. GLERUM:  To be clear, it's not an increase in

14   the overall aggregate amount of the budget, but rather we

15   were (indiscernible - 2:59:47) of some of the items based on

16   what we've been able to determine within the first few weeks

17   of the case.  We can make adjustments to certain line items

18   to accommodate the requests of the committee as far as that

19   goes.

20               THE COURT:  But in terms of an aggregate cap for

21   pre-closing -- or pre-termination event fees --

22               MR. GLERUM:  It's the same.

23               THE COURT:  -- it's still -- it's still the same

24   amount?

25               MR. GLERUM:  The fee line item -- if you look at

1    the budget.

2          THE COURT:  Two-and-a-quarter, was it not?

3          MR. GLERUM:  Two and a half.  It's two and a half;

4    it's 2525.  That line item would go up by $300,000 to 2.8 --

5          THE COURT:  Two five.

6          MR. GLERUM:  2.825.

7          THE COURT:  Uh-huh.

8          MR. GLERUM:  And then we have, based on sort of

9    where we've been thus far in the case, we can pull that from

10   other line items and adjust it, again, without increasing

11   the aggregate amount of the budget.

12         THE COURT:  All right.

13         MR. GRILLO:  And absent those changes, the order

14   will be as previously submitted.

15         THE COURT:  This all -- this all relates to --

16   JPMC is agent for the first.  Are there any changes that you

17   made with respect to the second?

18         MR. GRILLO:  I'm going to get to that, Your Honor,

19   if I may?

20         THE COURT:  Sure.

21         MR. GRILLO:  We had asked for -- we had asked for

22   -- well, nobody had asked -- there was a request made, filed

23   with the committee with respect to a lien change deadline

24   that is still being examined by the committee -- by the

25   junior lenders

1          THE COURT:  This is -- we're in and out done with

2     the JPMC issues and we've moving on to the second?

3          MR. GRILLO:  Correct, Your Honor.  Yes.

4          THE COURT:  So the challenge date that was in the

5     proposed final order that's reflected in the interim order

6     as to the first liens remains the same?

7          MR. EISENBERG:  That would remain the same, Your

8     Honor.

9          THE COURT:  All right.  So now let's focus on the

10    second lien issues.

11         MR. SALZBERG:  Your Honor, this is Mark Salzberg

12    on behalf of PineBridge.

13         Counsel had made a request that we agree -- I

14    think "we" being the collective second lien lenders to a 75-

15    day investigation period that would not be stopped -- would

16    not have the earlier of language, so it would be a straight

17    75 days from the date the committee is formed.

18         Our concern with that, Your Honor, is the fact

19    that sale hearing will occur, the sale will be approved and

20    then the committee would, if the committee chooses, seeks to

21    unwind or to disallow PineBridge's claim, but the

22    transaction, as it's presently contemplated, as it's

23    formulated, would provide PineBridge with a note security

24    agreement guarantee and I think that what the committee is

25    then saying is that they would then want to unwind that

1    transaction.

2            It seems to us that if there is a sale that's

3    approved and one of the terms of the sale is notes,

4    guarantees, security agreements being executed in favor of

5    PineBridge, the issue of the lien validity or whatever other

6    challenge they want to assert, should be asserted

7    beforehand.  So we're not willing -- we're not oh this was

8    just suggested to us about a half hour ago.  We're not at

9    the present time of agreeing to a straightforward 75-day

10    investigation period ruling out the earlier language.

11            MR. GRILLO:  Can I respond to that real quick,

12    Your Honor?  I think --

13            THE COURT:  Are there -- just before we go to

14    other points, there was some issue expressed by the

15    committee about concerns about what were essentially

16    adequate protections to the second lien lenders, even though

17    they're really not moving.  Whatever rights they have, they

18    have.  They're not advancing money.  Their, theoretically,

19    their cash collateral may be they utilize, but it's all

20    subsumed under what's happening in the first with the

21    rollup.

22            So are there any language changes being proposed

23    as to how -- the order was purported to provide adequate

24    protection to the seconds.

25            MR. SALZBERG:  Your Honor, paragraphs 15(a) and

1    15(b) address that, and I've spoken with counsel for the

2    committee and I believe the language in those provisions

3    already makes it clear that the only way that we're getting

4    adequate protection is if there's a diminution of the value

5    of our collateral, which presupposes we have a secure -- we

6    have a lien.  Counsel suggests that may be we put the word

7    "solely" in there.  I don't think that's necessary, but we

8    would be willing to do that.

