1   UNITED STATES BANKRUPTCY COURT

2   EASTERN DISTRICT OF NEW YORK

3   Case No. 13-74303-ast

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5

6   In the Matter of:

7

8   PERSONAL COMMUNICATIONS DEVICES, LLC,

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                  U.S. Bankruptcy Court

15                  Alfonse M. D'Amato Federal Courthouse

16                  271-C Cadman Plaza East

17                  Brooklyn, New York

18

19                  October 10, 2013

20                  10:47 AM

21

22

23   B E F O R E :

24   HON ALAN S. TRUST

25   U.S. BANKRUPTCY JUDGE

1    Hearing on the Approval of the Successful Bid(s) and Backup

2    Bid(s) [10]

3

4    Adj Motion for 2004 Examination Motion of the Official

5    Committee of Unsecured Creditors for Leave to Conduct

6    Discovery of the Second Lien Lenders Filed by Schuyler G.

7    Carroll on behalf of Official Committee of Unsecured

8    Creditors [143]

9

10    Adj Motion for 2004 Examination Motion of the Official

11    Committee of Unsecured Creditors for Leave to Conduct

12    Discovery of Debtors Filed by Schuyler G. Carroll on behalf

13    of Official Committee of Unsecured Creditors [140]

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach, CERT*D-397

1    A P P E A R A N C E S :

2    GOODWIN PROCTER, LLP

3         Attorneys for Debtors

4         The New York Times Building

5         620 Eighth Avenue

6         New York, New York 10018

7

8    BY:  EMANUEL C. GRILLO, ESQ.

9         MATTHEW L. CURRO, ESQ.

10

11   LATHAM & WATKINS, LLP

12         Attorneys for DLJ Investment Partners

13         53rd at Third, 885 Third Avenue

14         New York, New York 10022

15

16   BY:  ADAM J. GOLDBERG, ESQ.

17

18   EDWARDS WILDMAN PALMER, LLP

19         Attorneys for JPMorgan Chase

20         111 Huntington Avenue

21         Boston, Massachusetts 02199

22

23   BY:  CHARLES L. GLERUM, ESQ.

24

25

1    PERKINS COIE, LLP

2         Attorneys for Official Committee of Unsecured Creditors

3         30 Rockefeller Plaza, 22nd Floor

4         New York, New York 10112

5

6    BY:  SCHUYLER G. CARROLL, ESQ.

7

8    OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

9         Attorneys for Verizon Wireless

10        One Penn Center, 19th Floor

11        1617 J.F.K. Blvd.

12        Philadelphia, Pennsylvania 19103

13

14   BY:  ANGELA L. BAGLANZIS, ESQ.

15        EDMOND M. GEORGE, ESQ.

16

17   MCGUIRE WOODS, LLP

18        Attorneys for Sprint & Virgin Mobile

19        1345 Avenue of the Americas

20        Seventh Floor

21        New York, New York 10105

22

23   BY:  SHAWN R. FOX, ESQ.

24

25

1  MUNSCH, HARDT, KOPF & HARR, P.C.

2      Attorneys for Quality One

3      3800 Lincoln Plaza

4      500 North Akard Street

5      Dallas, Texas 75201

6

7  BY:  JOSEPH J. WIELEBINSKI, ESQ.

8

9  DUANE MORRIS, LLP

10      Attorneys for Unspecified

11      1540 Broadway

12      New York, New York 10036

13

14  BY:  PATRICIA H. HEER, ESQ.

15

16  MAGNOZZI & KYE, LLP

17      Attorneys for Oracle America, Inc.

18      23 Green Street

19      Suite 302

20      Huntington, New York 11743

21

22  BY:  AMISH R. DOSHI, ESQ.

23

24

25

1    PATTON BOGGS, LLP

2        Attorneys for Unspecified

3        2550 M Street, NW

4        Washington, DC 20037

5

6    BY:  MARK A. SALZBERG, ESQ.

7

8    UNITED STAETS DEPARTMENT OF JUSTICE

9        Attorneys for U.S. Trustee

10        560 Federal Plaza

11        Central Islip, New York 11722

12

13    BY:  CHRISTINE BLACK, ESQ.

14

15    APPEARING TELEPHONICALLY:

16    SCOTT FRIEDMAN

17    MARK HAUT

18    KATHLEEN LAMANNA

19    JULIE CURLEY

20    PAUL WINTERHALTER

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE CLERK:  Calendar Number 1, 2 and 3, Case

3    Number 13-74303, Personal Communications Devices, LLC.

4            THE COURT:  I'll take appearances, please, first

5    in the Brooklyn courtroom.

6            MR. GRILLO:  Sure.  Emmanuel Grillo, G-R-I-L-L-O,

7    Goodwin & Proctor, LLP, counsel on behalf of the debtors.

8            MR. CARROLL:  Good morning, Your Honor. Schuyler

9    Carroll of Perkins Coie on behalf of the official committee

10   of unsecured creditors.

11           MR. GLERUM:  Good morning, Your Honor.  Charlie

12   Glerum, G-L-E-R-U-M, of Edwards Wildman here on behalf of

13   JPMorgan Chase.

14           MR. DOSHI:  Good morning, Your Honor.  Amish Doshi

15   on behalf of Oracle America, Inc.

16           MR. GOLDBERG:  Good morning, Your Honor.  Adam

17   Goldberg of Latham & Watkins on behalf of DLJ Investment

18   Partners.

19           MS. BAGLANZIS:  Good morning, Your Honor.  Angela

20   Baglanzis of Obermayer, Rebmann, Maxwell & Hippel.  I'm here

21   with Mr. Edmond George, also of my firm, we filed a motion

22   for pro hac for him.  We represent Verizon Wireless.

23           THE COURT:  All right. Good morning.

24           MR. GEORGE:  Good morning, Your Honor.  Edmond

25   George from Obermayer.

1            THE COURT:  Okay.

2            MR. GEORGE:  I don't know, Your Honor, that I'll

3    necessarily have anything to say today, but I'm not licensed

4    here and Ms. Baglanzis moved -- filed a motion for pro hac

5    admission.  So I don't know how you're handle -- Your Honor

6    wants to handle that or --

7            THE COURT:  I'm sure the order will be processed

8    and if -- if there's something you need to add, feel free.

9            MR. GEORGE:  Thank you, Judge.

10           THE COURT:  All right.

11           MR. FOX:  Your Honor, Shawn Fox from McGuire Woods

12   on behalf of Sprint and Virgin Mobile.

13           MR. SALZBERG:  Good morning, Your Honor.  Mark

14   Salzberg, Patton Boggs on behalf of the Pine Bridge

15   entities.

16           MR. WIELEBINSKI:  Good morning, Your Honor.  Joe

17   Wielebinski with Munsch Hardt.  I represent the stalking

18   horse buyer, Quality One Wireless.  Also with me today is

19   Marshall Harris, general counsel for Quality One Wireless

20   sitting over there.

21           THE COURT:  All right.

22           Then in the Central Islip courtroom.

23           MS. BLACK:  Christine Black, Office of the United

24   States Trustee.

25           THE COURT:  And  understand we may have parties on

1    the telephone who are listening in.  I'll just take

2    appearances if there's anyone on the telephone who is

3    listening in.

4         MS. LAMANNA:   Yes, Your Honor.  Kathleen Lamanna

5    of Shipman & Goodwin for U.S. Bank as administrative agent.

6         MR. HAUT:  Your Honor, Mark Haut with Norton Rose

7    Fulbright representing AT&T.

8         MR. FRIEDMAN:  Your Honor, Scott Friedman

9    represented Claims Recovery Group.

10         THE COURT:  All right.  Anyone else?

11         All right.  Then, Mr. Grillo, if you would bring

12    us up to speed on the status of the sale and efforts to

13    resolve the various objections.

14         MR. GRILLO:  I do, Your Honor.  But before I do

15    that, a couple of things.

16         One is a word of thanks first to you and your

17    staff.  Everyone in the courtroom is keenly aware of the

18    larger government picture that's out there.  We appreciate,

19    one, you accommodating us here and, two, both the people who

20    are here in the courtroom today and in the building making

21    it available to us notwithstanding the larger government

22    issue.

23         So we do want to express, on behalf of I think

24    everybody, all of our thanks.  And people have talked about

25    it over the last couple of days.  So we did want to say that

1      first.

2              THE COURT:  All right.  Well, very well.

3              MR. GRILLO:  Okay.

4              THE COURT:  As far as I know, we've got four or

5      five days to wrap this up.

6          (Laughter)

7              MR. GRILLO:  I was hoping Your Honor wouldn't say

8      that because -- now to the status update and where we are at

9      the moment.

10              We -- well, let me back up a little bit.  We run

11     an auction process.  We had people participate for an

12     extended period of time.  We met yesterday with all of the

13     parties in interest.  We left the bidding open for a

14     considerable period of time.  We had not, at least as of

15     that point, received a fully qualified bid.  We extended the

16     date through that point in time.

17              What we've done is in that time, or since that

18     time, we've worked with the parties who were at the time --

19     Quality One Wireless, the committee, our senior lenders, our

20     junior lenders -- to try and reach a resolution on the open

21     issues.  Your Honor is aware that the committee has filed an

22     extensive objection.  We had other objections on limited

23     issues.

24              I'm pleased to say with respect to the limited

25     objections, if I can address those first for a moment,

1    Verizon, AT&T both filed objections that primarily, but not

2    exclusively, had to do with existing purchase orders, making

3    sure that those were assumed by the buyer and that there

4    would be no gap in liability upon the closing of a sale for

5    liabilities that the buyer was assuming, particularly

6    warranty liabilities and what we typically call MDF

7    liabilities.  Effectively, providing continuity of service

8    in connection with those contracts.

9              We've agreed on language in the form of the order

10   that addresses those concerns.

11             Oracle also filed an objection.  We noted that

12   counsel had made his appearance a couple of moments ago.

13   They raised two sets of issues, one with respect to adequate

14   assurance.  We believe, and they can certainly confirm, that

15   those -- that that part of the issue is resolved.  There's

16   an open issue that we need to carry relating to a split of

17   the license.  And what we mean by that, Your Honor, is that

18   as part of the transition from PCD to Quality One --

19   assuming we ultimately get to that point -- there would be a

20   sharing of the software, the hardware, and the data that

21   Oracle provides service to and, effectively, there would be

22   two entities using that, both, you know, Old Co. and New Co.

23             And there's an issue on the split of the license

24   that we don't have fully resolved.  We have some language

25   that we are working on, but I can't report that that's

1    resolved today.

2          Those issues are, frankly, sort of, you know, what

3    we would typically see in this context; people wanting to

4    make sure that if their contracts are being assumed, that

5    they have the comfort that that's being taken care of.  We

6    think that those issues, obviously subject to the open point

7    on Oracle, are essentially resolved.

8          That being said, where we are larger picture is

9    that we negotiated in our offices until after midnight last

10   night and picked it back up at 8:30 here this morning to try

11   and figure out if we can resolve the committee's objections

12   on a consensual basis.  I think that we've made considerable

13   progress.  I'll refrain from using words like, almost there.

14   I'll also refrain for my senior lenders of saying, ten more

15   minutes, because they don't believe I have any credibility

16   any longer when I say something's going to take ten more

17   minutes.  But we did -- we did approach Your Honor's staff a

18   little while ago saying that we were still working.

19         There's a couple of updates that have come in, but

20   we came back to sort of chat with Your Honor and let you

21   know where we are.  We did want to carry on, if we could,

22   those conversations.  We also wanted to get a sense of Your

23   Honor's schedule that -- as we have before to impose upon

24   you again, so that this way we can see whether or not if

25   there's something that we could work with you or we could

1    take another break, hopefully conclude those discussions and

2    see if we can reach a resolution.

3            We're prepared to go forward either way today,

4    either with a resolution or without a resolution.  And there

5    will be people on board and there will be people who won't

6    be.  We have testimony that we're prepared to offer, if we

7    can do that.  The hope is that if we take a little bit more

8    time we'll get done.  I won't have (indiscernible), out of

9    respect for Mr. Rutiger (ph) and his client, but I think --

10   I'm looking at the clock now.  I leave it to Your Honor to

11   inform us as to what you would like to do today, so that

12   this way we can sort of see if we can work around that.

13           THE COURT:  The absent point from your

14   presentation, so we're taught not to infer or assume, but

15   there were no other bids at this juncture or --

16           MR. GRILLO:  There have been no other qualified

17   bids.

18           THE COURT:  Qualified bids at this juncture.

19           MR. GRILLO:  There have been no qualified bids at

20   this juncture.

21           THE COURT:  All right.  Then in terms of the

22   timing mechanics, I wanted to get a sense from you all of

23   how -- how large the gulf, how deep the river, and I -- as

24   most of the attorneys, I often will get we're 92 percent of

25   the way there, we're 87 percent of the way there.  Those are

1    somewhat meaningful, but somewhat not.

2            But if I just could, Mr. Carroll, from the

3    committee's standpoint.

4            MR. CARROLL:  Absolutely, Your Honor.

5            I don't know that I have a number and as you said,

6    I'm not sure those are helpful.  But I think we're down to

7    certain limited issues at this point that in most respects

8    don't relate to the buyer and in only limited respects

9    relate to the debtor.  They are much more related to the

10    lenders and I think that's about it, right?  I -- vis-à-vis

11    the lenders and the committee, and they are relatively

12    limited at this point, Your Honor.

13            THE COURT:  All right.

14            In terms of the timing mechanics and that -- this

15    is part of why I wanted to visit with you, we have a couple

16    of different breakpoints for you all.  One is I can adjourn

17    you all till noon, give you another hour or so to see if you

18    can resolve these -- these issues.  I can adjourn you all

19    till 3:00 because I have a 2:00 calendar and give you, you

20    know, through between now and then to resolve them.

21            Either one of those is fine with the Court with

22    the exception that if I bring you back at 3, and we're in a

23    contested setting and there's going to be testimony to be

24    given, we're going to have a fairly small window of time to

25    get that testimony up and done.  Again, as I said to Mr.

1    Grillo, as far as the U.S. Government is concerned, as far

2    as this Court is aware, we're around at least for a few more

3    days.

4         (Laughter)

5              THE COURT:  But we also do have the Monday holiday

6    approaching and I know that everyone is trying to move warp

7    speed to get this done.  So if we can get it up and finished

8    and concluded today, that would be great.  Now if that means

9    bringing you back at noon, that's fine.  If it means

10   bringing you back at 3 after my 2:00 calendar, that's --

11   that's fine as well.  But just let me know which you think

12   would be more -- more productive.

13             MR. CARROLL:  Mr. Grillo and I just spoke briefly

14   and we both think that noon would be better to do it, Your

15   Honor.

16             THE COURT:  All right.

17             All right.  So then what I'll do is this.  We will

18   recess you all until 12:00 and we'll see where we are at

19   that juncture.  All right.

20             MR. CARROLL:  Thank you, Your Honor.

21             THE COURT:  All right.  Very well.

22             MS. BLACK:  Your Honor --

23             THE COURT:  -- So we'll be adjourned on PCD until

24   noon.

25             MS. BLACK:  -- Christine Black --

1          THE CLERK:  All rise.

2          MS. BLAC:  -- Office of the United States --

3      (Recess taken at 10:58 a.m.; resume at 12:02 p.m.)

4          THE COURT:  Please be seated.

5          All right.  We'll go back on the record on

6   Personal Communications Devices.

7          Mr. Grillo.

8          MR. GRILLO:  Yes, Your Honor.  Thank you.

9          Still formulating my thoughts as to what to say to

10  the Court.  I think that -- well, let me back up a little

11  bit.

12          We had a deal that, you know, was our stalking

13  horse bid.  We have worked with the parties to try and

14  conclude that deal.  We have -- we now have two proposals,

15  one is obviously, you know, the original deal and one that

16  we're trying to finish up or that we've been working to

17  finish up pretty much since yesterday.

18          I purposefully in the opening remarks this morning

19  did not do anything to say we were close or offer Your Honor

20  percentages because I -- I did not know where we were.

