Hearing Date: January 27, 2014 at 11:00 am (ET)
Objection Deadline: January 20, 2014 at 4:30 pm (ET)

**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel:  (212) 813-8800
Fax:  (212) 355-3333
Emanuel C. Grillo
Matthew L. Curro
Christopher Newcomb

*- and -*

**TOGUT, SEGAL & SEGAL LLP**
One Penn Plaza, Suite 3335
New York, New York  10119
Tel:  (212) 594-5000
Frank A. Oswald
David A. Paul
Leo Muchnik

*Co-Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| PERSONAL COMMUNICATIONS | ) | Case No.  13-74303 (AST) |
| DEVICES, LLC, *et al.*,[1] | ) | 13-74304 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MOTION AUTHORIZING CERTAIN PAYMENTS FROM
PROCEEDS OF SALE FOR INCENTIVE COMPENSATION TO GEORGE APPLING
UNDER INCENTIVE PLAN AGREEMENT PURSUANT TO 11 U.S.C. §§ 105,  363
AND 503 AND RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

---

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171) and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096). The Debtors' mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

Personal Communications Devices, LLC ("PCD") and Personal Communications Devices Holdings, LLC ("Holdings", and together with PCD, the "Debtors"), debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby submit this motion (this "Motion") pursuant to sections 105(a), 363(b) and 503(c) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order, substantially in the form attached hereto as Exhibit A, approving certain payments to Mr. George Appling ("Mr. Appling") pursuant to the Amended and Restated Senior Executive Incentive Plan Agreement (the "Incentive Agreement"), dated April 12, 2013,[2] between PCD and Mr. Appling, as such agreement was modified by a further agreement by and among Mr. Appling, the Committee, Quality One, the Debtors and the Debtors' Second Lien Lenders (as such terms are defined below) and consented to by the Official Committee of Unsecured Creditors. In support of this Motion, the Debtors respectfully represent as follows:

## Introduction

By this Motion, the Debtors seek approval of certain amounts payable to Mr. Appling pursuant to the Incentive Agreement and in connection with the sale of the Debtor's assets. The payments for which the Debtors now seek court approval relate to an incentive program the Debtors implemented prepetition as an incentive for Mr. Appling before and after the commencement of the Chapter 11 Cases. Importantly, the payments to be made to Mr. Appling represent a significant reduction from the amount to which Mr. Appling would have been entitled under the terms of this Incentive Agreement. In addition, as part of a settlement described below that resolved the Committee's objections to the Sale, the Committee (along with

---

[2] A copy of the Incentive Agreement is attached hereto as Exhibit B.

the other parties to the Sale) has consented to these payments from the proceeds of a letter of credit, the sale and the notes payable to the Second Lien Lenders.

When Mr. Appling joined the Debtors as their Chief Executive Officer, the Debtors were already experiencing financial and operational difficulties.  As a result of the actions taken by the Debtors' former CEO, Mr. Philip Christopher, the Debtors' situation became dire, more quickly than the Debtors could have anticipated.  When the Debtors, their secured lenders and Mr. Appling first agreed to the payments set forth in the Incentive Agreement, the Debtors were indebted to their  First Lien Lenders in the amount of more than $100 million and to their Second Lien Lenders in the amount of approximately $70 million.  Moreover, a number of the Debtors' trade vendors had cut off credit to the Debtors – requiring prepayment or cash on delivery in numerous instances – and the Debtors had excessive amounts of aging inventory in serious risk of immediate obsolescence and the corresponding devaluation.  Indeed, substantial portions of the inventory that successfully sold under Mr. Appling's direction was old enough that it no longer qualified for inclusion in the Debtors' borrowing base under the Debtors' senior credit facility. Finally, the Debtors continued to suffer from the exodus of key personnel after the departure of Mr. Philip Christopher, increasing the difficulty of providing the services required to market and maintain the enterprise value of the Debtors' business.

