**<u>Exhibit A</u>**

**(Comparison of Amended Disclosure Statement to Original Disclosure Statement)**

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| PERSONAL COMMUNICATIONS DEVICES, LLC, *et al.*,[1] | Case No.    13-74303 (AST) |
| Debtors. | 13-74304 (AST) |

### DISCLOSURE STATEMENT WITH
### RESPECT TO THE ~~DEBTORS'~~ FIRST AMENDED PLAN OF LIQUIDATION
### UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE PROPOSED
### BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
Tel:  (212) 813-8800
Fax:  (212) 355-3333
Emanuel C. Grillo
Matthew L. Curro
Christopher Newcomb

~~TOGUT, SEGAL & SEGAL LLP~~
~~One Penn Plaza, Suite 3335~~
PERKINS COIE LLP
30 Rockefeller Plaza
22nd Floor
New York, New York ~~10119~~10112
Tel:  (212) ~~594~~262-~~5000~~6900
~~Frank A. Oswald~~
~~David A. Paul~~
~~Leo Muchnik~~Fax:  (212) 977-1636
Schuyler Carroll
Tina N. Moss
Gary F. Eisenberg

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Tel:  (212) 594-5000
Frank A. Oswald
David A. Paul
Leo Muchnik

*Counsel to the Official Committee of Unsecured Creditors*

---

[1]      The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Personal Communications Devices, LLC, a Delaware limited liability company (4171) and Personal Communications Devices Holdings, LLC, a Delaware limited liability company (4096).  The Debtors' mailing address is 80 Arkay Drive, Hauppauge, Suffolk County, NY 11788.

*Co-Counsel to the*
 *Debtors and Debtors in Possession*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

   **A.**   Holders of Claims Entitled to Vote ......................................... 1

   ~~**B.**~~   ~~Substantive Consolidation~~ ................................................. ~~2~~

   ~~C~~**B.**   Recommendation ................................................................ 2

   ~~D~~**C.**   Legal Advisors ................................................................... 2

   ~~E~~**D.**   Important Dates ................................................................. ~~3~~2

   ~~F~~**E.**   Voting Procedures .............................................................. 3

II.   Overview of the Plan ........................................................................ 4

   **A.**   Summary of the Plan .......................................................... 4

   **B.**   Summary of Treatment of Claims and Interests Under the Plan ...... 4

III.   Plan Voting Instructions and Procedures ............................................ 6

   **A.**   Notice to Holders of Claims and Interests ............................... 6

   **B.**   Holders of Claims Entitled to Vote ........................................ 7

   **C.**   Acceptance of the Plan ....................................................... 8

   **D.**   Solicitation Package ........................................................... ~~8~~9

   **E.**   Voting Procedures, Ballots and Voting Deadline ...................... 9

   **F.**   Withdrawal of Ballots; Revocation; Changes to Vote ................. ~~9~~10

   **G.**   Waivers of Defects and Other Irregularities ............................ 10

IV.   Overview of Debtors' Operations and Events Leading to the Chapter 11 Cases ...... ~~10~~11

   **A.**   Corporate Structure ........................................................... ~~11~~12

   **B.**   Business Overview ............................................................. ~~11~~12

   **C.**   Prepetition Capital Structure and Debt Obligations ................... ~~12~~13

   **D.**   Events Leading to Chapter 11 ............................................... ~~13~~14

V.   CHAPTER 11 CASES ........................................................................ ~~15~~16

   **A.**   Continuation of Business; Stay of Litigation ........................... ~~15~~16

   **B.**   First Day Orders ............................................................... ~~15~~16

   **C.**   Sale of the Debtors' Assets ................................................. ~~16~~17

   **D.**   Debtor-in-Possession Financing ........................................... ~~19~~20

   **E.**   Appointment of Creditors' Committee .................................... ~~20~~21

   **F.**   Other Material Relief Obtained During the Chapter 11 Cases ....... ~~20~~21

     **1.**   Retention of Professionals ................................................ ~~20~~21

ACTIVE/71480023.6

| | | |
|---|---|---|
| 2. | Retention Plan | 21 |
| 3. | Extension of Time to Assume or Reject Leases | ~~21~~22 |
| 4. | Motion to Make Certain Payments to George Appling Under Incentive Plan Agreement | 22 |
| 5. | The HTC Motion for an Administrative Expense Claim | 23 |
| G. | Summary of Claims Process and Bar Date | ~~22~~23 |
| 1. | Schedules and Statements of Financial Affairs | ~~22~~23 |
| 2. | Claims Bar Date and Proofs of Claim | ~~22~~23 |
| 3. | Administrative Claims Bar Date | ~~22~~24 |
| H. | The Debtors' Causes of Action | ~~22~~24 |
| 1. | The Committee Obtains Standing to Pursue The Estates' Causes of Action | ~~23~~24 |
| 2. | The Second Lien Lender Adversary Proceeding | ~~23~~24 |
| 3. | The Philip Christopher Litigation | ~~23~~25 |
| VI. | The Plan of Liquidation | ~~24~~26 |
| A. | Purpose and Effect of the Plan | ~~24~~26 |
| B. | Classification and Treatment of Claims and Interests | ~~24~~27 |
| C. | Classification and Treatment of Claims and Interests | ~~26~~28 |
| 1. | Unclassified Claims | ~~26~~28 |
| 2. | Unimpaired Claims | ~~27~~30 |
| 3. | Impaired Claims | ~~29~~31 |
| 4. | Interests | ~~30~~33 |
| 5. | Special Provision Regarding Unimpaired Claims | ~~30~~34 |
| D. | Acceptance Or Rejection Of The Plan | ~~31~~34 |
| 1. | Impaired Classes of Claims Entitled to Vote | ~~31~~34 |
| 2. | Acceptance by an Impaired Class | ~~31~~34 |
| 3. | Presumed Acceptances by Unimpaired Classes | ~~31~~34 |
| 4. | Classes Deemed to Reject Plan | ~~31~~34 |
| 5. | Confirmation Pursuant to Bankruptcy Code Section 1129(b) | ~~31~~34 |
| E. | Means For Implementation Of The Plan | ~~31~~35 |
| 1. | ~~Substantive Consolidation / Merger /~~ Dissolution | ~~31~~35 |
| 2. | Implementing Actions | ~~32~~35 |
| 3. | Limited Liability Company Action | ~~32~~35 |
| F. | Sources For Plan Distribution | ~~33~~37 |
| G. | Conditions to Plan Effectiveness | ~~33~~37 |

ACTIVE/71480023.6

**H.**     Liquidating Trust ............................................................................ ~~34~~37

   **1.**     ~~Establishment~~Name of the Liquidating Trust ........................ ~~34~~37

   **2.**     Establishment of the Liquidating Trust .................................. 37

   ~~2~~3.     Trust Distributions ................................................................ ~~34~~38

   ~~3~~4.     Duration of Trust .................................................................. ~~34~~38

   ~~4~~5.     Liquidation of Causes of Action ........................................... ~~35~~38

   ~~5~~6.     Liquidating Trustee ............................................................... ~~35~~38

   ~~6~~7.     Federal Income Taxation of Liquidating Trust ...................... ~~38~~42

   ~~7~~8.     No Revesting Of Assets ......................................................... ~~39~~43

   ~~8~~9.     Exemption From Certain Transfer Taxes ................................ ~~39~~43

   ~~9~~10.   Preservation Of Causes Of Action; Settlement Of Causes Of Action ...... ~~39~~43

   ~~10~~11.  Effectuating Documents; Further Transactions ...................... ~~40~~44

**I.**     Treatment Of Executory Contracts And Unexpired Leases ............. ~~40~~44

   **1.**     Rejected Contracts And Leases. ............................................. ~~40~~44

   **2.**     Bar Date for Filing Claim for Rejection Damages ................. ~~40~~44

**J.**     Treatment of Disputed, Contingent and Unliquidated Claims ......... ~~41~~44

   **1.**     Objections to and Resolution of Disputed Claims ................. ~~41~~44

   **2.**     No Distributions Pending Allowance. ..................................... ~~41~~45

   **3.**     Estimation of Claims ............................................................. ~~41~~45

   **4.**     No Post-Effective Date Interest. ............................................ ~~42~~45

**K.**     ~~Confirmation And~~ Consummation Of The Plan ........................... ~~42~~45

   ~~**1.**     Conditions To Confirmation. ................................................. 42~~

   ~~2~~1.     Conditions To Effective Date. ............................................... ~~42~~45

   ~~3~~2.     Waiver Of Conditions. ........................................................... ~~42~~46

**L.**     Allowance And Payment Of Certain Administrative Claims ........... ~~43~~46

   **1.**     Professional Fee Claims ........................................................ ~~43~~46

~~Each holder of a Professional Fee Claim seeking an award by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 330, 331 and 503(b)(2) of the Bankruptcy Code shall (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is sixty (60) days after the Effective Date or such other date as may be fixed by the Court and (ii) if granted such an award by the Court, be paid in Cash in such amounts as are Allowed by the Court (A) on the date such Professional Fee Claim becomes an Allowed Professional Fee Claim, or as soon thereafter as is practicable or (B) upon such other terms as may be mutually agreed upon between such holder of a Professional Fee Claim and the~~

Liquidating Trustee.  Objections to Professional Fee Claims must be filed no later than twenty-five (25) days after the filing of the subject final fee application. .................................... 43

**M.**    Effect Of Plan Confirmation .................................................................. 43 46

  **1.**   Discharge of the Debtors ................................................................. 43 46

  **2.**   Injunction ........................................................................................ 43 47

  **3.**   Exculpation and Limitation of Liability ......................................... 44 47

  **4.**   Dissolution of the Creditors' Committee ........................................ 44 48

On the Effective Date, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for (i) final allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith and (ii) reimbursement of expenses incurred by the members of the Committee.  All prior transfers and assignments of Assets (including without limitation any Causes of Action) from the Debtors to the Committee shall deemed to constitute, as of the Effective Date, transfers of such Assets (including without limitation any Causes of Action) from both the Debtors and the Committee to the Liquidating Trust.  The Committee's standing to prosecute Causes of Action on behalf of the Debtors is hereby ratified.  The Liquidating Trustee shall succeed to all rights of the Committee previously granted or transferred by any of the Debtors to the Committee. ............................................................................................. 44

**N.**    Retention Of Jurisdiction ........................................................................ 45 48

  **1.**   Claims and Actions .......................................................................... 45 48

  **2.**   Retention of Additional Jurisdiction .............................................. 45 48

VII.   Certain Factors to be Considered .................................................................. 46 50

 **A.**   General Considerations ............................................................................ 46 50

 **B.**   Certain Bankruptcy Considerations ........................................................ 46 50

 **C.**   Administrative and Priority Claims ......................................................... 47 50

VIII.  Certain U.S. Federal Income Tax Consequences of the Plan ........................ 47 51

 **A.**   Certain Tax Consequences of the Plan .................................................... 49 53

  **1.**   Treatment of Transfers to and Distributions by the Liquidating Trust ... 49 53

  **2.**   Allocation of Plan Distributions between Principal and Interest ..... 52 56

  **3.**   Withholding, Backup Withholding, and Information Reporting ..... 53 56

 **B.**   Importance of Obtaining Professional Tax Assistance ............................ 54 57

IX.    Feasibility of the Plan and Best Interests of Creditors .................................. 54 58

 **A.**   Feasibility of the Plan .............................................................................. 54 58

 **B.**   Acceptance of the Plan ............................................................................ 54 58

ACTIVE/71480023.6

**C.**    Best Interests Test ........................................................................... ~~54~~58

**D.**    Liquidation Analysis ........................................................................ ~~55~~59

**E.**    Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan ........................................................................ ~~56~~59

**F.**    Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative ........................................................................ ~~56~~59

X.    Alternatives to Confirmation and Consummation of the Plan ................ ~~57~~60

**A.**    Alternative Plan(s) of Liquidation ................................................. ~~57~~60

**B.**    Liquidation under Chapter 7 ........................................................... ~~57~~61

**C.**    Dismissal of the Chapter 11 Cases ................................................ ~~58~~61

XI.    THE SOLICITATION AND VOTING PROCEDURE ................................ ~~58~~61

**A.**    Parties in Interest Entitled to Vote ................................................ ~~58~~61

**B.**    Classes Impaired under the Plan ..................................................... ~~58~~62

XII.    FURTHER INFORMATION ...................................................................... ~~58~~62

**A.**    Further Information; Additional Copies ......................................... ~~58~~62

**B.**    Internet Access to Bankruptcy Court Documents .......................... ~~59~~62

XIII.    RECOMMENDATION AND CONCLUSION ............................................ ~~59~~62

v

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION OF PERSONAL COMMUNICATIONS DEVICES, LLC AND PERSONAL COMMUNICATIONS DEVICES HOLDINGS, LLC AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN AS SET FORTH IN THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY ADVERSARY PROCEEDING OR NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

FURTHERMORE, THIS DISCLOSURE STATEMENT SHALL NOT HAVE ANY PRECLUSIVE EFFECT WITH RESPECT TO ANY DESCRIPTION OF FACTS OR OTHER MATTERS CONTAINED HEREIN, NOR SHALL IT BE CONSTRUED AS THE BASIS FOR COLLATERAL ESTOPPEL, ISSUE PRECLUSION OR ANY SIMILAR DOCTRINE WITH RESPECT TO ANY DESCRIPTION OF FACTS OR OTHER MATTERS CONTAINED HEREIN.

# I.
# INTRODUCTION

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the First Amended Plan of Liquidation of Personal Communications Devices, LLC ("**PCD LLC**") and Personal Communications Devices Holdings, LLC ("**Holdings**" and together with PCD, the "**Debtors**"), dated as of ~~December 24~~February 11, ~~2013~~2014 (the "**Plan**").  The Debtors and the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases (the "**Committee**" and together with the Debtors, the "**Plan Proponents**") are the proponents of the Plan.

All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  A copy of the Plan is annexed hereto as Appendix A.

## A.    Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject a proposed plan.  Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section VII of this Disclosure Statement.

Claims in Class 3 (Convenience Claims) ~~and~~, Class 4a (General Unsecured Claims against PCD LLC) and Class 4b (General Unsecured Claims Against Holdings) of the Plan are impaired.  As a result, holders of Claims in Class 3, Class 4a and Class 4b are entitled to vote to accept or reject the Plan.

Claims in Class 1 (Priority Claims) and Class 2 (Miscellaneous Secured Claims) of the Plan are unimpaired.  As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan.

Holders of Equity Interests (Class 6a and 6b) and Intercompany Claims (Class 5) are not expected to receive any distributions under the Plan and are therefore deemed to have rejected the Plan.  With respect to Classes 5, 6a and 6b, the ~~Debtors~~Plan Proponents intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class that cast ballots for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Section IX of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of

the Bankruptcy Code or both.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section ~~VIII~~IX.~~B.2~~F of this Disclosure Statement.

**B.**    ~~Substantive Consolidation~~

~~The Plan is premised upon the substantive consolidation of the Debtors and their Estates.  The filing of the Plan and this Disclosure Statement will constitute the Debtors' motion for, and entry of the Confirmation Order will constitute the approval of, pursuant to section 105(a) of the Bankruptcy Code, the substantive consolidation of these Chapter 11 Cases effective as of the Effective Date.  The Debtors believe that no creditor will receive a recovery inferior to that which it would receive if they proposed a chapter 11 plan of liquidation that was completely separate as to each entity and, therefore, the Debtors do not believe that any creditor will be materially adversely affected by not voting on and receiving distributions on an entity by entity basis.~~

~~C.~~ **Recommendation**

The ~~Debtors~~Plan Proponents urge creditors to vote to accept the Plan because the Plan will maximize the recovery for creditors and accomplish the objectives of chapter 11.  The ~~Debtors~~Plan Proponents believe acceptance of the Plan is in the best interests of the Debtors, their creditors, and their estates and that the Plan provides the highest or otherwise best recovery for holders of general unsecured claims.

**C.**    ~~D.~~ **Legal Advisors**

The legal advisors for the Debtors are Goodwin Procter LLP and Togut, Segal & Segal LLP, and the legal advisor for the Committee is Perkins Coie LLP.  They can be contacted at:

| **Goodwin Procter LLP** | **Perkins Coie LLP** |
|---|---|
| The New York Times Building | 30 Rockefeller Plaza |
| 620 Eighth Avenue | 22nd Floor |
| New York, New York 10018 | New York, New York 10112 |
| Attn:   Emanuel C. Grillo | Attn:   Schuyler Carroll |
| egrillo@goodwinprocter.com | scarroll@perkinscoie.com |
| Matthew L. Curro | Tina N. Moss |
| mcurro@goodwinprocter.com | tmoss@perkinscoie.com |
| Christopher Newcomb | Tel:  (212) 262-6900 |
| cnewcomb@goodwinprocter.com | Fax:  (212) 977-1636 |
| Telephone:  (212) 813-8800 | |
| Fax:  (212) 355-3333 | |

ACTIVE/71480023.6

**D.    E. Important Dates**

| Important Dates | |
|---|---|
| Deadline by which to object to the Disclosure Statement ("***Disclosure Statement Objection Deadline***") | January 21, 2014 at 5:00 p.m. (prevailing Eastern Time |
| Voting Record Date ("***Record Date***") | ~~January 27~~February 12, 2014 |
| Deadline by which to object to the Plan ("***Plan Objection Deadline***") | March ~~3~~12, 2014 |
| Deadline to submit Ballots ("***Voting Deadline***") | March ~~3~~12, 2014 at 5:00 p.m. (prevailing Eastern Time |
| Hearing to consider the adequacy of the Disclosure Statement | ~~January 27~~February 12, 2014 at ~~11:00~~2:00 p.m. (prevailing Eastern Time). |
| Confirmation Hearing | [March ~~10~~19, 2014] |

No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

**E.    F. Voting Procedures**

Only Holders of Claims in Class 3 ~~and~~, Class 4a and 4b are allowed to vote on the Plan.  If you hold claims in Class 3 (Convenience Claims) ~~or~~, Class 4a (General Unsecured Claims against PCD LLC or Class 4b (General Unsecured Claims Against Holdings) and are entitled to vote to accept or reject the Plan, you must complete a Ballot that is enclosed with this Disclosure Statement for the purpose of voting on the Plan.  You may send your completed Ballot to the following addresses:

| If returned by overnight courier or messenger: | If returned by regular mail: |
|---|---|
| Personal Communications Devices, LLC<br>Ballot Processing<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 | Personal Communications Devices, LLC<br>Ballot Processing<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station PO Box 5014<br>New York, NY 10150-5014 |

Do not return any other documents with your Ballot.