9              MR. EISENBERG:  I think we would agree with that.

10   I think one thing, just to make a slight clarification to

11   what counsel for the first lien holders indicated, he

12   indicated that to the extent that they didn't have a lien

13   pre-petition, I think the actual language would be a

14   defective lien, and I think that is what was assumed, but I

15   just want to make sure that it's clear for the record.

16             THE COURT:  It's the big three, right, valid,

17   perfected and enforceable?

18             MR. EISENBERG:  Exactly.  And that would apply

19   with respect to the second lien lenders, Your Honor.

20             THE COURT:  All right.  So then are we left to the

21   challenge period issue on second?

22             MR. SALZBERG:  I believe so, with respect to

23   PineBridge, Your Honor.

24             THE COURT:  All right.  Mr. Eisenberg, I'm not

25   sure how much of this is academic.  If the stalking horse is

1    the successful bidder, they're not delivering cash money,

2    they're delivering notes and paper, but where's the

3    committee on that?  Essentially, the way it's being posed is

4    to truncate the challenge period such that a pre-closing

5    challenge would have to be brought to the second position.

6            MR. EISENBERG:  Right.  And frankly, Your Honor,

7    we find that difficult for the following reason.  We think

8    that as a practical matter, it's much more likely to be an

9    issue that we may raise with respect to the seconds and

10   therefore the need for an investigation and a look at

11   period, so that's why we sought the extra time with respect

12   to the seconds as opposed to the firsts.

13           I think we (indiscernible - 3:05:21) overall, but

14   it was likely, you know, without waiving our rights to come

15   back and address the first time, we didn't see it as big a

16   problem.  That's why the 60-day period as the first position

17   was not really a concern to us.

18           The second thing -- position where we do have some

19   concerns, it's a lot of activity early in the case, Your

20   Honor, and if we're forced to come in and rush to file an

21   adversary proceeding, when we may not have necessarily

22   investigated everything earlier on, we're at a stalemate,

23   curved, you know, fewer than 60 days into the case, that

24   does put a tight (indiscernible - 3:05:53) and frankly, I

25   think we would suggest that, you know, the fact that the

1    second lien lender does a deal with the stalking horse

2    shouldn't be a reason why they are entitled to deviate from

3    the ordinary guidelines that are in effect in the district

4    that says that 60 days is the period that would run and

5    that's usually not subject to a shortened period if there

6    was simply a sale that occurs earlier.

7             MR. SALZBERG:  Your Honor, what we're talking

8    about here -- there's a 15-day -- I believe a 15-day

9    extension.  If the committee wants to take discovery and

10   they've been involved -- I mean we will agree to expedite

11   the discovery.  If they want documents, we'll get the

12   documents, but we believe that this issue and any sort of

13   challenge should be asserted before the sale.  It shouldn't

14   be that the sale was done.  The sale was approved, and the

15   sale was free and clear and then suddenly the challenge is

16   asserted.

17            THE COURT:  You're not suggesting before the sale

18   hearing?

19            MR. SALZBERG:  In the sale hearing, I'm sorry, the

20   sale hearing.

21            The way it's structured right now, is the

22   challenge period would end at the earlier of the latter of

23   60 days from the appointment of the committee or the date

24   before the sale hearing.  That's how it's presently

25   formulated.

1            THE COURT:  All right.  And when we shift over to

2    the big procedures motion, is there any adjustment being

3    made to the sale hearing date or is it contemplated that

4    that would stay?

5            MR. GRILLO:  Not the sale date -- not the sale

6    date, Your Honor.  The auction -- the auction itself we have

7    agreement on, an extension of the auction and the big

8    deadline --

9            THE CLERK:  Stand next to the microphone.

10           MR. GRILLO:  I'm sorry.

11           Again, Your Honor, with respect to the sale

12   hearing date, I believe we have agreement, and subject to

13   making sure the other pieces all fit and I think we're

14   there.  But I think we have agreed that I'm keeping the

15   hearing date on October 10th.  We're talking about pushing

16   back the auction and the bid deadline from its current dates

17   so we'll push that back, but we're not talking about moving

18   the hearing date.

19           THE COURT:  Mr. Dimino, your office -- only this

20   is on the timing mechanic.