21          Up until a minute ago I felt like we were closer.

22  I think the critical element for today -- I'm sorry.  Is

23  that my feedback?

24          THE COURT:  No.  That's -- they dropped the

25  monitor.

1              Verizon is here, right, just in case?

2        (Laughter)

3              THE COURT:  Or are we AT&T?  I'm not sure.

4              MR. GRILLO:  Well, maybe -- maybe we should start

5        there, Your Honor.

6              I think to the extent that we wrap up a deal, I

7        think those issues are resolved and to the extent that we

8        are torturing others, I believe we've agreed on language --

9        I'm looking at Mr. Curro (ph) and they can -- maybe what we

10       should do is dispense with that portion of this first.  In

11       other words, the people who are less sort of mono-a-mono at

12       this point, the Verizons, the AT&Ts and the Oracles, I would

13       ask the Court maybe if we can get them to represent that we

14       have agreement on those points should an order be entered

15       and reserving their rights in the event that we don't get to

16       the end today.  But we have agreed on form of language that

17       has been incorporated into the order and that people have

18       signed off on?

19              UNIDENTIFIED SPEAKER:  Correct.  People have --

20       everyone signed off on.

21              THE COURT:  There was a --

22              MR. GRILLO:  Okay.

23              THE COURT:  There was a revised form of order

24       uploaded yesterday that had some changes from the previous

25       version and those changes seemed to reflect agreements with

1    service providers.  Is that --

2              UNIDENTIFIED SPEAKER:  That's --

3              MR. GRILLO:  That's what we were referring to,

4    Your Honor.  So maybe what we can do is we can sort of --

5    and then be kind to those who -- who maybe have other things

6    to do, who are affected by just that portion, not that

7    they're not affected by the overall deal, but they're not

8    sort of the central players as far as that goes.

9              So if I could ask them --

10             THE COURT:  All right.

11             MR. GRILLO:  -- to sort of come up and represent

12   where they believe we are.

13             THE COURT:  The -- what the Court had received

14   yesterday in both clean and redline had changes starting at

15   paragraph 22 that related to AT&T, then it related to

16   Sprint, then that related to Verizon.  I think the Verizon

17   section was the longest, so --

18             MR. GEORGE:  Yes.  Well, sorry about that, Judge.

19             Your Honor, I spoke to Counsel to the debtor and

20   --

21             THE COURT:  Just go ahead and restate your name.

22             MR. GEORGE:  I'm sorry, Your Honor.  Edmond

23   George, Obermayer, Rebmann, Maxwell & Hippel on behalf of

24   Verizon Wireless and Verizon Sourcing.

25             We do have an agreement with the debtor.  I

1    haven't seen a redline of the order, although I saw counsel

2    to the debtor write it in in hand.  I trust that the things

3    that he's represented to me that he's going to put into the

4    order he's going to, and with that understanding I don't

5    know if Your Honor wants me to go through the individual

6    changes, but they're very slight.  But as long as counsel

7    makes the representation that what we discussed this morning

8    will be included into the order, I think that's suffices.

9               THE COURT:  So is that further changes to what was

10   uploaded yesterday?

11              MR. GEORGE:  Yes.

12              THE COURT:  All right.  Do you want to just make a

13   brief statement as to what the further changes from

14   yesterday --

15              MR. GEORGE:  Yes, Your Honor.

16              THE COURT:  -- relate to in substance?

17              MR. GEORGE:  There was an issue about the cure

18   number and we were trying to verify it, and we had inserted

19   a footnote that that was a number that we thought was a

20   correct one and we would do a reconciliation to the extent

21   necessary.

22              We've now agreed on that number, and so the

23   footnote that was indicated on page 22 of the order will be

24   removed and that number that we put down as the cure, which

25   is approximately $14,800, will be the cure amount.

1          The other interlineations was made to language

2    with respect to the release that was to be granted and we

3    added some additional language at the end of paragraph

4    number 24(iii), Your Honor.  We interlineated the words at

5    the end of that paragraph with respect to all pending and

6    future orders.

7          And then the debtor already had inserted the

8    language on the release that was going to be granted to

9    Verizon and there really wasn't any change to that language.

10   The debtor was just attempting to determine whether the

11   other parties found that acceptable, and they've represented

12   that it is.

13         So with those changes, Your Honor, Verizon is

14   satisfied with the language with respect to cure.

15         THE COURT:  All right.  And, Mr. Grillo, those are

16   changes consistent with what the debtor understands?

17         MR. GRILLO:  They are.  And I believe Mr.

18   Wielebinski can make the same representations with respect

19   to Quality One.

20         MR. WIELEBINSKI:  Correct, Your Honor.  We -- we

21   have been a part of this process and we agree with those

22   changes as the Court was advised.

23         THE COURT:  All right.  Thank you.

24         MR. GEORGE:  With that, Your Honor, if we can take

25   leave if Your Honor's going to have a hearing this afternoon

1    as I don't think we have to be here for it.

2              THE COURT:  Well --

3              MR. GRILLO:  We (indiscernible).

4         (Laughter)

5              THE COURT:  Either way you all are welcome to

6    stay, but also free to go.

7              MR. GEORGE:  Well, thank you, Judge.

8              THE COURT:  All right.

9              MR. FOX:  Your Honor, Shawn Fox from McGuire Woods

10   on behalf of Sprint.

11             As you saw, there's language that was inserted in

12   the order.  We've agreed with that language prior to it

13   being inserted, so it's fine with us.  I guess I would

14   reserve our rights with respect to, I don't know, the change

15   in the buyer or something along those lines.  But beyond

16   that, I don't think we have a problem.

17             MR. GRILLO:  Your Honor, with respect to all of

18   the service providers, to the extent that something really

19   different happens, we would not hold anyone to that.  That

20   -- it's all for this deal, for this order should we get to

21   that point.

22             THE COURT:  All right.  Very well.

23             MR. FOX:  So with that, Your Honor, I have nothing

24   else.

25             THE COURT:  All right.  Then same with Sprint, you

1    all are welcome to stay, but also free to go.

2            MR. FOX:  Thank you, Your Honor.

3            THE COURT:  Mr. Wielebinski, I take it the

4    language is acceptable for the --

5            MR. WIELEBINSKI:  It is acceptable, Your Honor.

6            THE COURT:  -- proposed buyer.

7            MR. WIELEBINSKI:  And on -- for all of the service

8    providers, Your Honor, we've -- we've agreed -- they've

9    essentially consented to the assumption and the assignment

10   to the buyer, if it's approved, if the transaction is

11   approved for 365 and we've satisfied them all with adequate

12   assurance requirements as well.

13           THE COURT:  All right.  Thank you.

14           MR. DOSHI:  Good afternoon, Your Honor.  For the

15   record Amish Doshi on behalf of Oracle America, Inc.

16           Your Honor probably doesn't see a paragraph for

17   Oracle America.  That's because we're still trying to

18   finalize language on it.  But for present purposes, just by

19   way of background, Oracle had basically two broad

20   objections.  One related to the assumption and assignment of

21   its agreements with the debtors and the second part related

22   to the transition services agreement.

23           Since the filing of the objections we've had

24   numerous communications with the stalking horse counsel as

25   well as with the debtors and we are, I want to say close.

1   We just have to tweak some language.  Mostly it relates to

2   the transition services agreement.

3           But for the purposes of this hearing, to the

4   extent the Court is inclined to enter an order, what we have

5   agreed in this order is that the Oracle objections is going

6   to be adjourned to a date to be determined prior to closing.

7   And in that interim time period we're going to try and work

8   out a solution regarding the outstanding issue.

9           I remain hopeful that we can get it resolved.  If

10  not, we'll come back on the Oracle issues before the

11  closing, if necessary.  I'm hopeful we won't have to.  We'll

12  probably try and work out some language with both parties.

13          But I also wanted to thank the staff -- talking

14  horse.  We've been in numerous discussions with them.

15          THE COURT:  So he's got to stay, then, right?  Is

16  that --

17      (Laughter)

18          THE COURT:  What I'm not certain of at this point

19  is if closing -- capital IF closing -- is supposed to happen

20  next week, if you all are contemplating adjourning for

21  language and then coming back between now and then on the

22  Oracle issue, I'm not sure that -- that we're going to be

23  here or even there for that.  Is it -- are you all

24  contemplating the closing Tuesday or Wednesday of next week

25  if there's a deal?

1          MR. GRILLO:  I think we tentatively were looking

2     at some time next week.  I wanted to say the 18th?

3          MR. WIELEBINSKI:  Thursday.

4          MR. GRILLO:  Thursday, the 17th?

5          MR. WIELEBINSKI:  Yes.

6          THE COURT:  All right.

7          MR. GRILLO:  Thursday, the 17th.  I -- if I may,

8     Your Honor, and for purposes of today, I think that with

9     respect to Oracle we agree with counsel's representations of

10    what the issues were.  I think it more relates to the

11    transition services agreement, which is not being approved

12    today, you know, which is part of one of the closing

13    documents or closing mechanics.  And I think that --

14         THE COURT:  All right.

15         MR. GRILLO:  -- if I may, I think that's where --

16    right where our -- where our issue is at.

17         THE COURT:  That's the -- that's the licensing on

18    the software issue?

19         MR. GRILLO:  Yes.  Correct.  That's what I raised

20    earlier as the licensing on the --

21         THE COURT:  All right.

22         MR. GRILLO:  -- software issue.

23         MR. DOSHI:  Yeah.  Basically, the issue is

24    assuming it's assumed and assigned, Oracle would not approve

25    of any sort of splitting or two different parties accessing

1    the same software at the same time period.  So we're going

2    to try and work out -- and that's correct.  The objection

3    really -- the one we're trying to resolve is relating to the

4    transition services agreement and language relating to that.

5    That's why we're adjourning it.  And assuming we get it

6    resolved, we can probably do some sort of a certificate of

7    counsel or certificate of no objection relating to it with a

8    stipulation, if it's necessary.

9            THE COURT:  All right.  So then in order to

10   release Oracle, what we'll do is when -- again for capital I

11   capital F purpose -- when there's a final proposed form of

12   order for the sale transaction, to the extent that that

13   requires Oracle input, if there's an Oracle contract being

14   assigned over as part of the sale transaction, then I'll

15   need certification that you all have signed off on that.

16            If this is an issue that is not needed to be

17   resolved prior to closing, which is not how I'm hearing it,

18   if you all don't get to an agreement, then I'll need to

19   reconcile this for language purposes because I -- I doubt

20   that we'll be able to get you back in for a hearing on that

21   issue.

22            In other words we'll -- we'll sort it out.  We may

23   just do it without you.

24            MR. DOSHI:  I'm happy to stay.  I'm happy to stay

25   if we need to.  But what we have agreed -- assuming the

1    Court is okay with this, that in the sale order that -- the

2    language says basically the Oracle objection is adjourned

3    prior to closing.  But if Your Honor is saying that in the

4    event that -- which I don't anticipate -- if we can't work

5    it out and if we have to come back to court, if I'm hearing

6    this correctly because of the governmental issue --

7              THE COURT:  Okay.  Let me --

8              MR. DOSHI:  -- we may not be able to come back to

9    court.

10             THE COURT:  Well, the coming back may just be the

11   Court resolving the issue on the papers as opposed to being

12   able to have a hearing and have you all come in.  If we need

13   to figure out a mechanic for that, we'll do that.  But

14   there's -- there's slim time between now and Wednesday of

15   next week.

16             MR. GRILLO:  What Your Honor -- what Your Honor

17   has done for us in the past, if I may, is offered that to

18   the extent that we have always had concerns about language,

19   what Your Honor has said to us historically is you propose

20   something, you propose something, and I'll make a decision,

21   right?  And I would sort of recommend that here in this

22   instance.

23             We are certainly not going to steamroll them in

24   any way.  We're certainly not going to -- you know, if we --

25   if we -- we all honestly believe we're going to get this

1    done.  In the event that we're, you know, sort of -- we

2    can't come to agreement on the language, I think we would

3    serve something up to Your Honor and then maybe have a short

4    telephonic or say here's what I've decided, you know, based

5    on what you've all said to me at this point in time.  If I

6    could --

7              THE COURT:  All right.

8              MR. GRILLO:  -- propose that as a means of trying

9    to resolve it.

10             THE COURT:  That --

11             MR. DOSHI:  Initially, I -- I think I'm okay as

12   long as we get an opportunity to be heard because our --

13             MR. GRILLO:  Absolutely.

14             MR. DOSHI:  -- our issue relates to the actual

15   split.  It's not just language, but the issue is there

16   cannot be any --

17             THE COURT:  Issue of who's --

18             MR. DOSHI:  -- splitting of --

19             THE COURT:  -- who's paying for the license and

20   whether or not there are two people sharing the license.

21             MR. DOSHI:  Correct.  So -- so the language has to

22   represent -- I mean, we may fight about words, but the issue

23   is we can't have shared access or splitting of the Oracle

24   licenses between two parties.  You know, pre it's whoever

25   the debtors' parties are and post-assumption the buyer.

1           So, you know, all that is -- if that is the

2    concept and if we're fighting about words, that's fine.  But

3    if we're disagree -- disagree on the concept of it, then,

4    you know, we definitely need to be heard on it.

5           But --

6           MR. GRILLO:  We don't disagree with that.

7           MR. DOSHI:  Right.  So --

8           THE COURT:  All right.

9           MR. DOSHI:  -- I just want the Court to be aware

10   of the issue.

11          THE COURT:  All right.  Well, then, if we get to

12   that point where there's still a disagreement prior to

13   closing and it's not just commas and semicolons, it's who

14   has to pay for what, then we'll just have to find a way to

15   get you all on the telephone before closing so that that's

16   not holding up all the rest, if we get to the all the rest

17   part.

18          So with that said, again, same.  You're free to

19   stay, also free to go.

20          MR. DOSHI:  That is -- that is perfectly

21   acceptable and if acceptable, I will take leave if Your

22   Honor has no objections.

23          THE COURT:  All right.  Very well.

24          MR. DOSHI:  Thank you.

25          THE COURT:  Do we have AT&T?

1              MR. GRILLO:  AT&T, I think, was on the phone

2     earlier, Your Honor.

3              MR. HAUT:  It's still on the phone.   Good

4     morning, Your Honor.  Mark --

5              THE COURT:  With respect to AT&T --

6              MR. HAUT:  -- Haut with --

7              THE COURT:  -- then, can I get an --

8              MR. HAUT:  -- Rose Fulbright --

9              THE COURT:  -- announcement?

10             MR. HAUT:  -- representing AT&T.

11             The debtors --

12             THE COURT:  That is our service provider.

13         (Laughter)

14             MR. HAUT:  -- and AT&T have agreed the language in

15     the sale order at paragraph 22 --

16             THE COURT:  All right.  Let's -- we'll circle back

17     to them.

18             MR. HAUT:   -- that it resolves AT --

19             THE COURT:  We may not have that telephonic --

20             THE CLERK:  No.  It's on -- they're supposed to be

21     --

22             THE COURT:  Are they here?

23             THE CLERK:  -- on the phone.  Is --

24             THE COURT:  AT&T?

25             THE CLERK:  Is AT&T --

1           MR. HAUT:  Yes.

2           THE CLERK:  -- on the phone?

3           MR. HAUT:  Yes.  I'm sorry.  Were you having

4    trouble hearing me?

5           THE COURT:  Help.

6           MR. HAUT:  Hello?  Hello?

7           THE COURT:  All right.  Well, we'll --

8           THE CLERK:  We'll have to --

9           MR. HAUT:  Can you -- can you hear me?

10          THE COURT:  Can we get a coverage map up on that

11   screen?

12      (Laughter)

13          MR. HAUT:  It's Mark Haut with AT&T.

14          THE COURT:  All right.  Well, then let's -- we'll

15   circle back to that.

16          So what remains that divides us and I think we had

17   some technical issues.  I did want to give the U.S. Trustee

18   a chance, also, to way in if needs be.

19          But where are we, then, now logistically on the

20   rest of the deal?