Under these extraordinarily adverse circumstances, Mr. Appling relied on his extensive industry contacts and long-standing relationships with the leading industry carriers, Verizon Wireless, AT&T and others, to liquidate the Debtors' highly volatile inventory at prices well in excess of their liquidation value and to negotiate the successful sale of the Debtors' business.  As a result of these efforts, the Debtors achieved the highly unlikely outcome over time of payment in full to the Debtors' First Lien Lenders as well as a substantial paydown of the Second Lien

Lenders pursuant to the sale of the Debtors' remaining business and assets  (the "363 Sale").

Despite the fact that the Debtors' secured lenders were, in the aggregate, undersecured on the

Petition Date, the 363 Sale resulted in millions of dollars being left behind for the benefit of

unsecured creditors, in addition to potentially valuable causes of action.  As a direct result of Mr.

Appling's efforts, the success of the inventory  sales along with the 363 Sale generated higher

than expected returns and thus, materially greater distributions to all creditors of the Debtors'

estates.[3]

Because of the structure of the negotiated settlement with the Committee and other

parties to the Sale, the payments for which approval is being sought will not result in any

decrease in the amount of funds available for the Debtors' unsecured creditors.  The sources of

payment for Mr. Appling are a letter of credit posted by JPMorgan Chase, N.A. ("JPMorgan"),

payments to be made by Quality One and a share of the proceeds of the notes issued by Quality

One to PineBridge[4] in connection with the Sale.

Accordingly, the Debtors submit the payments to Mr. Appling satisfy the criteria under

sections 363 and 503(c)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of

Bankruptcy Procedure.

### Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] To the extent, the factual statements and conclusions set forth herein are contested, the Debtors will offer the testimony of Mr. Howard Gross or Mr. Eric Barbieri, both senior managing directors of Richter Consulting, the financial advisors to the Debtors in support thereof at the hearing on this Motion.

[4] PineBridge and the DLJ investment funds constituting the Second Lien Lenders consented to these payments.  On account of the intercreditor agreement between them, the amounts will be paid from the proceeds of the PineBridge notes issued by Quality One.

3.      The statutory bases for the relief requested herein are sections 105(a), 363 and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure.

### Background

4.      On August 19, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code until such time as they sold their remaining business and assets, free and clear of all liens, claims and interests under sections 363 and 365 of the Bankruptcy Code, to Quality One Wireless and its affiliates (together, "Quality One") pursuant to an order of this Court, dated October 17, 2013 [Docket No. 207] (the "Sale Order").

6.      On August 26, 2013, the United States Trustee appointed an official committee of unsecured creditors (the "Committee").  The Committee subsequently retained Perkins Coie LLP as its counsel.

7.      PCD, one of the above-captioned debtors, which had been headquartered in Hauppauge, New York, distributed wireless communications devices and accessories, and provided value-added services to mobile device manufacturers and wireless telecom carriers. Collectively, the Debtors acted as a critical intermediary between domestic wireless carriers (e.g., Verizon Wireless, Sprint, AT&T) and various foreign, generally smaller market, wireless handset manufacturers.  In that role, PCD provided numerous product planning, logistics, reverse logistics, and after-market services that were designed to benefit and streamline the path to the end user for all sides of the wireless device supply chain.

5

8.      The Debtors serviced domestic wireless carriers by acting as the carrier's trusted partner in screening and qualifying new vendors to fill product lineups and by providing supply chain and technical services to bring those products to market.  On the other side of the supply equation, the Debtors worked directly with various foreign wireless handset manufacturers to shepherd their products through all stages of product development in the domestic carrier market. In addition to working to bring devices to market, PCD also provided a full complement of authorized repair and warranty services to its domestic carrier clients.

9.      In 2012, the Debtors generated $1.6 billion in revenue but suffered a loss of $16.9 million on a normalized basis.  Due to a number of factors, including a shift in consumer preferences within the mobile device market and the damage inflicted upon the Debtors by its prior management, the Debtors' business declined, such that their resulting cash flow was insufficient to meet the their debt service requirements.  The Debtors sought chapter 11 protection to effect a sale of substantially all of their assets, which sale closed on October 17, 2013, and resulted in a significant number of jobs being saved.