To be counted, your Ballot indicating acceptance or rejection of the Plan must be received by no later than **5:00 p.m. (prevailing Eastern Time) on March [~~3~~12], 2014**.  Any executed Ballot received that does not indicate either an acceptance or a rejection of the Plan will not be counted.

Any Claim in either Class 4a or Class 4b as to which an objection or request for estimation is pending or which is listed on the Debtors' schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired

3

leases, and statements of financial affairs (collectively, the "**Schedules**") as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Epiq Bankruptcy Solutions, LLC at 1-646-282-2400. You may also contact Eqiq via email at tabulation@epiqsystems.com with a reference to "Personal Communications Devices, LLC" in the subject line.

## II.
## OVERVIEW OF THE PLAN

### A.    Summary of the Plan

The Plan is a liquidating plan. Pursuant to a prior order of the Bankruptcy Court dated October 17, 2013 (the "**Sale Order**") [Docket No. 207], the Debtors have sold substantially all of their assets to Quality One Wireless, LLC and Q1W Newco, LLC (together, "**Quality One**").

On December 24, 2013 the Debtors filed ~~the~~their original plan of liquidation. On February 11, 2014, the Plan Proponents filed this First Amended Plan. The Plan provides for the orderly liquidation of the remaining assets of the Debtors and the distribution of the proceeds of the liquidation of the Debtors' assets according to the priorities set forth in the Bankruptcy Code. There are two (2) distinct legal entities that are being liquidated pursuant to the Plan. While the Plan ~~provides~~does not provide for the substantive consolidation of the Debtors' Estates and Chapter 11 Cases~~. Following entry of the Confirmation Order~~, on the Effective Date, all assets and liabilities of both Debtors shall be transferred to the Liquidating Trust. The Liquidating Trustee shall, using commercially reasonable efforts, segregate each Debtor's assets and make payments under the Plan to each Class of Claimants corresponding to each Debtor. In furtherance of the foregoing distribution scheme, on the Effective Date, (i) ~~all~~no Distributions shall be made under this Plan on account of intercompany claims ~~by, between and~~ among the Debtors ~~shall be eliminated,~~and (ii) all ~~assets and liabilities~~guarantees of Holdings of the obligations of PCD LLC shall be eliminated so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of the Debtors shall be ~~merged or treated as if they were merged together, (iii) any obligation of a Debtor and all guarantees thereof by the other Debtor shall be deemed to be one obligation of the Liquidating Trust, (iv) the Interests shall be cancelled, and (v) each Claim filed or to be filed against any Debtor shall be deemed filed only~~one obligation against the Liquidating Trust ~~and shall be deemed a single Claim against and a single~~corresponding to an obligation of ~~the Liquidating Trust established pursuant to the Plan~~PCD LLC.

### B.    Summary of Treatment of Claims and Interests Under the Plan[2]

---

[2] ~~Because the Disclosure Statement has been proposed prior to January 6, 2014, the deadline established by the Bankruptcy Court for filing proofs of claim against the Debtors,~~ All amounts included in the Disclosure Statement

| Description | Treatment | Entitled to Vote | Estimated Allowed Amounts ($) | Estimated Recovery |
|---|---|---|---|---|
| Administrative Claims (including professional fees) | Unimpaired; payment in full, in cash, of the allowed amount of such Claim (or as otherwise agreed) | No | ~~N/A~~1,826,000 | 100% |
| Priority Tax Claims | Unimpaired; payment in full, in cash, of the allowed amount of such Claim (or as otherwise agreed) | No | [    ]7,720 | 100% |
| Class 1: Priority Claims | Unimpaired; payment in full, in cash, of the allowed amount of such Claim (or as otherwise agreed) | No | [    ]102,000 | 100% |
| Class 2: Miscellaneous Secured Claims | Unimpaired; payment in full, in cash, of the allowed amount of such Claim (or as otherwise agreed) | No | [    ]N/A | 100% |
| Class 3: Convenience Claims | Unimpaired; payment in full, in cash, of the allowed amount of such Claim (or as otherwise agreed) | Yes | [    ]N/A | [    ]Unknown (Dependent on how many claimants elect) |
| Class 4a: General Unsecured Claims Against PCD LLC | Impaired; shall receive pro rata share of proceeds remaining after payment of allowed administrative, allowed priority and allowed miscellaneous secured claims | Yes | [    ]175,773,000 | [    ]2.8% |

~~Bankruptcy Court for filing proofs of claim against the Debtors,~~ All amounts included in the Disclosure Statement are preliminary estimates subject to update or revision and all estimated recovery amounts ~~omitted will be provided after January 6, 2014 but prior to the hearing to consider the adequacy of the Disclosure Statement~~are subject to variation based on events that the Plan Proponents do not control.  For example, cash available for distribution may be used by the Liquidating Trust to fund pursuit of causes of action that the Debtors have that are being transferred to the Liquidation Trust pursuant to the Plan.  If any litigation is successful or produces a successful settlement, recoveries could be higher than estimated, but there can be no assurance that this result will materialize.  Conversely, should the litigation prove unsuccessful, this could result in the estimated recoveries being substantially lower than estimated, particularly if some of the Available Cash is used in pursuit of such litigation.  In addition, one of the assets is a note from Quality One (received pursuant to the sale of assets discussed *infra* in Section V.C.)  If that note is not collected in full or in part, this could result in the estimated recoveries being substantially lower than estimated.

ACTIVE/71480023.6

| Description | Treatment | Entitled to Vote | Estimated Allowed Amounts ($) | Estimated Recovery |
|---|---|---|---|---|
| Class 4b:  General Unsecured Claims Against Holdings | Impaired; shall receive pro rata share of proceeds remaining after payment of allowed administrative, allowed priority, allowed miscellaneous secured claims and allowed general unsecured claims against PCD LLC | Yes | N/A | 0% |
| Class 5: Intercompany Claims | Impaired; shall receive no distribution | No | N/A | 0% |
| Class 6a:  Equity Interests in PCD LLC | Impaired; shall receive no distribution | No | N/A | 0% |
| Class 6a:  Equity Interests in Holdings | Impaired; shall receive no distribution | No | N/A | 0% |

As contemplated by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified under the Plan.  Allowed Administrative and Allowed Priority Tax Claims are intended to be paid in full on or, as soon as reasonably practicable after, the Effective Date of the Plan (or thereafter when they become Allowed), or, for ordinary course Administrative Claims, when such claims become due and, for Priority Tax Claims, as contemplated in 11 U.S.C. § 507(a)(8).

**ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERY, THERE IS NO ASSURANCE THAT THE ACTUAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED OR THAT THE ACTUAL PERCENTAGE RECOVERY BY HOLDERS OF ALLOWED CLAIMS WILL NOT BE MATERIALLY LESS THAN THE ESTIMATED AGGREGATE AMOUNTS SHOWN IN THE TABLE ABOVE.**

The actual recoveries under the Plan by the Debtors' Creditors will be dependent upon a variety of factors including, but not limited to, whether, and in what amount and with what priority, contingent Claims against the Debtors become non-contingent and fixed; whether, and to what extent, Disputed Claims are resolved in favor of the Debtors; and whether, and to what extent Causes of Action held by the Debtors are resolved in favor of the Debtors. Accordingly, no representation can be or is being made with respect to whether each estimated percentage recovery shown in the table above will be realized by the Holder of an Allowed Claim in any particular Class regardless of the amounts ultimately available for distribution to any Class of Allowed Claims.

ACTIVE/71480023.6

In the view of the Debtors, the Plan provides the Holders of Claims with the best recovery possible. Accordingly, the Debtors believe that the Plan is in the best interests of such Holders and strongly recommend that all such Holders entitled to vote, vote to accept the Plan.

## III.
## PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.    <u>Notice to Holders of Claims and Interests</u>

This Disclosure Statement will be transmitted to Holders of Claims that are entitled to vote on the Plan. A discussion and listing of those Holders of Claims that are entitled to vote on the Plan and those Holders of Claims that are not entitled to vote on the Plan is provided herein. The primary purpose of this Disclosure Statement is to provide adequate information to enable such Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court has been asked to approve this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable such Claimholders to make an informed judgment with respect to acceptance or rejection of the Plan. The Bankruptcy Court's approval of this Disclosure Statement (when such approval is obtained) does not constitute either a guaranty of the accuracy or completeness of the information contained herein, or an endorsement of the Plan by the Bankruptcy Court.

When and if confirmed by the Bankruptcy Court, the Plan will bind all holders of Claims against and Interests in the Debtors, whether or not such holders are entitled to vote or did vote on the Plan and whether or not holders receive or retain any distributions or property under the Plan. Thus, you are encouraged to read the Plan and this Disclosure Statement carefully. In particular, all holders of impaired claims who are entitled to vote are encouraged to read this Disclosure Statement and its exhibits carefully and in their entirety before voting to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.**

No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

Certain of the information contained in this Disclosure Statement is by its nature forward looking and contains estimates and assumptions that may be materially different from actual, future results.

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The <u>Plan Proponents</u> Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this

7

Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

The financial information contained herein has not been audited by a certified public accounting firm and has not been prepared in accordance with generally accepted accounting principles.

## B.    Holders of Claims Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are in a class that will receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a proposed chapter 11 plan.  Classes of claims in which the holders of claims are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Classes of claims or interests that receive no distribution on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitled the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In addition, a holder of an impaired claim or interest which is entitled to receive or retain property under the plan may vote to accept or to reject a plan only if the claim or interest is "allowed" for purposes of voting, which means generally that no party in interest has objected to such claim or interest or, if no proof of claim was filed, that such claim or interest has not been scheduled by the Debtor as contingent, unliquidated or disputed.

Thus, the Holder of a Claim against a Debtor that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (i) the Plan ~~provides~~entitles such Holder to a Distribution in respect of such Claim, (ii)(a) the Claim has been scheduled by the Debtors (and such claim is not scheduled at zero or as disputed, contingent or unliquidated) or (b) the Claimholder has filed a Proof of Claim on or before the Bar Date applicable to such Holder, pursuant to Bankruptcy Code sections 502(a) and 1126(a) and Bankruptcy Rules 3003 and 3018, and (iii) (a) no objection to the Claim has been timely filed or any timely objection been withdrawn, dismissed or denied by Final Order, or (b) pursuant to Bankruptcy Rule 3018(a), upon application of the Holder of the Claim with respect to which there has been an objection, the Bankruptcy Court temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan, all as further set forth in the Disclosure Statement Motion.

Under the Plan, ~~Class~~Classes 1 and ~~Class~~ 2 are Unimpaired and are presumed under Bankruptcy Code section 1126(f) to have accepted the Plan, and their votes to accept or to reject the Plan will not be solicited.  ~~Class~~Classes 3 ~~and Class~~, 4a and 4b are Impaired under

the Plan and are entitled to vote on the Plan, subject to the limitations set forth above. Classes 5, 6a and 6b are Impaired under the Plan and will not receive or retain any distribution or property under the Plan on account of their Claims or Interests and, therefore, are deemed under Bankruptcy Code section 1126(g) to have rejected the Plan and are not entitled to vote to accept or reject the Plan.  Pursuant to Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified as they will be paid in full and are not entitled to vote on the Plan.

## C.    Acceptance of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan. Acceptance of a plan by a class of interests requires acceptance by at least two-thirds (2/3) of the number of shares in such class that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section IX of this Disclosure Statement entitled, "Feasibility of the Plan and Best Interests of Creditors".

Bankruptcy Code section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

## D.    Solicitation Package

Accompanying this Disclosure Statement are copies of (1) the Plan; (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider confirmation of the Plan and related matters and the time for filing objections to confirmation of the Plan (the "***Confirmation Hearing Notice***"); and (3) if you are the Holder of Claim(s) entitled to vote on the Plan, one or more Ballots (and return envelopes) to be used by you in voting to accept or reject the Plan.

The Confirmation Hearing Notice sets forth in detail, among other things, procedures governing voting deadlines and objection deadlines with respect to the Plan and confirmation of the Plan.  The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in connection with this section of the Disclosure Statement.

## E.    Voting Procedures, Ballots and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims.  After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to

ACTIVE/71480023.6

you with this Disclosure Statement.  You must complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN [——————], 2013March 12, 2014] AT 4:005:00 P.M. (EASTERN TIME) (THE "*VOTING DEADLINE*") BY EPIQ BANKRUPTCY SOLUTIONS, LLC (THE "*VOTING AGENT*").

DO NOT RETURN ANY STOCK CERTIFICATES OR DEBT INSTRUMENTS WITH YOUR BALLOT.

If you have any questions about (i) the procedure for voting your Claim or with respect to the packet of materials that you have received or (ii) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)) an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact Epiq at (646) 282-2400 or visit **http://dm.epiqLLCepiq.com/PCD**.

## F.    Withdrawal of Ballots; Revocation; Changes to Vote

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claim(s) to which it relates, including, at a minimum, the claim number from the Claims Agent's claim register and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Voting Agent in a timely manner at the address set forth above. The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Plan have been received.

Any party who previously submitted a properly completed Ballot to the Voting Agent prior to the Voting Deadline may revoke such Ballot and change her, his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted for purposes of determining whether the requisite acceptances of the Plan have been received.

## G.    Waivers of Defects and Other Irregularities

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of Ballots will be determined by the Voting Agent and the DebtorsPlan Proponents in their sole discretion, which determination will be final and binding, subject to approval by the Bankruptcy Court (if necessary). As indicated in Section III.F. above, "Withdrawal of Ballots;

10

ACTIVE/71480023.6

Revocation; Changes to Vote," effective withdrawals of Ballots must be delivered to the Voting Agent prior to the Voting Deadline. The ~~Debtors~~Plan Proponents reserve the absolute right to contest the validity of any such withdrawal. Unless otherwise directed by the Court, a purported notice of withdrawal of Ballots that is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast Ballot. The ~~Debtors~~Plan Proponents also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The ~~Debtors~~Plan Proponents further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the ~~Debtors~~Plan Proponents, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the ~~Debtors~~Plan Proponents (or the Bankruptcy Court) determine. Neither the ~~Debtors~~Plan Proponents nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not therefore been cured or waived) will be invalidated.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code section 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Bankruptcy Court has entered an order (the "***Solicitation Procedures Order***", Docket No. [____]) which sets forth assumptions and procedures for tabulating Ballots that are not completed fully or correctly. The Solicitation Procedures Order also establishes a deadline by which the Debtors must file an objection to a Claim, the effect of which would be to require the Holder of such Claim to seek an order authorizing them to vote on the Plan pursuant to Bankruptcy Rule 3018.

## IV.
## OVERVIEW OF DEBTORS' OPERATIONS AND EVENTS LEADING TO THE CHAPTER 11 CASES

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the anticipated liquidation of the Debtors' remaining assets. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

For a description of the Plan and various risks and other factors pertaining to the Plan as it relates to Claims against and Interests in the Debtors, please see sections VI and VII hereof.

This Disclosure Statement contains summaries of certain provisions of the Plan, certain documents related to the Plan, certain events in the chapter 11 cases and certain financial information. Although the Debtors believe that such summaries are fair and accurate, such summaries are qualified in their entirety by reference to the full text of such documents. Factual information contained in this Disclosure Statement has been provided by the Debtors, except where otherwise specifically noted. The Debtors do not warrant or represent that the information contained herein, including financial information, is without any inaccuracy or omission.

As to contested matters, adversary proceedings and other actions or threatened actions, nothing contained in this Disclosure Statement shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver. All such statements are statements but made in settlement negotiations pursuant to Rule 408 of the Federal Rules of Evidence and other applicable evidentiary rules. The Debtors reserve their rights to assert in any such contested matters, adversary proceedings and other actions or threatened actions that this Disclosure Statement is not admissible in any non-bankruptcy proceeding involving any of the Debtors or any other party. This Disclosure Statement shall not be deemed advice on the tax, securities or other legal effects of the Plan as to Holders of Claims or Interests. You should consult your personal counsel or tax advisor on any questions or concerns respecting tax, securities, or other legal consequences of the Plan.

The Debtors expressly reserve (subject to any potential Committee objection) all of their rights to dismiss any of the Chapter 11 Cases at any time. The ~~Debtors~~Plan Proponents believe that the Plan will enable the Debtors to accomplish the objectives of Chapter 11 and that acceptance of the Plan is in the best interests of the Debtors and the Holders of all Claims. Accordingly, the ~~Debtors~~Plan Proponents urge Holders of Claims to vote to accept the Plan.

## A.    Corporate Structure

Holdings is the direct parent of PCD and owns 100% of PCD's membership interests. Membership interests in Holdings are held by various parties detailed in the chart attached as Appendix B.

## B.    Business Overview

PCD began distributing mobile devices in 1984 as part of Audiovox Corporation. In 1992, all businesses related to the distribution of mobile communication devices were consolidated into Audiovox Communications Corporation ("**ACC**"), a subsidiary of Audiovox Corporation. ACC, as well as Audiovox's handset manufacturing business, were acquired by UTStarcom, Inc. on November 1, 2004. In July 2008, a group of private investors and management led by PineBridge Investments purchased PCD from UTStarcom, Inc.