21           MR. DIMINO:  Judge, I'm a little confused.

22           Which timing mechanic is still open, that we were

23   just discussing?  In terms of the sale, we have no -- the

24   big procedure and when the auction is, we have no objection.

25           THE COURT:  It seems the current issue is should

1    the committee be put to -- or any other party in interest --

2    be put to filing an objection to the second lien position

3    before either the sale hearing or the sale closing, either

4    of which could be less than 60 days from committing

5    formation?

6              MR. DIMINO:  Judge, the complication in that --

7    and I'll get to that as I see it is -- if the time extended

8    beyond the sale hearing and the stalking horse bidder is the

9    successful bidder, the pre-petition, second position list of

10   creditors have entered into an agreement where there will be

11   a post-sale continuation of their position.  Actually, it

12   will be elevated to a first position.

13             If the committee was successful in challenging

14   their secured petition post-sale, then the only option would

15   be, I presume, that estate would then stand in the shoes of

16   the secured creditors' position because you can't unwind

17   that without then unwinding the sale.

18             So if the committee is saying that's what they' oh

19   if they were successful, that's what they would see happen,

20   I assume we can extend it.

21             If they're saying that it would undo the sale

22   itself, which I don't know that they could, so I'm assuming

23   that you would end up taking back the position of the

24   secured creditor.

25             THE COURT:  It would seem that it's --

1          MR. DIMINO:  In that case, I don't know that it

2     matters that you would go beyond the sale date.

3          THE COURT:  Well, it would seem to the Court that

4     if we, the royal we, don't know if there's going to be a

5     cash buyer come in to this equation.

6          MR. DIMINO:  Right.

7          THE COURT:  That's part of what's brought 30 of

8     you all here this afternoon, and so, if there's a cash

9     buyer, it's a completely different dynamic.  The sale -- the

10    first lien holder, absent timely challenged, is going to be

11    paid at the closing.

12          The second lien lender, absent timely challenged,

13    it's a sale free and clear.  There's no requirement that the

14    second lien funds be dispersed at the closing unless I

15    require that, and I wouldn't want to let an expedited sales

16    process truncate a reasonable objection period.

17          MR. SALZBERG:  It appears that whichever the

18    scenario, if I understand how the committee envisions this,

19    in either scenario, if there is a third party that comes in

20    and it's a successful bidder, there'll be cash.  That cash,

21    if it pays off the second position, they may be liable to

22    bring that money back in, if the credit committee is

23    successful.

24          If the stalking horse bidder is successful and it

25    turns out that that second position is not an effective or

1    not a secured position or avoidable secured position, then

2    it appears that the estate would then step into the shoes

3    and it wouldn't matter if the action took place before or

4    after the sale.

5            So I think that under either scenario, if you were

6    to extend the time beyond the sale hearing, I believe that

7    there's no impediment to complete the sale process.

8            MR. GRILLO:  Your Honor, I can make it simpler

9    than that, actually, if I may, Your Honor?

10           I think what Mr. Dimino is exactly right.  In

11   other words, we don't need to hold up the sale depending on

12   what Your Honor wants to do with the challenge period

13   because of the following ways, there's two forms of

14   consideration.  Either there's cash and if the reserve

15   periods are there, a certain amount of it can be reserved or

16   all of it can be reserved depending on, you know, until we

17   get to the end of the period, if there's a successful

18   bidder, bidding cash.

19           If it's the existing bid, then we know that both

20   parties are just getting notes.  The Court can very easily,

21   has authority over all of the parties, if it were to find

22   that those liens were not valid, then it can have the notes

23   recast for the benefit of the estate, as opposed to, you

24   know, the secured creditors.

25           I think there's a simple solution to that problem

1    either way because under any circumstances, the estate was

2    only going to get -- where it goes to the secured creditors

3    or otherwise -- the proceeds of the sale.  The liens would

4    attach to the proceeds.  If the proceeds are a note, then

5    the proceeds are a note and the person's getting that gets

6    it made out to the estate.  If it's cash, then cash is

7    obviously easier to move, so I don't think it's that

8    complicated at the end of the day.

9            MR. EISENBERG:  I would tend to concur, Your

10   Honor.  I mean the disposition on what is received after the

11   sale is available to be attached and garnered for the

12   benefit of the committee and for the estate to the extent

13   that there's a successful challenge to the liens.  The fact

14   that a second lien creditor takes a note instead of cash,

15   the cash could be redirected if the Court held up approving

16   the dissemination of the cash to the second lien lender.