21          MR. GRILLO:  Sure.

22          Where we are at the moment, Your Honor, is again

23   we have been sort of working on what was the original deal

24   and then a modified deal.  The modified deal, if it comes

25   together, would obviously satisfy all the constituencies.

1    We have narrowed down the issues, I believe, considerably,

2    but we have at least I would say two, maybe three tough

3    issues to work out.  It's -- what we definitely need to do

4    in the debtors' view is one way or another we will need to

5    proceed (indiscernible).

6              If we -- and I think the parties  -- I'm trying to

7    speak as straight as I can about it.  I think parties would

8    take different points of view as to which deal can get done.

9    I think the debtors have a point of view.  I think the --

10   each of the secured lenders has a point of view, and I think

11   the committee has a point of view.  And those are not yet

12   the same.

13             With that, I believe that, you know, if we -- you

14   know, if we take a little bit more -- well, let me step

15   back.

16             If Your Honor -- if we were forced to go forward

17   with a hearing because we didn't reach agreement now, based

18   on -- I know that Your Honor mentioned that you had a 2:00

19   and that you asked us originally if we would come back at

20   three.  It's 12:19 now and my guess is that by 3:00 we're

21   going to have to proceed with one way or another.  The buyer

22   has made it clear to us that we need to be able to push

23   something over the line today.  The deals are substantially

24   similar, but there are material changes between the same

25   parties.  It's just a question of, you know, what the

1    consideration is and there's movements of certain pieces and

2    things like that.  But we do not have a final resolution.

3          We would like to proceed with something

4    consensually.  If we can't proceed, then essentially I think

5    what Your Honor would see, to preview what would happen this

6    afternoon, a question would be raised of which of two deals

7    could go forward, the original stalking horse proposal or

8    that deal as proposed to be modified, but not yet signed off

9    on by everybody.  And the question is whether or not which

10   one can go forward.  And I think the parties would take

11   different views as to how that would -- how that would --

12   how that would proceed.

13         So what I -- I think in terms of what we would --

14   what would be required in the event that we did not reach an

15   agreement, is there's obviously a material objection to the

16   committee to which the debtors would need to respond.  We're

17   prepared to respond with testimony, if we need to do that.

18   We would have one, perhaps two witnesses.  We would expect

19   on direct it would be, you know, 30 to 45 minutes.  I think

20   the parties would all want to make some degree of legal

21   argument as to why we would need to make a choice between

22   the two.

23         But I think either way there would be some -- the

24   debtors would like to make a record to make sure that a deal

25   can get done today.  We think it's critically important for

1    all the reasons that Your Honor has heard in the hearings

2    leading up to this one.  I don't think anyone would disagree

3    that time is -- is not this company's ally at this point,

4    this debtors' ally and that we need to reach a resolution.

5             So I guess what I'm saying in an extraordinarily

6    roundabout way is that if we come back at three, the thought

7    is is that either we're going to have it wrapped up or we

8    need to move forward with the hearing.  And, I mean, I'll

9    ask everyone else if, you know, Your Honor wants to solicit

10   some input on that point.

11            THE COURT:  All right.  Thank you.

12            Mr. Carroll.

13            MR. CARROLL:  Your Honor, before I comment, can I

14   just have one second?

15            THE COURT:  Sure.

16       (Pause)

17            THE CLERK:  They should be on the phone, Judge.

18       (Pause)

19            MR. CARROLL:  Your Honor, I think from our point

20   of view it really comes down to the -- the two alternatives

21   are the debtor can proceed with the agreement as originally

22   proposed, subject to our lengthy objection with a lot of

23   different issues, or the debtor can proceed with the

24   agreement that has been revised subject to, I think, two

25   very limited issues which it seems to me the Court could

1    very easily decide as legal issues without any testimony and

2    without much fanfare.

3            So obviously I -- I hope that we could resolve it,

4    but I think the right choice would be that the Court could

5    consider the revised agreement.  Certainly, if the Court

6    decides you cannot approve that agreement, everybody has

7    their rights and the debtor can come back and say, no, I

8    want to go ahead with the first agreement.

9            But it would seem to me -- obviously the second

10   agreement is better for the creditors so it's a self-serving

11   statement.  But I think from a logistics and efficiency

12   standpoint, I think that makes a lot of sense.

13           THE COURT:  All right.  Ms. Black.

14           MS. BLACK:  Good afternoon.  Christine Black,

15   Office of the United States Trustee.

16           The United States Trustee's reservation --

17           THE COURT:  Hang on one --

18           MS. BLACK:  -- about the APA -- can you hear me?

19           THE COURT:  Hang on one second.  We're still

20   having -- all right.  Can you --

21           MS. BLACK:  The United States Trustee's

22   reservation about the APA concerns certain of the payments

23   going to Mr. Apling (ph) as part of the transition or the

24   transactional expenses which, according to the APA, would be

25   payable at the closing in cash.  It would -- it also

1    constitutes an approval of the administrative expenses to do

2    that.

3              Your Honor, this is a 50 page APA.  Buried in that

4    APA is the approval of certain administrative expenses which

5    we all know have been subject to changing legislation and,

6    in fact, in certain instances payments to insiders are

7    prohibited.

8              The United States Trustee is concerned about the

9    lack of adequate due process and would submit to the Court

10   that it would be appropriate that either there be a full

11   motion or a separate motion seeking the approval of the

12   payments to Mr. Apling or, in lieu of that, that any money

13   that would be payable to Mr. Apling be escrowed pending a

14   full hearing so that all the parties can be really familiar

15   with what is going to be paid to Mr. Apling and, under the

16   circumstances, that he's getting that payment.

17             I will note that the trust -- the committee's

18   application or opposition papers were filed under seal.

19   Certain of the creditors were not apprised of the terms and

20   contents of that document and agreement.  And under the

21   circumstances it's the position of the Office of the United

22   States Trustee that authorizing that payment at closing is

23   inappropriate at this time.

24             MR. GRILLO:  TO be clear, Your Honor, to address

25   the United States Trustee's concern, there -- there are

1    amounts that would be reserved.  We have always intended to

2    come to the Court for approval before those amounts are in

3    any way paid.  They are subject to -- in our view subject to

4    court approval.

5              What we've been doing is obviously there is an

6    allocation issue in terms of how things are allocated.  But

7    the bottom line is it -- what we were hoping to do is to get

8    agreements in principal from the parties as to the

9    allocation and then come back to the Bankruptcy Court for

10   approval.

11             So there would be no money paid absent a further

12   motion to the Court.

13             So to the U.S. Trustee's point, we understand the

14   concern.  The concern was raised by the committee in its

15   papers because there are allocation issues.  We're not

16   prepared to disburse that money today absent a full

17   agreement on notice to the parties in the appropriate

18   matter.

19             So to address the U.S. Trustee's concern.

20             THE COURT:  All right. So -- were you able to hear

21   that part, Ms. Black?  I know we're having some technical

22   issues.  Were you able to hear Mr. Grillo's statement?

23   Essentially, the -- any money to Mr. Apling would be

24   reserved and determined by the Court on notice to parties in

25   interest before disbursed.

1      MS. BLACK:  That's -- that's fine, Your Honor.

2  Under the circumstances we just requested a full motion so

3  that everyone could be apprised.

4      Thank you, Mr. Grillo and the Court.

5      THE COURT:  All right.  Very well.

6      So then why don't we -- why don't we proceed this

7  way?  I'm going to -- I'll recess you all.  Let's -- let's

8  have you start filing back in about 2:30 -- oh, I'm sorry.

9  Mr. Wielebinski, did you --

10     MR. GRILLO:  I -- I wouldn't -- I think the lender

11  -- the two sets of lenders wanted to be heard as well and

12  Mr. Wielebinski, if I may, Your Honor.

13     THE COURT:  All right.  Certainly.

14     Mr. Wielebinski.

15     MR. WIELEBINSKI:  Thank you, Your Honor.

16     Your Honor, we have been through a very difficult,

17  challenging, painstaking process.  I've done numerous of

18  these sales.  This one has been pretty brutal, and I don't

19  think anybody would object to that, that characterization.

20     We believe we need to move forward.  We know the

21  Court's been incredibly patient.  I would urge Mr. Grillo to

22  urge the Court to proceed now so that we can get as much

23  testimony in as possible and hopefully get a ruling today,

24  one way or the other.  This is costing my client a lot of

25  money and we need to get it to -- well, everybody's sake,

1    including for the employees that are out there wondering

2    what's going on.

3              I have a suggestion, Your Honor, and the

4    suggestion is this, because I heard Mr. Schuyler -- I heard

5    Schuyler say that there are just a couple of issues out

6    there.  My suggestion, Your Honor, is --

7              THE COURT:  Well, the objection started with four

8    and now there are three, so we're -- we're making progress.

9         (Laughter)

10             MR. WIELEBINSKI:  It's 12:29.  Give us 30 minutes

11   and let's see if we can come in with an agreement.  If we

12   can't, I would say let's start at 1:00 and if we have to

13   take a break, but we've got witnesses.  We know we're going

14   to have cross-examination.  It's going to be a long day in

15   order to get the entire hearing.

16             I've -- I've sat through those discussions out

17   there, or actually I've stood through those discussions and

18   I think we are close, but I think if the parties are going

19   to do it, they're going to do it now.  And otherwise I don't

20   think there's going to be two options, Your Honor.  We're

21   going to say our option is the first option and we're going

22   forward it and any negotiations we've had, that's off the

23   table.

24             So that's my suggestion, Your Honor.

25             THE COURT:  All right.

1            Mr. Glerum.

2            MR. GLERUM:  Thank you, Your Honor.

3            Briefly, there are pressing time issues here.

4    There is a frustrated buyer and our loan is slowly expiring.

5            I, too, have sat through hours of negotiations.  I

6    was preparing -- and the second deal is better, but

7    everybody's not on board with it.  And I think that until

8    everyone is on board with it, that it is incumbent upon Mr.

9    Grillo to proceed with the first deal, the original deal

10   that he filed with the Court and get it approved.

11           It -- I was going to suggest that he start right

12   away.  I defer to counsel for the buyer.  If he thinks

13   another 30 minutes would be useful, then fine.  We'll have

14   another 30 minutes.  But we have to get this deal approved

15   today and that Mr. Grillo's ready to go forward.  And I

16   would submit that if the 30 minutes doesn't work that Mr.

17   Grillo proceed with the -- to get approval of the motion

18   that he has filed and the asset purchase agreement that he

19   has filed.

20           Thank you.

21           THE COURT:  Thank you.

22           Mr. Salzberg and then, I take it, Mr. Goldberg.

23           MR. SALZBERG:  Your Honor, Mark Salzberg on behalf

24   of Pine Bridge.

25           We would agree with counsel's statements just made

1    that -- I never say it -- never say enough is enough when

2    you're talking.  Maybe another 15 or 30 minutes would do it.

3    I don't know.  We've tried for many, many hours.  But, you

4    know, I'm willing to continue talking for another 15, 20, 30

5    minutes.  If not, I think we come back in and I think

6    counsel's right; that the debtor should put on the original

7    transaction for approval.

8                 Thank you, Your Honor.

9                 THE COURT:  All right.  Thank you.

10                MR. GOLDBERG:  Good afternoon, Your Honor.  Adam

11   Goldberg of Latham & Watkins on behalf of DLJ Investment

12   Partners.

13                We're working closely with the other parties to

14   reach an agreement and like the other counsels that have

15   spoken to you, I'm hopeful that we can reach something in

16   the next 30 minutes, but it depends on the cooperation from

17   everyone.

18                THE COURT:  All right.

19                MR. GOLDBERG:  Thanks.

20                THE COURT:  Thank you.

21                And I -- do we have Mr. Haut back now on the phone

22   for AT&T?

23                MR. HAUT:  Yes.  Can everyone hear me now?  Hello?

24                THE COURT:  All right.

25                MR. HAUT:  Hello?

1          THE COURT:  All right.  So then what we'll do is

2     this.  We'll go ahead and recess until 1:00.  We're going to

3     have --

4          MR. HAUT:  Can anyone hear me?

5          THE COURT:  Mr. Haut?

6          THE CLERK:  Judge, that's why.

7          MR. HAUT:  Yes.  I'm here.  Can -- can you hear

8     me?

9          THE COURT:  We -- we can hear you now.

10        (Laughter)

11        MR. HAUT:  Oh, okay.  All right.  I'm glad.

12        UNIDENTIFIED SPEAKER:  Wrong carrier, Your Honor.

13        MR. HAUT:  Sorry for the technical difficulties.

14        THE COURT:  With apologies to Verizon.

15        (Laughter)

16        THE COURT:  The -- when last we had the revised

17    proposed form of sale order open there were iterations in

18    paragraph 22 that related to AT&T and the Court's question

19    was whether those resolved the objection that AT&T had filed

20    -- limited objection that AT&T had filed.

21        MR. HAUT:  That is correct, Your Honor.  The

22    language in paragraph 22 is an agreement between all the

23    parties that resolves AT&T's objection.  We, as the same

24    with most parties, reserve our rights to the extent there's

25    a different buyer or that paragraph ends up needing to be

1  changed.  But it does reflect our agreement and resolves our

2  objection.

3           THE COURT:  All right.

4           Mr. Grillo, Mr. Wielebinski?

5           MR. WIELEBINSKI:  That's correct, Your Honor.

6           MR. GRILLO:  That is correct, Your Honor.

7           THE COURT:  Okay.  Thank you, Mr. Haut.  You are

8  welcome to stay on or ring off or do both.

9           MR. HAUT:  Thank you, Your Honor.  We plan on

10  listening to the sale hearing so we can report back the

11  results --

12           THE COURT:  All right.

13           MR. HAUT:  -- to our client.

14           THE COURT:  All right.  So then mechanically what

15  we'll do is this.  We'll -- we may need to have a personnel

16  change inside the court.  I'll bring you all back in at

17  1:15.  I'll start then by taking either the announcement of

18  the agreement or a proffer of the testimony of the first

19  witness for the debtor.

20           Under the time constraints, it seems to the Court

21  appropriate to go ahead and take the direct testimony by

22  proffer.  That will obviously save us some time in the

23  process.  And then open that witness or those witnesses for

24  cross-examination before we break for our 2:00 calendar.  So

25  you'll have a natural second break at 2:00.  So if you don't

1    get it completely done by 1:15 for some reason, there's --

2    there will be more time to chat out in the hallway in

3    between.

4              For the Court's benefit, though, it seems that at

5    least on the present -- can you drop that?  Can you lower

6    that?

7              On the present proposed sale as it currently

8    exists, as far as what the Court is aware of, there are

9    three -- by category there are three objections remaining

10   from the committee:  One is what happens to the estate's

11   causes of action, including the Chapter 5's; the second is

12   what happens to the notes and guarantees to go to the second

13   lien lenders; and the third is how do we -- how do we

14   calculate how much the buyer is paying, what happens to the

15   estate's cash as of closing.  Those generically seem to be

16   the three issues, at least, that remain from the objection

17   that are subject of discussion.

18              Mr. Carroll.

19              MR. CARROLL:  I think, Your Honor, the last one

20   encompasses the payment to Mr. Apling.

21              THE COURT:  Well, the -- from the Court's vantage

22   point, the Apling issue is presently moot because while a

23   certain amount of money may be set aside, none of it is

24   going to be disbursed until there's a hearing on full

25   notice.  So that's not something I need to resolve today.

1    MR. CARROLL:  I'm not sure that's correct, Your

2  Honor, because I -- I do believe the sale provides for it in

3  certain ways as it stands now or maybe it doesn't provide

4  for it, and the way it is structured we don't believe is

5  appropriate.

6    THE COURT:  Well --

7    MR. CARROLL:  I guess I can make it simpler, Your

8  Honor.  The way the original APA is structured, the buyer

9  only pays the money if Mr. Apling is entitled to it and we

10  don't believe that the Court can approve that type of a term

11  in the APA.

12    THE COURT:  Well, whatever the calculated math

13  would be, because I sealed the terms of the agreement, so to

14  speak generically about it, whatever the math would be to

15  Mr. Apling, that amount of money would need to be paid at

16  closing and escrowed and then I'll figure out who gets it

17  later as opposed to that amount of money being withheld from

18  the closing and then go ask Quality One for it.