10.      A detailed description of the Debtors' business, capital structure, and the circumstances leading to the chapter 11 filings is set forth in the *Declaration of Raymond F. Kunzmann in Support of Chapter 11 Petitions and First Day Motions and Applications* (the "First Day Declaration") filed on the Petition Date and incorporated herein by reference.[5]

### The Appling Incentive Plan

11.      On August 17, 2012, George Appling was hired as Chief Executive Officer of the Debtors.  At that time, PCD and Mr. Appling entered into an Employment Agreement governing the terms of Mr. Appling's employment.  Mr. Appling was hired to replace the Debtors' former

---

[5]    Capitalized terms used but not defined herein shall have the meanings set forth in the First Day Declaration.

LIBNY/5261080.7

CEO, Philip Christopher, who had left the company and engaged in a campaign to abscond with PCD's business by improperly competing with the Debtors and taking their employees. As noted above, at the time of Mr. Appling's hiring, the Debtors were experiencing significant (and worse than expected) financial and operational problems and thus, the Debtors promised Mr. Appling various performance-based incentives.

12.    Mr. Appling brought extensive experience and relationships in the wireless and technology sectors, including expertise in supply chain management, business strategy, organizational performance, and marketing/branding to the organization. His knowledge of the Debtors' industry and operations was crucial to the Debtors' ability to maximize the value of their assets. Faced with substantial inventory backlogs, Mr. Appling used his relationships with both carriers and other customers to reduce the Debtors' inventory in an extremely challenging market in which consumer demand became increasingly concentrated in Apple and Samsung products.

13.    As the Debtors' financial situation became increasingly distressed and the Debtors undertook to restructure their debts, the Debtors and their outside advisors engaged in discussions with various parties regarding potential strategic transactions, including a potential sale of all or substantially all of the Debtors' assets. The Debtors and their professional advisors, in consultation with the advisors and holders of the Debtors pre-petition secured debt, ultimately determined that the most optimal means to maximize value for the Debtors' estates was to pursue a going concern sale of the Debtors' businesses. During the marketing and evaluation process, the Debtors continued to liquidate their inventory at relatively advantageous prices versus their likely liquidation value. By the end of April, 2013, the Debtors had significantly reduced the exposure of their senior secured creditors. The Debtors believe this reduction in debt was critical

to the Debtors' ability to sell their business as a going-concern, thereby realizing maximum value and saving a significant number of jobs.

14.    Confronted with substantial inventory risk and a declining willingness of suppliers to provide the Debtors with new product on credit, the Debtors determined that it was necessary and beneficial to provide Mr. Appling with the incentives to achieve a successful sale of the Debtors' assets in a timely and efficient manner notwithstanding the adverse circumstances facing the Debtors.  Accordingly, PCD and Appling entered into the Executive Incentive Agreement, effective March 6, 2013.  As the Debtors' reorganization further progressed out of court, the Debtors and Mr. Appling agreed to amend the Executive Incentive Plan.  On April 12, 2013, the Amended and Restated Senior Executive Plan Agreement between PCD and Appling became effective (the "Incentive Agreement").

15.    The Incentive Agreement provided for certain payments to be made to Mr. Appling upon the substantial completion of "a sale, financing, wind-down or other restructuring transaction of [PCD] or [Holdings] whether in a single transaction or series of transactions" (a "Transaction").  Mr. Appling became entitled to a payment upon completion of a Transaction and delivery of funds to the Debtors.  The amount of the payment was based on the achievement of certain milestone amounts of Net Proceeds (as defined in the Incentive Agreement).

16.    Net Proceeds is defined to include proceeds from a Transaction, including cash, proceeds of indebtedness or equity interests, paid to the Debtors or their stakeholders from (i) a sale of the Debtors' stock, (ii) a sale of the Debtors' assets, (iii) debt financing, (iv) assumption of debt by a counterparty, or (v) distribution in a liquidation or wind-down.  Subject to certain restrictions, Mr. Appling need not have been employed at the time the Transaction was closed in order to receive payment of the award set forth in the Incentive Agreement.