PCD serviced domestic wireless carriers by acting as their trusted partner in screening and qualifying new vendors to fill product lineups and by providing supply chain and technical services to bring those products to market. Thus, PCD provided valuable services to the domestic carriers.

12

PCD had numerous long-standing relationships with domestic wireless carriers, including AT&T, Verizon Wireless and T-Mobile, who depended on the Debtors to work with vendors to ensure (1) product development, (2) the convenience of dealing with a single "vendor" for multiple products with multiple suppliers, (3) technical approval and quality control, (4) dependability of delivery of handsets and (5) post-sales support and reverse logistics.

On the other side of the supply equation, PCD also worked directly with various foreign wireless handset manufacturers to shepherd their products through all stages of product development in the domestic carrier market. These foreign manufacturers depended on PCD for access to the U.S. market since, without PCD's expertise, many of the foreign manufacturers would have been unable to bring their products to market in a timely fashion due to a lack of expertise or of sufficient dedicated resources to navigate the highly-complex US carrier approval process.

In addition to working to bring devices to market, PCD also provided a full complement of authorized repair and warranty services to its domestic carrier clients.

## C.    **Prepetition Capital Structure and Debt Obligations**

As of the Petition Date, PCD had secured indebtedness in the approximate principal amount of $104,976,000. Of that amount, approximately $33,980,947 was secured by a first priority lien (the "***First Lien Debt***"). The remaining secured indebtedness was secured by a second priority lien.

PCD's first-lien secured debt was governed by that certain Amended and Restated Credit Agreement, dated as of May 14, 2012 (as amended, modified or supplemented from time to time, the "***First Lien Credit Agreement***," and together with the other documents and agreements executed in connection therewith, the "***First Lien Loan Documents***"), among PCD, LLC, as borrower, the guarantors thereto, and JPMorgan Chase Bank, N.A. ("***JP Morgan***"), as Administrative Agent, Wells Fargo Capital Finance, LLC as Syndication Agent, Bank of America, N.A., as Documentation Agent, and the lenders thereto (the "***First Lien Lenders***"). The First Lien Credit Agreement was amended on December 21, 2012, to, among other things, reduce the Aggregate Revolving Commitments (as defined in the First Lien Credit Agreement). The First Lien Debt was paid in full with the proceeds of the DIP Facility (as defined below).

PCD's second-lien secured debt was governed by that certain Amended and Restated Second Lien Credit Agreement, dated as of May 14, 2012 (as amended, modified and supplemented from time to time, the "***Second Lien Credit Agreement***," and together with the other documents and agreements executed in connection therewith, the "***Second Lien Loan Documents***," and together with the First Lien Loan Documents, the "***Secured Loan Documents***"), among PCD, LLC, as Borrower, the loan guarantors party thereto, the Lenders party thereto, and U.S. Bank National Association, ("***US Bank***") as Administrative Agent, and the lenders thereto (the "***Second Lien Lenders***"). DLJ Investment Partners, L.P., DLJ Investment Partners II, L.P. and IP III Plan Investors, L.P. (collectively, the "***CS Term Lenders***") and PineBridge Vantage ~~Capital~~Partners, L.P.~~, The Insurance Company of the State~~

of Pennsylvania, PineBridge Co-Investment AIV Partners, L.P., Vantage Star Investment Corp., PineBridge Plan Star Investment Corp., PineBridge PEP IV Co-Investment L.P., and PineBridge PEP V Co-Investment L.P. (collectively, "***PineBridge***") and The Insurance Company of the State of Pennsylvania (together with PineBridge, the "***PineBridge Entities***") were the Second Lien Lenders.  As of the Petition Date, the aggregate principal amount of the term loan made pursuant to the Second Lien Loan Documents was approximately $68,912,13468,912,134.78 (together with additional interest and fees and applicable expenses, the "***Second Lien Debt***").[3]

Under the Secured Loan Documents and the pledge and security agreements entered into in connection therewith, the lenders thereto (collectively, the "***Prepetition Secured Lenders***") maintained a security interest in substantially all of the Debtors' assets (other than commercial tort claims).  The Prepetition Secured Lenders are also party that certain Intercreditor Agreement (the "***Intercreditor Agreement***"), dated as of July 1, 2008, by and among PCD, LLC, PCD Holdings, PCD Communications Canada LTD, JPMorgan, in its capacity as collateral agent for the First Lien Obligations (as defined in the Intercreditor Agreement), and U.S. Bank, in its capacity as collateral agent for the Second Lien Obligations (as defined in the Intercreditor Agreement).  Subsequent to its initial execution, the Intercreditor Agreement was confirmed in connection with the May 2012 refinancing pursuant to that certain Confirmation of Intercreditor Agreement, dated as of May 14, 2012.

As described below, underand more fully described in the Sale Order (as defined below), the Second Lien Lenders released theirand discharged (A) any and all secured claims they may have had as of the date of the Sale Order against the Debtors or their estates pursuant to the Second Lien Credit Agreement or otherwise and (B) any and all other claims they may have had as of the date of the Sale Order against the Debtors or their estates pursuant to the Second Lien Credit Agreement.  The Sale Order does not preclude the Second Lien Lenders from asserting claims against the Debtors or their Estates (a) arising in connection with any Challenge (as defined in the Sale Order) or other claim brought by the Committee or third party, including, without limitation, a claim to the extent that the notes and guarantee issued to the Second Lien Lenders in consideration of their secured claims under the Second Lien Loan Documents in exchange for new notes and security agreements issued by Quality One (as defined below), the purchaser ofCredit Agreement, or any proceeds thereof, become property of the estates as a result of such Challenge or other claim, or (b) for reimbursement or indemnification arising out of any action brought by the Debtors' assets, Committee and/or third party.

### D.    Events Leading to Chapter 11

---

[3]    Of this amount, $35,274,008.10 constitutes the aggregate principal amount due and owing on account of the CS Term Loans (as defined in the Second Lien Credit Agreement) to the CS Term Lenders.  As of August 19, 2013, the CS Term Lenders were owed $1,066,058.91 in accrued but unpaid interest as to their respective CS Term Loans.  In addition, $33,638,126.68 constitutes the principal amount due and owing to the PineBridge Entities for amounts  advanced under the Second Lien Credit Agreement. As of August 19, 2013, the PineBridge Entities were owed $1,016,618.94 in accrued but unpaid interest on such principal amount.

ACTIVE/71480023.6

PCD's Chapter 11 filing was the result of changing industry dynamics within the wireless device space exacerbated by a set of events detailed below.

(i)    *A Shift in the Mobile Device Market*

In the last three to five years, the mobile device industry has experienced dramatic changes in consumer demand and industry dynamics. Specifically, because of a shift in consumer demand towards premium smartphones, industry profits as a whole have been consolidated amongst fewer and fewer manufacturers. This resulting profit concentration has predictably had a considerable impact on the ability of non-premium handset manufacturers to generate the profit they once did. PCD, as a supplier of non-premium and niche handsets and wireless devices, has correspondingly been adversely affected as profit margins continued to erode.

Against this difficult business environment, two major events contributed to PCD's descent into Chapter 11. First, starting in the second half of 2011, several manufacturers working with PCD introduced new products to the U.S. market. Likely as a result of the industry shift noted above, many of those products did not meet their manufacturers' sales expectations. As the device manufacturers struggled to meet their sales numbers, many of them began requesting that PCD accept an increasing number of devices, swelling PCD's inventory to historically high levels. While PCD historically carried approximately $300 to $350 million in inventory at any given time, by the start of 2012, PCD's inventory had grown to almost $600 million worth of product. The inventory buildup did not cause immediate alarm because several of the manufacturers provided PCD with extended payment terms and, in some cases, price protection – that is, if PCD were forced to liquidate the inventory for less than the purchase price, the manufacturer would reimburse the difference.

In the first seven months of 2012, PCD was able to reduce its inventory level to approximately $400 million – a level much more in line with PCD's historical practice. However, at that point, PCD's remaining inventory was beginning to age in the rapidly changing mobile device market. As PCD was forced to liquidate the inventory, in many instances for markedly lower prices than projected, certain manufacturers began to delay, or refuse, payment of the inventory price protections in place. This caused a significant strain on PCD's cash flow and liquidity. The Debtors and the Committee are continuing to evaluate any possible causes of action the Debtors may have arising from such refusal.

(ii)    *The Former CEO's Departure and Resulting Litigation*

The second major event that caused significant disruption to PCD's business was the departure of PCD's former Chief Executive Officer, Philip Christopher ("*Christopher*"), in September 2012. Upon his departure, ~~Mr. Christopher took with him~~ a number of key PCD employees and approximately one-third of PCD's total workforce left to ~~a competitor~~work with Christopher at Airtyme Communications, LLC ("*Airtyme*"). The defection of those employees ~~and Mr. Christopher's~~was all part of a scheme by Christopher to ruin PCD's business and to compete ~~unlawfully~~with PCD in violation of his employment contract and in breach of his fiduciary duties. These departures caused substantial disruption to PCD. As a result of ~~Mr.~~ Christopher's and others' actions, on September 27, 2012, PCD initiated a

15

lawsuit against AirTyme Communications, LLC ("*AirTyme*"), Reliance Communications, LLC ("*Reliance*"), Philip Christopher, Louis Antoniou, Kostas Kastamonitis, Cornelius VinGanhoven, Stacy Klug, Eileen McGilly and Bonnie Rabinowitz (the "*Defendants*").  The lawsuit in which these matters are addressed is captioned *Personal Communications Devices, LLC v. Airtyme Communications PVT. LTD., et al.* (the "*State Court Litigation*"), and is currently pending in the Supreme Court of New York, Suffolk County, Index No. 30060/12.

Christopher denies that he violated his employment agreement or otherwise breached his fiduciary duties.  Christopher further denies that he was the cause of PCD's failure and has filed an answer in the State Court Litigation. that includes counterclaims against the Debtors as well as cross claims against  PineBridge Vantage Capital, L.P. and Jonathan Stearns, all of which are described more fully at Section V.H.3 below.

As a result of extensive settlement discussions, the Debtors were able to settle their claims against each of the Defendants except Mr. Christopher and Mr. Kastamonitis.

The disruption that resulted from the departure of not only Mr. Christopher, but a large number of other employees was not, by itself, fatal.  However, the departure caused yet another financial and operational strain on PCD's business at the exact time when PCD could not afford any other setbacks.  Instead of focusing on PCD's core business turnaround, much of management's attention was focused on blunting the effects of Mr. Christopher's schemeactions to undermine PCD's business, including the departure of a significant portion of PCD's engineering and programming department.  As a result, PCD was forced to hire a number of temporary workers, including temporary engineers and programmers, at rates far in excess of what PCD had paid to its own employees.  In addition, to reduce employee attrition, PCD was required to grant substantial retention bonuses to its remaining employees.  These retention bonuses cover the period from September 2012 to September 2013 and were payable in two installments.  The Board subsequently modified the retention to divide the second installment into three periods and approving the amounts payable for the period from March 1 to June 13, 2013, to be paid on June 14, 2013, for the period from June 14 to July 29, 2013, to be paid on July 29, 2013, and for the period from July 30 to September 1, 2013, to be paid on September 2, 2013.  These increases in payroll further strained PCD's free cash flow.

## V.
## CHAPTER 11 CASES

### A.    Continuation of Business; Stay of Litigation

After the Petition Date, the Debtors continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  Under the Bankruptcy Code, the Debtors are required to comply with certain statutory reporting requirements, including the filing of monthly operating reports.  As of the date hereof, the Debtors have complied with such requirements.  The Debtors are authorized to operate their business in the ordinary course, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors.  This relief provides the Debtors with the "breathing room" necessary to assess their business and carry out an organized reorganization or wind-down process.  The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization or liquidation.

## B.    First Day Orders

At the first day hearing (the "***First Day Hearing***") held in these Chapter 11 Cases, the Debtors filed numerous motions seeking immediate relief.  The Bankruptcy Court entered numerous "first day orders" (the "***First Day Orders***").  The First Day Orders were intended to facilitate the transition between the Debtors' prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.  Many of the First Day Orders obtained in these Chapter 11 Cases are typical for large chapter 11 cases.

The First Day Orders in the Chapter 11 Cases authorized, among other things:

(1)    the joint administration of the Chapter 11 Cases for procedural purposes (Docket No. 32);

(2)    the retention of Epiq as the Debtors' claims and noticing agent (the "***Claims Agent***") (Docket No. 40);

(3)    the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date (Docket No. 33);

(4)    payment of employees' accrued prepetition wages and employee benefit claims (Docket No. 43);

(5)    continued utility services during the first months of the Chapter 11 Cases (Docket No. 34); and

(6)    the maintenance of certain prepetition customer programs and practices (Docket No. 35);

## C.    Sale of the Debtors' Assets

(i)    *Marketing Efforts*

For a number of months prior to the Debtors' Chapter 11 filing, the Debtors sought to maximize the value of their assets through a going-concern sale.  In January of 2013, the Debtors retained BG Strategic Advisors, LLC ("***BGSA***"), a boutique investment bank, to begin

17

soliciting interest from strategic and financial investors for a sale of the Debtors' business. In connection therewith, BGSA contacted sixty-seven (67) strategic and financial investors regarding an investment in the Debtors or a sale transaction that would ensure the continuity of the Debtors' specialty mobile device distribution and services business as a going concern. Twenty-six (26) of these investors expressed sufficient interest in the Debtors' assets to execute non-disclosure agreements and conduct preliminary due diligence for a possible transaction. The Debtors, working in tandem with BGSA and their financial advisors, Richter Consulting, Inc. ("*Richter*"), provided a substantial range of data detailing all aspects of the Debtors' business to potential bidders.

Over the course of a search process running from February through the middle of June 2013, BGSA ultimately solicited six (6) bids for the Debtors' assets, five of which were in writing, and one of which was made verbally but never reduced to writing. During this time, the Debtors also sought advice on the prospects for a "naked" auction of their assets without the presence of a stalking horse bidder, as well as the possibility of a credit bid by the Debtors' pre-petition secured lenders.

Having considered all of these alternatives in consultation with their legal and financial advisors, including BGSA, the Debtors determined that the bid submitted by Quality One, an Orlando, Florida-based wireless equipment and service provider, was the highest and best bid and represented the best overall value for the Debtors' assets. The Debtors thereafter, on June 24, 2013, executed a term sheet with Quality One which outlined the terms of a purchase of substantially all of the Debtors' assets by Quality One. As part of the proposed transaction, Quality One agreed to serve as stalking horse bidder under the terms of a definitive Asset Purchase Agreement, which was negotiated between the signing of the terms sheet and the Petition Date.

### (ii)    *The Sale Motion*

On August 19, 2013 – shortly before the filing of the Debtors' Chapter 11 Cases – the Debtors and Quality One executed that certain Asset Purchase Agreement (the "*APA*"), pursuant to which, Quality One agreed to acquire substantially all of the Debtors' assets for a combination of cash, assumed liabilities, and the issuance of new notes to the Debtors' Second Lien Lenders. As noted above, Quality One's bid remained subject to higher or better offers. Immediately after executing the APA, the Debtors commenced these Chapter 11 Cases and filed a motion with the Bankruptcy Court (the "*Sale Motion*") [Docket No. 10] pursuant to section 363 of the Bankruptcy Code for authority to sell the Debtors' assets and consummate the transactions contemplated by the APA. In the Sale Motion, the Debtors also sought approval of certain bidding procedures (the "*Bidding Procedures*") pursuant to which the Debtors would continue to market their assets. Under the APA (as initially agreed to), Quality One was entitled to certain bidding protections, including an expense reimbursement up to $1 million and a break-up fee of $4.5 million (the "*Bidding Protections*").

### (iii)    *The Bidding Procedures Hearing*

On September 10, 2013, the Bankruptcy Court held a hearing to consider approval of the Bidding Procedures and the proposed Bidding Protections. Prior to the hearing, the

ACTIVE/71480023.6

Committee and Philip Christopher lodged objections to the Bidding Procedures. After consideration of the Debtors' motion, the objections thereto, and the arguments made on the record at the hearing, the Bankruptcy Court approved the Bidding Procedures by order dated September 16, 2013 (the "***Bidding Procedures Order***") [Docket No. 116]. Under the Bidding Procedures Order, and after negotiations with the Committee, Quality One agreed to reduce the amount of the Bidding Protections to an expense reimbursement of up to $1 million and a break-up fee of $3.5 million. As part of a compromise reached between the Debtors, Quality One and the Committee at the hearing to consider the Bidding Procedures, Quality One agreed to:

- First, in the event of a Net Working Capital (as defined in the APA) adjustment of greater than $7.5 million, Quality One would issue a promissory note for the benefit of the Debtors' unsecured creditors in an amount equal to the excess adjustment over $7.5 million up to $750,000; or

- Second, in the event Quality One became entitled to payment of the Bidding Protections, Quality One would pay $750,000 to the Estates for the benefit of the unsecured creditors.[34]

(iv)    *The Auction*

Between the date the Bidding Procedures Order was entered and the Sale Hearing, which was held on October 10, 2013, the Debtors continued to aggressively market their assets. Concurrently therewith, the Committee and its professionals, including its financial advisor, FTI Consulting, Inc. ("***FTI Consulting***"), also explored the marketplace for potential bidders for the Debtors' assets.

While the Debtors were hopeful that another Qualified Bid would be submitted, no Qualified Bids other than the bid from Quality One were received. Accordingly, Quality One was declared the highest and best offer by the Debtors, in consultation with the Committee and JPMorgan, at the auction that was held on October 9, 2013.