17   Payments to be made under the note can simply be redirected.

18   I don't think it's that complicated of a problem.

19           The length of the sale, I think, is an artificial

20   one.  To the extent that the committee is going to resolve

21   objections with respect to the timing on the sale, we

22   shouldn't be prejudiced from bringing a challenge to need,

23   simply because rather than taking cash, the second lien

24   lender decided to take a note.  That shouldn't be a way of

25   truncating the challenge.

1          THE COURT:  It would seem to the Court that the

2     challenge date, whether it's for the committee or other

3     parties in interest, should in this case be 60 days from

4     formation of the committee, which appears to be October 24.

5     There's been a lot of initial activity in the case.  Some of

6     that will continue with ferreting out potential purchasers,

7     et cetera, but it would seem to the Court that 60 days from

8     committing formation of this case would be appropriate.

9          The post-sale hearing may be around the date of

10    the sale closing, but, again, the sale hearing date and the

11    sale closing date shouldn't necessarily drive the challenge

12    date, at least on the second liens.  So I'll fix that to

13    October 24th, which is 60 days from the formation of the

14    committee.

15          That doesn't mean that you would all have to wait

16    until then if you think you have enough to bring a lawsuit,

17    but, you know, people are driven by deadlines.

18          MR. SALZBERG:  Your Honor, so Your Honor is fixing

19    the challenge for the second lien lenders to expire on

20    October 24th.

21          THE COURT:  Correct.

22          MR. GOLDBERG:  Your Honor, for the record, Adam

23    Goldberg of Latham and Watkins on behalf of DLJ as a second

24    lien lender.

25          That resolution is acceptable to us.  I just

1   wanted to note for the record, that of course, the issue of

2   unrolling the sale will come before the Court, but we

3   reserve all of our rights with respect to how it could be

4   unwound in the future.

5           THE COURT:  Thank you.

6           MR. GOLDBERG:  Thank you.

7           THE COURT:  So what else do we have, as dangerous

8   as that is, if anything, on the -- I hate to ask what else

9   you haven't agreed to in a 65-page document, but are we

10  otherwise done on the DIP?

11          MR. GRILLO:  I --

12          THE COURT:  The DIP?

13          MR. GRILLO:  I'm sorry, Your Honor.

14          THE COURT:  I recognize you may move some

15  semicolons and dependent clauses and things like that.

16          MR. GRILLO:  Your Honor, if I may?

17          The DIP in a 65-page DIP order, I think we have an

18  agreement as to how it will be fixed, so we can take that

19  back and figure that out amongst the people who are here.

20          With respect to the bid procedures, there's still

21  one or two open points that, if Your Honor will indulge us

22  one more time for ten minutes, we'll try to resolve -- we're

23  just trying to coordinate communications back and forth with

24  clients.  We just need to sort of touch base one more time.

25          But we did have the DIP done, so we wanted to

1    report back on that.

2              THE COURT:  All right.  So then on the -- I'll go

3    ahead and break you.  I'll then finish discussions on the

4    DIP procedures.

5              On the DIP, as quickly as you all can, send me an

6    approved as to form revised version.  If there are some

7    minor languaging issues that you all can't agree to, just

8    reflect that in the body of the document and I'll reconcile

9    the differences in chambers, but we'll otherwise be in

10   recess until 3:30?

11             MR. GRILLO:  That would be perfect, Your Honor.

12   3:30 would be great.

13             THE COURT:  I know this is all being measured by

14   when does traffic start building up on the LIE, so take your

15   time.

16        (Laughter)

17             THE CLERK:  All rise.

18        (Recess at 3:16 p.m.)

19             THE COURT:  Thank you, please be seated.

20             We'll go back on the record in Personal

21   Communications Devices.

22             Mr. Grillo?

23             MR. GRILLO:  Yes, thank you, Your Honor.

24             Again, Emanuel Grillo, on behalf of the debtors.

25             Your Honor, I think -- I'm crossing my fingers --

1    I believe we have a deal on the DIP procedures and the

2    break-up fee and the remaining points that would allow the

3    motion to go forward.

4            THE COURT:  All right.

5            MR. GRILLO:  Simply stated -- and I'll take them

6    in parts if I may, starting with the dates.

7            The proposed hearing date for the sale approval

8    hearing, working backwards, of October 10th, would remain in

9    place.  Bids would be due on October 8th and an auction, if

10   necessary, would be held on October 9th.