19    MR. CARROLL:  And that's exactly our position,

20  Your Honor, and that if Your Honor determines Mr. Apling is

21  not entitled to it, the estate should be retaining it.

22    THE COURT:  Mr. Grillo, is there a -- does the

23  debtor have a different view on that because when I thought

24  that issue was moot before, that's what I contemplated was

25  going to happen.

1          MR. GRILLO:  So -- so, Your Honor, under the

2     original deal the amount is viewed as what we called the

3     transaction expense.  Okay.  The transaction expenses were

4     being picked up under the original deal by Quality One to

5     pay.  If that transaction is approved, whether or not Mr.

6     Apling gets the money, it either goes -- either he gets paid

7     because the Court has authorized its payment to him, or it

8     goes back to Quality One.

9          One of the -- one of the terms of the modified

10    deal is that -- and that was a way of getting, frankly, the

11    buyer to pick up a certain expense outside the purchase

12    price that would otherwise be a cost to the estate or to its

13    creditors.

14          What the -- what was ultimately agreed to in the

15    modified proposal was the funds come into the estate to be

16    determined as to how they would be resolved after the fact.

17          So there's a difference in treatment.  I think

18    Your Honor can still rule on it at the appropriate time and

19    I don't think it -- you know, if we're going forward with

20    the original deal, then, frankly, you know, the estate could

21    come up short, but that's just the nature of what was

22    negotiated in the first instance.

23          If the second deal actually gets approved and goes

24    forward, then, yes, there's different treatment for those

25    funds.  Either way, though, the bottom line is Your Honor

1    can rule on that and if it's something, then, that has to be

2    posted by Quality One because it's due and owing and Your

3    Honor approved the original deal, then that's how it is.  If

4    we get agreement on the second deal, then the money comes in

5    and it either goes to Mr. Apling or it goes someplace else

6    in the estate.

7            But, again, it doesn't need to be resolved today

8    because the bottom line is is that it's either going to --

9    if we have to go forward with the first deal because we

10    don't believe we have agreement, then, you know, then

11    admittedly the estate doesn't come out the same way.  That

12    was the function of the negotiations, you know, for a whole

13    variety of broader issues.

14            THE COURT:  All right.  So there are still four

15    issues for discussion out in the hallway, then.

16            MR. CARROLL:  And there's one more, Your Honor,

17    and that is not really in discussion out in the hallway, but

18    if we are going forward with the original deal, our

19    objection that the proposed -- the APA should not be

20    approved at all because the estate comes out better in a

21    liquidation.

22            THE COURT:  All right.

23            MR. CARROLL:  And that's sort of where I got, Your

24    Honor, my proposal before that it's a lot easier to go ahead

25    with two limited legal issues on the amended deal than it is

1    to start from scratch on that deal.

2            THE COURT:  All right.  Well, then, let's see

3    where you all are come 1:15 and we'll be back.

4            MR. CARROLL:  Thank you, Your Honor.

5            THE COURT:  We'll be in recess until 1:15 on PCD.

6            THE CLERK:  All rise.

7        (Recess taken at 12:40 p.m.; resumed at 1:19 p.m.)

8            THE COURT:  Thank you.  Please be seated.

9            Mr. Grillo.

10            MR. GRILLO:  Yes.  Thank you, Your Honor.

11            I am pleased to report to the Court that I

12    believe, subject to everyone signing off, I believe we have

13    an agreement that's been reached.

14            THE COURT:  All right.

15            MR. GRILLO:  And if I'll take a few minutes and

16    sort of convey that into the record and for the benefit of

17    Your Honor, the other parties will inevitably correct

18    portions of it, but I -- but I think we'll -- I think we'll

19    get there.

20            Part of it -- and, essentially, what this amounts

21    to is a conclusion.  You heard me speak earlier, Your Honor,

22    of the original deal and a modified deal.  This is

23    essentially the conclusion of the modified deal, and we

24    think all parties are on board.

25            THE COURT:  Okay.

1          MR. GRILLO:  And it becomes fully consensual on

2    that basis.

3          THE COURT:  Okay.

4          MR. GRILLO:  So if I may, Your Honor?

5          THE COURT:  Yes.

6          MR. GRILLO:  The stalking horse APA with Quality

7    One and its affiliate is approved by all of the undersigned

8    parties as we're going to amend now as part of the record

9    and will ultimately be amended as part of the documents.

10   There will be no other bids taken.  The auction is formally

11   closed.  And as a result this is the highest and best offer

12   and the parties have agreed that that is, in fact, the case.

13          There are several elements of the deal that are

14   going to change.  The first is there's an administrative

15   expense claims reserve account that was budgeted at $3

16   million that will be fixed at $3 million and will not be

17   subject to reduction or offset and will be available to

18   satisfy administrative expenses.  And to the extent that

19   there is a balance over what administrative expenses are

20   required, that that will remain part of the estate and be

21   used by the unsecured creditors.

22          THE COURT: Is there any -- just on that narrow

23   issue, is there any disagreement about who is in that

24   reserve and who is out of that reserve?

25          MR. GRILLO:  There's no -- as far as the budget

1    items that go for that, there is -- there is -- we think the

2    budget items that it will cover are relatively modest.  We

3    expect that there will be a substantial portion that will be

4    left for the unsecureds.

5              But part of it, Your Honor, is to address

6    unsecured -- actually, administrative claims that may also

7    arise.  We haven't set an administrative claims bar date

8    yet.  There are always things that come up, so that was sort

9    of the reserve fund to make sure -- to address one of the

10   objections that we would ultimately not be administratively

11   insolvent.

12             THE COURT:  All right.

13             MR. GRILLO:  I should also note that, you know,

14   for the avoidance of doubt the administrative claims reserve

15   amount shall not be effected or impacted by the tests and

16   conditions in Section 4.6 of the stalking horse APA.

17             What that means, Your Honor, is there was a test

18   with respect to certain payments and eligible receivable

19   thresholds that have to be met.  I think the parties are

20   comfortable that those tests will be passed either way, and

21   that's no longer a limitation or requirement on the payment

22   of the $3 million.

23             With respect to the transaction expenses -- and

24   this was the element of the transaction that we mentioned

25   earlier with respect to the Apling payment, the parties have

1    agreed in principle to the terms of a motion to be proposed

2    on the allocation of the $4.8 million to be paid in the

3    aggregate by the purchasers, and that motion will be

4    presented to the Court before any payments are made.

5          And pending -- pending further order to the Court,

6    those amounts will not be paid out, but they will be paid in

7    by the borrower -- excuse me -- by the purchaser in three

8    installments:  $3 million at closing; $1 million within 90

9    days of the closing date; and $800,000 to be paid within 150

10   days of the closing date.

11         And for the avoidance of doubt, if any portion of

12   the transaction expenses is not due and payable to the

13   parties as set forth or the Court doesn't approve a full

14   amount expending all of that, that will remain in the

15   benefit -- will remain in the debtors' estates.  So the

16   funds do not go back.

17         The next item is that at closing the purchasers

18   will issue a single promissory note to the debtors' estate

19   for the benefit of the unsecured creditors in the aggregate

20   amount of $2 million.  For the avoidance of doubt, other

21   than the estate note the purchasers will not be required to

22   issue any other promissory notes for the benefit of the

23   unsecured creditors at closing.

24         If Your Honor recalls, in connection with the

25   resolution of the bid procedures motion, there was the

1   agreement to contribute a note to the estate for the amount

2   of $750,000.  This $2 million note replaces the $750,000

3   note and effectively supersedes it at this point.  So

4   there's a change in consideration in this regard of $1.25

5   million.

6           The estate note shall be due and payable on the

7   second anniversary of the closing date and shall have

8   substantially the same terms as the promissory notes issued

9   by the purchaser to Pine Bridge provided that the note shall

10  be unsecured and guaranteed on a subordinated basis by

11  Quality One.  The note shall be pari passu in right of

12  payment of principal at maturity and interest and in right

13  of acceleration to the promissory notes issued by the buyer

14  to Pine Bridge and subordinated in right of payment to the

15  purchaser's lender and the CS term lenders, provided further

16  that it shall be subordinated to all secured lenders in

17  respect of payments from collateral and such notes shall not

18  entitle any holder of that note to any right of prepayment

19  or any rights in respect of any collateral securing the Pine

20  Bridge notes and security agreement, the CS notes or

21  security agreement, or any rights to approve sale of

22  inventory or amendments.

23      (Pause)

24          MR. WIELEBINSKI:  Your Honor, may I approach?  We

25  have a draft stipulation and just for the ease of you

 1    listening to this and maybe seeing it in writing it might be

 2    easier --

 3              THE COURT:  That's fine.

 4              MR. WIELEBINSKI:  -- if you --

 5              THE COURT:  That's fine.  If you want to hand that

 6    on up.

 7              MR. WIELEBINSKI:  It's not signed, Your Honor.

 8        (Pause)

 9              THE COURT:  And this stipulation addresses the

10    note terms?

11              MR. GRILLO:  This stip -- these are the items that

12    I have read into the record thus far.  I'm actually at Item

13    Number 5, Your Honor, so we can follow along.

14              THE COURT:  All right.

15              MR. GRILLO:  You have Mr. Wielebinski's copy,

16    that's why it's all folded.

17        (Laughter)

18              MR. GRILLO:  So following along, Item 5 was that

19    the litigation claims, other than those that relate to

20    purchase assets, purchase contracts and assumed liabilities

21    shall be excluded assets.

22              What that effectively means is that to the extent

23    there's an issue on a receivable that's been sold, they

24    would -- they would get -- Quality One, that is -- the

25    benefit of the claim in connection with a receivable.

1        What it doesn't include, as the next sentence

2    suggests for avoidance of doubt, is the rights, claims,

3    causes of action of the sellers, i.e. the estate's against

4    Phillip Christopher (ph), directly or indirectly, whether

5    arising before or after the closing date, and then there's a

6    description of the action; any avoidance or other actions

7    arising under Chapter 5 of the Bankruptcy Coe; any claims

8    and causes of action against the Tagi (ph) High Technologies

9    America, Inc. or any of its affiliates; claims and causes of

10   actions with respect to present and former directors and

11   officers, including anything that is covered by insurance;

12   any direct rights to cover any -- recover under any D&O

13   liability insurance for present and former directors; and

14   any claims and causes of action against the existing

15   lenders, particularly the second lien lenders.

16        And --

17        THE COURT:  So even -- even if a -- even if a

18   cause of action associated to an assigned asset goes over

19   like an account receivable, if there's a Chapter 5 related

20   to that same entity, the Chapter 5 stays with the estate?

21        MR. GRILLO:  Correct.  The Chapter 5 stays with

22   the estate.

23        THE COURT:  All right.

24        MR. GRILLO:  And the debtors have agreed to assign

25   its rights to bring any such actions to the committee as

1    part of this process.

2              THE COURT:  All right.

3              MR. GRILLO:  Next, Your Honor, there is a concept

4    in the agreement called the wind down payment.  That was

5    essentially to assist in the funding of a wrap up of the

6    Chapter 11 cases, putting together a plan and the like.

7    That amount was increased from $250,000 to $500,000.

8              THE COURT:  All right.

9              MR. GRILLO:  And then, Your Honor, as part of all

10   of this, the purchasers wanted to make clear -- Quality One,

11   that is, that they would be released from any claims and

12   causes of action as part of this process.  And so the

13   parties agreed that the purchaser should have a full and

14   complete release.  It obviously does not release any claims

15   that would arise under the stalking horse APA or the

16   obligations there under.  So everything separate and apart

17   from the agreement would be released.

18              There is a provision which is the old paragraph 9.

19   The paragraph that's 8, Your Honor, goes away because we've

20   resolved the remaining objections.  That was in the event

21   that we didn't have a full and complete deal and proceeded.

22   But in paragraph 9, in the event that the committee asserts

23   any causes of action against any third party on behalf of

24   the debtors' estates, and they require the assistance of the

25   purchasers as obviously the purchasers will succeed to all

1    of the books and records, the committee and the purchaser

2    shall agree on the costs associated with such assistance and

3    they shall be paid by the committee prior to the rendering

4    of any assistance.

5            Then, also, lastly, as a point of clarity, the

6    professional fees account which was set up as part of the

7    DIP to make sure that the professional fees in the Chapter

8    11 cases were paid is clearly an excluded asset because that

9    was really just a cash account and they wouldn't be

10   purchasing that as part of the transaction.

11           What is -- what is not in the stipulation itself,

12   Your Honor, are provisions that relate to the second lien

13   lenders.  And I would like to take a moment and go through

14   those.

15           THE COURT:  All right.

16           MR. GRILLO:  So in order to provide security with

17   respect to any potential claim that may be brought against

18   the lenders, as I understand it both second lien lenders

19   have agreed to hold cash proceeds from the pay downs that

20   they receive under their notes in segregated accounts at

21   each second lien lender.

22           So, for example, DLJ on the one hand, if it

23   receives proceeds of their collateral as part of the deal --

24   as part of the ultimate pay down of those notes, they would

25   hold the -- those proceeds in segregated accounts with the

1    names of accounts -- with the names of those accounts to

2    include a reference to PCD, effectively allowing the

3    parties, in the event of a judgment, to have those

4    earmarked.

5            They will represent today that there are no liens

6    on the accounts or the funds -- excuse me -- on the -- or on

7    the investment funds themselves today.  So the lenders, by

8    way of background, are investment funds that are managed on

9    the one hand by CS DLJ and on the other hand by Pine Bridge

10   investment, so they're dedicated investment funds.  There

11   are presently no liens on the funds where there will be no

12   liens on the account that's set up to hold the proceeds as

13   of today.

14           They further agree that to the extent that any

15   third party looks to take action against the account,

16   against the funds and thus seeking a lien on those accounts

17   where the proceeds go while the actions are pending, that

18   they will provide prompt notice to the committee of any such

19   action.

20           This will -- this arrangement will remain in place

21   until the earliest of (1) denial of standing of the

22   committee to bring any actions under the Second Circuit case

23   law in STN (sic); or (2) the denial or dismissal of all

24   claims.

25           And this third element which varies between the

1   two as a matter of function of when they will receive

2   proceeds because under the waterfall the DLJ funds get paid

3   first and the PB funds get paid second.  In the case of the

4   DLJ funds, this arrangement will last for one year.  The

5   committee may seek to extend that period and DLJ reserves

6   the right to oppose any extension.

7           And in the case of Pine Bridge, they agree to

8   start a one-year period from the point in time that they

9   start to receive proceeds.  So it's the same setup.  It just

10  starts later because under the proposal they don't receive

11  proceeds until after -- yes.

12          MR. CARROLL:  It's actually form the point in time

13  when they receive their last proceeds, Your Honor, Pine

14  Bridge.  The one year period starts from the time they

15  receive --

16          THE COURT:  Starts now, but it expires one year

17  from the last payment of --

18          MR. CARROLL:  Exactly.

19          THE COURT:  -- Pine Bridge.

20          MR. GRILLO:  Mark, you got --

21          MR. SALZBERG:  Yeah.  That's --

22          THE COURT:  Yeah.  We'll go through the --

23          MR. GRILLO:  Okay.  I just --

24          THE COURT:  -- the whole series of --

25          MR. GRILLO:  No.  I understand.  I just wanted to

1    make sure.  That was the one point that I wasn't sure I had

2    right anyway.

3              Okay.  With respect to the fees and expenses

4    incurred by the second lien lenders, given the forms of the

5    notes they have typical provisions that say that the

6    borrower, in this case Quality One and its affiliate, would

7    typically be liable for enforcement actions or any actions

8    taken against the collateral, sort of typical -- typical

9    repayment or reimbursement provisions.

10             What the parties agree to make clear is that

11   Quality One is not liable for fees and expenses that arise

12   against either DLJ or PB in connection with what we'll

13   generically refer to as this bankruptcy litigation, so the

14   enforcement claims and things like that.  Their obligation

15   to reimburse effectively starts for post-closing events that

16   occur.