17.    Prior to and after the Debtors' bankruptcy filing, Mr. Appling assumed significant additional responsibilities and time commitments to assist the Debtors in managing its operations and working towards a successful sale of their business.  These additional responsibilities included, among other things, providing extensive assistance to the Debtors' bankruptcy counsel and advisors with respect to issues arising in these Chapter 11 Cases, as well as ensuring and maintaining the relationships with the remaining customers and marketing partners of the Debtors through extraordinarily tenuous times.  The Debtors faced substantial risk that the major carriers would no longer re-sell the products distributed by the Debtors.  Mr. Appling played a crucial role in negotiating the APA (as defined below), including undertaking extensive travel to ensure that certain of the Debtors' suppliers would support a new business under Quality One's ownership.

18.    The Debtors believe that the Incentive Agreement was appropriately designed to incentivize Mr. Appling to continue his substantial efforts in operating the Debtors' businesses and assisting in facilitating the Sale.

### The APA and The Sale Hearing Settlement

19.    As noted above, prior to the execution of the APA, the Debtors spent ten months actively pursuing a solution to their liquidity issues.  This effort culminated in the execution of the asset purchase agreement (the "APA") with Quality One on August 19, 2013.  Under the APA, Quality One agreed to purchase the Debtors' assets and to serve as the Debtors' stalking horse bidder in connection with an auction process.  As such, concurrently with the filing of these Chapter 11 Cases, the Debtors filed a motion to implement certain bidding procedures, hold an auction and, ultimately, sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code (the "Sale Motion") [Docket No. 10].

9

20.     Under the APA, Quality One agreed to pay certain "Transaction Expenses" as part of its Purchase Price.  These Transaction Expenses included payments that were to be made in cash at Closing to Mr. Appling in accordance with the Incentive Agreement.  Accordingly, under the terms of the APA, such obligations would only be due from Quality One in the event they were due to Mr. Appling in accordance with his Incentive Agreement.

21.     On October 7, 2013, the Committee filed its objection to the Sale Motion (the "Committee Sale Objection").[6]  In its objection, the Committee objected to the Sale on a number of grounds, including to the payments due to Mr. Appling.

22.     On October 10, 2013, the Bankruptcy Court held a hearing on the Sale Motion. As a result of extensive negotiations between the Debtors, the Committee, Quality One, Mr. Appling and the Debtors' prepetition secured lenders, the parties were able to reach a global resolution to various issues pertaining to the Sale, including the issues raised in the Committee Sale Objection (the "Sale Settlement").  As part of the Sale Settlement, all parties agreed to support payments to Mr. Appling on account of the Debtors' obligations under the Incentive Agreement in the amount of up to $2,700,000, as follows:

| Amount | Source | When Due |
|---|---|---|
| $500,000 | Letter of Credit collateralized by the Debtors prepetition | At Closing |
| $100,000 | Quality One | Within 90 Days of Closing |
| $800,000 | Quality One | Within 150 Days of Closing |
| up to $1,300,000 | PineBridge | Appling to receive "Pro Rata Amount" as PineBridge receives payment on the PineBridge Notes and Security Agreements (as such terms are defined in the Sale Order) |
| Total:  (up to) $2,700,000 | | |

---

[6] The Committee Sale Objection was filed under seal.  Docket No. 177 references the Committee Sale Objection.

LIBNY/5261080.7

Under the Sale Settlement, Mr. Appling agreed to accept substantially less than the amount to which he was entitled under the Incentive Agreement. In addition, a substantial portion of the amount to be paid to Mr. Appling is coming directly from the recoveries of one of the Debtors' prepetition second lien lenders, PineBridge (and certain affiliated entities). Using the transaction value associated with the Quality One purchase, Mr. Appling would have been entitled to approximately $3.53 million under the Incentive Agreement. Under the Sale Settlement, Mr. Appling will receive $1,400,000 from the Debtors or from funds that would have otherwise been paid to the Debtors (i.e. the purchase price paid by Quality One). The remaining amounts due to Mr. Appling will be borne by PineBridge proportionately with the amount PineBridge receives on account the PineBridge Notes and Security Agreement. As such, no payments for which approval is sought herein will reduce the amount of Estate funds available for distribution to general unsecured creditors.