(v)    *The Committee's Objection to the Sale and the Sale Hearing*

On October 7, 2013, the Committee filed their Objection to the Sale Motion (the "***Committee Sale Objection***") [Docket No. 177.] In the Committee Sale Objection, the Committee objected to the Sale on a number of grounds, including, among other grounds:

- <u>first</u>, that a Chapter 7 liquidation would provide greater value to the Debtors' Estates;

- <u>second</u>, that the Debtors' prepetition second lien lenders should not receive any money or proceeds from the Sale until the Committee's challenge period expired;

---

[34] This agreement was eventually superseded by the settlement that was reached at the hearing to approve the Sale.

- <u>third</u>, that certain payments constituting "Transaction Expenses" due under the APA to the Debtors' former Chief Executive Officer, George Appling, were improper; and

- <u>fourth</u>, that Chapter 5 avoidance actions should not be transferred and sold to Quality One.

The Debtors, Quality One, Mr. Appling, the Debtors' prepetition secured lenders and representatives of the Committee met in advance of and during the Sale Hearing in an attempt to resolve the Committee Sale Objection. Ultimately, the parties were able to reach a consensual resolution and the Sale, and related agreements of the parties, were approved pursuant to the Sale Order. All other objections to the Sale, including the objection filed by Philip Christopher, were resolved prior to the Sale Hearing or overruled by the Bankruptcy Court.

The settlement between the parties approved pursuant to the Sale Order included, among others, the following terms:

- Quality One agreed to fund a "Wind-Down Payment" (as defined in the APA) in the amount of $500,000, which represented an increase to the Wind-Down Payment of $250,000;

- Quality One agreed to fund an Administrative Expense Claims Reserve Account in the amount of $3 million;

- The "Transaction Expenses" (as defined in the APA) due from Quality One were fixed at $4.8 million. Of that amount, (i) $1.2 million was paid at Closing for the benefit of the Estates; and (ii) $900,000 becomes due within ninety (90) days of the Closing Date for the benefit of the Estates;

- Quality One agreed to issue a promissory note for the benefit of the Estates at Closing in the amount of $2 million, which note shall be due and payable on the second anniversary of the Closing Date; and

- All litigation claims other than those arising from or related to the Purchased Assets, the Purchased Contract and the Assumed Liabilities were agreed to be Excluded Assets (as such terms are defined in the APA).

As noted above, the Sale closed on October 17, 2013. In connection with closing, the Debtors and Quality One entered into a Transition Services Agreement, pursuant to which both parties agreed to perform certain services for one another to facilitate the transition of the Debtors' business to Quality One's ownership.

The proceeds of the Sale were used to pay in full all claims of the DIP Lenders. In addition, pursuant to the Sale Order, the Second Lien Lenders received in exchange for their claims under the Second Lien Loan Documents new notes and security interests issued by

Quality One.  Accordingly, all secured claims of the DIP Lenders, the First Lien Lenders and the Second Lien Lenders have been satisfied.

## D.    Debtor-in-Possession Financing

On August 21, 2013, the Bankruptcy Court granted the Debtors interim authority to enter into the DIP Facility (the "*Interim DIP Order*," Docket No. 39).  The Interim DIP Order approved the DIP Facility on an interim basis and authorized the Debtors to obtain credit and incur debt on an interim basis up to the initial aggregate committed amount of $40 million.

The Bankruptcy Court granted final authority to enter into the DIP Facility on September 13, 2013 (the "*Final DIP Order*," Docket No. 114).  The Final DIP Order approved the DIP Facility on a final basis and authorized the Debtors to borrow under the DIP Facility up to the aggregate committed amount of $46 million.

Under the terms of the DIP Credit Agreement and the Final DIP Order, to secure the repayment of the borrowing and all other obligations arising under the DIP Facility, the Debtors granted the DIP Lenders priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests and liens upon on substantially all of the Debtors' assets, senior and superior in priority to all other secured and unsecured Creditors of the Debtors' Estates except as otherwise provided in the Final DIP Order.  Obligations under the DIP Facility were also granted "superpriority" claim status under Bankruptcy Code section 364(c)(1), meaning they had priority over all other administrative expenses.  The liens and claims granted to the DIP Lenders were subject to the fees and expenses of the U.S. Trustee under 28 U.S.C. § 1930 and the Clerk of the Bankruptcy Court, as well as a carve-out for fees and disbursements of the Debtors' professionals and the Creditors' Committee's professionals.  The DIP Credit Agreement also contained covenants, representations and warranties, events of default, and other terms and conditions typical of credit facilities of a similar nature.

Under the terms of the DIP Credit Agreement and the Final DIP Order, the proceeds of the DIP Facility were to be used solely for (a) working capital and general corporate purposes (including capital expenditures), (b) payment of costs of administration of the Chapter 11 Cases and (c) payment in full of the First Lien Debt.  As noted above, all DIP financing ~~claim~~claims were paid in full upon the closing of the Sale.

## E.    Appointment of Creditors' Committee

On August 26, 2013, pursuant to Bankruptcy Code section 1102(a), the U.S. Trustee appointed certain entities as members to the Creditors' Committee.  Upon its appointment, the Creditors' Committee was comprised of the following members:  (1) HTC, (2) Pantech Co., Ltd., and (3) TCT Mobile Inc.

The Bankruptcy Court authorized the retention of certain professionals by the Creditors' Committee, including (i) Perkins Coie LLP as bankruptcy counsel (Docket No. 129); and (ii) FTI Consulting, Inc. as financial advisor [Docket No. 128].

ACTIVE/71480023.6

**F.**     **Other Material Relief Obtained During the Chapter 11 Cases**

      In addition to the first day relief sought in these Chapter 11 Cases, the Debtors have sought authority with respect to a multitude of matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates. Set forth below is a brief summary of certain of the principal motions the Debtors have filed during the pendency of the Chapter 11 Cases.

      **1.**     **Retention of Professionals**

      During these Chapter 11 Cases, the Bankruptcy Court has authorized the retention of various Professionals by the Debtors, including:

      (i)     the retention of Goodwin Procter LLP ("***Goodwin***") as bankruptcy counsel [Docket No. 132];

      (ii)     the retention of Togut, Segal & Segal LLP as bankruptcy co-counsel [Docket No. 134];

      (iii)     the retention of Benjamin Gordon Strategic Advisors, LLC as investment banker [Docket No. 169]; and

      (iv)     the retention of Richter Consulting, Inc. ("***Richter***") as financial advisors [Docket No. 133].

      ~~In addition, the Bankruptcy Court has authorized the retention of the following Professionals by the Committee:~~

      ~~(i) the retention of Perkins Coie LLP as bankruptcy counsel [Docket No. 129]; and~~

      ~~(ii) the retention of FTI Consulting, Inc. as Committee financial advisor [Docket No. 128].~~

      **2.**     **Retention Plan**

      On the August 20, 2013, the Debtors filed their Motion for an Order Approving the Continuation of the Prepetition Retention Program (the "***Retention Motion***") [Docket No. 14]. Pursuant to that motion, the Debtors sought to make certain payments totaling approximately $461,000 that had been previously agreed to between the Debtors and their employees to induce the employees to remain with PCD. Under the Retention Motion, the Debtors were not seeking to pay any amounts to any "insiders" (as such term is defined in the Bankruptcy Code).

      The Retention Program had been implemented by the Debtors in September, 2012. The Retention Program was necessitated by two primary factors. First, the Debtors' former chief executive officer left the company in September, 2012, taking with him approximately one-third of the Debtors' employees. The loss of such a large number of employees at one

time resulted in a considerable loss of employee morale and an increased workload for those employees who remained with the Company.  Second, the Debtors' employees were generally aware that the Debtors were experiencing some degree of financial trouble.  The Debtors believed that, without a retention program in place, they would likely lose more employees, which they did not believe they could sustain.

Under the Retention Program, the Debtors offered the majority of their employees an increase in their base pay, along with two additional payments, made in six-month intervals, provided such employee remained with the company through September, 2013.  The additional payments ranged from a total of 40% to 100% of such employee's annual base pay, with the first payment due and paid in March, 2013.  The Board subsequently modified the Retention Program to divide the second installment into three periods and paying the amount payable for the first period from March 1 to June 13 on June 14, 2013, and paying the amount payable for the second period from June 14th to July 29 on July 29, 2013.  The remaining amounts due under the Retention Program vested on September 1, 2013.

On September 26, 2013, the Bankruptcy Court approved the Debtors' Retention Program and authorized the payment of the remaining amounts due thereunder [Docket No. 137].

### 3.       Extension of Time to Assume or Reject Leases

On November 15, 2013, the Debtors filed their Motion Pursuant to Section 365(d)(4) of the Bankruptcy Code to Extend the Period within which the Debtors May Assume or Reject Certain Unexpired Leases of Non-Residential Real Property [Docket No. 240].  Pursuant to this motion, the Debtors sought to extend the time within which they are authorized to assume or reject certain nonresidential real property leases that relate to the Debtors' office headquarters and main warehouse in Hauppauge, New York.  The Debtors sought a 90-day extension.  The requested extension was necessary to allow the Debtors to fulfill their obligations under the Transition Services Agreement entered into with Quality One, which required the Debtors to give Quality One access to its Hauppauge properties while the Debtors completed the transition of their businesses to Quality One.

On December 9, 2013, the Bankruptcy Court approved the Debtors' request and extended the time for the Debtors to assume or reject such leases until the earlier of March 17, 2014 or the date on which an order confirming a plan of liquidation is entered by the Bankruptcy Court [Docket No. 248].

### 4.       Motion to Make Certain Payments to George Appling Under Incentive Plan Agreement

On January 3, 2014, the Debtors filed their Motion Authorizing Certain Payments from Proceeds of Sale for Incentive Compensation to George Appling Under Incentive Plan Agreement Pursuant to 11 U.S.C. §§ 105, 363 and 503 and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "*Appling Motion*") [Docket No. 261].  Pursuant to the Appling Motion, the Debtors have sought authority to make certain payments to George Appling, the Debtors' former Chief Executive Officer, totaling approximately $2.7 million.  The payments

relate to incentive plan compensation owed to Mr. Appling and which was the subject of a global resolution that permitted the Sale of the Debtors' assets to close. The Committee has agreed to support the payments. Objections have been filed to the Appling Motion by the US Trustee and Philip Christopher. On February 12, 2014, the Bankruptcy Court heard oral arguments and took evidence in respect of the Appling Motion. [The matter remains under advisement before the Bankruptcy Court / On [INSERT DATE], the Bankruptcy Court ruled [INSERT].]

### 5.    The HTC Motion for an Administrative Expense Claim

On January 6, 2014, HTC Corporation and HTC America, Inc. (together, "*HTC*") filed their Motion for Allowance and Payment of Administrative Expense Pursuant to 11 U.S.C. § 503(b)(1) [Docket No. 264] (the "*HTC Admin Claim Motion*"). In the HTC Admin Claim Motion, HTC seeks allowance of an administrative expense claim in the amount of $10,088,436.77 (the "*HTC Admin Claim*") based on HTC's purported satisfaction of certain in-warranty and off-warranty repairs to phones sold by PCD to Verizon Wireless.

The Debtors dispute the validity of the HTC Admin Claim in its entirety and, accordingly, on January 31, 2014, filed an objection thereto [Docket No. 294]. The Debtors dispute, among other things, that any of the purported repair work performed by HTC inured to the benefit of the Debtors' estates. In addition, the Debtors assert that the majority of the work performed by HTC was performed prepetition and, accordingly, could at best form the basis of a prepetition general unsecured claim. The Debtors have requested that the HTC Admin Claim Motion be denied in its entirety. On February 7, 2014, the Committee joined in the Debtors' objection to the HTC Admin Claim Motion [Docket No. 312].

A hearing is currently scheduled for March 19, 2014 before the Bankruptcy Court to hear and determine the HTC Admin Claim Motion.

## G.    Summary of Claims Process and Bar Date

### 1.    Schedules and Statements of Financial Affairs

The Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "*Schedules and Statements*") with the Bankruptcy Court on September 16, 2013. Among other things, the Schedules and Statements set forth the Claims of known Creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

### 2.    Claims Bar Date and Proofs of Claim

By order dated October 30, 2013, the Bankruptcy Court established **January 6, 2014 at 5:00 p.m.** (prevailing Eastern Time) as the general bar date for filing nongovernmental Proofs of Claim against the Debtors (the "*General Bar Date*"). Governmental Units ~~were~~are required to file proofs of claim by **February 18, 2014 at 5:00 p.m.** (prevailing Eastern Time) (the "*Governmental Units Bar Date*"). Notice of the General Bar Date and the Governmental Units Bar Date was mailed to Creditors on October 31, 2013.

24

The Bankruptcy Court's orders bars any Holder of a Claim that does not file a Proof of Claim required to be filed by the General Bar Date or the Governmental Units Bar Date, as the case may be, from asserting any such Claim against the Debtors or any successors to the Debtors.  As of the date of this Disclosure Statement, over [⸻135] Proofs of Claim and administrative claim requests have been timely filed and not withdrawn in the Chapter 11 Cases.

### 3.    Administrative Claims Bar Date

Under the Plan, the Debtors are requesting that an Administrative Claims bar date be established. Except as provided in Sections 2.1.2 and 2.1.3 of the Plan for (i) U.S. Trustee Fees  and (ii) Professionals requesting compensation or reimbursement for Professional Fee Claims, respectively, requests for payment of Administrative Claims must be filed no later than forty-five (45) days after notice of entry of the Confirmation Order is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court. **Holders of Administrative Claims who are required to file a request for payment of such Claims and who do not file such requests by the Administrative Claim Bar Date, shall be forever barred from asserting such Claims against the Debtors, their property, the Liquidating Trust, or the Liquidating Trust's property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, or recover such Administrative Claim.**

### H.    The Debtors' Causes of Action

### 1.    The Committee Obtains Standing to Pursue The Estates' Causes of Action

On October 11, 2013, the Debtors filed a proposed Stipulation with the Committee authorizing the Committee to bring certain causes of action on behalf of the Debtors' Estates (the "***Committee Stipulation***") [Docket No. 190]. Each ofThe PineBridge Entities and the CS Term Lenders filed objections to the Committee Stipulation [Docket Nos. 193, 195].  The Bankruptcy Court held a telephonic hearing on the Committee Stipulation on October 15, 2013, after which, the Bankruptcy Court took the matter under advisement.  On October 24, 2013, the Bankruptcy Court issued a written decision approving the Committee Stipulation, in part, and granting the Committee standing and authority to pursue certain causes of action against the Second Lien Lenders, as well as to pursue certain other "retained claims" against all other parties [Docket No. 218].

### 2.    The Second Lien Lender Adversary Proceeding

On October 28, 2013, the Committee, on behalf of the Debtors' Estates, commenced an adversary proceeding against the Second Lien Lenders, captioned *Official Committee of Unsecured Creditors v. PineBridge Vantage Capital, L.P., et al. (In re Personal Communications Devices, LLC)*, Adv. Pro. No. 13-8174 (AST).  In the complaint, the Committee seeks relief against the Second Lien Lenders on the grounds that (i) the Second Lien Lenders' claims should be recharacterized as equity contributions rather than debt; (ii) payments made to the Second Lien Lenders purportedly for the payment of tax obligations should be returned to the estates because they were fraudulent transfers under applicable state

25

and bankruptcy law and/or unjust enrichment under applicable state law; (iii) the claims of the PineBridge Entities should be equitably subordinated to the claims of general unsecured creditors; (iv) the Second Lien Lenders' should be required to set off any asset sale proceeds received under the Sale Order against distributions received in excess of their actual tax liability; and (v) the Second Lien Lenders' negative capital accounts breached the terms of the applicable organizational documents.  Pursuant to an order of the Bankruptcy Court ofentered the same dateday the complaint was filed [Docket No. 225], the Committee's complaint was filed under seal.  On December 23, 2013, the PineBridge Entities and the CS Term Lenders filed their respective motions to dismiss the adversary proceeding, which were also filed under seal.  This matter remains pending before the Bankruptcy Court.

On December 20, 2013, certain of the PineBridge entities filed their Motion to Withdraw the Reference [Adv. Pro. No. 13-8174 (AST), Docket No. 9], to which the CS Term Lenders have joined [Adv. Pro. No. 13-8174 (AST), Docket No. 18], and which remains pending as of the date hereof.

On January 24, 2014, the Committee filed its First Amended Complaint against the Second Lien Lenders, which was also filed under seal.  In the First Amended Complaint, the Committee seeks relief against the Second Lien Lenders on the grounds that (i) the Second Lien Lenders' claims should be re-characterized as equity contributions rather than debt; (ii) payments made to the Second Lien Lenders purportedly for the payment of tax obligations should be returned to the Estates as unjust enrichment under applicable state law; (iii) the claims of the PineBridge Entities should be equitably subordinated to the claims of general unsecured creditors; (iv) the Second Lien Lenders should be  required to set off any asset sale proceeds received under the Sale Order against distributions received in excess of their actual tax liability; (v) the Second Lien Lenders' negative capital accounts breached the terms of the applicable organizational document; (vi) Second Lien Lenders do not have valid enforceable security interests on the Debtors' commercial tort claims or any proceeds thereof; and (vii) any and all proofs of claim filed by the Second Lien Lenders should be disallowed.  The Second Lien Lenders have requested that the Plan Proponents advise that the Second Lien Lenders believe that the causes of action asserted by the Committee in the First Amended Complaint are meritless and that the Second Lien Lenders intend to file motions to dismiss the First Amended Complaint and otherwise vigorously defend against such causes of action.  The Committee disputes the Second Lien Lenders' contention.  The Liquidating Trust is expected to pursue the adversary proceeding in which the First Amended Complaint has been filed, oppose the Second Lien Lenders' anticipated motions and seek to maximize recovery on the claims asserted in the First Amended Complaint.  The foregoing is a summary of the First Amended Complaint and does not in any way supersede or control over the actual allegations set forth in the First Amended Complaint.