11           With respect to the break-up fee, and the expense

12   reimbursement, I am describing those together in the

13   aggregate, Your Honor.  So there is an aggregate amount of

14   $4.5 million -- I got it, I just wanted to make sure it got

15   it right -- $4.5 million dollars.

16           Of that $4.5 million dollars, and this will tie

17   back to the sale of the -- to the actual contract terms of

18   the seconds, so if Your Honor indulges me to go through in

19   full detail.  To the extent that the break-up fee is due and

20   payable to Quality One, on account of the bid, then there

21   will be a sharing formula in place between Quality One and

22   the estate and Quality One will agree to contribute back

23   $750,000 of the break-up fee when paid.

24           The flipside of that, Your Honor, is if it's not

25   paid because Quality One is the successful bidder, and in

1    those circumstances, if Your Honor recalls, there is a

2    working capital adjustment that we discussed earlier that

3    had a collar on it of $7.5 million dollars.  So the base

4    note for PineBridge is set at 25 and there's a collar of

5    $7.5 million either way.

6              If the working capital adjustment comes in above

7    the collar -- so without changing any of the amounts paid to

8    either the junior secured creditors -- but if it comes in

9    above that number, then for the first -- on a dollar for

10   dollar basis, above that $7.5 million dollars, the

11   purchaser, again, assuming it's Quality One, will agree to

12   contribute back to the estate one dollar for each dollar

13   that it's over to a cap of $750,000.  So it's the same

14   number as in connection with the break-up fee.

15             So in the event that the break-up fee is approved

16   by Your Honor and payable, the break-up fee and the expense

17   reimbursement, the aggregate amount of $4.5 million, they

18   will receive back -- they will contribute back to the estate

19   $750,000.

20             If on the other hand they become the successful

21   bidder and the working capital adjustment is above the $7.5

22   million dollars based on the formula set forth in the APA,

23   for each dollar over that up to a cap of $750,000, Quality

24   One will contribute that back in the form of a note

25   consistent with the terms of the PineBridge notes.  So it

1   will be the same form of consideration as the other notes.

2   It's an unsecured note.

3          THE COURT:  All right.

4          MR. GRILLO:  I believe that's the agreement.  I'm

5   going to -- I keep looking over my shoulder each time that

6   one confirms up on that, Your Honor.

7          THE COURT:  In terms of --

8          MR. GRILLO:  The executory contract, yes.

9          Thank you, yes.  Mr. Carroll reminded me.

10          Executory contracts are due, October 3rd,

11   Thursday, at 5:00 p.m.

12          THE COURT:  That's the to be assumed list?

13          MR. GRILLO:  Yes, that's correct.

14          THE COURT:  All right.

15          MR. GRILLO:  Right.  So that's, Your Honor, just

16   to sort of tie the whole timeline together.  That's -- so

17   what that will do is that will give several days to

18   perspective bidders to take a look at the contracts that

19   have been identified by Quality One for purposes of the bid

20   so we can applize (ph) the bid so to speak, you know, if

21   somebody else were to submit one three or four days later.

22          THE COURT:  I'm going to -- in terms of the

23   initial overbid and then the bid increments?

24          MR. GRILLO:  Yes, we have bid -- the increment,

25   for the initial overbid and each bid thereafter are each

```
 1   $50,000 increments.

 2           THE COURT:  So then the initial overbid is a

 3   million nine fifty -- what would be the first competitive

 4   bid $109,050,000?

 5           MR. GRILLO:  It's four million five plus fifty,

 6   right.

 7           And Your Honor, depending on the activity --

 8   there's a discussion going on about, you know, whether

 9   that's an appropriate number under the circumstances.  We've

10   been in auctions where we've increased it, you know, because

11   everyone is bidding up, you know, quickly.  We would

12   maintain the flexibility of working with the committee that

13   if we do have a robust auction, we would increase the bid

14   increments, but we wanted to make certain that the amounts

15   are at least $50,000, but not more than -- at least to start

16   and then we'll see what we get at the auction.

17           THE COURT:  Then as far as the data room and the

18   committee involvement, I take it the data room is either

19   done or will be done?

20           MR. GRILLO:  It is.  It's been done, Your Honor.

21   We'll make sure that everybody has access.

22           I spoke to Mr. Catalanello and make sure that his

23   client gets access.  We'll have that lined up for today.  We

24   will make sure that everybody else, anyone who's interested

25   will be in there.  It's been updated.  All the materials are
```

1    in there.