17             So in other words, because you've got a -- because

18   you've got the same lenders financing both deals, we -- the

19   parties wanted to make it clear that Quality One is not

20   responsible for what I've generically called all of this,

21   everything that we're kind of doing here among the parties.

22             But in the -- in the future if there's action

23   against either the second lien holders arising out of this

24   bankruptcy settlement, they don't get to look to Quality One

25   for that or do they?

1          MR. GRILLO:  That's correct.

2          THE COURT:  They do not.

3          MR. GRILLO:  They do not.

4     (Pause)

5          MS. LAMANNA:  Your Honor, this is Kathleen Lamanna

6   of --

7          MR. GRILLO:  The parties did agree that --

8          MS. LAMANNA:  -- Shipman & Goodwin for U.S. Bank.

9          MR. GRILLO:  -- notwithstanding the hold

10  provisions --

11         MS. LAMANNA:  I have a request for a point of

12  clarification.  I'll just --

13         MR. GRILLO:  -- that we outlined earlier --

14         MS. LAMANNA:  -- wait until the end or --

15         MR. GRILLO:  -- that --

16         MS. LAMANNA:  -- do it now.  I wasn't sure what

17  you preferred.

18         MR. GRILLO:  -- the two sets of lenders will be

19  able to pay from the proceeds of the collateral as they are

20  received, subject to certain distinctions that I'll make in

21  a second, fees and expenses incurred in the bankruptcy

22  litigation.  So, effectively, out of their pockets, but out

23  of their pockets from the proceeds of the collateral that

24  they receive.

25         So to the extent, for example, that $5 million of

1    the collateral is sold during the course of the bankruptcy,

2    the permitted use of those funds or the permitted release of

3    those funds which DLJ receives first will be to cover legal

4    expenses that they incur as part of the litigation that

5    takes place in the context of the bankruptcy.

6              In order to accommodate PB's ability to do that as

7    well, because it is junior in the priority of the waterfall

8    with respect to proceeds of collateral, Quality One has

9    agreed to make a payment with respect to those fees in six

10   months effectively in the form of a graduated prepayment

11   provide -- up to a million dollars to cover those fees

12   provided that no event of default has occurred and that DLJ

13   has received at least one-half of the amount that's due

14   under its note.

15             So we expect the face value of that note to be

16   approximately $36.3 million.  So in order for them to upset

17   the existing priority, which would have DLJ coming first and

18   Pine Bridge coming second, Quality One has agreed to make,

19   with the permission of DLJ, payments in six months up to a

20   million dollars reflecting reimbursement for any amounts

21   paid to cover litigation expense coming out here.

22             So, effectively, both parties within that first

23   six-month period will be able to pay their own litigation

24   expenses from the proceeds of the collateral.

25             MS. LAMANNA:  Your Honor, I apologize.  This is

1    Kathleen Lamanna on the line.  Can you hear me?

2              THE COURT:  We can hear you.

3              MS. LAMANNA:  Thank you very much.

4              I'm sorry.  Just by way of a point of

5    clarification -- and I can do this now or wait till the end,

6    depending on Your Honor's preference.  But I wanted to just

7    request a clarification with respect to the treatment of the

8    second lien lender fees and expenses.

9              THE COURT:  Well, we're --

10             MR. GRILLO:  Yes.

11             THE COURT:  I don't think we're fully through it

12   yet, so let -- let me get all of the terms in and then I'm

13   going to ask for each of the respective part -- well, who is

14   it that you represent?

15             MR. GRILLO:  U.S. Bank.

16             MS. LAMANNA:  I'm sorry.  I'm --

17             THE COURT:  Oh, U.S. Bank.

18             MS. LAMANNA:  -- sorry.  I'm representing U.S.

19   Bank which is the administrative agent for the second lien

20   lenders.

21             THE COURT:  All right.

22             MS. LAMANNA:  That's fine, Your Honor.  I will --

23   I will hold off.

24             THE COURT:  Are you asking Mr. Grillo to go back

25   through all of it, or was there a particular point that

1  wasn't --

2          MS. LAMANNA:  It's a point of clarification, I

3  believe, Your Honor, with respect to the discussion on the

4  waterfall and payments to DLJ and Pine Bridge, just with

5  respect to the administrative agent's fees and expenses.

6          MR. GRILLO:  Can I have one moment to talk to the

7  second lien lenders, Your Honor?

8          THE COURT:  Yes.  Go ahead.

9      (Pause)

10          MR. GRILLO:  Your Honor, by way of background,

11  U.S. Bank is the agent with respect to the second lien, so

12  we assume that there are agency fees and the like that we

13  assume counsel is inquiring about.

14          The arrangements that we're speaking about have to

15  do with sort of the -- with the post -- with the new notes

16  to the new second lien lenders.  I do not believe that

17  either of the new lenders -- of the second lien lenders is

18  expecting for them to continue to serve, and it's without

19  prejudice to their rights, whatever they may be, to collect

20  their fees for their existing services during the course of

21  the bankruptcy case.

22          And I'll ask the parties --

23          MS. LAMANNA: Your Honor, that's very helpful.

24  And, yes, my understanding is that the very modest fees and

25  expenses of the administrative agent are being paid pursuant

1   to the prior orders of the court.  That hasn't happened yet

2   and that's why I just want to make sure that everyone's on

3   the same page with respect to the releases being sought, et

4   cetera (indiscernible) in any way release the administrative

5   agent's rights with respect to those fees and expenses.

6           So I apologize for the interruption, but I felt

7   that it was important.

8           THE COURT:  All right.  Thank you.

9           Mr. Grillo.

10           MR. GRILLO:  Yes.  That's my understanding, Your

11   Honor, and I know you're going to call upon everyone else to

12   make sure that they ultimately agree.

13           What I have as the last point, Your Honor, is if

14   there will be a modification to the inter-creditor agreement

15   between Quality One, Pine Bridge and DLJ, and that to

16   accommodate the payment of the fees and expenses that may be

17   advanced to Pine Bridge as part of this agreement, that DLJ

18   will have a right to turn over in the event that the amounts

19   are not sufficient to pay the DLJ note in full while they

20   have -- that is, while Pine Bridge has received that payment

21   that we talked about at the end of the six-month period.

22           So they will have a right of -- and to the extent

23   that it's not paid, they will have a right of first recovery

24   on the PB note to the extent that it's unpaid.

25           So, effectively, what it amounts to is because DLJ

1    is allowing the payment to cover the fees to be made, in the

2    event that DLJ has a shortfall, they have a direct right of

3    recovery under both the note, to the extent it's unpaid, and

4    a direct right of turnover against Pine Bridge.

5              I'm sort of looking around to make sure I didn't

6    miss anything.  But I guess everyone will have comments.

7              THE COURT:  I'm going to go ahead and go round

8    robin to each of the parties in interest now to make sure

9    that these terms as outlined on the record reflect the

10   agreements of the various constituencies.  So we'll go ahead

11   and --

12             MR. GLERUM:  Charlie Glerum, Your Honor, for

13   JPMorgan Chase.

14             THE COURT:  I didn't hear your -- I didn't hear

15   your client in there, so I'm --

16             MR. GLERUM:  That's what I wanted --

17             THE COURT:  -- assuming it's okay with you.

18             Mr. GLERUM:  -- to make sure -- the -- we heard

19   the term second lien lenders and we heard the term lenders

20   sometimes.  And the only thing that affects us in this deal

21   principally is that paragraph 4 reads that the buyer shall

22   initiate a wire transfer to us at closing in an amount that

23   fully satisfies the various obligations and that's still the

24   deal.

25             Thank you.

1          THE COURT:  All right.

2          So in other words, structurally, the first --

3     JPMorgan Chase, the first lien holder, gets paid in closing.

4     They're done.  The reserve that's been set aside through the

5     DIP order stays with the estate, does not go over to the

6     purchaser, and then all these other arrangements about fees

7     going places and disbursements being withheld will have

8     nothing to do with Chase because they'll be out at that

9     point.

10          MR. GLERUM:  Yes, Your Honor.

11          MR. GRILLO:  That's exactly right, Your Honor.

12          THE COURT:  All right.

13          MR. GRILLO:  That was the one part of the deal

14     that really did not change, and so no offense to Mr. Glerum.

15     We just weren't changing that payment in full.

16          THE COURT:  All right.  So Mr. Carroll or -- well,

17     Mr. Goldberg, come on up.

18          MR. GOLDBERG:  Thank you, Your Honor.  Adam

19     Goldberg of Latham & Watkins on behalf of DLJ Investment

20     Partners.

21          I think Manny did a great job of explaining the

22     resolution that we reached after a lot of hard work from all

23     the parties.  I -- there are just a couple of issues that I

24     wanted to clarify to make them abundantly clear given that

25     we haven't had time to put together a formal stipulation for

1    Your Honor.

2            The first is that with regard to notice to the

3    committee of any actions against segregated funds held by

4    DLJ, and I understand for Pine Bridge as well, the notice is

5    related to actions to impose security on the funds --

6    segregated funds held that are distributed on account of the

7    notes as opposed to any legal action against the fund that

8    holds the account.

9            Second, that the terms and timing of release of

10    segregated funds to -- for use by each of the second lien

11    lenders are different, so that if, for example, all claims

12    against my client, DLJ, were denied or released by the

13    committee, then DLJ would be used -- be able to use its

14    funds even if Pine Bridge remained in litigation.

15            Third, just given the attention that was put on

16    the issue concerning the right to reimbursement of fees by

17    Quality One, I think the way I would describe the

18    distinction is that we agree that Quality One would not be

19    liable for fees in connection with the prior credit

20    agreement and the liens that are before Your Honor.  But to

21    the extent there are any future actions concerning the liens

22    created with respect to the new Quality One notes that are

23    being provided to the second lien lenders, those fees and

24    expenses would be reimbursable.

25            There is one point that was brought to my

1    attention this morning that we hadn't had a chance to

2    discuss and actually I understood, contrary to what Mr.

3    Grillo had explained, Mr. Grillo mentioned that the right to

4    pursue causes of action would be assigned to the creditors'

5    committee.  We had understood that that would not occur

6    today and that it would be brought before Your Honor on

7    notice and hearing at which all parties have the opportunity

8    to object.  And we just want to make sure that is -- is

9    actually the procedure that the debtors envision.

10           MR. GRILLO:  The debtors have agreed to assign

11   their rights to the committee.  To the extent that parties

12   have the right to object to that, then we will -- then we'll

13   provide an opportunity.  But we -- we have agreed to turn

14   them over.  I -- it -- they're just the debtors' causes of

15   action.  I don't know what -- what rights parties have to

16   object to that.  But if -- to the extent we need to put that

17   on, we can put that on for a hearing.

18           THE COURT:  But -- so mechanically what at least

19   DLJ is looking for is some type of -- some type of procedure

20   by which the causes of action are assigned for prosecution

21   purposes whether it's by motion or by some other protocol,

22   you all are just asking for that not to be -- not for the

23   actual assignment of the causes of action to be approved

24   today.

25           MR. GOLDBERG:  Yes.  That's right, Your Honor.

1    That all parties will have an opportunity to review the

2    procedure for providing the committee with standing to

3    pursue those causes of action, and that the parties comply

4    with the standards of the Second Circuit for granting

5    standing to another party.

6              THE COURT:  All right.

7              Mr. Carroll.

8              MR. CARROLL:  Your Honor, I think it's a lot

9    simpler than that.  When the debtor assigns voluntarily, I

10   don't think we need to comply with any standards.  So I

11   think the debtor can presently make that assignment.  If DLJ

12   or Pine Bridge wants to come back later and object to it,

13   that's fine.  But at present and particularly with respect

14   to the upcoming challenge deadline, our position would be

15   that the committee is not required to do anything further

16   and can commence that prosecution if we deem it appropriate.

17             THE COURT:  All right.  All right.  Any other

18   issues from the DLJ standpoint?

19             MR. GOLDBERG:  Well, no.  That's all, Your Honor.

20   I guess in terms of the standing issue, then I guess it

21   would be helpful for some direction from the Court about how

22   we should address any issue, if we should perhaps ask the

23   debtor to file a stipulation on these issues or if we should

24   raise them in response to any action that the committee

25   brings.

1            THE COURT:  All right.  Well, let me get the rest

2     of what may be on the list of not quite agreed to, if any,

3     and then we'll circle back to this.  And if there are any

4     others, any other.

5            MR. GOLDBERG:  Thank you, Your Honor.

6            THE COURT:  Okay.

7            MR. SALZBERG:  Your Honor, Mark Salzberg, Patton

8     Boggs on behalf of Pine Bridge.  I appreciate the efforts of

9     Mr. Grillo and his team to drive the parties to agreement

10    today.  And he did correctly synthesize and announce what

11    the terms are with respect to second lien as modified, I

12    think, correctly by counsel for DLJ.

13            Just one point of clarification.  There was a

14    right of reimbursement that was noted by Mr. Grillo.  To the

15    extent that DLJ was not satisfied, they would have -- or

16    their note was not satisfied they would have a right of

17    reimbursement.

18            A point of clarification in the sense of the

19    million dollar payment from Quality One, the -- essentially,

20    a prepayment under the note for the legal fees, that is not

21    subject to a turnover for reimbursement at the time that it

22    is delivered.  That is my understanding.  So as -- if DLJ is

23    not satisfied in full at that time, which would be six

24    months out, that money would be able to be used by Pine

25    Bridge for legal expenses.  Is that correct?

1          MR. GOLDBERG:  At that time, Your Honor, but it

2    may be in the future that it would become subject to

3    turnover --

4          MR. SALZBERG:  Yeah.

5          MR. GOLDBERG:  -- if there's an event of default

6    or --

7          THE COURT:  It's a timing mechanic.  The scope of

8    the target is the million dollars or whatever portion of it

9    is actually paid over by Quality One to Pine Bridge.  Then

10   it's a timing mechanic that you all need to work out:  When

11   does DLJ need to have been paid off before it can seek

12   access to the million dollars.  Now I'm assuming that's an

13   issue that you all can work out.

14         MR. SALZBERG:  Yes, Your Honor.  That will be

15   addressed in the papers.

16         MR. GOLDBERG:  Yes, Your Honor.  Thank you.

17         MR. SALZBERG:  Thank you, Your Honor.

18         THE COURT:  All right.

19         Mr. Carroll.

20         MR. GLERUM:  I apologize, Your Honor.  I have one

21   more.

22         I thought the we did this, but this is a mini-

23   controversy.  But there is a cash collateral account at

24   JPMorgan Chase to -- that -- to secure amounts that might be

25   drawn on a letter of credit issued for the benefit of Mr.

1    Apling.

2              That arrangement, the cash collateral account, is

3    unaffected by the transaction that you're being asked to

4    approve today.  And the -- that cash collateral account will

5    remain with JPMorgan and will be used to pay JPMorgan, if

6    any draws are made on the Apling letter of credit.

7              THE COURT:  Mr. Grillo.

8              MR. GRILLO:  Obviously, no draws will be made,

9    Your Honor, until we come back to the Court on that point,

10   just for clarification.

11             MR. GLERUM:  Thank you.

12             THE COURT:  All right.

13             All right.  So, Mr. Carroll --

14             MR. CARROLL:  I thank you, Your Honor.  We

15   appreciate your assistance and your patience in getting us

16   to this point, and for all the parties working together.  I

17   think Mr. Grillo and the other parties have accurately

18   stated it.

19             THE COURT:  All right.  Thank you.

20             Mr. Wielebinski.

21             MR. WIELEBINSKI:  Your Honor, I, too, want to

22   thank all the parties for working cooperatively to reach an

23   agreement.

24             I think Mr. Grillo and the other parties correctly

25   stated the terms of our agreement subject, of course, to

1    Your Honor eventually approving the sale order.

2              I did want to clarify something, and it is in the

3    stipulation in front of you.  It's paragraph number 2 and

4    it's with respect to the $3 million expense claim reserve

5    account.  The language at the end actually says that, for

6    the avoidance of doubt the foregoing shall not effect or

7    impact the tests and conditions set forth in Section 4.6 of

8    the stalking horse APA with respect to whether a material

9    adverse event has occurred.