## Relief Requested

23.    By this Motion, the Debtors respectfully request the entry of an order pursuant to sections 363(a), 503(c)(3), and 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure approving the payment of the foregoing amounts to Mr. Appling in exchange for which Mr. Appling will release any and all claims he may have against the Debtors for amounts due under the Incentive Agreement.

## Basis for Relief Requested

### A.    The Incentive Plan Agreement and Payment Is Permitted under Section 503(c)(3)

24.    Section 503(c) of the Bankruptcy Code sets forth the criteria for courts to use in approving certain types of payments to insiders and other transfers or obligations that are outside the ordinary course of business. *See* 11 U.S.C. § 503(c)(3).

LIBNY/5261080.7

25.      The Debtors' implementation of the Incentive Agreement is permitted under

section 503(c)(3) of the Bankruptcy Code[7].  Section 503(c)(3) prohibits "transfers or obligations

that are outside the ordinary course of business and not justified by the facts and circumstances

of the case." 11 U.S.C.  § 503(c)(3).  In determining whether certain payments are justified by

the "facts and circumstances" of the case, Courts may employ a business judgment standard.  *In*

*re Dana Corp.*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006).

26.      The business judgment rule generally shields decisions made by a debtor's

management from judicial second guessing.  *See Comm. of Asbestos-Related Litigants v. Johns-*

*Manville Corp.  (In re Johns-Manville Corp.)*, 60 B.R.  612, 615-16 (Bankr. S.D.N.Y. 1986).

When a debtor demonstrates that it is exercising sound business judgment, a presumption arises

that the debtor's decision was made on an informed basis, in good faith, and in the honest belief

that the decision was in the debtor's best interest.  *See Official Comm. Of Subordinated*

*Bondholders v.  Integrated Res., Inc.  (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y.).

Therefore, when a debtor's actions satisfy the business judgment rule, a debtor's request for

relief should be approved under section 363(b)(1) of the Bankruptcy Code.

27.      Courts apply the business judgment standard to determine whether an incentive

plan should be authorized under Bankruptcy Code section 503(c)(3).  *See In re Dana Corp.*, 358

---

[7]       The requirements set forth in section 503(c)(1) apply only to retention plans and do not apply to incentive plans that provide compensation to employees who contribute to preserving value and achieving financial objectives.  See 11 U.S.C.  § 503(c)(1); *In re Global Homes Prods., LLC*, 369 B.R.  778, 787 (Bankr.  D.  Del. 2007).  Under the Incentive Agreement, the payments to Mr. Appling are being made in recognition or Mr. Appling's efforts to complete the Sale of the Debtors' business and are not being made for purposes of retention. Indeed, Mr. Appling no longer remains employed by the Debtors.

Similarly, section 503(c)(2) sets forth restrictions applicable only to severance plans, which do not apply to incentive plans.  See 11 U.S.C.  §§ 503(c)(2); *In re Dana Corp. (Dana II)*, 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) (explaining sections 503(c)(1) and (c)(2) did not apply to the incentive plan).  Therefore, section 503(c)(2) does not apply to the Incentive Agreement because payments to Appling thereunder are not triggered by the termination of employment, but rather are linked to performance targets.  It is clear that the payments incentivize and reward achievement of performance based on a targeted goal and do not provide payment for retention or severance and therefore are not governed by sections 503(c)(1) or (c)(2) of the Bankruptcy Code.

B.R. at 571 (providing that management incentive programs should be evaluated under the business judgment standard); *see also In re Nobex Corp.*, No. 05-20050 (CSS), Jan. 12, 2006 Hearing Tr. at 86-87 (Bankr. D. Del. 2006) (finding that the standard under section 503(c)(3) is the business judgment standard).

28.     The Debtors are seeking approval for the payments to Mr. Appling under the Incentive Agreement because such payments are part of a negotiated deal, approved by the Committee, that permitted the Debtors to consummate the sale of their assets for the benefit of all stakeholders. In addition, payment of these amounts, a substantial portion of which is coming from PineBridge and not the Debtors, will relieve the Debtors' estates of any potential administrative claim liability that could result from the Incentive Agreement. Accordingly, approval of the Appling payments is within the Debtors' business judgment.