### 3.    The Philip Christopher Litigation

As noted above, the Debtors and their former Chief Executive Officer, Philip Christopher, are adverse parties in the State Court Litigation.  Mr. Christopher has asserted various counterclaims against the Debtors, certain of the Debtors' equity holders, andincluding PineBridge Vantage Capital L.P. and Jonathan Stearns, one of the Debtors' board members.  Mr. Christopher has asserted counterclaims for, among other things, (i) age discrimination,

under New York State Executive Law § § 296 et seq., and New York City Administrative Code § 8-502, (ii) breach of contract, (iii) tortious interference with contractual relations and (iv) tortious interference with existing and prospective business relations and economic advantage.  The Debtors do not believe they have any liability with respect to any of the counterclaims brought by Christopher.  Christopher asserts that he has no liability to the Debtors with respect to any of the claims brought against him in the State Court Litigation.

On September 18, 2013, PineBridge Direct Investments, LLC, PineBridge Global Investments LLC and PineBridge Investments LLC filed a Notice of Removal removing the State Court Litigation to the United States District Court for the Eastern District of New York. *See* Case No. 13-cv-05186 (ADS) (E.D.N.Y.).  On October 11, 2013, Judge Arthur Spatt of the United States District Court for the Eastern District of New York referred the foregoing case to the Bankruptcy Court to be considered by Judge Alan S. Trust.  On October 25, 2013, the State Court Litigation was docketed as an adversary proceeding in the Debtors' Chapter 11 Cases.  *See* Adv. Pro. No. 13-08173 (AST) [Adv. Pro. Docket No. 1].  On October 28, 2013, Mr. Christopher moved to remand the State Court Litigation back to New Your Supreme Court, Suffolk County division [Adv. Pro. Docket No. 2].  The Bankruptcy Court has not yet ruled on the remand motion, and this matter remains pending.  This is an action that the Liquidating Trust is expected to pursue.

## VI.    THE PLAN OF LIQUIDATION

**A.**    **Purpose and Effect of the Plan**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  Chapter 11 also allows a debtor to formulate and consummate a plan of liquidation.

A plan of liquidation sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of liquidation by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

Consistent with the Court's approval of the Debtors' liquidation, the Plan provides for the distribution of the proceeds of the liquidation of all assets of the Debtors to various Creditors as contemplated under the Plan and for the wind-up the Debtors' corporate affairs. Under the Plan, Claims against, and Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Interests of the various Classes will be treated in accordance with the provisions in such Plan for each such Class.  On the Distribution Dates, the Debtors will make Distributions to certain Classes of Claims as provided in such Plan.  A general description of the Classes of Claims

ACTIVE/71480023.6

against the Debtors created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

## B.    Classification and Treatment of Claims and Interests

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.  Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan).  If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement

28

(or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan.  Accordingly, their votes are not solicited.  Under the Debtors' Plan, the Claims in Class 1 (Allowed ~~Other~~ Priority Claims) and Class 2 (~~Allowed~~Miscellaneous Secured Claims) and ~~Equity Interests in Class 5~~ are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a chapter 11 plan.  For example, a class is deemed to reject a chapter 11 plan under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class ~~do~~are not _entitled to_ receive or retain property under the plan on account of their claims or equity interests.  Under this provision of the Bankruptcy Code, the holders of _Claims in Class 5 (intercompany claims) and_ Equity Interests in ~~Class 4~~Classes 6a and 6b are deemed to reject the Plan because they are not expected to receive any distributions under the Plan on account of their ~~retained Equity~~ Interests.  Because ~~Class 4 (Equity Interests) is~~Classes 6a and 6B are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such ~~Class~~Classes.  Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the equity interests in such ~~Class~~Classes.  For a more detailed description of the requirements for confirmation, see Section VIII.B.2. below, entitled "CONFIRMATION OF THE PLAN; Requirements for Confirmation of the Plan; Requirements of Section 1129(b) of the Bankruptcy Code."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Equity Interests in, the Debtors into the following Classes:

| Class | Claims Designation | Impairment | Entitled to Vote |
|-------|--------------------|------------|------------------|
| **1** | Priority Claims | Unimpaired | No |
| **2** | Miscellaneous Secured Claims | Unimpaired | No |
| **3** | Convenience Claims | Impaired | Yes |
| **4a** | General Unsecured Claims _Against PCD LLC_ | Impaired | Yes |
| **4b** | General Unsecured Claims Against Holdings | Impaired | Yes |
| **5** | Intercompany Claims | Impaired | No |
| **6b** | Equity Interests _in PCD LLC_ | Impaired | No |
| **6b** | Equity Interests in Holdings | Impaired | No |

ACTIVE/71480023.6

## C.    Classification and Treatment of Claims and Interests[5]

### 1.    Unclassified Claims

#### (a)    Administrative Claims

An Administrative Claim means a Claim for costs and expenses of administration of the Chapter 11 Cases with priority under section 507(a)(2) of the Bankruptcy Code, including, without limitation, costs and expenses allowed under section 503(b) of the Bankruptcy Code, the actual and necessary costs and expenses of preserving the Estates of the Debtors, any Professional Fee Claim and any fees or charges assessed against the Estates of the Debtors under 28 U.S.C. § 1930.

Except as otherwise provided in the Plan, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Priority Claim becomes an Allowed Priority Claim or (b) the date that is ninety (90) days after the date on which such Priority Claim becomes an Allowed Priority Claim, a Holder of an Allowed Priority Claim shall receive, to be paid out of the Liquidating Trust, in full and final satisfaction, settlement and release of and in exchange for such Allowed Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Claim or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing.  Notwithstanding the foregoing, or anything to the contrary in the Plan, no Distributions shall be made to the Holder of any Allowed Priority Claims unless (a) the Liquidating Trust has sufficient Available Cash to pay, or reserve for, as the case may be, the Face Amount of all Administrative Claims and Priority Tax Claims; and (b) either (i) the Liquidating Trust has sufficient Available Cash to pay, or reserve for, as the case may be, the Face Amount of all Priority Tax Claims or (ii) the Liquidating Trust Oversight Committee consents to all or any portion of such Distribution. Class 1 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

Administrative Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

#### (b)    Priority Tax Claims

A Priority Tax Claim means a Claim of a Governmental Unit of the kind specified in Bankruptcy Code sections 502(i) or 507(a)(8).

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Distribution Date, a Holder of an Allowed Priority Tax Claim shall be entitled to receive, to be paid out of the Liquidating Trust, in full and final satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (i) regular installment Cash payments, occurring not less frequently than quarterly over a period not exceeding five (5) years after the

---

[5] The descriptions provided herein in respect of the treatment of Claims and Interests are qualified in their entirety by reference to the Plan.

Petition Date, in an aggregate principal amount equal to the unpaid portion of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the Case Interest Rate from the Effective Date through the date of payment thereof or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; provided, however, that the Liquidating Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty.  Notwithstanding the foregoing, or anything to the contrary in the Plan, no Distributions shall be made to the Holder of any Allowed Priority Tax Claims unless (a) the Liquidating Trust has sufficient Available Cash to pay, or reserve for, as the case may be, the Face Amount of all Administrative Claims; and (b) either (i) the Liquidating Trust has sufficient Available Cash to pay, or reserve for, as the case may be, the Face Amount of all Priority Tax Claims or (ii) the Liquidating Trust Oversight Committee consents to all or any portion of such Distribution.  Priority Tax Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

Priority Tax Claimholders will be paid in full on account of their Claims and are not entitled to vote on the Plan.

(c)     **Secured Claims for First Lien Debt and Second Lien Debt**

The secured claims for the First Lien Debt and the Second Lien Debt have been satisfied with the consent of the relevant parties subject to the terms and conditions of the Sale Order and, accordingly, have not been classified under the Plan.

**2.     Unimpaired Claims**

(a)     **Class 1:  Priority Claims**

A Priority Claim means any claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

On, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Priority Claim becomes an Allowed Priority Claim or (b) the date that is ninety (90) days after the date on which such Priority Claim becomes an Allowed Priority Claim, a Holder of an Allowed Priority Claim shall receive, to be paid out of the Liquidating Trust, in full and final satisfaction, settlement and release of and in exchange for such Allowed Priority Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Claim or (ii) such other treatment as to which such Holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing.  Notwithstanding the foregoing, or anything to the contrary in the Plan, no Distributions shall be made to the Holder of any Allowed Priority Claims unless (a) the Liquidating Trust has sufficient Available Cash to pay, or reserve for, as the case may be, the Face Amount of all Administrative Claims and Priority Tax Claims; and (b) either (i) the Liquidating Trust has sufficient Available Cash to pay, or reserve for, as the case may be, the Face Amount of all Priority Tax Claims or (ii) the Liquidating Trust Oversight Committee consents to all or any portion of such Distribution.

31

Class 1 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

    (b)  **Class 2:  Miscellaneous Secured Claims**

    A Miscellaneous Secured Claim means any Claim that is secured by a Lien on Collateral, to the extent such lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and only to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff; *provided* that to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as an Unsecured Claim unless, in any such case, the class of which such Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

    Provided that the holder of a Class 2 Claim has not previously been paid by the Debtors or accepted other consideration in exchange for such Class 2 Claim, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim or (b) the date that is ninety (90) days after the date on which such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, a holder of an Allowed Miscellaneous Secured Claim shall receive, in full and final satisfaction, settlement and release of and in exchange for, such Allowed Miscellaneous Secured Claim, (i) Cash equal to the unpaid portion of such Allowed Miscellaneous Secured Claim, to be paid out of the Liquidating Trust, (ii) a return of the holder's Collateral securing the Miscellaneous Secured Claim or (iii) such other treatment as to which such holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing. Any holder of a Miscellaneous Secured Claim shall retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Debtors or the Liquidating Trustee free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until such time as (a) the holder of such Miscellaneous Secured Claim (i) has been paid Cash equal to the value of its Allowed Miscellaneous Secured Claim, (ii) has received a return of the Collateral securing the Miscellaneous Secured Claim or (iii) has been afforded such other treatment as to which such holder and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; or (b) such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable. Notwithstanding the foregoing, or anything to the contrary in the Plan, no Distributions shall be made to the holder of any Allowed Miscellaneous Secured Claim unless either (a) the Liquidating Trust has sufficient Available Cash to pay, or reserve for, as the case may be, the Face Amount of all Miscellaneous Secured Claims or (b) the Liquidating Trust Oversight Committee consents to all or any portion of such Distribution. Class 2 is conclusively presumed to have accepted the Plan and, therefore, holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

ACTIVE/71480023.6

Class 2 is conclusively presumed to have accepted the Plan and, therefore, Holders of Class 2 Claims are not entitled to vote to accept or reject the Plan.

**3.    Impaired Claims**

(a)    **Class 3:  Convenience Claims**

A Convenience Claim means a General Unsecured Claim (a) Allowed in an amount greater than or equal to $2,000 for which the Holder of such Claim elects on its Ballot to have its Claim reduced to $2,000 and treated as a Convenience Claim or (b) Allowed in an amount greater than or equal to $1,000 and less than $2,000 which Claim will be reduced to $1,000.

Provided that the Face Amounts of all Administrative Claims, Priority Tax Claims, Priority Claims and Miscellaneous Secured Claims have been paid in full or, to the extent not paid in full, funds sufficient to satisfy, in the aggregate, the Face Amount of all such Claims have been placed in a segregated reserve, and subject to the occurrence of the Effective Date, on, or as soon as reasonably practicable after, the Initial Distribution Date, (i) each Holder of an Allowed Convenience Claim in the amount of $2,000 shall receive from the Liquidating Trustee, in full and final satisfaction, settlement and release of and in exchange for such Convenience Claim, Cash in the amount of $~~200~~300 and (ii) each Holder of an Allowed Convenience Claim in the amount of $1,000 shall receive from the Liquidating Trustee, in full and final satisfaction, settlement and release of and in exchange for such Convenience Claim, Cash in the amount of $100.

Class 3 is Impaired and is entitled to vote on the Plan.

(b)    **Class 4~~a~~:  General Unsecured Claims Against PCD LLC**

~~A General Unsecured Claim means a Claim that is not an Administrative Claim, Priority Tax Claim, Priority Claim, Miscellaneous Secured Claim, Convenience Claim or Intercompany Claim.~~

Provided that the Face Amounts of all Administrative Claims, Priority Tax Claims, Priority Claims and Miscellaneous Secured Claims have been paid in full or, to the extent not paid in full, funds sufficient to satisfy the Face Amount of all such Claims have been placed in a segregated reserve, and subject to the occurrence of the Effective Date, on, or as soon as reasonably practicable after, the earlier of (a) the Distribution Date immediately following the date a General Unsecured Claim becomes an Allowed General Unsecured Claim or (b) the date that is ninety (90) days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim against PCD LLC shall receive from the Liquidating Trustee, in full and final satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of Available Cash to be distributed to holders of Allowed General Unsecured Claims. More than one Distribution Date may occur, as the Liquidating Trustee shall determine. Class 4~~a~~ is Impaired and is entitled to vote on the Plan.

No Cash payment shall be made on account of Allowed General Unsecured Claims Against PCD LLC until Cash sufficient to pay all estimated Administrative Claims, Disputed

33

Claims, and Post-Effective Date Costs has been deposited into such reserves as the Debtors or the Liquidating Trustee deem necessary.

Allowed General Unsecured Claims in Class 4a will not include interest from and after the Petition Date or include any penalty on such Claim.  Any such interest or penalty component of any such Claim, if Allowed, will be paid only in accordance with section 726(b) of the Bankruptcy Code as if these Chapter 11 Cases were cases under chapter 7.

Holders of Class 4a Claims are entitled to vote to accept or reject the Plan.

(c)    **Class 4b:  General Unsecured Claims Against Holdings**

Provided that the Face Amount of all Allowed General Unsecured Claims against PCD LLC has been paid in full or, to the extent not paid in full, funds sufficient to satisfy the Face Amount of all such Claims have been placed in a segregated reserve, and subject to the occurrence of the Effective Date, on, or as soon as reasonably practicable after all Allowed Claims in Class 4a have been paid or properly reserved for, each holder of an Allowed General Unsecured Claim against Holdings shall receive from the Liquidating Trustee, in full and final satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of Available Cash to be distributed to holders of Allowed General Unsecured Claims Against Holdings.  More than one Distribution Date may occur, as the Liquidating Trustee shall determine.  Class 4b is Impaired and is entitled to vote on the Plan.

Allowed General Unsecured Claims in Class 4b will not include interest from and after the Petition Date or include any penalty on such Claim.  Any such interest or penalty component of any such Claim, if Allowed, will be paid only in accordance with section 726(b) of the Bankruptcy Code as if these Chapter 11 Cases were cases under chapter 7.

Holdings' only asset was its equity ownership of PCD LLC.  Because the liabilities of PCD LLC exceed its assets, it is not currently expected that holders of claims in Class 4b against Holdings will receive or retain any distributions on account of their claims.

(d)    (c) Class 5:  Intercompany Claims

An Intercompany Claim means any Claim held by a Debtor against another Debtor.

In connection with, to the extent of and as a result of, the substantive consolidation of the Debtors' Estates and the Chapter 11 Cases, on the Confirmation Date or such other date as may be set by an order of the Bankruptcy Court, but subject to Upon the occurrence of the Effective Date, all Intercompany Claims shall be deemed eliminated, cancelled and/or extinguished and the Holders of Class 5 Claims shall not be entitled to, and shall not receive or retain any property or interest in property on account of such Claims.

By operation of the Bankruptcy Code, Class 5 is deemed to have rejected the Plan and, therefore, Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan. However, the Debtors support approval of the Plan.

34

4.      **Interests**

(a)      **Class 6a and Class 6b: Equity Interests**

An Equity Interest means any ownership, membership or equity interest in either of the Debtors, including, without limitation, any issued, unissued, authorized or outstanding shares of common or preferred stock or any other equity security of the Debtors, together with any warrants, options or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto, and any and all interests in the foregoing that was in existence immediately prior to or on the Petition Date. This shall apply with respect to both Class 6a and Class 6b.

On the Effective Date, all Interests shall be cancelled and each Holder thereof shall not be entitled to, and shall not receive or retain any property or interest in property on account of, such Interests.

Class 6 is deemed to have rejected the Plan and, therefore, Holders of Class 6 Interests are not entitled to vote to accept or reject the Plan.

5.      **Special Provision Regarding Unimpaired Claims**

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors and the Liquidating Trustee with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

D.      **Acceptance Or Rejection Of The Plan**

1.      **Impaired Classes of Claims Entitled to Vote**

Subject to Article IV VI of the Plan, the votes of Holders of Claims and Interests in Impaired Classes who receive or retain property on account of their Claims or Interests and who are entitled to vote under the Solicitation Procedures Order will be solicited for acceptance or rejection of the Plan.

2.      **Acceptance by an Impaired Class**

In accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims of such Class that are entitled to vote and have timely and properly voted to accept or reject the Plan.

3.      **Presumed Acceptances by Unimpaired Classes**

Classes 1 and 2 are Unimpaired by the Plan.  Under Bankruptcy Code section 1126(f), such Claimholders are conclusively presumed to accept the Plan, and the votes of such Claimholders will not be solicited.

### 4.  Classes Deemed to Reject Plan

Claimholders in Class 5 and Interest Holders in ~~Class~~Classes 6a and 6b are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), Holders of Claims in Class 5 and Holders of Interests in ~~Class~~Classes 6a and 6b are deemed to reject the Plan, and the votes of such Claimholders or Interest Holders will not be solicited.