2            Here are some of the other issues that have been

3    raised.  Inventory isn't scheduled.  It's on the existing

4    bid as it stands now.  The issue of the ROFOR (ph) that was

5    raised, just -- I can address that real quickly, too.  I

6    mean we didn't -- sort of peace broke out, so I didn't get

7    to do my closing -- but the bottom line is that what that

8    was designed to do was that was to cover sales before the

9    auction sale.

10           So what it was designed to do is to prevent either

11   the company or the lenders from forcing the liquidation of

12   inventory that was to be sold at below market value.  So it

13   was to protect the value of the assets going into the

14   auction.  It wasn't to give Quality One, frankly, some sort

15   of untort advantage, but we do have inventory that, you

16   know, with respect to its value, it varies and you really

17   need a skilled set of people to try and maximize that.  What

18   they didn't want to have happen was they wanted the business

19   to continue operating in the ordinary course and the way to

20   do that, because primarily what we do at this point is sell

21   inventory, is to make sure that it wasn't sold below certain

22   floors and if it was going to be sold between now and the

23   sale, there's no intention to do so, but if we were forced

24   do, for some unknown reason, that they would have the right

25   to come in and buy that in the interim.  So it was really

1    just to preserve the existing value of the business as it

2    stood right now.  That was my last point on that.

3            THE COURT:  The provisions of the proposed bid

4    procedures say in sole discretion of the debtor or in the

5    business judgment of the debtor.  Those will all become

6    consultation with the committee and in the event of a

7    disagreement to be determined by the Court?

8            MR. GRILLO:  Sure.

9            Your Honor, the question's being raised that of

10   the $4.5 million dollars, you know, that becomes subject to

11   that sharing formula, but of that $4.5 or net $3.75, but a

12   million dollars of that is designated as expense

13   reimbursement, versus break-up fee.

14           So the aggregate doesn't change from what I told

15   Your Honor, it's just a division between the two numbers.

16   That was the request from Mr. Wielebinski.

17           And counsel for PineBridge wanted me to confirm,

18   which I will, that we are not changing any of the

19   consideration under the proposed deal by virtue of this

20   working capital adjustment payment to the estate, that it

21   was not affecting their deal and that is correct, it is not

22   affecting their deal.

23           THE COURT:  That just addresses that gap above

24   that seven and a half, that's otherwise already in the

25   contract.

1          MR. GRILLO:  Yeah, that, otherwise, would have

2     gone to Quality One, that's correct.

3          THE COURT:  So, do you want to address that fix in

4     the form of the order or are you going to modify the sale

5     agreement so the other purchasers --

6          MR. GRILLO:  I think we have to modify the sale

7     agreement because I know that (indiscernible - 3:48:15) and

8     capital judgment comes up there.  I don't think, without

9     looking at it, that there's a particular provision in the

10    order that's affected.

11          But the sale agreement, we have to address,

12    repost.  We obviously need to make changes to the order.

13    What we'd like to do, Your Honor, is get preliminary

14    approval from Your Honor, subject to an order, as with the

15    DIP that we all agree upon, and we will all work hard to

16    submit that as soon as possible to the Court.

17          THE COURT:  All right.  Well, let's go ahead and

18    get our series of "oh yeses" on the record.

19          MR. GRILLO:  I guess I'll step back.

20          THE COURT:  So we'll start with the guy with the

21    money.

22          MR. WIELEBINSKI:  Your Honor, I think Mr. Grillo

23    outlined what we agreed to correctly.  I think the only part

24    I might want to clarify is it is payment from the buyer

25    protections when paid and if paid, we just want to make sure

1   that, you know, the obligation arises when we get the cash

2   and we will be happy to pay out what we agreed.  That's the

3   only clarification.

4          THE COURT:  Or let's just string it so it doesn't

5   flow through the buyer.  Mechanically either way is fine, as

6   long as the at the end of the day -- if, at the end of the

7   day, Quality One winds up not being the successful bidder,

8   they walk away with $3.750 million and the estate has got

9   $750,000 just out of the buyer protection side.

10          However, that's all mechanic language that I'll

11   leave to you all, but that's the end of the day part.

12          As far as the morning start of the discussion

13   about the finance and contingency, does that stay in the

14   contract as written or is that being modified out?

15          MR. WIELEBINSKI:  I was really hoping that you had

16   forgotten about that, Your Honor.