10             As Mr. Grillo stated it, I think he actually read

11   it the opposite way; that this payment is made despite those

12   -- those tests.  Those tests remain and we're making that

13   payment subject to those conditions in the APA.

14             The second thing, Your Honor, is you raised an

15   issue about -- and I don't know if you want to --

16             MR. GRILLO:  I was just going to corroborate Mr.

17   Wielebinski's statement.  If I said it the other way, I

18   misspoke.  We don't think it's going to be an issue.  The

19   test does apply, but we don't think we're going to have a

20   problem with that, Your Honor.

21             THE COURT:  All right.  So it will be -- in the

22   final document to be submitted it will be as written in this

23   current draft stipulation.

24             MR. GRILLO:  Correct.  If I -- if I misspoke, then

25   I apologize.

1          MR. WIELEBINSKI:  And for the record, Your Honor,

2     that's the first time Mr. Grillo has agreed with me

3     throughout this process.

4          (Laughter)

5          MR. WIELEBINSKI:  Your Honor, the second issue is

6     you raised this Chapter 5 question.  We are going to convey

7     those rights.  I -- I want the Court to be clear that those

8     claims are there and they can pursue them, but to the extent

9     that they impact our rights in or to or under the assets

10    we've purchased, or are otherwise subject to protections

11    we're given in the asset purchase agreement or the sale

12    order or other orders collateral to the sale order, then

13    we're going to reserve all our rights.

14          And an example is the contracts that were assumed

15    and assigned.  The case law says that, you know, that

16    assumption and the payment of the cure is an absolute

17    defense to Chapter 5 actions.  So we don't expect that after

18    we paid the cure we're going to have to repay it because a

19    Chapter 5 cause of action was brought.

20          So we will reserve our rights with respect to

21    that.

22          THE COURT:  All right.  Mr. Carroll.

23          MR. CARROLL:  Yes, Your Honor.  And I don't think

24    there is a dispute.  Obviously, I don't know what claims may

25    arise later.  But certainly with respect to the example that

1    Mr. Wielebinski raised, we agree with that and, in fact, the

2    Verizon resolution or settlement, however you would like to

3    term it, provides for a release to Verizon with our

4    understanding that such a Chapter 5 claim is included in

5    that.

6             THE COURT:  All right.  But this is -- this is not

7    a conveyance and re-conveyance.  This is excluding from the

8    assets going over various causes of action including the

9    Chapter 5's.  So those are not being conveyed to Quality One

10   and then coming back.  They're simply not being conveyed.

11            MR. CARROLL:  No.  I think it is as you said

12   earlier, Your Honor.  The Chapter 5 claims are being -- are

13   not being conveyed to --

14            THE COURT:  To Quality One.

15            MR. CARROLL:  Actually, it's exactly as you just

16   said it, Your Honor.  I apologize.

17            THE COURT:  All right.

18            All right.  Ms. Black, anything from your office?

19            MS. BLACK:  Your Honor, Christine Black, Office of

20   the United States Trustee.  We are okay with the revisions

21   to the documents subject to seeing a final (indiscernible).

22            THE COURT:  All right.

23            It seems, then, that the only issue from the --

24   oh, Mr. Goldberg.

25            MR. GOLDBERG:  Sir --

1       THE COURT:  Other than the proffer to support

2  approving all of this, which we'll get to in a moment, but

3  Mr. Goldberg.

4       MR. GOLDBERG:  I just thought Your Honor might be

5  ready to address the standing issue, and I had a few remarks

6  on it if -- whenever you're ready.

7       THE COURT:  All right.  Well, that seems to the

8  Court to be entirely a timing mechanic, even though it's

9  made into the deal.  But it is -- it is built into it as an

10  integral part of the deal.

11       So it is -- Mr. Carroll, from the committee's

12  standpoint, is the committee seeking final approval today as

13  part of the sale of the -- whether it's an assignment for

14  prosecution rights or a -- the creation of a standing right?

15  Is that something that the committee is seeking to have

16  finally approved today or is that something that the

17  committee contemplates a sale order and provides that the

18  debtor will convey to the committee all rights, all

19  standing, et cetera, and then it's a question of when that

20  would be approved?

21       MR. CARROLL:  We view it, Your Honor, that the

22  approval is done today and that perhaps DLJ or Pine Bridge

23  may come back in the litigation and argue that that

24  assignment wasn't appropriate in some respect.

25       But as to standing to commence those litigations,

1    that the debtor is giving us everything we need to and we

2    are permitted to commence those litigations.

3                    THE COURT:  All right.

4                    So, Mr. Goldberg, from that -- as articulated,

5    does DLJ have an objection?

6                    MR. GOLDBERG:  Yes, Your Honor.  This was brought

7    up to us actually at the hearing.  I was informed before the

8    hearing that the debtor would be seeking to assign standing

9    on notice and hearing at which parties may be heard, but I

10   have not had a chance to prepare on this issue.

11                   But I would direct the Court's attention to the

12   final DIP order, which includes lengthy stipulations by the

13   debtors to the validity and enforceability and perfection of

14   the liens and claims of the second lien lenders, and a

15   release of the second lien lenders from liability.

16                   Now, of course, that's not binding on the

17   creditors' committee yet.  We all know that they have until

18   October 24th to file a motion to obtain standing to pursue

19   those claims.  But from the debtors' perspective, those

20   stipulations are binding.  Presumably, they exercised their

21   fiduciary duties and analyzed any claims that they did have

22   and decided to release those claims.

23                   So I don't see what standing the debtor has to

24   assign to the creditors' committee.  Rather, it should be

25   the creditors' committee filing a motion for standing before

1    Your Honor.

2              THE COURT:  But the two are not necessarily

3    inconsistent.  In other words, if -- if the debtor is

4    assigning for -- is providing the committee with standing to

5    prosecute claims and causes of action that belong to the

6    estate, but the debtor has at least released whatever claims

7    it might have against DLJ and Pine Bridge, the assignment of

8    standing wouldn't negate whatever effect that release had in

9    the DIP order.  In other words, it's not going to undue --

10   as far as that release in the DIP order may have gone, if

11   the debtor assigns its standing to pursue claims on behalf

12   of the estate to the committee, that wouldn't undue whatever

13   release was provided in the DIP order.

14             MR. GOLDBERG:  But the debtor --

15             THE COURT:  The debtors' rights go over such as

16   they are.

17             MR. GOLDBERG:  Well, Your Honor, for the debtors'

18   release to be given any effect, I don't see how they can

19   simply decide we don't believe that there are causes of

20   actions.  We've released those claims and causes and action

21   and agree with their secured lenders as an inducement to

22   consent to the use of their cash collateral and other

23   collateral as well as the priming by a DIP facility as part

24   of a consensual sale process, and then turn around at the

25   end of that sale process and say to that secured lender that

1    has cooperated and granted concessions that, actually, we're

2    not going to honor our agreement and we're freely going to

3    assign the claims that we didn't think existed to someone

4    who we believe will pursue them.

5            THE COURT:  But that -- that would somewhat

6    vitiates the -- allowing the committee or other parties in

7    interest to have an independent right of review and to bring

8    -- to bring litigation.  As you're articulating it, that

9    would render that provision meaningless if the debtors'

10   agreement that it doesn't have defenses would bind other

11   parties -- other parties in interest.

12           MR. GOLDBERG:  The creditors' committee retains

13   the right, Your Honor, and as embodied in the DIP order,

14   that right is to analyze the claims and causes of action

15   that the estate, not the debtors, may have.  And to pursue

16   those through a motion for standing filed by October 24th.

17   To that end, we have agreed with the creditors' committee to

18   provide them discovery and are working in a cooperative

19   manner because, Your Honor, we don't think we'll ever be

20   liable for any claims or causes of action.

21           But there is an established process under the

22   Second Circuit case of STN that requires that the creditors'

23   committee obtain standing following a cost benefit analysis

24   to determine whether it's actually in the interest of the

25   estate, given that the debtor has already determined in

1    their fiduciary duties to release those causes of action.

2              THE COURT:  All right.  Thank you.

3              Mr. Salzberg, are you --

4              MR. SALZBERG:  Just very quickly, Your Honor.

5              It was contemplated in the settlement that was

6    announced by Mr. Grillo that, in fact, the committee would

7    be bringing that motion for standing because, if I'm not

8    mistaken, the hold order or essentially the freeze of the

9    money, one of the elements that would terminate that freeze

10   would be a denial of standing of the motion to confer

11   derivative standing, an STN motion.  So that was -- that was

12   contemplated in the settlement that was announced on the

13   record today.

14             THE COURT:  But I think that's the first --

15             MR. SALZBERG:  That's the first of three.

16             THE COURT:  -- that's the first part today that I

17   didn't quite follow, so can you run back through that.

18             MR. SALZBERG:  Yes.  That was the monies that were

19   going to be agreed to be held by the second lien lenders

20   would expire at the earlier of the term of -- the denial of

21   a motion for derivative standing, or STN motion, a dismissal

22   of any claims brought by the committee, a dismissal by the

23   Bankruptcy Court not subject to an appeal, or what was -- it

24   was then a time period following, for instance, with respect

25   to Pine Bridge one year after the payment in full of the

1    note subject to the right of the committee to seek an

2    extension of that time period.

3           But it was always contemplated the committee would

4    bring that motion for standing.

5           THE COURT:  All right.  All right.  Thank you.

6           Mr. Carroll.

7           MR. CARROLL:  Yes, Your Honor.

8           THE COURT:  Let's -- let's -- let's go from the

9    analytic to the practical.  So assuming that -- because I do

10   have the 2:00, but I think we're close to wrapping up on

11   PCD.  Assuming an order is entered quickly after it's

12   submitted to me because you have a lot of where for art

13   tho's and semi colons to finish up here, and this may best

14   go, Mr. Wielebinski, to you representing the checkbook, when

15   do you all contemplate having an actual closing?  And

16   whether it's an actual or a virtual, when do you actually

17   contemplate closing?

18          MR. WIELEBINSKI:  I think we're currently looking

19   at the 18th; is that right?

20          UNIDENTIFIED SPEAKER:  The 17th.

21          MR. WIELEBINSKI:  The 17th of this month, Your

22   Honor.

23          THE COURT:  All right.

24          MR. WIELEBINSKI:  Next Thursday.

25          THE COURT:  All right.

1        (Pause)

2            THE COURT:  All right.  Hang on one second, then.

3            And for the parties here for the 2:00 and on the

4    phone for the 2:00, just bear with us.

5        (Pause)

6            THE COURT:  All right.  So the Court protocol's,

7    then, will be as follows.

8            With respect to the assignment of standing rights

9    to the committee, first, the proposed form of sale order

10   will provide that it is the debtors' intention and agreement

11   that -- fill your adjectives and adverbs -- to assign to the

12   committee all rights, causes of action, et cetera, make it

13   in better prose than I'm articulating it.  That motion, Mr.

14   Carroll, can the committee have that filed by tomorrow

15   morning?

16           MR. CARROLL:  Your Honor, here's the problem with

17   that motion is a couple of issues.  The motion that the

18   second lien lenders are contemplating isn't a motion that

19   exists because what actually is happening is the debtor is

20   assigning it's causes of action to the committee and there's

21   nothing else that needed.  We don't need any more finding

22   from the Court other than the approval of that assignment.

23           What the second lien lenders are saying is the

24   committee must make a motion under STN, but STN only applies

25   if the debtor refuses.  And if we have to make that motion,

1    what we're required to do is set forth the merits of those

2    claims, set forth many different things, including why the

3    debtor refused.

4         We haven't gotten most of the documents that are

5    supposed to be produced.  We haven't taken the 2004 exams.

6    So we cannot do that.  And that's one of the reasons why an

7    important element of this, which I know Mr. Goldberg said he

8    heard for the first time today, but we raised with the

9    debtor probably about six weeks ago and got their agreement

10   a long time ago.

11        So that's a very important point to us because,

12   otherwise, we're going to be running around for the next two

13   weeks drafting that motion instead of focusing on trying to

14   figure out what, in fact, the valid legal arguments are, and

15   to the extent necessary, drafting a complaint.  This really

16   becomes a sideshow distraction, Your Honor, and is another

17   obstacle that the lenders tried to create that, in this

18   case, isn't there because the debtor has agreed to the

19   assignment.

20        THE COURT:  Mr. Grillo --

21        MR. GRILLO:  Yes.

22        THE COURT:  -- because part of it is from the

23   Court's vantage point -- let me work backwards from

24   practical back to the analytic.  You all are going to close

25   on the 17th.  I will set a protocol such that I will make a

1    decision on this narrow issue on Wednesday, October 16th, so

2    that we can have a sale order and a closing.  What I hear

3    the second lienholders asking for is some form of notice

4    through a protocol because the assignment or the creation of

5    standing isn't built into the current motion that's before

6    the Court.

7            MR. GRILLO:  I think, Your Honor, it is, as I see

8    it, just -- and I know Your Honor has something else so I'll

9    be extraordinarily brief.

10           Whatever rights the debtors have, we think the

11   standing is ultimately a motion to dismiss issue or not.

12   The debtors have agreed -- and I think Mr. Carroll is right

13   in terms of what the burden is.  The burden is if the

14   debtors decide not to pursue something, then the -- and not

15   to transfer it to the committee or allow someone else to

16   pursue it on behalf of the estate, then that's how -- then

17   you need an STN motion in that context.

18           We're agreeing to do that.  The debtors are not

19   going to pursue whatever claims the estate has or doesn't

20   have.  I think the standing issue, frankly, can get resolved

21   in a motion to dismiss, you know, if a complaint is actually

22   brought.

23           So to sort of reduce the expenses on the estate at

24   this point, the debtors have -- the committee has asked to

25   bring those actions.  The debtors have agreed that they can,

1    in fact, as far as the debtor is concerned.  They take with

2    them whatever burdens are in the DIP loans or not.  The way

3    the DIP order is set up, it's stipulations as opposed to

4    findings.  The releases are what they are, what they cover

5    or what they don't.

6            But the bottom line is is that from a standing

7    perspective, I don't know that we need something separate on

8    that before that point in time.  They can certainly raise it

9    as part of a motion to dismiss the complaint if they think

10   there's an issue based on the transferability.

11           But I don't think it's subject to everyone else's

12   judgment, frankly, what the debtors do with the causes of

13   action, so long as it doesn't abandon them and there's no

14   one pursuing them on behalf of the estate.

15           THE COURT:  All right.

16           MR. GOLDBERG:  Your Honor, if I may for a just a

17   moment respond to the debtors' arguments.

18           According to the DIP order the debtor does not

19   have a right to assign.  The debtor has --

20           THE COURT:  Well, this is broader, though, than

21   just the second lienholder.  These are all of the estates'

22   rights and causes of action.

23           MR. GOLDBERG:  Yes.  And their -- the committee

24   has -- the debtor has the ability to bring those causes of

25   action.  And so if there is, for example, a preference or

1    fraudulent transfer action against someone who received a

2    transfer from the estates prior to the bankruptcy petition,

3    those are not released by the DIP order.

4            With respect to the second lien lenders as a

5    material inducement to cooperate in this process, to consent

6    to the priming of the liens, the debtors waived their rights

7    to pursue those claims and, therefore, have no standing to

8    assign.  They in their fiduciary duties have decided that

9    those claims are not worth pursuing.  And so now it is with

10   the creditors' committee, according to the procedure in the

11   DIP order and embodied in the concept of the challenge

12   action, to obtain standing.

13           And the procedures of STN are built for exactly

14   this purpose; to determine whether it is in the cost benefit

15   -- the benefit of the estate to incur the costs of pursuing

16   that action given that the debtor, the party that knows the

17   most about the prepetition conduct, has decided in their

18   fiduciary duties to release those causes of action.

19           THE COURT:  All right.  So how -- how quickly can

20   the second lienholders file their written objection this

21   assignment?

22           The Court's -- the Court's focus isn't so much on

23   substantively who ultimately might win or lose on a 12(b)

24   motion to dismiss filed a year from now.  It's the change in

25   the asset sale proposal that these causes of actions are

1    going from the buyer, to which the committee objected, and

2    now to the committee with a certain carve out for assets

3    accepted by the buyer.