**B.     The Appling Payments Described Herein Were Essential to Preserve the Value of the Debtors' Businesses through the Sale**

29.     Finally, section 105(a) of the Bankruptcy Code empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. The purpose of section 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 *Collier on Bankruptcy*, ¶ 105.01 (15th ed. rev.); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (equitable powers derive from section 105); *Management Technology Corp. v. Pardo*, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (same).

30.     As discussed above, the Debtors' submit that the payments described herein properly incentivized Mr. Appling to undertake the additional responsibilities to operate the Debtors' businesses throughout the chapter 11 cases and in connection with the Sale. It was critical that Mr. Appling remained incentivized to achieve the Debtors' financial objectives by

13

maintaining uninterrupted operation of the Debtors' businesses during these Chapter 11 Cases. Indeed, it was on this basis that PineBridge agreed to carve out a significant portion of these amounts from their proceeds. In light of the foregoing, the Debtors respectfully submit that the relief requested herein was an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their creditors and their estates.

**C.     The Payments are Appropriate Under Bankruptcy Rule 9019**

31.     Bankruptcy Rule 9019, which governs the approval of compromises and settlements, provides that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. P. 9019(a). Pursuant to Bankruptcy Rule 9019, bankruptcy court can approve a compromise or settlement if it is in the best interest of the estate. *See Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

32.     Although Rule 9019(a) contains no standards for judicial approval of a settlement, case law directs a court to determine whether the settlement is "fair and equitable" and "in the best interests of the estate." *TMT Trailer Ferry*, 390 U.S. at 424; *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (a court need only find that the settlement is fair and equitable, reasonable and in the best interests of the debtors' estate); *see also In re Hydronic Enter., Inc.*, 58 B.R. 363 (Bankr. D.R.I. 1986). This does not require that the court substitute its judgment for that of the debtor. *In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984). Rather, a court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal citations omitted); *accord Drexel Burnham*, 134 B.R. at 505. In addition, the court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); *see*

*also Nellis*, 165 B.R. at 123 ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process . . . .").

33.    Applying the foregoing standard, the Debtors submit that, to the extent needed, the payments to Mr. Appling are separately justified under Bankruptcy Rule 9019.  First, the payments were part of the negotiated settlement – the Sale Settlement – that permitted the 363 Sale to proceed with the consent of the Committee and other parties in interest.  Second, the payments will resolve any claims that Mr. Appling may have against the Debtors arising out of the Incentive Agreement.  Accordingly, the Debtors believe that the payments to Mr. Appling represent a settlement of Estate liability that is in the best interests of the Debtors and their Estates.

## NOTICE

34.    Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Eastern District of New York; (b) Edwards Wildman Palmer LLP as counsel to JPMorgan; (c) Latham & Watkins LLP as counsel to DLJ Investment Partners; (d) Patton Boggs LLP as counsel to PineBridge Investments; (e) the Taxing Authorities; (f)  George Appling; (g) Perkins Coie LLP, as counsel for the Committee and (g) all other parties required to receive service under Rules 2002-2 of the Local Bankruptcy Rules for the Eastern District of New York. A copy of this Motion is also available on the website maintained by the Debtors' notice and claims agent, Epiq Systems, Inc.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## NO PRIOR RELIEF

35.    No previous motion for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as <u>Exhibit A</u>, and grant the Debtors such other and further relief to the Debtors as may be just and appropriate under the circumstances.


Dated: January 3, 2014               Respectfully submitted,
      New York, New York

                                */s/ Emanuel C. Grillo*
                                GOODWIN PROCTER LLP
                                Emanuel C. Grillo
                                Matthew Curro
                                Christopher Newcomb
                                The New York Times Building
                                620 Eighth Avenue
                                New York, NY 10018-1405
                                Tel:  212.813.8800
                                Fax:  212.355.3333

                                *Attorneys for the Debtors*
                                *and Debtors in Possession*