### 5.  Confirmation Pursuant to Bankruptcy Code Section 1129(b)

Because Classes 5, 6a and 6b are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Court by employing the "cramdown" procedures set forth in section 1129(b) of the Bankruptcy Code.  The ~~Debtors~~Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Exhibit or schedule, including to amend or modify the Plan or such Exhibits or schedules to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

## E.  Means For Implementation Of The Plan

### ~~1. Substantive Consolidation / Merger / Dissolution~~

### 1.  Intercompany Claims / Guarantees

~~The Plan contemplates and is predicated upon the substantive consolidation of the Debtors' Estates.  Entry of the Confirmation Order shall constitute approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Chapter 11 Cases.  On and after~~On the Effective Date, (i) all assets and liabilities of the Debtors shall be ~~merged so that all of the assets of the Debtors shall be available to pay all of the liabilities~~transferred to the Liquidating Trust and the Liquidating Trustee shall, using commercially reasonable efforts, segregate each Debtor's assets and make payments under the Plan to each Class of Claimants corresponding to each Debtor, (ii) no Distributions shall be made under ~~the~~this Plan on account of intercompany claims among the Debtors~~,~~ and (iii) all guarantees of ~~the Debtors~~Holdings of the obligations of ~~any other Debtor~~PCD LLC shall be eliminated so that any claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of the Debtors shall be one obligation ~~of the Liquidating Trust, and (iv) each and every Claim filed or to be filed in the Case of any of the Debtors shall be treated as a single claim filed~~ against the Liquidating Trust corresponding to an obligation of PCD LLC.

### 2.  Implementing Actions

On the Effective Date, the following shall occur to implement ~~the~~this Plan:

(a)  All Debtors shall be deemed dissolved without any further action by the Debtors, including the filing of any documents with the Secretary of State for any state

36

in which the Debtors are incorporated or any other jurisdiction, or without the necessity for any payments to be made in connection therewith; *provided*, *however*, that the Debtors shall have the authority to take all necessary actions to merge or dissolve the Debtors in and withdraw the Debtors from applicable state(s); and

(b) The Liquidating Trustee shall make all Distributions required to be made on the Effective Date to holders of Allowed Claims pursuant to the Plan.

3. Limited Liability Company Action

(a) *Transfer of Estate Assets*.

(b) Upon the Effective Date, (a) The members of the board of managers of each of the Debtors shall be deemed to have resigned; and

(c) (b) Each of the Debtors shall cause (and shall be deemed to have caused) its Assets and the Assets of its Estate to be transferred to the Liquidating Trust in accordance with the this Plan.; and

(d) The Liquidating Trustee shall make all Distributions required to be made on the Effective Date to holders of Allowed Claims pursuant to this Plan.

**3.** **Limited Liability Company Action**

(a) *No Further Duties*

Upon transfer of the Debtors' Assets to the Liquidating Trust, the Debtors shall have no further duties or responsibilities in connection with the implementation of the Plan.

(b) *Dissolution of the Debtors* *Retention of Books and Records*

On the Effective Date, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith.

As soon as practicable after the transfer of the Assets to the Liquidating Trust, the Liquidating Trustee shall provide for the retention and storage of the books, records and files that shall have been delivered to the Liquidating Trust until such time as all such books, records and files are no longer required to be retained under applicable law, including, without limitation, any law or rule imposing an obligation to retain and preserve documents, data and other information for purposes of litigation, and file a certificate informing the Bankruptcy Court of the location at which such books, records and filed are being stored.

The Professionals employed by the Debtors shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of Final Fee Application, upon the submission of invoices to the Liquidating Trust in accordance with the Post-Effective Date Budget. Any time or expenses incurred in the preparation, filing and prosecution of the Final

37

Fee Applications shall be disclosed by each Professional in its Final Fee Application and shall be subject to approval of the Bankruptcy Court.

(c)     *Cancellation of Existing Securities and Agreements*

Except as otherwise provided in the Plan, and in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, the Interests and any other promissory notes, share certificates, whether for preferred or common stock, other instruments or agreements evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards and commitments shall be deemed cancelled and of no further force and effect with respect to the Debtors, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be released.; *provided* that, for the avoidance of doubt, the foregoing shall have no effect on the rights or obligations of non-Debtors with respect to other non-Debtors in connection with such contracts, instruments or other agreement or documents.

(d)     *No Further Action*

Each of the matters provided for under the Plan involving the limited liability company structure of the Debtors or limited liability company action to be taken by or required of the Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement of further action by any Person, including but not limited to, the Liquidating Trust, the Liquidating Trustee, holders of Claims or Interests against or in the Debtors, or directors, officers or managers of the Debtors.

(e)     *Execution of Instruments Authorized*

The Liquidating Trustee shall be and hereby is authorized, on and after the Effective Date, to sign in the name of any Debtor (with a limited power of attorney), execute, deliver and file all documents and instruments that the Liquidating Trustee determines in its sole discretion will further the accomplishment of the transactions contemplated under this Plan.

(f)     *Post-Effective-Date Work by Debtors' Professionals*

The Professionals employed by the Debtors shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of Final Fee Application, upon the submission of invoices to the Liquidating Trust in accordance with the Post-Effective Date Budget.  Any time or expenses incurred in the preparation, filing and prosecution of the Final Fee Applications shall be disclosed by each Professional in its Final Fee Application and shall be subject to approval of the Bankruptcy Court.

**F.     Sources For Plan Distribution**

ACTIVE/71480023.6

All Cash necessary for the Liquidating Trustee to make payments of Cash pursuant to the Plan shall be obtained from the following sources:  (a) the Debtors' Cash on hand, which shall be transferred to the Liquidating Trustee on the Effective Date, (b) Cash received in liquidation of the assets of the Liquidating Trust and (c) proceeds of the Causes of Action.

## G.    Conditions to Plan Effectiveness

The Plan may not be consummated, and the Effective Date shall not occur, unless and until each of the following conditions shall have been either satisfied or waived:

   (a) The Court has entered the Confirmation Order;

   (b) No stay of the Confirmation Order is in effect;

   (c) All documents, instruments and agreements, in form and substance satisfactory to the ~~Debtors~~Plan Proponents, provided for under or necessary to implement the Plan have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and

   (d) The ~~Debtors~~Plan Proponents shall have received all authorizations, consents, regulatory approvals, rulings, opinions or other documents that are determined by the Debtors to be necessary to implement the Plan.

## H.    Liquidating Trust

### 1.    Name of the Liquidating Trust

Under the APA, Quality One acquired the sole right to the use of the name "Personal Communications Devices" or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including without limitation, "PCD" or any other name or mark confusingly similar thereto owned or licensed by the Debtors.  The Debtors further agreed to cease using any such marks, including on publicly displayed materials.  Accordingly, so as to comply with the foregoing obligations under the APA, as of the Effective Date, the name of the Liquidating Trust will be the "Devices Liquidating Trust."

### 2.    ~~1.~~ Establishment of the Liquidating Trust

The Liquidating Trust shall be established and shall become effective on the Effective Date.  All Distributions to the Holders of Allowed Claims shall be from the Liquidating Trust.  The Liquidating Trust shall hold and administer the following assets and the Net Proceeds thereof (collectively, the "***Liquidating Trust Assets***"):

   (a) the Assets of the Debtors, including but not limited to the Causes of Action for liquidation and distribution in accordance with the Plan; and

(b)    all other property of the Debtors and the Estates, and each of them, both of which sets of assets shall be transferred by the Debtors to the Liquidating Trust on the Effective Date for liquidation and distribution in accordance with the Plan.

### 3.    2.  Trust Distributions

The Liquidating Trustee shall liquidate all Assets of the Debtors and the Estates (including, without limitation, all Causes of Action) and distribute the Net Proceeds of such liquidation from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

### 4.    3.  Duration of Trust

The Liquidating Trust shall have an initial term of five (5) years; *provided*, *however*, that, if warranted by the facts and circumstances, and subject to the approval of the Bankruptcy Court with jurisdiction over the case, upon a finding that an extension of the term of the Liquidating Trust is necessary to accomplish the liquidating purpose of the Liquidating Trust, the Liquidating Trust's term may be extended for a finite term based on facts and circumstances.  Each extension of the term of the Liquidating Trust must be approved by the Court within six (6) months of the beginning of the extended term.  The Liquidating Trust may be terminated earlier than its scheduled termination if (a) the Bankruptcy Court has entered a Final Order closing the Chapter 11 Cases pursuant to Bankruptcy Code section 350(a) and (b) the Liquidating Trustee has administered all assets of the Liquidating Trust and performed all other duties required by the Plan and the Liquidating Trust Agreement.  As soon as practicable after the Final Trust Distribution Date, the Liquidating Trustee shall seek entry of a Final Order closing the Chapter 11 Cases pursuant to Bankruptcy Code section 350.

### 5.    4.  Liquidation of Causes of Action

Notwithstanding any other term or provision of the Plan, the Debtors shall have, prior to the Effective Date, and the Liquidating Trustee shall have, on and after the Effective Date, sole authority and responsibility for investigating, analyzing, commencing, prosecuting, litigating, compromising, collecting, and otherwise administering the Causes of Action. Pursuant to Bankruptcy Code section 1123(a)(5), the transfer of all Causes of Action to the Liquidating Trust shall take effect notwithstanding any applicable non-bankruptcy law.  All powers granted to the Committee to pursue, and all actions taken by the Committee in pursuit of, Causes of Action prior to the Effective Date shall be deemed ratified and approved *nunc pro tunc* to the Confirmation Order.

### 6.    5.  Liquidating Trustee

(a)    Appointment

---

[6] To be determined and disclosed in the Plan Supplement.  The Committee shall select the initial Liquidating Trustee and the initial members of the Liquidating Trust Oversight Committee.

ACTIVE/71480023.6

The initial Liquidating Trustee shall be [_____].[6] The appointment of the Liquidating Trustee shall be effective as of the Effective Date. Successor Liquidating Trustee(s) shall be appointed as set forth in the Liquidating Trust. The salient terms of the Liquidating Trustee's employment, including the Liquidating Trustee's duties and compensation (which compensation shall be negotiated by the Liquidating Trustee and the Liquidating Trust Oversight Committee) shall be set forth in the Liquidating Trust Agreement and the Confirmation Order. The Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings.

(b)    Term

Unless the Liquidating Trustee resigns or dies earlier, the Liquidating Trustee's term shall expire upon termination of the Liquidating Trust pursuant to the Plan and/or the Liquidating Trust Agreement.

(c)    Powers and Duties

The Liquidating Trustee shall have the rights and powers set forth in the Liquidating Trust Agreement including, but not limited to, the powers of a debtor-in-possession under Bankruptcy Code sections 1107 and 1108. The Liquidating Trustee shall be governed in all things by the terms of the Liquidating Trust Agreement and the Plan. The Liquidating Trustee shall administer the Liquidating Trust, and its assets, and make Distributions from the proceeds of the Liquidating Trust in accordance with the Plan. In addition, the Liquidating Trustee shall, in accordance with the terms of the Plan, take all actions necessary to wind down the affairs of the Debtors consistent with the Plan and applicable non-bankruptcy law. Without limitation, the Liquidating Trustee shall file final federal, state, foreign and, to the extent applicable, local, tax returns. Subject to the terms of the Liquidating Trust Agreement, which includes, among other things, limitations on the Liquidating Trustee's discretion to take certain action without approval of the Liquidating Trust Oversight Committee or, in some circumstances, the Bankruptcy Court, the Liquidating Trustee shall be authorized, empowered and directed to take all actions necessary to comply with the Plan and exercise and fulfill the duties and obligations arising thereunder, including, without limitation, to:

(i)    employ, retain, and replace one or more attorneys, accountants, auctioneers, brokers, managers, consultants, other professionals, agents, investigators, expert witnesses, consultants, and advisors as necessary to discharge the duties of the Liquidating Trustee under the Plan and the Liquidating Trust Agreement;

---

[6] To be determined and disclosed in the Plan Supplement. The Committee shall select the initial Liquidating Trustee and the initial members of the Liquidating Trust Oversight Committee.

ACTIVE/71480023.6

(ii)   object to the allowance of Claims pursuant to the terms of the Plan;

(iii)   open, maintain and administer bank accounts as necessary to discharge the duties of the Liquidating Trustee under the Plan and the Liquidating Trust Agreement;

(iv)   pay reasonable and necessary professional fees, costs, and expenses as set forth in the Plan;

(v)   investigate, analyze, commence, prosecute, litigate, compromise, and otherwise administer the Causes of Action and all related Liens for the benefit of the Liquidating Trust and its beneficiaries, as set forth in the Plan, and take all other necessary and appropriate steps to collect, recover, settle, liquidate, or otherwise reduce to Cash the Causes of Action, including all receivables, and to negotiate and effect settlements and lien releases with respect to all related Claims and all related Liens;

(vi)   administer, sell, liquidate, or otherwise dispose of all Collateral and all other Assets of the Estates in accordance with the terms of the Plan;

(vii)   represent the Estates before the Bankruptcy Court and other courts of competent jurisdiction with respect to matters concerning the Liquidating Trust;

(viii)   seek the examination of any entity under and subject to the provisions of Bankruptcy Rule 2004;

(ix)   comply with applicable orders of the Bankruptcy Court and any other court of competent jurisdiction over the matters set forth herein;

(x)   comply with all applicable laws and regulations concerning the matters set forth herein;

(xi)   exercise such other powers as may be vested in the Liquidating Trust pursuant to the Liquidating Trust Agreement, the Plan, the Plan Supplement or other Final Orders of the Bankruptcy Court;

(xii)   execute any documents, instruments, contracts, and agreements necessary and appropriate to carry out the powers and duties of the Liquidating Trust; and

ACTIVE/71480023.6

(xiii)    stand in the shoes of, and have full authority as the sole legal representative of, the Debtors for all purposes.

(d)    Fees and Expenses

Except as otherwise provided in the Plan, compensation of the Liquidating Trustee and the costs and expenses of the Liquidating Trustee and the Liquidating Trust (including, without limitation, professional fees and expenses) shall be paid from the Liquidating Trust.  The Liquidating Trustee shall pay, without further order, notice, or application to the Bankruptcy Court, the reasonable fees and expenses of the Liquidating Trustee Professionals, as necessary to discharge the Liquidating Trustee's duties under the Plan and the Liquidating Trust Agreement.  Payments to the Liquidating Trustee, or to the Liquidating Trustee Professionals, shall not require notice to any party, or an order of the Bankruptcy Court approving such payments; *provided, however*, that the Liquidating Trustee shall be entitled to payment of reasonable fees and expense incurred prior to the Effective Date in an amount to be agreed to by the Debtors and approved by the Bankruptcy Court in the Confirmation Order.

(e)    Retention of Professionals and Compensation Procedure

On and after the Effective Date, subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may engage such professionals and experts as may be deemed necessary and appropriate by the Liquidating Trustee to assist the Liquidating Trustee in carrying out the provisions of the Plan and the Liquidating Trust Agreement, including, but not limited to, Professionals retained prior to the Effective Date by either the Debtors or the Creditors' Committee.  Subject to the terms of the Liquidating Trust Agreement, for services performed from and after the Effective Date, Liquidating Trustee Professionals shall receive compensation and reimbursement of expenses in a manner to be determined by the Liquidating Trustee.

(f)    Liquidating Trustee as Successor

Pursuant to Bankruptcy Code section 1123(b), the Liquidating Trustee shall be the successor to the Debtors for all purposes.

(g)    Compromising Claims

Pursuant to Bankruptcy Rule 9019(b), the Plan, including specifically the limitations imposed by Section 11.1 thereof, and the Liquidating Trust Agreement, as of the Effective Date, the Liquidating Trustee is authorized to approve compromises of the Causes of Action and all Claims, Disputed Claims, and Liens and to execute necessary documents, including Lien releases and stipulations of settlement or release, without notice to any party and without further order of the Bankruptcy Court, except as otherwise provided in the Liquidating Trust Agreement.

(h)    Investment Powers

43

The powers of the Liquidating Trustee to invest any Cash that is held by the Liquidating Trust, other than those powers reasonably necessary to maintain the value of the assets and to further the Liquidating Trust's liquidating purposes, shall be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or treasury bills. The Liquidating Trustee is prohibited from continuing or engaging in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Liquidating Trust.

(i)      Distributions

The Liquidating Trustee shall make continuing efforts to dispose of the Liquidating Trust's assets, make timely Distributions, and not unduly prolong the duration of the Liquidating Trust.

(j)      Vesting of Assets

On the Effective Date, all property or Assets treated by the Plan, including, without limitation, any minutes, and general organizational records of Debtors, and any books and records relating to the foregoing not otherwise treated by the Plan, shall vest in the Liquidating Trust free and clear of all Liens, Claims, encumbrances, and other interests and shall thereafter be administered, liquidated by sale, collection, recovery, or other disposition and distributed by the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement and the Plan.

### 7.  6.  Federal Income Taxation of Liquidating Trust

(a)      **Treatment of Liquidating Trust and Asset Transfers**

For federal income tax purposes, the Debtors, the Liquidating Trust, the Liquidating Trustee and the Holders of Claims shall treat the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124. For U.S. income tax purposes, the transfer of assets to the Liquidating Trust under the Plan is treated as a deemed transfer by the Debtors to the Holders of Claims in satisfaction of their Claims followed by a deemed transfer of the assets by the Holders of Claims to the Liquidating Trust. For U.S. federal income tax purposes, the Holders of Claims will be deemed to be the grantors and owners of the Liquidating Trust and its assets and the Liquidating Trust will be taxed as a grantor trust as set forth in Sections 671 through 677 of the Tax Code (i.e. as a pass-through entity not subject to an entity-level tax) owned by the Holders of Claims. The Liquidating Trust will file U.S. federal income tax returns as a grantor trust under Section 671 of the Tax Code and Treasury Regulations Section 1.671-4 and report, but not be subject to tax on, the Liquidating Trust's items of income, gain, loss deductions and credits for U.S. federal income tax purposes ("***Tax Items***"). The Holders of Claims will report such Tax Items on their individual U.S. federal income tax returns and pay any resulting U.S. federal income tax liability. The Debtors, the Liquidating Trust and the Holders of Claims will use consistent valuations of the assets transferred to the Liquidating

ACTIVE/71480023.6

Trust for all federal income tax purposes, such valuations to be determined jointly by the Debtors and the Liquidating Trustee.