17      (Laughter)

18          THE COURT:  As Judge Hale would have said, I have

19   a long memory for the shortcomings of others.

20      (Laughter)

21          MR. WIELEBINSKI:  You know I'm going to pass that

22   on to him, Judge.

23          I think where we are is the parties have continued

24   to work on it this afternoon and I don't have anything that

25   says we have the signed agreement.  I think what we're going

1    to do is continue to work on it and get it done before we

2    submit the order to you and I think that's the appropriate

3    way to handle it.

4              I don't see it as a waiver of the condition.  I

5    think it becomes a -- essentially, it's been satisfied by

6    the parties coming to an agreement.

7              MR. GRILLO:  Yes, we were not submitting an order

8    unless we had that issue wrapped up.

9              THE COURT:  All right.

10             Mr. Carroll?

11             MR. CARROLL:  Yes, Your Honor.

12             First, let me thank you for your assistance this

13   morning.  I don't think we ever would have gotten to this

14   point without your assistance and your time.

15             And as Mr. Grillo and Mr. Wielebinski have played

16   out, that is the deal that we have agreed to.

17             THE COURT:  All right.  Thank you.

18             From the -- yes?

19             MR. CATALANELLO:  For the record, Gerard

20   Catalanello from the law firm of Duane Morris.  On behalf of

21   Mr. Christopher, we agree with the resolutions placed on the

22   record today.  Thank you.

23             THE COURT:  All right.  Then as far as KPMC and

24   then the seconds?

25             MR. CARROLL:  Your Honor, they last once the

1    (indiscernible - 3:51:30).

2              UNIDENTIFIED MALE SPEAKER:  Oh, he's here again.

3         (Laughter)

4              MR. GLERUM:  We thought you said seconds, I'm

5    sorry.

6         (Laughter)

7         These changes are fine with us.  I mean you guys gotta

8    get your creditor agreement done, however, real fast.  That

9    would be today, otherwise, I've got issues.

10             THE COURT:  All right.

11             From the seconds?

12             MR. SALZBERG:  I'm not sure how to follow that.

13             Your Honor, Mark Salzberg, on behalf of

14   PineBridge.  The changes, most of them don't really impact

15   us.  We were not involved in the discussions.  They're fine

16   with us.

17             We're endeavoring to finish the underlying

18   documentation.  You referenced the contingencies and the

19   sale in the DIP order and counsel's correct, that the

20   parties are discussing and we hope that we'll be able to

21   reach a financial resolution.

22             MR. GOLDBERG:  Your Honor, for the record, I'm

23   Adam Goldberg of Latham & Watkins, on behalf of DLJ

24   Investment Partners.  We, likewise, have no issues with the

25   changes that have been resolved.

1              If I may take two minutes of the Court's time, I

2     would like to address one point.  In the committee's

3     objections to the bidding procedures, that is particular to

4     DLJ, I'm happy to do that, now or at any other time if the

5     Court would entertain it.

6              THE COURT:  Go ahead.

7              MR. GOLDBERG:  Thank you, Your Honor.

8              The -- we're very conscious that the committee was

9     very recently formed and is -- will conduct its

10    investigation of the pre-petition capital structure and

11    transactions of the debtors that occurred before the

12    petition date.

13             The committee argued in their objection that DLJ,

14    like PineBridge, is an insider of the debtors.  We just want

15    to take a moment to point out, Your Honor, that the

16    committee's arguments are just that, arguments.  The

17    committee has thus far submitted no evidence for suggest

18    that DLJ is an insider.

19             In fact, DLJ is independent from PineBridge and

20    has a distinct relationship with the debtors.  In

21    particular, unlike PineBridge, DLJ has no voting Board

22    members, only observer status; whereas, PineBridge has the

23    majority of the voting stock in the debtors.  DLJ has less

24    than 10 percent of the voting stock.

25             And the committee has shown no evidence of any

1    other control exerted by DLJ over the debtors.

2              While PineBridge and DLJ are both party to the

3    same second lender creditor agreement, that creditor

4    agreement reflects the different relationships that

5    PineBridge and DLJ have with the debtors.  In particular,

6    DLJ is entitled to payment priority for its loans over the

7    loans extended by PineBridge, and in addition, an agent has

8    been appointed to represent all of the lenders and DLJ,

9    alone, is entitled to direct that agent as required lenders

10   until its loans are paid in full.