4              So from a notice of due process standpoint, I'm

5    willing to create a protocol where the second lienholders

6    can file an objection to that occurring, whether it's by the

7    debtor and the committee filing a motion or filing a

8    stipulation, what have you.  Any protocol is fine so that

9    you all get your chance to file the written objection to

10   what, from the Court's vantage point, is a little bit of a

11   change.  It's not a seed change, but it's a little bit of a

12   change to the asset purchase agreement of the sale that was

13   first proposed.

14             So it's really a timing mechanic at this point.

15   They've put on the record the proposed stipulation.  There's

16   going to be at some point either today or tomorrow what I

17   fear will now be a 78 page sale order from the 34 pages we

18   already have.  There's going to be language in that that you

19   all are still working out.  There's going to be a provision

20   in that to which you all will not agree.

21             So now it's a mechanic because I'm going to make a

22   decision as part of this overall sale before it closes

23   whether there's a conveyance of rights or a creation of

24   standing, however it's -- however it's articulated.

25             So I can give you all -- I can have the debtor and

1    the committee file a two-page stipulation that's excerpted

2    from the sale order.  It can be built into the sale order

3    and you all can object to it.  Either way, I'm going to

4    decide it substantively before the sale closes.

5            So mechanically how do you all want to -- want to

6    go about it?

7            MR. GOLDBERG:  Well, we can work under whatever

8    time period the Court requires to approve the sale to meet

9    the milestones in the process.  If the Court, I think,

10   mentioned Wednesday is October 16th, which is in six days.

11   We can have an objection on file for Monday morning or

12   whenever the Court so desires.

13           THE COURT:  All right.  Mr. Salzberg.

14           MR. SALZBERG:  Your Honor, we can also have an

15   objection or a paper filed by Monday or Tuesday at the

16   latest.  Whatever works with the Court's schedule.

17           THE COURT:  All right.

18           So Mr. Grillo, Mr. Carroll.

19       (Pause)

20           MR. CARROLL:  Your Honor, what Mr. Grillo and I

21   were discussing was rather than the need for -- to deal with

22   this in connection with the sale, DLJ and Pine Bridge have

23   the right to raise this on a motion to dismiss.  And let

24   them raise it on a motion to dismiss rather than now when we

25   have short timetables and maybe we never get there.

1            THE COURT:  All right.  So the committee is

2    willing to accept this assignment of rights without

3    prejudice to DLJ or Pine Bridge contesting, essentially, the

4    validity or effectiveness of that assignment in any

5    subsequent litigation?

6            MR. CARROLL:  Yes.  The only caveat to that, Your

7    Honor, is one of timing.  To the extent that we commence an

8    action on or before the challenge deadline and DLJ or Pine

9    Bridge come back and say you could not do that because you

10    didn't have authority to, that wouldn't -- we wouldn't allow

11    them to reserve that argument.  But they certainly can say

12    we don't have authority.  They can't say we didn't timely

13    commence it because we didn't have authority.

14            THE COURT:  All right.  Well, I'm either going to

15    decide it now or I'm going to reserve it until the time of a

16    standing motion to dismiss.  So either way is fine, but I'm

17    not going to let this issue now wag the whole sale process.

18    So --

19            MR. CARROLL:  And that's where I think Mr. Grillo

20    and I were trying to do, Your Honor, to take this out of

21    that and allow you to address the sale separately.

22            MR. SALZBERG:  Your Honor, very briefly.

23            The whole point of the deadline for the challenge

24    period expiring on October 24th was to set a time period for

25    the committee to bring a motion -- I think it says that in

1    the DIP order -- to bring a motion to confer standing to

2    bring an action against Pine Bridge or Credit Suisse or DLJ.

3              We have no problem, speaking for Pine Bridge,

4    putting together papers, submitting them to Your Honor as

5    soon as you would like them.  Monday again would be fine.

6    And we think the issue would be properly teed up for a

7    decision by Your Honor in the context of the sale order.

8              MR. GOLDBERG:  Your Honor, just practically

9    speaking, we put in a great deal of effort and work into

10   reaching what we thought was a completely consensual

11   agreement and sale proposal for Your Honor.

12             This issue of assignment of claims was represented

13   to me when we walked into the door at -- was it 1:15 today

14   as not being a part of the sale.  It was removed from a

15   prior draft of the stipulation.  And so now to have it be a

16   part of the sale is something that wasn't before us when we

17   agreed to the terms presented before Your Honor.

18             So I do ask that we have the opportunity to

19   consider the issue more fully and that this issue be removed

20   from a term of the sale.

21             THE COURT:  All right.  I'm going to take my 2:00

22   calendar and that should be done in half an hour.  Don't

23   take that as a hit, Mr. Ringgold, but that -- we should be

24   done with the 2:00 calendar in half an hour.  So why don't

25   you all visit through this last piece.

1          Before I release you out to that, though, at the

2     moment this is -- well, these are the same dangerous words

3     that were said outside.  This is the last piece other than

4     actually getting then the proffer of the testimony.  So

5     we're not -- we're not rewinding the clock.  This is --

6     you're in the funnel now resolving, if you can, this last

7     piece of it.  Then when you come back you'll tell me what

8     you have worked out or not worked out.

9          But, again, from the Court's vantage point, if I

10    need to decide -- if I need to decide something

11    substantively before the sale is to close, I will do that.

12    If there's a protocol you all want to establish that avoids

13    the need to do that, that's fine as well.  But either way,

14    we're going to get it resolved this afternoon and -- so that

15    the sale, hopefully, can go forward and close.

16          All right.

17          MR. CARROLL:  Thank you, Your Honor.

18          THE COURT:  All right.  So we'll adjourn on PCD

19    until 2:45.

20       (Recess taken at 2:18 p.m.; resumed at 3:06 p.m.)

21          THE COURT:  Thank you.  Please be seated.

22          Are you going to ask for ten more minutes?

23          MR. GRILLO:  I am not.

24       (Laughter)

25          UNIDENTIFIED SPEAKER:  No.  No.  Please.  No.

1          MR. GRILLO:  I am not.  I am not going to ask for

2     ten more minutes.  I -- I promise this will only take ten

3     minutes.  How's that?

4          THE COURT:  I'm not sure how many ten more minutes

5     Mr. Glerum can take.

6          MR. GRILLO:  Thank you, Your Honor.

7          Again, for the record, Emmanuel Grillo on behalf

8     of the debtors.

9          Two things, Your Honor.  First, with respect to

10    the issue that we closed with, we will prepare and file a

11    separate stipulation with presentment to the Court.

12          I guess the question is if Your Honor wants to

13    hear argument on it and when you want to do that.

14          THE COURT:  More than what I've heard already or

15    --

16          MR. GRILLO:  It's never enough it seems.  But the

17    bottom line is is that I know the parties would like to be

18    heard on the point.  So depending on what Your Honor would

19    like to do.

20          THE COURT:  All right.

21          MR. GRILLO:  And we'll separate it out from the

22    sale stipulation and we'll put it separately, and then we'll

23    sort of deal with it on its own.  We've agreed, you know, to

24    turn it over.  The committee agreed to accept.  The parties

25    obviously want to be heard on that point.  So whatever Your

1    Honor would like to do in terms of timing.

2              THE COURT:  All right.  And in terms of the rest

3    of the sale order, how quickly do you all anticipate being

4    able to have a sale order to the Court to review?

5              MR. GRILLO:  My guess is that we're going to turn

6    it tonight and get it out to everybody.  Comments usually

7    take -- you know, fortunately, some of the things as Your

8    Honor saw were sort of written up in the stipulation.  So we

9    have part of the work done already.

10             THE COURT:  I was wondering who brought the

11   printer.  Was there a printer --

12        (Laughter)

13             MR. GRILLO:  No.  That was actually from last

14   night, actually.  That was part of the deal.  But, you know,

15   we'll turn it tonight.  We'll get it around to everyone.

16   The hope is that we can get comments done from everyone by

17   tomorrow and submit it by the close of business tomorrow.  I

18   mean, I would like to say earlier than that, but I think

19   that's unrealistic given the number of parties that are

20   involved.

21             THE COURT:  All right.  We'll go -- as you all

22   know, other than the other issues going out that are in the

23   press, Monday is also actually a legal holiday.  But if the

24   final, final form of order hits -- even if it hits on

25   Monday, we'll look for it so that we can try to get it -- at

1    least get my signature on it -- I'm not sure how to get the

2    clerk's office to enter it.  That's a different mechanic.

3    But if we have the order -- in other words, if we have the

4    final, final version of that -- of the sale order by Monday,

5    we'll look for it and try to get it entered Monday.  Worst

6    case, we'll have it entered Tuesday and it will -- it will

7    contain the 14 -- the waiver of the 14 day stay under the

8    circumstances.  So that won't be a hitch in the giddy-up.

9            As far as this discreet issue of standing, then, I

10   take it now the debtor and the committee are going to file a

11   -- I'm going to say dangerously two or three page

12   stipulation on the standing issue?

13           MR. GRILLO:  Yeah.  One and a half pages.  I think

14   it's -- yeah.  The stipulation itself will not be --

15           THE COURT:  There's --

16           MR. GRILLO:  -- the issue.

17           THE COURT:  -- a doubter among you on that and

18   it's -- and it's the drafter of the 67 page DIP order.

19       (Laughter)

20           MR. GRILLO:  Thank you.  Thank you.  Thank you.

21   Thank you.  Thank you, Your Honor.  I greatly appreciate

22   that comment.

23           THE COURT:  Although with --

24           MR. CARROLL:  But, Judge, I don't want to

25   exaggerate.  It was actually 64.

1              THE COURT:  Well --

2              MR. CARROLL:  I happen to have had the last page

3    right here in front of me.

4              THE COURT:  If you all are going to be fair,

5    though, you need -- you do need to put at least ten to 15 of

6    those pages on the second lienholder, so you can't put them

7    all on --

8              MR. GRILLO:  Right.

9              THE COURT:  -- on the first.

10             MR. GRILLO:  Fair enough.  Yes.  Duly noted, Your

11   Honor.

12             THE COURT:  All right.  So get that stipulation

13   filed and served within this group let's say by 2:00

14   tomorrow.

15             MR. GRILLO:  Sure.

16             THE COURT:  And then I'll look for an objection to

17   be filed, we'll say by noon on Monday.

18             MR. GOLDBERG:  yes, Your Honor.

19             MR. GLERUM:  That's fine, Your Honor.

20             THE COURT:  And -- all right.  And then I'll take

21   -- hang on one second.

22        (Pause)

23             THE COURT:  I'll then -- I'll take argument

24   telephonically on Tuesday morning, October 15th, Tuesday

25   morning, October 15th at 9:30.  That will be by telephone.

1    So the stip to be filed by 2 p.m. --

2            MR. GRILLO:  2 p.m. tomorrow.

3            THE COURT:  -- tomorrow the 11th, objections by 2

4    p.m. on the 14th, and then I'll take argument at 9:30 a.m.

5    telephonically because I'll be in Central Islip on October

6    15th on the narrow issue of the assignment and the protocol

7    of the assignment of the right to bring causes of action to

8    which the debtor has agreed to the creditors' committee.

9    I'm assuming that briefing -- and I'll take simultaneous

10   briefing.  So to the extent that the committee and the

11   debtor want to anticipate the objection that's been somewhat

12   outlined here today, if you all want to also file briefing

13   on that issue, that would also be due by Monday, the 14th at

14   2:00.

15           I'm assuming that that briefing will be informed

16   both by STN and with thanks to my law clerk --

17           MR. GRILLO:  Commodore.

18           THE COURT:  -- Commodore International as well.

19           MR. GRILLO:  Yes.

20           THE COURT:  All right.

21           All right.  So then I'll take a proffer of

22   testimony in support of the sale or is there --

23           MR. GRILLO:  Yes.

24           THE COURT:  -- something else?

25           MR. GRILLO:  That's it.

1          THE COURT:  All right.

2          All right.  So Mr. Grillo.

3          MR. GRILLO:  Yes.  Thank you, Your Honor.

4          In support of the sale motion that was presented

5    to the Court today and approve -- and for approval of the

6    stalking horse APA with Quality One Wireless, the debtors

7    and Quality One would jointly present two witnesses.

8          The first witness would be Eric Barbieri, managing

9    director of Richterconsulting.com.  Mr. Barbieri is here in

10   the courtroom today.

11         The second witness for whom testify is -- will be

12   proffered will be Marshall Harris.  Marshall Harris is the

13   general counsel of Quality One and he is also in the

14   courtroom today.

15         We would actually ask to incorporate by reference

16   as part of the record the prior testimony of Mr. David

17   Saperstein (ph) who spoke at the bid procedures hearing

18   about the process and what had occurred through that date,

19   and also the first day affidavits that were submitted and

20   not subject to -- well, were made available to cross-

21   examination of Mr. Ray Cunsmann (ph).  Mr. Cunsmann is not

22   here with us today as we didn't proffer -- who we didn't

23   believe to offer any new testimony.  We would just

24   incorporate by reference his prior testimony about the need

25   for a sale.

1           THE COURT:  All right.  So then first the Court

2   will take notice of the various pleadings thus far filed in

3   the PCD cases.  I will incorporate the declaration of Mr.

4   Cunsmann.  I'll incorporate the testimony on both direct and

5   cross-examination and redirect of Mr. Saperstein from the

6   bid procedures hearing.

7           Let's then get Mr. Barbieri up to the lectern.

8           If you will identify yourself and please raise

9   your right hand to be sworn by the court reporter.

10           MR. BARBIERI:  Sure.  Eric Barbieri, B-A-R-B-I-E-

11   R-I.  I'm with Richter Consulting.

12      (Witness sworn)

13           THE COURT:  All right.  So I'm --

14           THE CLERK:  State please --

15           THE COURT:  Go ahead.

16           THE CLERK:  Go ahead.

17           THE COURT:  So I'm going to have Mr. Grillo make a

18   proffer of your testimony.  I'm then going to ask you

19   whether or not you incorporate that proffer as your

20   testimony.

21           All right.  So, Mr. Grillo.

22           MR. GRILLO:  Now that he's been sworn in, if

23   called to the stand, Mr. Barbieri would testify to the

24   following:

25           First, that he's a managing director of Richter

1    Consulting.  Richter Consulting specializes in among other

2    things advising troubled companies.

3          Mr. Barbieri would also testify that as part of

4    this responsibilities at Richter Consulting he was assigned

5    to the engagement of the debtors, PCD, and that his

6    engagement commenced in September of 2012.

7          He would also testify that with respect to his

8    duties, that they were wide-ranging with respect to a wide

9    variety of financial services and that he was responsible,

10   in part, for assisting the company in developing its

11   business plan, assisting the company in preparing its

12   numbers, performing a variety of analyses and preparing a

13   variety of financial reports, not just for the company

14   itself, but for its lenders.

15         He would also testify that he communicated with

16   its lenders on a regular basis in order to provide them with

17   the information as it was requested from time to time.

18         Mr. Barbieri, if also called to testify, would

19   also state that his knowledge of the financial conditions of

20   the debtor is -- is deep and broad; that he has -- was aware

21   of all of the operational issues of the company, and that he

22   was familiar with the restructuring negotiations that began

23   shortly after Mr. Apling took office as the CEO of the

24   company.

25         He would testify that going back to September of

1    last year the company entered a severe amount of distress

2    due to a number of factors:

3              One, the changes in the marketplace for smart

4    phones that the company distributed in the United States and

5    abroad;

6              Number two, the company was also affected by the

7    departure of Mr. Christopher, and as a a result of these two

8    and other events, began to experience severe extremis on its

9    operations.

10              As a result, its financial performance declined

11    and whereas the money -- whereas the corporation had made

12    money in prior years, 2012 started to run negative, and that

13    from that point in time the company wound up in default by

14    the end of the year under its credit agreement.

15              Mr. Barbieri would also testify that during that

16    time frame he participated in negotiations with the lenders

17    with respect to the defaults and also worked with the

18    company to develop a strategy for responding to them.