        (b)      **Reserves that may be Established by the Liquidating Trustee**

The Plan permits the Liquidating Trustee to create separate reserves for Disputed Claims. The Liquidating Trustee may, at the Liquidating Trust's sole discretion, file an election to treat any such reserve as a Disputed Ownership Fund ("**_DOF_**") within the meaning of Treasury Regulations Section 1.468B-9(b)(1) for U.S. federal income tax purposes rather than to tax such reserve as a part of the Liquidating Trust. If such an election were made, the Liquidating Trust would comply with all U.S. federal and state tax reporting and tax compliance requirements of the DOF, including but not limited to the filing of a separate U.S. federal income tax return for the DOF and the payment of federal and/or state income tax due.

### 8. ~~7.~~ No Revesting Of Assets

The property of the Debtors' Estates shall not be vested in the Debtors on or following the Effective Date, but shall be vested in the Liquidating Trust and continue to be subject to the jurisdiction of the Bankruptcy Court following confirmation of the Plan until such property is distributed to Holders of Allowed Claims in accordance with the provisions of the Plan, the Liquidating Trust Agreement, and the Confirmation Order.

### 9. ~~8.~~ Exemption From Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers from any of the Debtors to the Liquidating Trust or to any other Person pursuant to the Plan in the United States shall not be subject to any stamp tax or similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 10. ~~9.~~ Preservation Of Causes Of Action; Settlement Of Causes Of Action

        (a)      **Preservation of Causes of Action**

In accordance with section 1123(b)(3) of the Bankruptcy Code or any corresponding provision of similar federal or state laws, and except as otherwise provided in the Final DIP Order, the Plan or the Confirmation Order, on and after the Effective Date, (a) the Liquidating Trustee shall be deemed to be a representative of the Debtors as the party in interest in the Chapter 11 Cases and any adversary proceeding in the Chapter 11 Cases, under the Plan or in any judicial proceeding or appeal as to which any of the Debtors is a party and (b) the Liquidating Trustee shall retain all of the Causes of Action of the Debtors and their Estates, including, without limitation, fraudulent transfer or preferential transfer claims under Chapter 5 of the Bankruptcy Code, if any, and all other causes of action of a trustee and debtor in possession under the Bankruptcy Code. The Liquidating Trustee and/or the Liquidating Trust may, in accordance with the Liquidating Trust Agreement, enforce, sue on,

ACTIVE/71480023.6

settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action.

The Debtors have not concluded their investigation into the Causes of Action. Accordingly, in considering the Plan, each party in interest should understand that any and all Causes of Action that may exist against such Person or entity may be pursued by the Liquidating Trust and/or the Liquidating Trustee. ~~The substantive consolidation of the Debtors and their Estates pursuant to the Plan shall not, and shall not be deemed to, prejudice any of the Causes of Action, which shall survive entry of the Confirmation Order for the benefit of the Debtors and their Estates, and, upon the Effective Date, for the benefit of the Liquidating Trust.~~

(b)    **Settlement of Causes of Action**

Subject to the terms of the Liquidating Trust Agreement, at any time after the Confirmation Date but before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle some or all of the Causes of Action with the approval of the Court pursuant to Bankruptcy Rule 9019. After the Effective Date, the Liquidating Trustee, in accordance with the terms of the Plan and the Liquidating Trust Agreement, will determine whether to bring, settle, release, compromise, enforce or abandon such rights (or decline to do any of the foregoing).

**11.    ~~10.~~ Effectuating Documents; Further Transactions**

Subject to the terms and conditions of the Plan, prior to the Effective Date, any appropriate officer of the applicable Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  Subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trust shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

I.    **Treatment Of Executory Contracts And Unexpired Leases**

1.    **Rejected Contracts And Leases.**

All executory contracts and unexpired leases of the Debtors not expressly assumed, rejected or terminated herein, or by order of the Court entered prior to the Confirmation Date, or which are not subject of a pending application to assume or reject on the Confirmation Date, shall be deemed rejected as of the Confirmation Date.

2.    **Bar Date for Filing Claim for Rejection Damages**

If the rejection of an executory contract or unexpired lease by the Debtors pursuant to Section 10.1 hereof results in damages to the counterparty to such contract or lease, then a Claim for damages or any other amounts related in any way to such contract or lease shall be

46

forever barred and shall not be enforceable against the Debtors, their successors and assigns or their property, unless a proof of claim is filed with the Court and served on the Liquidating Trustee within thirty (30) days after the service of notice of the Effective Date, which notice shall prominently state that such executory contracts and unexpired leases have been rejected; *provided*, *however*, that the rejection claim bar date for unexpired leases and executory contracts rejected prior to the Confirmation Date shall be the date set forth in the applicable order rejecting such lease or contract.

**J.      Treatment of Disputed, Contingent and Unliquidated Claims**

     **1.      Objections to and Resolution of Disputed Claims**

After the Effective Date, the Liquidating Trustee shall have the right to make and file objections to Claims and to withdraw such objections.  Subject to the preceding sentence, all objections shall be litigated to Final Order; *provided*, *however*, that, with respect to Claims having a Face Amount less than $[25,000]1,000,000, the Liquidating Trustee shall have the authority to compromise, settle or otherwise resolve any Claim without approval of the Court or notice to any party; *provided*, *however*, that the Liquidating Trustee reserves the right to seek relief before the Court with respect to any Disputed Claim.

The Liquidating Trustee shall file and serve all objections to Claims upon the holder of the Claim as to which the objection is made no later than one hundred and eighty (180) days after the later of the Effective Date or the date on which a proof of claim or request for payment is filed with the Court (the "***Objection Deadline***").  The Objection Deadline may be extended for one ninety (90) day period by the Liquidating Trustee by filing a notice of the extended Objection Deadline with the Court.  Thereafter, the Objection Deadline may be further extended only by an order of the Court.

     **2.      No Distributions Pending Allowance.**

Notwithstanding any other provision hereof, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes Allowed.

     **3.      Estimation of Claims**

The Debtors and, after the Effective Date, the Liquidating Trustee on behalf of the Liquidating Trust, may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or any other person previously objected to such Claim, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Liquidating Trust, as the case may be, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims

ACTIVE/71480023.6

may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 4.    No Post-Effective Date Interest.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

## K.    ~~Confirmation And~~ Consummation Of The Plan

### ~~1. Conditions To Confirmation.~~

~~The following are conditions precedent to the occurrence of the Confirmation Date:~~

~~(a) A Final Order finding that the Disclosure Statement contains adequate information pursuant to Bankruptcy Code section 1125 shall have been entered by the Bankruptcy Court;~~

~~(b) The Global Plan Settlement Approval Order, which may be the Confirmation Order, in form and substance reasonably acceptable to the Debtors, shall have been entered by the Bankruptcy Court prior to or contemporaneously with the Confirmation Order;~~

~~(c) A proposed Confirmation Order in form and substance, reasonably acceptable to the Debtors; and~~

~~(d) Approval of all provisions, terms and conditions of the Plan in the Confirmation Order.~~

### 1.    ~~2.~~ Conditions To Effective Date.

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing in accordance with Article VIII.C. of the Plan.

(a)    The Court has entered the Confirmation Order;

(b)    No stay of the Confirmation Order is in effect;

(c)    All documents, instruments and agreements, in form and substance satisfactory to the ~~Debtors~~Plan Proponents, provided for under or necessary to implement the Plan have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby; and

(d)    The ~~Debtors~~Plan Proponents shall have received all authorizations, consents, regulatory approvals, rulings, opinions or other documents that are determined by the Debtors to be necessary to implement the Plan.

### 2.    ~~3.~~ Waiver Of Conditions.

48

The Debtors and the Committee may jointly, but not severally, waive any of the conditions set forth in Section 8.6 of the Plan without notice and a hearing. Additionally, the Debtors' rights under the "mootness doctrine" shall be unaffected by any provision hereof. The failure to satisfy any condition may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied (including, without limitation, any act, action, failure to act, or inaction by the Debtors). If the Debtors fail to assert the non-satisfaction of any such conditions, such failure shall not be deemed a waiver of any other rights thereunder.

### L.    Allowance And Payment Of Certain Administrative Claims

#### 1.    Professional Fee Claims

Each holder of a Professional Fee Claim seeking an award by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 330, 331 and 503(b)(2) of the Bankruptcy Code shall (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is sixty (60) days after the Effective Date or such other date as may be fixed by the Court and (ii) if granted such an award by the Court, be paid in Cash in such amounts as are Allowed by the Court (A) on the date such Professional Fee Claim becomes an Allowed Professional Fee Claim, or as soon thereafter as is practicable or (B) upon such other terms as may be mutually agreed upon between such holder of a Professional Fee Claim and the Liquidating Trustee. Objections to Professional Fee Claims must be filed no later than twenty-five (25) days after the filing of the subject final fee application.

### M.    Effect Of Plan Confirmation

#### 1.    Discharge of the Debtors

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation will not discharge Claims against the Debtors; provided, however, that no Claimholder or Interest Holder may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against, any Debtor, the Liquidating Trust, the Liquidating Trustee, and/or their respective successors, assigns and/or property, except as expressly provided in the Plan.

#### 2.    Injunction

**The Plan is the sole means for resolving, paying or otherwise dealing with Claims and Interests. To that end, except as expressly provided herein, at all times on and after the Effective Date, through and including the date of entry of a Final Decree closing the Chapter 11 Cases, all Persons who have been, are, or may be holders of Claims against or Interests in the Debtors arising prior to the Effective Date, shall be enjoined from taking any of the following actions against or affecting the Liquidating Trustee, the Debtors, the Liquidating Trust, their estates, or their property, including the Assets, with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan).**

(a)     commencing, conducting or continuing in any manner, directly or indirectly any suit, action, or other proceeding of any kind against the Debtors, their Estates, the Liquidating Trust or their property (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date);

(b)     enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree, or order against the Debtors, their Estates, the Liquidating Trust or their Assets;

(c)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien against the Debtors, their Estates, the Liquidating Trust or their Assets;

(d)     asserting any right of subrogation, or recoupment of any kind, directly or indirectly against any obligation due the Debtors, their Estates, the Liquidating Trust or their Assets; and

(e)     proceeding in any manner in any place whatsoever against the Debtors, their Estates, or their Assets that does not conform to or comply with the provisions of the Plan.

3.     **Exculpation and Limitation of Liability**

**Except to the extent arising from willful misconduct or gross negligence, any and all Claims, liabilities, causes of action, rights, damages, costs and obligations held by any party against the Debtors, the Committee and their respective attorneys, accountants, financial advisors, agents and other professionals, and their officers, directors and employees, whether known or unknown, matured or contingent, liquidated or unliquidated, existing, arising or accruing, whether or not yet due in any manner arising between the Petition Date and the Effective Date and related to the administration of the Chapter 11 Cases or the formulation, negotiation, prosecution or implementation of this Plan, shall be deemed fully waived, barred, released and discharged in all respects, except as to rights, obligations, duties, claims and responsibilities preserved, created or established by terms of this Plan.**

4.     **Dissolution of the Creditors' Committee**

On the Effective Date, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for (i) final allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith and (ii) reimbursement of expenses incurred by the members of the Committee.  All prior transfers and assignments of Assets (including without limitation any Causes of Action) from the Debtors to the Committee shall deemed to constitute, as of the

Effective Date, transfers of such Assets (including without limitation any Causes of Action) from both the Debtors and the Committee to the Liquidating Trust. The Committee's standing to prosecute Causes of Action on behalf of the Debtors is hereby ratified. The Liquidating Trustee shall succeed to all rights of the Committee previously granted or transferred by any of the Debtors to the Committee.

## N.    Retention Of Jurisdiction

### 1.    Claims and Actions

The Court shall retain jurisdiction over the Chapter 11 Cases, including, without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of ~~the~~this Plan are implemented. The Court shall also expressly retain jurisdiction to hear and determine all Causes of Action on behalf of the Estates and Claims against the Debtors or the Liquidating Trust~~.~~; *provided*, notwithstanding the foregoing or any other provision of the Plan or Disclosure Statement, nothing in the Plan or Disclosure Statement shall modify or affect in any way (a) whether the Bankruptcy Court has jurisdiction to hear and/or determine any Cause of Action in the adversary proceeding against the Second Lien Lenders, captioned *Official Committee of Unsecured Creditors v. PineBridge Vantage Capital, L.P., et al. (In re Personal Communications Devices, LLC)*, Adv. Pro. No. 13-8174 (AST) or (b) any motion to withdraw the reference with respect to any Cause of Action in the adversary proceeding against the Second Lien Lenders, captioned *Official Committee of Unsecured Creditors v. PineBridge Vantage Capital, L.P., et al. (In re Personal Communications Devices, LLC)*, Adv. Pro. No. 13-8174 (AST).

### 2.    Retention of Additional Jurisdiction

Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order, substantial consummation of the Plan and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending, and the allowance of Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters, whether filed or commenced before or after the Effective Date;

(c)    To hear and determine any objection to, or request for estimation of, any Administrative Claim or Claim;

(d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

ACTIVE/71480023.6

(e)      To issue orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)      To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order;

(g)      To hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331 and 503(b) of the Bankruptcy Code and the Plan;

(h)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Sale Order, the Plan, the Confirmation Order, any transactions or payments contemplated by the Asset Purchase Agreement, the Plan, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i)      To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(j)      To recover all Assets of the Debtors, wherever located;

(k)      To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors or the Liquidating Trust for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)      To hear and determine any applications for the assumption and assignment or rejection of executory contracts and leases that may be designated by the Debtors prior to the Confirmation Hearing, and assumed and assigned or rejected thereafter, and the allowance of Claims resulting therefrom;

(m)      To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(n)      To enter a final decree closing the Chapter 11 Cases; ~~and~~

(o)      To resolve any disputes among the Plan Proponents regarding the Plan; and

(p)      ~~(o)~~ To hear any other matter not inconsistent with the Bankruptcy Code.

## VII.    CERTAIN FACTORS TO BE CONSIDERED

The Holders of Claims against any of the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

## A.    General Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain Claims and Interests receive no Distributions pursuant to the Plan.

## B.    Certain Bankruptcy Considerations

Even if all Impaired voting Classes vote in favor of the Plan and, with respect to any Impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Bankruptcy Code section 1129 requires, among other things, a showing that the value of Distributions to dissenting Holders of Claims and Interests may not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Section XI.D. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix C annexed hereto for a Liquidation Analysis of the Debtors.[47]

The Plan provides for certain conditions that must be fulfilled prior to Confirmation of the Plan and the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to Confirmation, if any, will be satisfied. If a chapter 7 liquidation were to occur, there is a substantial risk that the value of the Debtors' Estates would be substantially eroded to the detriment of all stakeholders.

## C.    Administrative and Priority Claims

As discussed elsewhere in this Disclosure Statement, the Plan provides that additional Distributions under the Plan (in excess of any Distributions made during the Chapter 11 Cases) to Holders of General Unsecured Claims and Convenience Claims are entirely dependent on whether there will be net cash remaining after payment in full of all Allowed Administrative, Priority Tax, Miscellaneous Secured and other Priority Claims, and all other costs and expenses of the wind-down of the Debtors' Estates ("*Liquidating Trust Net Available Cash*").

While the Debtors currently estimate that there will be Liquidating Trust Net Available Cash, all Allowed Administrative, Priority Tax, Miscellaneous Secured and ~~Non-Tax~~other Priority Claims have not yet been resolved or fixed in amount, and all costs and expenses of completing the wind-down of the Estates cannot be estimated with certainty. As a result, the actual allowed amounts of all such Claims could turn out to be substantially higher than the

---

[47] The Liquidation Analysis will be provided after the occurrence of the general Bar Date, which is January 6, 2014.

ACTIVE/71480023.6

estimate made by the Debtors herein, and there can be no assurance that there will be any Liquidating Trust Net Available Cash.

Additionally, as the number and amount of Priority Tax Claims and Administrative Claims are presently unknown to the Debtors, it is possible that, if the actual number and amount of Priority Tax Claims and Administrative Claims exceeds the Debtors' estimates, the Debtors may not obtain enough Cash to satisfy all Priority Tax Claims and Administrative Claims in full. Accordingly, should Priority Tax Claims and Administrative Claims exceed the amount of Cash held by the Debtors and Holders of such Priority Tax Claims and Administrative Claims refuse to consent to less than payment in full, the Bankruptcy Court may deny Confirmation of the Plan. As set forth elsewhere in the Plan and the Disclosure Statement, the Debtors reserve their right to seek to dismiss or convert one or more of the Chapter 11 Cases.

## VIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtors, the Liquidating Trust and certain Holders that are entitled to vote to accept or reject the Plan. This discussion is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the Tax Code (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and persons that have a functional currency other than the U.S. dollar). This discussion assumes that Holders hold their Claims as capital assets for U.S. federal income tax purposes (generally, property held for investment). This discussion does not address any aspects of state, local, non-U.S. taxation or U.S. federal taxation other than income taxation. Furthermore, this discussion generally does not address the U.S. federal income tax consequences to Holders that are Unimpaired under the Plan or Holders that are not entitled to receive or retain any property under the Plan.

The tax treatment of Holders of Claims and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen

or resident of the United States for U.S. federal income tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim, and any instrument received in exchange therefor, is considered a "security" for U.S. federal income tax purposes; and (xii) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its own tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. There can be no assurance that the Internal Revenue Service ("**_IRS_**") will not take a contrary view with respect to one or more of the issues discussed below. No ruling has been or will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.

ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE TAX CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR

230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    Certain Tax Consequences of the Plan

### 1.    Treatment of Transfers to and Distributions by the Liquidating Trust

#### (a)    Treatment of Beneficiaries of the Liquidating Trust

For all U.S. federal income tax purposes, all parties must treat the transfer of Assets to the Liquidating Trust as (i) a transfer of the Assets to the beneficiaries of the Liquidating Trust followed by (ii) a transfer of the Assets by such beneficiaries to the Liquidating Trust, with the beneficiaries being treated as the grantors and owners of the Liquidating Trust. Each Holder that is a beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the fair market value of the Assets deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive the Assets under the Plan in respect of its Claim should generally hold such Assets going forward with tax basis for U.S. federal income tax purposes in an amount equal to the fair market value of such Assets on the date of the transfer to the Liquidating Trust.

As each Holder's share of the Assets may change depending upon the resolution of Disputed Claims, the Holders may be prevented from recognizing, for U.S. federal income tax purposes, all of their loss in connection with the consummation of the Plan until all Disputed Claims have been resolved.

The Liquidating Trustee and the beneficiaries of the Liquidating Trust are required to value the Assets consistently and to use such valuations for all U.S. federal income tax purposes. The Liquidating Trust Agreement will provide for (i) consistent valuation of the Assets by the Liquidating Trustee and the beneficiaries of the Liquidating Trust, (ii) the Liquidating Trust to determine the fair market value of the Assets, and (iii) the Liquidating Trust to send such determination to each beneficiary of the Liquidating Trust.

#### (b)    Tax Treatment of Liquidating Trust

##### (i)    *General*

As described in Section 9.8(a) of the Plan, and except as otherwise described below, the parties believe and intend to take the position that, for U.S. federal income tax purposes, the Liquidating Trust is a grantor trust.

A grantor trust is treated as a pass-through entity for U.S. federal income tax purposes. Accordingly, in general, no tax should be imposed on the deemed transfer of Assets by a Holder to the Liquidating Trust. In addition, no tax should be imposed on the Liquidating Trust on the deemed receipt of such Assets or on income earned or gain recognized by the

56

Liquidating Trust with respect to those Assets. Instead, the beneficiaries of the Liquidating Trust will be taxed on their respective allocable shares of such net income or gain for U.S. federal income tax purposes in each taxable year of the Liquidating Trust, and will be responsible for paying the U.S. federal income taxes associated with such income or gain whether or not they received any distributions from the Liquidating Trust in such taxable year.

There can be no assurance that the IRS will agree with the classification of the Liquidating Trust, or any reserves within the Liquidating Trust, as a grantor trust or part of a grantor trust. A different classification could result in a different U.S. federal income tax treatment of the Liquidating Trust or a reserve within the Liquidating Trust. Such treatment could include, but is not limited to, the imposition of an entity-level tax on either the Liquidating Trust or a reserve within the Liquidating Trust. Such a tax, if imposed, could result in a material reduction in the amount that would otherwise be available for distribution to Holders.

(ii)    ***Reserves that may be Established by the Liquidating Trustee***

A portion of the Assets transferred to the Liquidating Trust will be attributable to Disputed Claims. The U.S. federal tax treatment of such transfers of Assets generally will be the same as the U.S. federal tax treatment of transfers of Assets with respect to Allowed Claims. The Liquidating Trustee, however, may create one or more reserve accounts for the Assets held on account of Disputed Claims. Under the Tax Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although the U.S. Treasury Department has issued certain Treasury regulations addressing the tax treatment of such funds, the U.S. Treasury Department has not issued Treasury regulations to address the tax treatment of such funds in a bankruptcy context. Accordingly, the proper U.S. federal tax treatment of such funds, and the extent to which a reserve established by the Liquidating Trustee would be treated as such a fund, is uncertain. Depending on the facts and the relevant law, such funds may be treated as grantor trusts to debtors, grantor trusts to Holders of Claims, or as trusts subject to an entity-level tax. Except as described below, the Debtors intend to treat the Assets held in any reserve established by the Liquidating Trustee on account of Disputed Claims as having been transferred to the Liquidating Trust by the Holders of such Disputed Claims, and the Holders of the Disputed Claims as grantors and owners of the Liquidating Trust.

Under the Plan, the Liquidating Trust may be allowed, for U.S. federal income tax purposes, to treat an account, trust, fund or reserve that holds assets to satisfy the Disputed Claims as a Disputed Ownership Fund ("***DOF***") as defined by Treasury Regulations Section 1.468B-9(b)(1) taxable under Section 468B of the Tax Code and Treasury Regulations Section 1.468B-9. If the Liquidating Trustee were to file an election to treat a reserve as a DOF, then the DOF would be treated as a separate taxable entity for U.S. federal income tax purposes, and would be required to file U.S. federal income tax returns and pay any U.S. federal income tax due on income earned or gain recognized that was attributable to the Assets held in the reserve with respect to which the DOF election was made. Any U.S. federal income tax liability of the DOF will reduce the distributions to certain Holders. For purposes of determining the DOF's U.S. federal income tax liability, a DOF would not be required to report as income transfers of assets to the DOF, but would be required to include in income

ACTIVE/71480023.6

all income received or accrued from assets transferred to the DOF. The DOF would not be allowed a U.S. federal income tax deduction for a distribution of Assets or of the net after-tax income earned by the DOF to a Holder. The initial tax basis of assets transferred to a DOF for U.S. federal income tax purposes would be the fair market value of the assets determined on the date of transfer to the DOF, and the DOF's holding period would begin on the date of the transfer.

No assurance can be given that the IRS would accept a DOF election made by the Liquidating Trustee with respect to a reserve. If the IRS were to successfully reject a DOF election, the reserve with respect to which the DOF election was made would be subject to the general rules for reserves described above.

(c)         **Treatment of the Debtors**

(i)    *Recognition of Gain or Loss*

The Debtors will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the fair market value of the Assets and the adjusted tax basis of such Assets on the deemed transfer of the Assets to the Holders of Claims in satisfaction of such Claims. The Debtors may, however, recognize some alternative minimum tax as a result of the transfer of the Assets. Any U.S. federal income tax incurred with respect to the deemed transfer of the Assets to the Holders of Claims will be paid by the Debtors or the Liquidating Trust to the IRS.

The foregoing conclusions are based on, among other things, the Debtors' assumptions concerning the fair market value of the Assets and the nature and magnitude of their respective tax attributes. Although the Debtors believe such assumptions are correct and appropriate, the IRS may challenge one or more of those assumptions, and if the IRS were to prevail in any such challenge, the Debtors' Estates could be subject to a tax liability that might be allowed as an Administrative Claim. Such an Allowed Administrative Claim would reduce the funds available to administrative and other Creditors.

(ii)    *Cancellation of Debt Income*

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("**COD**") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

The Tax Code permits a debtor in bankruptcy to exclude its COD income from gross income if the discharge occurs in a title 11 case. Thus, although the Debtors will realize COD income as a result of the satisfaction of Claims, the Debtors will not be required to recognize any of that COD income for U.S. federal income tax purposes.

(d)    **Treatment of Holders of Interests**

In accordance with the Plan, Holders of Interests will not receive any recovery under the Plan.  A Holder of an Interest will generally recognize a loss in an amount equal to such Holder's adjusted tax basis in its Interest.  Capital losses are subject to various limitations under the Tax Code.

## 2.    Allocation of Plan Distributions between Principal and Interest

The Plan provides that, to the extent that any Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest on such indebtedness, such distribution will, to the extent permitted by applicable law, be allocated for U.S. federal income tax purposes first to the principal amount of the Claim and second, to the extent the distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.  A Holder may be able to recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("**OID**") was previously included in income and is not paid in full.  Current U.S. federal income tax law is unclear on this point, and no assurance can be given that the IRS will not challenge the Debtors' position.  Holders of Claims are urged to consult their own tax advisors regarding the particular U.S. federal income tax consequences to them of the treatment of accrued but unpaid interest, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income by such Holder.

If, contrary to the intended position, such a distribution were treated as allocated first to accrued but unpaid interest, a Holder would realize ordinary income with respect to such distribution in an amount equal to the accrued but unpaid interest not already taken into gross income for U.S. federal income tax purposes under the Holder's method of accounting, regardless of whether the Holder would otherwise realize a loss as a result of the Plan.  A Holder should also recognize ordinary income on the exchange (but not in excess of the amount of gain recognized, as described above) to the extent a distribution is received in exchange for market discount not previously taken into account for U.S. federal income tax purposes under the Holder's method of accounting.

## 3.    Withholding, Backup Withholding, and Information Reporting

In connection with the Plan and all Distributions under the Plan, the Liquidating Trustee shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any U.S. federal, state, provincial, local, or non-U.S. taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements.  The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder.  All Holders of Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes.  For example, with respect to any employee-related withholding, if the Debtors are obligated by law to withhold amounts from Distributions to a

ACTIVE/71480023.6

present or former employee to satisfy such present or former employee's tax and other payroll obligations, the Liquidating Trustee may withhold a portion of the Distributions allocated to the Holder of an Allowed Claim that is a present or former employee, whether or not such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such Holder's tax and other payroll obligations with respect to the Distributions.

Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidating Trustee in connection with such Distribution. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Article Section 7.2.2 of the Plan.

Moreover, under certain circumstances, Holders may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such Holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the Holder is a U.S. person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each Holder is strongly urged to consult its tax advisor regarding these Treasury regulations and whether the transactions contemplated by the Plan would be subject to these Treasury regulations and require disclosure on the Holders' tax returns.

**B.**      **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY

ACTIVE/71480023.6

VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.
## FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.    Feasibility of the Plan

The ~~Debtors~~Plan Proponents believe that the Cash on hand, the proceeds from the Assets, and recoveries on account of retained Causes of Action will be sufficient to pay all Administrative and Priority Claims that become Allowed, based upon the ~~Debtors~~Plan Proponents' estimates.  Accordingly, the ~~Debtors~~Plan Proponents believe that the Plan is feasible.

### B.    Acceptance of the Plan

As a condition to confirmation of any plan, the Bankruptcy Code requires that each class of impaired claims vote to accept that plan, unless the plan satisfies the best interests test, as set forth below.

Bankruptcy Code Section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Thus, Impaired Classes under the Plan will have voted to accept such Plan only if two-thirds (2/3) in amount and a majority in number actually voting in each Class cast their Ballots in favor of acceptance.  Holders of Claims who fail to vote for the Plan are not counted as either accepting or rejecting that Plan.

### C.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that such Plan is in the best interests of all holders of claims or interests that are impaired by that Plan and that have not accepted that Plan.  The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtors were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code.  Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the

results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of the ineffectiveness associated with replacing existing management and professionals in a chapter 7 case.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

### D.    Liquidation Analysis

In order to determine the amount of hypothetical chapter 7 liquidation value available to Creditors, the Debtors have prepared a liquidation analysis, a copy of which is annexed hereto as Appendix C (the "*Liquidation Analysis*"). [5] The ~~Debtors~~Plan Proponents believe that such Liquidation Analysis demonstrates that in a chapter 7 liquidation, Holders of certain Claims against the Debtors, including General Unsecured Claimholders, would receive less of a recovery as compared to the recovery under the Plan.

Notwithstanding the foregoing, the ~~Debtors~~Plan Proponents believe that the Liquidation Analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that will be available after completion of a chapter 7 wind-down. Claims estimates are based solely upon the Debtors' review of any Claims filed, a review that is ongoing, and the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. Further, because the Assets include Causes of Action, the amounts anticipated to be recovered by the Liquidating Trustee cannot be predicted with certainty and are necessarily subject to considerable variation depending on the outcome of the Causes of Action.

### E.    Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Plan

It is impossible for the Debtors to determine with any specificity the value each Creditor will receive as a percentage of its Allowed Claim. This difficulty in estimating the value of recoveries is due to, among other things, the inherent uncertainty in estimating the amount of Administrative Claims, Priority Tax Claims, Miscellaneous Secured Claims, and other Priority Claims that will ultimately become Allowed, as well as, to a lesser degree, the ultimate amount of Allowed Claims in any Impaired Class.

Notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims with precision, the ~~Debtors~~Plan Proponents believe that the Liquidation Analysis and proposed

---

[5] ~~The Liquidation Analysis will be provided by the Debtors at least seven (7) days prior to the hearing to consider the adequacy of the Disclosure Statement.~~

ACTIVE/71480023.6

recoveries to each Class of Impaired Claims under the Plan imply a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of Bankruptcy Code section 1129 is satisfied.

## F.    Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative

Under the Plan, Classes 5, 6a and 6b are deemed to have rejected the Plan.  In view of the deemed rejection by such Holders, the ~~Debtors~~Plan Proponents will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Specifically, Bankruptcy Code section 1129(b) provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  A bankruptcy court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of claims which rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain any property at all on account of such junior interest under the plan.

## X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The ~~Debtors~~Plan Proponents believe that the Plan affords Holders of Claims the potential for a better realization on the Debtors' Assets than a chapter 7 liquidation, and, therefore, is in the best interests of such Holders.

If, however, the requisite acceptances of voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include:  (a) formulation of an alternative plan or plans of liquidation, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

A.    **Alternative Plan(s) of Liquidation**

If the requisite acceptances are not received or if the Plan is not confirmed, the ~~Debtors~~Plan Proponents or any other party in interest could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the ~~Debtors~~Plan Proponents have explored various other alternatives in connection with the Plan process.  The ~~Debtors~~Plan Proponents believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

B.    **Liquidation under Chapter 7**

If no Plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to complete the liquidation of the Debtors' assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors.

The ~~Debtors~~Plan Proponents believe that in a liquidation under chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a diminution in the value of the Debtors' Estates.  The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority.  In such a case, the proceeds of the liquidation would be distributed by the chapter 7 trustee in accordance with chapter 7.  The ~~Debtors~~Plan Proponents believe that such a result would reduce Distributions to all Holders of General Unsecured Claims compared to those under the Plan, because of additional administrative expenses for the chapter 7 trustee and professionals retained by it.  See Exhibit C.

C.    **Dismissal of the Chapter 11 Cases**

If no Plan is confirmed, the Debtors (subject to any objection that the Committee may have) or other parties in interest may seek dismissal of the Chapter 11 Cases pursuant to Bankruptcy Code section 1112.  Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain Creditors to foreclose on their Liens on substantially all of the Debtors' remaining assets.  Accordingly, the ~~Debtors~~Plan Proponents believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets, would lower the return to Creditors and would possibly eliminate any return to Holders of Claims other than Miscellaneous Secured Claims.

## XI.    THE SOLICITATION AND VOTING PROCEDURE

A.    **Parties in Interest Entitled to Vote**

ACTIVE/71480023.6

Under Bankruptcy Code section 1124, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (ii) the claim or interest is impaired by the plan.  If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

**B.**     **Classes Impaired under the Plan**

Classes 3, 4a and 4b are entitled to vote to accept or reject such Plan.  Classes 1 and 2 are Unimpaired.  By operation of law, each Unimpaired Class of Claims is conclusively presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject that Plan.  Classes 5, 6, 7, a and 86b will not receive or retain any property under the Plan.  By operation of law, each Class which ~~receive~~receives or retains no property under the Plan is deemed to have rejected the Plan and, therefore, is not entitled to vote to accept or reject such Plan.

## XII.    FURTHER INFORMATION

**A.**     **Further Information; Additional Copies**

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact the Voting Agent at 1-646-282-2400.  You may also contact Eqiq via email at tabulation@epiqsystems.com with a reference to "Personal Communications Devices, LLC" in the subject line.

**B.**     **Internet Access to Bankruptcy Court Documents**

Bankruptcy Court documents filed in these Chapter 11 Cases as well as the Bankruptcy Court's calendar and other administrative matters may be found, downloaded and printed from the Bankruptcy Court's website found at http://www.vaeb.uscourts.gov, as well as at the website maintained by the Voting Agent at **http://dm.epiq11.com/PCD.**

## XIII.   RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the ~~Debtors~~Plan Proponents believe that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the ~~Debtors~~Plan Proponents urge all Holders of Claims in Classes 3, 4a and 4b to vote to **ACCEPT** the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before 5:00 p.m. (prevailing Eastern Time) on **March [~~3~~12], 2014**.

ACTIVE/71480023.6

Dated: ~~December 24~~February 11,          Respectfully Submitted,
~~2013~~2014

      Hauppauge, New York          PERSONAL COMMUNICATIONS DEVICES, LLC and
PERSONAL COMMUNICATIONS DEVICES
HOLDINGS, LLC


/s/ *Raymond F. Kunzmann*
By:  Raymond F. Kunzmann
Title:  Chief Financial Officer

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

/s/ *Schuyler M. Carroll*
By:  Schuyler M. Carroll, Esq.
Title:  Partner, Perkins Coie LLP, Counsel to the
Committee

ACTIVE/71480023.6

**Appendix A**
**(The Plan)**

**Appendix B**
**(Equity Ownership of Holdings)**

**Appendix C**
**(Liquidation Analysis)**
**[TO BE PROVIDED]**

| Summary report: Litéra® Change-Pro TDC 7.5.0.20 Document comparison done on 2/11/2014 4:15:34 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:**iw://GOODWINDMS/ACTIVE/71480023/1 | |
| **Document Author:** MC24 | |
| **Modified DMS:** iw://GOODWINDMS/ACTIVE/71480023/6 | |
| **Document Author:** MC24 | |
| **Changes:** | |
| Add | 424 |
| Delete | 334 |
| Move From | 19 |
| Move To | 19 |
| Table Insert | 6 |
| Table Delete | 5 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format Changes | 0 |
| **Total Changes:** | 807 |