11             That is to say, Your Honor, if evidence is ever

12   presented to the Court on DLJ status, it will though that

13   DLJ is not an insider.

14             THE COURT:  When you say agent has been appointed

15   for all the lenders, you mean all, including the firsts or

16   all, just meaning all the seconds?

17             MR. GOLDBERG:  It's only the second lien, Your

18   Honor.  US Bank is the agent for the seeked lien lenders.

19             THE COURT:  All right.  Thank you.

20             MR. GOLDBERG:  Thank you, Your Honor.

21             MR. CARROLL:  Just very briefly, Your Honor.  It's

22   not an issue for today.  I think that Mr. Goldberg actually

23   made our point when he said they're observer status, their

24   voting rights, et cetera, but I don't think we need to argue

25   it today.

1           THE COURT:  All right.  Very well.

2           MR. GRILLO:  Thank you for your time, Your Honor.

3    On behalf of everyone here, you've been more than

4    accommodating to all of us today.

5           We're going to take everyone back and get to work

6    on what we need to get done for the Court.

7           THE COURT:  All right.  So, again, first, I

8    appreciate you all got all of these worked out.  I will

9    approve the bid procedures as modified on the record.  They

10   do sound to the Court to be reasonable and appropriate in a

11   case of this nature.

12          Please go ahead and submit at your earliest

13   convenience, a revised agreed form of order.  If there are

14   disagreements on language and clauses, semicolons, if you

15   can't reconcile those, submit them to me and I'll reconcile

16   them in chambers so we is can get the process afoot.

17          One last housekeeping matter, you noticed a series

18   of retention applications being filed yesterday.  Nothing

19   outrageous about that.

20          Did you all intend to want to proceed by hearing

21   on those or simply by submission through the U.S. Trustee's

22   Office?

23          MR. GRILLO:  Your Honor, we had the hearing date

24   of the 20th, was sort of held aside for that.  So in the

25   event that there are objections, we would hope to resolve

1    them at a hearing on the 20th.

2          THE COURT:  Mr. Dimino?

3          MR. DIMINO:  Judge, I (indiscernible) this

4    afternoon.  If counsel -- I had asked counsel for the

5    creditors to review those and advise me whether or not there

6    were any objections and any motions pending.

7          If there are no objections, then I just need

8    counsel for the debtor to e-mail me the order and I will

9    process them for the Court.

10         THE COURT:  Mr. Carroll, I just wanted to make

11   sure that you're okay on the timing mechanic here.

12         MR. CARROLL:  Yes, Your Honor.

13         We have -- I have asked one of my colleagues to

14   take a look at them and he's done that today.  I'll consult

15   with him later today and get back to Mr. Dimino tomorrow at

16   the latest.

17         THE COURT:  All right.  So then by -- will you all

18   have other fish to fry -- but if you could all let the Court

19   know by Monday if there are any objections to the retention

20   applications so they can be added to the calendar, because

21   right now they're not.

22   MR. DIMINO:  Judge, it was my intention that if there were

23   any objections that either my office or any counsel had,

24   that I would contact counsel and make sure the notice came

25   through.

Page 147

1

2        (Whereupon these proceedings were concluded at 3:57

3    P.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                        I N D E X

1

2                    T E S T I M O N Y

3   PLAINTIFF'S

4   WITNESS              EXAM BY              PAGE      LINE

5   David Saperstein    Examination by affidavit  73        2

6                       Mr. Carroll              73        11

7                       Mr. Catalanello          89        13

8

9   Conor P. Tully      Mr. Catalanello          94        15

10                      Mr. Grillo               100       19

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                              RULINGS

4                                              Page        Line

5    Adj Motion to Pay Pre-petition Personnel    14          12

6    Wages, Salaries, and Other Compensation

7

8    Adj Motion for Interim and Final Orders     13          15

9    Authorizing Debtors to continue utilizing

10   Debtors' bank accounts

11

12   Adj Motion of the Debtors for Entry of      15          40

13   Interim and Final Orders

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          I, William J. Garling, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    William

7    Garling

Digitally signed by William
Garling
DN: cn=William Garling, o, ou,
email=digital1@veritext.com,
c=US
Date: 2013.10.04 17:31:52 -04'00'

8

9

10

11

12

13    Veritext

14    200 Old Country Road

15    Suite 580

16    Mineola, NY 11501

17

18    Date:  October 4, 2013

19

20

21

22

23

24

25