19              In that respect, Mr. Barbieri would also testify

20    that with respect to the number of actions that the company

21    took, it agreed to retain an investment banker to look at a

22    potential sale of the company.  When advising the board,

23    along with the other -- along with the company's other

24    advisors and its management team, it was ultimately

25    determined that the highest and best value for the company

1    would be in a going concern sale.

2            Mr. Barbieri and his colleagues from Richter

3    Consulting prepared a number of liquidation analyses over

4    the course of the first six to seven months of 2013 and he

5    would further testify that his conclusion from the

6    preparation of those liquidation analyses is that the

7    volatile value of the debtors' inventory and the value that

8    the debtors provided for their inventory meant that if the

9    company were forced to liquidate, that it would have a

10   severely depressing effect on its asset values, primarily in

11   two respects:

12           First, with respect to the inventory.  The

13   inventory requires it to be programmed in order to achieve

14   its value.  It also needs to be accompanied by a service

15   plan in order to continue to service the products for the

16   carriers.  If it were unable to do that; that is, if it

17   discontinued operations or couldn't provide a successor to

18   its operations, then in that instance there would have a

19   very -- there would be a very negative effect on value

20   prospectively.

21           Similarly, with respect to its receivables, which

22   is another one of the purchased assets that are part of the

23   asset purchase agreement here, the receivables are owed

24   primarily to the carriers.  With respect to the carriers

25   such as Verizon, Sprint & AT&T, there are ongoing

1    obligations of PCD, particularly to service and provide

2    warranty coverage for the devices that it sells.

3         In the absence of being able to provide that

4    service or contract out to provide that service, it is

5    highly likely that the carriers would -- would adversely

6    charge PCD against the receivables, thereby dragging them

7    down in value and reducing the likelihood of collectability

8    in full of the amounts outstanding in a liquidation.

9         So Mr. Barbieri would testify that it was the

10   combined conclusion of the management team, the board and

11   its advisors that a going concern sale was in the best

12   interest of the business.

13        Mr. Barbieri would further testify that the

14   company engaged in a sale process that was run by BGSA in

15   which the management team, including Mr. Apling, played an

16   important leading role.  Also, with the assistance of its

17   lenders, the company agreed -- the company concluded that

18   maintaining its operations during this time would be the

19   best way to maximize value.

20   He would also testify that in December or January of --

21   December 2012, January of 2013 that the senior bank debt at

22   that time was north of $150 million; that it had been paid

23   down from an even higher amount than that; and that the

24   company continued to maximize the value by selling at higher

25   values than liquidation value the excess inventory that it

1    had over a period of time that allowed it to reduce its bank

2    debt and to continue to operate at least on a somewhat

3    reduced basis.

4         With respect to the sale process, Mr. Barbieri

5    would say that he played a material role in advising the

6    company during that period of time, mostly preparing the

7    reports that were circulated to potential purchasers,

8    helping them analyze business plans, negotiating the terms

9    of the sale.  He participated closely in the negotiations

10    with Quality One as well as with other potential purchasers

11    and played a meaningful role in all of those negotiations.

12         He would further testify that with respect to

13    those negotiations, that the company did its best to

14    leverage what -- you know, what little ability it had to try

15    and maximize the value and the return as part of that

16    process, and that included a number of elements such as the

17    working capital adjustment, all with the goal of maximizing

18    the return to the estate from that process.

19         For these reasons, if asked for his conclusion,

20    Mr. Barbieri would conclude in his testimony that the sale

21    that is proposed and presented to the Bankruptcy Court today

22    provides greater value than would a liquidation of the

23    assets in a Chapter 7 or in an out of court format.

24         With respect to the other elements that have been

25    raised, Mr. Barbieri would testify that with respect to the

1    payments made to the second lien lenders that the company

2    has not -- the company has paid down its (indiscernible)

3    looked to sort of negotiate with the second lien lenders as

4    to what transaction made sense;

5            that he made sure that they had given their

6    approval to that transaction given the liens that they had

7    on the claims;

8            And that the price for the assets which originally

9    included the litigation claims that were part of the estate

10   was the highest and best offer it had and that subject to a

11   follow up with respect to the post-bankruptcy auction

12   process, that this was ultimately the best offer that was

13   received and, in fact, was the only qualified offer that was

14   received.

15           There are certain closing conditions to the

16   transaction.  Mr. Barbieri would conclude as part of his

17   testimony that the debtors had the ability -- have the

18   ability to satisfy those closing conditions, those that were

19   in the debtors' control, for example, those -- of those that

20   were raised in the creditors' committee objection.  One of

21   the elements was that the components -- the cash component

22   of the stalking horse price -- purchase price cannot exceed

23   $47 million.

24           Mr. Barbieri would testify that the amounts

25   outstanding under the DIP loan agreement which would have to

1    be satisfied in cash as part of the closing would not exceed

2    that amount.  Also, that the composition of the assets

3    pursuant to which 80 percent had to consist of accounts --

4    eligible accounts receivable will also be met.

5            There is an MAE provision in the agreement which

6    states that if the net -- negative -- net working capital

7    adjustment was adjusted downward at closing by 7.5 million

8    or more, that that would be a material adverse change or

9    material adverse affect that would allow Quality One to exit

10   the transaction.

11           Mr. Barbieri would testify that the company's net

12   working capital position which he has monitored closely will

13   not be negative and will, in fact, be higher, and it is his

14   belief and understanding that if current trends continue, by

15   the time of the final closing it will, in fact, be

16   substantially higher than even the upward adjustment of 7.5

17   million.

18           With respect to some of the issues on the purchase

19   price, concerns were raised about the variable nature of the

20   purchase price.  For the same reasons, with regard to the

21   working capital adjustment, Mr. Barbieri would testify that

22   there would be -- that the purchase price would be

23   sufficient to pay the DIP loan in full and also to max out

24   the amounts payable under the notes; that there is also

25   sufficient value in the transaction such that the

1    modifications that have been proposed and raised today as

2    part of the transaction can be satisfied.

3              With regard to concerns about whether or not the

4    debtors have given away their upside as part of the

5    transaction, certainly the modifications that have been made

6    to the transaction today, Mr. Barbieri would testify that,

7    in fact, that the debtors have captured significant value

8    that they would otherwise not have been able to undertake

9    today, especially in light of the fact that there was not a

10   formally qualifying competing bid as part of this auction.

11             With respect to a potential risk of administrative

12   insolvency, the fact that the (indiscernible) to the

13   purchase price consideration, number one, confirming that

14   the full amount of the administrative expense reserve will

15   be available; that between that and the increase in the

16   amount of the wind down expenses from 250,000 to 500,000,

17   those two elements ensure that there is minimal, if

18   negligible risk of administrative insolvency.

19             Finally, with respect to a concern that may have

20   been raised with respect to the sale of cash, the company

21   does not, in fact, retain its cash, but turns it over to its

22   lender through a lock box system because this is an asset

23   based facility.

24             When asked ultimately whether or not, given all of

25   the circumstances and given his experience with the company

1    for well over a year, Mr. Barbieri would testify that it is

2    in his belief as a financial consultant with approximately

3    20 years of experience that this sale is in the best

4    interest of the business and his testimony would be that

5    it's his recommendation that the sale be approved by this

6    Court.

7              All right.  Mr. Barbieri, if you would step

8    forward.

9              Have you heard the proffer made of the testimony

10   that you would give here today?

11             MR. BARBIERI:  I have.

12             THE COURT:  Do you accept that proffer as your own

13   testimony?

14             MR. BARBIERI:  Yes, I do.

15             THE COURT:  All right.

16             Any party present wish to cross-examine Mr.

17   Barbieri on his proffer?

18             All right.  Very well.  You may step back.  Thank

19   you.

20             Then as to Mr. Harris, sir, if you would step

21   forward.  And when you get to the lectern if you would state

22   your name and then raise your right hand to be sworn by the

23   court reporter.

24             MR. HARRIS:  Marshall Harris, H-A-R-R-I-S.

25        (Witness sworn)

1           THE COURT:  All right.  Will Mr. Harris's proffer,

2   Mr. Grillo, that be made by you?

3           MR. GRILLO:  Yes.

4           THE COURT:  All right.  Very well.

5           Sir, if you would just step back or to the side

6   for Mr. Grillo.

7           Same as with Mr. Barbieri.  Mr. Grillo will

8   outline the proffer of your testimony.  I'll ask then you

9   whether you adopt that as your -- as your testimony.

10          MR. GRILLO:  If called to testify, Mr. Harris, we

11  believe, would testify to the following:

12          Number one, that he is the general counsel of

13  Quality One Wireless and that as part of his

14  responsibilities he played a significant, if not leading

15  role in connection with the negotiations related to the

16  asset purchase agreement that's presently before the Court.

17          With respect to his responsibilities in that

18  regard, he was responsible for and familiar with all aspects

19  of the asset purchase agreement and, in fact, was the

20  leading negotiator on behalf of Quality One in connection

21  with that transaction.

22          In addition, it was among his responsibilities to

23  make sure that all of the closing conditions for the

24  transaction would ultimately be met.  And specifically in

25  that regard among his responsibilities was to ensure that

1    the form and substance of the notes and the guarantees which

2    were being provided by his financing sources were, in fact,

3    satisfactory to them and that he has that approval from

4    them.

5              He would also testify with respect to the assigned

6    purchase contracts that that requirement or that closing

7    condition has also been met; that is, that Quality One has

8    reached agreement with respect to the contracts that it

9    intends to take assignment of after assumption by the

10   debtors, and that is part of the order.

11             He would also testify that he participated in the

12   settlements that were made part of the record today and that

13   those are acceptable to Quality One.

14             He would also testify that with respect to the

15   condition relating to the number of employees that were

16   required as part of a condition that we needed to hire that

17   he has surpassed and achieve -- has achieved and surpassed

18   that threshold in terms of the number of employees that are

19   required to be signed.

20             In addition, if asked Mr. Harris would take the

21   position that this is -- this has been an arm's length

22   transaction; that there was no other prior relationship

23   other than a minor vendor/vendee, vendor/seller --

24   seller/buyer relationship for certain equipment with respect

25   to the debtors; that there is no other interlocking

1    management that existed at any time prior to that.  The

2    buyer was not an insider of the debtor as that is defined

3    under the Bankruptcy Code, and the buyer has not engaged in

4    any conduct that would permit or cause the agreement to be

5    avoided under Section 363(m), and on that basis would be

6    entitled to the protections of 363(m) with respect to the

7    good faith protections afforded by that provision of the

8    Bankruptcy Code.

9            Finally, if -- if asked, Mr. Harris would testify

10   that the purchaser is not a successor to the debtor; that it

11   is intending to buy its assets free and clear of all liens,

12   claims and encumbrances other than those that are expressly

13   part of the assumed liabilities.  It's not a continuation or

14   substantial continuation of the debtors' business or

15   enterprise.  It does not have a common identity of

16   incorporators, directors or equity holders with the debtor,

17   and is not holding itself out as a -- to the public as a

18   continuation of the debtors.

19           We believe if called to testify that he would also

20   indicate that Quality One ahs the financial wherewithal as a

21   result of its credit facility to satisfy its obligations

22   under the agreement, not just merely the purchase price

23   consideration, but the ongoing obligations under the assumed

24   contracts and, thus, could satisfy its requirements for

25   adequate assurance of those agreements.  And, certainly,

1    there are no longer any pending objections in this regard.

2            As a result, Mr. Harris would, I think, also ask

3    this Court to approve the transaction on this basis pursuant

4    to the terms in the APA and the proposed form of order.  And

5    that would conclude his direct testimony.

6            THE COURT:  All right.  Very well.

7            Mr. Harris, have you heard the proffer made of

8    your testimony?

9            MR. HARRIS:  Yes, Your Honor.

10           THE COURT:  Do you adopt that proffer as your own

11   testimony?

12           MR. HARRIS:  Yes, Your Honor, with one slight

13   modification or clarification.  The forms of notes to the

14   second and third lenders and the related documents will

15   require some modification based on the modifications agreed

16   upon today.  But beyond that the form and substance has been

17   approved.

18           THE COURT:  All right.

19           Any party present wish to cross-examine Mr. Harris

20   on his testimony?

21           Very well.  Thank you, sir.  You may return to

22   your seat.

23           MR. GRILLO:  Your Honor, that would conclude the

24   direct evidence that the debtors would offer in support of

25   the sale motion before the Court.

1          THE COURT:  All right.

2          Anything further, then, from any other party in

3     interest present?

4          All right.  Then based upon the record made, both

5     the evidence presented which I've incorporated into this

6     hearing, the evidence presented today given the agreements

7     that have been made and made a part of the record which will

8     become part of the sale order, the Court is prepared to

9     approve the sale to the purchaser as designated in the

10    proposed form of order, euphemistically referred to today as

11    Quality One.

12         The Court, among other findings, does find that

13    the sale of the assets of the debtor being sold is in the

14    best interest of the estate; that the debtors' assets which

15    are being sold have been actively, openly and vigorously

16    marketed, and that the sale, both the price and

17    consideration, are a fair representation of those assets in

18    the marketplace; that the negotiations have been at arm's

19    length; that the case has had active representation between

20    the debtor, the committee, the lenders and the proposed

21    purchaser.  There -- there is no collusion among parties,

22    and that the purchaser will be entitled to the 363(m)

23    protections.

24         Under the circumstances, including the prior DIP

25    order, both interim and final which have been entered by the

1    Court, cause does exist to waive the 14 day stay otherwise

2    available under Rule 6004.  So upon entry of the final sale

3    order, the parties may move expeditiously to close on the

4    sale.

5            I have -- the Court has reviewed generally a

6    proposed form of -- amended proposed form of sale order.  I

7    know it's going to be changed somewhat to the next

8    iteration, but the other findings which the Court has been

9    asked to make in the proposed form of order that has been

10   thus far uploaded, the Court is also prepared to make and

11   will be part of the final sale record.

12           Mr. Grillo.

13           MR. GRILLO:  We have nothing further, Your Honor.

14   We would like to thank the Court for its time and attention.

15           THE COURT:  All right.  Well, very well.  With the

16   Court's appreciation for you all getting this done, I said

17   at a prior hearing that the more time you spend talking to

18   each other, the less time you need to spend talking to me

19   and that has apparently again proven out.

20           So, again, the Court's appreciation for the good

21   work that has been done.  And from a timing mechanic, as

22   soon as you can get us a final order we will look for it.

23   If it's to us Monday, we will look for it Monday so that it

24   can get entered.

25           And we will -- the Court will resolve this issue

1    about the assignment at -- following the hearing or at the

2    hearing to be held Tuesday morning.

3                So with that, we will be adjourned on PCD.

4                MR. GRILLO:  Thank you, again, Your Honor.

5          (A chorus of thank you)

6          (Whereupon, these proceedings were concluded at 3:06

7    p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                       RULINGS

4                                          Page        Line

5    Hearing on the Approval of the

6    Successful Bid(s) and Backup Bid(s)

7    [10]                                   --          --

8

9    Adj Motion for 2004 Examination

10   Motion of the Official Committee of

11   Unsecured Creditors for Leave to

12   Conduct Discovery of the Second Lien

13   Lenders Filed by Schuyler G. Carroll

14   on behalf of Official Committee of

15   Unsecured Creditors [143]

16

17   Adj Motion for 2004 Examination

18   Motion of the Official Committee of

19   Unsecured Creditors for Leave to

20   Conduct Discovery of Debtors Filed by

21   Schuyler G. Carroll on behalf of

22   Official Committee of Unsecured

23   Creditors [140]                        --          --

24

25

1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6        Sherri L        Digitally signed by Sherri L Breach
                          DN: cn=Sherri L Breach, o, ou,
7        Breach           email=digital1@veritext.com, c=US
                          Date: 2013.12.18 12:09:54 -05'00'
8

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13   Veritext

14   330 Old Country Road

15   Suite 300

16   Mineola, New York 11501

17

18   Date: November 25, 2013

19

20

21

22

23

24

25